UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————————

JAMEL CLARK, also known as
Jahmel Clark,

                              Plaintiff,

                                                                    9:17-CV-00366
v.                                                  (DNH/TWD)

GERALD GARDNER, et al.,

                              Defendants.
———————————————————————————

APPEARANCES:                              OF COUNSEL:

JAMEL CLARK
Plaintiff, *pro se*
99-A-0475
Elmira Correctional Facility
P.O. Box 500
Elmira, NY 14902

BARBARA D. UNDERWOOD            DAVID ROSENBERG, ESQ.
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

## I.    INTRODUCTION

      On April 3, 2017, Plaintiff Jamel Clark, an inmate in custody of the New York State

Department of Corrections and Community Supervision ("DOCCS"), commenced this action

pursuant to 42 U.S.C. § 1983 asserting allegations of wrongdoing arising out of his confinement

at Shawangunk Correctional Facility ("Shawangunk") in 2014.  (Dkt. No. 1.[1])  By Decision and Order filed June 22, 2017, the following claims survived initial review pursuant to 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A: (1) First Amendment retaliation claim against Corrections Officer ("C.O.") DeGraff and C.O. Karamanos; (2) Eighth Amendment excessive force claim against C.O. DeGraff, C.O. Karamanos, C.O. McElroy, and Sergeant Harrison; and (3) Fourteenth Amendment due process claim against Lieutenant Gardner, Deputy Superintendent of Security Pingotti, Lieutenant Palen, Plant Superintendent Farah, Superintendent Smith, Director Venettozi, and Commissioner Annucci, arising from six disciplinary hearings in 2014.  (Dkt. No. 9.)

Pending before the Court is a partial motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure filed on behalf of Defendants Gardner, Pingotti, Palen, Smith, Venettozi, and Annucci.  (Dkt. No. 33.)  Defendants seek dismissal of Plaintiff's Fourteenth Amendment due process claim, in part, and with respect to five out of the six disciplinary hearings, arguing Plaintiff fails to sufficiently allege he was deprived of an actual liberty interest.  (Dkt. No. 33-1 at 5-13.[2])  Annucci also seeks dismissal for lack of personal involvement as to the sixth, and final disciplinary hearing, wherein Plaintiff alleges he was sentenced to 120 days confinement without due process of law.  *Id*. at 13-15.

---

[1]  As set forth in the June 22, 2017, Decision and Order, Plaintiff identifies himself in the complaint as "Jahmel Clark" and states that his DIN is 99-A-0475.  (Dkt. No. 9.)  However, because the inmate with DIN 99-A-0475 is identified on the public website maintained by DOCCS as "Jamel Clark," *see* http://nysdoccslookup.doccs.ny.gov, Plaintiff is identified on the docket and will be referred to in this action as "Jamel Clark."

[2]  Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

Plaintiff opposes the motion and Defendants have filed a reply.  (Dkt. Nos. 38[3], 39.)  Without

permission from the Court, Plaintiff has also filed an "Addendum Affidavit" in opposition to the

motion, which the Court has considered in deference to Plaintiff's *pro se* status.  (Dkt. No. 44.)

    For the reasons that follow, the Court recommends that Defendants' motion be granted in

part and denied in part.

## II.    BACKGROUND

    The following relevant facts are derived from the face of the operative complaint and are

accepted as true for the purposes of deciding the pending partial motion to dismiss.  *Erickson v.*

*Pardus*, 551 U.S. 89, 94 (2007).  Plaintiff alleges Gardner, Pingotti, Palen, Farah, Smith,

Venettozi, and Annucci violated his Fourteenth Amendment due process rights during six

disciplinary hearings in 2014.  (Dkt. No. 1.)

    **First Hearing**.  On July 25, 2014, Plaintiff was issued an inmate misbehavior report

("IMR") for various items of contraband found during a cell search while Plaintiff was out to

court and housed at another facility.  (Dkt. No. 1 at 11.)  On August 6, 2014, Gardner conducted

the disciplinary hearing.  *Id*. at 13-14.  Plaintiff was denied relevant documents, a witness, and

employee assistance.  *Id*. at 14-15.  On August 25, 2015, Plaintiff was found guilty and

---

[3]  Plaintiff's opposition submission (Dkt. No. 38) does not address any of the Defendants'
submitted grounds for dismissal.  Instead, Plaintiff's "opposition" primarily consists of new,
unrelated allegations against personnel at Attica Correctional Facility that allegedly occurred
several months after Plaintiff commenced this action and his "reply" to Defendants' answer (Dkt.
No. 32), neither of which are properly before the Court.  *See* Fed. R. Civ. P. 7(a)(7); *see also*
*Kiryas Joel All. v. Vill. of Kiryas Joel*, No. 11-CV-3982 (JSR), 2011 WL 5995075, at *10
(S.D.N.Y. Nov. 29, 2011) ("[T]he plaintiffs cannot use their opposition to the motion to dismiss
to raise new claims or arguments, and thus the [c]ourt does not address the new arguments made
in the plaintiffs' memorandum."), *aff'd*, 495 F. App'x 183 (2d Cir. 2012).  Furthermore, to the
extent Plaintiff requests discovery and appointment of counsel in his opposition submission (Dkt.
No. 38), such requests are **denied without prejudice** as premature and for the reasons set forth
in the June 22, 2017, Order (Dkt. No. 9), respectively.

sanctioned to 60 days confinement in the Segregated Housing Unit ("SHU"). *Id*. at 16.[4]  Smith and Annucci affirmed the disposition on appeal. *Id*. at 17.

     **Second Hearing**. On September 7, 2014, Plaintiff was issued an IMR for possession of a marijuana cigarette. *Id*. at 20. Gardner conducted this disciplinary hearing on September 15, 2014. *Id*. at 21-22. Plaintiff was denied the opportunity to present a defense, witnesses, and employee assistance. *Id*. at 22-23. Plaintiff was found guilty and sentenced to 90 days confinement in the SHU. *Id*. at 23. Smith and Annucci affirmed the disposition on appeal. *Id*.

     **Third Hearing**. On September 30, 2014, Plaintiff was issued an IMR for testing positive for K2, a synthetic marijuana. *Id*. at 25. Pingotti conducted Plaintiff's disciplinary hearing. *Id*. at 27. Plaintiff was denied documents, as well as relevant video and audio footage, removed from the hearing, and did not receive a written statement of the disposition. *Id*. at 25-27. On October 14, 2014, Plaintiff was found guilty and sentenced to 60 days in the SHU. *Id*. at 28. Smith and Annucci affirmed the disposition on appeal. *Id*.

     **Fourth Hearing**. On October 17, 2014, Plaintiff was issued an IMR for destruction of property and possession of weapons. *Id*. at 30-31. On October 21, 2014, Palen conducted the disciplinary hearing. *Id*. at 30. Plaintiff was denied employee assistance, evidence, and witnesses. *Id*. at 31-33. Plaintiff was found guilty and sentenced to 30 days confinement in the SHU. *Id*. at 33. Plaintiff filed an appeal. *Id*. at 33-34. Smith assigned the appeal to Pingotti, who affirmed the decision. *Id*.

     **Fifth Hearing**. On November 18, 2014, Plaintiff was issued an IMR for making threats. *Id*. at 37. Gardner conducted the hearing and denied Plaintiff's request for documents, witnesses,

---

[4]  Plaintiff states he was released from the SHU on September 4, 2014. (Dkt. No. 1 at 17.) Although not entirely clear, Plaintiff states after being assaulted, he received medical attention and was eventually returned to the SHU. *Id*. at 18-21.

and employee assistance. *Id*. at 38. On December 10, 2014, Plaintiff was found guilty and sanctioned to 30 days confinement in the SHU. *Id*. at 39. On appeal, Smith affirmed Gardner's decision. *Id*.

**Sixth Hearing**. On October 24, 2014, Plaintiff was issued an IMR for refusing to obey orders. *Id*. at 34. Farah conducted the disciplinary hearing and denied Plaintiff documents, video footage, and witnesses. *Id*. Plaintiff was removed from the hearing and was not provided with a written statement of the disposition. *Id*. at 36. On December 18, 2014, Plaintiff was found guilty and sanctioned to 120 days of confinement in the SHU. *Id*. at 37. Smith affirmed the disposition. *Id*. Plaintiff filed a formal appeal to Annucci, who referred the matter to Venettozi. *Id*. Venettozi affirmed the disposition and sanctions. *Id*.

## III.   LEGAL STANDARD

A defendant may move to dismiss a complaint on the ground that the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Id*. at 679 (internal citation and punctuation omitted). As the

Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570) (alterations omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## IV.   DISCUSSION

### A.   Fourteenth Amendment Due Process

Plaintiff claims his Fourteenth Amendment right to due process was violated during various disciplinary hearings. To successfully state a claim under § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). Defendants contend the Court should dismiss this claim, in part, because with respect to five out of the six alleged disciplinary sanctions, Plaintiff fails to allege he was deprived of an actual liberty interest. (Dkt. No. 31-1 at 5-13.)

### 1.    Liberty Interest

An inmate retains a protected liberty interest in remaining free from segregated confinement if the prisoner can satisfy the standard set forth in *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). Therefore, a plaintiff must show that (1) the state actually created a protected liberty interest in being free from segregation, and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 783-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658.

As to the first factor, "[t]he prevailing view in this Circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor." *Liao v. Malik*, No. 9:13-CV-1497 (GTS/DEP), 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (collecting cases). As to the second factor, the plaintiff bears the "burden of proving that the conditions of his confinement constituted an atypical, significant hardship in relation to the ordinary incidents of prison life in order to recover damages" under § 1983. *Vasquez v. Coughlin*, 2 F. Supp. 2d 255, 260 (N.D.N.Y. 1998).

The Second Circuit has instructed that in determining whether an inmate's SHU confinement has imposed an atypical and significant hardship, a court must consider, among other things, both the duration and conditions of confinement. *J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013). Thus, while not dispositive, the duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted).

The Second Circuit has declined to provide a bright-line rule as to what duration of punitive confinement implicates a prisoner's constitutional rights; however, general guidelines

have been defined.  *See Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).  For example, segregation for a period of 30 days was found by the Supreme Court in *Sandin* not to impose a significant hardship on an inmate.  *Sandin*, 515 U.S. at 485-86.  In explaining its reasoning, the Court found that the disciplinary confinement failed to present "a dramatic departure from the basic conditions" of an inmate's normal sentence.  *Id.*  Thus, courts have consistently held that SHU or keeplock confinement under ordinary conditions for 30 days does not rise to a level sufficient to establish a due process claim.  *See Smart v. Goord*, 441 F. Supp. 2d 631, 640 (S.D.N.Y. 2006) ("[T]he decisions in the Second Circuit are unanimous that keeplock . . . of 30 days or less in New York prisons is not 'atypical or significant hardship' under *Sandin*." (internal quotation omitted)); *Ochoa v. DeSimone*, No. 9:06-CV-119 (DNH/RFT), 2008 WL 4517806, at *4 (N.D.N.Y. Sept. 30, 2008) (holding 30 days SHU and keeplock confinement insufficient to create liberty interest); *Escalera v. Charwand*, No. 9:04-CV-0983 (FJS/DEP), 2008 WL 699273, at *8 (N.D.N.Y. Mar. 12, 2008) (same).

Confinement for 101 days or fewer under typical punitive segregation conditions "generally do[es] not constitute 'atypical' conditions of confinement."  *Bunting v. Nagy*, 452 F. Supp. 2d 447, 456 (S.D.N.Y. 2006) (quoting *Sealey v. Giltner*, 197 F.3d 578, 589 (2d Cir. 1999)).  By contrast, 305 days or more of segregated confinement has been deemed an atypical and significant hardship.  *See Colon*, 215 F.3d at 231-32.  "A period of confinement between 101 and 305 days is considered to be an 'intermediate duration' and could implicate a liberty interest should a detailed record of the conditions of confinement indicate that it was an atypical and significant hardship."  *Bunting*, 452 F. Supp. 2d at 456 (citing *Sealey*, 197 F.3d at 589); *see also Palmer*, 364 F.3d at 64-65.

"Overlapping disciplinary penalties may, under some circumstances, have to be aggregated for purposes of determining whether a liberty interest was violated." *Reynoso v. Selsky*, 292 F. App'x 120, 122 (2d Cir. 2008) (summary order).

### 2. Analysis

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *Lewis v. Murphy*, No. 9:12-CV-00268 (NAM/CFH), 2014 WL 3729362, at *7 (N.D.N.Y. July 25, 2014) (citing *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994)). Plaintiff claims he was denied due process at disciplinary hearings conducted by Defendants Gardner, Pingotti, Palen, and Farah while confined at Shawangunk during the period from August to November 2014, and was sanctioned, in the aggregate, to more than 300 days SHU confinement in a cell which lacked proper weatherproofing, was cold, and contained a dilapidated mattress. (Dkt. No. 1 at 29-30, 41-42.[5]) Defendants Smith, Annucci, Pingotti, and Venettozi affirmed the various dispositions on appeal. *Id*. at 29-42.

Defendants move to dismiss Plaintiff's Fourteenth Amendment due process claim with respect to the first five alleged disciplinary sanctions because Plaintiff has failed to plausibly allege he was deprived of an actual liberty interest. (Dkt. No. 31-1 at 5.) Defendants argue Plaintiff has neither alleged nor asserted facts to plausibly suggest that his SHU confinement amounted to an "atypical and significant hardship" and that five out of the six disciplinary sanctions, when considered individually, fail to implicate a liberty interest based upon the duration of the confinement. (Dkt. No. 31-1 at 5-13.) In opposition to Defendants' motion, Plaintiff declares he was "consecutively confined to the [SHU] for approximately 305 days."

---

[5] Plaintiff's Eighth Amendment conditions of confinement claim based on the temperature of his SHU cell was dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. §1 915A(b)(1). (Dkt. No. 9 at 18-19.)

(Dkt. No. 44 at 3.)  Therefore, at issue is whether Plaintiff's alleged "overlapping disciplinary penalties," should be aggregated for purposes of the *Sandin* inquiry.

In support of their motion, Defendants contend the six disciplinary sentences must be evaluated individually and not aggregated.  (Dkt. No. 31-1 at 10-13).  Defendants cite *Taylor v. Artus*, No. 9:05-CV-271 (LEK/GHL), 2007 WL 4555932, at *8 (N.D.N.Y. Dec. 19, 2007), for the proposition that "[g]enerally, it appears from Second Circuit decisions that separate SHU sentences constitute a 'sustained period of confinement' when (1) they are contiguous *and* (2) they either (a) were imposed by the same disciplinary hearing officer or (b) were based on the same administrative rationale and are executed under the same conditions."  (Dkt. No. 31-1 at 10.)  Defendants argue aggregation is improper because Plaintiff's disciplinary sanctions were not all imposed by the same hearing officer nor were they based on the same administrative rationale and executed under the same conditions.  *Id*. at 11-12.  Defendants note at issue are six separate disciplinary hearings stemming from six different misbehavior reports issued for six different infractions, and on six different occasions.  *Id*. at 11.

However, *Taylor* is procedurally and factually distinguishable from the case at bar.  In *Taylor*, the issue was before the court on summary judgment and the sentences at issue were not overlapping as alleged here.  *See Taylor*, 2007 WL 4555932, at *8.  Additionally, the Second Circuit has suggested that, "consecutive sentences resulting from separate hearings adjudicating different misbehavior reports should be aggregated for the purpose of determining whether the confinement constitutes atypicality."  *Koehl v. Bernstein*, No. 10 Civ 3808 (SHS/GWG), 2011 WL 2436817, at *19 (S.D.N.Y. Jun. 17, 2011) (citing *Sealey*, 197 F.3d at 587-88); see also *Toliver v. Stefinik*, No. 9:12-CV-77 (MAD/ATB), 2016 WL 3349316, at *8 (N.D.N.Y. June 15, 2016) (aggregating where the inmate-plaintiff "served consecutive terms of confinement

exceeding 30 days, and all of [his] disciplinary hearings at Shawangunk were conducted by the same individual"). "Furthermore, the Second Circuit has expounded the responsibility for issuing officers to include the entire period in SHU that a prisoner was confined, if the officer extended the period of confinement to constitute an atypical penalty." *Richardson v. Hillman*, 201 F. Supp. 2d 222, 229 (S.D.N.Y. 2001). Other cases have similarly aggregated sentences based on separate violations. *See, e.g.*, *Bunting*, 452 F. Supp. 2d at 457 (aggregating the inmate's sentences imposed in May 1998, August 1998 and November 1998 (all from unrelated incidents), which resulted in 365 days of consecutive keeplock confinement); *Sealey*, 197 F.3d at 587 (aggregating an inmate's SHU sentences which ran without interruption, and holding that official who imposed second, 83 day sentence bore responsibility for 101 day aggregate of those 83 days of confinement that the 18 days that preceded it); *Gibson v. Rosati*, No. 9:13-CV-503 (GLS/TWD), 2017 WL 1534891, at *10-11 (N.D.N.Y. Mar. 10, 2017) (aggregating the inmate's sentences despite the fact that they each stemmed from an unrelated disciplinary hearing involving separate incidents), *report-recommendation adopted by* 2017 WL 1512371 (N.D.N.Y. Apr. 27, 2017).

Here, at least for purposes of this motion, the Court finds it appropriate to aggregate Plaintiff's alleged disciplinary sanctions. As set forth above, all of Plaintiff's disciplinary hearings were conducted at Shawangunk within a six-month period. Gardner conducted Plaintiff's First, Second, and Fifth Hearings. Smith and Annucci affirmed Plaintiff's First, Second, and Third Hearings. Pingotti and Palen conducted Plaintiff's Third and Fourth Hearings, respectively, thereby extending Plaintiff's confinement, while Pingotti affirmed the Fourth Hearing. Farah conducted the Sixth Hearing, which was affirmed by Smith, Annucci, and Venettozi.

Accepting all of the factual allegations in the complaint as true, and construing the complaint liberally in the *pro se* litigant's favor, Plaintiff's alleges 305 days or more of consecutive SHU confinement, which has been deemed an "atypical and significant hardship." *See Colon*, 215 F.3d at 231-32. As such, Plaintiff has plausibly alleged a liberty interest and, therefore, the Court recommends denying Defendants' motion to dismiss Plaintiff's Fourteenth Amendment due process claim for failure to state a claim. In so ruling, no opinion is expressed as to whether this claim can withstand a properly filed motion for summary judgment.

### B.    Personal Involvement

Personal involvement is a prerequisite to the assessment of damages in a § 1983 claim, and *respondeat superior* is an inappropriate theory of liability for any constitutional claim. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). "The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citations omitted)[6].

---

[6] The Second Circuit has thus far expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

Defendants also seek dismissal of Plaintiff's Fourteenth Amendment due process claim with respect to the sixth and final disciplinary sanction as against Annucci for lack of personal involvement.  (Dkt. No. 31-1 at 13-15.)

Here, the Court finds Plaintiff has failed to plausibly allege Annucci was personally involved in the sixth disciplinary hearing.  Even accepting Plaintiff's allegations as true, at most, Plaintiff claims to have sent a formal appeal to Annucci, who delegated the matter to Venettozi. (Dkt. No. 1 at 37.)  It is well-settled "that receipt of letters or grievances, by itself, does not amount to personal involvement."  *Guillory v. Ellis*, No. 11-CV-600 (MAD/ATB), 2012 WL 2754859, at *10 (N.D.N.Y. July 9, 2012) (citing *Vega v. Artus*, 610 F. Supp. 2d 185, 199 (N.D.N.Y. 2009)); *see also Bussey v. Phillips*, 419 F. Supp. 2d 569, 590 (S.D.N.Y. 2006) ("Referring a matter to a subordinate for investigation is not enough to support a claim of personal involvement.") (citation omitted).  Therefore, the Court recommends dismissing Plaintiff's Fourteenth Amendment due process claim with respect to the sixth disciplinary action asserted against Annucci for lack of personal involvement with leave to amend.

**WHEREFORE**, based on the findings above, it is hereby

**RECOMMENDED** that Defendants' partial motion to dismiss (Dkt. No 31) be **GRANTED in part and DENIED in part**; and it is further

**RECOMMENDED** that Plaintiff's Fourteenth Amendment due process claim with respect to the sixth and final disciplinary sanction as against Annucci be dismissed with leave to amend for lack of personal involvement; and it is further

**RECOMMENDED** that Defendants' motion otherwise be denied; and it is further

**ORDERED** that Plaintiff's request for appointment of counsel and discovery (*see* Dkt. No. 38) are **DENIED without prejudice** for the reasons stated above; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[7]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: July 5, 2018
     Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[7]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

Case 9:17-cv-00366-DNH-TWD    Document 45    Filed 07/05/18    Page 15 of 126

2016 WL 1128245
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Shihsiang Liao, a/k/a Shih-
Siang Shawn Liao, Plaintiff,
v.

Faisal Malik,[1] Defendant.

Civil Action No. 9:13-CV-1497 (GTS/DEP)
|
Signed 02/26/2016

[1]   The remaining defendant in this action is identified
in plaintiff's complaint as S. Malik. *Dkt. No. 1 at
3.* It is clear from his motion papers, however, that
defendant's first name is 'Faisal.' See, e.g., *Dkt. No.
41-2 at 1.* The clerk of the court is respectfully directed
to adjust the court's records accordingly.

**Attorneys and Law Firms**

FOR PLAINTIFF: SHIHSIANG LIAO, Pro se, P.O.
Box 472, Wassaic, NY 12592.

FOR    DEFENDANT:    HON.    ERIC    T.
SCHNEIDERMAN, New York State Attorney General,
The Capitol, KEITH J. STARLIN, ESQ., Assistant
Attorney General, Albany, NY 12224.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. MAGISTRATE JUDGE

**\*1**  This is a civil rights action brought by *pro se* plaintiff
Shihsiang Liao, a former New York State prison inmate
who has also identified himself as Shih–Siang Shawn
Liao, against four employees of the New York State
Department of Corrections and Community Supervision
("DOCCS"), including its former commissioner and
current acting commissioner, pursuant to 42 U.S.C. §
1983. While his complaint contains additional claims, the
sole remaining cause of action in this case is asserted
against defendant Faisal Malik based on allegations that
he denied plaintiff due process while assisting him in
preparing for a disciplinary hearing by failing to interview
and obtain witnesses identified by plaintiff.

Currently pending before the court is a motion brought
by the defendant Malik requesting the entry of summary
judgment dismissing plaintiff's remaining claim. For the
reasons set forth below, I recommend that defendant's
motion, which plaintiff has not opposed, be granted.

I. *BACKGROUND*[2]

[2]   In light of the procedural posture of this case, the
following recitation is derived from the record now
before the court, with all inferences and ambiguities
resolved in plaintiff's favor. *Terry v. Ashcroft,* 336
F.3d 128, 137 (2d Cir. 2003).

Prior to his release from prison in or about September
2014, *Dkt. No. 25,* plaintiff was an inmate held in
the custody of the DOCCS.[3] *See generallyDkt. No. 1.*
At the times relevant to his remaining claim, plaintiff
was confined initially in the Ogdensburg Correctional
Facility ("Ogdensburg"), located in Ogdensburg, New
York, and later the Gouverneur Correctional Facility
("Gouverneur"), located in Gouverneur, New York. *Id.*;
*Dkt. No. 41–6 at 19.*

[3]   It appears that following his release from prison in
New York, plaintiff served time in two correctional
facilities in Ohio. Dkt. Nos. 25, 30; *see alsoDkt. No.
41–6 at 129.*

On November 19, 2010, plaintiff was issued a series
of misbehavior reports accusing him of violating prison
rules arising from conduct occurring while housed in
Ogdensburg. *Dkt. No. 1 at 4,* 21–24; *Dkt. No. 41–7.* The
charges set forth in those misbehavior reports accused
the plaintiff of (1) soliciting goods or services without
consent from the superintendent or his designee; (2)
the unauthorized exchange of personal items without
authorization; (3) possession of contraband; (4) taking
state property; (5) providing incomplete, misleading, and/
or false statements or information; (6) impersonation; and
(7) providing legal assistance to another inmate without
prior approval from the superintendent or his designee.
*Dkt. No. 1 at 21–24; Dkt. No. 41–7.* Those charges were
based upon a search of plaintiff's cell, conducted on
November 19, 2010, and the resulting confiscation of
several prohibited items. *Dkt. No. 1 at 4,* 21–24; *Dkt. No.
41–7;see alsoDkt. No. 41–6 at 17–19.*

Following the issuance of the misbehavior reports,
plaintiff was transferred to a special housing unit ("SHU")

in Gouverneur to await a Tier III disciplinary hearing concerning the pending charges.[4] *Dkt. No. 41–6 at 16,* 19. In preparation for the Tier III hearing, defendant Faisal Malik, who at the time was a vocational instructor at the facility, was assigned to assist plaintiff. *Dkt. No 1 at 7; Dkt. No. 41–2 at 1,* 6–7. After receiving the assignment, defendant Malik met with plaintiff on November 22, 2010. *Dkt. No. 41–2 at 7; Dkt. No. 41–6 at 28.* While the parties generally disagree as to what occurred after their meeting on November 22, 2010, both plaintiff and defendant appear to agree that plaintiff provided defendant with several names of individuals who he wished to have testify on his behalf at the upcoming disciplinary hearing. *Dkt. No. 1 at 7; Dkt. No. 41–2 at 7; Dkt. No. 41–6 at 21.* One of the individuals was identified by plaintiff as Ronlad Gantt, an inmate in Ogdensburg. *Dkt. No. 41–2 at 7.* Another potential witness was Tom Lawrence, the facility law librarian at Ogdensburg. *Id.*; *see also Dkt. No. 41–6 at 32.* The other witnesses plaintiff identified to defendant Malik during their meeting were (1) May Liao, plaintiff's sister, who lived in Seattle, Washington; (2) Scot Liao, plaintiff's father, who lived in Taiwan; (3) Ronald Abraham, an administrative law judge who lived in Brooklyn, New York; (4) Imam Settles, the Imam assigned to Ogdensburg; and (5) an individual plaintiff indicated worked as a volunteer for an organization called Chan Meditation. *Dkt. No. 1 at 26; Dkt. No. 41–2 at 7; Dkt. No. 41–3.* Plaintiff expected that defendant Malik would contact each of the individuals and ensure that they would be available to testify at the hearing by way of personal appearance, telephone, or written affidavit. *Dkt. No. 41–6 at 40–41.*

[4]    The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace,* 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes,* 143 F.3d 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

**\*2**  A Tier III hearing was conducted by Hearing Officer Randy Abar, beginning on November 30, 2010, to address the charges lodged in the misbehavior reports dated November 19, 2010. *Dkt. No. 41–8.* On December 2, 2010,

at the close of the hearing, plaintiff was found guilty on all counts, with the exception of the charge of unlawful soliciting. *Dkt. No. 41–8 at 28.* Based upon that finding, Hearing Officer Abar imposed a penalty that included six months of disciplinary SHU confinement, with a corresponding six-month loss of recreation, packages, commissary, and telephone privileges, and additionally recommended that plaintiff forfeit three months of good time credits. *Id.* The hearing officer's determination was administratively reversed on May 9, 2012, based upon a review by Corey Bedard, the DOCCS's Acting Director of Special Housing/Inmate Disciplinary Program. *Dkt. No. 1 at 38.*

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on or about December 5, 2013. *Dkt. No. 1.* As defendants, plaintiff's complaint names K. Trimm, a corrections sergeant; Faisal Malik, a civilian employee; Ann Charlebois, the former DOCCS Acting Superintendent; Brian Fischer, the former DOCCS Commissioner; and Anthony J. Annucci, the Acting DOCCS Commissioner, and sets forth several causes of action against those individuals. *See generally id.* Upon initial review of plaintiff's complaint and accompanying application for leave to proceed *in forma pauperis* ("IFP"), pursuant to 28 U.S.C. §§ 1915(e) and 1915A, Chief District Judge Glenn T. Suddaby issued a decision and order on June 4, 2014, granting plaintiff's IFP application and dismissing all claims with the exception of plaintiff's procedural due process cause of action against defendant Malik. *Dkt. No. 11.*

On July 9, 2015, following the close of discovery, defendant Malik moved for summary judgment, requesting dismissal of plaintiff's remaining claim against him on a variety of grounds. *Dkt. No. 41.* That motion, to which plaintiff failed to respond, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Plaintiff's Failure to Oppose Defendant's Motion*
Before turning to the merits of defendant's motion, a threshold issue to be addressed is the legal significance of plaintiff's failure to oppose defendant's motion, and

specifically whether that failure should be construed as a consent to the dismissal of his complaint.

Pursuant to Local Rule 7.1(b)(3), by failing to oppose defendant's motion, plaintiff has effectively consented to the granting of the relief sought. That rule provides as follows:

> Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y. L.R. 7.1(b)(3); *see also Jackson v. Fed. Express,* 766 F.3d 189, 194 (2d Cir. 2014) (holding that the district courts may enter summary judgment in favor of the moving party where the non-moving party fails to respond in opposition, but not without first "ensur[ing] that each statement of material fact is support by record evidence sufficient to satisfy the movant's burden of production" and "determin[ing] whether the legal theory of the motion is sound").

In this case, plaintiff has not responded to defendant's motion. The motion was properly filed by defendant Malik, and defendant, through his motion, has met his burden of demonstrating entitlement to the relief requested. With respect to the question of whether defendant has met his burden, I note that the "burden of persuasion is lightened such that, in order to succeed, his motion need only be 'facially meritorious.' " *See Rodriguez v. Goord,* No. 04–CV–0358, 2007 WL 4246443, at *1 (N.D.N.Y. Nov. 27, 2007) (Scullin, J., *adopting report and recommendation by* Lowe, M.J.) (finding that whether a movant has satisfied its burden to demonstrate entitlement to a dismissal under Local Rule 7.1(b)(3) "is a more limited endeavor than a review of a contested motion to dismiss" (citing cases)). [5]

**\*3** Because defendant has accurately cited both proper legal authority and evidence in the record supporting the grounds on which his motion is based, and plaintiff has failed to respond in opposition to the motion to dismiss, I find that defendant's motion is facially meritorious. *Jackson,* 766 F.3d at 194. Accordingly, I recommend that the court grant defendant's motion on this basis.

It should also be noted that there are additional consequences flowing from plaintiff's failure to file an opposition to defendant's Local Rule 7.1(a)(3) Statement of Material Facts. Local Rule 7.1 provides, in relevant part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in cases where a non-movant has failed to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV–0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's Local Rule 7.1 Statement, *Dkt. No. 41* at 3, and he has failed to do so, I recommend that the court deem the facts contained in defendant's Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996). As to any facts not contained in defendant's Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry,* 336 F.3d at 137.

---

[5]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

### B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*4** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C. *Analysis of Plaintiff's Procedural Due Process Claim*

In his remaining claim, plaintiff contends that defendant Malik deprived him of procedural due process as guaranteed under the Fourteenth Amendment while assisting him in preparing for his Tier III disciplinary hearing. *Dkt. No. 1 at 7–8.* To prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir. 2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir. 1996).

As to the first element, in *Sandin v. Conner,* 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–84; *Tellier,* 280 F.3d at 79–80; *Hynes,* 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g.,* *LaBounty v. Coombe,* No. 95–CV–2617, 2001 WL 1658245, at \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94–CV–0985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under Sandin.

Atypicality in a *Sandin* inquiry is normally a question of law.[6] *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker,* 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a court may not need to undergo a detailed analysis of these considerations. *Arce,* 139 F.3d at 336; *Hynes,* 143 F.3d at 658.

6      In cases where there is factual dispute concerning the conditions or duration of confinement, however,

it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999).

**\*5** As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis,* 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis,* 576 F.3d at 133 (citing *Colon,* 215 F.3d at 232–33 n.5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.'" *Davis,* 576 F.3d at 134 (quoting *Welch v. Bartlett,* 196 F.3d 389, 392–93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon,* 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

In this instance, although Hearing Officer Abar sentenced plaintiff to six months of disciplinary SHU confinement, plaintiff testified at his deposition that he served approximately five months, or 150 days, in the SHU, having been released early for good behavior. *Dkt. No. 41–6 at 118.* Because this period of disciplinary confinement falls between 101 and 305 days, in order to determine whether plaintiff suffered an atypical hardship, and therefore has been deprived a liberty interest, the court is required "to articulate specific findings of the conditions of the imposed confinement relative to the ordinary prison conditions[.]" *Reynoso v. Selsky,* 292 F. App'x 120, 123 (2d Cir. 2008). While plaintiff's testimony from his deposition suggests that the conditions of his SHU confinement were not extraordinary in any way,[7] defendant has not provided the court any evidence with respect to the conditions of ordinary prison life in support of his motion. Because the court is without this evidence, it cannot undertake the type of specific fact-finding required to determine, on summary judgment, whether plaintiff suffered an atypical and significant hardship during his confinement. *See Reynoso,* 292 F. App'x at 123 (reversing

the district court where it had neglected "to articulate findings as to why the 150–day total sentence was not 'atypical and significant' " and commenting that "[s]uch a determination is anything but simple, and cannot be resolved summarily"). For this reason, I have assumed, for purposes of this report, that plaintiff was deprived of a liberty interest by way of his five-month SHU confinement and have proceeded to analyze whether defendant Malik provided plaintiff with constitutionally adequate assistance prior to his disciplinary hearing.

7    Plaintiff testified that, while confined in the SHU, he (1) requested legal materials from the law library daily and that they were delivered to him approximately four days later; (2) was permitted to choose non-legal books to read once per week when a corrections officer would do rounds with a cart of books; (3) was permitted to shower three times per week; (4) was provided access to the outdoors for a period of recreation time one hour per day; (5) ate three meals per day; and (6) was allowed to write, send, and receive mail and otherwise correspond with corrections staff by way of "interview slips." *Dkt. No. 41–6 at 119–26.*

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell,* 418 U.S. 539 (1974). In its decision in *Wolff,* the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564–69; *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, it is also required that a hearing officer's disciplinary determination garners the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985); *Luna,* 356 F.3d at 487–88.

**\*6** Plaintiff's only contention against defendant Malik is centered upon the duty under *Wolff* to provide assistance in preparing a defense. As the Second Circuit has noted, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence

and presenting a defense when he is faced with disciplinary charges." *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir. 1988). That requirement is particularly acute when an inmate faces obstacles in defending himself, including "being confined full-time to SHU[.]" *Eng,* 858 F.2d at 897. Although the Second Circuit in *Eng* specifically declined to define the extent of an assistant's obligations in helping an inmate to prepare for a disciplinary hearing, it offered the following observation:

> Although this is not the occasion to define the assigned assistant's precise role and the contours of the assistant's obligations, such help certainly should include gathering evidence, obtaining documents and relevant tapes, and interviewing witnesses. At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself.

*Id.* at 898; accord, *Samuels v. Selsky,* 166 F. App'x 552, 556 (2d Cir. 2006). [8]

[8]   The constitutional requirement to provide an assistant to an inmate to aid in preparing for a disciplinary hearing is echoed in New York by regulation. 7 N.Y.C.R.R. §§ 251–4.1, 251–4.2; *see also Brooks v. Prack,* 77 F.Supp.3d 301, 315 (W.D.N.Y.2014); *Fernandez v. Callens,* No. 06–CV–0506, 2010 WL 4320362, at *9 (W.D.N.Y. Oct. 29, 2010).

The scope of the assistance that must be provided to an accused inmate, as contemplated under *Wolff* and *Eng,* is not unlimited, and clearly does not require the assignment of counsel or of the functional equivalent of a private investigator. *See Samuels,* 166 F. App'x at 556 ("The required assistance does not equate to legal counsel."); *Fernandez,* 2010 WL 4320362, at *9 ("The Supreme Court has held that a prisoner's right to assistance as a matter of federal constitutional law is more limited, determining that the institutional concerns implicated in prison administration would not be furthered by entitling inmates to legal counsel in the form of a retained or assigned attorney."); *Gates v. Selsky,* No. 02–CV–0496, 2005 WL 2136914, at *6 (W.D.N.Y. Sept. 2, 2005) (citing cases). The assigned assistant is required only to perform

those functions that the plaintiff would have, had he not been hampered through SHU confinement, and need not go beyond the inmate's instructions. *See Silva v. Casey,* 992 F.2d 20, 22 (2d Cir. 1993) ("[A]n assistant must be assigned to the inmate to act as his *surrogate* – to do what the inmate would have done were he able." (emphasis in original)); *accord, Samuels,* 166 F. App'x at 556; *see also Lewis v. Murphy,* No. 12–CV–0268, 2014 WL 3729362, at *12 (N.D.N.Y. July 24, 2014) (Mordue, J., *adopting report and recommendation by* Hummel, M.J.). Significantly, any claim of deprivation of assistance is reviewed for harmless error. *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir. 2009).

In support of his motion, defendant Malik, a vocational instructor who is periodically assigned to assist inmates in connection with disciplinary hearings and has received DOCCS training for serving in that role, has submitted a declaration detailing his efforts to assist plaintiff in mounting a defense to the charges against him. *See generally Dkt. No. 41–2.* According to that declaration, after being assigned to the matter, defendant Milak met with plaintiff on November 22, 2010, to discuss the charges against him. *Dkt. No. 41–2 at 6–7.* After reviewing the charges and insuring that plaintiff understood them, defendant Malik inquired as to what assistance plaintiff desired. *Id.* at 7. Liao identified several witnesses who he contemplated calling as witnesses at the hearing, including inmate Gantt; Ogdensburg Law Librarian Tom Lawrence; May Liao, plaintiff's sister; Scot Liao, plaintiff's father; Ronald Abraham, an administrative law judge; Imam Settles assigned to Ogdensburg; and an unidentified individual who plaintiff referred to as a volunteer at Chan Meditation. *Id.; see also Dkt. No. 41–3.* Plaintiff told defendant Malik that he would like all of those individuals to testify at the upcoming hearing, either in person or by phone, notwithstanding that plaintiff's sister lived in the State of Washington, plaintiff's father was located in Taiwan, and Ronald Abraham resided in Brooklyn. *Dkt. No. 41–2 at 7.* Uncertain of the extent of his obligation with regard to plaintiff's requested witnesses, defendant Malik contacted the prison disciplinary office and learned that inmate Gantt had been released on November 17, 2010. *Id.* at 8; *see also Dkt. No. 41–4.* Defendant was informed by the disciplinary officer on duty that employee assistants are not required to track down non-inmate potential witnesses outside of the facility or to arrange for or schedule the testimony of non-inmates who are "outside the correctional facility." *Dkt. No. 41–2 at 8.*

**\*7** Immediately following his discussion with the disciplinary office, defendant Malik reports that he returned to plaintiff's cell and informed him of Gantt's release from Ogdensburg, and advised plaintiff that he would have to provide contact information for the other desired witnesses who were not inmates and/or working in a DOCCS facility. *Dkt. No. 41–2 at 9*. Defendant Malik informed plaintiff "that he would then have to tell the hearing officer that he wanted them to testify, that the hearing officer would then decide if they could testify, and that if he/she decided to allow them to testify, their testimony would then be scheduled and arranged." *Id.* According to defendant, plaintiff responded by providing defendant Malik the phone number for his sister, and defendant wrote that number down on the assistant form. *Id.*; *Dkt. No. 41–3*. Plaintiff also told defendant that he would obtain the contact information for the other witnesses, aside from Tom Lawrence, from his sister. *Dkt. No. 41–2 at 9–10*. Plaintiff "did not tell [defendant Malik] that he needed assistance with anything else," and defendant then asked plaintiff to sign and date the assistant form, and plaintiff complied. *Id.* at 10. Defendant Malik did not hear anything further from plaintiff in connection with his assignment as plaintiff's assistant. *Id.* at 10.

Although plaintiff's version of the interaction with defendant Malik on November 22, 2010, differs to some degree, the factual disputes are not material. Plaintiff contends that defendant Malik forced plaintiff to sign the assistant form at the end of their meeting, which plaintiff alleges lasted only fifteen minutes, by threatening plaintiff with an additional misbehavior report for failing to comply with a direct order. *Dkt. No. 1 at 7–8; Dkt. No. 41–6 at 23*. Additionally, plaintiff alleges that he did not see or speak with defendant Malik again after their first meeting. *Dkt. No. 41–6 at 29*. Defendant Malik disputes these allegations by plaintiff. *Dkt. No. 41–2 at 9–11*.

Even assuming plaintiff's allegations are true – that he was forced to sign the assistant form and did not see or hear from defendant Malik again after their first meeting – there is no record evidence that supports plaintiff's claims that defendant Malik did nothing to assist him. In fact, on the first day of the disciplinary hearing, plaintiff was under the impression that defendant Malik was contacting witnesses for him. *Dkt. No. 41–6 at 58*. While defendant Malik has offered a detailed account of his efforts to

provide plaintiff assistance, Dkt. No. 41–2, plaintiff has failed to adduce any evidence, nor is there any in the record, that suggests defendant Malik provided plaintiff with constitutionally inadequate assistance. It is clear from plaintiff's deposition testimony that he expected defendant Malik to undertake the role of plaintiff's advocate by contacting his requested witnesses, explaining plaintiff's circumstances, and arranging for them to testify in person, by phone, or by way of a prepared affidavit. Dkt. No. 41–6 at 34–36, 38–41. Additionally, plaintiff expected defendant Malik to arrange a settlement of the misbehavior report between him and facility security to avoid the need for a disciplinary hearing. *Id.* at 84.

Plainly, plaintiff's expectations for his assigned assistant were unreasonable and exceeded the constitutional requirements under *Wolff* and *Eng*. Both the Supreme Court and courts in this circuit have unequivocally held that the constitution does not require inmate assistants to serve as legal counsel or investigator for prisoners. *Wolff,* 418 U.S. at 570; *Samuels,* 166 F. App'x at 556; *Gates,* 2005 WL 2136914, at \*6. Setting aside plaintiff's unsupported allegations that defendant Malik did not assist him in any way, the uncontroverted record evidence in this case reflects that defendant met with plaintiff ahead of the hearing, explained to him the charges, asked for a list of potential witnesses, clarified his role as plaintiff's assistant with the disciplinary office, and informed plaintiff that he would be responsible for gathering the contact information for the witnesses that were not employed at Ogdensburg and then requesting them as witnesses during the hearing. *See Dkt. No. 41–2.* This conduct satisfies the due process to which plaintiff was entitled. In any event, even assuming defendant Malik's assistance fell short, any error was harmless in light of Hearing Officer Abar's rejection of plaintiff's requests to call the potential witnesses plaintiff alleges defendant Malik should have contacted prior to the hearing. [9] *Dkt. No. 41–6 at 99; Dkt. No. 41–8 at 2,* 3, 4, 16, 26. Based upon the foregoing, I recommend defendant Malik's motion be granted. [10]

[9]     At the hearing, plaintiff did not request to call Imam Settles or the individual referred to by plaintiff as a volunteer at for Chan Meditation as witnesses. *See generally Dkt. No. 41–8.*

[10]     In light of my recommendation that defendant's motion be granted on the merits, I have not addressed

the additional arguments set forth in his motion. With respect to whether plaintiff exhausted the available administrative remedies prior to filing this action, however, it is worth noting that there is no dispute that plaintiff failed to file a grievance through the DOCCS's inmate grievance program regarding the alleged inadequate assistance he received from defendant Malik. *Dkt. No. 41–6 at 104.* Plaintiff's vague and unsupported allegations that he did not file a grievance because he "was afraid of retaliation" is not sufficient to excuse that failure. *See, e.g., Baines v. McGinnis,* 766 F.Supp.2d 502, 504 (W.D.N.Y.2011) (citing *McCloud v. Tureglio,* No. 07–CV–0650, 2008 WL 1772305, at *11 (N.D.N.Y. Apr. 15, 2008) (Mordue, J., *adopting report and recommendation by* Lowe, M.J.)). While it is true that an appeal from a disciplinary hearing that raises the precise procedural infirmities asserted in a section 1983 action may be sufficient to exhaust administrative remedies, *LaBounty v. Johnson,* 253 F.Supp.2d 496, 502 n. 5 (W.D.N.Y.2013), there is no record evidence reflecting whether plaintiff raised his claim regarding defendant Malik in his appeal of Hearing Officer Abar's determination that was ultimately reversed. It seems unlikely that plaintiff would have included this ground as a basis for his appeal in light of his insistence that he did not file a grievance through the facility because of a fear of retaliation and that, by naming a particular person in a grievance or complaint, he would be targeted by corrections officers. See *Dkt. No. 41–6 at 138–40,* 156–57, 162. Accordingly, while I do not recommend dismissal of defendant's complaint on this basis, and do not intend to render any findings on this issue, it does appear likely that plaintiff's complaint is procedurally barred based on his failure to exhaust the available administrative remedies prior to filing suit.

## IV. *SUMMARY AND RECOMMENDATION*

**\*8** Defendant has moved for summary judgment dismissing the sole remaining claim in this action, relating to plaintiff's allegation that he was denied procedural due process as a result of defendant's failure to render proper assistance to him in preparing for a disciplinary hearing. Because plaintiff has failed to oppose defendant's motion, and I find that it is facially meritorious, I recommend that it be granted on this basis. Moreover, the record before the court, including a declaration from defendant Malik detailing his efforts on plaintiff's behalf, demonstrates both that there are no genuine disputes of material fact for trial and that no reasonable factfinder could conclude that defendant deprived plaintiff of procedural due process. Accordingly, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment *(Dkt. No. 41)* be GRANTED and that plaintiff's remaining claim in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

## All Citations

Not Reported in F.Supp.3d, 2016 WL 1128245

---

**End of Document**　　　　© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4517806
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kirk OCHOA, Plaintiff,
v.
Carol DeSIMONE, Inmate Records Coordinator;
D.S.A. Badger; Lt. Santos, Defendants.

Civ. No. 9:06-CV-119 (DNH/RFT).
|
Sept. 30, 2008.

**Attorneys and Law Firms**

Kirk Ochoa, Bronx, NY, pro se.

Andrew M. Cuomo, Attorney General for the State of New York, Senta B. Suida, Esq., Assistant Attorney General, of Counsel, Syracuse, NY, for Defendants.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*6** Plaintiff, Kirk Ochoa, brought this civil rights action pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated September 10, 2008, the Honorable Randolph F. Treece, United States Magistrate Judge, recommended that the defendants' motion for summary judgment (Dkt. No. 32) be granted; that plaintiff's retaliation claim be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii); and that the plaintiff's complaint be dismissed. Objections to the Report-Recommendation have not been filed.

Based upon a careful review of the entire file and the recommendations of Magistrate Judge Treece, the Report-Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment (Docket No. 32) is GRANTED;

2. Plaintiff's retaliation claim is DISMISSED; and

3. Plaintiff's complaint is DISMISSED.

The Clerk is directed to enter judgment accordingly and close the file.

IT IS SO ORDERED.

RANDOLPH F. TREECE, United States Magistrate Judge.

### *REPORT-RECOMMENDATION and ORDER*

**\*1** On January 30, 2006, *pro se* Plaintiff Kirk Ochoa filed this civil rights lawsuit, pursuant to 42 U.S.C. § 1983, alleging that (1) Defendant Carol DeSimone retaliated against him for filing lawsuits and grievances; (2) Defendant Badger violated his due process rights by denying him a legal assistant and the right to call witnesses during a disciplinary hearing; and (3) Defendant Santos violated his rights by ruling against him in a separate disciplinary hearing. Dkt. No. 1, Compl. at ¶ 7. Defendants have filed a Motion for Summary Judgment to which Plaintiff has not responded. Dkt. No. 32, Defs.' Mot. for Summ. J. The original deadline for Plaintiff's response to the Defendants' Motion was February 25, 2008. *See id.* After Plaintiff failed to meet that deadline, on April 4, 2008, this Court issued the following Order:

> Plaintiff shall file and serve any opposition to Defendants' Motion for Summary Judgment on or before May 19, 2008; ***Plaintiff is warned that failure to oppose Defendants' Motion will result in this Court accepting the facts set forth by Defendants as true.*** *See* N.D.N.Y.L.R. 7.1(a)(3) ("*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*" (emphasis in original)). ***Plaintiff is further warned that failure to respond may, if appropriate, result in the granting of Defendants' Motion, in which [case] there will be no trial.*** *See* N.D.N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.").

Dkt. No. 33, Order dated Apr. 11, 2008 (emphasis in original).

Because Plaintiff has failed to respond to the Defendants' Motion, we will accept the facts set forth by Defendants as true.

## I. FACTS

At the time of the events alleged in the Complaint, Plaintiff was in the New York State Department of Correctional Services' (DOCS) custody at the Oneida Correctional Facility. Defs.' Mot. for Summ. J., Ex. 3, Statement Pursuant to Rule 7.1 (hereinafter "Defs.' 7.1 Statement"), at ¶ 3. Plaintiff was subsequently released from DOCS custody on September 6, 2007. *Id.* at ¶ 2. The material facts giving rise to Plaintiff's claims are as follows.

On October 26, 2005, Defendant Carol DeSimone filed a Misbehavior Report (hereinafter "October Report") against Plaintiff accusing him of harassment. *Id.,* Ex. B, Misbehavior Rep., dated Oct. 26, 2005. Defendant Deputy Superintendent for Administration John Badger presided as Hearing Officer over the ensuing Disciplinary Hearing, which was held on November 8, 2005. *Id.,* Ex. C, Disciplinary Hr'g Tr., dated Nov. 8, 2005. At the conclusion of the Hearing, Plaintiff was found guilty and sentenced to thirty (30) days in the Special Housing Unit ("SHU") and one month recommended loss of good time. *Id.* at p. 7. Plaintiff appealed Badger's determination and it was reversed on January 13, 2006. *Id.,* Ex. D, Order Reversing Hr'g Decision, dated Jan. 13, 2006.

**\*2** On December 2, 2005, Plaintiff was issued another Misbehavior Report (hereinafter "December Report") for refusal to obey a direct order. *Id.,* Ex. E, Misbehavior Rep., dated Dec. 2, 2005. Defendant Lieutenant Lance Santos presided over Plaintiff's Disciplinary Hearing at the conclusion of which Plaintiff was found guilty and sentenced to thirty (30) days keeplock. *Id.,* Exs. F, Disciplinary Hr'g Tr., dated Dec. 7, 2005 & G, Inmate Disciplinary Hist. Plaintiff did not appeal that decision. *Id.* at ¶ 11.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of

material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

**B. Due Process Claims**

**\*3** Plaintiff asserts that Defendant Badger violated his due process rights by denying him a legal assistant and the right to call witnesses during a disciplinary hearing related to the October Report, and that Defendant Santos violated his rights by ruling against him in a disciplinary hearing related to the December Report.[1] Badger sentenced Plaintiff to thirty (30) days in SHU with a recommended one month loss of good time and Santos sentenced him to thirty (30) days keeplock. Defs.' 7.1 Statement at ¶¶ 6 & 10.

[1]   The basis for Plaintiff's claim against Defendant Santos is not entirely clear. His Complaint states: "Defendant Lt. Santos Hearing Decision informing Plaintiff that these rules apply while not in DOCS custody is a violation of due process of [law][.] DOCS own rule book clearly states that rules only apply in DOCS custody not out side [sic] custody." Compl. at ¶ 7. Because Plaintiff's claim is unclear, we liberally construe it as a due process claim.

In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). Such interests are derived from the Fourteenth Amendment Due Process Clause itself or from state statute or regulations. *Id.*

The Supreme Court has narrowly circumscribed the scope of liberty interests emanating from the Due Process Clause to protect "no more than the 'most basic liberty

interests in prisoners.' " *Id.* (quoting *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). Furthermore, "changes in the conditions of confinement having a substantial adverse impact on the prisoner are not alone sufficient to invoke the protections of the Due Process Clause '[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him.' " *Vitek v. Jones,* 445 U.S. 480, 493, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (quoting *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976)).

However, when a prisoner is subjected to conditions that are "unexpected," *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), and "qualitatively different from the punishment characteristically suffered by a person convicted of crime," the Due Process Clause itself confers a liberty interest. *Vitek v. Jones,* 445 U.S. at 493 (holding an involuntary transfer to a state mental hospital implicated a liberty interest protected by the Due Process Clause); *see also Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (finding the Due Process Clause provides a liberty interest in being protected from the involuntary administration of psychotropic drugs).

In the case at bar, Plaintiff's disciplinary confinement in SHU and keeplock does not constitute an "unexpected" change in condition, nor did those conditions exceed the sentence imposed upon him. *See Dawes v. Dibiase,* 1997 WL 376043, at *4 (N.D.N.Y. July 3, 1997) (citing *Washington v. Harper & Vitek v. Jones* for the proposition that the Due Process Clause will apply by its own force only for deprivations much more severe than solitary confinement for a year). Therefore, Plaintiff does not have a liberty interest in remaining free from SHU confinement emanating from the Due Process Clause itself.

State statutes and regulations may also confer liberty interests to prisoners. *Arce v. Walker,* 139 F.3d at 334 (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. at 460). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. at 484. Thus, a prisoner asserting a denial of due process as a result of segregated confinement or loss of privileges must (1) make a threshold showing that an atypical and significant

hardship was imposed upon him, and (2) establish that the "state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

**\*4** While the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard, *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections, *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (stating that confinement in SHU exceeding 305 days was atypical); *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (finding 305 days of SHU confinement atypical).

In this case, neither of Plaintiff's thirty (30) day stints in SHU and keeplock, without more, [2] constitute an atypical and significant hardship, and therefore Plaintiff has not asserted that he has a liberty interest at stake. *See Sealey v. Giltner,* 197 F.3d 578, 590 (2d Cir.1999) (101 days in normal SHU conditions did not constitute an atypical and significant hardship); *see also Sandin v. Conner,* 515 U.S. at 486; *Thompson v. LaClair,* 2008 WL 191212, at *3 (N.D.N.Y. Jan.22, 2008) (30 days in SHU does not constitute an atypical and significant hardship).

[2]     The Second Circuit has held open the possibility that a period of restricted confinement if less than 101 days could create a liberty interest if the record were to reflect atypical and significant conditions of confinement. *See Colon v. Howard,* 215 F.3d at 232 n. 5. In this case, Plaintiff has adduced no allegations regarding the conditions of his confinement beyond the loss of privileges that normally accompany disciplinary confinement.

Therefore, these claims should be **dismissed** as a matter of law. [3]

[3]     With respect to Plaintiff's due process claim against Santos, Plaintiff failed to appeal Santos's decision and therefore that claim should be dismissed for failure to exhaust administrative remedies as well. *See* Defs.' 7.1 Statement at ¶ 10; 42 U.S.C. § 1997(e)(a) ("No action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or

other correctional facility until such administrative remedies as are available are exhausted.")

**C. Retaliation Claim**

Plaintiff asserts that Defendant DeSimone issued the October Misbehavior Report against him in retaliation for his filing "court actions and grievances against [Oneida Correctional Facility] and its staff." Compl. at ¶ 5. The Defendants failed to address this claim in their Motion for Summary Judgment. *See* Dkt. No. 32, Pl.'s Mem. of Law. However, notwithstanding that omission, under 28 U.S.C. § 1915(e)(2)(B)(ii), this Court has the power to review Plaintiff's Complaint for failure to state a claim *at any time. See, e.g., Zimmerman v. Burge,* 2008 WL 850677, at *7 (N.D.N.Y. Mar.28, 2008) (noting that "even where a defendant has not requested dismissal based on a failure of the plaintiff to state a claim upon which relief may be granted, a district court may, *sua sponte,* address whether a pro se prisoner has failed to state a claim[.]") (citing 28 U.S.C. § 1915(e)(2)(B)(ii)). We find that, even accepting all Plaintiff's factual allegations as true, he has not stated a valid claim § 1983 retaliation claim.

The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove, "first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted). Thus, there must be a "causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

**\*5** A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting

circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d at 138-39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). Other factors that can infer an improper or retaliatory motive include the inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by the defendant regarding his motive for disciplining plaintiff. *McEachin v. Selsky,* 2005 WL 2128851, at *5 (N.D.N.Y. Aug.30, 2005) (citing *Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995)).

Moreover, "in the prison context [the Second Circuit has] previously defined 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (emphasis in original). This objective test will apply even though a particular plaintiff was not himself deterred. *Id.* If the plaintiff can carry that burden, the defendants will still be entitled to summary judgment if they can show, by a preponderance of the evidence, that they would have taken the same action in the absence of the prisoner's First Amendment activity. *Davidson v. Chestnut,* 193 F.3d 144, 148-49 (2d Cir.1999); *see Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

In asserting his retaliation claim, Plaintiff generally states that he filed grievances and lawsuits which formed the basis for Defendant DeSimone's retaliatory Misbehavior Report. The Supreme Court has noted that the right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *See United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967). The Second Circuit has held that within the prison context, "inmates must be 'permit[ted] free and uninhibited access ... to both *administrative and judicial* forums for the purpose of seeking redress of grievances against state officers.' " *Franco v. Kelly,* 854 F.2d at 589 (quoting *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976)) (emphasis and alterations in original).

Fatal to Plaintiff's retaliation claim, however, is his failure to specify what lawsuits or grievances he filed, against whom, and where such were filed. Plaintiff does not indicate that Defendant DeSimone was even aware of any lawsuit or grievance which he may have filed. Therefore, Plaintiff has failed to allege a causal connection between his filing of grievances and lawsuits and DeSimone's filing of the Misbehavior Report. "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

Therefore, it is recommended that this claim be **dismissed.**

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 32) be **granted;** and it is further

**RECOMMENDED,** that Plaintiff's retaliation claim be **dismissed** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii); and it is further

**RECOMMENDED;** that in light of the above recommendations, Plaintiff's Complaint (Dkt. No. 1) be **dismissed;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

### All Citations

Not Reported in F.Supp.2d, 2008 WL 4517806

2008 WL 4517806

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 699273
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

William ESCALARA, Plaintiff,
v.
T. CHARWAND, C.O., et al., Defendants.

No. 9:04-CV-0983 (FJS/DEP).
|
March 12, 2008.

**Attorneys and Law Firms**

William Escalara, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State
of New York, Bruce J. Boivin, Esq., Christopher Hall,
Esq., Assistant Attorney General, of Counsel, Albany,
NY, for Defendants.

### *ORDER*

FREDERICK J. SCULLIN, JR., Senior District Judge.

**\*1** Presently before the Court is Magistrate Judge David
E. Peebles February 19, 2008 Report-Recommendation
in which he recommends that defendants' motion for
summary judgment dismissing plaintiff's complaint be
granted and that plaintiff's complaint be dismissed in
all respects, without prejudice as to defendants West,
C. Lambard, Baldwin, and J. Roch, but otherwise
with prejudice. The Court having reviewed the Report-
Recommendation and the entire file in this matter, and no
objections to said Report-Recommendation having been
filed, the Court

**ORDERS** that the Report-Recommendation of
Magistrate Judge David E. Peebles filed February 19,
2008, is for the reasons stated therein, **ACCEPTED** in its
entirety and the Court further

**ORDERS** that defendants' motion for summary judgment
dismissing plaintiff's complaint is **GRANTED,** and that
plaintiff's complaint is dismissed in all respects, without
prejudice as to defendants West, C. Lambard, Baldwin,
and J. Roch, but otherwise with prejudice, and the Court
further

**ORDERS** that the Clerk of the Court is to enter judgment
in favor of Defendants and close this case.

**IT IS SO ORDERED.**

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff William Escalera, a New York State prison
inmate who is proceeding *pro se* and *in forma pauperis,*
has commenced this proceeding pursuant to 42 U.S.C.
§ 1983, alleging deprivation of his civil rights. In an
amended complaint which is both difficult to follow
and couched in vague and conclusory terms, plaintiff
appears to assert claims of First Amendment free speech
and procedural due process deprivations arising from
the issuance of misbehavior reports concerning his
conduct as a prison inmate, implicating matters which
include his verbal communications with fellow inmates,
determined by prison officials to violate policies regarding
such interaction, and the disciplinary proceedings which
followed. [1]

[1]    Plaintiff's complaint also purports to assert an equal
protection denial cause of action, although the
particulars of that claim are not well-defined.

Currently pending before the court is a motion filed
by those defendants who to date have appeared in the
action, seeking the entry of summary judgment dismissing
plaintiff's claims as lacking in merit. Having carefully
reviewed the record in the light of defendants' motion,
without the benefit of any opposing submissions by
the plaintiff, I conclude no reasonable factfinder could
determine that plaintiff's constitutional rights have been
abridged, and therefore recommend that defendants'
motion be granted.

### I. *BACKGROUND*

Plaintiff is a prison inmate who has been entrusted
to the custody of the New York State Department
of Correctional Services (the "DOCS"). *See generally,*
Amended Complaint (Dkt. No. 12); *see also* Defendants'
Exhibits (Dkt. No. 59-4) Exh. A (Transcript of Plaintiff's
Deposition, held on May 23, 2006) at 11. At the times
relevant to his claims plaintiff was designated to the

Clinton Correctional Facility ("Clinton"), categorized by the DOCS as a maximum security prison. Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 10-11. At Clinton, plaintiff worked as a maintenance recycling porter and was permitted to sleep in a cubicle located within a dormitory in the Clinton Annex under conditions more akin to those existing in a medium security prison. *Id.* at 9-10.

**\*2** Between the time of his transfer into Clinton in May of 2004, *see* Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 11, and the end of 2004 the plaintiff, who as a prison inmate has amassed a lengthy disciplinary record, was the recipient of several misbehavior reports accusing him of violating various prison disciplinary rules. Defendants' Exhibits (Dkt. No. 59-5) Exh. D. The particulars of those misbehavior reports can be summarized as follows:

| Date of Incident | Violations Alleged |
|---|---|
| 6/14/04 | Creating a disturbance (Rule 104.13) and violation of refusal to obey a direct order (Rule 106.10) |
| 6/24/04 | Property in an unauthorized location (Rule 113.22) |
| 6/26/04 | Refusal to obey a hearing disposition (Rule 181.10) |
| 6/26/04 | Interference with prison officials (Rule 107.10), creating a disturbance (Rule 104.13), making a threat (Rule 102.10) and a messhall violation (Rule 124.16) |
| 8/11/04 | Creating a disturbance (Rule 104.13) and interference with prison officials (Rule 107.10) |
| 9/23/04 | Loss/damage to property (Rule 116.10), Creating a disturbance (Rule 104.13), refusal to obey an order (Rule 106.10) and interference with prison officials (Rule 107.10) |
| 10/27/04 | Creating a disturbance (Rule 104.13) |
| 12/15/04 | Interference with prison officials (Rule 107.10), refusal to obey a direct order (Rule 106.10), delay in count (Rule 112.20) and count violation (Rule 112.21) |
| 12/26/04 | Movement violation (Rule 109.12) |

*Id.* Tier II disciplinary hearings were conducted at various times in connection with a majority of those reports, in each instance resulting in a finding of guilt on one or more of the charged violations and the imposition of sanctions which generally included loss of recreation, package, commissary and/or telephone privileges of varying durations and, in some instances, keeplock confinement extending up to thirty days on one occasion.[2] *Id.* Plaintiff appealed each of the

adverse hearing determinations and resulting disciplinary penalties to the facility superintendent, defendant Artus, who on each occasion affirmed the hearing officer's decision. Amended Complaint (Dkt. No. 12) at 4; *see also* Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 50.

2    The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

At one point plaintiff attempted to speak with his prison counselor, defendant Joswick, regarding the frequency with which misbehavior reports were being administered to him by prison officials. Amended Complaint (Dkt. No. 12) at 4; Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 59-60. In apparent response to Escalara's persistence, defendant Joswick advised that he was not plaintiff's "pen pal" and threatened disciplinary action if plaintiff continued in his efforts to communicate with him. Amended Complaint (Dkt. No. 12) at 2; Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 60. The situation between the two was alleviated, however, when plaintiff was assigned a new counselor to replace defendant Joswick, therefore making it unnecessary for prison officials to take the threatened disciplinary measures. Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 61.

## II. *BACKGROUND*

**\*3** Plaintiff commenced this action on August 19, 2004 and, at the direction of the court based upon perceived deficiencies in plaintiff's initial pleading, *see* Dkt. No. 6, submitted an amended complaint on December 27, 2004, the filing of which was authorized by the court following a review of the new pleading. Dkt. Nos. 12, 14. Named as defendants in plaintiff's amended complaint are Clinton Superintendent Artus; Mr. Douglas, a dietician at the facility; Mr. Joswick, plaintiff's former corrections counselor; Corrections Lieutenants Baldwin and Armitage; and Corrections Officers T. Charland, West, W. Brown, R. Caron, C. Lambard, L. Favro, and J. Roch. 3 In his complaint, plaintiff claims violation

of his rights of free speech and association, deprivation of procedural due process, and the denial of equal protection, and seeks recovery of compensatory and punitive damages. Dkt. No. 12.

3    The clerk is directed to amend the docket to reflect the correct spelling of the last names of defendants Charland and Armitage.

On August 23, 2005 an answer was filed by the New York State Attorney General, acting on behalf of various of the defendants named by the plaintiff, including Thomas Charland, Jeffrey Joswick, Dale Artus, William Brown, and Randy Caron. Dkt. No. 31. In that answer defendants have generally denied plaintiff's allegations, additionally asserting various affirmative defenses. *See id.* A second answer was subsequently filed, also by the New York State Attorney General, on behalf of defendant Michael Douglas mirroring the earlier filed answer. Dkt. No. 52. To date, defendants Corrections Captain West, Corrections Lieutenant Baldwin, C. Lambard, and J. Roch have neither been served nor otherwise appeared in the action.

On January 30, 2007, following the close of discovery, the defendants who thus far have appeared in the action moved seeking the entry of summary judgment dismissing plaintiff's complaint in its entirety, as a matter of law. Dkt. No. 59. In their motion, defendants assert that the evidence in the record fails to support plaintiff's claimed constitutional deprivations. *Id.* Despite inclusion within defendants' motion of language properly advising Escalera of the significance of the motion and the potential consequences of any failure on his part to properly respond as required, *see* Dkt. No. 59, plaintiff has not filed any papers in opposition to the pending motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Status of Unserved Defendants*
Despite the filing on December 27, 2004 of plaintiff's amended complaint and the clerk's issuance on March 28, 2005 of summonses, four of the named defendants, including Captain West, Corrections Officer C. Lambard, Lieutenant Baldwin, and Corrections Officer J. Roch,

have neither been served nor otherwise appeared in the action. [4]

[4] The summonses issued to Captain West and C. Lambard were returned in July of 2005, unexecuted. Dkt. Nos. 20, 21. The record is unclear as to the status of efforts to serve the remaining two defendants, Corrections Lieutenant Baldwin and Corrections Officer J. Roch.

Rule 4(m) of the Federal Rules of Civil Procedure authorizes dismissal of a plaintiff's claims against a defendant where a summons and complaint is not served upon that party within 120 days after filing of the complaint, absent a showing of good cause. [5] Fed.R.Civ.P. 4(m); *Shuster v. Nassau Cty.,* No. 96 Civ. 3635, 1999 WL 9847, at *1 (S.D.N.Y. Jan. 11, 1999) (Rule 4(m) authorizes dismissal where no service within 120 days after filing of the complaint); *Romand v. Zimmerman,* 881 F.Supp. 806, 809 (N.D.N.Y.1995) (McAvoy, C.J.) (120-day period for service of a summons and complaint by a plaintiff under Fed.R.Civ.P. 4(m) applies to *pro se* plaintiffs as well as those represented by counsel). Inasmuch as the four missing defendants have not been served or otherwise appeared in the action within the appropriate time period, this court has never acquired jurisdiction over them, and the complaint should be dismissed as against those defendants, without prejudice. *See, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1282 (S.D.N.Y.1989) (citing *Mississippi Publishing Corp. v. Murphree,* 326 U.S. 438, 444-45, 66 S.Ct. 242, 245-46 (1946)) (court lacks jurisdiction until defendants properly served with summons and complaint).

[5] That period is further restricted by the local rules of this court, which require that service be effected within sixty days. *See* Northern District of New York Local Rule § 4.1(b).

**B.** *Plaintiff's Failure to Oppose Defendants' Motion*
**\*4** Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to dismissal of plaintiff's complaint, based upon their motion.

This court's rules provide that

[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). While *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, *see Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N .Y.1997) (McAvoy, C.J.)), the failure of such a plaintiff to oppose a summary judgment motion does not preclude the court from deciding the motion. *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). As can be seen by the face of Local Rule 7.1(b)(3), however, before summary judgment can be granted under such circumstances the court must review the motion to determine whether it is facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

While a plaintiff's failure to properly oppose a defendant's motion does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences. By opting not to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged. Courts in this district have routinely invoked Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement. [6] *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). I recommend that the court

2008 WL 699273

follow this well-established practice and, notwithstanding plaintiff's *pro se* status, accept defendants' assertion of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, in light of plaintiff's failure to respond to that statement, when reviewing defendants' motion for facial sufficiency.

6    According to Local Rule 7.1(a)(3), "any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *See* N.D.N.Y.L.R. 7.1(a)(3).

C. *Summary Judgment Standard*

**\*5** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security*

*Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

D. *Plaintiff's First Amendment Claim*

**\*6** The essence of plaintiff's First Amendment claim appears to be that when engaged in the behavior giving rise to the issuance to him of misbehavior reports, including laughing at corrections officers and talking loudly across a cell block to fellow inmates, in violation of well known and understood directives prohibiting such actions, his conduct was protected under the First Amendment and, accordingly, when disciplined for those actions his constitutional rights were abridged. Defendants assert that the record fails to support a First Amendment deprivation, as a matter of law.

The First Amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble ...." U.S. Const. amend. I. The protections afforded by the First Amendment, like many other constitutional guarantees, are not necessarily forfeited by a person upon his or her entry into prison; many rights conferred by the Constitution, however, are by definition extinguished, or in some cases give way to legitimate, countervailing penological concerns, upon incarceration. *Shakur v. Selsky,* 391 F.3d 106, 113 (2d Cir.2004). As the Supreme Court has noted, "[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration."

2008 WL 699273

*Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125, 97 S.Ct. 2532, 2537-38 (1977).

While the point of demarcation is not always readily discernable, it is clear that prison inmates enjoy some measure of First Amendment protection, yet forfeit those free speech rights which are incompatible with legitimate penological considerations. *See Pell v. Procunier,* 417 U.S. 812, 822, 94 S.Ct. 2800, 2804 (1974). As the Supreme Court has observed,

> [a] prison inmate retains those First Amendment rights that are not inconsistent with his [or her] status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

*Id.*

Thus, for example, prison officials may not deter the right of a prison inmate to voice complaints regarding prison conditions through established processes by taking adverse actions which are intended, or which have the affect, of chilling or abridging such rights. *See Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Conversely, and at the other end of the spectrum, prison officials are empowered to control the use of threatening and abusive language by inmates. *Jermosen v. Coughlin,* 878 F.Supp. 444, 450-51 (N.D.N.Y.1995) (McAvoy, C.J.). The right of officials to control inmate speech and other behavior through the imposition of measures reasonably calculated to preserve the safety and security of a prison facility, its employees and inmates, is well established, even though such measures may impinge upon an inmate's ability to speak freely or to associate with others. *See Auleta v.. LaFrance,* 233 F.Supp.2d 396, 399 (N.D.N.Y.2002) (Kahn, D.J.) (noting that restrictions on inmate communication are constitutional if reasonably related to legitimate penological interests) (citing *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261 (1987)).

**\*7** In this instance plaintiff does not allege, nor does the record disclose, that plaintiff was engaged in protected activity when disciplined for violating prison rules. Typical of plaintiff's claims, by contrast, is the contention that he was issued a misbehavior report by Corrections Officer Charland for talking loudly within the prison dormitory, despite his awareness that the officer was known to be particularly strict, and that he prohibited such potentially disruptive communications. *See* Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 10-11.

Clearly, policies of the type implicated by defendant Charland's response to plaintiff's actions are reasonably related to legitimate penological concerns, and thus do not give rise to the constitutional claims for deprivation of the First Amendment right of free speech or association. *Cf. Percy v. Jabe,* 823 F.Supp. 445, 448 (E.D.Mich.1993) (noting that prison officials should be afforded wide latitude in imposing visitation restrictions at prison in light of, *inter alia,* perceived threats to security and order at the institution). It would be novel indeed for prison inmates to assert a First Amendment right to speak freely and communicate with other inmates and prison officials, without restriction based upon legitimate penological concerns. Plaintiff has cited no case authority, nor is the court aware of any, which stands for such a broad proposition and supports an open-ended, unlimited right of prison inmates to speak freely within the prison setting, however disruptive the conduct might be.

Because plaintiff has failed to allege and prove that he was engaged in constitutionally protected activity when disciplined by prison officials, and finding that defendants' actions in disciplining him were reasonably related to legitimate penological concerns, I recommend a finding that his First Amendment claims are deficient as a matter of law.

### E. *Plaintiff's Procedural Due Process Claims*

Intertwined with his First Amendment cause of action is plaintiff's claim that during the course of issuance of misbehavior reports and the ensuing disciplinary proceedings, his procedural due process rights were abridged. To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v.. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000)

(citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996). In their motion the defendants, while not conceding any lack of sufficient due process, assert that plaintiff cannot establish the deprivation of a constitutionally cognizable liberty interest. [7]

[7]   The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U .S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* the constitutionally mandated due process requirements, include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin,* 858 F .2d 889, 897-98 (2d Cir.1988). Plaintiff's complaint does not elaborate on his claim that defendants failed to observe these guaranteed safeguards in connection with his various disciplinary proceedings.

In *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84, 115 S.Ct. at 2300; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658. Since the prevailing view is that by its regulatory scheme New York State has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor, *see, e.g., LaBounty v. Coombe,* No. 95 CIV 2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.), I must find that the conditions of plaintiff's disciplinary confinement as alleged do not rise to the level of an atypical and significant hardship under *Sandin* in order to recommend that defendants' motion be granted.

**\*8** Atypicality in a *Sandin* inquiry is normally a question of law . [8] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999). When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary. [9] *Hynes,* 143 F.3d at 658; *Arce,* 139 F.3d at 336.

[8]   In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999).

[9]   While not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin. Colon,* 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin, see id.* at 232 n. 5, the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure). In fact, in *Colon v. Howard* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See id.* at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

Most of the disciplinary charges against the plaintiff in 2004, virtually all lodged as Tier II level violations, resulted in only modest disciplinary sanctions by constitutional standards. On one occasion plaintiff was sentenced to keeplock confinement for a period of thirty days, receiving shorter keeplock confinements of ten or fifteen days or even more modest restrictions on certain other occasions. [10] Plaintiff's keeplock confinement stemming from the August 11, 2004 and September 23,

2004 misbehavior reports were served in his dormitory cubicle, and plaintiff was permitted to talk with other inmates and to maintain his prison employment during that period. Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 11-12, 18-19, 31-32. Similarly, the keeplock confinement sentences imposed as a result of the June 26, 2004 misbehavior reports were also served by the plaintiff within his dormitory cubicle, while maintaining his prison employment. *Id.* at 37, 46.

10    Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v. Greene,* No. 95-CV-1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). An inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Inmates can leave their cells for showers, visits, medical exams and counseling. *Id.* Inmates can have cell study, books and periodicals. *Id.* The main difference between keeplock and the general population is that keeplocked inmates do not leave their cell for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.*

Conspicuously absent from either plaintiff's amended complaint or the record now before the court is any evidence establishing that the defendants deprived Escalera of any constitutionally significant liberty interest by their actions. This marked deficiency warrants summary dismissal of plaintiff's due process claims, as a matter of law, without the need to examine the sufficiency of the protections afforded to him in connection with those misbehavior reports.

### F. *Equal Protection*

Plaintiff's amended complaint also asserts a claim for denial of equal protection. Though this is far from clear, plaintiff's equal protection claim appears to be limited to defendant Joswick, his former prison counselor. Defendants also seek dismissal of this claim as lacking in merit.

The Equal Protection Clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

**\*9** Nothing either contained within plaintiff's amended complaint, or otherwise disclosed in the record, reflects any disparity in treatment by defendant Joswick, a corrections counselor, of the plaintiff and other inmates based upon plaintiff's inclusion in an identifiable or suspect class, nor does the record suggest that if such disparate treatment occurred, it was motivated by some other invidious, prohibited discrimination. Under these circumstances plaintiff's equal protection claim fails, as a matter of law, and is subject to dismissal. *See, e.g., Pena v. Racore,* No. 95-CV-5307, 2001 WL 262986, at *4 (E.D.N.Y. Mar. 14, 2001) (rejecting plaintiff's equal protection claim where he alleged only a difference in treatment and failed to suggest that defendants' actions demonstrated intentional and arbitrary discrimination).

### IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's amended complaint, drafted in exceedingly conclusory terms and bereft of factual allegations, alleges deprivation of his right to free speech under the First Amendment, his right to procedural due process, and his right to equal protection of the law. Having carefully reviewed the record now before the court I am unable to discern any triable, genuinely disputed issue of material fact, and conclude that no reasonable factfinder could determine, based upon the record, that plaintiff's constitutionally rights have been abridged. Accordingly, it is hereby

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 59) be GRANTED, and that plaintiff's complaint be dismissed in all respects, without prejudice as to defendants West, C. Lambard, Baldwin, and J. Roch, but otherwise with prejudice.

NOTICE: pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Any objections shall be filed with the clerk of the court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993)*.

It is further ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 699273

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 3729362
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Marc LEWIS, Plaintiff,

v.

MURPHY, Captain, Coxsackie Correctional
Facility; J. Lewis, Corrections Counselor,
Coxsackie Correctional Facility; Matthews, Deputy
Superintendent for Administration, Coxsackie
Correctional Facility; Christopher Miller, Deputy
Superintendent for Security, Coxsackie Correctional
Facility; Eric G. Gutwein, Commissioner
Hearing Officer, N.Y.S., D.O.C.C.S., Defendants.

No. 9:12–CV–00268 (NAM/CFH).
|
Signed July 24, 2014.
|
Filed July 25, 2014.

**Attorneys and Law Firms**

Marc Lewis, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Joshua E. McMahon, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

### *ORDER*

NORMAN A. MORDUE, Senior District Judge.

 **\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Christian F.
Hummel, duly filed on the 27th day of June 2014.
Following fourteen (14) days from the service thereof, the
Clerk has sent me the file, including any and all objections
filed by the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report–Recommendation, and no
objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its
entirety.

2. The defendants' motion for summary judgment (Dkt.
No. 46) is granted and the Clerk shall enter judgment
accordingly.

3. The Clerk of the Court shall serve a copy of this Order
upon all parties and the Magistrate Judge assigned to this
case.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION AND ORDER** [1]

[1]     This matter was referred to the undersigned for report
        and recommendation pursuant to 28 U.S.C. § 636(b)
        and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate
Judge.

Plaintiff *pro se* Marc Lewis ("Lewis"), an inmate currently
in the custody of the New York State Department of
Correctional and Community Supervision ("DOCCS"),
brings this action pursuant to 42 U.S.C. § 1983 alleging
that defendants, five DOCCS employees, violated his
rights under the Fourteenth Amendment. Compl. (Dkt.
No. 1). Presently pending is defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56. Dkt.
No. 46. Lewis opposes and defendants replied. Dkt. Nos.
57, 61. For the following reasons, it is recommended that
defendants' motion be granted.

### I. Background

The specific facts of the case are set forth in the
Report–Recommendation and Order filed February
28, 2012, familiarity with which is assumed. *See*
Dkt. No. 39 (Report–Recommendation); Dkt. No. 43
(Memorandum–Decision and Order). The facts are
related herein in the light most favorable to Lewis as the
non-moving party. At all relevant times, Lewis was an
inmate at Coxsackie Correctional Facility ("Coxsackie").

### A. November 5, 2011 Letter

On November 5, 2011, Lewis was watching television when non-party Correctional Officer Whit ("Whit") changed the channel on the television that Lewis was watching. Dkt. No. 46–9 at 2. Lewis wrote a letter to non-party Superintendent Martuscello ("Martuscello") complaining about the incident and stated that Whit harassed and intimidated him. Compl. ¶ 1. Lewis indicated that he would "blow the whistle on a lot of other wrong doings in this facility if need be." Dkt. No. 46–9 at 4. Lewis further indicated that he feared correctional officers would retaliate against him because he filed this complaint. *Id.* at 3. Lewis sent a copy of this letter to non-party Commissioner Fisher. Lewis Dep. # 1 (Dkt. No. 46–6) at 43:8–14. On November 7, 2011, Lewis was taken from his cell and told by non-party Sergeant Martin that he was being placed under keeplock [2] status for threats Lewis made against someone in the administration building. *Id.* at 27:14–22. At that time, Lewis had yet to receive a copy of the misbehavior report. *Id.* at 28:11–15. Based on the content of the November 5, 2011 letter, Lewis was charged with making threats and attempting to bribe and extort personnel. Dkt. No. 46–9 at 1.

[2]    "Keeplock" is a form of disciplinary confinement where an inmate is confined in his cell for the duration of the disciplinary sanction. *Gittens v. Lefevre,* 891 F.2d 38, 39 (2d Cir.1989) (citing N.Y. COMP.CODES R. & REGS. tit. 7, § 251–1.6 (2012)).

### B. Tier III Disciplinary Hearing

**\*2** On November 10, 2011, Lewis was escorted by non-party Correctional Officer Stevenson ("Stevenson") to attend his disciplinary hearing before defendant Captain Murphy ("Murphy"). Lewis Dep. # 1 at 34:8–12, 35:12–13. Murphy started the recording, explained the hearing process, and took Lewis's plea. *Id.* at 35:17–22. Lewis advised Murphy that he had not been served with a copy of the misbehavior report and had not yet been provided inmate assistance. Compl. ¶ 4; Murphy Decl. (Dkt. No. 46–22) ¶ 8. Murphy attested that he immediately stopped the hearing and directed Stevenson to provide Lewis with a copy of the misbehavior report and to arrange for the plaintiff to receive inmate assistance. Murphy Decl. ¶¶ 8, 11. Lewis also objected to Murphy being the officer who

reviewed the misbehavior report and authorized Lewis to be placed in keeplock pending a disciplinary hearing, and the hearing officer. *Id.* ¶ 9. According to DOCCS Directive 4932, 251–2.2(f) Murphy could not serve as both the reviewing and hearing officer on the same misbehavior report. Dkt. No. 46–12 at 4. Lewis was then brought back to his cell to review the misbehavior report and receive inmate assistance. Compl. ¶ 5.

### 1. Inmate Assistance

Defendant Corrections Counselor Jackie Lewis ("Counselor Lewis") was assigned as Lewis's employee assistant. Lewis Decl. (Dkt. No. 46–14) ¶ 4. On November 10, 2011, Counselor Lewis arrived at Lewis's cell to help prepare a defense for his hearing. *Id.* ¶ 7. During the meeting, Lewis requested that Martuscello and Fischer be called as witnesses and asked for the name of the review officer who authorized his keeplock confinement. *Id.* ¶ 8; Lewis Dep. # 1 at 40:8–16. Counselor Lewis indicated that Murphy was the reviewing officer and took note of the witnesses whom Lewis wanted to question. Lewis Dep. # 1 at 40:15–17; Dkt. No. 46–15. Lewis also stated that he requested an explanation of the charges but Counselor Lewis said she was not going to do that because she was trying to go home. Compl. ¶¶ 7–8. Since Counselor Lewis did not meet Lewis's standards for assistance, Lewis did not sign the inmate assistance form and Counselor Lewis left the cell at that time. *Id.* ¶ 8. Counselor Lewis maintains that Lewis never asked her for definitions or an explanation of the charges. Lewis Decl. ¶ 9.

### 2. Hearing Extension

On November 10, 2011, a request for an extension of the Tier III disciplinary hearing was filed because Lewis was going to be in court from November 14, 2011 to November 18, 2011 and no staff was available to conduct the hearing before that time. Dkt. No. 46–17; Compl. ¶ 10. The request indicated that defendant Commissioner's Hearing Officer Gutwein ("Gutwein") was the hearing officer and that the hearing had not commenced. Dkt. No. 46–17. Lewis contends that defendant Deputy Superintendent for Administration Matthews ("Matthews") had filed the request. Compl. ¶ 10. Lewis believes that the request contained false information because Murphy began the hearing on November 10, 2011 and Lewis was only in

Case 9:17-cv-00366-DNH-TWD    Document 45    Filed 07/05/18    Page 40 of 126

court from November 14, 2011 to November 16, 2011. *Id.* Matthews attested that Lewis is mistaken about who wrote the report. Matthews Decl. (Dkt. No. 46–16) ¶¶ 8–10. Matthews explained that although the request indicates "Matthew" as the contact person, extension requests are filed by clerical staff in Coxsackie's Discipline Office; thus the reference to "Matthew" refers to someone in that office, and not Matthews. *Id.*

**\*3** Later on November 10, 2011, Lewis wrote a letter to Martuscello explaining his November 5, 2011 letter and objecting to Murphy being the hearing officer. Dkt. No. 46–19. Martuscello directed defendant Deputy Superintendent Miller ("Miller") to respond to the letter. Miller Decl. (Dkt. No. 46–18) ¶ 7. By letter dated November 15, 2011, Miller informed Lewis that Gutwein was assigned as the hearing officer. *Id.;* Dkt. No. 46–20.

### 3. Hearing on November 21, 2011

On November 17, 2011, a second request to extend the date of the disciplinary hearing to November 21, 2011 was filed because no hearing officer was available to conduct the hearing before that time. Dkt. No. 46–13. On November 21, 2011, Gutwein conducted the disciplinary hearing for Lewis. Hr'g Tr. (Dkt. No. 46–10) at 2.[3] Lewis pleaded not guilty to the charges against him. *Id.* at 3. Lewis objected to: (1) Murphy commencing a disciplinary hearing concerning the same misbehavior report on November 10, 2011; (2) Murphy being both the reviewing and hearing officer; (3) Gutwein commencing the hearing more than seven days after placement in keeplock; and (4) Counselor Lewis providing inadequate assistance because she did not fulfill his requests. *Id.* at 4.

[3]    The page numbers following "Hr'g Tr." refer to the pagination of the header numbers generated by CM/ECF, not the individual transcripts.

Lewis requested that Counselor Lewis, Murphy, Stevenson, Fischer, Martin, and Martuscello be called as witnesses. Hr'g Tr. at 8. Lewis also requested that the November 5, 2011 letter be produced as evidence. *Id.* Gutwein noted for the record that the November 5, 2011, letter was placed in the hearing packet and denied Lewis's request to have the log books produced as evidence. *Id.* at 8, 19. Gutwein denied Lewis's request to call Murphy, Stevenson, and Counselor Lewis as witnesses on relevance

grounds as Lewis wanted them to testify to the defects of the disciplinary hearing. Gutwein Decl. (Dkt. No. 46–8) ¶ 28; Hr'g Tr. at 19, 20. Since Gutwein called Martin to testify to the misbehavior report, Gutwein declined to call Martuscello and Fischer as witnesses for their testimonies would have been duplicative. Hr'g Tr. at 8, 19, 20.

Gutwein produced Martin and asked him questions concerning the grounds for authoring the misbehavior report. Hr'g Tr. at 9. Martin explained that Lewis's November 5, 2011 letter contained statements threatening actions if certain demands were not met and Lewis would "blow the whistle if need be." *Id.* Lewis was afforded an opportunity to direct questions at Martin through Gutwein. *Id.* Gutwein denied Lewis's request to have the definitions of bribery, extortion, and threats because the definitions would be irrelevant to the incident in the report. *Id* . at 19.

Gutwein then made a written disposition and found Lewis guilty of the charges based on: (1) the misbehavior report, which stated that Lewis would retaliate if his demands were not met; (2) review of the November 5, 2011 letter stating that Lewis will retaliate by "blowing the whistle on the wrong doings by staff"; (3) Martin's testimony stating that the letters contained an ultimatum; (4) Lewis's Testimony stating that the hearing was commenced previously in an improper and untimely manner; and (5) Lewis's disciplinary history. Hr'g Tr. at 20. Gutwein sentenced Lewis to seven months in the Special Housing Unit ("SHU"),[4] along with seven months without packages, commissary privileges, phone privileges, and loss of good time credits. *Id.* Gutwein's determination and sentence was made to impress upon Lewis that it is a serious violation to threaten employees, which would not be tolerated at the correctional facility and that Lewis should modify his behavior in the future. Gutwein Decl. ¶ 12.

[4]    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ....″ N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

### C. SHU conditions

**\*4** On November 30, 2011, Lewis received a letter indicating that he had been unsatisfactorily discharged from the Aggression Replacement Training ("ART") Program because he was going to be in SHU for seven months. Compl. ¶ 39. Nevertheless, Lewis was able to complete this program after his release from SHU. Lewis Dep. # 1 (Dkt. No. 46–6) at 69:7–14.

Since Lewis had his telephone privileges taken away, he was unable to call his sister who was in need of a kidney transplant. Lewis Dep. # 2 (Dkt. No. 46–7) at 12:6–11. Lewis also stated he was in the process of filing paperwork to donate a kidney to his sister but being in SHU prevented him from finishing it. *Id.* at 12:3–5, 13:2–3. By the time Lewis was released from SHU, his sister had received a transplant. *Id.* at 13:4–7.

Lewis was also unable to interact with other inmates by attending group activities such as congregational prayer or group chow during his time in SHU. Compl. ¶ 46. Lewis contends that he was "restrained from practicing the prerequisite [rituals] associated with performing his [religious] prayers" while in SHU because the cells were unsanitary, he had to share a cell, the correctional officers gave him showers whenever they wanted, and he was not given a shower three times a week. Dkt. No. 57 at 15–16. Lewis claims he was prevented from practicing Islam because Muslims must be "in a state of purification in order to pray" and Islamic law states that men must not expose their body from the navel to the knee. Therefore he was restrained from doing "wudu," a ritual where one must wash their whole body in preparation for prayer. *Id.* at 16.

### D. Appeal of the Hearing Disposition

Lewis filed an appeal of the hearing disposition. Compl. ¶ 34. Miller reviewed the appeal and found "the hearing to be without procedural error and the resulting sanctions appropriate." Dkt. No. 46–21. Lewis appealed to non-party Albert Prack, the director of the Special Housing/ Inmate disciplinary program, who reversed the guilty determination on the ground that "the evidence used fails to provide enough information to support the charges."

Dkt. No. 57 at 49. Therefore, after sixty-nine days, Lewis was released from the SHU. Compl. ¶ 45.

## II. Discussion

Lewis contends that (1) all defendants deprived him of his Fourteenth Amendment rights by denying him procedural due process in connection with the disciplinary hearings at issue and (2) defendants Miller, Matthews, Murphy, and Gutwein conspired against him to cover up Murphy's improper commencement of the hearing.

Defendants seek summary judgment dismissing the complaint in its entirety. Defs.' Mem. of Law (Dkt. No. 46–2) at 3. Defendants specifically move for summary judgment on the grounds that: (1) Lewis failed to establish a due process claim; (2) Lewis failed to establish an actionable conspiracy claim; and (3) defendants are entitled to qualified immunity. *Id.* Additionally, Matthews moves for summary judgment for lack of personal involvement. *Id.*

### A. Legal Standard

**\*5** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary

Case 9:17-cv-00366-DNH-TWD   Document 45   Filed 07/05/18   Page 42 of 126
Lewis v. Murphy, Not Reported in F.Supp.3d (2014)
2014 WL 3729362

judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by *pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### B. Personal Involvement

**\*6** "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [5] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

[5]     Various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated *Iqbal's* impact on the five *Colon* factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon* 's personal involvement standard).

Lewis has failed to establish the personal involvement of defendant Matthews in allegedly depriving him of his Fourteenth Amendment due process rights by filing a Tier III hearing extension request. Lewis contends that Matthews filed a Tier III hearing extension form that falsely indicated Gutwein as the hearing officer, the hearing had not yet commenced, and the dates for which Lewis would be out of the facility for an unrelated trial. Compl. ¶ 10. Matthews attested that the notation "Contact: Matthew" on the extension request did not refer to him. Rather, the extension requests are submitted by members of Coxsackie's Discipline Office; hence, it can be inferred that the notation refers to a clerical staff member in the Discipline Office. Therefore, Matthews

did not participate directly in the alleged constitutional violation. Matthews Decl. (Dkt. No. 46–16) ¶ 10; Dkt. No. 46–17. Furthermore, Matthews attested that he was not even aware of Lewis's disciplinary hearing or the extension request until after the lawsuit was filed. Matthews Decl. (Dkt. No. 46–16) ¶ 11. Accordingly, Matthews could not have failed to remedy any wrong after he was informed of the violation through a report or appeal, since he was never informed of any violation.

In addition, Matthews did not exhibit deliberate indifference to Lewis's rights by failing to act on information indicating that unconstitutional acts were occurring because Matthews had no information indicating that any wrong was occurring. Matthews also attested that he had no supervisory role over Coxsackie's inmate disciplinary program; consequently, Matthews could not have created or allowed the continuation of a policy or custom under which unconstitutional practices occurred. Matthews Decl. ¶ 2. Lastly, since Matthews held no supervisory authority over the inmate disciplinary program, he could not have been grossly negligent in supervising subordinates who committed the allegedly wrongful acts. *Id.* Lewis points to no evidence in the record to substantiate his assertions that Matthews created the extension request. Moreover, Lewis testified in his deposition and indicated in his response papers that he voluntarily withdraws his claims against Matthews. Lewis Dep. # 2 (Dkt. No. 46–7) at 28; Resp. (Dkt. No. 57) at 9. It is fair to conclude that a rational finder of fact would determine that these assertions are merely speculative and therefore, Lewis cannot establish the personal involvement of Matthews in the alleged unconstitutional actions.

**\*7** Accordingly, defendants' motion on this ground should be granted.

### C. Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. It is important to emphasize that due process "does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished without due process of the law." *Baker v. McCollan,* 443 U.S. 137, 145 (1979) (internal quotation

and citations omitted). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted). An inmate retains a protected liberty interest in remaining free from segregated confinement if the prisoner can satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995).

### 1. Liberty Interest

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *See generally Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) ("[Procedural] due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). This standard requires a prisoner to establish that the confinement or condition was atypical and significant in relation to ordinary prison life. *See Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (citations omitted). The Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citations omitted). Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required." *Id.* at 64–65 (citing *Colon,* 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may

Case 9:17-cv-00366-DNH-TWD Document 45 Filed 07/05/18 Page 44 of 126
Lewis v. Murphy, Not Reported in F.Supp.3d (2014)
2014 WL 3729362

be issued "as a matter of law." *Id.* at 65 (citations omitted). Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality. *Id.* (citing *Colon,* 215 F.3d at 231–32). Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short—e.g. 30 days—and there was no indication [of] ... unusual conditions." *Harvey v. Harder,* No. 09–CV–154 (TJM/ATB), 2012 WL 4093792, at *6 (N.D.N.Y. July 31, 2012) (citing *inter alia Palmer,* 364 F.3d at 65–66). [6]

[6] All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

**\*8** Defendants contend that Lewis has failed to demonstrate that he suffered from atypical and significant confinement and therefore cannot establish a protected liberty interest. The Court considers factors such as the length of time the prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" to determine whether the prisoner can establish a liberty interest in remaining free from segregated confinement. *Palmer,* 364 F.3d at 64–65. The length of time in which Lewis spent in confinement was sixty-nine days, which is less than an intermediate amount of time. As such, the length of time itself cannot determine that the confinement was atypical and significant. Therefore, the Court determines if the confinement is atypical and significant by looking at the conditions of the segregated confinement compared to ordinary prison conditions.

Lewis contends that his confinement was atypical and significant because he was deprived of: (1) communications with the outside world; (2) an opportunity to possibly donate a kidney to his sister; (3) religious practices due to the unsanitary conditions of his confinement; (4) participation in the ART program; and (5) interaction with other inmates during activities like group chow and congressional prayer. [7] Dkt. No. 57 at 12–14. In New York, under "normal SHU conditions" an inmate is:

[7] Lewis may be attempting to raise First Amendment claims based on the denial of attendance to congregated services and sanitary conditions of his SHU cell. However, these claims were not specifically pled in the original complaint. Moreover, Lewis made no attempt to amend his complaint to include these claims. Therefore, the Court addresses these issues as arguments for establishing a liberty interest for purposes of a Fourteenth Amendment claim.

placed in a solitary confinement cell, kept in his cell for twenty-three hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited.

*Colon,* 215 F.3d at 230; *see also* N.Y. COMP.CODES R. & REGS. tit. 7, §§ 304.1–.14, 305.1–.6 (setting forth minimum conditions of SHU confinement). Lewis's confinement was of a similar kind, with twenty-three hours a day of isolation, an hour of recreation, and denial of telephone and commissary privileges. Such a claim falls short of establishing a liberty interest as Lewis fails to allege any particular condition or further deprivation outside of those generally applicable to the incidents of prison life in SHU confinement. *Vasquez,* 2 F.Supp.2d at 259; *Frazier,* 81 F.3d at 317 (explaining that while prisoners in SHU may be deprived of "certain privileges that prisoners in the general population enjoy," there exists no liberty interest in remaining a part of the general prison population); *see also Alvarado v. Halle Hous. Assoc.,* 152 F.Supp.2d 355, 355 (S.D.N.Y.2001) (finding restrictions such as loss of phone privileges, one hour of exercise a day, and three showers per week, fail to meet *Sandin* requirements).

**\*9** Lewis's inability to communicate with the outside world through phone or post for the purpose of transplanting his kidney to his sister or otherwise is not considered atypical because loss of telephone privileges is an aspect of SHU confinement in New York and courts have held that this would not violate an inmate's constitutional rights. *See Long v. Crowley,* No. 09–CV–456(F), 2012 WL 1202181, at *11 (W.D.N.Y. March 22, 2012) (sixty days in keeplock with loss of telephone and commissary privileges is not a protected liberty interest); *Borsock v. Early,* No. 03–CV–395 (GLS/RFT), 2007 WL 2454196, at *9 (N.D.N.Y. Aug. 22, 2007) (GLS/RFT)

(finding that a ninety-day confinement in SHU with a ninety-day loss of packages, commissary and telephone privileges is insufficient to raise a liberty interest).

Lewis has failed to show that his unsatisfactory discharge from his ART programming due to his placement in SHU posed an atypical and significant hardship. Compl. ¶ 46; *Thompson v. LaClair,* No. 08–CV–37 (FJS/DEP), 2009 WL 2762164, at *8 (N.D.N.Y. Jan. 30, 2009) (plaintiff's inability to participate in ASAT, ART, and MAWP programs not atypical and significant hardship; *Deutsch v. U.S.,* 943 F.Supp. 276, 280 (W.D.N.Y.1996) (holding that prisoners do not have a protected liberty interest in rehabilitative programs). Moreover, Lewis was able to complete this program after his release from SHU. Lewis Dep. # 1 at 69:7–14.

Lewis's claim that his exclusion from group activities posed an atypical and significant hardship is also unfounded because SHU confinement usually segregates the inmate from the rest of the prison and therefore, the inmate would be unable to participate in group activities. *Sealey v. Coughlin,* 997 F.Supp. 316, 321 (N.D.N.Y.1998) ("plaintiff's administrative segregation in SHU was not an atypical and significant hardship"); *Edmonson v. Coughlin,* 21 F.Supp.2d 242, 249, 250 (W.D.N.Y.1998) (plaintiff's inability to participate in congregate activities such as group counseling, and religious services during his eight months of administrative segregation is not a protected liberty interest).

Lastly, in his opposition papers to the instant motion, Lewis claims that the unsanitary conditions of his cell posed an atypical and significant hardship. Lewis contends that he was "restrained from practicing the prerequisite [rituals] associated with performing his prayers" while in SHU because the cells were unsanitary, he had to share a cell, the correctional officers gave him showers at their choosing, and he was not given a shower three times a week. Dkt. No. 57 at 15–16. Lewis contends that his cell always accumulated dirt and dust, was cleaned once a week with a dirty sponge without any germicidal cleaning agents, and the water used was "black from prior use of 20 or more cells." *Id.*

Courts have found that the denial of a clean cell and personal hygiene items, as well as double-celling in SHU, do not constitute an atypical and significant hardship. *See Davidson v. Murray,* 371 F.Supp.2d 361,

364, 369 (W.D.N.Y.2005) (concluding that the denial of hygiene items and cleaning materials is not an atypical and significant hardship); *McNatt v. Unit Manager Parker,* No. 99–CV–1397 (AHN), 2000 WL 307000, at *4, *8 (D.Conn. Jan. 18, 2000) (finding stained, smelly mattresses, unclean cell, no cleaning supplies for toiletries for six days, no shower shoes, and dirty showers during SHU confinement do not constitute a constitutional violation of due process); *Bolton v. Goord,* 922 F.Supp. 604, 630 (S.D.N.Y.1998) (finding double-celling of inmates is not considered an atypical and substantial hardship). Nevertheless, a finder of fact may conclude that Lewis's cell conditions in conjunction with the denial of three showers a week to constitute an atypical and significant hardship that amount to a protected liberty interest. *See, e.g., Welch v. Bartlett,* 196 F.3d 389, 393 (2d Cir.1999) (stating that allegations of "inadequate amounts of toilet paper, soap and cleaning materials, a filthy mattress, and infrequent changes of clothes" may be a constitutional violation). Drawing every inference in Lewis's favor, these conditions were present during the entirety of Lewis's SHU confinement. Moreover, defendants do not specifically address these allegations with argument or evidence. Therefore the Court will proceed as though Lewis has established a protected liberty interest.

### 2. Procedural Due Process

**\*10** Defendants argue that Lewis was afforded ample due process. While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural due process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner is "entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted).

### a. Written Notice

In this case, Lewis received proper written notice. An inmate must be provided advance written notice of the charges against him at least twenty-four hours before the

disciplinary hearing commences. *Wolff,* 418 U.S. at 563–64. Notice must be written "in order to inform [the inmate] of the charges and to enable him to marshal the facts and prepare a defense." *Id.* at 564. When Lewis was brought to the hearing before Murphy on November 10, 2011, Lewis had not yet received written notice of the charges. Murphy attested that once Lewis stated he did not receive a copy of the misbehavior report or inmate assistance, Murphy stopped the hearing immediately. Murphy attested that no testimony was taken, he did not review any documentary evidence other than the misbehavior report, and did not discuss the statements in the misbehavior report with Lewis. Murphy Decl. ¶ 16. Lewis was then provided a copy of the misbehavior report and inmate assistance on the same day. On November 21, 2011, Gutwein took over Lewis's Tier III disciplinary hearing. Even assuming Murphy had commenced the hearing, the ultimate penalty imposed on Lewis was by Gutwein based on the evidence presented on November 21, 2011. Lewis received a copy of the misbehavior report on November 10, 2011, well in advance of the November 21, 2011 hearing date. As such, Lewis received advanced written notice of the charges against him.

Accordingly, defendants' motion on this ground should be granted.

### b. Opportunity to Call Witnesses and Present Documentary Evidence

Lewis contends that he was deprived of an opportunity to call all his requested witnesses and present some documentary evidence. However, "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992). With respect to documentary evidence, Lewis requested the admission of the logbooks as evidence to show that he had already been taken for a disciplinary hearing regarding the same misbehavior report. Hr'g Tr. at 19. Gutwein correctly denied this request because they were irrelevant to the charges in the misbehavior report and would not have aided in Lewis's defense to such charges. Gutwein Decl. ¶¶ 33–34. As for the November 5, 2011 letter, Gutwein allowed for a copy of it to be placed in the hearing packet as evidence. Hr'g Tr. at 8.

**\*11** As for witnesses, Gutwein permitted Martin to testify at Lewis's disciplinary hearing but denied the request for Murphy, Stevenson, and J. Lewis on relevance grounds because their testimonies would have concerned the alleged defects in the disciplinary hearing rather than the charges giving rise to the hearing. Gutwein Decl. ¶ 28. Furthermore, since Martin was to testify to the content of the November 5, 2011 letter, Gutwein denied testimonies from Martuscello and Fischer on the grounds that they would be unnecessary and duplicative. *Id.* ¶ 32.

Lewis was provided with an opportunity to question Martin through Gutwein. "While inmates do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials." *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 125 (S.D.N.Y.2002). Thus, Gutwein retained the authority to administer the questioning in a manner he saw fit. Gutwein did not permit Lewis to ask every question, but Gutwein offered reasoning for the denial of certain questions that Lewis wanted to ask. Hr'g Tr. at 9–18. A review of the hearing transcript shows that Lewis was permitted to question Martin rather extensively until Lewis was finished. *Id.* As such, Lewis was provided an opportunity to call witnesses and present documentary evidence. *Sira,* 380 F.3d at 69.

Accordingly, defendants' motion on this ground should be granted.

### c. Fair and Impartial Hearing Officer

Lewis contends that Gutwein was not an impartial hearing officer because Gutwein had not allowed Lewis to call his requested witnesses and denied him the standard and legal definitions of bribery, extortion, and threats. Prisoners have a constitutional right to a fair and impartial hearing officer. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges ... [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] .." and the Second Circuit has held that the test is whether there was " 'reliable

evidence' of the inmate's guilt." *Luna v. Pico,* 356 F.3d 481, 487–88 (2d Cir.2004); *see also Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985).

As discussed *supra,* "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992). Therefore, Gutwein was within his discretion to deny the calling of certain witnesses and the admission of certain evidence.

**\*12** Even though Lewis's guilty determination was reversed, it is not clear evidence that Gutwein was not a fair and impartial hearing officer. The determination was reversed on the grounds that there was insufficient evidence to support the charges, not on any procedural defects. Dkt. No. 57 at 49. The record shows no indication that Gutwein was biased and failed to serve a fair and impartial hearing officer. It is unclear to the Court how the denial of the requested definitions served as evidence of bias on Gutwein's part. Rather, it is clear from the hearing transcript that Gutwein allowed Lewis to state all of his objections for the record and question Martin as much as he needed to. *See generally* Hr'g Tr.

Gutwein had reliable evidence of Lewis's guilt, which is presented in his statement of the evidence relied upon. Gutwein relied on the statements in the November 5, 2011 letter that stated Lewis would 'blow the whistle' on wrongdoings in the facility and Martin's testimony regarding the ultimatums made by Lewis. Hr'g Tr. at 20–21. Lewis had admitted to writing the November 5, 2011 letter. *Id.* at 6. Gutwein's determination was made to impress upon Lewis that it is a serious violation to threaten employees, which would not be tolerated at the correctional facility and that he should modify his behavior in the future. Lewis points to no evidence in the record to show that Gutwein came to his determination improperly. As such, despite Lewis's contentions of bias, the record is clear that there is no question of material fact regarding the process that Lewis was provided.

Accordingly, defendants' motion on this ground should be granted.

### d. Written Statement of Disposition

It is undisputed that Lewis received a written statement of the hearing disposition. On November 21, 2011, Lewis was present when Gutwein rendered his decision on the misbehavior report. Hr'g Tr. at 20–21. The record indicates that Lewis received a written statement of the evidence relied upon and the reasons for the disciplinary action. *Id.;* Dkt. No. 46–11 at 9. Thus, Lewis was provided with a written statement of the Tier III disciplinary hearing disposition. *Sira,* 380 F.3d at 69.

Accordingly, defendants' motion on this ground should be granted.

### e. Inmate Assistance

"An inmate's right to assistance with his disciplinary hearing is limited." *Neree v. O'Hara,* No. 09–CV–802 (MAD/ATB), 2011 WL 3841551, at \*13 (N.D.N.Y. July 20, 2011) (*Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993)). This Circuit has held that an assistant is constitutionally necessary when the plaintiff is confined in SHU and unable to marshal evidence and present a defense. *Id.* (citation omitted). In such a case, the assistant need only perform what the plaintiff would have done but need not go beyond the inmate's instructions. *Lewis v. Johnson,* No. 08–CV–482 (TJM/ATB), 2010 WL 3785771, at \*10 (N.D.N.Y. Aug. 5.2010) (citing *Silva,* 992 F.2d at 22). Furthermore, "any violations of this qualified right are reviewed for 'harmless error.' " *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437 (W.D.N.Y.2010) (citing *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir.2009)). Lewis was confined in SHU from November 7, 2011, onward and thus was entitled to an inmate assistant. Dkt. No. 46–12 at 5; N.Y. COMP.CODES R. & REGS. tit. 7 § 251–4.1(a)(4).

**\*13** Lewis alleges that he was deprived of adequate inmate assistance. Lewis first met with his inmate assistant, Counselor Lewis, on November 10, 2011. According to Lewis, Counselor Lewis refused to give him definitions of the charges against him and interview potential witnesses. Counselor Lewis denies that she was asked to give explanations of the charges and notes that the alleged request is not indicated on the assistant form. Lewis Decl. ¶ 9; Dkt. No. 46–17. Gutwein had also denied Lewis's request for the definitions of threats, bribery, and extortion during the hearing on relevance grounds.

Taking Lewis's version of events as true, even if Counselor Lewis failed to provide such definitions of the charges, Lewis does not demonstrate that he was somehow prejudiced as a result of this error, and does not show that he was unable to present a defense or that the outcome of the hearing would have been different had Counselor Lewis provided such definitions. *Clark v. Dannheim, 590 F.Supp.2d 426, 429–31 (W.D.N.Y.2008)* ("To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing." (citation omitted)).

Furthermore, Lewis was able to present a defense and pose questions to Martin that evinced an understanding of the charges. *See generally* Hr'g Tr. at 5–18. For example, Lewis asked Martin whether the November 5, 2011 letter contained any threats of harm, which suggests that Lewis had some understanding of what constitutes "threat." *Id.* at 9. Lewis then asked "did I—anything of value to or from—Martuscello, yourself or anyone," which shows that Lewis understood the nature of the extortion charge. *Id.* at 10. Lastly, Lewis asked "did I give or attempt to give—money, gifts,—or anything worth—value ... to ... Superintendent Martuscello and—or—administrator ...." This demonstrates that Lewis had an understanding of what bribery meant. *Id.* at 11.

Lewis also alleged that Counselor Lewis failed to interview Martuscello or Fischer but does not show how this would have changed the outcome of the hearing or how this failure prejudiced him as a result. Therefore, any shortcomings in the assistance rendered by Counselor Lewis was harmless error and does not rise to the level of a due process violation. *Hernandez v. Selsky, 572 F.Supp.2d 446, 455 (S.D.N.Y.2008)* (plaintiff failed to show how outcome of hearing would have been different had employee assistant interviewed witnesses, and thus any alleged inadequate assistance was harmless error not warranting denial of summary judgment). Additionally, even though Gutwein failed to provide an explanation of the charges, Lewis was not prejudiced as a result because Gutwein described in his hearing disposition the evidence he relied upon to determine that Lewis was guilty. An explanation of these charges to Lewis would not have changed the evidence which Gutwein had relied upon. As such, Lewis's due process claim based on inadequate inmate assistance must fail.

**\*14** Accordingly, defendants' motion for on this ground should be granted.

### f. Timeliness

Lewis contends that the Tier III disciplinary hearing concerning the November 7, 2011 misbehavior report was not commenced in a timely manner because his hearing did not begin until November 21, 2011. Where an inmate is confined pending a disciplinary hearing, the hearing must commence within seven days of his initial confinement and conclude within fourteen days of the writing of the misbehavior report. N.Y. COMP.CODES R. & REGS. tit. 7 § 251–5.1(a)(b);[8] Dkt. No. 46–12 at 5–6. The Commissioner of Correctional Services or his designee must authorize any delay beyond those time limits. N.Y. COMP.CODES R. & REGS. tit. 7 § 251–5.1(a)(b); Dkt. No. 46–12 at 5–6.

[8]    Section 251–5.1, states that

(a) Where an inmate is confined pending a disciplinary hearing or superintendent's hearing, the hearing must be commenced as soon as is reasonably practicable following the inmate's initial confinement pending said disciplinary hearing or superintendent's hearing, but, in no event may it be commenced beyond seven days of said confinement without authorization of the commissioner or his designee.

(b) The disciplinary hearing or superintendent's hearing must be completed within 14 days following the writing of the misbehavior report unless otherwise authorized by the commissioner or his designee. Where a delay is authorized, the record of the hearing should reflect the reasons for any delay or adjournment, and an inmate should ordinarily be made aware of these reasons unless to do so would jeopardize institutional safety or correctional goals.

(c) Violation hearings must be completed within seven days of the writing of the misbehavior report.

N.Y. COMP.CODES R. & REGS. tit. 7 § 251–5.1.

Lewis's Tier III hearing was timely commenced. Although Lewis's hearing was initially required to commence by November 14, 2011, an extension was granted until November 18, 2011 because Lewis was scheduled to be out of the facility from November 14, 2011 through November

18, 2011, and no staff was available to conduct the hearing before that time period. Gutwein Decl. ¶ 21; Dkt. No. 46–13. A second request was made on November 17, 2011 because no hearing officer was available to conduct plaintiff's hearing until November 21, 2011. Gutwein Decl. ¶ 22; Dkt. No. 46–13. DOCCS Central Office Special Housing Unit granted the facility permission to commence Lewis's hearing by November 21, 2011 and the hearing commenced on that date. Dkt. No. 46–13. Therefore, the hearing was commenced in a timely manner in accordance with the pertinent New York regulations.

Accordingly, defendants' motion on this ground should be granted.

### D. Conspiracy

Lewis claims that defendants Murphy, Miller, and Gutwein conspired to deny him procedural due process. To establish a claim under Section 1985(3), a plaintiff must allege that (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff, and (2) an overt act was committed in furtherance of that goal. *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. *Ciambriello,* 292 F.3d at 325. Therefore, the plaintiff must provide some details of the time, place, and the alleged affects of the conspiracy, which would include facts to demonstrate that there was an agreement between the defendants to achieve some unlawful goal. *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted).

In this case, defendants all deny conspiring to cover up the hearing that was allegedly commenced by Murphy. Lewis Dep. # 2 at 1–8; Gutwein Decl. ¶ 39; Miller Decl. ¶ 17; Matthews Decl. ¶ 12; Murphy Decl. ¶ 11. Lewis points to no evidence in the record to show that there was an agreement between the defendants to deprive him of his constitutional rights. Lewis alleges that the defendants conspired to cover up Murphy's attempt to start the Tier III disciplinary hearing because Murphy could not have served as the hearing officer. Murphy stated that he stopped the hearing once he realized that Lewis had not received a copy of the misbehavior report. Lewis was provided a copy and the hearing commenced on November 21, 2011 with Gutwein as the hearing officer.

Therefore, there was no wrongdoing on Murphy's part for the defendants to cover up.

**\*15** Lewis alleges that there must have been an agreement to conspire against him because of the alleged discrepancies and false statements in the extension requests, Miller's letter ruling on the appeal, and other prison forms. These allegations are conclusory and do not provide any evidence that the defendants made an actual agreement to deprive Lewis of his constitutional rights. Furthermore, as discussed *supra,* there was no deprivation of Lewis's constitutional rights and therefore there can be no valid conspiracy claim.

Moreover, Lewis's conspiracy claim fails on the grounds that it is barred by the intra-corporate conspiracy doctrine. The doctrine states that "officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Nassau Cnty. Employee "L" v. Cnty. of Nassau,* 345 F.Supp.2d 293, 304 (E.D.N.Y.2004) (internal citations and quotation marks omitted). The doctrine applies when officers and officials are working in the scope of their official duties. *Id.* Although the doctrine began in cases involving corporations, the doctrine has been extended where there are allegations of conspiracy between a public entity and its employees. *Id.; see also Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 76 (E.D.N.Y.2002) (collecting cases). This doctrine would therefore exclude conspiracy claims against employees of DOCCS working within the scope of their employment. *Hartline v. Gallo,* 546 F.3d 95, 99, n. 3 (2d Cir.2008) (citations omitted); *Little v. City of New York,* 487 F.Supp. 426, 441–42 (S.D.N.Y.2007) (citations omitted). There is an exception to the doctrine when the individuals of the conspiracy are "pursuing personal interests that are separate and apart from the entity." *Nassau Cnty. Employee "L",* 345 F.Supp.2d at 304. Furthermore, personal bias is not considered a personal interest and is not within the exception to the intra-corporate conspiracy doctrine. *Everson,* 216 F.Supp.2d at 76 (citations omitted).

In this case, Lewis's allegations of conspiracy are against defendants who were all employees of DOCCS, which is one public entity, who were acting within the scope of their employment when they filed extension requests and other prison forms. Therefore, they are legally incapable of conspiring against each other. Lewis makes no allegation that the defendants were pursuing personal interest apart

from their official duties. As such, Lewis's conspiracy claim fails as a matter of law.

Accordingly, defendants' motion on this ground should be granted.

### E. Qualified Immunity

Defendants contend that even if Lewis's § 1983 Fourteenth Amendment and conspiracy claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 F. App'x 146 (2d Cir.2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230.

**\*16** Here, the second prong of the inquiry need not be addressed with respect to Lewis's Fourteenth Amendment and conspiracy claims against the defendants because, as discussed *supra,* it has not been shown that defendants violated Lewis's Fourteenth Amendment rights or conspired against Lewis to violate his Fourteenth Amendment rights.

Accordingly, defendants' motion on this ground should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 46) is **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Dated: June 27, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 3729362

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 4555932
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Bashan TAYLOR, Plaintiff,

v.

Dale ARTUS, Superintendent, Clinton Correctional
Facility; Lieutenant Armsteal, Tier Two Hearing
officer; Renown, Correctional Sergeant; Castiron,
Correctional Officer; Christian, Correctional Officer;
and Mahuta, Correctional Officer., Defendants.

No. 9:05-CV-0271 (LEK/GHL).
|
Dec. 19, 2007.

**Attorneys and Law Firms**

Bashan Taylor, Ray Brook, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State
of New York, Jeffrey P. Mans, Esq., Assistant Attorney
General, of Counsel, Albany, NY.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

 *1 This matter comes before the Court following a
Report-Recommendation filed on November 5, 2007, by
the Honorable George H. Lowe, United States Magistrate
Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c)
of the Northern District of New York. Report-Rec. (Dkt.
No. 34).

Within ten days, excluding weekends and holidays, after
a party has been served with a copy of a Magistrate
Judge's Report-Recommendation, the party "may serve
and file specific, written objections to the proposed
findings and recommendations," FED. R. CIV. P. 72(b),
in compliance with L.R. 72.1. No objections have
been raised in the allotted time with respect to Judge
Lowe's Report-Recommendation. Furthermore, after examining
the record, the Court has determined that the Report-
Recommendation is not subject to attack for plain error
or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No.
34) is **APPROVED** and **ADOPTED** in its **ENTIRETY;**
and it is further

**ORDERED,** that Defendants' Motion for summary
judgment (Dkt. No. 32) is **GRANTED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on
all parties.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This action has been referred to me for Report and
Recommendation by the Honorable Lawrence E. Kahn,
Senior United States District Judge, pursuant to 28
U.S.C. § 636(b) and Local Rule 72.3(c) of the Local
Rules of Practice for this Court. Plaintiff Bashan
Taylor ("Plaintiff"), currently an inmate at Adirondack
Correctional Facility, commenced this *pro se* civil rights
action pursuant to 42 U.S.C. § 1983.

Liberally construed, Plaintiff's Amended Complaint
alleges that seven employees of Clinton Correctional
Facility ("Clinton C.F.")-Superintendent Dale Artus,
Correctional Lieutenant Armsteal, Correction Sergeant
Renown, and Correctional Officers Castiron, Chapman,
Christian, and Mahuta ("Defendants")-violated his rights
under the First, Eighth and Fourteenth Amendments
when, between approximately August 13, 2004, and June
2, 2005, they committed various acts of misconduct,
including (1) issuing unjustified misbehavior reports
charging him with variety of infractions (e.g., burning
incense in his cell, not attending a mandatory meal, not
responding to "call out[s]" to "attend [ ] law library"), (2)
not following the proper procedures at prison disciplinary
hearings, resulting in his disciplinary convictions, (3)
refusing to help him when he complained about the
aforementioned misbehavior reports and disciplinary
convictions, (4) threatening to beat him, (5) denying him
access to the facility's law library, and (6) depriving him of
various pieces of his personal property (e.g., taking money
out of his facility bank account due to his "[disciplinary]
tickets," and taking various legal papers that he had been

instructed to leave outside a mess hall). (*See generally* Dkt. No. 9 [Plf.'s Am. Compl.].)

**\*2** Currently pending before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 32.) Despite having been twice advised of the potential consequences of failing to respond to Defendants' motion (Dkt. No. 32, Part 1; Dkt. No. 33), Plaintiff has not responded. For the reasons that follow, I recommend that Defendants' motion be granted. In the alternative, I recommend that the Court revoke Plaintiff's *in forma pauperis* status as having been improvidently granted, and dismiss his Amended Complaint without prejudice to refiling upon payment of the filing fee.

## I. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Unopposed Motion for Summary Judgment Under Rule 56 of the Federal Rules of Civil Procedure

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [1] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [2]

[1]  A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[2]  *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [3] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [4] Rather, "[a] dispute regarding

a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [5]

[3]  Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

[4]  Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[5]  *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

What this somewhat complex burden-shifting standard means is that, where a plaintiff has failed to respond to a defendant's motion for summary judgment, "[t]he fact that there has been no response to a summary judgment motion does not ... [by itself] mean that the motion is to be granted automatically." [6] Rather, practically speaking, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the defendants' motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the defendants. [7] However, where a plaintiff has failed to respond to a defendant's statements of material fact contained in its Statement of Material Facts (a/k/a its "Rule 7.1 Statement"), the facts as set forth in that Statement will be accepted as true [8] to the extent that (1) those facts are supported by the evidence in the record, [9] and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. [10] Here, I note that Plaintiff has been *twice* so advised-first by Defendants on or about

December 29, 2006, and then by the Court on or about July 3, 2007. [11]

6    *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996).

7    *See Champion,* 76 F.3d at 486 ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]; *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001) (Scullin, C.J.) (stating that, where a plaintiff has failed to respond to a defendant's motion for summary judgment, "[t]he Court must review the merits of Plaintiff's claims"). This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the nonmoving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

8    *See* N.D.N.Y. L.R. 7.1(a)(3) ("*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*").

9    *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[W]here the non-movant party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Govan v. Campbell,* 289

F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added]; *Adirondack Cycle & Marine, Inc. v. Am. Honda Motor Co., Inc.,* 00-CV-1619, 2002 U.S. Dist. LEXIS 4386, at *2-3, 2002 WL 449757 (N.D.N.Y. Mar. 18, 2002) (McAvoy, J.) ("Local Rule 7.1 requires a party opposing summary judgment to respond to the statement of undisputed material facts submitted by the movant. To the extent such facts are not controverted, *the properly supported facts* will be taken as true.") [emphasis added; citation omitted]; *cf.* Fed.R.Civ.P. 83(a)(1) ("A local rule shall be consistent with ... Acts of Congress and rules adopted under 28 U.S.C. §§ 2072 and 2075 [which include the Federal Rules of Civil Procedure] ...."); Fed.R.Civ.P. 56(e) (requiring that, "if the non-movant does not ... respond [to a summary judgment motion], summary judgment, *if appropriate,* shall be entered against the non-movant," and requiring that, as a threshold matter, the motion for summary judgment must be "made *and supported* as provided in this rule") [emphasis added].

10   *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

11   (Dkt. No. 32, Part 1, at 1-2 [Defendants' Notice of Motion, filed 12/29/06, specifically advising Plaintiff of consequences of failing to respond to their motion, including the consequences of failing to respond to their Rule 7.1 Statement of Material Facts], *accord,* Dkt. No. 33, at 2-3 [Order of Court, filed 7/3/07, sua sponte giving Plaintiff an additional 30 days in which to respond to Defendants' motion, and advising him of the consequences of failing to oppose their motion, including the consequences of failing to respond to their Rule 7.1 Statement of Material Facts].)

**\*3** Implied in the above-stated standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.* [12] However, in the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit. [13] Here, I note that Plaintiffs' Amended

Complaint does *not* contains a verification pursuant to 28 U.S.C. § 1746. [14]

12    *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S. APP. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13, 2004 WL 5477530 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

13    *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

14    (Dkt. No. 1.)

**B. Legal Standard Governing Unopposed Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6) of the Federal Rules of Civil Procedure**

To the extent that a defendant's motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is based solely on the allegations asserted in a plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Rule 12(b)(6). In such a circumstance, "a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." [15] Here, I note that several portions of Defendants' Memorandum of Law argue that various of Plaintiff's claims should be dismissed

due to his failure to state a claim upon which relief may be granted. [16]

15    *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

16    (*See, e.g.,* Dkt. No. 32, Part 21, at 9-12, 15-20 [Defs.' Mem. of Law].)

Moreover, I note that, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted. [17]

17    The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

For these reasons, it is appropriate to briefly summarize the recently clarified legal standard governing Rule 12(b)(6) motions to dismiss. Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Rule 8(a)(2); [18] or (2) a challenge to the legal cognizability of the claim. [19]

18    *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus.,*

*Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

19    *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-02 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Such a statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." [20] The purpose of this rule is to "facilitate a proper decision on the merits." [21] A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [22]

20    *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ); *see also Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (quoting *Conley,* 355 U.S. at 47).

21    *See Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48).

22    *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [23] However, it is well established that even this liberal notice pleading standard "has its limits." [24] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard. [25]

23    *See, e.g., Swierkiewicz,* 534 U.S. at 513-14 (noting that "Rule 8(a)(2)'s simplified pleading standard applies

to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

24    2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

25    *See, e.g., Bell Atl. Corp. v. Twombly,* ---U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-74, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Dura Pharm.,* 125 S.Ct. at 1634-35, *Christopher v. Harbury,* 536 U.S. 403, 416-22, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-35 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-09 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2]). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

**\*4** Most notably, in the recent decision of *Bell Atl. Corp. v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated a claim upon which relief could be granted, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." --- U.S. ----, ---- - ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007). 26 Rather than turning on the conceivability of an actionable claim, the Court clarified, the Rule 8 standard turns on the "plausibility" of an actionable claim. *Id.* at 1965-74. More specifically, the Court held that, for a plaintiff's complaint to state a claim, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming, of course, that

all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

26    The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

Having said that, it should be emphasized that, "[i]n reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." 27 Moreover, it should be noted that "[t]his standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" 28 In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are generally to be construed with an *extra* degree of liberality. Indeed, generally "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." 29 In addition, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." 30 However, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." 31 For example, an opportunity to amend should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." 32

27    *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

28    *Hernandez,* 18 F.3d at 136 [citation omitted]; *see also Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003)

[citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

29    *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

30    *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

31    *Stinson v. Sheriff's Dep't of Sullivan County,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz,* 2007 WL 2027912, at *2 (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dep't.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins,* 2007 WL 37404, at *4 (Kahn, J., adopting report-recommendation of Lowe, M.J.).

32    *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

Finally, it is important to observe that "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3). The Court's consideration of whether a movant has met its burden "to demonstrate entitlement" to the relief requested under Local Rule 7 .1(b)(3) is a more limited endeavor than a consideration of a contested motion requesting such relief. [33]

33    *See, e.g., Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before an unopposed motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious* ) (emphasis added) (citations omitted); *Race Safe Sys., Inc. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-10 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *see also Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2, 1997 WL 640982 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b] [3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 WL 589372, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

## II. ANALYSIS

*5 Because Plaintiff has failed to respond to Defendants' motion (despite having been twice advised of the adverse consequences of failing to so respond), the task before the Court is to determine whether Defendants have met their lightened burden on their motion. *See, supra,* Parts I.A., I.B. of this Report-Recommendation.

Defendants' motion is premised on the following five legal arguments, which are set forth in their Memorandum of Law: (1) all of Plaintiff's claims should be dismissed because he failed to allege facts plausibly suggesting, and/or failed to adduce any evidence establishing, that he exhausted his available administrative remedies before filing this action in federal court; (2) Plaintiff's due process claim (under the Fourteenth Amendment) should be dismissed because (a) he has adduced no evidence that he had a liberty interest protected by the Fourteenth Amendment, and (b) in any event, he has adduced no evidence that he was not afforded all the process that

he was due at his disciplinary hearings; (3) Plaintiff's deprivation-of-property claim (under the Fourteenth Amendment) should be dismissed because (a) he fails to allege facts plausibly suggesting that any Defendant was personally involved in the deprivation of his property, and (b) in any event, he fails to adduce evidence establishing that he availed himself of the state-provided post-deprivation remedy for such a deprivation of property, i.e., the filing of an action in the New York State Court of Claims; (4) Plaintiff's denial-of-access-to-the-courts claim (under the First Amendment) should be dismissed because he has failed to allege facts plausibly suggesting that he suffered any injury as a result of that denial; and (5) any retaliation claim (under the First Amendment) that Plaintiff is attempting to assert should be dismissed because he has failed to allege facts plausibly suggesting that he had been engaging in activity that is protected by the First Amendment before adverse action had been taken against him. (*See* Dkt. No. 32, Part 21, at 9-20 [Defs.' Mem. of Law].) I will address each of these arguments in turn (to the extent that I need to do so).

### A. Whether Plaintiff's Amended Complaint Should Be Dismissed Due to a Failure to Exhaust His Available Administrative Remedies

Defendants correctly recite the law governing prisoners' exhaustion of available administrative remedies. (*See* Dkt. No. 32, Part 21, at 9-11 [Defs.' Mem. of Law].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e.

The Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 [citation omitted]. Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative

defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

### 1. Availability

**\*6** Defendants do not, in their motion papers, offer specific evidence (such as the affidavit of the supervisor or coordinator of the Clinton C.F. Inmate Grievance Program) that, during the time in question, there was a working grievance program specifically *at Clinton C.F.* Granted, in his *original* Complaint, which was verified, Plaintiff answered "yes" to the question, "Is there a prisoner grievance procedure at [Clinton Correctional Facility]?" (Dkt. No. 1, ¶ 4.a. [Plf.'s Verified Compl., dated 2/22/04].) Ordinarily, a sworn allegation such as this is sufficient to constitute evidence for purposes of a motion for summary judgment.[34] The problem is that, after making this sworn allegation in his original Complaint, Plaintiff filed an Amended Complaint which was not verified (and which, in any event, made no such allegation). It is rather well settled that an amended complaint supersedes the original complaint for all pleading purposes (unless the amended complaint has incorporated a portion of the original complaint by specific reference). However, it appears to be a matter of some dispute whether an *unsworn* amended complaint renders a *sworn* original complaint as without any evidentiary value whatsoever for purposes of a summary judgment motion.[35]

---

[34]  *See, supra,* note 13 of this Report-Recommendation.

[35]  On the one hand, there are cases holding that an unsworn amended complaint renders a sworn original complaint as without evidentiary value for purposes of a summary judgment motion. *See, e.g., Hatcher v. Fields,* No. 96-7085, 1997 WL 431784, at *2, n. 2 (10th Cir. Aug.1, 1997); *King v. Dogan,* 31 F.3d 344, 346 (5th Cir.1994). On the other hand, there are cases holding that a sworn original complaint

retains its evidentiary value, for purposes of a summary judgment motion, even after the filing of an unsworn amended complaint. *See, e.g., Morrison v. Fox,* 05-CV-3394, 2007 U.S. Dist. LEXIS 73328, at *3, n. 1, 2007 WL 2908480 (D.S.C. Oct. 1, 2007) ("[I]n light of the Plaintiffs *pro se* status, the Court considers any factual allegations set forth in the Plaintiff's unverified amended complaint that mirror the allegations set forth in his initial verified complaint as evidence for purposes of evaluating the Defendants' motion for summary judgment."); *White v. Simpson,* 04-CV-0728, 2006 WL 1007527, at *2, n. 4 (N.D.Tex. Apr.18, 2006) (even where plaintiff submitted an unsworn amended complaint, the court relied on his sworn original complaint, for purpose of summary judgment motion); *cf. Hoskins v. Alameda County Sheriff's Deputies,* 96-CV-0428, 1998 U.S. Dist. LEXIS 12404, at *6, 1998 WL 470480 (N.D.Cal. Aug. 5, 1998) ("Because plaintiff's original complaint was verified ... and he amended his complaint in response to this court's order, this court will liberally construe the amended complaint to be verified as well."), *rev'd on other grounds,* 188 F.3d 513 (9th Cir.Cal.1999). Here, I note that Plaintiff's unsworn Amended Complaint (which was filed in response to the Court's Order, and which alleges that Defendant Artus did not help Plaintiff after receiving one or more writings from Plaintiff) appears consistent with Plaintiff's sworn original Complaint (which specifically alleges that, during the time in question, there was a grievance program available at Clinton C.F.). (*Compare* Dkt. No. 9, ¶ 1 [Plf.'s Am. Compl.] *with* Dkt. No. 1, ¶ 4.a. [Plf.'s Compl.].)

Fortunately for Defendants, the Court need not resolve this issue in order to decide Defendants' motion. This is because, in order for Defendants to meet their modest threshold burden with respect to this first inquiry on a motion for summary judgment, it does not appear that they need to adduce evidence that, during the time in question, there was a working grievance program *specifically at Clinton C.F.* Rather, it appears sufficient for a defendant to adduce evidence merely that, during the time in question, the New York State Department of Correctional Services ("DOCS") had available to inmates, *in general,* an Inmate Grievance Program. [36] Here, Defendants have adduced at least some evidence of such a fact. [37]

[36]   *See, e.g., Wilkinson v. Banks,* 02-CV-0361, 2007 WL 2693636, at *7-8 (W.D.N.Y. Sept.10, 2007) (granting defendants' motion for summary judgment after,

*inter alia,* [1] noting that defendants had, through an affidavit of Thomas Eagen, adduced evidence indicating the existence of DOCS' Inmate Grievance Program, and [2] finding that plaintiff had adduced no evidence suggesting that the Program was not available to him during the time in question). Indeed, some authority exists suggesting that this is the sort of fact of which a court might take judicial notice. *See Wegman v. Grimmke,* 03-CV-2345, 2004 WL 2202642, at *4 (W.D.N.Y. Sept.30, 2004) (granting defendants' motion for summary judgment after, *inter alia,* [1] appearing to take judicial notice of the existence of DOCS' Inmate Grievance Program, and [2] finding that plaintiff had adduced no evidence suggesting that the Program was not available to him during the time in question).

[37]   (*See* Dkt. No. 32, Part 3, ¶ 1-2 [Affid. of Def. Eagen, swearing that, *inter alia,* he is the "Director of the Inmate Grievance Program of the New York State Department of Correctional Services," that he is the "custodian of the records maintained by the Central Office Review Committee," and that the Committee's computer database contains records of all appeals received from "the facility Inmate Grievance Program Offices" since 1990].)

The steps involved in this Inmate Grievance Program are well established:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

*White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6, 2002 WL 31235713 (S.D.N.Y. Oct. 3, 2002) (citing N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7). DOCS also has a separate and distinct

administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

**\*7** B. For Tier II disciplinary hearings, the appeal is to the facility Superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility Superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

Individual decisions or dispositions regarding inmate misbehavior reports and hearings, or inmate grievances, are not considered grievable matters; however, the policies, rules and procedures of the disciplinary and grievance programs may be the subject of a grievance. *See* 7 N.Y.C.R.R. § 701.3(e)(1), (2); *see also* N .Y. Dep't Corr. Serv. Directive No. 4040 at III.E. Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

In their motion papers, Defendants have adduced evidence establishing that, despite this available grievance procedure, Plaintiff never filed any grievance appeal with CORC during the time in question (or at any time). (Dkt. No. 32, Part 3, ¶ 3 [Affid. of Eagen].) Plaintiff has adduced no record evidence controverting this fact.[38]

[38] Indeed, in his original Complaint, which (again) was verified, Plaintiff asserts facts indicating that the highest level of DOCS staff to which he appealed any Inmate Grievance Resolution Committee decision was the office of the Clinton C.F. Superintendent. (Dkt. No. 1, ¶ 4.c.(i) [Plf.'s Verified Compl.].)

As a result, I find that, despite the fact that administrative remedies were indeed available to Plaintiff, he failed to pursue those remedies.

### 2. Forfeiture/Estoppel

I find no evidence in the record that Defendants forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it. (*See* Dkt. No. 28, Part 1, ¶¶ 16-17 [Defs.' Answer, raising exhaustion as a defense].) Nor do I find any evidence in the record that Defendants' own actions somehow inhibited Plaintiff's exhaustion of remedies sufficient to estop one or more of the Defendants from raising Plaintiff's failure to exhaust as a defense. Granted, I acknowledge that, in his Amended Complaint, Plaintiff alleges that, at various points in time, (1) Defendant Castiron "threatened to beat [Plaintiff]," (2) Defendant Renown "threatened" Plaintiff, and (3) Defendant Amsteal "act[ed] crazy." (Dkt. No. 1, ¶¶ 5, 7, 10 [Plf.'s Am. Compl.].) However, Plaintiff has adduced no evidence in support of the alleged actions. The Amended Complaint does not constitute such evidence since it is not verified. And, while the original Complaint is verified, it contains absolutely no factual assertions regarding such actions. (*See* Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.].)

### 3. Special Circumstances

Finally, I find no evidence in the record establishing (or even factual allegations in Plaintiff's Amended Complaint plausibly suggesting) the existence of any special circumstances that would justify Plaintiff's failure to comply with the administrative procedural requirements.

As a result, I recommend that Plaintiff's Amended Complaint be dismissed due to his failure to adduce any evidence that he exhausted his administrative remedies before filing this action in federal court.

### B. Defendants' Other Asserted Grounds for Dismissal

**\*8** Because I find that Defendants' have met their modest burden with regard to their first ground for dismissal (i.e., Plaintiff's failure to exhaust his available administrative remedies before filing this action in federal court), I need not, and do not, reach the merits of their other arguments, except to make the following two observations.

First, with respect to Defendants' argument that Plaintiff has adduced no evidence that he had a liberty interest protected by the Fourteenth Amendment, Defendants appear to be correct when they argue that, for several *separate* periods of confinement to be considered *together* (for purposes of applying *Sandlin v. Connor,* 515 U.S. 472 [1995] ), those separate periods of confinement must

2007 WL 4555932

be *consecutive*. (Dkt. No. 32, Part 21, at 12-14 [Defs.' Mem. of Law].) In particular, the precise issue, in such a circumstance, is whether the disciplinary confinements in question constitute a "sustained" period of confinement such that they may be aggregated for purposes of the Due Process Clause.[39] Generally, it appears from Second Circuit decisions that separate SHU sentences constitute a "sustained" period of confinement when (1) they are contiguous *and* (2) they either (a) were imposed by the same disciplinary hearing officer or (b) were based on the same administrative rationale and are executed under the same conditions.[40] Here, Defendants have adduced evidence that the five periods of confinement in question were *not* contiguous or consecutive. (*See* Dkt. No. 32, Parts 10, 12, 14, 16, 18 [Affid. of Jarvis, attaching, as exhibits, Plaintiff's disciplinary hearing dispositions, showing sentences imposed as a result of his disciplinary convictions].) And Plaintiff has adduced no evidence controverting that fact.

[39]    As the Second Circuit has held, "separate SHU sentences should be aggregated for purposes of the *Sandin* inquiry when they constitute a *sustained* period of confinement." *Giano v. Selsky,* 238 F.3d 223, 226 (2d Cir.2001) [internal quotations and citations omitted; emphasis added].

[40]    *See Giano,* 238 F.3d at 226 (aggregating 670 days in administrative segregation at Attica C.F. to 92 days in administrative segregation at Clinton C.F., which segregation *immediately followed* the prior segregation, where it was clear that the subsequent segregation was "simply a continuation" of the prior segregation because "the two periods of confinement were based on the same administrative rationale and ... the conditions of Giano's confinement were ... identical at both facilities"); *Sealey v. Giltner,* 197 F.3d 578, 580, 587-88 (2d Cir.1999) (taking 83-day sentence in SHU imposed by Defendant Giltner at April 16 disciplinary hearing, and aggregating it to 18-day sentence in SHU that plaintiff had served *immediately prior* to April 16 disciplinary hearing, but not aggregating it to sentence that resulted from a subsequent disciplinary hearing conducted by a *different hearing officer* ); *cf. Sims v. Artuz,* 230 F.3d 14, 18-19, 23-24 (2d Cir.2000) (leaving it to district court to explore whether to aggregate any of the 60-day to 360-day sentences from seven disciplinary hearings that occurred within a four-and-one-half-month period, where all of those sentences were contiguous, two of them were administered by the same disciplinary hearing officer, and two others were also administered by the same disciplinary hearing officer).

Second, with respect to Defendants' argument that Plaintiff's denial-of-access-to-the-courts claim (under the First Amendment) should be dismissed because he has failed to allege facts plausibly suggesting that he suffered any injury as a result of that denial, Defendants are correct when they argue that, to be viable, such a claim must allege facts plausibly suggesting that Plaintiff suffered an injury as a result of the denial. It is well settled that inmates have a First Amendment right of access to the courts that requires states "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights."[41] "However, this right is not 'an abstract, freestanding right to a law library or legal assistance' and cannot ground a Section 1983 claim without a showing of 'actual injury.' '[42] As a result, to state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury.[43] It is worth noting that "[t]his actual injury requirement 'is not satisfied by just any type of frustrated legal claim,' because the Constitution guarantees only the tools that 'inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement."[44] " 'Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.' "[45] Here, Plaintiff does not allege facts plausibly suggesting that he suffered any injury as a result of being denied the ability to go to the facility's law library and being deprived of certain of his legal materials. (*See generally* Dkt. No. 9 [Plf.'s Am. Compl.].) Even if he had alleged such facts, he has not adduced any evidence in support of such an allegation.

[41]    *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), *modified on other grounds, Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606, (1996); *see also Bourdon v. Loughren,* 386 F.2d 88, 92 (2d Cir.2004) [citations omitted].

[42]    *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 [1996] ).

*Lewis,* 518 U.S. at 353; *Renelique v. Duncan,* 03-CV-1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr.12, 2007) (Strom, J.); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

*Collins,* 423 F.Supp.2d at 415-16 (quoting *Lewis,* 518 U.S. at 355).

*Id.*

**C. Whether, in the Alternative, the Court Should Revoke Plaintiff's *In Forma Pauperis* Status as Having Been Improvidently Granted, and Dismiss Plaintiff's Amended Complaint Without Prejudice to Refiling Upon Payment of the Filing Fee**

**\*9** Finally, in the interest of thoroughness, I think it is appropriate to mention an alternative ground for dismissal of Plaintiff's Amended Complaint. Under the so-called "Three Strikes Rule" set forth in the federal statute governing *in forma pauperis* proceedings, in no event shall a prisoner be permitted to bring an action *in forma pauperis*

> if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it ... fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g). The power of a federal district court to invoke this rule is not limited to the outset of a litigation but extends all throughout the pendency of the proceeding. In other words, specifically, federal district courts have the authority to rescind or revoke the *in forma pauperis* status that it has previously bestowed upon a plaintiff, where it discovers that the status was improvidently granted, even if the courts exercise that authority well into the pendency of the proceedings. [46]

**Northern District of New York:** *See Flemming v. Goord,* 06-CV-0562, 2007 WL 3036845, at *2 (N.D.N.Y. Oct.16, 2007) (Mordue, C.J., adopting Report-Recommendation by Homer, M.J.); *Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *13-14 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting Report-Recommendation of Lowe, M.J.);

*Gamble v. Monette,* 06-CV-0136, 2007 WL 2089697, at *1-4 (N.D.N.Y. July 20, 2007) (Kahn, J., adopting Report-Recommendation of DiBianco, M.J.); *Pettus v. Brown,* 06-CV-0152, 2007 WL 1791120, at *2-3 (N.D.N.Y. June 19, 2007) (Mordue, C.J., adopting Report-Recommendation of Homer, M.J.); *Gill v. Pidlypchak,* 02-CV-1460, 2006 WL 3751340, at *5 (N.D.N.Y. Dec.19, 2006) (Scullin, J.); *Polanco v. Burge,* 05-CV-0651, 2006 WL 2806574, at *2 (N.D.N.Y. Sept.28, 2006) (Kahn, J., adopting Report-Recommendation by Homer, M.J.).

**Western District of New York:** *See Polanco v. Hopkins,* 03-CV-6661, 2007 WL 914023, at *3-6 (W.D.N.Y. Mar.23, 2007).

**Eastern District of New York:** *See McFadden v. Parpan,* 16 F.Supp.2d 246, 247 (E.D.N.Y.1998); *see also Rolle v. Nassau County Correctional Facility,* 01-CV-2414, Order, at 2 (E.D.N.Y. filed Nov. 17, 2004) ("A court may revoke the *in forma pauperis* status it previously bestowed upon a [plaintiff], where that status is later determined to be 'improvident' ") [citation omitted], *accord, Rolle v. Kurtzrock,* 03-CV-1789, Order (E.D.N.Y. filed June 17, 2004).

**District of Connecticut:** *See Demos v. John Doe,* 118 F.Supp.2d 172, 174 (D.Conn.2000).

Here, the Court granted Plaintiff's request to proceed *in forma pauperis* on July 7, 2005. (Dkt. No. 10, at 3.) However, it is clear from the United States Courts' Public Access to Court Electronic Records ("PACER") Service that, as of July 7, 2005, Plaintiff had already received three "strikes" for purposes of 28 U.S.C. § 1915(g). Specifically, Plaintiff's Complaint in the prisoner civil-rights action of *Taylor v. Goldman,* 04-CV-1212 (E .D.N.Y.), was dismissed by Order of Chief Judge Raymond J. Dearie, of the Eastern District of New York, on April 8, 2004, for failure to state a claim upon which relief may be granted. His Complaint in the prisoner civil-rights action of *Taylor v. Zubizarreta,* 04-CV-1565 (E.D.N.Y.), was dismissed, also by Order of Chief Judge Dearie, on August 12, 2004, for failure to state a claim upon which relief may be granted. And his Complaint in the prisoner civil-rights action of *Taylor v. Goldman,* 04-CV-5121 (E.D.N.Y.), was dismissed, also by Order of Chief Judge Dearie, on December 3, 2004, for failure to state a claim upon which relief may be granted. [47] Finally, I find nothing on the face of the Amended Complaint indicating that Plaintiff is in "imminent danger of serious physical injury." [48]

47    I note that, *after* Plaintiff's *in forma pauperis* status was (improvidently) granted in this case on July 7, 2005, he earned at least **four** more "strikes," for purposes of 28 U.S.C. § 1915(g). *See Taylor v. Second Dept. Appellate Div.,* 05-CV-4791 (E.D.N.Y.) (Dearie, C.J.) (dismissing Plaintiff's Complaint for failure to state a claim on October 17, 2005); *Taylor v. Gemill,* 05-CV-6093 (E.D.N.Y.) (Dearie, C.J.) (dismissing Plaintiff's Complaint for failure to state a claim on January 17, 2006) *Taylor v. Artis,* 05-CV-1569 (N.D.N.Y.) (Sharpe, J.) (dismissing Plaintiff's Complaint for failure to state a claim on May 10, 2006); *Taylor v. Bisceglia,* 06-CV-0277 (N.D.N .Y.) (Mordue, C.J.) (dismissing Plaintiff's Amended Complaint for failure to state a claim on May 10, 2007); *see also Taylor v. Bennett,* 05-CV-10709 (S.D.N.Y.) (Berman, J.) (granting defendants' "motion to dismiss" Plaintiff's Amended Complaint on January 24, 2007, but not indicating grounds for dismissal).

48    28 U.S.C. § 1915(g); *see also Malik v. McGinnis,* 293 F.3d 559, 561 (2d Cir.2002) (examining plaintiff's allegations in order to determine if plaintiff's case fell within the exception to the three strikes rule for prisoners in "imminent danger of serious physical injury").

As a result, I recommend that, in the alternative, the Court should revoke Plaintiff's *in forma pauperis* status and dismiss Plaintiff's Amended Complaint without prejudice to refiling upon payment of the filing fee.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 32) be *GRANTED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 4555932

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 2436817
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Edward KOEHL,
v.
Dr. Fredrick BERNSTEIN, et al., Defendants.

No. 10 Civ. 3808(SHS)(GWG).
|
June 17, 2011.

*REPORT AND RECOMMENDATION*

GABRIEL W. GORENSTEIN, United States Magistrate
Judge.

**\*1** Plaintiff Edward Koehl, proceeding *pro se,* brings this
action pursuant to 42 U.S.C. § 1983, alleging that various
defendants, including employees of the New York State
Department of Correctional Services ("DOCS") and the
New York State Division of Parole ("DOP"), violated his
constitutional rights during his incarceration at DOCS'
Green Haven Correctional Facility ("Green Haven").
Defendants have now moved to dismiss the complaint
pursuant to Fed R. Civ. P. 12(b)(6). For the reasons stated
below, the motion to dismiss should be granted in part and
denied in part.

I. *BACKGROUND*

A. *Facts Alleged by Koehl*
For purposes of deciding the defendants' motion to
dismiss, the Court assumes the allegations in plaintiff's
complaint are true and draws all reasonable inferences
from those facts in favor of the plaintiff. *See, e.g., Global
Network Commc'ns, Inc. v. City of New York,* 458 F.3d
150, 154 (2d Cir.2006). In light of Koehl's *pro se* status, the
Court in some instances has considered factual allegations
contained in his memorandum submitted in opposition to
the defendants' motion where they amplify claims made in
the complaint. *See, e.g., Woods v. Goord,* 2002 WL 731691,
at *1 n. 2 (S.D.N.Y. Apr. 23, 2002) (considering *pro se*
prisoner's factual allegations in briefs as supplementing
the complaint); *Burgess v. Goord,* 1999 WL 33458, at * 1 n.
1 (S.D.N.Y. Jan. 26, 1999) ("In general, 'a court may not
look outside the pleadings when reviewing a Rule 12(b)

(6) motion to dismiss. However, the mandate to read the
papers of pro se litigants generously makes it appropriate
to consider plaintiff's additional materials, such as his
opposition memorandum.' ") (quoting *Gadson v. Goord,*
1997 WL 714878, at *1 n. 2 (S.D.N.Y. Nov. 17, 1997))
(additional citations omitted).

In October 2008, Koehl was transferred to Green Haven.
*See* Amended Complaint, filed July 16, 2010 (Docket #
6) at 10 ¶ 1 ("Am.Compl."). At Green Haven, defendant
Robert E. Ercole, who was a warden in the facility at
the time, "callously and deliberately assigned [him] to a
double bunk cell, top bunk, third floor." *Id.* at 10 ¶ 2.
Koehl "was forced to carry [his] property to the third
floor, [which] aggravated [his] previously complained of
conditions." *Id.* As a result of this incident, Koehl spent
three days in the hospital. *Id.* Upon release from the
hospital, Koehl was again placed into a double bunk,
and his "bunk mates (2 out of 3), were chain smokers,
who smoked all day and night in the cell." *Id.* at 10 ¶
3. Koehl filed grievances about the bunk problems, but
Ercole falsified records, stating that Koehl had signed a
waiver agreeing to double bunk in order to be transferred
to Green Haven. *Id.* Koehl spent 60 days in a double bunk,
during which time his counselor demanded that he sign a
waiver agreeing to remain in the double bunk and, when
Koehl refused, defendant Deputy Superintendent Richard
Cunningham signed an order in retaliation requesting that
Koehl be transferred to a facility seven hours away from
his family. *Id.* at 1, 10 ¶ 3.

**\*2** Defendant Dr. Weinstein conducted an
electromyography ("EMG") of Koehl in October or
November 2008 as a result of Koehl's complaints to his
assigned facility doctor, Dr. J. Fein, regarding "extreme
pain, numbness and weakness in [his] arms, hands, legs,
neck and back." *Id.* at 10 ¶ 4. Dr. Weinstein informed
Koehl that "nothing [wa]s wrong with [him]," at which
point Koehl called Dr. Weinstein "a liar" and produced
a previous EMG, conducted on March 18, 2008, which
showed results different from the October or November
EMG. *Id.* Dr. Weinstein agreed to conduct an MRI
after Koehl stated that he was going to have his family
file a complaint with the DOCS Central Office. *Id.*
Between June 2007 and October 2008, Koehl repeatedly
complained of extreme pain and weakness, but defendants
DOCS Commissioner Brian Fischer and DOCS Chief
Medical Officer Dr. Lester Wright, *id.* at 2 ¶¶ 14–15,
denied him "proper testing," including an MRI of the

2011 WL 2436817

spine, a CT scan, and neuro imaging, "[c]ontrary to numerous recommendations via the Clinton [Correctional Facility] medical staff and outside providers," *id.* at 10–11 ¶ 4.

Defendant Dr. Fredrick Bernstein, the facility Medical Director, deliberately scheduled Koehl's MRI for December 30, 2008, a date on which Bernstein knew Koehl's family would be visiting from Staten Island. *Id.* at 1, 11 ¶ 5. Dr. Bernstein "orchestrated this conflict so [that] he [could] later state that [Koehl had] refused treatment." *Id.* On February 9, 2009, Koehl was administered an MRI which indicated he suffered from "degenerative disk disease." *Id.* at 11 ¶ 6. Neurosurgeons at Albany Medical Center ("the neurosurgeons") informed him that if he had "seen them several years" before, when he had "first complained of the symptoms, [his] prognosis would be much better." *Id.* The neurosurgeons told Koehl that surgery could only stop the condition from worsening and would not cure the disease. *Id.* On July 6, 2009, Koehl had surgery, *id.,* and several weeks later he met with Dr. Fein who scheduled Koehl for another appointment with the neurosurgeons, *id.* at 11 ¶ 7. In September 2009, the neurosurgeons "ordered steroids, xrays," "an EMG, and a new neck brace" for Koehl. *Id.* at 11 ¶ 7. The new brace "kept popping off" which "exacerbated Koehl's condition," and Dr. Bernstein "deliberately refused to order a new neck brace until" January 2010, after Koehl had filed a grievance, and "callously changed the type of xrays" that were ordered. *Id.* at 11 ¶ 7. In November 2009, Dr. Weinstein conducted an EMG and reported "that nothing was wrong." *Id.* However, Dr. Weinstein's "report and conclusions were knowingly false." *Id.* In a subsequent appointment with the neurosurgeons, Koehl was informed that his condition had "progressed for the worse," and the neurosurgeons ordered an MRI and CT scan to be conducted. *Id.* In order to save costs, Dr. Bernstein, Dr. Wright, and Fischer "callously and deliberately ignored the orders of the neurosurgeons and canceled the MRI." *Id.* at 11–12 ¶ 7. The CT scan, which was performed on December 10, 2009, "proved inconclusive" because it was conducted while Koehl was "still and facing front." *Id.* at 12 ¶ 7. On January 19, 2010, X-rays were taken at Putnam Hospital which indicated that some of Koehl's vertebrae had not fused and that the rods, clamps, and screws had come loose, pinching his spinal cord. *Id.* at 12 ¶ 8. On February 11, 2010, Koehl was again seen by the neurosurgeons. *Id.* Koehl informed these

doctors that Dr. "Bernstein, [Dr.] Wright and Fischer [had] callously changed and/or ignored their orders." *Id.*

**\*3** Since he arrived at Green Haven, Koehl's "chronic and life threatening lung diseases have grown progressively worse" because he is "constantly ... exposed to unconstitutional levels of second hand tobacco smoke." *Id.* at 12 ¶ 10. Koehl complained to Dr. Fein, Dr. Bernstein, Cunningham, Ercole, and William Lee, Ercole's successor at Green Haven, *id.* at 1, who stated "that since prisoners are prohibited from smoking indoors, there are no [environmental tobacco smoke] problems in the housing blocks," *id.* at 12 ¶ 10. The low number of misbehavior reports issued at Green Haven for smoking in unauthorized areas demonstrates these defendants' callous and deliberate refusal to enforce the indoor smoking ban. *Id.* at 13 ¶ 10. Koehl has also repeatedly been denied access to his assigned pulmonary specialist and has been "denied proper testing and access to a qualified specialist." *Id.* at 13 ¶ 11. When he was allowed a pulmonary function analysis on February 27, 2009, it "showed a significant drop in [his] lung capacity." *Id.*

Koehl wears dentures. *Id.* at 13 ¶ 12. Because he has "no bottom ridge line, denture adhesive is a medical necessity." *Id.* Fischer and Dr. Wright will not provide Koehl with denture adhesive or with an implant and he is only able to obtain the adhesive by purchasing it in the facility commissary. *Id.*

Additionally, Fischer, Ercole, and Lee have denied Koehl appropriate clothing to wear during his daily period of outdoor recreation. *Id.* at 14 ¶ 13. In order for Koehl to obtain "life saving" clothing items he would have to pay for them. *Id.* Thus, he "cannot go outside for recreation without endangering [his] life." *Id.*

Cunningham, Ercole, and Lee have subjected Koehl to cruel and unusual punishment by ignoring medical orders and forcing him to "pack up all [of his] property and carry it from cell to cell." *Id.* at 10 ¶ 2; *id.* at 14 ¶ 14(a). On December 11, 2008, Koehl was moved from a double bunk cell to a single cell, *id.* at 14 ¶ 14(a); on December 24, 2008, he was moved from the first floor to the second floor, *id.* at 14 ¶ 14(a)(i); on April 16, 2009, he was moved to a cell on the third floor that contained "lead paint rust dust," *id.* at 14 ¶ 14(a)(ii); and between April 24, 2009 and February 2, 2010, he was moved to four different cells, *id.* at 14 ¶¶ 14(a)(iii)-(vi).

Cunningham and DOP employees Lester Edwards, Andrea Evans, Francis Herman, and Terrence X. Tracy "conspired to sabotage [Koehl's] application for Commutation of Sentence ... in retaliation for ... redress of grievances, reversals of false misbehavior reports, and civil awards alleging abuse." *Id.* at 1, 2 ¶¶ 6–8; *id.* at 15 ¶ 14(b). When Koehl asked Cunningham why the legal mail he sent was always returned, Cunningham told him that because of all of Koehl's "past complaints and winning law suits against DOCS employees," Cunningham would "do whatever he [could] to stop [Koehl's] mail from leaving the facility." *Id.* While more than ten letters were sent in with the application from both Koehl's family and his DOCS spiritual advisor, the DOP only received one of these letters. *Id.* Tracy told Koehl that the DOP had "no record of ... receiving any letters." *Id.* In October 2009, Koehl submitted a FOIL request which confirmed that each letter had been received and sent to the DOP for processing. *Id.* Koehl's family subsequently submitted letters to the Governor and Evans, complaining about the non-receipt of the letters, but the Governor did not respond and Edwards, answering for Evans, "purposely refused to address the actual wording in the submitted complaints." *Id.* at 15–16 ¶ 14(b). On January 16, 2010, the DOP notified Koehl that his application for a commutation of sentence had been denied. *Id.* at 16 ¶ 14(b).

**\*4** Defendants Fischer, I. Russo, Andrew Harvey, and Joseph Brennan "conspired to issue [Koehl] a tier III misbehavior report in retaliation for redressing [his] grievances and so [he] could be transferred out of the jail to preclude [him] from substantiating [his] claims in a pending matter." *Id.* at 2 ¶¶ 9–11; *id.* at 16 ¶ 14(c). Russo issued this report, which stated that on October 9, 2006, Koehl had harassed Brennan. *Id.* at 16 ¶ 14(c). Koehl was denied the ability to view, obtain, or comment on any of the evidence presented to the committee reviewing the report and was found guilty of the allegations on March 7, 2007. *Id.* Koehl was assessed a sentence of 90 days in "the Box (SHU)" and his appeal was denied in June 2007. *Id.* at 17 ¶ 14(c).

At about the same time, defendants R. Hilliar and D. Sawyer "callously and deliberately advance[d] knowingly false and unsubstantiated charges via a tier II misbehavior report in retaliation for redressing grievances." *Id.* at 2 ¶¶ 12–13; *id.* at 17 ¶ 14(c). The report, issued by Hilliar,

alleged that Koehl had harassed her. *Id.* Koehl "was not allowed access to any of [his] property and exculpatory evidence." *Id.* at 17 ¶ 14(c). On March 8, 2007, Sawyer conducted a hearing and Koehl was found guilty of the allegations in the tier II report. He was assessed a "30 days keep-locked" penalty and "30 days loss of phones, package[s] and commissary to run consecutive in SHU with the" 90–day sentence, "totaling 120 days in SHU." *Id.* His appeal was denied on March 22, 2007, and on July 7, 2007, the "guilty verdict was reversed and ordered expunged from [his] records." *Id.*

**B.** *Procedural History*
The original complaint in this action was filed on May 10, 2010, *see* Complaint, filed May 10, 2010 (Docket # 2) ("Compl."), and an amended complaint was filed on July 16, 2010, *see* Am. Compl. On November 1, 2010, defendants filed the instant motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). *See* Notice of Motion to Dismiss, filed Nov. 1, 2010 (Docket # 25); Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint, filed Nov. 1, 2010 (Docket # 26) ("Def.Mem."); Declaration of Counsel, filed Nov. 1, 2010 (Docket # 27); Notice to Pro Se Litigant Who Opposes a Rule 12 Motion Supported by Matters Outside the Pleadings, filed Nov. 1, 2010 (Docket # 28). Koehl filed a memorandum in opposition to this motion, *see* Plaintiff's Verified Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint Pursuant to F.R.C.P. Rule 12(b)(6) or (c), filed Dec. 29, 2010 (Docket # 46) ("Pl.Mem."); and defendants filed a reply brief, *see* Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Complaint, filed Jan. 26, 2011 (Docket # 50) ("Def.Reply").

**II.** *LAW GOVERNING MOTIONS TO DISMISS*
A party may move for judgment pursuant to Federal Rule of Civil Procedure 12(b)(6) where the opposing party has "fail[ed] to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b) (6). Separately, Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Under this rule, a complaint "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir.2007) (quoting *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 512 (2002)).

**\*5** Nonetheless, the Supreme Court has held that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level ...." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (citations, internal quotation marks, and brackets omitted); *see also id.* at 557 (pleading must "possess enough heft to show that the pleader is entitled to relief") (internal quotation marks and brackets omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (citation and internal quotation marks omitted); *accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007) ("a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion") (citations omitted).

In the case of *pro se* plaintiffs, "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations and internal quotation marks omitted); *accord In re Sims,* 534 F.3d 117, 133 (2d Cir.2008); *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a *pro se* party's pleadings should be construed liberally and interpreted "to raise the strongest arguments that they suggest") (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

### III. *DISCUSSION*

Koehl's amended complaint does not clearly identify the claims it purports to assert. In moving to dismiss the amended complaint in its entirety, the defendants have categorized the claims in the amended complaint and have made arguments seeking dismissal with respect to each. In his opposition papers, Koehl has not argued that any claims exist beyond those identified in the defendant's moving papers. Nor does the Court discern any such claims. Accordingly, we address each of the claims as identified in the defendants' moving papers.

#### A. *Eleventh Amendment*

Defendants have moved to dismiss Koehl's claims against the State of New York and the individual defendants in their official capacities based on the Eleventh Amendment. The Eleventh Amendment bars lawsuits by a citizen of a state against that state or its agencies, absent the state's consent or a statutory waiver of immunity. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99–100 (1984). It is well settled that Congress did not intend to abrogate state sovereign immunity when it enacted 42 U.S.C. § 1983. *See Quern v. Jordan,* 440 U.S. 332, 343–44 (1979). Koehl's complaint does not state whether he seeks damages against the individual defendants in their official or individual capacities. To the extent it seeks damages against any of the defendants in their official capacities, however, it would be barred by the Eleventh Amendment. *See, e.g., Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003) ("The Eleventh Amendment bars the award of money damages against state officials in their official capacities."); *Eng v. Coughlin,* 858 F.2d 889, 894 (2d Cir.1988) ("Eleventh Amendment immunity protects state officials sued for damages in their official capacity."). Accordingly, all claims against the State of New York for damages must be dismissed as well as any claims for damages against other defendants brought in their official capacities.

**\*6** We now consider Koehl's claims insofar as they are brought against defendants in their individual capacities.

#### B. *Fourteenth Amendment Due Process Claims*

Koehl alleges certain claims regarding discipline that was meted out to him. Koehl asserts that Harvey "callously and deliberately denied [him] all due process rights ... by refusing to allow [him] ... to view, obtain or comment on any of the" evidence used to find him "guilty" of the allegations outlined in the tier III misbehavior report. *See* Am. Compl. at 16 ¶ 14(c). Koehl further asserts that "instead of finding [him] guilty of the allegedly harassing passage stated in the misbehavior report, he [was] ... found guilty of an uncharged passage that appeared in the provided letter." *Id.* at 17 ¶ 14(c). He was sentenced to 90 days in the SHU and denied leave to appeal. *Id.*

Separately, Koehl alleges that Hilliar filed a false tier II misbehavior report against him and that he was wrongly convicted of the charge listed in that report. *Id.* He states that he "was not allowed access to any of [his] property and exculpatory evidence" and that the hearing officer informed him that he would be found guilty "no matter

what." *Id.* Koehl was found guilty and assessed a "30 days keep-locked" penalty and "30 days loss of phones, package[s] and commissary." *Id.* Koehl alleges that he commenced an Article 78 proceeding and that a judge of the New York State Supreme Court reversed the guilty verdict. *Id.* In his memorandum of law, Koehl asserts that after the tier II disposition, he was transferred to "Upstate CF," at which point he was informed that the 90 day SHU assessment and the 30 day keep-lock assessment were to "be added together" and that Koehl was to spend the entire 120 period in the SHU. Pl. Mem. at 24.

Koehl also contends that he endured a number of hardships in the SHU during this time, including the loss of three toenails and denial of his yarmulke and prayer book. *Id.* at 24–25. Defendants argue that Koehl fails to establish a deprivation of a Fourteenth Amendment right to due process in the context of these prison disciplinary hearings as "he must establish that the confinement imposed on him created an atypical and significant hardship relative to ordinary incidents of prison life." Def. Mem. at 9 (citing *Sandin v. Conner,* 515 U.S. 472, 484 (1995)).

#### 1. *Law Governing Disciplinary Proceedings*

A party asserting a due process claim " 'must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process.' " *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). Prisoners subject to disciplinary proceedings can show a liberty interest only if "disciplinary punishment 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (quoting *Sandin,* 515 U.S. at 484); *accord Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir.2009). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)); *accord Davis,* 576 F.3d at 133.

**\*7** In *Sealey v. Giltner,* 197 F.3d 578 (2d Cir.1999), the Second Circuit suggested that consecutive sentences

resulting from separate hearings adjudicating different misbehavior reports should be aggregated for the purpose of determining whether the confinement constitutes atypicality. *See id.* at 587–88. *Sealey* aggregated the 18 and 83–day periods the plaintiff was kept in the SHU on the ground that "[w]herever the point is beyond which confinement in harsh conditions constitutes atypicality, a prison official must not be permitted to extend such confinement beyond that point without according procedural due process." *Id.* at 587. It noted that "if conditions were of sufficient harshness that confinement for 365 days constituted atypicality, an official who held a hearing for a prisoner already confined in such conditions for 364 days would normally have to accord procedural due process before continuing the confinement beyond an aggregate interval of 365 days." *Id.* at 587 n. 7; *see also Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (noting that it was "possible that some or all of [plaintiff's sentences] should be aggregated for purposes of the *Sandin* inquiry") (citation omitted). Other cases have similarly aggregated sentences based on separate violations. *See, e.g., Bunting v. Nagy,* 452 F.Supp.2d 447, 457 (S.D.N.Y.2006); *Charles v. Maleh,* 2006 WL 581206, at \*12 (D.Conn. Mar. 8, 2006). Thus, for purposes of this motion we will aggregate Koehl's sentences and treat the time spent in the SHU as 120 days.

"The Second Circuit has not established a bright-line rule as to how lengthy a term of disciplinary confinement (i.e., either 'keeplock' or SHU confinement) will be considered atypical and significant." *Bunting,* 452 F.Supp.2d at 455. Nevertheless, the Second Circuit has established "guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed." *Palmer,* 364 F.3d at 64. Among these guidelines is that for confinements of "an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Id.* at 65 (citations omitted)

As noted, Koehl has alleged that he spent 120 days in the SHU, thus placing him within the guideline governing intermediate durations of confinement. For such a duration of confinement, the fact-finding required by the Second Circuit to determine whether this intermediate sentence constitutes an atypical and significant hardship cannot occur on a motion to dismiss. *Gonzalez–Cifuentes v.. Torres,* 2007 WL 499620, at \*3 (N.D.N.Y. Feb. 13, 2007); *accord Thomas v. Calero,* 2011 WL 1532058,

at *8 (S.D.N.Y. Mar. 17, 2011) (finding that while plaintiff had "not alleged that the conditions of his confinement differed from normal SHU circumstances," his "confinement in SHU for 291 days [wa]s sufficient, for pleading purposes, to implicate a liberty interest") (291–day confinement); *Smart v. Goord,* 441 F.Supp.2d 631, 641 (S.D.N.Y.2006) ( "[Plaintiff] has not alleged that the conditions of her confinement were more severe than normal SHU conditions .... However, such detailed factual allegations are not necessary to withstand a motion to dismiss.") (70–day confinement); *Harris v. McGinnis,* 2004 WL 2187137, at *4 (S.D.N.Y. Sept. 30, 2004) (denying motion to dismiss even though "[t]he Complaint makes no representation as to the parameters of 'normal' conditions of confinement, and it is thus impossible to determine on the face of the Complaint that the keeplock conditions to which Plaintiff was subjected were not atypical within the meaning of *Sandin"* ) (151–days in keeplock). Even if it could be said that a prisoner has some obligation to describe his conditions of confinement in order to make out a due process claim, here Koehl alleges that his confinement was in fact "atypical" and constituted a "significant hardship" because he was not allowed to attend his grandmother's funeral and was not allowed to communicate with his family. Am. Compl. at 17 ¶ 14(c). Accordingly, his pleading cannot be dismissed for failure to describe in detail the conditions of his confinement.

### 2. *Statute of Limitations*

**\*8** In New York, pursuant to New York Civil Practice Law and Rules § 214(5), a three year statute of limitations governs a section 1983 action. *Okure v. Owens,* 816 F.2d 45, 49 (2d Cir.1987), *aff'd,* 488 U.S. 235 (1989); *see Harris v. City of New York,* 186 F.3d 243 (2d Cir.1999). Defendants argue that any claim against Fischer, Russo, Harvey and Brennan based on the tier III report should be dismissed because the allegedly retaliatory report was issued in October 2006, outside the three year statute of limitations for section 1983 actions. *See* Def. Mem. at 14. In fact, although the incident on which the report was based occurred on October 9, 2006, the complaint alleges that the misbehavior report was not issued until February 21, 2007, and that Koehl was found guilty of the charges in this report on March 7, 2007. *See* Am. Compl. at 16 ¶ 14(c). It would thus appear that the hearing took place on March 7, 2007, and the resulting sentence was issued on that date. Koehl's original complaint in this action is dated March 3 and March 5, 2010. *See* Compl. at 18, 20. Under the rule that the complaint in a *pro se*

prisoner case is deemed filed on the date it is delivered to prison officials for mailing, *see Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), any claim would had to have accrued by March 5, 2007, at the latest. Accordingly, the question arises whether the limitations period arose when the allegedly false report was issued—in which case the complaint would be untimely—or when Koehl was found guilty of the charges.

While the analysis will be different to the extent a claim of retaliation is made—an issue we discuss in section III.C below—we conclude that because the due process claim arises out of the punishment that was meted out on the hearing date, any due process claim began to accrue on that date, and not on the date the misbehavior report was issued. Accordingly, we reject defendants' argument that Koehl's due process claim is untimely.

### 3. *Personal Involvement*

Defendants do not argue that Koehl's due process claim should be dismissed because he received sufficient process at the administrative hearings, and thus we do not address this prong of the due process analysis. Instead, their remaining defense is that the claims against Fischer, Russo, Brennan, and Hilliar should be dismissed because the complaint does not allege that they were personally involved in the due process violation. *See* Def. Mem. at 10. [1]

[1]    Defendants have not moved to dismiss the due process claims against Harvey and Sawyer on the ground of lack of personal involvement. *See* Def. Mem. at 10; Am. Compl. at 16–17 ¶ 14(c).

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (internal quotation marks and citation omitted). In addition, personal liability under section 1983 cannot be imposed upon a state official based on a theory of *respondeat superior. See, e.g., Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior"* ) (citation omitted), *cert. denied,* 543 U.S. 1093 (2005); *accord Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). According to the Second Circuit, personal involvement can be shown by

**\*9** evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring

*Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 127 (2d Cir.2004) (quoting *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). More recently, the Supreme Court held in *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009), that "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id. at 1948.* The Supreme Court explicitly rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id. at 1949.* Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id. Iqbal* has caused some courts to question whether all five of the personal involvement categories survive that decision. *See generally D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (citing cases and concluding that the five categories were not necessarily preempted by *Iqbal* ).

With regard to the tier III report, Koehl alleges that Russo, Brennan, and Fischer "conspired to issue [him this report] ... in retaliation for redressing [his] grievances and so [he] could be transferred out of the jail." Am. Compl. at 16 ¶ 14(c). He states that Russo authored the report, which was contrary to the record, and that he refused to allow Koehl to view, obtain, or comment on any of the evidence that was used to find him guilty of the charges. *Id.* He states that this report stemmed from

an alleged grievance letter he sent to Brennan, which was "deemed harassment," and that Brennan swore and signed a complaint demanding Koehl be charged for the alleged letter. *Id.* In his memorandum in opposition, Koehl states that he appealed the hearing officer's decision with regard to this report to Fischer, and that Fischer stated that the entire file was classified. *See* Pl. Mem. at 23. Fischer affirmed the sentence on April 27, 2007. *See id.*

The complaint's allegations against Russo are sufficient to show personal involvement as Koehl has alleged that Russo directly participated in the alleged violation. Specifically, Koehl asserts that Russo denied him his due process rights by refusing to allow him to view, obtain, or comment on the evidence used to find Koehl guilty of the charge in the tier III report. *See* Am. Compl. at 16 ¶ 14(c).

**\*10** On the other hand, the allegations against Brennan are not sufficient to show personal involvement. Brennan, who is "Chairperson, Committee on Professional Standards, Third Judicial Department," apparently received a letter that was traced to Koehl through handwriting analysis and other means—a letter that Koehl denies he wrote. *Id.* The complaint alleges Brennan demanded that Koehl be charged for writing this letter and that he was so charged. But there is no claim that Brennan had any involvement in the adjudication of the report. Thus, there are no facts sufficient to support a finding that Brennan was personally involved in violating Koehl's due process rights. *See Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) ("The filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing.") (citing *Sommer v. Dixon,* 709 F.2d 173, 174–75 (2d Cir.), *cert. denied,* 464 U.S. 857 (1983)); *Anderson v. Banks,* 2008 WL 3285917, at *2 (N.D.N.Y. Aug. 7, 2008)* (writing of false misbehavior reports is "not sufficient to state a due process claim"); *Muhammad v. Pico,* 2003 WL 21792158, at *16 (S.D.N.Y. Aug. 5, 2003)* (filing of an allegedly false report did not personally involve the sergeant who filed it in the due process violations alleged because " 'but for causation' ... is not the standard for Section 1983 liability") (citations omitted); *see generally Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report") (citing *Freeman v.. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)).

As to Fischer, once the hearing on the tier III report was over and the decision was issued, the due process violation was completed. The only opportunity that Fischer had to rectify this violation was through the appeal process itself. To be sure, one of the methods recognized by the Second Circuit to show personal involvement is that the defendant, "after being informed of the violation through [an appeal], failed to remedy the wrong." *Colon,* 58 F.3d at 873. But this category does not apply to Fischer because—as has been held in a related context—"affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983." *Manley v. Mazzuca,* 2007 WL 162476, at *10 (S.D.N.Y. Jan. 19, 2007) (citing, *inter alia, Foreman v. Goord,* 2004 WL 1886928, at *7 (S.D.N.Y. Aug. 23, 2004) ("The fact that [the prison superintendent] affirmed the denial of plaintiff's grievances is insufficient to establish personal involvement.")). As was noted in *Thompson v. New York,* 2001 WL 636432 (S.D.N.Y. Mar. 15, 2001), "[w]ere it otherwise, virtually every prison inmate who sues for constitutional torts by prison guards could name the Superintendent as a defendant since the plaintiff must pursue his prison remedies and invariably the plaintiff's grievance will have been passed upon by the Superintendent." *Id.* at *7 (citations omitted). "The reference in case law to an official who fails to remedy a violation logically applies only to ongoing, and therefore correctable, constitutional violations—not to a specific event that is later subject to formal review by designated officials once the constitutional violation has already concluded." *See Odom v. Calero,* 2008 WL 2735868, at *7 (S.D.N.Y. July 10, 2008) (internal quotation marks omitted); *Harnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008) ("If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation."). Accordingly, the mere allegation that Fischer failed to grant Koehl's appeal is insufficient to show that he was "personally involved" in committing the alleged due process violation.

**\*11** Koehl alleges that defendant Hilliar issued him an allegedly false tier II report stating that he had harassed her. *See* Am. Compl. at 17 ¶ 14(c). However, for the same reasons already stated with respect to Koehl's allegations against Brennan, such allegations are not enough to show personal involvement by Hilliar. *See Williams,* 781 F.2d at 324; *Anderson,* 2008 WL 3285917, at *2.

C. *Retaliation Claims*

It is well established that the First Amendment protects prisoners from retaliation for engaging in protected speech, which includes submitting grievances regarding prison conditions. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). To establish a *prima facie* case of retaliation, an inmate must show: (1) that his speech or conduct was constitutionally protected; (2) that the defendant took adverse action against the plaintiff; and (3) that a causal connection exists between the protected speech and the adverse action. *Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) (citing *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002)). However, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (internal quotation marks and citations omitted); *accord Rivera v. Goord,* 253 F.Supp.2d 735, 749 (S.D.N.Y.2003). "In making this determination, the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens before a retaliatory action taken against them is considered adverse." *Davis,* 320 F.3d at 353 (internal punctuation and citation omitted). Because of the ease with which claims of retaliation can be invoked, the Second Circuit has directed courts to examine such claims "with skepticism and particular care." *Colon,* 58 F.3d at 872 (citation omitted); *see Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.") (citations omitted).

1. *Facility Transfer*

Here, Koehl asserts that defendant Cunningham retaliated against him for filing grievances by transferring him to the "5 Points" facility. *See* Am. Compl. at 10 ¶ 3. Defendants argue that Koehl's claim should be dismissed because: (1) Koehl "has no liberty interest in a particular location," Def. Mem. at 11; Def. Reply at 6; (2) "the facility transfer claim is moot because plaintiff was not transferred out of Green Haven by the time he filed the

complaint," Def. Mem. at 11; Def. Reply at 6; and (3) "the complaint does not explain why the transfers were retaliatory," Def. Mem. at 12; Def. Reply at 6. [2]

[2]    Defendants also cite to the section of their brief discussing Koehl's Eighth Amendment claim in support of their argument that Koehl has not stated a retaliation claim. *See* Def. Mem. at 12 (citing arguments set forth in Point IVa). As this claim is analyzed under a different legal standard than the retaliation claim, and as defendants have not explained their citation to this section, we do not consider this citation to constitute an additional argument in support of dismissal of Koehl's retaliation claim.

**\*12**  Defendants' first argument must fail because, although prisoners have no liberty interest in remaining at a particular facility, prison officials may not transfer inmates in retaliation for exercising their constitutional rights. *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) ("[a] prisoner has no liberty interest in remaining at a particular correctional facility, but prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights") (citations omitted). Because it is well established that the filing of grievances is constitutionally protected activity, prison officials may not transfer inmates in retaliation for such activity. *See Morales,* 278 F.3d at 131. The Court would normally accept defendants' second and third arguments, but inasmuch as Koehl alleges that he was transferred to the "5 Points" facility on June 10, 2010, *see* Pl. Mem. at 20, and that the allegedly retaliatory action taken by defendants was the result of Koehl's filing of "grievances and complaints," Pl. Mem. at 19, we will deem these allegations to amend his complaint. *See Woods,* 2002 WL 731691, at \*1 n. 2. [3]

[3]    Defendants also argue in a footnote that Koehl's allegations against Cunningham with regard to this claim are "speculative." *See* Def. Mem. at 12 n. 3. Koehl specifically alleges, however, that he filed complaints in writing with Cunningham about his cell conditions and that Cunningham subsequently signed the retaliatory request that Koehl be transferred to "5 Points" Correctional Facility. *See* Am. Compl. at 10 ¶ 3; Pl. Mem. at 19.

### 2. Executive Clemency Application

Defendants argue that Koehl has failed to state a claim for retaliation with regard to the sabotage of his executive clemency application by Cunningham, Edwards, Evans, Herman, and Tracy. *See* Def. Mem. at 12–13. Koehl alleges that these defendants sabotaged his application in retaliation for the "redress of grievances, reversals of false misbehavior reports, and civil awards alleging abuse." Am. Compl. at 15–16 ¶ 14(b). In addition to grievances, the filing of civil lawsuits comprises constitutionally protected activity. *See Espinal v. Goord,* 554 F.3d 216, 227 (2d Cir.2009) (holding plaintiff's earlier federal lawsuit was a protected activity) (citation omitted). Thus, Koehl has sufficiently alleged that his speech or conduct was constitutionally protected.

In the prison context, the adverse action element of a retaliation claim is satisfied if the plaintiff alleges facts sufficient to demonstrate that the retaliatory conduct by defendants "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (internal quotation marks and citations omitted). A reasonable jury could find that a deliberate effort by a prison official to sabotage an application for clemency fits within this category.

With respect to the personal involvement of the defendants in this activity, we agree with defendants that Koehl does not allege adverse action on the part of Evans, Edwards, Herman, and Tracy. *See* Def. Mem. at 13. The only allegations Koehl makes regarding Evans and Edwards are that these defendants responded to his questions about the DOP's receipt of letters sent as part of the executive clemency application. *See* Am. Compl. at 15 ¶ 14(b); Pl. Mem. at 25–28. Herman is only mentioned as part of Koehl's discussion of the Department's review of applications for executive clemency. *See* Pl. Mem. at 25–26. No specific allegations are made against him. With respect to Tracy, Koehl states in the complaint that, "[o]n appeal, Defendant Tracy, callously and deliberately falsified official records to continue the conspiracy." Am. Compl. at 15 ¶ 14(b). The problem with this allegation is that it is far too vague and conclusory to identify Tracy's involvement in the scheme.

**\*13**  As for Cunningham, defendants argue that Koehl "does not allege a single actual adverse measure by Cunningham." Def. Mem. at 13. Koehl, however, alleges that Cunningham informed him that "because

of [his] past complaints and winning law suits against DOCS employees," he would "submit an unfavorable recommendation to the Division of Parole regarding [Koehl's] pending application for Commutation of Sentence," that he would "do whatever he [could] to stop [Koehl's] mail from leaving the facility," and that he would "call in every favor ... to sabotage [the] application." Am. Compl. at 15 ¶ 14(b). This is sufficient to show Cunningham's personal involvement. It is also sufficient to show a causal connection between the protected speech and the adverse action since Koehl alleges that Cunningham specifically stated that he was taking the adverse action because of Koehl's protected activities.

### 3. Misbehavior Reports

As was true for the due process claims, defendants argue that the retaliation claims against Fischer, Russo, Harvey, and Brennan—based on the tier III misbehavior report —should be dismissed on statute of limitations grounds. Def. Mem. at 14. As noted in section III.B.2 above, this argument raises the question of whether the claim accrued when the allegedly false report was issued—in which case the complaint would be untimely—or when Koehl was found guilty of the charges alleged.

We believe the answer to this question lies in the specific claim made against a defendant. To the extent a defendant's retaliatory act is the issuance of a false misbehavior report itself, the claim is untimely. See, e.g., Davidson v. Pearson, 2007 WL 952047, at *2 (W.D.N.Y. Mar. 28, 2007) ("[p]laintiff's claims initially accrued on December 27, 1998, the date the alleged false misbehavior report was issued"). To the extent a claim against a defendant is that he took some retaliatory action at the hearing on March 7, 2007, the claim would be timely.

Thus, we examine each potential defendant separately. Fischer's role is not alleged at all in the description of this incident, Am. Compl. at 16–17 ¶ 14(c), and thus the claim must be dismissed as to him. With respect to Brennan, as noted in section III.B.3 above, there is no allegation regarding his involvement in the adjudication of the report and thus no claim can survive as to him. The allegations against Russo are somewhat unclear, but it appears that Koehl is alleging that Russo denied him documents both before and after the hearing date, Am. Compl. at 16–17 ¶ 14(c), and thus we will assume that some of his conduct may fall within the limitations period. Harvey is alleged

to be the hearing officer, and thus any claim against him would be timely.

Turning to the merits, the allegations are sufficient to show Russo and Harvey's personal involvement in that both are alleged to have personally committed acts of retaliation. They are also sufficient to allege a causal connection between their actions and Koehl's protected activities. See Am. Compl. at 16 ¶ 14(c) (defendants actions were done "in retaliation for redressing [Koehl's] grievances and so [Koehl] could be transferred out of the jail to preclude [him] from substantiating [his] claims in a pending matter"). Accordingly, the retaliation claim against Russo and Harvey survives.

**\*14** With respect to the claim regarding the tier II report, this claim is not time-barred but must be dismissed as against defendant Sawyer because there are no facts alleged that he had any personal involvement in the issuance of this misbehavior report, let alone that his involvement in the matter arose because of his desire to retaliate. As discussed above, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Farrell, 449 F.3d at 484 (internal quotation marks and citation omitted). Here, Koehl alleges that Sawyer was the hearing officer in the adjudication of the tier II report, see Am. Compl. at 17 ¶ 14(c); Pl. Mem. at 24. While Koehl alleges that he was wrongly denied access to certain evidence during the tier II hearing, he does not allege any facts reflecting that Sawyer was aware that the misbehavior report had been allegedly issued in retaliation for the filing of grievances. Thus, the allegations against Sawyer with regard to the tier II misbehavior report must be dismissed.

With respect to Hilliar, defendants make no argument that she should be dismissed from this claim. See Def. Mem. at 14. And the complaint contains sufficient allegations reflecting that her involvement in the issuance of the report arose from her desire to retaliate against Koehl's appeal of grievances. See Am. Compl. ¶ 14(c) at 17.

### D. Eighth Amendment Claims

The Supreme Court has held that "the Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Rhodes v. Chapman, 452 U.S. 337, 349 (1981)). The Eighth Amendment imposes an obligation

on prison officials to provide "humane conditions of confinement," including "adequate food, clothing, shelter, and medical care." *Farmer,* 511 U.S. at 832. To establish a violation of the Eighth Amendment on the basis of inhumane prison conditions, a plaintiff must show that the deprivation is sufficiently serious as to result in a denial of " 'the minimal civilized measure of life's necessities,' " *Wilson v. Seiter,* 501 U.S. 294, 298 (1991) (quoting *Rhodes,* 452 U.S. at 347), and that the prison officials acted with "a sufficiently culpable state of mind," *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citation omitted). In the context of conditions of confinement, the requisite mental state is "deliberate indifference ." *Wilson,* 501 U.S. at 302–03.

### 1. Exposure to Environmental Tobacco Smoke

Defendants have moved to dismiss Koehl's claim that his exposure to environmental tobacco smoke ("ETS"), including the 60 days he spent in a double bunk cell with inmates who smoked, constituted cruel and unusual punishment. Defendants argue "that DOCS' practice of double-cell housing does not violate the Eighth Amendment," *see* Def. Mem. at 15 (citing *Jones v. Goord,* 435 F.Supp.2d 221, 257 (S.D.N.Y.2006)), and that DOCS not only has an indoor smoking ban, but that DOCS personnel were actively enforcing this ban, *see* Def. Reply at 5.

**\*15** In *Rhodes v. Chapman,* 452 U.S. 337 (1981), the Supreme Court held that "double celling" is generally permissible under the Eighth and Fourteenth Amendments. *Id.* at 347–48, 352. Nevertheless, when combined with other adverse conditions, double bunking may constitute cruel and unusual punishment. *See Bolton v.. Goord,* 992 F.Supp. 604, 626 (S.D.N.Y.1998). Thus,"[e]xposure to secondhand smoke can give rise to an Eighth Amendment violation." *Jones v. Goord,* 435 F.Supp.2d at 249 (citation omitted). Of course, "[a]s with all claims relating to conditions of confinement, an Eighth Amendment claim based on exposure to secondhand smoke must show that the exposure created an 'unreasonable risk of serious damage' to inmates' future health, and that prison officials were deliberately indifferent to that risk." *Id.* (citing *Helling v. McKinney,* 509 U.S. 25, 35 (1993)).

We will address the 60 days Koehl spent in a double cell in October through December 2008 separately from Koehl's general claim that his exposure to ETS at Green Haven constituted a violation of the Eighth Amendment. Koehl alleges that in October 2008, Ercole assigned him to a double bunk cell in which two out of three of his cell mates "were chain smokers, who smoked all day and night in the cell." *See* Am. Compl. at 10 ¶ 3. With regard to this 60 day assignment, Koehl has alleged facts from which it could be inferred that his exposure to secondhand smoke created an unreasonable risk of serious danger to his health and that defendant Ercole was deliberately indifferent to this risk. Koehl alleges that following his transfer to Green Haven he has had difficulty breathing, his lung disease has progressively worsened, his "heart valves [have] started leaking," and his "fingernails have turned yellow." Pl. Mem. at 8–9, 12, 15. Thus, Koehl has satisfied the objective prong of the Eighth Amendment analysis.

Liberally reading the complaint, Koehl also alleges that he complained about both the conditions in the cell and the impact of these conditions on his lung disease to Ercole and Cunningham in person and in writing and that they refused to enforce the smoking ban and ignored his complaints. *See* Am. Compl. at 10 ¶ 3; *id.* at 12–13 ¶ 10. Koehl alleges that it was defendant Ercole who assigned him to this cell and that Ercole "deliberately and repeatedly falsified records" and ordered Koehl's counselor to demand that Koehl sign a waiver so that he would remain in the double bunk cell. *Id.* at 10 ¶ 3. Thus, Koehl's allegations are sufficient to allow the conclusion that Ercole was aware of the risk Koehl faced and that he deliberately disregarded this risk. *See Farmer,* 511 U.S. at 847 (deliberate indifference exists where an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it"); *Weaver v. Clarke,* 45 F.3d 1253, 1256 (8th Cir.1995) (finding deliberate indifference alleged where the complaint portrayed the prison officials as "consistently unwilling to enforce the smoking ban in [plaintiff's] room and repeatedly unresponsive to any of [plaintiff's] requests and protests").[4] Accordingly, Koehl has stated a claim that his 60 day assignment by Ercole to double bunk in a cell with "chain smokers" constituted cruel and unusual punishment.

[4]    Defendants argue that Koehl's complaint "acknowledges that DOCS has prohibited indoor smoking, and, in fact, was actively enforcing it." Def. Mem. at 21 (citation omitted). While Koehl does acknowledge that there is an indoor smoking ban, *see*

Am. Compl. at 13 ¶ 10, he also alleges that his cell mates "smoked all day and night in the cell," *id.* at 10 ¶ 3, in contravention of the ban, and that Ercole was aware of this noncompliance, *id.* There are no allegations in the complaint that the ban was "actively enforc[e]d" during this particular time period. *See* footnote 5 below and accompanying text.

**\*16** As to defendant Cunningham, Koehl has not alleged that he was personally involved in the alleged deprivation of his Eighth Amendment rights with regard to this 60 day cell assignment. Here, Koehl alleges that it was Ercole who assigned him to this cell, and that Cunningham merely disregarded his complaints, Am. Compl. at 10 ¶ 3, and refused to allow an investigative report into Koehl's medical concerns with regard to his cell assignments, *see* Pl. Mem. at 19. Because "it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations," *Greenwaldt v. Coughlin,* 1995 WL 232736, at \*4 (S.D.N.Y. Apr. 19, 1995), Koehl has failed to allege that Cunningham had any personal involvement in his exposure to ETS.

In addition, Koehl does not state an Eighth Amendment claim with regard to his general allegation that defendants Fischer, Ercole, Lee, Cunningham, and Dr. Bernstein refused to enforce the New York ban on smoking in prisons. *See* Am. Compl. at 13 ¶ 10. Koehl has failed to allege facts from which it could be inferred that defendants Fischer, Lee, Cunningham, and Bernstein were at any time deliberately indifferent to the risk created by Koehl's alleged exposure to secondhand smoke, or that Ercole was deliberately indifferent other than with regard to the 60 days Koehl spent in a double bunk cell with "chain smokers" in October through December 2008. While Koehl makes the broad allegation that Fischer, Ercole, Lee, Cunningham, and Bernstein "callously and deliberately refused to enforce the state's indoor smoking ban," *id.,* this statement is conclusory and unsupported by any allegations regarding either the objective harm to Koehl (outside of the 60 days he spent with the "chain smokers") or these defendants' subjective knowledge of the harm it was causing to Koehl. The complaint's reference to Bernstein's refusal to administer a "cotinine level test," and Ercole, Lee, and Cunningham's failure to install carbon monoxide detectors, Am. Compl. at 12 ¶ 10, does not show deliberate indifference to Koehl's health.

Notably, "[w]hether a prison has a non-smoking policy bears heavily on the question of deliberate indifference," *Enigwe v. Zenk,* 2007 WL 2713849, at \*6 (E.D.N.Y. Sept. 14, 2007) (citing *Helling,* 509 U.S. at 36), and "imperfect enforcement of the policy alone may not support a finding of deliberate indifference," *Enigwe,* 2007 WL 2713849, at \*6 (citing *Scott v. District of Columbia,* 139 F.3d 940, 942–43, 944 (D.C.Cir.1998) (dismissing claims where inmates alleged smoking in housing units but failed to present any evidence in support of claims)). As noted in the exhibits provided by Koehl, attached to his memorandum in opposition, Green Haven policy prohibits smoking in all buildings, and permits it only in restricted outdoor areas. *See* Green Haven Correctional Facility Complaint Investigation, dated May 28, 2009 (annexed as Ex. 23 to Verified Exhibits (annexed to Pl. Mem.) ("Verified Exs.")) ("May 2009 Compl. Invest.") at 1–2. Additionally, these exhibits demonstrate that Green Haven personnel, including defendants Cunningham and Lee, personally investigated Koehl's complaints regarding indoor smoking. *See id.* at 1; Emails from Lee and Devine, dated Mar. 2010 (annexed as Ex. 24 to Verified Exs.) ("Lee Emails") at 2–3. For example, Cunningham was present at the investigation of Koehl's May 6, 2009 complaint and he issued a memo to all Green Haven staff on June 10, 2009, regarding the facility's smoking policy. *See* May 2009 Compl. Invest. at 1; Lee Emails at 2. When Lee became aware of Koehl's complaints and the subsequent report, he issued memos to both staff and inmates regarding the smoking ban and he "directed that security supervisors ensure that staff are enforcing the prohibition." Lee Emails at 2. [5] Thus, while Koehl alleges that the non-smoking policy was not enforced and that defendants were deliberately indifferent to smoking by prisoners, the exhibits provided by Koehl show that at least some efforts were taken to enforce the ban. [6]

[5]    We note that these exhibits do not affect our finding that Ercole's assignment of Koehl to a double bunk cell with "chain smokers" in October through December 2008 constituted a violation of the Eighth Amendment, as these exhibits involve action taken only in 2009 and 2010 and do not involve enforcement of the smoking ban by defendant Ercole.

[6]    As defendants note, Def. Reply at 6 n. 1, Koehl references his treatment and conditions at DOCS' Auburn Correctional Facility for the first time in his opposition brief. *See* Pl. Mem. at 14, 16, 17, 20. As Koehl was not transferred to the Auburn facility until

after he filed the complaint in this action, we do not consider statements in Koehl's memoranda of law regarding the conditions at the Auburn facility.

### 2. *Cell Transfers and Assignments*

**\*17** Koehl claims that the conditions he endured while he was being transferred between cells constituted cruel and unusual punishment because he was forced to carry his belongings from cell to cell which "aggravated [his] previously complained of [medical] conditions." Am. Compl. at 10 ¶ 2; *id.* at 14 ¶ 14. He alleges that his assignment to non-first floor cells, double bunk cells, and a cell which contained "air-borne, lead paint rust dust" constituted a violation of the Eighth Amendment. *Id.*

However, other than Koehl's allegations regarding the 60 days he spent in a double bunk cell with smokers, discussed above, Koehl fails to allege facts from which it could be inferred that his specific cell assignments or physical transfer between cells constituted a violation of the Eighth Amendment. Koehl alleges that when he first arrived at Green Haven—before Ercole assigned him to spend 60 days in a double bunk cell with "chain smokers"—Ercole assigned him to a double bunk cell on the third floor of the facility. *See* Am. Compl. at 10 ¶ 2. Beyond the conclusory allegation that Ercole "callously and deliberately assigned" him to this cell, *id.,* Koehl alleges no facts from which it could be inferred that Ercole was deliberately indifferent to the risk this assignment allegedly caused Koehl. Koehl does not allege that he made Ercole aware of his medical conditions or that Ercole otherwise knew about them. *See Farmer,* 511 U.S. at 847 (deliberate indifference exists where an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it"). Thus, Koehl alleges no facts from which it could be inferred that Ercole knew that Koehl faced a substantial risk of serious harm with regard to this cell assignment.

Other than the cell assignments discussed in paragraphs 2 and 3 of the complaint, Koehl does not allege facts from which it could be inferred that defendant Ercole was personally involved in his cell assignments or transfers. Nor does Koehl allege that defendants Cunningham or Lee were personally involved in his assignments and transfers. He merely states that Cunningham, Ercole, and Lee "physically harmed [him] and deliberately ignored medical orders." Am. Compl. ¶ 14(a). This

broad statement cannot, however, support a deliberate indifference claim and Koehl does not allege any facts supporting the inference that these defendants were involved in the cell assignments and transfers discussed in paragraph 14 of the amended complaint. *See Iqbal,* 129 S.Ct. at 1949 (federal pleading standard requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and a pleading fails if it "offers labels and conclusions" or "tenders naked assertion[s] devoid of further factual enhancement") (internal quotation marks and citations omitted); *Joseph v. Fischer,* 2009 WL 3805590, at \*2 (W.D.N.Y. Nov. 6, 2009) ("conclusory allegations that defendants ha[d] 'personal knowledge' of the events complained of" was insufficient to allege personal involvement). Thus, Koehl's Eighth Amendment claim regarding cell assignments and transfers cannot be sustained on this ground.

**\*18** Koehl's claim that he was under threat of transfer if he did not agree to double bunking, *see* Am. Compl. at 10 ¶ 3, should be dismissed because threats alone do not deprive a plaintiff of any constitutional rights. *See Lamar v. Steele,* 698 F.2d 1286, 1286 (5th Cir.) (per curiam), *cert. denied,* 464 U.S. 821 (1983); *see also Gaut v. Sunn,* 810 F.2d 923, 925 (9th Cir.1987) (threats to deter prisoner from "pursuing legal redress" insufficient to state a claim under § 1983 unless the prisoner was actually deprived access to the court) (internal quotation marks omitted); *Grant v. Fernandez,* 1997 WL 118257, at \*2 (N.D.Cal. Mar. 5, 1997) ("[O]nly harassment and threats coupled with conduct implicating the Eighth Amendment's proscription against cruel and unusual punishment ... may present a claim under § 1983.") (citation omitted).

### 3. *Weather Appropriate Clothing*

Koehl claims that Fischer, Ercole, and Lee denied him appropriate clothing for outside recreation in violation of the Eighth Amendment. *See* Am. Compl. at 14 ¶ 13. Koehl alleges that "most of the winter [he] cannot go outside for recreation without endangering [his] life." *Id.* Prison officials "may be held liable ... for failure to provide adequate clothing, if (1) the inadequacy is 'sufficiently serious' *and* (2) the official's failure is the result of his 'sufficiently culpable state of mind'—i.e., his 'deliberate indifference' to the inmate's health." *Shaffer v. Coombe,* 1995 WL 495067, at \*1 (W.D.N.Y. Aug. 10, 1995) (quoting *Farmer,* 511 U.S. at 833). "Deliberate indifference to an inmate's health equates to 'recklessly

disregarding' a risk to such, and the recklessness *vel non* of the official is judged subjectively." *Shaffer,* 1995 WL 495067, at *1 (quoting *Farmer,* 511 U.S. at 835, 839). We note that this is not a case where Koehl alleges he was confined to a cold cell without the minimal clothing necessary to keep warm. *See, e.g., Corselli v. Coughlin,* 842 F.2d 23, 27 (2d Cir.1988) (claim allowed where prisoner had been deliberately exposed to bitter cold in his cell block for three months).

First, this claim cannot survive in light of the fact that Koehl had a mechanism to stay warm in winter by staying indoors; any time he chose to spend outdoors in the cold was not prolonged, and no substantial harm has been alleged. *See, e.g., Tafari v. McCarthy,* 714 F.Supp.2d 317, 358 (N.D.N.Y.2010) (no Eighth Amendment violation where prisoner was "on many occasions" exposed to "below zero weather for an hour at a time during recreation period") (internal quotation marks and citation omitted); *Davis v.. Buffardi,* 2005 WL 1174088, at *2 (N.D.N.Y. May 4, 2005) (denying claim under Fourteenth Amendment where pretrial detainees failed to submit any evidence that "the temperature in [the prison] was so cold that Plaintiffs experienced substantial harm"); *Brown v. McElroy,* 160 F.Supp.2d 699, 706 (S.D.N.Y.2001) (where prisoner alleged his cell was "extremely cold" and guard would not allow him to enter the hallway for warmth even when prisoner complained about being sick from the low temperatures, claim was dismissed because allegations were "not sufficiently serious" and prisoner could "get warm with some blankets").

**\*19** In addition, the claim fails because Koehl makes only a conclusory allegation that Fischer, Ercole, and Lee "created and enforced unconstitutional customs and policies that ... continually denied [him] adequate clothing for the weather." Pl. Mem. at 28. While personal involvement of a supervisor may be established by showing that he created a policy or custom under which the violation occurred, *Back,* 365 F.3d at 127 (citing *Colon,* 58 F.3d at 873), conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement. *See, e.g ., Green v. Wright,* 2010 WL 3474973, at *2 (W.D.N.Y. Sept. 1, 2010) ("Here, the Court is concerned about the conclusory nature of plaintiff's assertion that defendant was personally involved in his treatment.... Without at least some kind of factual assertion about an unconstitutional policy, not

even the liberal standards for assessing *pro se* pleadings can save plaintiff's claim in its current form."); *Joseph v. Fischer,* 2009 WL 3805590, at *2 (W.D .N.Y. Nov. 6, 2009) ("conclusory allegations that defendants ha[d] 'personal knowledge' of the events complained of" are insufficient to allege personal involvement); *Davis v. City of New York,* 2000 WL 1877045, at *9 (S.D.N.Y. Dec. 27, 2000) (merely asserting that "[defendant] was actively involved in" an incident is conclusory and insufficient to establish defendant's personal involvement in the allegedly unconstitutional custom or policy) (internal quotation marks and citations omitted); *Funches v. Reish,* 1998 WL 695904, at *4–5 (S.D.N.Y. Oct. 5, 1998) (dismissing deliberate indifference to medical care claim against warden of prison facility based upon conclusory allegation that warden created "custom" of denying medical care); *Reid v. Artuz,* 984 F.Supp. 191, 195 (S.D.N.Y.1997) (dismissing an asthmatic prisoner's section 1983 claim against a supervisory official when the plaintiff "fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably conclude personal involvement by the supervisory official ... [—] that [defendant] created or continued a policy or custom which allowed the violation to occur"); *Shaffer,* 1995 WL 495067, at *1 (to satisfy the "deliberate indifference" prong of the Eighth Amendment analysis, "there must be allegations that at least suggest that the defendants were aware of the harm the plaintiff alleges") (citing *Farmer,* 511 U.S. 841). Here, Koehl has failed to allege with the requisite specificity that these supervisory defendants had any personal involvement in the alleged constitutional deprivations. Other than the conclusory statement of their involvement in the unconstitutional policy, Koehl makes no further allegations against them with regard to this claim. Thus, absent from the complaint are any facts suggesting that these defendants knew of, let alone approved, any alleged misconduct with regard to Koehl's clothing. *See Iqbal,* 129 S.Ct. at 1949 (federal pleading standard requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and a pleading fails if it "offers labels and conclusions" or "tenders naked assertion[s] devoid of further factual enhancement") (internal quotation marks and citations omitted). Accordingly, this claim should be dismissed.

### 4. *Medical Treatment*

**\*20** To establish a violation of the Eighth Amendment arising out of inadequate medical treatment, a prisoner is required to prove "deliberate indifference to [his] serious

medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). The deliberate indifference standard consists of both a subjective prong and an objective prong. *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154 (1995). Under the subjective component, the prisoner must show that the defendant officials acted with a "sufficiently culpable state of mind" in depriving the prisoner of adequate medical treatment. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). The "subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Id.* (quoting *Farmer,* 511 U.S. at 835) (alterations in original); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (likening the necessary state of mind to "the equivalent of criminal recklessness") (internal quotation marks and citation omitted), *cert. denied,* 543 U.S. 1093 (2005); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (per curiam) (same). In order to be found "sufficiently culpable," the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 834, 837 (internal quotation marks and citation omitted); *accord Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009). As already noted, "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998).

Under the objective prong, the alleged medical need must be "sufficiently serious." *Hathaway,* 37 F.3d at 66 (internal quotation marks and citations omitted). A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Id.* (internal quotation marks and citation omitted). "Factors that have been considered include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 702 (citations omitted) (alteration in original).

a. *Dental Care*
With respect to Koehl's claim that he has been denied denture adhesive or an implant, *see* Am. Compl. at 13–14

¶ 12, defendants argue that the claim should be dismissed because the fact that a prisoner may prefer a different course of medical treatment does not give rise to an Eighth Amendment violation, *see* Def. Mem. at 18–19 (citing *Chance,* 143 F.3d at 703; *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)).

**\*21** In order to state a claim for deliberate indifference under the Eighth Amendment, Koehl "must allege facts indicating that a substantial risk of serious harm would arise from the denial of the requested dental care ... and that the defendants perceived this risk and chose not to provide the requested treatment." *Partee v.. Grood,* 2007 WL 2164529, at \*5 (S.D.N.Y. July 25, 2007), *aff'd,* 335 F. App'x 85 (2d Cir.2009). "[I]nsufficient dental treatment may rise to the level of a Constitutional violation if it leads to extreme pain, deterioration of the teeth, and an inability to eat properly." *Id.* at \*5 (citing *Chance,* 143 F.3d at 703). However, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703 (citing *Dean,* 804 F.2d at 215).

Assuming *arguendo* that Koehl has alleged facts indicating that a substantial risk of harm arose from his lack of dental care, he has failed to allege that either Fischer or Wright were personally involved in the deprivation of treatment. *See* Am. Compl. at 12–13 ¶ 12; Def. Reply at 2–3. Koehl merely alleges that he was denied dental care pursuant to "Fischer and Wright's policies and customs," Am. Compl. at 13 ¶ 12. Koehl does not, however, allege what these policies are. Nor are there allegations from which it could be inferred that either Fischer or Wright knew of, let alone were involved in, the failure to provide him with dental adhesives or implants. As already noted, conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement. *See Joseph,* 2009 WL 3805590, at \*2 ("Plaintiff's complaint contains many conclusory allegations and, therefore, it is not possible to determine if there is personal involvement for each defendant.... Plaintiff needs to describe the events in sufficient detail to allow for a determination of defendants' personal involvement in the alleged incidents.").

b. *Cervical Spine and Back Injuries*
With respect to Koehl's claim regarding the medical treatment he received for his back, defendants argue that

Koehl has failed to allege the subjective component of a deliberate indifference claim. *See* Def. Mem. at 19.

Turning first to the conduct of Dr. Weinstein, Koehl has not alleged facts giving rise to the inference that Dr. Weinstein acted with a "sufficiently culpable state of mind." Koehl alleges that in late 2008, Weinstein conducted an EMG, which Koehl believed contradicted the results of a previous EMG. *See* Am. Compl. at 10 ¶ 4. After Koehl called Dr. Weinstein "a liar," Dr. Weinstein agreed to order an MRI. *Id.* Koehl also alleges that in late 2009, Dr. Weinstein conducted another EMG "and stated that nothing was wrong." *See id.* at 11 ¶ 7. Koehl states that "[l]ater testing revealed that [Dr.] Weinstein's report and conclusions were knowingly false." *Id.* Apart from the conclusory allegation that Dr. Weinstein's conclusions were "knowingly" false, these allegations do not support the claim that Dr. Weinstein was deliberately indifferent to Koehl's medical problems. Instead, they constitute allegations that Dr. Weinstein did not give Koehl's condition proper treatment—allegations that are insufficient to show a constitutional violation. *See Perkins v. Kansas Dep't of Corr.,* 165 F.3d 803, 811 (10th Cir.1999) ("a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation"); *Troy v. Kuhlmann,* 1999 WL 825622, at *6 (S.D.N.Y. Oct. 15, 1999) ("[A] prisoner's disagreement with the diagnostic techniques or forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim.") (citation omitted).

**\*22** With regard to Fischer and Drs. Wright and Bernstein, however, Koehl has alleged facts creating the inference that these defendants acted with a "sufficiently culpable state of mind," thus satisfying the subjective prong of the deliberate indifference analysis. While defendants argue that Koehl's medical care was "attentive" and that Koehl's claims against Fischer and Drs. Wright and Bernstein regarding his denial of proper diagnostic testing "lack [ ] merit in light of the extensive testing plaintiff received," Def. Mem. at 20, Koehl specifically alleges that, "as a cost saving measure," Fischer and Drs. Wright and Bernstein "callously and deliberately ignored the orders of the neurosurgeons" by canceling Koehl's MRI, changing the type of x-rays ordered, and refusing to order Koehl a new neck brace, Am. Compl. at 11–12 ¶¶ 7, 8. He states that despite his complaints of "extreme pain and weakness in [his] arms,

hands, legs, neck and back," Fischer and Dr. Wright repeatedly denied Koehl proper testing for his medical condition. *Id.* at 10–11 ¶ 4. Koehl also alleges that Dr. Bernstein deliberately scheduled Koehl's MRI on the date when Koehl's parents were visiting so that he could later claim that Koehl had refused treatment. *See id.* at 11 ¶ 5. The Second Circuit has held that the "allegation of ulterior motives, if proven true, would show that the defendants had a culpable state of mind and that their choice of treatment was intentionally wrong and did not derive from sound medical judgment." *Chance,* 143 F.3d at 704. Because Koehl has alleged ulterior motives, including monetary incentives, on the part of Fischer and Drs. Wright and Bernstein, he has alleged facts that create the inference that these defendants had a sufficiently culpable state of mind.

Defendants argue that because Fischer is not a doctor and was not involved in Koehl's medical treatment, that he was entitled to rely on the treatment of medical staff. *See* Def. Reply at 4–5 (citing *Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000)). This argument fails, however, because Koehl does not merely allege that Fischer deferred to the treatment articulated by Koehl's doctors. Instead, he alleges that Fischer directly interfered with Koehl's treatment "as a cost saving measure." Am. Compl. at 11–12 ¶¶ 7, 8.

Defendants also argue that the claims against Dr. Bernstein should be dismissed because they are, "at most, negligence claims." Def. Mem. at 20. While it is true that "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim," *Chance,* 143 F.3d at 703 (citing *Estelle,* 429 U.S. at 105–06), "[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan," *Chance,* 143 F.3d at 703 (citing *Waldrop v. Evans,* 871 F.2d 1030, 1035 (11th Cir.1989) ("choice of an easier but less efficacious course of treatment can constitute deliberate indifference"); *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974)). Here, Koehl claims Dr. Bernstein ignored the orders of his doctors not on the basis of his own medical view, but because of monetary incentives, and that he deliberately interfered with Koehl's treatment in order to make it appear as though Koehl had refused treatment. Accordingly, Koehl has alleged that Dr. Bernstein was more than merely negligent.

### c. *Lung Disease*

**\*23** Koehl alleges that his "chronic and life threatening lung diseases have grown progressively worse" because of his exposure to ETS and that defendants have denied him proper medical treatment for his worsening condition. *See* Am. Compl. at 12–13 ¶¶ 10–11. Specifically, Koehl states that Dr. Bernstein refused to administer a "cotinine level test," that "Ercole, Lee and Cunningham denied the installation of detectors," *id.* at 12 ¶ 10, and that Fischer and Drs. Bernstein and Wright denied him access to a pulmonary specialist, *id.* at 13 ¶ 11. He states that he complained both verbally and in writing to Dr. Fein, Dr. Bernstein, Cunningham, Ercole, and Lee regarding his medical problems, but that his complaints were "ignored and/or brushed under the rug." *Id.* at 12 ¶ 10.

These allegations are insufficient because the complaint does not allege facts satisfying the subjective prong of the deliberate indifference analysis. Koehl has not alleged facts showing that these defendants consciously disregarded a risk of serious harm. Nor does Koehl state that defendants had an ulterior motive for their actions. *See* Am. Compl. at 12–13 ¶¶ 10–11. While Koehl alleges that he should have been allowed to see a pulmonary specialist, *id.* at 13 ¶ 11, he also alleges that he was given multiple CT scans and a pulmonary function analysis, *id.* And in the exhibits attached to Koehl's opposition memorandum, he includes a letter from Dr. Hosannah, a cardiothoracic surgeon at Albany Medical Center, stating that on January 29, 2008, Koehl "underwent a successful bronchoscopy and mediastinoscopy." Letter from Dr. Hosannah to Dr. Weissman, dated Apr. 9, 2008 (annexed as Ex. 15 to Verified Exs.). Thus, while Koehl alleges he was "denied proper testing," Am. Compl. at 13 ¶ 11, the complaint and attached papers cannot plausibly be read to suggest that Koehl was not examined, treated, or administered medically-indicated tests for his lung disease—situations that case law has found to constitute deliberate indifference. *See, e.g., Abraham v. DiGuglielmo,* 2010 WL 2136600, at \*9 (E.D.Pa. May 25, 2010) (doctor's "decision to prescribe antibiotics without examining plaintiff or administering tests to confirm the diagnosis" was found to constitute deliberate indifference); *see also Verley v. Goord,* 2004 WL 526740, at \* 13 (S.D.N.Y. Jan. 23, 2004) ("Because, in his Complaint, [plaintiff] alleged no facts indicating that [the doctor] purposely failed to treat his medical condition or that the diagnosis was contrary to accepted medical standards, [plaintiff's] allegations of a failure to diagnose and treat his back

ailment, as stated in the Complaint, are insufficient to state a claim."). The mere allegation that Koehl had a painful lung disease that was not alleviated by treatment does not by itself reflect that the defendants acted with deliberate indifference, inasmuch as "there exist many medical conditions that do not respond to treatment." *Bryant v. Wright,* 2010 WL 3629443, at \*9 (S.D.N.Y. Aug. 31, 2010), *adopted by* 2010 WL 3629426 (S.D.N.Y. Sept. 15, 2010).

### E. *Qualified Immunity*

**\*24** The doctrine of qualified immunity precludes civil liability where prison officials performing discretionary functions "did not violate clearly established law," or where "it was objectively reasonable for the defendant[s] to believe that [their] action[s] did not violate such law." *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (internal quotation marks and citation omitted); *accord Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (qualified immunity ensures that defendants have "fair notice" that their conduct is unlawful before being exposed to liability and that "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right' ") (quoting *Anderson v.. Creighton,* 483 U.S. 635, 640 (1987)) (additional citations omitted). A qualified immunity defense may be asserted as part of a motion under Fed.R.Civ.P. 12(b)(6) if it is based on facts appearing on the face of the complaint, though defendants asserting the defense at this stage face a "formidable hurdle." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004).

While defendants' memorandum of law contains a brief section asserting that the doctrine of qualified immunity shields defendants from liability, they argue the applicability of the qualified immunity defense only in the vaguest and most general terms. *See* Def. Mem. at 21–23. Significantly, they do not discuss any of the substantive constitutional rights raised, do not provide any explanation as to what specific right was not "clearly established," and do not discuss why defendants would have been reasonable in believing that their alleged conduct was constitutional for any of Koehl's specific claims. Accordingly, there is no basis on which to conclude that the defendants against which Koehl has sufficiently

alleged constitutional claims are entitled to qualified immunity.

IV. *CONCLUSION*

For the foregoing reasons, defendants' motion to dismiss (Docket # 25) should be granted in part and denied in part. Specifically, the following claims should be dismissed: (1) all claims against the State of New York for damages and against the defendants brought in their official capacities; (2) Fourteenth Amendment Due Process claims against Brennan, Fischer, and Hilliar based on disciplinary proceedings; (3) First Amendment retaliation claims (a) against Evans, Edwards, Herman, and Tracy with regard to Koehl's executive clemency application, and (b) against Fischer and Brennan with regard to the tier III misbehavior report and against Sawyer with regard to the tier II misbehavior report; (4) Eighth Amendment claims (a) against Cunningham for his involvement in Koehl's 60 day assignment to a cell with "chain smokers," (b) against Fischer, Ercole, Lee, Cunningham, and Dr. Bernstein for their failure to enforce the New York ban on smoking in prisons, (c) against Ercole, Cunningham, and Lee with regard to Koehl's cell assignments and transfers generally, (d) against Fischer, Ercole, and Lee for their failure to provide Koehl with weather appropriate clothing, (e) against Fischer and Wright for their failure to provide Koehl with dental care, (f) against Dr. Weinstein for his failure to treat Koehl's cervical spine and back injuries, and (g) against Dr. Bernstein, Dr. Fein, Dr. Wright, Ercole, Lee, Cunningham, and Fischer for their failure to treat Koehl's lung disease.

**\*25** Thus, the following claims remain: (1) Fourteenth Amendment Due Process claims against Harvey, Sawyer, and Russo based on disciplinary proceedings; (2) First Amendment retaliation claims (a) against Cunningham with regard to Koehl's facility transfer, (b) against Cunningham with regard to Koehl's executive clemency application, and (c) against Russo and Harvey with regard to Koehl's tier III misbehavior report and against Hilliar with regard to the tier II misbehavior report; (3) Eighth Amendment claims (a) against Ercole for his involvement in Koehl's 60 day assignment to a cell with "chain smokers," and (b) against Fischer, Dr. Wright, and Dr. Bernstein for their failure to treat Koehl's cervical spine and back injuries

### *PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Sidney H. Stein, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Stein. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010).

### All Citations

Not Reported in F.Supp.2d, 2011 WL 2436817

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 3349316
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michel Toliver, Plaintiff,

v.

J. Stefinik, Correction Officer, Shawangunk
Correctional Facility; J. Gardner, Lieutenant
Hearing Officer, Shawangunk Correctional
Facility; Stone, Corrections Officer, Shawangunk
Correctional Facility; Aube, Sgt. in House Unit,
Shawangunk Correctional Facility; Gaye (John
Doe), Corrections Officer, Shawangunk Correctional
Facility; Keys, Corrections Officer, Shawangunk
Correctional Facility; L. Pingott, Captain (Security),
Shawangunk Correctional Facility; D. Degraff,
Corrections Officer, Shawangunk Correctional
Facility; Sergeant Preston, Sergeant Corrections,
Shawangunk Correctional Facility; R. Cutler,
Corrections Officer, Shawangunk Correctional
Facility; Budziszewski, Corrections Officer,
Shawangunk Correctional Facility; R. Kane,
Corrections Officer, Shawangunk Correctional
Facility; C.O. North; J. Peterson, Defendants.

9:12-CV-00077
|
Signed 06/15/2016

**Attorneys and Law Firms**

MICHEL TOLIVER, 464 Hudson Street, #222, New
York, New York 10014, Plaintiff Pro Se.

OFFICE OF THE NEW YORK, STATE ATTORNEY
GENERAL, The Capitol, OF COUNSEL: CATHY Y.
SHEEHAN, AAG, Albany, New York 12224, Attorneys
for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge

**\*1** On January 17, 2012, Plaintiff commenced this civil
rights action, pursuant to 42 U.S.C. § 1983, alleging that
twenty employees of the New York State Department
of Corrections and Community Supervision ("DOCCS")

violated his constitutional rights during his confinement at
the Shawangunk Correctional Facility ("Shawangunk").
*See* Dkt. No. 1. By Decision and Order dated May
3, 2012, this Court dismissed, *sua sponte*, Defendants
Schneiderman, Bellamy, and Prack from the action
because the complaint did not state facts suggesting their
personal involvement in the alleged violations of Plaintiff's
constitutional rights. *See* Dkt. No. 9 at 8-10.

On June 28, 2012, Plaintiff filed an amended complaint
(Dkt. No. 27), which, by Decision and Order dated
December 6, 2012 (Dkt. No. 85), this Court accepted
for filing against seventeen of the original Defendants, as
well as Correction Officer ("C.O.") North, who was not
named in the original complaint. Liberally construed, the
surviving claims in Plaintiff's amended complaint include
(1) a First Amendment claim, based on Defendants'
alleged filing of false misbehavior reports against Plaintiff,
in retaliation for his pursuit of complaints, grievances,
appeals, and Article 78 actions; (2) an equal protection
claim based on alleged discrimination against Plaintiff
because of his race, disability, and/or sexual orientation;
(3) a conspiracy claim related to the retaliation and
discrimination claims; (4) a Fourteenth Amendment claim
alleging denial of procedural due process in connection
with various disciplinary proceedings; and (5) an Eighth
Amendment claim for failure to provide adequate medical
care. Dkt. No. 27 at 8-9; Dkt. No. 35. Plaintiff seeks both
monetary and injunctive relief. Dkt. No. 27 at 14.

Defendants filed a motion, pursuant to Fed. R. Civ.
P. 12(b)(6), seeking dismissal of Plaintiff's amended
complaint in its entirety, on behalf of all but one of
the remaining Defendants. [1] *See* Dkt. No. 134. Plaintiff
responded to the motion to dismiss, and defense counsel
chose not to file a reply. Dkt. No. 150. On November
17, 2014, Magistrate Judge Baxter issued a Report-
Recommendation recommending that the Court grant-
in-part and deny-in-part Defendants' motion to dismiss.
Dkt. No. 155. This Court adopted Magistrate Judge
Baxter's November 17, 2014 Report-Recommendation,
dismissing Plaintiff's conspiracy claim and all claims
against Defendants Fischer, Maly, and LeClaire.

[1]     C.O. North, who, by then, was no longer an active
        DOCCS employee, had not been served with the
        amended complaint and was not then represented in
        this action. *See* Dkt. No. 91. C.O. North has since
        accepted service, and is currently represented by the

Attorney General's Office, as are the other remaining thirteen Defendants.

This Court has previously found that, in litigating this case, Plaintiff has made numerous

> abusive and frivolous filings, which have included more than twenty motions, for preliminary injunctive relief, eight motions to amend the amended complaint, several requests for sanctions, repeated motions to compel discover seeking evidence which is clearly irrelevant to the matter at hand, numerous motions for reconsideration of the Court's denials of Plaintiff's frivolous motions, and countless appeals to this Court of Magistrate Judge Baxter's denials of his frivolous requests.

**\*2** *See* Dkt. No. 233. Since Defendants filed their summary judgment motion, Plaintiff has filed several additional motions to amend or supplement his amended complaint, which this Court denied as frivolous, vexatious, and in clear contravention of repeated notices to Plaintiff "that the Court will not permit [him] to amend the amended complaint in this now four-year old case." *See* Dkt. Nos. 244, 246. Plaintiff filed two Interlocutory Appeals both of which were dismissed by the Second Circuit. *See* Dkt. Nos. 252, 256.

On March 22, 2016, Magistrate Judge Andrew T. Baxter issued a Report-Recommendation recommending that Defendants' summary judgment motion be granted in full.[2] *See* Dkt. No. 249. Specifically, Magistrate Judge Baxter found that Plaintiff's retaliation, equal protection, and Eight Amendment medical indifference claims should be dismissed without prejudice for failure to exhaust all available administrative remedies. *See id.* Further, Magistrate Judge Baxter recommended dismissing Plaintiff's procedural due process claims with prejudice because Plaintiff's factual allegations failed to implicate a liberty interest that would warrant due process protection.

[2]   Although Magistrate Judge Baxter's March 22, 2016, Report-Recommendation indicates that the

Defendants' summary judgment motion should be granted in part, it is clear upon review that all remaining claims in Plaintiff's amended complaint must be dismissed on the grounds stated. Magistrate Judge Baxter found it unnecessary, as does this Court, to address multiple grounds on which to dismiss the same claims. Therefore, the Report-Recommendation actually recommends granting Defendants' summary judgment motion in full, terminating the instant action in its entirety.

Currently before this Court is Magistrate Judge Baxter's Report-Recommendation, to which neither party has objected.

# I. DISCUSSION

## A. Standard

When a party files specific objections to a magistrate judge's report-recommendation, the district court "make[s] a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). However, when a party files "[g]eneral or conclusory objections, or objections which merely recite the same arguments [that he] presented to the magistrate judge," the court reviews those recommendations for clear error only. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, *2 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

A litigant's failure to file objections to a magistrate judge's report-recommendation, even when that litigant is proceeding pro se, waives any challenge to the report on appeal. *See Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point") (citation omitted). A pro se litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson*, 968 F.2d 298, 299 (2d Cir. 1992); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (holding that a pro se party's failure to object to a report-recommendation

does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

**\*3** In the present matter, Magistrate Judge Baxter provided Plaintiff adequate notice that he was required to file any objections to the Report-Recommendation, and specifically informed him that failure to object to any portion of the report would preclude his right to appellate review. *See* Dkt. No. 249 at 26. Specifically, Magistrate Judge Baxter informed Plaintiff that "**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72." Dkt. No. 249 at 26.

Magistrate Judge Baxter clearly provided Plaintiff with sufficient notice of the consequences of failing to object to the Report-Recommendation. Although Plaintiff requested and was granted two extensions of time to file objections, no objections have been filed.

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and, based on the undisputed facts, judgment for the movant is warranted as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement;

rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* at 295 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment." *Kotler v. Fischer*, No. 9:09-CV-01443, 2012 WL 929823, \*12 (N.D.N.Y. Mar. 19, 2012) (citations omitted). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Cary v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## B. Exhaustion

**\*4** The Prison Litigation Reform Act ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1983; 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all suits brought by inmates regarding aspects of prison life. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002). Inmates must exhaust all available administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004). The failure to exhaust is an affirmative defense that must be raised by the defendants and, as such, it is the defendants' burden to establish that the plaintiff failed to meet the exhaustion requirements. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004); *see,*

*e.g.*, *Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *Woodford*, 548 U.S. at 90-103.

New York State has a three-step administrative review process. First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC") which reviews and investigates the formal complaint before issuing a written determination. *See* 7 N.Y.C.R.R. § 701.5(b). Second, an adverse decision by the IGRC may be appealed to the Superintendent of the Facility. *See id.* at § 701.5(c). Third, an adverse decision by the Superintendent may be appealed to Central Office Review Committee ("CORC"), which makes the final determination within the administrative review process. *See id.* at § 701.5(d). If all three of these levels of review are exhausted, the prisoner may seek relief in federal court pursuant to § 1983. *See* *Bridgeforth v. DSP Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing *Porter*, 534 U.S. at 524); *Singh v. Goord*, 520 F. Supp. 2d 487, 495-96 (S.D.N.Y. 2007) (quoting *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)). When a plaintiff presents a claim arising "directly out of a disciplinary or administrative segregation hearing ... (*e.g.*, a claim of denial of procedural due process), he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal." *Sweet v. Wende Corr. Facility*, 514 F. Supp. 2d 411, 413 (W.D.N.Y. 2007) (internal quotation and citations omitted); *see also* *Davis v. Barrett*, 576 F.3d 129, 131-32 (2d Cir. 2009).

To the extent a civil rights claim must be exhausted by the grievance process, completion of the three-tiered process, through and including a final decision by CORC, must be completed before an action asserting that claim may be initially filed. *See, e.g.*, *Casey v. Brockley*, No. 9:13-CV-1271, 2015 WL 8008728, *5 (N.D.N.Y. Nov. 9, 2015) ("Receiving a decision from CORC *after* commencing

litigation does not satisfy PLRA's requirement that administrative remedies be exhausted *before* filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice") (citing *Neal v. Goord*, 267 F.3d 116, 122-23 (2d Cir. 2001), *overruled on other grounds*, *Porter v. Nussle*, 534 U.S. 516 (2002)); *Rodriguez v. Rosner*, No. 12-CV-958, 2012 WL 7160117, *8 (N.D.N.Y. Dec. 5, 2012). "[A] post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced." *Guillory v. Haywood*, No. 9:13-CV-1564, 2015 WL 268933, *11 (N.D.N.Y. Jan. 21, 2015) (citing *Neal*, 267 F.3d at 122) (other citation omitted).

**\*5** When the Second Circuit decided *Giano*, it also decided four other related cases, further clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and carved out particular instances in which the requirement could be waived or excused. *See* *Hemphill*, 380 F.3d at 686; *Abney v. McGinnis*, 380 F.3d 663 (2d Cir. 2004); *Johnson v. Testman*, 380 F.3d 691 (2d Cir. 2004); *Ortiz v. McBride*, 380 F.3d 649 (2d Cir. 2004). Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement: (1) whether the administrative remedies were available to the inmate; (2) whether the defendants' own actions inhibited exhaustion, estopping them from raising the defense of exhaustion; (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *See* *Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill*, 380 F.3d at 686). Although the Second Circuit has "questioned," without deciding, whether *Hemphill* remains good law after *Woodford*, it has applied the three-part inquiry to recent cases. *See, e.g.*, *Heyliger v. Gebler*, 624 Fed. Appx. 780, 782-83 (2d Cir. 2015); *Davis v. State of New York*, 311 Fed. Appx. 397, 399 (2d Cir. 2009); *Snyder v. Whittier*, 428 Fed. Appx. 89, 91 (2d Cir. 2011).

In their answer to the amended complaint, Defendants properly asserted the affirmative defense that Plaintiff failed to exhaust his administrative remedies prior to bringing this federal civil rights action. *See* Dkt. No. 171 at 4. Plaintiff's argument that Defendants waived their right to assert an exhaustion defense by not raising it in their pre-answer motion to dismiss is without merit. *See* Dkt. No. 242-1 at 12; *Villante v. VanDyke*, 93 Fed. Appx. 307, 309 (2d Cir. 2004) (explaining that "[f]ederal Rule of Civil Procedure 8(c) requires only that an affirmative defense

be included in a responsive pleading, such as an answer, not that it be the subject of a pretrial motion" and finding that the defendants, "having raised the exhaustion defense in their answer, did not waive the defense by failing to include it in their first motion for summary judgment"); *see also Belgrave v. Pena*, 254 F.3d 384, 387 (2d Cir. 2001) (permitting a defendant to amend its answer to state an exhaustion defense). As Magistrate Judge Baxter correctly found, Defendants did not waive the exhaustion defense by not asserting it in their initial motion to dismiss. *See* Dkt. Nos. 104, 171.

Defendants have submitted an affidavit from Michael Cunningham, the supervisor of the Inmate Grievance Program ("IGP") at Shawangunk listing all of the grievances filed by Plaintiff between February 2011 (the date of Plaintiff's transfer to Shawangunk) and July 2012. *See* Dkt. No. 236-3 at 2. Additionally, Defendants submitted a certified copy of a CORC report showing Plaintiff's appeals to CORC of grievances filed between 2011 and 2015. [3] *See* Dkt. No. 236-8 at 3-5. This data indicates that Plaintiff filed five grievances at Shawangunk before he filed his initial complaint on January 17, 2012, and that although he fully exhausted two of those claims, they were not exhausted until February and March of 2011, after Plaintiff filed his initial complaint. *See* Dkt. No. 236-10 at 21.

[3]     The information from these two sources was collated in a spreadsheet summarizing Plaintiff's grievance filings and appeals, attached as Appendix A to Defendants' Memorandum of Law. *See* Dkt. No. 236-10 at 20-21.

In his response in opposition to Defendants' motion for summary judgment, Plaintiff claims, in conclusory terms, that he submitted many more grievances than Defendants acknowledged in their motion, which the IGRC refused to file, and that he filed additional appeals to CORC, which CORC refused to accept. *See* Dkt. No. 242-1 at 2-3. Plaintiff's amended complaint, although often vague and confusing, appears to allege that he "circulated" or filed "complaints" or grievances on the following dates: March 9, 22, 25, and 30. *See* Dkt. No. 27 at 11-12. Plaintiff attached a letter to his amended complaint sent by DOCCS Deputy Commissioner LeClaire dated April 26, 2011, in response to a complaint from Plaintiff, which reminds Plaintiff that "[a]llegations of misconduct by facility staff should be directed to facility officials through the established grievance mechanism or by writing to

the Superintendent." *See* Dkt. No. 27 at 63. Thus, it appears as though Plaintiff may be referring to informal complaints that he failed to properly direct to the established grievance mechanism.

**\*6** Plaintiff has submitted a copy of one formal grievance, dated March 9, 2011, that does not appear to be reflected on Defendants' spreadsheet. In the amended complaint, however, Plaintiff merely alleges that he "circulated" this grievance to "the above named defendants," so it is unclear whether he properly submitted this grievance to IGRC. *See* Dkt. No. 27 at 11, 63; Dkt. No. 236 at 21; Dkt. No. 243-4 at 31. Further, Plaintiff has not submitted any documentation to suggest that he appealed a denial of the March 9, 2011 grievance. *See* Dkt. No. 27 at 11. Finally, whether Plaintiff properly submitted the March 9, 2011, grievance is unimportant as the substance of that grievance was covered, in much greater detail, in Plaintiff's March 10, 2011 grievance, which was properly submitted to IGRC and appealed. *See* Dkt. No. 236 at 21.

As Magistrate Judge Baxter correctly found, Plaintiff's vague and conclusory allegations that he filed other grievances that were not accepted by the IGRC at Shawangunk do not, in light of the documentation that Defendants have provided about Plaintiff's grievance history, create a factual dispute material to the issue of whether Plaintiff exhausted his administrative remedies before he filed his initial complaint. *See Jeffreys v. City of new York*, 426 F.3d 549, 554 (2d Cir. 2005) (explaining that where a plaintiff, in response to a motion for summary judgment, provides only their "own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account" (quotation and internal citation omitted); *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case") (citations omitted).

Similarly, as Magistrate Judge Baxter correctly found, Plaintiff's claim that CORC sometimes refused to accept his appeals does not create a material issue of fact with respect to the exhaustion issue. Plaintiff has submitted two

letters, received by him from CORC, dated July 20, 2011, [4] and June 12, 2012, returning papers to him and advising Plaintiff that appeals of grievances must be submitted through the IGRC at his facility, and not sent directly to CORC for review. *See* Dkt. No. 4-2 at 8-9; Dkt. No. 27 at 70. Only the July 20, 2011 letter is relevant to the exhaustion issue in this case because it pre-dates the filing of Plaintiff's initial complaint, whereas the June 12, 2012, letter was sent and received after the commencement of this action. *See* Dkt. No. 4-2 at 9. It is clear that the July 20, 2011 letter refers to Grievance No. 26770-11, which Plaintiff did ultimately appeal to exhaustion. *See* Dkt. No. 236-10 at 21. While CORC's return of Plaintiff's initial inquiry relating to Grievance No. 26770-11 may have delayed CORC's decision, it was Plaintiff's own mistake that would have caused that delay and would not estop Defendants from using the affirmative defense of exhaustion, nor is it a "special circumstance" under the *Hemphill* factors.

[4]    Magistrate Judge Baxter's March 22, 2016, Report-Recommendation refers to this as the July 11, 2011 letter, which was the date on which Plaintiff received an adverse decision to his SHG-26770-11 Grievance; however, the actual letter from Karen Bellamy, Director of IGP, is dated July 20, 2011.

Plaintiff's primary argument as to why his failure to exhaust administrative remedies before filing this action should be excused, is that CORC far exceeded the time limits set by DOCCS regulations in denying his final appeal of Grievance No. 26770-11. *See* Dkt. No. 242-1 at 4-8. However, it is well-established law in the Second Circuit that a plaintiff must wait for a final decision from CORC before filing an action, even if CORC's decision is untimely under DOCCS internal rules and regulations. *See Casey*, 2015 WL 8008728, at *6 ("CORC's failure to act within the time frame set out in the regulations does not constitute a special circumstance justifying the failure to exhaust") (collecting cases); *Guillory*, 2015 WL 268933, at *12 ("although regulations require CORC to respond within thirty days, its failure to do so is not a 'special circumstance' which might defeat an exhaustion defense" (citation omitted)). The numerous grievances pursued by Plaintiff in 2011 and 2012, as well as the two appealed grievance decisions, clearly indicate that Plaintiff had access to, and took advantage of, the grievance process and was thus not inhibited from fully utilizing the grievance process. *See* Dkt. No. 236-10 at 21. Therefore, Plaintiff has failed to establish a material issue of fact with

respect to the availability of the administrative grievance remedies that might justify Plaintiff's failure to exhaust the administrative grievance process before filing this action.

**\*7** As Magistrate Judge Baxter correctly found, Plaintiff's retaliation, equal protection, and Eighth Amendment medical claims must be dismissed without prejudice for failure to exhaust the administrative grievance process prior to filing this action. While requiring Plaintiff to initiate a new lawsuit now that at least two of his claims have been fully exhausted may seem judicially inefficient, if the resulting decision is favorable to the plaintiff "the federal court will have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset." *Neal*, 267 F.3d at 123. Moreover, "allowing prisoner suits to proceed, so long as the inmate eventually fulfills the exhaustion requirement, undermines Congress' directive to pursue administrative remedies prior to filing a complaint in federal court." *Id.*

### C. Due process claims

Defendant's have not argued that Plaintiff failed to fully appeal the disciplinary hearings challenged in the Amended Complaint. *See* Dkt. Nos. 27, 236. Accordingly, as Magistrate Judge Baxter correctly found, the due process claims cannot be dismissed based on failure to exhaust, and must be addressed on the merits. *See* Dkt. No. 249.

The Fourteenth Amendment to the Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV, § 1. "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted). These procedural protections include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Id.* (citing *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974)) (other citation omitted). Additionally, the hearing officer's findings must be supported by "some"

"reliable evidence." *Id.* (citing *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)) (other citation omitted).

To successfully state a claim under section 1983 for denial of due process, a plaintiff must establish both the existence of a protected liberty or property interest, and that he or she was deprived of that interest without being afforded sufficient process. *See Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004) (citing *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)); *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). In *Sandin*, the Supreme Court held that although states may create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. 483-84 (internal citations omitted).

The Second Circuit has refused to set a bright line rule on when confinement becomes atypical. "In order to determine whether a liberty interest has been affected, district courts are required to examine the circumstances of a confinement ... and to identify with specificity the facts upon which [their] conclusions [are] based." *Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir. 1998) (citations omitted). While under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin*, the Second Circuit generally takes the position that confinement in a Special Housing Unit ("SHU"), without unusual conditions, for a period of up to 101 days will not constitute an atypical hardship, while confinement for a period of more than 305 days has been held to be atypical even if under "normal conditions." *Ortiz*, 380 F.3d at 654; *see Colon v. Howard*, 215 F.3d 227, 231, 232 n.5 (2d Cir. 2000). The "atypicality" inquiry under *Sandin* is normally a question of law. *Colon*, 215 F.3d at 230-31; *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).

**\*8** "Overlapping disciplinary penalties may, under some circumstances, have to be aggregated for purposes of determining whether a liberty interest was violated."

*Reynoso v. Selsky*, 292 Fed. Appx. 120, 122 (2d Cir. 2008) (citation omitted). "Generally, it appears from Second Circuit decisions that separate SHU sentences constitute a 'sustained' period of confinement [that may be aggregated] when (1) they are contiguous *and* (2) they either (a) were imposed by the same disciplinary hearing officer or (b) were based on the same administrative rationale and are executed under the same conditions." *Taylor v. Artus*, No. 9:05-CV-271, 2007 WL 4555932, \*8 (N.D.N.Y. Dec. 19, 2007) (collecting cases) (emphasis in original).

Although all relevant disciplinary proceedings involved Tier II hearings, for which the maximum possible confinement was 30 days of segregated housing or keeplock and would not, therefore, trigger due process protection individually, it is appropriate to aggregate two discrete periods in 2011 for due process analysis purposes. During these two discrete periods, Plaintiff served consecutive terms of confinement exceeding 30 days, and all of Plaintiff's disciplinary hearings at Shawangunk were conducted by the same individual, Defendant Gardner.[5] *See* Dkt. No. 236-10 at 17 (citing N.Y. Comp. Codes R. & Regs. Tit. 7 § 253.7(a)(1)(iii)).[6] When aggregated, these two distinct periods constitute a 59 day consecutive period of keeplock served between March 14 and May 11, 2011, and a 64 day consecutive period of keeplock served between October 14 and December 16, 2011. *See* Dkt. No. 236-9 at 7-8. However, as Magistrate Judge Baxter correctly found, Plaintiff's liberty interests were not implicated by the disciplinary proceedings challenged in the amended complain, even after aggregating the two consecutive periods of keeplock, given the absence of any allegations from Plaintiff about unusually harsh conditions of his keeplock.

5    Plaintiff began serving more severe disciplinary sentences following disciplinary proceedings in July 2012, but that, and subsequent disciplinary hearings occurred after Plaintiff filed his amended complaint, and are not part of this action. *See* Dkt. No. 236-9 at 6-7.

6    The federal district courts in New York, applying *Sandin*, have consistently held that terms of special housing or "keeplock" of approximately 30 days, and the related loss of privileges, do not implicate a liberty interest protected by the due process clause, even in the absence of detailed factual development regarding the conditions of confinement. *See, e.g.*,

*Brown v. Secore*, No. 9:08-CV-085, 2010 WL 980233, *5 (N.D.N.Y. Mar. 15, 2010) (collecting cases).

Plaintiff's inmate history does not list two misbehavior reports filed by Defendant Budziszewski, which Defendants included with their motion. *See* Dkt. No. 236-6 at 69, 82-84. Plaintiff contends in his amended complaint that there were additional misbehavior reports filed against him in 2011 which are not reflected on the disciplinary history submitted by Defendants. *See* Dkt. No. 27 at 11, 24, 34-35, 48. Plaintiff, however, does not provide any specific allegations to suggest that he served punishment on disciplinary charges brought against him prior to the filing of his amended complaint on June 26, 2012 beyond that reflected in his disciplinary history or in the other disciplinary records submitted by Defendants.

Plaintiff has not submitted any evidence establishing, or even made any allegations, that the conditions he experienced while serving keeplock sentences at Shawangunk were more harsh than typical keeplock conditions. Therefore, as Magistrate Judge Baxter correctly found, none of the periods of keeplock confinement he served would implicate a liberty interest warranting due process protection. *See, e.g.*, *Holland v. Goord*, No. 05-CV-6295, 2006 WL 1983382, *7 (W.D.N.Y. July 13, 2006) (finding 77 days in keeplock during which the plaintiff was deprived of TV, phone, packages, and commissary, and was unable to attend Muslim services and classes, did not constitute a liberty interest); *Pilgrim v. Bruce*, No. 9:05-CV-198, 2008 WL 2003792, *15 (N.D.N.Y. May 7, 2008) (finding that a plaintiff's conclusory allegations, which notably failed to include claims that he was denied food, clothing, bedding, heat, running water, toiletries, or medicine during his 60 days in keeplock, fail to establish that he was subject to more severe conditions than in normal restrictive confinement); *Holmes v. Grant*, No. 03-CIV-3426, 2005 WL 2839123, *5 (S.D.N.Y. Oct. 25, 2005) (finding that sixty days in the SHU at Shawangunk is "insufficient to constitute a deprivation of a liberty interest").

**\*9** Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's due process claims.

## II. CONCLUSION

After carefully considering Magistrate Judge Baxter's Report-Recommendation, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's March 22, 2016 Report-Recommendation is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' summary judgment motion is **GRANTED in full**; and the Court further

**ORDERS** that Plaintiff's retaliation, equal protection, and Eighth Amendment medical indifference claims are **DISMISSED** without prejudice; and the Court further

**ORDERS** that Plaintiff's procedural due process claims are **DISMISSED** with prejudice; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 3349316

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1512371
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Dana GIBSON, Plaintiff,

v.

C. ROSATI, et al., Defendants.

9:13-cv-503 (GLS/TWD)
|
Signed 04/27/2017

**Attorneys and Law Firms**

FOR THE PLAINTIFF: DANA GIBSON, 05-A-3824,
Upstate Correctional Facility, P.O. Box 2001, Malone,
New York 12953, pro se.

FOR THE DEFENDANTS: HON. ERIC T.
SCHNEIDERMAN, OF COUNSEL: JOSHUA E.
MCMAHON, Assistant Attorney General, New York
State Attorney General, The Capitol, Albany, New York
12224.

### ORDER

Gary L. Sharpe, U.S. District Judge

**\*1** The above-captioned matter comes to this court
following an Order and Report-Recommendation by
Magistrate Judge Thérèse Wiley Dancks, duly filed on
March 10, 2017. (Dkt. No. 192.) Following fourteen days
from the service thereof, the Clerk has sent the file,
including any and all objections filed by the parties herein.

No objections having been filed [1], and the court having
reviewed the Report and Recommendation for clear error,
it is hereby

[1]    Plaintiff was granted two (2) extensions of time to file
       objections to the report-recommendation, where the
       latter extension permitted the plaintiff until April 24,
       2017 to file any objections. (Dkt. Nos. 193-196.)

**ORDERED** that the Report-Recommendation (Dkt. No.
192) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Plaintiff's motion for partial summary
judgment (Dkt. No. 153) is **DENIED**; and it is further

**ORDERED** that Defendants' cross-motion for partial
summary judgment (Dkt. No. 163) is **GRANTED**; and it
is further

**ORDERED** that this matter is deemed trial ready and a
scheduling order will be issued in due course; and it is
further

**ORDERED** that the clerk provide a copy of this Order to
the parties in accordance with the court's Local Rules of
Practice.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 1512371

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00366-DNH-TWD   Document 45   Filed 07/05/18   Page 91 of 126
Guillory v. Ellis, Not Reported in F.Supp.2d (2012)
2012 WL 2754859

2012 WL 2754859
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Patrick GUILLORY, Plaintiff,

v.

Kurt ELLIS, Cleric, Mid–State Correctional
Facility; Kyle Ready, Correctional Officer, Mid–
State Correctional Facility; Theda Kupiec, Senior
Mail Room Supervisor, Mid–State Correctional
Facility; Sheila Marlenga, Facility Steward, Mid–
State Correctional Facility; Maureen Boll, Deputy
Commissioner, Department of Corrections and
Community Supervision; and Brian Fischer,
Commissioner, Department of Corrections
and Community Supervision, Defendants.

No. 9:11–CV–600 MAD/ATB.
|
July 9, 2012.

**Attorneys and Law Firms**

Patrick Guillory, 09–B–0714, Gouverneur Correctional
Facility, Scotch Settlement Road, Gouverneur, New
York, Plaintiff pro se.

Office of The New York State Attorney General, The
Capitol, Albany, New York, for Defendants.

William J. McCarthy, Jr., AAG, of Counsel.

MEMORANDUM–DECISION AND ORDER

DAGOSTINO, J.

I. INTRODUCTION

**\*1** On November 4, 2011, Plaintiff *pro se* filed a motion
for a Temporary Restraining Order ("TRO"), and on
December 29, 2011, Plaintiff filed a motion for summary
judgment relating to his civil rights complaint. In his
civil rights complaint, Plaintiff alleges that Defendants
subjected him to religious discrimination, denied him
access to courts, and retaliated against him for exercising
his First Amendment Rights. *See* Dkt. No. 48–1; Dkt. No.
54 at 1.

Magistrate Judge Baxter issued a Report–
Recommendation dated March 22, 2012, recommending
that the Court deny both motions. *See* Dkt. No. 54 at
2. Currently before the Court are Plaintiff's objections
to Magistrate Judge Baxter's March 22, 2012 Report–
Recommendation. [1]

[1]   Plaintiff's objections to Magistrate Judge Baxter's
Report–Recommendation were filed with the Court
on March 27, 2012, as well as supplemental objections
to the same, filed with the Court on April 3, 2012 and
May 21, 2012. *See* Dkt. Nos. 56, 58 & 70.

II. BACKGROUND

A. Factual Background
In a September 27, 2011 Decision and Order, the Court
dismissed some of Plaintiff s claims "with prejudice"
and some "without prejudice with leave to replead,"
and allowed the following claims to proceed without
amendment to the complaint:

(1) Plaintiff's First Amendment Free Exercise Clause
and Religious Land Use and Institutionalized
Persons Act ("RLUIPA") [2] claim against Defendant
Ready regarding the events of December 7, 2010;

[2]   42 U.S.C. § 2000cc (2006).

(2) Plaintiff's First Amendment Free Exercise Clause
and RLUIPA claims against Defendant Ellis
regarding the events of March 20, 2011;

(3) Plaintiff's claim that Defendant Ready denied
Plaintiff the right to attend a religious service
on December 7, 2010 in retaliation for filing a
grievance;

(4) Plaintiff's Equal Protection claim against
Defendant Ready;

(5) Plaintiff's claim that Defendants Kupiec and
Marlenga lost or destroyed Plaintiff's property
in retaliation for filing grievances;

(6) Plaintiff's claim that Defendants Kupiec and
Marlenga interfered with Plaintiff's right to send
and receive mail;

(7) Plaintiff's claim that Defendants Kupiec and Marlenga denied Plaintiff access to the courts, and

(8) Plaintiff's claims against defendants Fischer and Boll (except those claims relating to the allegedly inadequate grievance system).

*See id.* at 41 n. 11. For a more complete discussion of the underlying claims, the Court directs the parties to the Court's September 27, 2011 Decision and Order.

B. Magistrate Judge Baxter's Report–Recommendation
In his Report–Recommendation date March 22, 2012, Magistrate Judge Baxter recommended that the Court deny Plaintiff's motions for summary judgement and for a TRO. *See* Dkt. No. 54 at 2.

Regarding the current motion for a TRO, this is the third of its kind that Plaintiff has filed. *See* Dkt. 35; Dkt. No. 54 at 3 n.3. Magistrate Judge Baxter noted that the Court previously denied Plaintiff's other two motions for injunctive relief based on Plaintiff's transfer from Mid–State Correctional Facility to Gouverneur Correctional Facility. *See* Dkt. No. 54 at 5. Ching to *Day v. Chaplin,* 354 Fed. Appx. 472, 473 (2d Cir.2009), the Court held that an inmate's request for injunctive relief against a particular correctional facility becomes moot upon transfer or discharge to a different correctional facility. As with his previous motions, Magistrate Judge Baxter equally found that Plaintiff's third motion for a TRO is moot. *See* Dkt. No. 54 at 5.

**\*2** Magistrate Judge Baxter based his decision on several factors, including that the motion for injunctive relief was not directed at the original defendants because Plaintiff had been transferred to a new correctional facility, and the " 'new' alleged deprivations" that had occurred after the issuance of the Court's previous order "were over." *See id.* at 5–6. Magistrate Judge Baxter also found that Plaintiff's concerns of possible future retaliation are "too speculative to warrant injunctive relief." *See id.* at 6 (citing *Smolen v. Dildine,* No. 11–CV–6434, 2011 WL 6030112, \*2 (W.D.N.Y. Dec. 5, 2011) (other citations omitted)).

As to the motion for summary judgment, Magistrate Judge Baxter's Report–Recommendation recommends that the Court find that there are questions of fact remaining with regards to certain claims, and that Plaintiff

has not met his burden entitling him to summary judgment with respect to other claims. *See id.* at 10, 11, 12, 16.

Regarding the claims involving an alleged violation of Plaintiff's First Amendment Free Exercise rights under RLUIPA, Magistrate Judge Baxter recommended, with respect to the December 7, 2010 incident involving Defendant Ready, [3] that "[P]laintiff's own exhibits show that there is a question of fact regarding these issues." *See id.* at 9–10. With respect to the March 20, 2011 incident involving Defendant Ellis, [4] Magistrate Judge Baxter examined Plaintiff's grievance, and the investigation report of that grievance, which indicated that the Rabbis arrived late for the Purim celebration. [5] *See* Dkt. No. 48–2, Ex. B. Magistrate Judge Baxter concluded that it is clear a question of fact remains regarding Defendant Ellis' conduct, and thus Plaintiff's motion should be denied. *See* Dkt. No. 54 at 11.

[3]     On December 7, 2010, Plaintiff was denied attendance to religious services by Defendant Ready despite his name appearing on a call-out list for such services. *See* Dkt. No. 54 at 9–10 (citing Compl. at ¶¶ 37–47).

[4]     On March 20, 2011 Plaintiff was permitted a scheduled visit with a Rabbi for a Purim celebration, but the service was cut short by Defendant Ellis. *See* Dkt. No. 54 at 10 (citing Compl. ¶ 65). Plaintiff filed a grievance with Mid–State's Superintendent regarding Defendant Ellis' action. *See* Dkt. 48–1 at ¶¶ 19, 20.

[5]     The Purim celebration commenced upon the arrival of the Rabbis. *See* Dkt. No. 48–2, Ex. B.

Regarding the claims involving retaliation, Magistrate Judge Baxter stated that the "fact that corrective action was taken after a grievance by plaintiff, without more, does not prove that a constitutional or statutory violation occurred." *See id.* Additionally, although an "alleged adverse action occurred in close proximity to the protected conduct," this does not "necessarily prove plaintiff's claim by a preponderance of the evidence." *See id.* at 12 (citing *Davis v. Goord,* 320 F.3d 346, 352–54 (2d Cir.2003); *Jackson v. Goord,* No. 06–CV–6172, 2011 WL 4829850, \*17 (W.D.N.Y. Oct. 12, 2011); *Brown v. Graham,* No. 9:07–CV–1353, 2010 WL 6428251, \*16–20 (N.D.N.Y. Mar. 30, 2010)). Accordingly, Magistrate Judge Baxter recommended that the Court find Plaintiff is not entitled to summary judgment on his retaliation claims. *See id* .

Addressing the access to courts/mail claims, Magistrate Judge Baxter noted that a constitutional violation of denying access to the courts requires that Plaintiff show Defendants' conduct was deliberate and malicious, and resulted in injury to Plaintiff. *See id.* at 13–14 (citing *Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008)). Magistrate Judge Baxter recommended that the Court find that a question of fact still exists, noting that just because Plaintiff received a reimbursement for the certified mail from Defendant Kupiec does not mean she was responsible for the error. *See id.* at 14. [6] As such, Magistrate Judge Baxter determined that a question of fact exists regarding causation in Plaintiff's access to the courts claim. *See id.* at 15. Magistrate Judge Baxter also came to the same conclusion regarding Plaintiff's claim that Defendant Kupiec destroyed his mail in retaliation for his complaints. *See id.*

[6]     Magistrate Judge Baxter also noted that Plaintiff filed a motion to dismiss his own complaint with prejudice in his case before the Court of Claims. *See id.* at 14. Magistrate Judge Baxter stated that "Plaintiff cannot ask the Court of Claims to dismiss his action and then blame the defendant for the 'injury' " if such injury does in fact exist. *See id.* at 15.

**\*3** With respect to the claims made against the supervisory officials, Magistrate Judge Baxter noted that "[p]ersonal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability." *See id.* at 16 (citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)) (other citations omitted). Magistrate Judge Baxter recommended the Court find that, "[b]ecause questions of fact remain regarding the individuals who allegedly committed the violations, and [D]efendants' Boll and Fischer's liability depends on the liability of their subordinates, [P]laintiff has not shown that he is entitled to summary judgment against these two [D]efendants." *See id.* at 17.

C. Plaintiff's objections to Magistrate Judge Baxter's Report–Recommendation

Plaintiff filed objections to Magistrate Judge Baxter's March 22, 2012 Report–Recommendation on March 27, 2012, and supplemental objections on April 3, 2012. *See* Dkt. No. 56; Dkt. No. 58. Plaintiff's sixteen objections are as follows: 1) his request for injunctive relief was, in fact, directed at the original Defendants in the complaint; 2)

his motion for a TRO is seeking to maintain the status quo regardless of whether the alleged deprivations are new, old, or pending; 3) he was not merely speculating about retaliation after the Court issued its September 27, 2011 Order, after which he was allegedly denied food for 104 hours; 4) he has met his burden for the Court to issue a TRO; 5) Defendants' failure to submit an affidavit in opposition to summary judgment and Defendants' had an adequate opportunity to conduct discovery; 6) the Court is promoting discovery abuse by issuing the Report–Recommendation since Defendants' request for an extension of time was not granted, nor has the pretrial discovery and scheduling order been amended for a continuance; 7) the Report–Recommendation prejudicially advocates for Defendants to be given an extension of time to respond to discovery, to be given an extension of time to respond to the application for summary judgment, and to be given the chance to affix an affidavit to support such extension; 8) summary judgment regarding the retaliation claims against Defendant Ready should be because on the Department of Corrections and Community Supervision ("DOCCS") Office of Counsel's response indicating that corrective action was taken in response to Plaintiff's grievance and this is an admission to malfeasance on Defendant Ready's part; 9) summary judgment should be granted in Plaintiffs favor against Defendant Ellis because where the law sets forth that where a non-moving party willfully fails to respond adequately to a properly filed motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute; 10) the Report–Recommendation violates Local Rule 7.1(a)(1) in that it contains citations to decisions exclusively reported on computerized databases, and copies of those decisions were not affixed to the Report–Recommendation, and the Report–Recommendation fails to support its denial of Plaintiff's motion as to the retaliation claims with any relevant facts; 11) the grievance response received containing an apology from Defendant Kupiec regarding her action of not mailing Plaintiff's Notice of Intention to File a Claim as instructed and the letter from Defendant Kupiec apologizing for destroying Plaintiff's test scores are admissions to his mail claims against Defendant Kupiec; 12) the Report–Recommendation sends the message that Defendants have special privileges with respect to discovery, and Magistrate Judge Baxter will go against his own prior text orders to support such abuse; 13) specifically detailed Defendants Boll and Fischer's personal involvement regarding the liability of

their subordinates, and thus there is no question of material fact regarding this issue; 14) granting Defendants' second letter motion for an extension, without an accompanying affidavit, is a double standard and is not in compliance with this Court's rules; and 15) the Report–Recommendation should be reversed in the interest of justice because the Federal Rules of Civil Procedure and the Northern District Local Rules should apply equally to both *pro se* litigants and prisoners, as well as state defendants. *See* Dkt. No. 56 at 3–34; Dkt. No. 58 at 3–7.

**\*4** In his supplemental objections filed on March 21, 2012, Plaintiff claims that he "received some documents from Defendants' Counsel ... which proves that more Jews are being starved throughout the Department of Correction and Community Supervision (DOCCS) when the said individuals file grievances." *See* Dkt. No. 70 at 2. Plaintiff claims that the two emails from DOCCS employees discussing two complaints filed by other inmates at Mid–State regarding issues similar to those in the present matter. *See id.* at Exhibit "A."

### III. DISCUSSION

A. Review of a Magistrate Judge's Decision
When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report of specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1) (2006). However, when a party files "[g]eneral or conclusory objection or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court review those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

B. Injunctive Relief

1. Standard of Review
A party seeking injunctive relief must demonstrate 1) irreparable harm; and 2) either a) a likelihood of success on the merits of the claims, or b) existence of serious questions going to the merits of the claims, and a balance

of hardships tipping decidedly in moving party's favor. *See D.D. ex rel. V.D. v. N.Y. City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits." ' *Candelaria v. Baker,* No. 00–CV–012E, 2006 WL 618576, \*3 (W.D.N.Y. Mar. 10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 (8th Cir.1994) (per curiam)).

A higher standard than ordinarily required must be met "where an injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act ." *Phillip v. Fairfield Univ.,* 118 F.3d 131, 133 (2d Cir.1997) (citation omitted). To meet such a higher standard, the moving party must "show[ ] 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from a denial of the injunction." *Id.* at 133 (other citations omitted). Additionally, "[i]n the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord,* 981 F.Supp. 140, 167 (W.D.N.Y.1997) (citing *Farmer v. Brennan,* 511 U.S. 825, 846–47, 114 S.Ct. 1970, 1983–84, 128 L.Ed.2d 811 (1994)) (other citations omitted).

2. Application
**\*5** Regarding Plaintiff's current motion, this Court agrees with Magistrate Judge Baxter's finding that Plaintiff has not met his burden showing that he is entitled to injunctive relief. The Second Circuit has repeatedly held that "a transfer from a prison facility moots an action for injunctive relief against the transferring facility." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996); *see, e.g., Day v. Chaplin,* 354 Fed. Appx. 472, 473–74 (2d Cir.2009) (other citations omitted). Since the alleged unconstitutional and retaliatory acts occurred while Plaintiff was incarcerated at Mid–State, his transfer to Gouverneur renders his application for a TRO moot.

Moreover, Plaintiff has directed his motion for a TRO to individuals not included in the original complaint, with the exception of Defendants Boll and Fischer. [7] *See* Dkt. No. 35–1 at ¶¶ 4–7. As such, this Court agrees with Magistrate Judge Baxter's finding that "[i]f additional individuals denied [P]laintiff his constitutional right to practice his religion, he may move to supplement his complaint or

Case 9:17-cv-00366-DNH-TWD    Document 45    Filed 07/05/18    Page 95 of 126
Guillory v. Ellis, Not Reported in F.Supp.2d (2012)
2012 WL 2754859

bring a separate action against individuals at Gouverner." *See* Dkt. No. 54 at 7. Even if Plaintiffs motion for a TRO was directed at Defendants in this action, Plaintiff has failed to establish an imminent threat of irreparable harm or that other serious injury that would result if injunctive relief is not granted because the alleged new deprivations have already occurred.

<sup>7</sup> Magistrate Judge Baxter's Report–Recommendation noted that original Defendants Boll and Fischer are employees of DOCCS, and are not located at any specific facility. *See* Dkt. No. 54 at 5 n.9 (citing Dkt. No. 45 at ¶¶ 40–48). Magistrate Judge Baxter further noted that Plaintiff's claim that Defendants Boll and Fischer approve all transfers—even if true—is not proof that they were responsible for subsequent denials of Plaintiff's religious rights by individuals at Gouverneur. *See* Dkt. No. 54 at 6 n.10.

Finally, Plaintiff's concerns of possible future retaliation are too speculative to warrant injunctive relief, since no imminent threat is posed. *See Smolen v. Dildine,* No. 11–CV–6434, 2011 WL 6030112, *2 (W.D.N.Y. Dec. 5, 2011) (citations omitted).

For the foregoing reasons, Plaintiff's motion for preliminary injunctive relief is denied.

## C. Summary Judgment

### 1. Standard of Review

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n.5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**\*6** In reviewing a *pro se* case, the court "must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 303 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). "Indeed, the Second Circuit has stated that '[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training." ' *Id.* (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). This does not mean, however, that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* (citing *Showers v. Eastmond,* No. 00 CIV. 3725, 2001 WL 527484, *2 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

### 2. Application

#### a. Sufficiency of Defendants' response

In his objection, Plaintiff argues that because Defendants failed to submit an affidavit in support of their response in opposition to summary judgment the Court must grant his motion. *See* Dkt. No. 56 at 12–15. While not issuing a formal response, Defendants submitted a letter to Magistrate Judge Baxter, stating that Plaintiffs motion for summary judgment is premature and should be denied because they have not had the opportunity to conduct discovery. *See* Dkt. No. 49 at 1.

The Second Circuit has held that,

a party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing " '(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." '

*Gurary v. Winehouse,* 190 F.3d 37, 43–44 (2d Cir.1999) (quoting *Meloff v. New York Life Ins. Co.,* 51 F.3d 372, 375 (2d Cir.1995)) (other citations omitted). Defendant's response to Plaintiff's motion for summary judgment only consisted of a letter to Magistrate Judge Baxter, citing to case law and Rule 56(f) of the Federal Rules of Civil Procedure, indicating that summary judgment should not be granted because they have not been afforded adequate opportunity to conduct discovery. Defendants failed to attach a Rule 56(f) affidavit to their response, and the letter did not address facts to be sought with additional discovery that would create a genuine issue of material fact. *See* Dkt. No. 49 at 1–2.[8]

[8]   Defendants referenced Rule 56(f) in the response letter to Magistrate Judge Baxter. However, "[a] reference to Rule 56(f) and to the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137 (2d Cir.1994) (citing *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 925 (2d Cir.1985)). As such, "the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 925 (2d Cir.1985) (other citations omitted).

Although Plaintiff is correct that Defendants' response was deficient, Plaintiff is still not entitled to summary judgment. Four days before the response deadline, Magistrate Judge Baxter issued a text order providing that "[n]o further submissions are required or allowed...." Clearly, Magistrate Judge Baxter believed, as does the Court, that Plaintiff's motion was premature and fell short of carrying his burden; and, therefore, did not require a formal response. Defendants' failure to comply with Rule 56(f) does not obviate Plaintiff's burden of proof, which he failed to meet. *See Vermont Teddy Bear Co., Inc. v. 1–800*

*Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (holding that "[a]n unopposed summary judgment motion may also fail where the undisputed facts fail " 'to show that the moving party is entitled to judgment as a matter of law' " ' (quotations omitted)); *see also Giannullo,* 322 F.3d at 140–41 (holding that the "non-movant is not required to rebut an insufficient showing").

*b. Religion*

**\*7** Prisoners are certain constitutional protection with regards to the First Amendment Free Exercise Clause. *See Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). "RLUIPA protects inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means." *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir.2006) (quoting 42 U.S.C. § 2000cc–1(a) (2006)); *see e.g., Brown v. Graham,* No. 9:07–CV–1353, 2010 WL 6428251, *15 (N.D.N.Y. Mar. 30, 2010) (citation omitted). Plaintiff claims that his First Amendment Free Exercise rights under RLUIPA were violated by Defendants Ready and Ellis.

With respect to the incident that occurred on December 7, 2010, involving Defendant Ready's refusal to allow Plaintiff to attend religious services, this Court agrees with Magistrate Judge Baxter's findings that a question of fact remains based on the exhibits Plaintiff submitted. Specifically, the investigation report issued in response to Plaintiffs grievance about the matter indicates that the call-out list for Jewish Services on December 2, 2010 was not distributed following normal procedure. *See* Dkt. No. 1, Ex. L. As a result of this error, the call-out list was hand delivered to housing units, but not the program areas, where Plaintiff was at the time of the incident. *See id.* The report also indicates that there was insufficient evidence "to substantiate any malfeasance by staff" and that there was "no malice intended." *See id.*

Plaintiff asserts that DOCCS Office of Counsel's response, indicating that corrective action was taken regarding this incident, is an admission to unconstitutional acts. *See* Dkt. No. 56 at 17–18. A statement indicating that corrective action was taken is not necessarily the equivalent of an admission to unconstitutional conduct. Additionally, in his objection, Plaintiff claims that the DOCCS Office of Counsel overruled the superintendent's decision regarding

2012 WL 2754859

the grievance. *See id.* at 18. This claim, however, is untrue. Plaintiff's own exhibit shows that the Central Office Review Committee ("CORC") upheld the decision of the superintendent regarding this grievance, and stated that it had "not been presented with sufficient evidence to substantiate that [Plaintiff] was purposefully denied attendance to the callout or discriminated against by staff." *See* Dkt. No. 1, Ex. S. Thus, there remains a question of material fact regarding the incidents of December 7, 2010, and Plaintiff's objection regarding the incident is unfounded.

Similarly, regarding the incident that occurred on March 20, 2011, it is clear from Plaintiff's own submissions that a question of fact still remains regarding Defendant Ellis' conduct. Plaintiff claims that the religious services scheduled for March 20, 2011 were intentionally cut short by Defendant Ellis in an expression of anti-Semitic behavior. *See* Dkt. No. 1 at ¶ 65. However, the investigation report in response to Plaintiff's grievance indicates that the Rabbis arrived late for the services, and inmates were sent back to their housing units until they arrived. *See* Dkt. No. 48–2, Ex. D. As such.

**\*8** Based on the foregoing, the Court finds that Plaintiff has failed to establish that there are no issues of material fact and is, therefore, not entitled to summary judgment on this claim.

### c. Retaliation

The Second Circuit has held that retaliation against a prisoner for filing a grievance is a violation of that prisoner's First Amendment right to petition the government for redress. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (citing *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988)). To establish a claim of retaliation, the plaintiff must establish "(1) that the disciplined conduct was constitutionally protected, and (2) that his punishment was motivated, in whole or in part, by his conduct—in other words, that the prison officials' actions were substantially improper retaliation." *Id.* Additionally, there must be a causal connection between the protected activity and the adverse action. *See Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

Plaintiff claims he was subjected to several instances of retaliation, including the following: (1) the events of March 20, 2011, for filing an earlier grievance against Defendant Ellis, and CO. Johnston;[9] (2) improperly mailing out Plaintiff's Notice of Intent to File a Claim in retaliation for filing grievances; (3) Defendant Kupiec's destruction of two of Plaintiff's packages in retaliation for filing a Notice of Intent to File a Claim and grievances; and (4) the tearing of Plaintiff's mail in retaliation for filing grievances. *See* Dkt. No. 48–1 at ¶¶ 20, 22, 23, 97.

[9]    Plaintiffs grievance number MS–20189–10 was filed in response to Defendant Ellis' and CO. Johnston's refusal to permit Plaintiff to remain in the law library when he was excused from work and/or programs in accordance with the Jewish Holiday. *See* Dkt. No. 1, Ex. F.

Again, Plaintiff has failed to establish that there are no issues of material fact regarding the above mentioned events. Plaintiff failed to put forth evidence indicating that these events "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord,* 320 F.3d at 353 (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)). In fact, evidence of the exact opposite exists in that Plaintiff continually filed grievances for acts he thought were in violation of his rights. Plaintiff is merely relying on the fact that these events occurred in close proximity to protected conduct, and such reliance "does not strongly establish [a] causal nexus." *Jackson v. Goord,* No. 06–CV–6172, 2011 WL 4829850, *17 (W.D.N.Y. Oct. 12, 2011).

### d. Access to Courts/Mail Claims

"Under the First Amendment, prisoners have a right to 'the free flow of incoming and outgoing mail.' " *Johnson v. Goord,* 445 F.3d 532, 534 (2d Cir.2006) (quoting *Davis v. Goord,* 320 F.3d at 351). A prisoner's right to send and receive mail can be regulated, if such regulation "is reasonably related to legitimate penological interests." *Id.* (quoting *Rodriguez v. James,* 83 F.2d 8, 12 (2d Cir.1987) (other quotation omitted)). To establish such a claim, it must be shown that "the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in an actual injury to the plaintiff." *Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008) (citing *Davis v. Goord,* 320 F.3d at 351). Actual injury is established by demonstrating that the plaintiff's efforts in

pursing a nonfrivolous claim were frustrated as a result of the defendant's actions. *See id.* (citing *Lewis v. Casey,* 518 U.S. 343, 353 (1996)).

**\*9** With respect to non-legal mail, a "prison official's interference with an inmate's mail may violate his First Amendment right to free speech, which includes the 'right to be free from unjustified governmental interference with communication.' " *Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, \*5 (S.D.N.Y. Mar. 29, 2001) (quoting *Brewer v. Wilkinson,* 3 F.3d 816, 820 (5th Cir.1993)). "In order for an inmate to state a claim for interference with incoming non-legal mail he must show a pattern and practice of interference that is not justified by any legitimate penological concern." *Id.* (citing *Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir.1999)).

In the present matter, Magistrate Judge Baxter correctly held that Plaintiff has failed to show that no question of fact exists regarding the issue of his legal mail not being sent out as instructed. Plaintiff has not produced any evidence showing that Defendant Kupiec's conduct was deliberate and malicious. Plaintiff states that the apology letter received from Defendant Kupiec was an admission to the error in mailing. *See* Dkt. No. 56 at 25. However, as Magistrate Judge Baxter noted, the fact that Defendant Kupiec responded to Plaintiff's complaint, apologized to Plaintiff for the error, and issued him a reimbursement does not establish that her conduct was deliberate and malicious. *See* Dkt. No. 54 at 14.

Plaintiff also refers to his claim that Defendant Kupiec lost or destroyed his mail, specifically his test scores, in retaliation for grievances filed. *See* Dkt. No. 54 at 15; Dkt. No. 56 at 25. Although Plaintiff may be able to succeed on a claim for interference with incoming non-legal mail by showing that a pattern and practice of interference exists between the two packages that were allegedly destroyed or missing, and the destruction of his test scores, that was not justified by any legitimate penological interest, questions of fact remain as to who committed the violations with respect to the two packages, and with regard to Defendant Kupiec's motive in ripping Plaintiff's mail, as noted by Magistrate Judge Baxter. *See* Dkt. No. 54 at 15.[10]

[10]  In a letter from Defendant Kupiec to Plaintiff, Defendant Kupiec apologizes for tearing the test scores because she mistook them for advertisements

that could not be forwarded. *See* Dkt. No. 48–2, Ex. S.

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly held that questions of fact exist which preclude summary judgment at this time.

*e. Supervisory Officials*

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quotation and other citations omitted). " '[W]hen monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required.' " *Id.* (quoting *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.)). There is a sufficient showing of personal responsibility of a defendant if (1) the defendant directly participated in the alleged constitutional deprivation; (2) the defendant is a supervisory official who failed to correct the wrong after learning about it through a report or appeal; (3) the defendant is a supervisory official who created a policy or custom under which the constitutional deprivation occurred, or allowed such a policy or custom to continue; or (4) the defendant is a supervisory official that was grossly negligent in managing subordinates who caused the constitutional deprivation. *See id.* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

**\*10** It is well-settled that receipt of letters or grievances, by itself, does not amount to personal involvement. *See Vega v. Artus,* 610 F.Supp.2d 185, 199 (N.D.N.Y.2009). Further, "[p]rison supervisors are entitled to refer letters of complaint to subordinates, and rely on those subordinates to conduct an appropriate investigation and response, without rendering the supervisors personally involved in the constitutional violations alleged in the letters of complaint" *Id.* at 199 n.13 (citations omitted); *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997).

Magistrate Judge Baxter correctly held that, because there are remaining questions of fact as to whether any unlawful violations actually occurred, Plaintiff's motion for summary judgment as to Defendants Boll and Fischer must be denied. Moreover, contrary to Plaintiff's assertion, Magistrate Judge Baxter did, in fact, address his claims against Defendants Fischer and Boll and correctly found that summary judgment as to those Defendants was

2012 WL 2754859

inappropriate at this time. *See* Dkt. No. 54 at 6 n.10, 16–17.

Based on the foregoing, the Court finds that Plaintiff has failed to establish that he is entitled to summary judgment as to Defendants Boll and Fischer.

*f. Other Objections*

In his tenth objection, Plaintiff states that the Report–Recommendation is in violation of Local Rule 7.1(a)(1) in that it contains citations to decisions exclusively reported on computerized databases, and copies of those decisions were not affixed to the Report–Recommendation. *See* Dkt. No. 56 at 21–22. By the very language of Local Rule 7.1(a)(1), however, this Local Rule is only applicable to parties, not the court. *See* LOCAL RULES N.D.N.Y. 7.1(a)(1). [11]

[11]    * * *

With regards to his twelfth objection, Plaintiff is not being "condimed [sic] for taking appropriate action" with respect to dismissing his own Court of Claims action. Magistrate Judge Baxter noted with respect to this claim, that "[i]f an injury exists, there is at least a question of fact regarding the causation of the injury to plaintiff's legal claim." *See* Dkt. No. 54 at 16; Dkt. No. 56 at 29. Plaintiff still has the opportunity to prove this claim at trial.

Plaintiff also objects to Magistrate Judge Baxter "granting" Defendants' second letter motion for an extension. Plaintiff's objection is without merit because, quite simply, Defendant's second letter motion to stay discovery was denied by Magistrate Judge Baxter in a text order dated May 15, 2012.

The Court has reviewed Plaintiff's remaining objections and finds that they are meritless and often quite difficult to comprehend.

## IV. CONCLUSION

After carefully considering Magistrate Judge Baxter's Report–Recommendation, Plaintiff's objections thereto, and the applicable law, and for the reasons stated herein, the Court hereby

ORDERS that Magistrate Judge Baxter's March 22, 2012 Report–Recommendation is ADOPTED in its entirety for the reasons stated therein; and the Court further

**\*11** ORDERS that Plaintiff's motions for preliminary injunctive relief (Dkt. No. 35) and for summary judgment (Dkt. No. 48) are DENIED; and the Court further

ORDERS that the Clerk of the Court shall serve the parties with a copy of this Memorandum–Decision and Order in accordance with the Local Rules.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2754859

---

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 5995075
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

KIRYAS JOEL ALLIANCE, et al., Plaintiffs,

v.

VILLAGE OF KIRYAS JOEL, et al., Defendant.

No. 11 Civ. 3982(JSR).
|
Nov. 29, 2011.

*OPINION AND ORDER*

JED S. RAKOFF, District Judge.

 **\*1** Plaintiffs, members of a "dissident" population within defendant Village of Kiryas Joel (the "Village"), bring this action alleging that the Village is a "theocracy," the affairs of which are so "inherently infused by, and entangled, with religion" that its "very existence" violates the Establishment Clause of the First Amendment. *See* Amended Complaint ("Am.Compl.") ¶ 1. In particular, plaintiffs allege that the Village is subject to the dictates of defendant Congregation Yetev Lev D' Satmar of Kiryas Joel ("Congregation Yetev"). Moreover, plaintiffs allege that a law requiring all buildings to have a "community room" (the "Community Room Law") violates the Establishment Clause because the purpose and effect of the law are to promote religion. Plaintiffs also allege that they have been discriminated against and repressed by the Village on the basis of their dissident views in a variety of ways, including: excess municipal fees, reduced police protection, and disparate enforcement of public speech and zoning ordinances.

On the bases of these allegations, the Amended Complaint asserts five claims: Violation of the Equal Protection Clause; Conspiracy to Violate the Equal Protection Clause; Violation of the Free Exercise Clause; Violation of the Establishment Clause; Violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*

The various defendants (eleven in all) have filed five separate motions to dismiss. After full consideration of the parties' written submissions and oral arguments, the Court

grants the motions . [1] As a result, all claims are dismissed with prejudice, except for the Establishment Clause claim relating to the Community Room Law. This latter claim is dismissed without prejudice to plaintiffs' filing a Second Amended complaint that attempts to cure the deficiencies identified herein.

[1]   By stipulation dated August 30, 2011, plaintiffs voluntarily dismissed the New York Secretary of State from the action. Plaintiffs also voluntarily withdrew their "official capacity" claims against defendants Reisman, Goldstein, Freund, Landau, and Welder. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Pl.Mem.") at 64. Finally, plaintiffs requested leave to amend their complaint to name Mayor Abraham Weider in his individual capacity, *id.,* but, as a result of the Court's instant decision, that request is moot.

For purposes of a motion to dismiss, the Court "accept[s] all well-pleaded allegations in the complaint as true [and] draw[s] all reasonable inferences in the plaintiff's favor." *S.E.C. v. Gabelli,* 653 F.3d 49 (2d Cir.2011) (quoting *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC,* 595 F.3d 86, 91 (2d Cir.2010)). The pertinent allegations, taken from the Amended Complaint, from documents expressly referenced in that complaint, and from materials in the public record that are subject to judicial notice, are as follows:

The Village of Kiryas Joel is an enclave located within the Town of Monroe in Orange County, New York. It was incorporated as a municipality in 1977 by the late Grand Rebbe of Satmar Hasidism, Joel Teitelbaum. Am. Compl. ¶¶ 39–41. Although the Village was created as an enclave for the Satmar Hasidim and remains populated almost exclusively by followers of Satmar Hasidism, a significant rift exists between two Satmar factions in the Village, namely the members of the Village's main congregation and the so-called "dissident" population. The schism primarily stems from a dispute over who should be the proper leader of the Satmar Hasidim. *Id.* ¶¶ 2, 41, 44–45, 48–59. The dissidents do not "approve of" the leadership of the current Grand Rebbe, Aron Teitelbaum. *Id.* ¶ 48. Instead, many of the dissidents believe that Aron's brother Zalman should be "running [Congregation Yetev] instead of Aaron." *Id.* ¶ 49. The Village has approximately 20,000 residents; roughly 8,000 of those residents share the plaintiffs' "dissident" views. *Id.* ¶¶ 11–20, 41.

**\*2** Defendant Abraham Weider is the Village's Mayor; he also serves as "Rosh H'Khal" or "Head of the Congregation" of Congregation Yetev. *Id.* ¶¶ 26–27, 30, 53. Moreover, "every other elected and appointed Village official" is allegedly a member of Congregation Yetev. Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl.Mem.") at 4. Defendant Moses Witriol, also a member of Congregation Yetev, is the Director of the Village of Kiryas Joel Department of Public Safety. Am. Compl. ¶ 190.

The rift between the two Satmar factions has spawned repeated litigation in state and federal courts over the past two decades. *See, e.g., Board of Educ. of Kiryas Joel Village School District v. Grumet,* 512 U.S. 687, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994). The Second Circuit has noted that some of the dissidents' previous allegations, are "deeply troubling in that, if true, [they] describe[ ] a town in which public institutions are routinely being used as instruments of the dominant religious group." *Waldman v. Village of Kiryas Joel,* 207 F.3d 105, 107 (2d Cir.2000).

The Amended Complaint further contends that the Village violated both plaintiffs' constitutional rights and their rights under RLUIPA by "thwarting" dissident congregation Bais Yoel's attempts to use a piece of residential property as a synagogue (the "Property,"). Am. Compl. ¶¶ 165, 173. The Property is an apartment annexed to Congregation Yetev's Grand Synagogue. It was originally built in 1975 to house the late Grand Rabbi Joel Teitelbaum and his spouse, Feige Teitelbaum (or the "Rebitzon"). Feige continued to live in the apartment until her death in 2001. Before her death, however, and after Joel Teitelbaum's death in 1979, she conveyed her interest in the Property to Bais Yoel. *See Congregation Yetev Lev D'Satmar, Inc. v. 26 Adar N.B. Corp.,* 192 A.D.2d 501, 596 N.Y.S.2d 435 (2d Dep't.1993) (per curiam) (upholding Feige's conveyance in a suit brought by Congregation Yetev to invalidate it). The transfer was akin to conveying a small wing of a house. In other words, Bais Yoel owns a "footprint" of real property within the Grand Synagogue's grounds—it does not own any of its surrounding lands nor any easements to accommodate parking access and utilities thereon. *See id.*

After the Rebitzon's death, Bais Yoel began using the Property to hold religious services. *See* Am. Compl. ¶¶ 167–69. By 2004, the Property was operating as a large-scale house of worship, with more than 300 persons visiting the Property on a daily basis. *See* Gimbel Decl. Ex. B, ("*Bais Yael I* Decision," dated Jan. 31, 2008) (unreported). However, after a trial in New York Supreme Court, that court held that the Property could only be used for residential purposes unless Bais Yael applied for and received municipal approval to use it for religious purposes. *See id.* The court further held that any municipal approval of the residence for religious services would require Congregation Yetev's permission, as well as Congregation Yetev's agreement to expand the scope of ingress, egress, and utility easements appurtenant to the property—all of which were then limited to residential use. *Id.* at 5–6, 885 N.Y.S.2d 741. The decision was affirmed on appeal, with modifications not material to this litigation. *See Bais Yael Ohel Feige v. Congo Yetev Lev D'Satmar of Kiryas Joel, Inc.,* 65 A.D.3d 1176, 885 N.Y.S.2d 741 (2d Dep't 2009) (per curiam).

**\*3** After *Bais Yoel I* was decided, plaintiffs continued to use the Property for religious services. Accordingly, by order dated November 30, 2009, Justice Owen of New York State Supreme Court held Bais Yoel, Zalman Waldman, Bernard Tyrnauer, and Meyer Deutsch in contempt for violating the trial court's judgment and continuing to use the Property "as a non-conforming, unlawful house of worship without municipal approval, and [failing] to satisfactorily excuse or explain said contempt." Gimbel Decl. Ex. C, Order dated Nov. 30, 2009, (*Bais Yoel I* "Contempt Order"). The Contempt Order stated that "plaintiffs' blatant disregard for the judicial system is so evident at this point that the Court believes the only appropriate remedy is to order full closure of the subject premises and, absent compliance, incarceration of those individuals responsible." *Id.* at 3, 885 N.Y.S.2d 741. The Order was affirmed on appeal. *See Bais Yael Ohel Feige v. Congo Yetev Lev D'Satmar of Kiryas Joel, Inc.,* 78 A.D.3d 626, 910 N.Y.S.2d 174, 175 (2d Dep't 2010) (per curiam).

Subsequently, plaintiffs filed a second state court action against Congregation Yetev and the Village, *Bais Yael Ohel Feige v. Congo Yetev Lev D'Satmar of Kiryas Joel,* No. 5655–2010 (N.Y.Sup.Ct.) ("*Bais Yoel II*"). Less than two weeks after *Bais Yoel II* was filed, Congregation Yetev began a construction project to expand and repave the parking lot outside its Grand Synagogue. *See* Am. Compl. ¶¶ 186–98. This "construction blitz ripped up the cartilage of the property, including a historic stone walkway, tore apart fencing, destroyed part of the porch

2011 WL 5995075

and other structures and ripped down utility wires running to the building." Pl. Mem. at 53; Am. Compl. ¶ 183. Officers of the KJPS were present for the operation and arrested several dissidents, including plaintiff Waldman, for attempting to obstruct the construction project. Am. Compl. ¶¶ 186–98. Plaintiffs immediately brought the construction project to the state court's attention, and successfully brought allegations related to the "blitz" into that litigation. *See* Crowley Decl. Ex. I at 20 (transcript of hearing on June 7, 2010). The Court granted the plaintiffs' request for a Temporary Restraining Order preventing further work on the construction project; the Second Department, however, lifted the TRO on appeal. *See* Crowley Decl. Exs I, L, M, N, O, P, R, S & T.

The Amended Complaint also alleges that the Village selectively enforces public speech ordinances so as to promote Congregation Yetev and discriminate against dissident views. Am. Compl. ¶¶ 100–60, 323–28. On at least two occasions, Moses Witriol and the KJPS allegedly refused to intervene to prevent Congregation Yetev from playing loud music at night through loudspeakers at its Grand Synagogue. *Id.* ¶¶ 105–111. This loud music playing allegedly violated a local noise ordinance. *Id.* On several occasions, Witriol also "escorted a truck, which was broadcasting 'anti-dissident' announcements, around the Village." *Id.* ¶ 128, 885 N.Y.S.2d 741. During the same time period, Joel Lieberman, a non-party dissident, was "prohibited from announcing a protest"— by driving a truck with loudspeakers—regarding "the Spanish government's treatment of Jewish graves in Spain." *Id.* ¶ 150, 885 N.Y.S.2d 741.

**\*4** Moreover, in November 2009, the Village denied plaintiff Tennenbaum and a group of dissidents a permit to hold a protest against Grand Rebbe Aron Teitelbaum in front of Teitelbaum's house. *Id.* ¶¶ 138–49. The Village denied Tennenbaum's permit application because, it said, the house was on a "dead-end street which also houses the only ambulance service in the Village, which is dependent on open ingress and egress to serve the needs of the Village." *Id.* ¶ 148, 885 N.Y.S.2d 741. Instead, the Village proposed that Tennenbaum "consider locations where your groups has [sic] already held past protests: along Forest or Bakertown Roads or even Acres Road. Your group has had many protests exercising its First Amendment rights along these locations without any interference from the Village." *Id.*

Next, the Amended Complaint alleges that the Kiryas Joel Department of Public Safety ("KJPS"), the Village's law enforcement arm, and Witriol, the Director of the KJPS, have "selectively-enforced" the law so as to "repress the dissidents." Am. Compl. ¶ 229; *see id.* ¶¶ 225–34. In support, plaintiffs allege that KJPS permitted schoolchildren from the United Talmudical Academy ("UTA"), the Village's private religious school, which is affiliated with Congregation Yetev, to "blanket the Village streets with hostile and harassing leaflets that contain the names, pictures and phone numbers of 'dissidents' who have married, or intend to marry ... without the Grand Rebbe's approval." Pl. Mem. at 51; Am. Compl. ¶¶ 292–321. The dissidents went out themselves at night to clean up the leaflets, because they were not cleaned up by the KJPS. *Id.* ¶ 307, 885 N.Y.S.2d 741. In response to this state of affairs, some dissidents "threw garbage on the streets to coerce the Village to clean everything up." *Id.* ¶ 317, 885 N.Y.S.2d 741. Plaintiff David Wolner was accused of being one of the garbage-throwers, an allegation which he denies; he was later charged with disorderly conduct. *Id.* ¶¶ 318–20.

In addition, "mobs of hundreds of UTA boys" assaulted two dissidents—plaintiff Isaac Srugo and non-party Rafael Rabinowitz. *Id.* ¶ 236, 885 N.Y.S.2d 741. Plaintiffs allege that both incidents were caused by the KJPS because the UTA students "knew that KJPS, as an instrumentality of the [Congregation Yetev]-run Village government, supported their missions" and so would not intervene to protect dissidents. *See* Pl. Mem. at 50. Plaintiff Kiryas Joel Alliance has allegedly been forced to hire private security to protect its members because of KJPS's refusal to protect them from such harassment. Am. Compl. ¶ 241.

Plaintiffs also allege that the Village, through its Community Room Law, uses its governmental authority to divert funds and resources to Congregation Yetev. The Village enacted the Community Room Law in 2007; it requires all building developers to construct a community room as a condition of obtaining Planning Board approval for new residential construction. *Id.* ¶¶ 348–49. The law imposes strict conditions on the operation of community rooms and requires developers to submit an "operational plan," that ensures "the perpetual continuing availability and use of the community room or rooms for recreational, community, charitable, civic or other uses." *Id.* ¶ 350, 885 N.Y.S.2d 741. Under the law, if

a developer finds it unfeasible to build a community room, he must pay a fee of "not less than $5,000 per unit" to the Village, which is deposited into a "community room fund" used solely for the provision of community rooms in the Village. *Id.* ¶ 351, 885 N.Y.S.2d 741.

**\*5** With one exception, all of the community rooms are allegedly used as synagogues and run by Congregation Yetev. *Id.* ¶¶ 352, 355. The exception is a community room which was recently built by a dissident developer. The Village initially refused to grant a Certificate of Occupancy to its builder, non-party Prag Realty, which is managed by non-party Lipa Deutsch, and sought to require the developer to pay the $5,000 per unit fee. *Id.* ¶¶ 357–62. The Village asserted that it assessed the fee because the community room did not meet the legal specifications for such rooms, but plaintiffs allege that the fee was assessed because Prag Realty did not intend to use the community room as a synagogue. *Id.* After Prag Realty retained counsel to dispute the Village's fee determination, however, the Village reversed its position and granted Prag Realty the Certificate of Occupancy without charging a fee. *Id.* ¶ 362, 885 N.Y.S.2d 741.

Against the background of these diverse allegations, the Court turns to a consideration of plaintiffs' claims. Under Rule 12(b) (6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Moreover, the Court cannot consider allegations that the plaintiffs raise for the first time in their brief opposing the motion to dismiss because "it is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Wright v. Ernst & Young LLP,* 152 F.3d 169, 178 (2d Cir.1998).

Before addressing the merits of plaintiffs' claims, the Court must consider two threshold issues: *res judicata* and standing. As for *res judicata,* the Village contends that those claims which are based on the Village's refusal to

allow Bais Yoel to use the Property as a synagogue, are barred by operation of *res judicata.*

Under New York and federal law, *res judicata* applies where "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. N.Y.C. Dep't of Corr.,* 214 F.3d 275,285 (2d Cir.2000) (citations omitted).[2] Thus, *res judicata* "prevents a party from litigating any issue or defense that could have been raised or decided in a previous suit, even if the issue or defense was not actually raised or decided." *Woods v. Dunlop Tire Corp.,* 972 F.2d 36, 38 (2d Cir.1992).

[2]    A federal court "must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Mira v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). Thus, the preclusive effect of the previous New York State actions is governed by New York law. However, "[t]here appears to be no significant difference between New York preclusion law and federal preclusion law." *Pike v. Freeman,* 266 F.3d 78, 91 n. 14 (2d Cir.2001), and thus the respective standards will not be discussed separately.

**\*6** In evaluating whether claims are barred by *res judicata,* the Court must determine whether the claims involve the same transaction. *Woods,* 972 F.2d at 38–39. The Court, therefore, looks primarily to the facts that underlie the cause of action, as opposed to the legal theory framing the complaint. *Id.* Moreover, while "[i]t is true that res judicata will not bar a suit based upon legally significant acts occurring after the filing of a prior suit that was itself based upon earlier act," nonetheless, where a plaintiff asserts in a later action "nothing more than additional instances of what was previously asserted," the actions arise from the same transaction. *Waldman,* 207 F.3d at 113.

Plaintiffs do not dispute that the first two requirements of *res judicata* are presented here, because the prior cases resulted in final judgments on the merits and involved the same parties or their privies. *See* Pl. Mem. at 13–18. However, they contend that the claims alleged here do not arise from the same transactions that were at issue in the previous cases. Specifically, plaintiffs argue that "two

independent fact patterns" on which Bais Yoel's claims in the instant action are predicated were not raised in the prior litigation: (1) the "construction blitz," and (2) the Village's failure to grant municipal approval for the Property to be used as a synagogue after Justice Owen's decision in *Bais Yoel I*. [3] Both "fact patterns," however, were significant issues in *Bais Yoel II*. In fact, the plaintiffs obtained a TRO against the construction work in *Bais Yoel II*. [4] Moreover, while the relief plaintiffs seek in this case is different from the easement they sought in the state court, that does not affect the Court's res judicata analysis. *See Waldman,* 207 F.3d at 110–12 (a plaintiff "cannot avoid the effects of res judicata by 'splitting' his claim into various suits, based on different legal theories," or by requesting different forms of relief).

[3]     Plaintiffs also raise some new facts in their opposition to the motion to dismiss. *See, e.g.,* Pl. Mem. 60 (discussing the ZBA's inaction). As discussed above, the Court cannot consider facts not raised in the Complaint.

[4]     As discussed above, the grant of that TRO was overturned on appeal.

Accordingly, res judicata bars plaintiff Bais Yoel's claims regarding the Village's allegedly discriminatory application of zoning ordinances. Insofar as plaintiffs' Equal Protection Clause and Establishment Clause claims are based on application of the zoning ordinances to the Property, those claims are dismissed with prejudice. And since plaintiffs' Free Exercise Clause and RLUIPA [5] claims are based entirely on the application of zoning ordinances to the Property, therefore, those claims are also dismissed, in their entirety, with prejudice.

[5]     As discussed above, plaintiffs received a full and fair adjudication in state court on the application of the zoning ordinances.

As for standing, several of plaintiffs' allegations relate to injuries allegedly suffered by non-parties, and therefore must be dismissed for lack of standing. To have standing, a plaintiff must demonstrate (1) "specific, concrete" facts demonstrating that the challenged practices directly harmed him or her by causing (2) a distinct and palpable "injury-in-fact" to a legally cognizable interest that is (3) fairly traceable to defendants' conduct and (4) capable of being redressed by a favorable court decision. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct.

2130, 119 L.Ed.2d 351 (1992). Moreover, standing must be established for each claim asserted. *See Lewis v. Casey,* 518 U.S. 343, 358 n. 6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Furthermore, "[i]t is axiomatic that the judicial power conferred by Art. III may not be exercised unless the plaintiff shows that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Blum v. Yaretsky,* 457 U.S. 991, 999, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). Therefore, as the Supreme Court held in *Blum:*

> **\*7** [i]t is not enough that the conduct of which the plaintiff complains will injure *someone* ..... Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject.

*Id.* (emphasis in original).

Here, the Amended Complaint asserts factual allegations relating to harms allegedly suffered by several non-parties including: municipal fees charged for garbage removal levied against non-parties Keren Chasanim and Congregation Tiv Livov; the KJPS' enforcement of Village noise ordinances against non-party Joel Lieberman; the KJPS' alleged failure to protect non-party Rafael Rabinowitz from attack by groups of UTA schoolchildren; the Village's alleged failure to grant property tax exemptions to non-parties Samuel Eisenberg and Congregation TA; Congregation Yetev's refusal to allow the non-party Pearlstein family to bury their relative Eziel Pearlstein in the main Congregation Yetev cemetery in the Village; the Village's alleged wrongful termination of non-party Lawrence Rossini from his position as a building inspector; and the Village's improper delay in granting non-parties Prag Realty and Lipa Deutsch Certificates of Occupancy for a residential development based on their plans to use a community room for non-religious purposes.

The Court finds unpersuasive plaintiffs' argument that the Kiryas Joel Alliance ("KJA") may assert, in a representative capacity, claims based on harms suffered by its members who are nonparties. As the Second Circuit held in *Nnebe v. Daus,* 644 F.3d 147, (2d Cir.2011) "an

organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983" because § 1983 rights are "personal to those" that are injured. *Id.* at 156.

Of course, an organization may bring suit on its own behalf "so long as it can independently satisfy the requirements of Article III standing as enumerated in *Lujan.*" *Id.; see also N.Y. Civil Liberties Union v. N.Y. City Transit Auth.,* 652 F.3d 247, 255 (2d Cir.2011) (organization has standing to sue when it alleges injuries to its own rights as an organization). Therefore, KJA's claim that it had to divert resources from its other activities to provide "security to the dissidents ... because KJPS was not properly attending to them," Pl. Mem. at 26, does provide standing as to that claim alone. *See Nnebe,* 644 F.3d at 156–57 (diversion of resources from an organization's main activities is a harm that confers standing on that organization). Therefore, of the claims discussed above, KJA has standing only to assert claims related to the KJPS' alleged failure to protect non-party Rafael Rabinowitz from attack by groups of UTA schoolchildren. All of the other claims discussed above are dismissed with prejudice for want of standing, with the exception of the Community Room Law claim, which is dismissed without prejudice.

 **\*8** Now that the Court has limited plaintiffs' claims to those for which they have standing and those that are not barred by *res judicata,* the Court turns to a consideration of the merits of the remaining claims. The plaintiffs assert three separate violations of the Equal Protection Clause. [6] First, plaintiffs allege that defendants "facilitate [Congregation Yetev]'s blatant violations of ... public speech laws while at the same time requiring 'dissidents' to strictly comply with them." Pl. Mem. at 47. Second, plaintiffs allege that plaintiffs Waldman and Wolner were falsely arrested and charged with crimes they did not commit. Am. Compl. ¶¶ 317–21, 333–37. Third, plaintiffs allege that the KJPS discriminatorily refuses to protect dissidents from violence perpetrated by UTA children.

[6]   Plaintiffs also brought two other equal protection claims, which are dismissed for the other reasons discussed above. The first, relating to zoning restrictions on the Bais Yoel property, is barred by res judicata. The second, relating to the Village's imposition of fees on dissident organizations, Pl. Mem. at 47–54, is dismissed for lack of standing.

In order to bring an equal protection claim, the plaintiffs first must plausibly allege intentional discrimination on the basis of an impermissible classification such as religion. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). However, a "plaintiff need not show ... that a government decisionmaker was motivated solely, primarily, or even predominantly" by the improper classification, so long as such classification was "a motivating factor." *United States v. Yonkers,* 96 F.3d 600,611–12 (2d Cir.1996). Intentional discrimination claims can be proven by, *inter alia,* pointing to laws that contain express discriminatory classifications, "identify[ing] a facially neutral law or policy that has been applied in an intentionally discriminatory manner," or alleging that a facially neutral statute had an adverse effect and was motivated by discriminatory animus. *Brown v. City of Oneonta,* 221 F.3d 337 (2d Cir.2000). A plaintiff alleging an equal protection claim under one of these theories "generally need not plead or show the disparate treatment of other similarly situated individuals." *Pyke v. Cuomo,* 258 F.3d 107, 109 (2d Cir.2001). The exception to this rule is for claims alleging selective prosecution, "because courts grant special deference to the executive branch in the performance of the core executive function of deciding whether to prosecute." *Id.* (internal quotation marks omitted).

Before addressing any of the other aspects of the remaining equal protection claims, an initial question must be answered: have the plaintiffs adequately pled that the actions here were motivated by religious differences? The Court concludes that the Amended Complaint does not adequately allege that the defendants' actions were motivated by religious differences. Indeed, the plaintiffs conceded during oral argument that their Amended Complaint largely failed to include such allegations, since it largely centered on a political controversy over who should be the leader of the Satmar Hasidim. *See* 8/31/11 transcript at 14–16. The Court cannot consider allegations raised for the first time at oral argument, because the Amended Complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 570). [7] These claims are dismissed with prejudice.

7    In any event, nothing raised at oral argument changes the Court's conclusion that these claims must be dismissed.

**\*9** The Court turns next to the Establishment Clause claims. The First Amendment directs that "Congress shall make no law respecting an establishment of religion." *U.S. Const. Amend. I.* In *Everson v. Board of Educ. of Ewing,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the Supreme Court stated that:

> The establishment of religion clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance.

*Id.* at 15–16 (internal quotation marks omitted). The Supreme Court recently reaffirmed the principle of neutrality set forth in *Everson,* describing it as the "touchstone" of Establishment Clause analysis. *See McCreary Cty. v. ACLU,* 545 U.S. 844, 860, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005).

In determining whether government action violates the Establishment Clause, the Court applies the familiar three-prong test espoused in *Lemon v. Kurtzman,* 403 U.S. 602, 612–13 (1971). *See Skoros v. City of New York,* 437 F.3d 1, 16–17 (2d Cir.2006). Under the so-called *Lemon* test, "a statute or practice ..., if it is to be permissible under the Establishment Clause, [1] must have a secular purpose; [2] it must neither advance nor inhibit religion in its principal or primary effect; and [3] it must not foster an excessive entanglement with religion." *County of Allegheny v. ACLU,* 492 U.S. 573, 592, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (*citing Lemon,* 403 U.S. at 613–14).

Here, plaintiffs claim that the Village violates the Establishment Clause because its governmental affairs are impermissibly intertwined with those of Congregation Yetev. In support, plaintiffs make three principal arguments: (1) that the Mayor of the Village holds a leadership position in Congregation Yetev, and that his "dual religious and governmental roles" operate to establish an official faith because his religious beliefs trump his governmental role with respect to his actions as Mayor, *see* Am. Compl. ¶ 344–47; (2) that all the other Village officials are members of Congregation Yetev, and therefore are controlled by the Grand Rebbe's dictates, *id.* at 26–27, 46; 3) that the Community Room Law violates the Establishment Clause in that it had the primary purpose and effect of advancing religion. The Court will address each of those claims in turn. [8]

8    In their response to the defendants' motion to dismiss, plaintiffs also argue that "the boundaries of the Village are drawn peculiarly to include only Satmars, the majority of whom are bound by the edicts of the Grand Rebbe and, therefore, exercise their franchise in a manner that advances the [Congregation Yetev] agenda," Pl. Mem. at 34. As discussed above, the plaintiffs cannot raise new claims in opposing a motion to dismiss. Moreover, this claim fails on the merits because the Supreme Court stated in *Grumet* that the Village's creation was not unconstitutional. 512 U.S. at 703 n. 7 (plurality); *see also id.* at 729 (Kennedy, J., concurring).

As to the first two claims regarding overlapping leadership in the Village and the Congregation, the Supreme Court held in *McDaniel v. Paty,* 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978), that the Establishment Clause does not bar an individual from holding public office simply because he is a member of the Clergy. *Id.* at 620 (striking down a Tennessee law barring ministers and priests from holding certain political offices); *see also Grumet,* 512 U.S. at 699 ("under *McDaniel* the Grand Rebbe [of Kiryas Joel] may run for, and serve on, his local school board"). Therefore, these two claims are not enough to make out an Establishment Clause violation.

**\*10** Finally, as to the Community Room Law, plaintiffs concede that the law is neutral on its face, see Am. Compl. ¶ 355, but they contend that "the Village's primary purpose in enacting and enforcing this law, and the law's primary effect," is to advance religion by requiring "residential developers to build religious structures as a condition of obtaining site plan approval, or to pay cash in lieu thereof to be used for the purpose of building

2011 WL 5995075

the same ." *Id.* ¶ 352. As discussed above, however, plaintiffs currently lack standing to bring a claim related to the Community Room Law. The plaintiffs have not adequately pled that they have suffered an injury as a result of the law, and no developer, including Prag Realty or Lipa Deutsch, is a party in this case. Therefore, this claim is dismissed without prejudice. Plaintiffs are given leave to amend their complaint to include new parties or to adequately plead injury to the current parties. Accordingly, all Establishment Clause claims are dismissed with prejudice, except for the claim relating to the Community Room Law, which is dismissed without prejudice.

The Court turns now to the plaintiffs claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.* As discussed above, this claim is barred by res judicata. Even if it were not, however, this claim would fail on the merits. Plaintiffs allege that the Village violated RLUIPA by refusing to grant Bais Yoel's application to use the Rebitzon's residence as a synagogue. Defendants argue in response that: (1) plaintiffs' RLUIPA claim is not yet ripe; and (2) plaintiffs fail to state a RLUIPA claim.

The Second Circuit has held that "to establish jurisdiction" over a RLUIPA claim, plaintiffs "have the high burden of proving that we can look to a final, definitive position from a local authority to assess precisely how they can use their property." *Murphy v. New Milford Zoning Coram.,* 402 F.3d 342,347 (2d Cir.2005) (internal quotation marks and citation omitted). Thus, a RLUIPA claim generally is not ripe unless and until the zoning and appeals process has been exhausted and a final decision has been rendered by the local zoning authority. *See id.*

Here, assuming arguendo that the claim is ripe, plaintiffs have failed to state a RLUIPA claim on the merits. RLUIPA provides a right of action in three circumstances allegedly applicable here—where a land use regulation or its implementation (i) imposes a "substantial burden" on the plaintiff's free exercise of religion, 42 U.S.C. § 2000cc(a)(1), (ii) discriminates on the basis of religion or religious denomination, 42 U.S.C. § 2000cc(b)(2), or (iii) unreasonably limits religious assembly, 42 U.S.C. § 2000cc(b) (3).

The plaintiffs have failed to allege a "substantial burden" in this case because Bais Yoel has ready alternatives: it presently uses other locations to worship and there are many other locations in the Village where the congregation may meet. *See Fortress Bible Church v. Feiner,* 734 F.Supp.2d 409, 503 (S.D.N.Y.2010) ("when an institution has a ready alternative ... its religious exercise has not been substantially burdened."). Moreover, plaintiffs' claim that the Village discriminated against Bais Yoel by requiring Bais Yoel to submit site plans fails because, as discussed above, it was the state courts and not the Village that ordered Bais Yoel to seek approval from the Village. [9] Finally, the Amended Complaint does not sufficiently allege facts to show that the Village unreasonably limits Bais Yoel's ability to worship freely in the Village, because the plaintiffs concede that numerous dissident congregations exist within the Village. Accordingly, for this additional reason independent of the bar of res judicata, the RLUIPA claims are again dismissed with prejudice.

[9]    Again, the plaintiffs cannot use their opposition to the motion to dismiss to raise new claims or arguments, and thus the Court does not address the new arguments made in the plaintiffs' memorandum. *See* Pl. Mem. at 62–63.

**\*11** The Court now turns to the plaintiffs last remaining claim: a claim alleging conspiracy under Section 1985, 42 U.S.C. § 1985. In order to state a conspiracy claim under Section 1985, "a plaintiff must plead (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of the citizens of the United States." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993) (per curiam). In addition, the conspiracy must have been motivated by discriminatory class-based animus. *See Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999).

In order to properly allege a conspiracy claim under § 1985, the Complaint must "provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord,* 340 F.3d 105, 110 (2nd Cir.2003) (internal citations omitted). The complaint here fails to provide any factual basis to support a meeting of

Case 9:17-cv-00366-DNH-TWD    Document 45    Filed 07/05/18    Page 108 of 126
Kiryas Joel Alliance v. Village of Kiryas Joel, Not Reported in F.Supp.2d (2011)
2011 WL 5995075

the minds, either explicit or tacit. Instead, the complaint merely includes a conclusory allegation that there was a conspiracy. This is not sufficient to survive the defendant's motion to dismiss, and this claim is therefore dismissed with prejudice.

The Court has considered plaintiffs' other arguments and finds them without merit. In light of the foregoing, the defendants' motions to dismiss are granted, and all claims are dismissed with prejudice, except for the Establishment Clause claim relating to the Community Room Law. That latter claim is dismissed without prejudice in order to give the plaintiffs one last chance to plead that claim adequately. Because the motions to dismiss all the claims are granted, defendants' additional motions to strike the demands for punitive damages and equitable relief are denied as moot .[10]

[10]  It is worth noting, however, that municipalities and municipal officials sued in their official capacities are immune from punitive damages under Section 1983. *See* *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)

( "considerations of history and policy do not support exposing a municipality to punitive damages for the bad-faith actions of its officials"); *Ivani Contracting Corp. v. City of N. Y.,* 103 F.3d 257,262 (2d Cir.1997) (officers sued in official capacity "enjoy the same immunity from punitive damages as the City").

Counsel for all remaining parties [11] should convene a conference call with the Court on November 30, 2011 at 2 p.m. to schedule dates for any proposed repleading and further proceedings. The Clerk of the Court is directed to close item numbers 26, 29, 34, 37, and 39 on the docket of this case.

[11]  Because defendants Congregation Yetev and Mr. Ekstein are named only in the Conspiracy Count, those parties are dismissed from the action with prejudice.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 5995075

---

End of Document                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1534891
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Dana GIBSON, Plaintiff,
v.
C. ROSATI, et al., Defendants.

9:13-cv-00503 (GLS/TWD)
|
Signed 03/10/2017

**Attorneys and Law Firms**

DANA GIBSON, 05-A-3824, Upstate Correctional
Facility, P.O. Box 2001, Malone, New York 12953, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General
of the State of New York, OF COUNSEL: JOSHUA
E. McMAHON, ESQ., Assistant Attorney General,
The Capitol, Albany, New York 12224, Counsel for
Defendants.

### ORDER AND REPORT-RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

## I. INTRODUCTION

*1 This *pro se* civil rights action, commenced by Plaintiff
Dana Gibson, an inmate in the custody of the New
York State Department of Corrections and Community
Supervision ("DOCCS"), pursuant to 42 U.S.C. § 1983,
has been referred for Report and Recommendation by the
Honorable Gary L. Sharpe, Senior United States District
Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule
72.3(c). In the third amended complaint, the operative
pleading, Plaintiff alleges:

1. Defendants Willie J. Tabb, Jr. ("Tabb"), Theresa A.
   Knapp-David ("Knapp-David"), and Vernon Fonda
   ("Fonda") violated Plaintiff's Eighth Amendment
   rights by failing to prevent Plaintiff's transfer to Great
   Meadow Correctional Facility ("Great Meadow") in
   October 2011;

2. Defendants C. Rosati ("Rosati"), D. Maguire
   ("Maguire"), C. Burnelle ("Burnelle"), P. LaRose
   ("LaRose"), S. DeLong ("DeLong"), S. Shattuck

("Shattuck"), and P. McNally ("McNally") used
excessive force or failed to intervene in violation of
Plaintiff's Eighth Amendment rights on February 10,
2013;

3. Defendants T. Johnston ("Johnston"), R. Lowry
   ("Lowry"), and John Kitchner ("Kitchner") used
   excessive force in violation of Plaintiff's Eighth
   Amendment rights on February 20, 2013;

4. Defendants J. Scroggy ("Scroggy"), Birrell
   ("Birrell"), and Albert Prack ("Prack") violated
   Plaintiff's Fourteenth Amendment right to due
   process during the disciplinary hearing stemming
   from the events that transpired on February 10, 2013;

5. Defendants DeLuccia ("DeLuccia"), Birrell, and
   Prack violated Plaintiff's Fourteenth Amendment
   right to due process during the disciplinary hearing
   stemming from the events that transpired on
   February 20, 2013; and

6. Defendant Donald Uhler ("Uhler") violated
   Plaintiff's Eighth and Fourteenth Amendment rights
   when he issued an indefinite restraint order and failed
   to provide weekly renewals.

(*See generally* Dkt. No. 119. [1] )

[1]    By Summary Order entered September 27, 2016,
       all claims against Defendant Vanessa Brown were
       dismissed. (Dkt. No. 183.)

Plaintiff has now moved for partial summary judgment
pursuant to Rule 56 of the Federal Rules of Civil
Procedure on his (1) Eighth Amendment failure to
protect claim against Tabb, Knapp-David, and Fonda;
(2) Fourteenth Amendment due process claim against
Scroggy, DeLuccia, Birrell, and Prack; and (3) Fourteenth
Amendment due process claim against Uhler. (Dkt. No.
153. [2] ) Tabb, Knapp-David, Scroggy, DeLuccia, Birrell,
Prack, and Uhler have opposed Plaintiff's motion, and
have cross-moved for summary judgment. (Dkt. No. 163.)
Plaintiff has opposed Defendants' cross-motion, and also
filed a reply. (Dkt. No. 180.) For the reasons explained
below, the Court recommends denying Plaintiff's motion,
and granting Defendants' cross-motion.

[2]    Throughout this litigation, Plaintiff has made
       personal references using both male and female
       pronouns. (*See, e.g.*, Dkt. Nos. 119, 153, and 180.)

Because Plaintiff has used male pronouns in the motion currently pending, the Court will do the same.

## II. FACTUAL BACKGROUND

### A. Plaintiff's Transfer from Upstate to Great Meadow

**\*2** In May of 2011, Plaintiff was incarcerated at Upstate Correctional Facility ("Upstate"). (Dkt. No. 119 at ¶ 15. [3]) On May 16, 2011, Plaintiff wrote a letter to Tabb, his corrections counselor, and requested an "employee separation" from seven corrections officers at Great Meadow. (Dkt. No. 153-4 at 15-16. [4]) Specifically, Plaintiff requested an "employee separation" from Great Meadow corrections officers Ricky R. Therrien ("Therrien"), R. Gosselin ("Gosselin"), Leroy F. Monroe ("Monroe"), Glenn C. Warner ("Warner"), Ricky J. Hance ("Hance"), and Edmund Trombley ("Trombley"), and Sergeant Mark W. Cleveland ("Cleveland"). *Id.* at 15. Plaintiff stated that he had previously sued those same officers in two civil actions filed in the Northern District of New York, *Gibson v. Mitchell-Oddey*, No. 9:03-cv-00082, and *Gibson v. Allen*, No. 9:07-cv-00617. *Id.* at 15-16. As such, Plaintiff feared if he were transferred to Great Meadow, they would "physically harm [Plaintiff] in retaliation for [his] success in such lawsuits against them." *Id.* at 16. [5]

[3]    Paragraph references are used where a document contains consecutively numbered paragraphs.

[4]    Page references to documents identified by docket number are to the page number assigned by the Court's CM/ECF electronic docketing system.

[5]    Plaintiff also requested separation from four corrections officers at Attica Correctional Facility ("Attica"). (Dkt. No. 153-4 at 15-16.)

On May 19, 2011, Tabb verbally advised Plaintiff that he would not submit Plaintiff's applications for "employee separations." (Dkt. No. 153-2 at ¶ 4.) Tabb returned Plaintiff's letter, which included the hand-written notation, "I cannot provide this info," dated May 19, 2011. (Dkt. No. 153-4 at 16.)

On May 23, 2011, Plaintiff filed a grievance (UST-46255-11) with the Inmate Grievance Resolution Committee ("IGRC") requesting "employee separation" from Therrien, Gosselin, Monroe, Warner, Hance, Trombley, and Cleveland "based upon their threats to

physically harm [him] in full retaliation" for filing *Gibson v. Mitchell-Oddey*, No. 9:03-cv-00082, and *Gibson v. Allen*, No. 9:07-cv-00617. (Dkt. No. 163-3 at 6-7.) Plaintiff stated that Tabb "refused to proceed" with his request for "employee separations," and that Senior Corrections Counselor Smith was aware of Plaintiff's request but "nothing was done." *Id.* at 16. Plaintiff requested "that this matter be fully investigated and such documents be proceeded and forwarded to Central Office for such requested employee separations." *Id.*

By written notice dated May 31, 2011, Tabb advised Plaintiff that "[i]nmates cannot file separations from staff. Staff can file separation from inmates through Central Office." (Dkt. No. 153-4 at 17.)

On June 7, 2011, the IGRC denied Plaintiff's grievance because "[t]here is no provision for inmates to be separated from staff." (Dkt. No. 163-3 at 8.) Plaintiff's appeal to the Superintendent was also denied:

> There is no provision for inmates to be separated from staff, as requested by [Plaintiff]. In the current matter, [Plaintiff] was advised of this fact by the assigned correctional counselor through written correspondence.

(Dkt. No. 163-3 at 4.) Plaintiff filed an appeal to the Central Office Review Committee ("CORC"), arguing:

> Contrary to [the Superintendent's decision], prison officials have an inherent duty under the Eighth Amendment of the U.S. Constitution to take "reasonable measures to guarantee the safety of inmates." *See Farmer v. Brennan,* 511 U.S. 825, 833 (1994) (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)).

> Accordingly, I requested such employee separations from such employees based upon their threats to physically harm me in retaliation for my successfully suing them in Federal Court.

> While such employee threats were taken lightly in the past in October, 2007, on October 11, 2007, upon being transferred to Great Meadow Correctional Facility where I was cut in my face by Correction Officer Edmund Trombley while other employees watched. Such actions resulted in my success in suing officer Trombley and others named in this grievance.

**\*3** Accordingly this grievance should be granted and I should be separated from such employees as requested.

(Dkt. No. 163-3 at 4-5.)

On July 27, 2011, the Prisoners' Rights Project sent a letter to Fonda, DOCCS Acting Inspector General, requesting that Plaintiff's "concerns and his request to be housed in a facility other than Attica and Great Meadow" be investigated. (Dkt. No. 153-4 at 26.)

On August 4, 2011, Plaintiff sent correspondence to Commissioner Brian Fischer ("Fischer"), requesting that he not be transferred to Great Meadow or Attica "based upon threats made on [his] life by employees at such facilities." (Dkt. No. 153-2 at ¶ 5.) Plaintiff advised Fischer that he had successfully sued Therrien, Gosselin, Monroe, Warner, Hance, Trombley, and Cleveland, and that "all named employees of Great Meadow ha[ve] threaten[ed] to physically harm [Plaintiff] if [he] returned to Great Meadow in retaliation for suing them." (Dkt. No. 153-4 at 19-20.) Plaintiff indicated that Tabb had refused to proceed with his employee separation requests and that his grievance (UST-46255-11) was pending CORC review. *Id.* Plaintiff's letter was referred to Associate Commissioner Knapp-David. (*See* Dkt. No. 153-4 at 22.)

On August 9, 2011, Plaintiff's concern that he would be assaulted by staff at Great Meadow and Attica was assigned to non-party DOCCS Inspector General's Officer Investigator, Jon Nocera ("Nocera"). (Dkt. No. 163-4 at 1.) Nocera interviewed Plaintiff on August 17, 2011. *Id.* Following the investigation, Nocera determined that Plaintiff's claims were unsubstantiated, concluding that there was "no evidence to support the allegations of staff misconduct." *Id.*

On August 17, 2011, CORC issued the following:

Upon full hearing of the facts and circumstances in the instant case, the action requested herein is hereby accepted only to the extent that CORC upholds the determination of the Superintendent for the reason stated.

CORC asserts that there is no provision in Department policy for an inmate to request a separation from staff. The grievant is advised to address specific instances of

harassment by staff to the attention of a supervisor for any remedial action deemed necessary.

In regard to the grievant's appeal, CORC asserts that all relevant information must be presented at the time of filing in order for a proper investigation to be conducted at the facility level.

(Dkt. No. 163-3 at 1.)

Subsequently, by letter dated August 24, 2011, Knapp-David responded to Plaintiff's August 4, 2011, letter:

The Office of Classification and Movement reviews an offender's transfer history and the separation system prior to issuing a transfer order. Be assured this procedure will be utilized prior to your transfer being considered.

Please address any further issues regarding transfer and/or separation with your assigned Correction Counselor who is in the best position to advise you.

(Dkt. No. 153-4 at 22.)

On August 29, 2011, Plaintiff sent a second letter to Tabb and requested that he not be transferred to Great Meadow or Attica "based upon threats made upon [his] life by employees of such facilities whom threatened to physically harm" him if he was transferred back to either facility. *Id.* at 23. On September 6, 2011, during his quarterly review with Tabb, Plaintiff provided the following statement: "I am ready to be released from [the segregated housing unit ("SHU") ] and request not to return to Attica or Great Meadow based on threats." *Id.* at 24.

**\*4** On October 31, 2011, Plaintiff was transferred to Great Meadow. (Dkt. No. 153-1 at ¶ 5.) From October 31, 2011, to February 10, 2013, Plaintiff testified that he had "plenty" of interactions with the officers he had previously sued, including Sergeant Cleveland. (Dkt. No. 163-3 at 28.) Plaintiff also testified that he did not file a single grievance, or otherwise write to complain, about a risk to his safety prior from September 7, 2011, until February 10, 2013. *Id.* at 28-29.

According to Plaintiff, on February 10, 2013, Plaintiff was physically attacked by Rosati, Burnelle, DeLong, LaRose, and Shattuck, while McNally failed to intervene, in "full retaliation" for Plaintiffs success in prior civil rights actions. (Dkt. No. 153-2 at ¶ 7; Dkt No. 119 at ¶¶ 9-11.)

Plaintiff claims Maguire stated, "[s]o you really think your hot shit for suing my bud Sergeant Cleveland and the rest of my guys for tuning you up ... well your shit stops here today." (Dkt. No. 119 at ¶ 10 (brackets, ellipses, and errors in original).) During the attack, Maguire stated, "[T]his is what you get for taking us to court motherfucker." (Dkt. No. 119 at ¶ 11 (brackets in original).)

Based on the above, Plaintiff alleges Tabb, Knapp-David, and Fonda "failed to take reasonable measures to guarantee" Plaintiff's safety in violation of his rights under the Eighth Amendment. (Dkt. No. 153-2 at ¶ 7.)

### B. First Disciplinary Hearing
On February 10, 2013, Plaintiff was issued three misbehavior reports. (Dkt. No. 153-2 at ¶ 13.) Specifically, Maguire charged Plaintiff with refusing a direct order, attempted assault, threats, violent conduct, and creating a disturbance. (Dkt. No. 153-4 at 35.) Burnelle charged Plaintiff with refusing a direct order, refusing to work, harassment, and threats. *Id.* at 36. Non-party Sergeant T. Vedder charged Plaintiff with refusing a direct order and violent conduct. *Id.* at 37.

Plaintiff was served copies of the misbehavior reports on March 5, 2013. (Dkt. No. 153-2 at ¶ 13.) At Plaintiff's request, Scroggy was assigned to assist Plaintiff in preparation for the Tier III disciplinary hearing.

Plaintiff's first disciplinary hearing, which combined the three February 10, 2013, misbehavior reports, began on March 14, 2013. (Dkt. No. 153-4 at 51.) Birrell served as the hearing officer and Plaintiff pleaded "not guilty" to all charges. *Id.* On March 22, 2013, Birrell found Plaintiff guilty of all charges and sentenced Plaintiff to fourteen months in the SHU, with a corresponding loss of commissary, packages, and phone use. *Id.* at 51-52. In support of his determination, Birrell relied upon the combination of the inmate misbehavior reports, investigation reports, mental health testimony, and use of force report, along with Plaintiff's testimony. *Id.* at 53.

Plaintiff appealed Birrell's decision, arguing among other things, he was deprived of his right to call a witness, he received insufficient assistance, the hearing officer's decision was not based upon substantial evidence, and the penalties imposed were excessive. *Id.* at 55-62.

On May 28, 2013, Prack affirmed Birrell's decision and modified Plaintiff's sentence, reducing Plaintiff's SHU confinement from fourteen months to eight months, and the loss of packages, commissary, and phone from fourteen months to twelve months. *Id.* at 63. By memorandum dated May 28, 2013, Prack advised Upstate Superintendent David A. Rock that Plaintiff's sentenced was modified because "the nature of the offense, however serious, does not warrant the penalty imposed." (Dkt. No. 163-9 at 2.)

**\*5** Based on the above, Plaintiff alleges Scroggy, Birrell, and Prack violated his Fourteenth Amendment due process rights during the first disciplinary hearing. (Dkt. No. 119 at ¶ 23.)

### C. Second Disciplinary Hearing
On February 20, 2013, Plaintiff was issued two inmate misbehavior reports. (Dkt. No. 153-2 at ¶ 13.) Specifically, Johnston charged Plaintiff with (1) attempted assault on staff, (2) violent conduct, (3) refusing a direct order, and (4) refusing staff directions for movement (lock in/lock out procedures). (Dkt. No. 153-4 at 65.) Non-party corrections officer Turner charged Plaintiff with assault. *Id.* at 66. Plaintiff was served with copies of the inmate misbehavior reports on March 5, 2013. *Id.* at 69. At Plaintiff's request, DeLuccia was assigned to assist Plaintiff in preparation for the second disciplinary hearing. (Dkt. No. 163-10 at 25-26.) Birrell served as the hearing officer. *Id.* at 2.

Plaintiff's second disciplinary hearing also commenced on March 14, 2013, and on March 22, 2013, Birrell found Plaintiff guilty of all charges. *Id.* In support of his decision, Birrell relied upon the inmate misbehavior reports, unusual incident report, use of force report, and mental health testimony. *Id.* at 4. Plaintiff was sentenced to eighteen months in the SHU, with a corresponding loss of packages, commissary, and phone privileges. *Id.* at 2. Following the Superintendent's review, Plaintiff's SHU confinement was reduced to ten months. *Id.* at 1.

Plaintiff appealed Birrell's decision, arguing, among other things, he was deprived of notice of the charges, he received insufficient employee assistance, the hearing officer's decision was not based upon substantial evidence, and the penalties imposed were overly harsh and excessive. (Dkt. No. 153-4 at 73-81.) On May 28, 2013, Prack

reviewed and affirmed Birrell's decision and the modified sentence. (Dkt. No. 153-4 at 81.)

Based on the above, Plaintiff alleges DeLuccia, Birrell, and Prack violated his Fourteenth Amendment due process rights during the secondary disciplinary hearing. (Dkt. No. 119 at ¶ 23.)

### D. Restraint Order

On or about April 18, 2013, Plaintiff was transferred from Great Meadow to Upstate. (Dkt. No. 153-2 at ¶ 9.) As a maximum security facility, all inmates housed at Upstate are required to wear mechanical restraints when outside of their cell. (Dkt. No. 163-13 at ¶ 24.) Mechanical restraints include handcuffs and a waist chain. *Id.* at ¶ 25.

On April 20, 2013, non-party Sergeant Gokey ("Gokey") sent a memorandum (subject: "restraint request") request to Uhler, Deputy Superintendent for Security at Upstate, requesting that Plaintiff "be placed on an order for use of a block box and waist chain every time he exits his cell." (Dkt. No. 163-6 at 17.) Gokey indicated that due to Plaintiff's propensity for violence, along with his "ability to slip out of handcuffs, necessitates the request for the use of the black box and waist chain restraints to aid in the safety and security of staff[.]" *Id.*

On April 22, 2013, Uhler issued an Interdepartmental Communication (subject: "retention strap"), advising that "due to [Plaintiff's] attempt to pull the mechanical restraints into his cell, [Plaintiff] will now be handcuffed in back, with a retention strap applied every time he leaves and enters his cell." *Id.* at 16.

**\*6** On April 23, 2013, Uhler issued a second Interdepartmental Communication (subject: "waist chain/ black box"), advising that due to Plaintiff's "ability to remove his secured hand restraints, [Plaintiff] will be secured with full restraints, to include a waist chain and black box during all movement out of his cell." *Id.* at 15. Uhler advised "this procedure" would continue until he withdrew the order. *Id.*

On April 24, 2013, Plaintiff filed a grievance (UST-51794-13) claiming that on April 22, 2013, and April 23, 2013, Uhler placed him on a "restraint order of a retention strap, waist chain, and black box" and that the order was "without just cause[.]" *Id.* at 9. Plaintiff argued that Uhler's order was being "used" against him

for disciplinary and retaliatory purposes. *Id.* On May 7, 2013, the IGRC advised Plaintiff that he was "placed on full restraints due to his ability to remove his secured hand restraints. He was put on a retention strap because he attempted to pull the mechanical restraints into his cell." *Id.* at 11. Plaintiff appealed to the Superintendent. *Id.*

On May 17, 2013, the Superintendent denied Plaintiff's grievance, finding that the staff acted appropriately, there was no misconduct, and that no further action would be taken. *Id.* at 8. The Superintendent further advised that Plaintiff would "remain on a restraint order until it is removed by the Deputy Superintendent for Security." *Id.*

On May 21, 2012, Plaintiff appealed to CORC, arguing that he was "not being afforded proper 7 day reviews and there is no reason for such restraint order and such is being imposed as a form of disciplinary." *Id.* (errors in original). CORC received Plaintiff's appeal on May 31, 2013. *Id.* at 5.

On September 17, 2013, in response to an electronic inquiry from Inmate Grievance Program Coordinator Rebecca Loren (Subject: UST-51794-13) inquiring as to whether "Form #2186 and #2186 Renewal" were completed, Uhler ultimately responded:

> I have reviewed directive 4933 and spoke with Col. Kirkpatrick, we both agree that the current procedure being used at Upstate is in compliance of the directive. We are not applying further restraints and/or additional restraints to a[n] inmate. In the directive, it sates [sic] that we can use hand restraints with a waist chain. I am simply directing what type of waist chain to be used.

*Id.* at 2-4.

On October 9, 2013, CORC issued a decision finding Plaintiff was on a "retention strap order" for security reasons as outlined in Uhler's April 23, 2013, memorandum, and was not on a "restraint order" requiring a seven day review. *Id.* at 1. CORC directed Plaintiff to address concerns regarding restraints to supervisory staff for the most expeditious means of resolution, and further advised Plaintiff that he was

"ultimately responsible for his actions." *Id.* CORC noted there was "no malfeasance by staff." *Id.*

Based on the above, Plaintiff alleges Uhler placed him on an "indefinite restraint" order as a form of cruel and unusual punishment and without due process in violation of the Eighth and Fourteenth Amendments. (Dkt. No. 119 at ¶¶ 18-20.)

## III. APPLICABLE LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

**\*7** Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 273 (citations omitted). The nonmoving party must do more than "rest upon the mere allegations ... of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005) (emphasis

in original). To defeat summary judgment, nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at \*3 (S.D.N.Y. Oct. 28, 1999 [6]) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

[6]   The Court will provide Plaintiff with copies of unpublished decisions in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76, 76 (2d Cir. 2009) (per curium).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (internal quotation marks omitted)).

## IV. ANALYSIS

### A. Tabb, Knapp-David, and Fonda

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in

Gibson v. Rosati, Slip Copy (2017)

2017 WL 1534891

their custody." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)). Prison officials are liable under the Eighth Amendment for harm incurred by an inmate if they act with deliberate indifference to the inmate's safety. *Morales v. New York State Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir. 1988) ("[A] state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under § 1983.").

**\*8** To prevail on a failure to protect claim, a plaintiff must demonstrate two elements, one objective and one subjective. To satisfy the objective prong of the test, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. That is, the deprivation "must be, in objective terms, 'sufficiently serious.' " *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). The standard "contemplates 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Id.* (quoting *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990)); (same). Under this standard, the plaintiff "must demonstrate that this grave harm was 'actual or imminent.' " *Dublin v. New York City Law Dep't*, No. 10 Civ. 2971 (LAP), 2012 WL 4471306, at *5 (S.D.N.Y. Sept. 26, 2012) (quoting *Benjamin v. Fraser*, 343 F.3d 35, 51 (2d Cir. 2003)).

As to the second prong, "[t]o prove deliberate indifference, the plaintiff must show that the 'official [knew] of and disregard[ed] an excessive risk to inmate health or safety.' " *Celestin v. Premo*, No. 9:12-cv-301 (GLS/RFT), 2014 WL 272443, at *5 (N.D.N.Y. Jan. 24, 2014) (quoting *Farmer*, 511 U.S. at 836). Indeed, "[t]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exits, *and* he must also draw that inference." *Id.* (internal quotation and citation omitted; emphasis in original). Mere negligence by a prison official will not suffice. *Hayes*, 84 F.3d at 620; *Hathaway*, 37 F.3d at 66 ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.").

Here, Plaintiff alleges Tabb, Knapp-David, and Fonda failed to protect him in violation of the Eighth Amendment. (Dkt. No. 119 at ¶¶ 14-17.) Specifically, Plaintiff claims that Tabb and Knapp-David, "failed to take any reasonable measures to protect Plaintiff's health

and safety" by refusing Plaintiff's requests for "employee separation" from certain employees at Great Meadow. (Dkt. No. 153-3 at 9-10.) Plaintiff claims that although Fonda opened an investigation to address Plaintiff's safety concerns, "no further action was taken." *Id.* Defendants argue that Plaintiff cannot establish either the objective or the subjective prong of his failure to protect claim. (Dkt. No. 163-1 at 5-9.)

To be sure, Plaintiff has offered evidence—through letters and grievances—that Tabb, Knapp-David, and Fonda were on notice that Plaintiff feared for his life if he was transferred to Great Meadow based on "verbal threats of retaliation," made by Great Meadow staff for "his success in prior civil litigation[.]" (Dkt. No. 153-4 at 15-16, 19-20, 22, 23, 26.) Similarly, at his deposition, Plaintiff confirmed that he requested not to be transferred to Great Meadow "because of the threats." (Dkt. No. 163-5 at 25.)

However, "[a] general, conclusory statement that an inmate fears for his safety, without more, is insufficient information from which an inference can be drawn that such inmate's safety is actually at risk." *Wilson v. Campbell*, No. 06-cv-0175 (GLS/RFT), 2008 WL 902187, at *5 (N.D.N.Y. Mar. 31, 2008); *see, e.g.*, *Desulma v. City of New York*, No. 98Civ.2078, 2001 WL 798002, at *6-7 (S.D.N.Y. July 6, 2001) ("verbal statements alone do not indicate a substantial threat of serious harm."); *Colliton v. Gonzalez*, No. 07 Civ. 02125 (RJH)(MHD), 2011 WL 1118621, at *6 n.6 (S.D.N.Y. Mar. 23, 2011) ("verbal threats, even death threats," over the course of eleven months before the altercation, "cannot give rise to a deliberate indifference claims absent evidence that [the inmate] was simultaneously subject to physical assault from the threatening inmates").

**\*9** Here, the record evidence demonstrates Plaintiff feared retaliatory attacks "based on threats." As such, Plaintiff has failed to demonstrate that he was incarcerated under conditions sufficiently serious to support a deliberate indifference claim. Because Plaintiff cannot meet the objective prong of his deliberate indifference claim, the Court need not address the subjective prong. *See, e.g.*, *Goris v. Breslin*, 402 Fed.Appx. 582, 584 (2d Cir. 2010) (court need not reach subjective prong where plaintiff failed to satisfy the objective prong); *Goodwin v. Kennedy*, No. CV 13-1774 (SJF)(AKT), 2015 WL 1040663, at *11 (E.D.N.Y. Mar. 10, 2015) (same).

**Gibson v. Rosati, Slip Copy (2017)**

2017 WL 1534891

Accordingly, the Court recommends granting Defendants' cross-motion for summary judgment on this claim.

**B. Scroggy, DeLuccia, Birrell, and Prack**

Plaintiff alleges Scroggy, DeLuccia, Birrell, and Prack violated his Fourteenth Amendment due process rights during two Tier III disciplinary hearings. (Dkt. No. 119 at ¶¶ 23-37.) Plaintiff moves for summary judgment, arguing he was denied (1) advance notice of the charges, (2) adequate pre-hearing assistance, (3) the right to call witnesses, (4) a fair and impartial hearing officer, and (5) a disposition based upon reliable evidence. (Dkt. No. 153-3 at 14-22.)

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or polices." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citation omitted). "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

To establish a procedural due process claim under § 1983, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998).

*1. Liberty Interest*

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *Lewis v. Murphy*, No. 9:12-CV-00268 (NAM/CFH), 2014 WL 3729362, at *7 (N.D.N.Y. July 25, 2014) (citing *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994)). An inmate retains a protected liberty interest in remaining free from segregated confinement if the prisoner can satisfy the standard set forth in *Sandin v. Conner*, 515 U.S. 472,

483-84 (1995). Therefore, a plaintiff must show that (1) the state actually created a protected liberty interest in being free from segregation, and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 783-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658.

As to the first factor, "[t]he prevailing view in this Circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor." *Liao v. Malik*, No. 9:13-CV-1497 (GTS/DEP), 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (collecting cases). As to the second factor, the plaintiff bears the "burden of proving that the conditions of his confinement constituted an atypical, significant hardship in relation to the ordinary incidents of prison life in order to recover damages" under § 1983. *Vasquez v. Coughlin*, 2 F. Supp. 2d 255, 260 (N.D.N.Y. 1998).

**\*10** The Second Circuit has instructed that in determining whether an inmate's SHU confinement has imposed an atypical and significant hardship, a court must consider, among other things, both the duration and conditions of confinement. *J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013); *Davis v. Barrett*, 576 F.3d 129, 133-34 (2d Cir. 2009) (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)); *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)); *see also Murray v. Arquitt*, No. 9:10-CV-1440 (NAM/CFH), 2014 WL 4676569, at *14 (N.D.N.Y. Sept. 18, 2014). Thus, while not dispositive, the duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted).

The Second Circuit has declined to provide a bright-line rule as to what duration of punitive confinement implicates a prisoner's constitutional rights; however, general guidelines have been defined. *See Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). Confinement for 101 days or fewer under typical punitive segregation conditions "generally do[es] not constitute 'atypical' conditions of confinement." *Bunting v. Nagy*, 452 F. Supp. 2d 447, 456 (S.D.N.Y. 2006) (quoting *Sealev v. Giltner*, 197 F.3d 578, 589 (2d Cir. 1999)). By contrast, 305 days or more of segregated confinement has been deemed an atypical and significant hardship. *See Colon*, 215 F.3d at

231-32. "A period of confinement between 101 and 305 days is considered to be an 'intermediate duration' and could implicate a liberty interest should a detailed record of the conditions of confinement indicate that it was an atypical and significant hardship." *Bunting*, 452 F. Supp. 2d at 456 (citing *Sealey*, 197 F.3d at 589); *see also Palmer*, 364 F.3d at 64-65.

In this case, Plaintiff was confined in the SHU from May 22, 2013, to January 21, 2014, (245 days), and from January 22, 2014, to May 19, 2014 (118 days), as punishment for the incidents that occurred on February 20, 2013, and February 10, 2013, respectively. (Dkt. No. 163-7 at 2.) Plaintiff thus served 363 consecutive days in the SHU. During this time, Plaintiff alleges that he suffered "a number of unlawfully harsh forms of treatment" including, but not limited to, the (1) deprivation of religion, (2) deprivation of medical care, (3) depravation of adequate law library services, (4) deprivation of exercise, (5) deprivation of showers, and (6) unlawful physical restraint orders. (Dkt. No. 119 at ¶¶ 32, 37.)

Defendants argue that "Plaintiff's sentences should not be considered in the aggregate for purposes of the liberty interest prong [because] [e]ach stemmed from an unrelated disciplinary hearing involving separate incidents that occurred ten (10) days apart from one another." (Dkt. No. 163-1 at 15 n.5.) The Court disagrees.

The Second Circuit has suggested that "separate SHU sentences 'should be aggregated for purposes of the *Sandin* inquiry'" when they constitute a sustained period of confinement." *Giano v. Selksy*, 238 F.3d 223, 226 (2d Cir. 2001) (quoting *Sims v. Artuz*, 230 F.3d 14, 22-23 (2d Cir. 2000)); *see also Sealey*, 197 F.3d at 589 (requiring district court to aggregate sanctions that caused inmate to serve consecutive time in segregation); *Richardson v. Hillman*, 201 F. Supp. 2d 222, 229 (S.D.N.Y. 2001) (citing *Sealey* and noting that the Second Circuit "has expounded the responsibility for issuing officers to include the entire period in the SHU that a prisoner was confined, if the officer extended the confinement period to constitute an atypical penalty"); *Koehl v. Bernstein*, No. 10 Civ. (SHS) (GWG), 2011 WL 2436817, at *7 (S.D.N.Y. June 17, 2011) (aggregating the 90 SHU confinement and 30 day keeplock confinement).

**\*11** In this case, the Court finds it appropriate to consider Plaintiff's sentences in the aggregate.[7] Accordingly, there can be no doubt that 363 days of consecutive SHU confinement "satisfies the *Sandin* inquiry based on duration alone." *Bunting*, 452 F. Supp. 2d at 457 (aggregating the inmate's sentences imposed in May 1998, August 1998, and November 1998 (all from unrelated incidents), which resulted in 365 days of consecutive keeplock confinement). Because the Court finds Plaintiff's SHU confinement implicated a liberty interest, the Court need not address Defendants' argument that as to each period of SHU confinement, 254 days and 118 days, respectively, Plaintiff failed to establish that the conditions of his confinement constituted an atypical and significant hardship when compared to those of an ordinary prisoner. (*See* Dkt. No. 163-1 at 15-19.)

[7]      The Court further notes that DOCCS also considered Plaintiff's SHU confinement stemming from the February 10, 2013, and February 20 2013, incidents in the aggregate. (*See* Dkt. No. 163-10 at 1.) On March 26, 2013, Prack reduced Plaintiff's SHU confinement stemming from the February 20, 2013, misbehavior reports from eighteen months to ten months, noting that "[t]he combined confinement time of [thirty-two] months is reduced." *Id.*

### 2. Procedural Due Process

The Fourteenth Amendment due process protections afforded a prison inmate do not equate to "the full panoply of rights due to a defendant in a criminal prosecution." *Sira*, 380 F.3d at 69. The constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff v. McDonald*, 418 U.S. 539, 564-70 (1974); *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004).

The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to ... an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing

*Wolff*, 418 U.S. at 570-71). Due process in this context requires only that the hearing officer's decision not be arbitrary. *Id.* (quoting *Wolff*, 418 U.S. at 571). A decision is not "arbitrary" if it is supported by "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985). "This standard is extremely tolerant and is satisfied 'if there is any evidence in the record that supports' the disciplinary ruling." *Sira*, 380 F.3d at 69 (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). "[O]nly 'reliable' evidence can constitute 'some evidence.' " *Id.* at 76 (quoting *Luna*, 356 F.3d at 488).

In addition, to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g.*, *Clark v. Dannheim*, 590 F. Supp. 2d 429, 429 (W.D.N.Y. 2008) (citing, *inter alia*, *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991) ("[I]t is entirely inappropriate to overturn the outcome of a prison disciplinary hearing because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial.")).

### 3. First Disciplinary Hearing

Plaintiff's first Tier III disciplinary hearing, pertaining to the charges stemming from the February 10, 2013, incident, commenced March 14, 2013. (Dkt. No. 153-4 at 42.) Plaintiff was charged with harassment, refusing a direct order, threats, facility program committee (refusing assignment), violent conduct, creating a disturbance, and assault on staff. *Id.* Plaintiff pleaded "not guilty" to all charges. *Id.* On March 22, 2013, Plaintiff was found guilty of all charges, and sentenced to fourteen months of SHU confinement, with a corresponding loss of package, commissary, and phone privileges. *Id.*

**\*12** Plaintiff claims he was denied adequate pre-hearing assistance, the right to present witnesses, and a fair and impartial hearing supported by reliable evidence. (Dkt. No. 119 at ¶¶ 23-37; Dkt. No. 153-2 at ¶¶ 13-31.) Defendants argue Plaintiff was afforded the minimum requirements of due process. (Dkt. No. 163-1 at 19-27.) The Court agrees with Defendants.

### a. Assistance

On March 5, 2015, while confined in the SHU, Plaintiff was served copies of the February 10, 2013, inmate misbehavior reports. (Dkt. Nos. 153-2 at ¶ 13; 153-4 at 51.) Because Plaintiff was confined in the SHU, he was entitled to assistance. *See Murray*, 2014 WL 4676569, at \*19 (citation omitted). An inmate's right to assistance is limited, however, and an inmate has no right to full counsel. *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993). The assistant need only perform what the plaintiff would have done but need not go beyond. *Lewis v. Johnson*, No. 9:08-CV-482 (TJM/ATB), 2010 WL 3785771, at \*10 (N.D.N.Y. Aug. 5, 2010). Significantly, any claim of depravation of assistance is reviewed for harmless error. *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009).

At Plaintiff's request, Scroggy was assigned to assist Plaintiff. (Dkt. No. 153-2 at ¶¶ 13-14.) On March 13, 2013, Plaintiff gave Scroggy an itemized list of the documents needed "to marshal the alleged facts and witnesses [he] needed interviewed." (Dkt. No. 153-2 at ¶ 14.) Specifically, Plaintiff requested Parts A, B, C, D, and E of the use of force report, the preliminary and final unusual incident reports, and all "to-and-from" memoranda regarding the alleged incident. *Id.* Plaintiff also requested that Burnelle be interviewed. *Id.* Plaintiff provided Scroggy with a list of questions to ask Burnelle during the interview. *Id.*

Scroggy provided Plaintiff with copies of the available documents, and advised Plaintiff to request the other documents from the hearing officer at the disciplinary hearing. (Dkt. No. 163-13 at ¶¶ 56, 57.) Scroggy did not interview Burnelle. (Dkt. No. 153-1 at ¶ 8.) Scroggy explained to Plaintiff that he would not interview a staff member. (Dkt. No. 153-1 at ¶ 8.) Burnelle was willing, however, to answer the questions at the disciplinary hearing. (Dkt. No. 163-9 at 34.)

On March 14, 2013, Plaintiff's Tier III hearing commenced; Birrell served as the hearing officer. (Dkt. No. 163-11 at 6.) At the start of the hearing, Plaintiff informed Birrell that Scroggy failed to provide all of the documents he had requested, specifically, the "UI and section B, C, D, and E of the Use of Force." *Id.* at 6, 9. Thereafter, Birrell read the three inmate misbehavior reports into the record, and Plaintiff pleaded not guilty to all charges. *Id.* at 7-8. Birrell also read the use of force

report into the record, as well as the unusual incident report. *Id.* at 9-11, 13-14. Birrell provided Plaintiff with copies of available documents, and explained to Plaintiff how he could obtain copies of certain documents once they were finalized. *Id.* 9-10, 13-15.

Even assuming Scroggy's assistance was inadequate, no reasonable factfinder could conclude that the deprivation resulted in any prejudice to Plaintiff because Birrell provided Plaintiff with copies of all available documents, and Plaintiff did not request to question Burnelle during the hearing. *See Murray*, 2014 WL 4676569, at *19 (the record established that the hearing officer took steps to provide the inmate with the requested evidence); *Lewis v. Murphy*, 2014 WL 3729362, at *13 (the plaintiff alleged that his counselor failed to interview witnesses but did not show how this shortcoming prejudiced the results); *Pilgrim* 571 F.3d at 206 (depravation of assistance is reviewed for harmless error).

**\*13** Based on the foregoing, the Court finds Plaintiff did not suffer from any constitutional violations as a result of Scroggy's lack of assistance, if any.

### b. Opportunity to be Heard and Present Witnesses

An accused prisoner has the right to a hearing where he is given a reasonable opportunity to call witnesses and present documentary evidence. *Sira*, 380 F.3d at 69. Although due process includes a right to call witnesses, this right is not unfettered. *Alicea v. Howell*, 387 F. Supp. 2d 227, 234 (W.D.N.Y. 2005) (citing *Ponte v. Real*, 471 U.S. 491, 495 (1985)). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia*, *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991) (a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence)); *see also Eleby v. Selsky*, 682 F. Supp. 2d 289, 291-92 (W.D.N.Y. 2010) (hearing officers have discretion to keep the hearing within reasonable limits, and "included within that discretion is the authority to refuse to call witnesses whose testimony the prison official reasonably regards as duplicative or non-probative").

In this case, Plaintiff requested the testimony of inmates T. Moore, E. Lopez, and J. Holloway. (*See* Dkt. No. 163-11 at 11, 16-17; Dkt. No. 153-2 at ¶¶ 18-19.) After

permitting Plaintiff to call and question inmate Moore, Birrell adjourned the hearing to locate inmate Lopez. (Dkt. No. 119 at 28-29; Dkt. No. 163-11 at 17.) Thereafter, Birrell informed Plaintiff that inmate Lopez was housed at Marcy Correctional Facility ("Marcy"). (Dkt. No. 163-11 at 17.) Birrell stated that he had contacted staff at Marcy to determine if inmate Lopez would testify, and inmate Lopez declined to testify, stating that had not been present at Great Meadow on February 10, 2013. *Id.* Inmate Lopez's refusal was documented and faxed to Great Meadow, and the form was included in Plaintiff's "hearing packet." *Id.*

Plaintiff states that off the record, he "expressed" to defendant Birrell "the bizarre and suspicious nature of the alleged witness refusal and requested that [Birrell] make a personal inquiry into the alleged witness refusal by inmate Lopez by interviewing inmate Lopez." (Dkt. 153-2 at ¶ 29.) According to Plaintiff, Birrell refused, stating "I don't think staff will lie." *Id.*

As the Second Circuit has explained, "[c]learly, if a witness will not testify if called, it cannot be a 'necessity' to call him. [Therefore,] if a prison official ... reasonably concludes that it would be futile to call a witness to testify, his refusal to do so will not constitute a violation of the prisoner's constitutional rights." *Silva*, 992 F.2d at 22. Courts have consistently held that a prison hearing officer's failure to call a fellow inmate who refuses to testify does not violate due process. *See Abdur-Raheem v. Caffery*, No. 13-CV-6315 (JPO), 2015 WL 667528, at *6 (S.D.N.Y. Feb. 17, 2015) (collecting cases, and finding the hearing officer did not violate inmate's due process rights when he proceeded without the testimony of a proposed witness, where that witness had indicated, by way of an inmate refusal form, that he would not testify).

**\*14** On summary judgment, however, Plaintiff claims that he "later discovered that correction officials at Marcy Correctional Facility ... threaten [sic] to physically harm inmate Lopez if he testified on [Plaintiff's] behalf." (Dkt. No. 153-2 at ¶ 20.) In support of his motion, Plaintiff has provided an unsigned and undated "Affidavit of Edgardo L. Lopez." (Dkt. No. 153-4 at 48.)

However, as Defendants correctly pointed out in their memorandum of law, even if this affidavit were admissible, by Plaintiff's own admission this information was not available to Birrell at the time of the disciplinary

hearing. (Dkt. No. 163-1 at 24.) Indeed, "a failure to summon the testimony of a witness who has refused to testify, in the absence of evidence that the refusal was linked to intimidation on the part of prison officials, does not violate due process because calling a witness who refuses to speak upon questioning would be futile." *Johnson v. Doling*, No. 9:05-CV-376 (TJM/RFT), 2007 WL 3046701, at *7 (N.D.N.Y. Oct. 17, 2007) (citing *Silva*, 992 F.2d at 22 and *Rossi v. Goord*, 2006 WL 2811505, at *14 (N.D.N.Y. Sept. 28, 2006)); *see also Sowell v. Bullis*, No. 9:13-CV-1482 (GLS/DJS), 2016 WL 1696454, at *8 (N.D.N.Y. Mar. 25, 2016).

Thereafter, Plaintiff advised Birrell that he no longer wished to call inmate Holloway. (Dkt. No. 163-11 at 17; *see also* Dkt. No. 163-5 at 71.)

Based on the foregoing, the Court finds Birrell's decision to proceed without the testimony of inmates Lopez and Holloway was justifiably based upon a reasonable conclusion of futility.

### c. Fair and Impartial Hearing and "Some Evidence"

An inmate subject is entitled to an impartial hearing officer who does not prejudge the evidence. *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996); *Patterson v. Coughlin*, 905 F.2d 564, 569 (2d Cir. 1990). But "prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* at 259 (citing *Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir. 1994) and *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989)). Further, prison officials "enjoy a rebuttable presumption that they are unbiased." *See Rodriguez v. Selsky*, No. 9:07-CV-0432 (LEK/DEP), 2011 WL 1086001, at *11 (N.D.N.Y. Jan. 25, 2011) (citation omitted). "A hearing officer may satisfy the standard of impartiality if there is some evidence in the record to support the findings of the hearing." *Fernandez v. Callens*, No. 06-CV-0506(Sr), 2010 WL 4320362, at *12 (W.D.N.Y. Oct. 29, 2010) (internal quotation marks and citation omitted). Moreover, "[a]n inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez*, No. 9:09 CV-626 (FJS/ATB), 2011 WL 7629513, at *11 (N.D.N.Y. Mar. 12, 2011) (citing *Francis*, 891 F.2d at 46).

Here, there is no evidence in the record, aside from Plaintiff's conclusory allegation, that Birrell failed to conduct the hearing in a fair and impartial manner. (*See* Dkt. No. 153-3 at 20.) The record evidence demonstrates that prior to issuing his determination, Birrell read a copy of the misbehavior reports into the record and asked Plaintiff if he understood the charges, provided Plaintiff with copies of all available documents and explained how Plaintiff could obtain copies of the unavailable documents, and adjourned the hearing to afford Plaintiff additional time to review the materials and prepare a defense. (*See* Dkt. No. 153-2 at ¶ 16; Dkt. No. 163-11 at 6-18; Dkt. No. 163-5 at 64-69.)

**\*15** Additionally, the record evidence demonstrates that Birrell's determination of guilt was supported by "some evidence" as required in *Hill*, 472 U.S. at 455, and "reliable evidence" pursuant to *Luna*, 356 F. 3d at 488. As reflected in the hearing transcript and disposition sheet, Birrell relied upon the combination of the inmate misbehavior reports, investigation reports, mental health testimony, use of force report, and Plaintiff's testimony. (Dkt. No. 163-9 at 6.)

Plaintiff argues, however, that inmate Moore's testimony demonstrated that Plaintiff was physically attacked by corrections officers, and therefore "contravened the alleged facts in both the inmate misbehavior reports and the use of force report" which reported Plaintiff as the attacker. (Dkt. No. 153-3 at 20-21.) Although Plaintiff's statement of the record is accurate, judicial review of the "some evidence" standard is "narrowly focused." *Sira*, 380 F.3d at 76. "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached...." *Hill*, 472 U.S. at 455-56 (citations omitted).

Based on the above, the Court finds no genuine issues of material fact concerning Birrell's impartiality. Further, Birrell's decision was supported by "some evidence" sufficient for due process. *See Hinton v. Prack*, No. 9:12-CV-1844 (LEK/RFT), 2014 WL 4627120, at *15 (N.D.N.Y. Sept. 11, 2014) (citation omitted) ("some evidence" standard satisfied where the misbehavior report was made by the officer personally involved in the incident and was based upon his first hand observation and

detailed account of the incident); *Creech v. Schoellkoph*, 688 F. Supp. 2d 205, 214 (W.D.N.Y. 2010) (same). Accordingly, the Court finds Plaintiff was afforded the minimum requirements of due process during the first disciplinary hearing.

#### d. Appeal

Plaintiff claims Prack violated his due process rights by failing to remedy the alleged constitutional violations stemming from the first disciplinary hearing. (Dkt. No. 119 at ¶ 30.) Specifically, Plaintiff alleges that on May 28, 2013, Prack "proactively participated in reviewing Plaintiff's administrative appeal" when he failed to remedy the unconstitutional conduct of Scroggy and Birrell. *Id.*; *see also* Dkt. No. 180-1 at 28-29. However, for the reasons set forth above, Plaintiff's was afforded the minimum requirements of due process. As such, Plaintiff cannot establish a Fourteenth Amendment due process claim against Prack based on the affirmance of a constitutional disciplinary hearing. *See, e.g.*, *Lopez v. Whitmore*, No. 13-CV-0952 (BKS/ATB), 2015 WL 4394604, at *11 (July 16, 2015) (dismissing due process claim against defendant Prack "[b]ecause his only involvement in plaintiff's claims was to affirm the results of a disciplinary hearing that th[e] court ... found comported with due process"); *Cole v. New York State DOCCS*, No. 9:14-CV-0539 (BKS/DEP), 2016 WL 5394752, at *28 (N.D.N.Y. Aug. 25, 2016).

Accordingly, the Court recommends granting Defendants' cross-motion for summary judgment on this claim.

#### 4. Second Disciplinary Hearing

Plaintiff's Tier III disciplinary hearing, pertaining to the charges stemming from the February 20, 2013, incident, also commenced March 14, 2013. (Dkt. No. 163-10 at 2.) Plaintiff was charged with violent conduct, assault on staff, refusing a direct order, and a movement regulation violation. *Id.* at 6. Birrell served as the hearing officer. *Id.* at 2. Plaintiff pleaded "not guilty" to all charges. *Id.* at 3. On March 22, 2013, Plaintiff was found guilty of all charges, and sentenced to eighteen months of SHU confinement, with a corresponding loss of package, commissary, and phone privileges. *Id.*

**\*16** Plaintiff claims he was denied adequate pre-hearing assistance, notice of the charges, and a fair and impartial hearing supported by reliable evidence. (Dkt. No. 119 at ¶¶ 23-37; Dkt. No. 153-2 at ¶¶ 13-31.) Defendants argue Plaintiff was afforded the minimum requirements of due process. (Dkt. No. 163-1 at 19-27.) The Court agrees with Defendants.

#### a. Assistance

As set forth above, because Plaintiff was confined to the SHU when he was served with copies of the February 20, 2013, misbehavior reports, Plaintiff was entitled to pre-hearing assistance. *See Murray v. Arquitt*, 2014 WL 4676569, at *19. At Plaintiff's request, DeLuccia was assigned to assist Plaintiff in preparation for the second disciplinary hearing. (Dkt. No. 153-2 at ¶¶ 24-25; Dkt. No.163-10 at 25.) DeLuccia met with Plaintiff on March 5, 2013, and on March 11, 2013. During those meetings, Plaintiff requested copies of the Use of Force Report (Parts A, B, C, D, and, E), the preliminary and final unusual incident report, and all to-and-from memoranda. (Dkt. No. 153-2 at ¶ 25.) According to Plaintiff, DeLuccia advised that she "would not do anything for" Plaintiff, and told Plaintiff to "ask the hearing officer during the hearing." *Id.* At his deposition, Plaintiff testified that "[DeLuccia] didn't do a damn thing." (Dkt. No. 163-5 at 83.)

Here, even assuming DeLuccia's assistance was inadequate, no reasonable factfinder could find that the deprivation resulted in any prejudice to Plaintiff. *See Clark*, 590 F. Supp. 2d at 429 (inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing). Indeed, Plaintiff testified that Birrell provided all of the documentation that Plaintiff had requested, and adjourned the hearing to afford Plaintiff time to review the documents and prepare his defense. *Id.* at 84.

Here, there is no evidence that Plaintiff was unable to present a defense or that the result of Plaintiff's hearing would have been any different had DeLuccia supplied Plaintiff with the requested documents. *See e.g.*, *Murray*, 2014 WL 4676569, at *19 (the record established that the hearing officer took steps to provide the inmate with the requested evidence). Based on the foregoing, Plaintiff did

not suffer from any constitutional violations as a result of DeLuccia's lack of assistance.

### b. Advance Notice of Charges

An accused prisoner has the right to be provided with advanced written notice of the charges brought against him. *Sira*, 380 F.3d at 69. "The effect of the notice should be to compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez*, 238 F.3d 188, 192-93 (2d Cir. 2001) (quoting *McKinnon v. Patterson*, 568 F.2d 930, 940 n.11 (2d Cir. 1977)) (alteration in original).

On March 5, 2013, Plaintiff was served with copies of the two February 20, 2013, inmate misbehavior reports. (Dkt. No. 163-10 at 3.) The misbehavior reports specified the rules that Plaintiff was alleged to have violated. *Id.* at 6-7. Specifically, "T. Johnston" charged Plaintiff with violent conduct, assault on staff, refusing a direct order, and a movement regulation violation. *Id.* at 7. The explanation in the misbehavior report was quite clear that Plaintiff attempted to assault Johnston on February 20, 2013, at approximately 10:15 a.m., while Johnston was attempting to escort Plaintiff to his doctor's call out. *Id.* Johnston alleged that while attempting to lock Plaintiff in his cell after he refused his medical call, Plaintiff ignored several direct orders and he "lunged forward attempting to strike me with his head." *Id.* Johnston claims physical force was necessary to control Plaintiff. *Id.* Thereafter, at approximately 10:25 a.m., Turner attempted to escort Plaintiff to a post-use-of-force medical examination. *Id.* at 6. Plaintiff "head butted" Turner in the forehead. *Id.* Turner charged Plaintiff with assault. *Id.* at 6.

**\*17** Plaintiff's second disciplinary hearing also commenced on March 14, 2013. (Dkt. No. 163-10.) Plaintiff alleges, however, that he was summoned to appear before Birrell for alleged violations of rules reported by "T. Johnson" instead of "T. Johnston." (Dkt. No. 119 at ¶ 34; Dkt. No. 163-5 at 86.) As such, Plaintiff claims he never received advance notice of the charges issued by "T. Johnson." (Dkt. No. 119 at ¶ 36.)

However, as reflected in the transcript of the hearing, Birrell referred to the charges issued by "Johnston" not "Johnson." (Dkt. No. 163-11 at 4.) In any event, Plaintiff testified that the charges issued by "T. Johnston" in the February 20, 2013, misbehavior report were the same as those read by Birrell during the second disciplinary hearing. (Dkt. No. 163-5 at 88.)

Accordingly, the Court finds Plaintiff was provided with "advance notice of the charges" as required for procedural due process.

### c. Fair and Impartial Hearing Officer and Some Evidence

Plaintiff claims he was deprived of the right to a fair and impartial hearing officer. (Dkt. No. 119 at ¶ 34.) As discussed above, prison officials enjoy a rebuttable presumption that they are unbiased and "in order to defeat a motion for summary judgment, a plaintiff-inmate must 'be armed with [something] more than conclusory allegations of bias and prejudgment' of the disciplinary hearing officer." *Bunting v. Nagy*, 452 F. Supp. 2d 447, 460-61 (S.D.N.Y. 2006) (quoting *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989)); *Rodgriguez v. Selsky*, 2011 WL 1086001, at \*11. Here, Plaintiff's claim of bias is entirely conclusory. Further, as was the case with the first disciplinary hearing, the record evidence demonstrates that prior to issuing his determination, Birrell read the misbehavior reports into the record, provided Plaintiff with copies of documents that he had previously requested, and adjourned the hearing to allow Plaintiff time to review the documents and prepare his defense. (Dkt. No. 163-5 at 84.)

In any event, a hearing officer satisfies the standard of impartiality "if there is some evidence in the record to support the findings of the hearing." *Fernandez v. Callens*, No. 06-CV-0506(Sr), 2010 WL 4320362, at \*12 (W.D.N.Y. Oct. 29, 2010) (internal quotation marks and citation omitted). As discussed below, Birrell's decision was supported by "some evidence."

The crux of Plaintiff's "some evidence" claim rests on a typographical error. (*See* Dkt. No. 119 at ¶ 34.) Specifically, Plaintiff claims that because the hearing record sheet and disposition sheet recorded that "T. Johnson" as opposed to "T. Johnston" charged Plaintiff with violent conduct, assault on staff, refusing a direct

order, and a movement regulation violation on February 20, 2013, Birrell's disposition was not based on "some evidence." (Dkt. No. 153-4 at 21-22; Dkt. No. 163-10 at 2-3.) Defendants argue that a minor typographical error does not obviate the otherwise ample support in the record for Birrell's determination. (Dkt. No. 163-1 at 26.) The Court agrees with Defendants.

The hearing disposition sheet indicates Birrell relied upon the combination of the misbehavior reports, the unusual incident report, mental health testimony, and use of force report. (Dkt. No. 163-10 at 4.) The misbehavior report issued by Johnston claimed, *inter alia*, Plaintiff ignored several direct orders and "suddenly lunged forward attempting to strike me with his head." *Id.* Similarly, the use of force memorandum, dated February 20, 2013, from "T. Johnston" to Superintendent Racette, advised that Johnston used force to restrain Plaintiff after Plaintiff "lunged forward" attempting to strike Johnston with his head. *Id.* at 13. The preliminary unusual incident report indicates that on February 20, 2013, "Officers T. Johnston and J. Kitchner then attempted to return [Plaintiff] to his cell and remove the restraint equipment and [Plaintiff] attempted to headbutt Officer Johnston." *Id.* at 30. Likewise, Part A of the use of force report indicates the following staff were involved in the February 20, 2013, incident: "T. Johnston, J. Kitchner, E. Turner, T. Smith, and M. Gilles." *Id.* at 28. An internal memorandum, dated February 20, 2013, from Sergeant Lowery, the supervisor on duty, to Lieutenant Smith, detailing the use of force and usual incident occurring on February 20, 2013, also refers to "Johnston." *Id.* at 10. Thus, the Court finds Birrell's determination was based on "some evidence."

 **\*18** Based on the foregoing, the Court finds Plaintiff was afforded the minimum requirements of due process during the second disciplinary hearing.

### d. Appeal

Plaintiff claims that Prack violated his due process rights by failing to remedy the alleged constitutional violations stemming from the second disciplinary hearing. (Dkt. No. 119 at ¶ 37.) Specifically, Plaintiff alleges that on May 28, 2013, Prack "proactively participated in reviewing Plaintiff's administrative appeal" when he failed to remedy the unconstitutional conduct of DeLuccia and Birrell. *Id.* However, as discussed above, a supervisor cannot be liable

for affirming a constitutional disciplinary hearing. *See Lopez v. Whitmore*, 2015 WL 4394604, at \*11.

Therefore, the Court recommends granting Defendants' cross-motion for summary judgment on this claim.

### C. Uhler

Plaintiff alleges that while housed at Upstate, Uhler placed him on an "indefinite restraint order" from April 22, 2013, through May 19, 2014, in violation of his right "to be free from unlawful restraint and due process pursuant to the Eighth and Fourteenth Amendments." (Dkt. No. 119 at ¶¶ 18-20.) Plaintiff moves for summary judgment on the Fourteenth Amendment due process claim. (Dkt. No. 153-3 at 11-14.) Defendants cross-move for summary judgment on the Fourteenth Amendment due process claim, as well as the Eighth Amendment conditions of confinement claim. (Dkt. No. 163-1 at 9-13.) In his opposition to Defendants' cross-motion, Plaintiff requests to withdraw the Eighth Amendment claim, and proceed only on the due process claim. (Dkt. No. 180-1 at 13.)

#### 1. Fourteenth Amendment

As discussed above, to prevail on a procedural due process claim under § 1983, a plaintiff must show that he possessed a protected property or liberty interest, and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier*, 280 F.3d at 79-80; *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998). Due process generally requires that the state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003). An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. at 484. The Second Circuit has refused to set a bright line rule on when confinement becomes atypical. Instead, "in order to determine whether a liberty interest has been affected, district courts are required to examine the circumstances of a confinement and to identify with specificity the facts upon which [their] conclusions [are] based." *Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir. 1998) (citations omitted).

2017 WL 1534891

Here, the restraint order required Plaintiff to be "secured with full restraints, to include a waist chain and black box during all movement out of his cell." (Dkt. No. 163-6 at 15.) Plaintiff argues the "indefinite restraint orders" violated his due process rights because he was not afforded a seven day review and renewal as required by 7 N.Y.C.R.R. § 305.4(b). (Dkt. No. 153-1 at 13.) However, "inmates do not have a liberty interest in being free from restraints while out of [their] cell." *Walker v. LaValley*, No. 9:12-CV-807 (TJM/CFH), 2014 WL 4744735, at *19 (N.D.N.Y. Sept. 23, 2014); *Walker v. Fisher*, No. 9:08-CV-1078 (TJM/ATB), 2011 WL 4369116, at *15 (N.D.N.Y. July 25, 2011), *aff'd*, 523 Fed.Appx. 43, 44 (2d Cir. 2013) (same). Indeed, "[p]lacing a prison inmate in restraints does not impose the 'atypical and significant hardship' envisioned in *Sandin*." *Walker v. Fischer*, 2011 WL 4369116, at *15 (citing *Brown v. Coughlin*, No. 93-CV-0633E(H), 1995 WL 643349, at *3 (W.D.N.Y. Oct. 13, 1995) (holding SHU inmate "does not have a liberty interest in being unencumbered by mechanical restraints")).

**\*19** Moreover, as a SHU facility, all inmates housed at Upstate are required to wear mechanical restraints when outside of their cell. (Dkt. No. 163-13 at ¶ 24.) Mechanical restraints include handcuffs and a waist chain. *Id.* at ¶ 25. As such, Plaintiff's due process claim fails as a matter of law as Plaintiff had no liberty interest that would trigger due process protections.

Further, to the extent Plaintiff argues that the restraints violated a DOCCS directive or policy, "a violation of prison regulations does not amount to a constitutional violation and is not a valid basis for relief in an action pursuant to 42 U.S.C. § 1983." *Davis v. Rynkewicz*, No. 11-CV-431(Sr), 2015 WL 1038098, at *18 (W.D.N.Y. Mar. 10, 2015) (citing *Cico v. Kourofsky*, No. 9:08-CV-491 (GLS/RFT), 2010 WL 5138549, at *4 (N.D.N.Y. Feb. 18, 2010) and *Lopez v. Reynolds*, 998 F. Supp. 252, 259 (W.D.N.Y. 1997) ("A prison inmate does not have a viable § 1983 claim based solely on prison officials' failure to adhere to the requirements of prison regulations, directives or policy statements.")). In any event, CORC determined during the grievance process that Plaintiff "was not on a restraint order," and therefore, would not have been subject to the seven day renewal as required by 7 N.Y.C.R.R. § 305.4(b). (*See* Dkt. No. 163-6 at 1.) Based on the foregoing, the Court recommends granting summary judgment to Uhler on this claim.

### 2. Eighth Amendment

The Eighth Amendment protects prison inmates from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. at 297; *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). As set forth above, the test for a 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer*, 511 U.S. at 834. Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.*

While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer*, 511 U.S. at 832. "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (citing *Hudson v. McMillan*, 503 U.S. 1, 9 (1992) ("only those deprivations denying the minimal civilized measures of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation") (internal quotations and citations omitted)). Mere discomfort that does not pose a serious risk to health or safety will not satisfy this standard. *See Trammel v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003).

Plaintiff's Eighth Amendment conditions of confinement claim against Uhler arises out of the "indefinite restraint order," directing Plaintiff to be secured in "full restraints, to include a waist chain and black box during all movement out of his cell." (Dkt. No. 163-6 at 15.) Accordingly, to prevail on this claim, Plaintiff must establish that Uhler was deliberately indifferent to a substantial harm. *See Farmer*, 511 U.S. at 834. However, under the deliberate indifference standard, "[t]he imposition of a restraint order only violates Eighth Amendment protections if imposed restraint is 'totally without penological justification, grossly disproportionate, or involves the unnecessary and wanton infliction of pain.' " *Walker v. LaValley*, 2014 WL 47447835, at *16 (quoting *Horne v. Coughlin*, 155 F.3d 26, 31 (2d Cir. 1998)). "This is because prison officials are granted wide latitude to place restraints on inmates." *Id.*

**\*20** Here, the record evidence demonstrates Plaintiff was placed on "full restraints" due to his "extreme disciplinary history" and "ability to easily slip out of mechanical restraints." (Dkt. No. 163-6 at 17, 15.) In his opposition, Plaintiff does not address the merits, and instead, requests to withdraw his Eighth Amendment claim against Uhler. (Dkt. No. 180-1 at 13. [8] ) Because Plaintiff moves to withdraw this claim so late in the litigation, and only after Defendants have cross-moved for summary judgment, the Court recommends dismissing Plaintiff's Eighth Amendment claim against Uhler with prejudice.

[8]    Plaintiff has not specified, however, whether he wishes to withdraw this claim with or without prejudice, nor has Plaintiff explained the reasons for this request. (Dkt. No. 180-1 at 13.) In light of the procedural posture of this action, Plaintiff has no right to a voluntary dismissal without prejudice of this claim. *See* Fed. R. Civ. P. 41(a)(1) ("Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper."); *Zagano v. Fordham Univ.*, 900 F.2d 12, 14 (2d Cir. 1990), *cert. denied*, 498 U.S. 899 (1990).

In any event, because Plaintiff has not raised any issue of material fact that would permit a reasonable juror to conclude that Uhler acted totally without any penological justification, the restraints were grossly disproportionate, or the restraints involved the unnecessary infliction of pain, the Court recommends granting summary judgment to Uhler on the merits of this claim.

### D. Qualified Immunity

Inasmuch as the Court is recommending that Defendants' cross-motion for partial summary judgment be granted in its entirety, the Court finds it unnecessary to reach Defendants' qualified immunity argument.

## V. CONCLUSION

Based on the findings above, it is recommended that Plaintiff's motion for partial summary judgment (Dkt. No. 153) be denied and Defendants' cross-motion for partial summary judgment (Dkt. No. 163) be granted. Thus, it is also recommended that Tabb, Knapp-David, Fonda, Scroggy, DeLuccia, Birrell, Prack, and Uhler be dismissed from this action. If the District Court accepts this Report and Recommendation, only Plaintiff's Eighth Amendment excessive force and failure to intervene claims against Rosati, Maguire, Burnelle, LaRose, DeLong, Shattuck, McNally, Johnston, Lowry, and Kitchner will remain for trial.

**WHEREFORE**, it is hereby

**RECOMMENDED** that Plaintiff's motion for partial summary judgment (Dkt. No. 153) be **DENIED**; and it is further

**RECOMMENDED** that Defendants' cross-motion for partial summary judgment (Dkt. No. 163) be **GRANTED**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [9] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

[9]    If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Slip Copy, 2017 WL 1534891

**Gibson v. Rosati, Slip Copy (2017)**

2017 WL 1534891

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.