UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JAMEL CLARK,

        Plaintiff,

               9:17-CV-0366
v.               (DNH/TWD)

GERALD GARDNER, et al.,

        Defendants.
_____

APPEARANCES:         OF COUNSEL:

JAMEL CLARK
*Plaintiff, pro se*
99-A-0475
Sullivan Correctional Facility
Box 116
Fallsburg, NY 12733

LETICIA JAMES        LAUREN ROSE EVERSLEY, ESQ.
Attorney General of the State of New York  Ass't Attorney General
*Attorney for Defendants*
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

## I.  INTRODUCTION

   This matter was referred for a Report and Recommendation by the Honorable David. N.

Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  *Pro*

*se* Plaintiff Jamel Clark ("Plaintiff" or "Clark"), an inmate in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS"), commenced this action

pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights at Shawangunk

Correctional Facility ("Shawangunk") in 2014.  (Dkt. No. 1.)

Defendants and claims remaining following initial review and motion practice are: (1)

First Amendment retaliation claims against Corrections Officer ("C.O.") David DeGraff

("DeGraff") and C.O. George Karamanos ("Karamanos"); (2) Eighth Amendment excessive

force claims against DeGraff, Karamanos, C.O. Richard McElroy ("McElroy"), and Sergeant

("Sgt.") Robert Harrison ("Harrison"); and (3) Fourteenth Amendment due process claims

against Lieutenant ("Lt.") Gerald Gardner ("Gardner"), Deputy Superintendent of Security Louis

Pingotti ("Pingotti"), Lt. Gregory Palen ("Palen"), Plant Superintendent Ronald Farah ("Farah"),

Superintendent Joseph Smith ("Smith"), DOCCS Director Donald Venettozzi ("Venettozzi"),

and DOCCS Acting Commissioner Anthony Annucci ("Annucci").  (Dkt. Nos. 9, 47.[1])

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of

Civil Procedure seeking dismissal of the complaint in its entirety.  (Dkt. No. 80.)  In support of

their motion, each Defendant has submitted declarations: Annucci (Dkt. No. 80-3); DeGraff

(Dkt. No. 80-5); Farah (Dkt. No. 80-6); Gardner (Dkt. No. 80-8); Harrison (Dkt. No. 80-9);

Karamanos (Dkt. No. 80-10); McElroy (Dkt. No. 80-11); Palen (Dkt. No. 80-12); Pingotti (Dkt.

No. 80-13); Smith (Dkt. No. 80-16); and Venettozzi (Dkt. No. 80-17).  Defendants also submit

declarations from the following DOCCS employees: Michael Cunningham, Shawangunk Inmate

Grievance Program ("IGP") Supervisor (Dkt. No. 80-4); Debra Fuller, Attica Correctional

Facility ("Attica") IGP Supervisor (Dkt. No. 80-7); Corey Proscia, Sullivan Correctional Facility

("Sullivan") IGP Supervisor (Dkt. No. 80-14); Rachel Seguin, Assistant Director of the IGP for

---

[1]  The Court refers to Defendants' DOCCS' ranks as indicated in 2014.  Their present
ranks and employment status may differ.

DOCCS (Dkt. No. 80-15); John Werlau, Shawangunk Correction Captain (Dkt. No. 80-18); and Sean White, Attica Correction Captain (Dkt. No. 80-19). Plaintiff filed a response. (Dkt. No. 87.) Defendants filed a reply and Plaintiff filed a sur-reply permitted by the Court. (Dkt. Nos. 88, 90, 92.)

For reasons explained below, the Court recommends that Defendants' motion for summary judgment be granted in part and denied in part.

## II.    BACKGROUND

### A.    Plaintiff's Housing Assignments

Plaintiff has been in DOCCS' custody since 1999. As relevant to this action, Plaintiff was incarcerated at Shawangunk from October 1, 2013, through December 23, 2014. (Dkt. No. 80-1 at ¶ 2.[2]) He was temporarily housed at Attica from July 20, 2014, through August 25, 2014, for a court trip. (Dkt. No. 1 at 11.) Between September 8 and 11, 2014, and October 30 and November 17, 2014, Plaintiff was temporarily housed at Downstate Correctional Facility ("Downstate") and Sullivan, respectively, for mental health observation. (Dkt. No. 1 at 20-21; Dkt. No. 80-18 at ¶ 7; 80-1 at ¶¶ 13, 14.) On December 23, 2014, Plaintiff was moved to Sullivan and on January 30, 2015, Plaintiff was transferred to Attica, where he remained through February 8, 2016. (Dkt. No. 80-1 at ¶¶ 16, 17.)

Generally, Plaintiff claims he spent more than 300 days in disciplinary confinement as a result of the six disciplinary hearings at issue. (Dkt. No. 1 at 41-42.) During his deposition,

---

[2] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office. Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs. Excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected unless indicated.

Plaintiff testified that he was "continuously" housed in disciplinary confinement from August 2014 until July 2015.  (Dkt. No. 80-2 at 140-42.)

Defendants' submissions indicate that from August 5, 2014, through August 25, 2014, Plaintiff was housed in the general population "B block" in cell 0B-1130 at Shawangunk.  (Dkt. No. 80-18 at ¶ 7.)  On August 25, 2014, Plaintiff was placed in the Special Housing Unit ("SHU") result of a disciplinary infraction following a hearing conducted by Gardner.  (Dkt. No. 80-1 at ¶ 3; *see* Part II.B., *infra*.)  Plaintiff was assigned to cell SH-00-006.[3]  (Dkt. No. 80-18 at ¶ 8.)  Plaintiff remained in the SHU at Shawangunk from August 25, 2014 through September 4, 2014.  (Dkt. No. 80-1 at ¶ 5.)  On September 3, 2014, Plaintiff's August 25, 2014, disciplinary hearing disposition was administratively reversed and, on September 4, 2014, Plaintiff was released back to general population.  *Id.* at ¶¶ 4, 5.

On September 4, 2014, Plaintiff was involved in an incident whereby he was violently assaulted.  *Id.* at ¶ 6.[4]  Plaintiff was transported to an outside hospital for medical evaluation and treatment of his injuries.  (Dkt. No. 1 at 19.)  Thereafter, Plaintiff was confined in the facility hospital.  *Id.* at 19-20.  As a result of this incident and on the recommendation of Lt. Connors, who is not a party, Plaintiff was placed under Involuntary Protective Custody ("IPC") status for his personal safety and for the safety and security of the facility.  *Id.* at ¶¶ 7, 8.[5]  Plaintiff was

---

[3] Inmates in Shawangunk's SHU are subject to, *inter alia*, limitations on personal property, packages, commissary, programs, visits, and telephone calls, and out-of-cell recreation is limited to one hour daily.  (Dkt. No. 80-18 at ¶ 11.)

[4] Plaintiff's Eighth Amendment claims related to the September 4, 2014, incident were dismissed on initial review without prejudice.  (Dkt. No. 9.)

[5] At Shawangunk, inmates in IPC are housed in the same block as the SHU, but on a different side of the block.  (Dkt. No. 80-1 at ¶ 9.)  Inmates in IPC are not subject to the same degrees of restriction as are inmates in SHU.  *Id.* at ¶ 10.

housed in IPC cell SD-00-005 from September 11, 2014, through October 30, 2014. *Id.* at ¶¶ 11, 12.

As noted, from October 30 through November 17, 2014, Plaintiff was temporarily housed at Sullivan for mental health observation. *Id.* at ¶¶ 13, 14. When he returned to Shawangunk, he was housed in the SHU from November 17 through December 23, 2014. *Id.* at ¶¶ 14, 15. On December 23, 2014, Plaintiff was moved to Sullivan. *Id.* at ¶ 16.

On January 30, 2015, Plaintiff was transferred from Sullivan to Attica. *Id.* at ¶ 17. Plaintiff was housed in the general population at Attica from January 30 through March 11, 2015. *Id.* at ¶¶ 18, 19. Between March 11 and March 16, 2015, Plaintiff was relocated to Attica's mental health observation unit. *Id.* at ¶ 20. From March 16, 2015, through February 8, 2016, Plaintiff was housed in general population at Attica. *Id.* at ¶ 21. Plaintiff was not housed in the SHU at Attica at any time in 2015. *Id.* at ¶ 22.

### B.    The August 25, 2014, Disciplinary Hearing[6]

On July 24, 2014, while temporarily housed at Attica, Plaintiff's cell at Shawangunk was searched. (Dkt. No. 1 at 11.) Various items of contraband were allegedly recovered during the search, along with several other unauthorized items. *Id.* Upon his return to Shawangunk on August 5, 2014, Plaintiff was served with an inmate misbehavior report ("IMR") regarding the cell search. *Id.* at 12.

Plaintiff alleges that on August 6, 2014, Gardner conducted a disciplinary hearing. *Id.* at 13.[7] Plaintiff claims that his requests for an employee assistant and for production of relevant

---

[6] Defendants refer to the six disciplinary hearings at issue by the date the decision was rendered. For consistency and ease of reference, the Court does the same.

[7] Gardner has no recollection of serving as the hearing officer for the August 25, 2014, disciplining hearing. (Dkt. No. 80-8 at ¶ 4 n.1.) Venettozzi states DOCCS' records reflect that

documents and reports were denied, including, among other things, a copy of DOCCS Directive 4934.  *Id*. at 14-15.  Plaintiff's request to call inmate Benjamin as a witness on his behalf was also denied.  *Id*. at 15.  Inmate Benjamin had told Plaintiff that he observed officers placing a television set and lamp in his cell prior to the July 24, 2014, cell search.  *Id*. at 16.

At the conclusion of the hearing, Gardner found Clark guilty of four of the five rule violations with which he had been charged.  *Id*.  Plaintiff was sanctioned with 60 days confinement in the SHU and loss of privileges, loss of honor visiting privileges for four months, loss of television in his cell for one year, and six months' loss of good time credits.  *Id*.

According to Plaintiff, the disciplinary determination was affirmed on administrative appeal by Smith.  *Id*. at 17.  After speaking with a member of the mental health staff regarding his hearing, Clark was informed by Smith that the disciplinary determination was being reviewed by DOCCS' Central Office.  *Id*.

On September 3, 2014, Plaintiff's August 25, 2014, disciplinary hearing disposition was administratively reversed.  (Dkt. No. 80-2 at ¶ 4.)  On September 4, 2014, Plaintiff was released from SHU.  *Id*. at ¶ 5.

### C.     The September 23, 2014, Disciplinary Hearing Conducted by Gardner

On September 7, 2014, C.O. Algarin search Plaintiff's cell and issued an IMR charging Plaintiff with possession of marijuana.  (Dkt. No. 80-1 at ¶ 23.)  Plaintiff was served a copy of the IMR the following day.  *Id.* at ¶ 24.

Shortly after receiving the IMR and being informed that a Tier III disciplinary hearing would be held upon his release from the facility hospital, Plaintiff attempted suicide.  (Dkt. No. 1

---

Plaintiff had a Tier III disciplinary hearing at Shawangunk on August 25, 2015, which was administratively reversed on September 3, 2014.  (Dkt. No. 80-17 at ¶ 13.)

at 20.)  Upon his release from the hospital, Plaintiff was sent to Downstate Correctional Facility and admitted to the "Office of Mental Health Suicide Prevention Crisis Observation and Treatment Unit."  *Id*. at 21.  DOCCS' Office of Special Housing/Inmate Disciplinary Programs granted an extension to commence the Tier III disciplinary hearing until Plaintiff returned to Shawangunk.  (Dkt. No. 80-1 at ¶ 30.)  On September 11, 2014, Clark was returned to Shawangunk and confined in the SHU.  (Dkt. No. 1 at 21.)

Plaintiff's Tier III disciplinary hearing commenced on September 15, 2014.  *Id*. at ¶ 31. Garner served as the hearing officer.  *Id*. at ¶ 32.  Plaintiff claims Gardner denied his request for an employee assistant and deprived him of his right to call witnesses and present a defense. (Dkt. No. 1 at 22-23.)

The hearing transcript reflects Gardner read Plaintiff his rights and obligations, which included his right to call witnesses and present evidence.  (Dkt. No. 80-1 at ¶ 33.)  Gardner adjourned the Tier III hearing on September 15, 2014, to address Plaintiff's concerns regarding his pre-hearing assistance.  *Id*. at ¶ 34.  Plaintiff selected Mr. Chumas, a civilian employee at Shawangunk, to be his assistant.  *Id*. at ¶ 25.  During his meeting with Mr. Chumas, Clark requested two inmates to appear as witnesses at his hearing, and he also requested a copy of DOCCS Directive 4933, which was provided.  *Id*. at ¶¶ 26, 27, 28.  On September 16, 2014, Mr. Chumas provided Plaintiff with additional requested documents, including certain log book pages, Unusual Incident Report, memoranda, cell inspection form, and contraband chain-of-custody documentation.  *Id*. at ¶ 35.

The hearing resumed on September 18, 2014.  *Id*. at ¶ 36.  Two inmate witnesses requested by Plaintiff testified at the hearing by speakerphone, and Plaintiff was permitted to ask the inmates questions.  *Id*. at ¶ 37.  A third inmate requested by Plaintiff refused to testify, which

was documented for the hearing record. *Id*. at ¶ 38. C.O. Comito, C.O. Keys, and C.O. Miller also testified at Plaintiff's request. *Id*. at ¶¶ 39, 43. Mr. Chumas testified regarding the assistance he provided to Plaintiff and C.O. Algarin testified regarding the circumstances of the IMR he wrote. *Id*. at ¶¶ 40, 41.

On September 23, 2014, Gardner found Plaintiff guilty of violating prison rule 113.25, as charged by C.O. Algarin. *Id*. at ¶¶ at 42-44. Gardner imposed penalties of 3 months SHU confinement, 6 months loss of certain privileges, and 6 months recommended loss of good time. *Id*. at ¶ 45. He advised Plaintiff of his right to appeal the Tier III hearing determination within 30 days. *Id*. at ¶ 46.

Gardner provided Plaintiff with a written hearing disposition sheet on September 23, 2014, which included a statement of the evidence used for the determination. *Id.* at ¶ 47. In his declaration, Gardner states he did not predetermine his decision prior to the conclusion of the hearing. *Id*. at ¶ 48.

Plaintiff claims both Smith and Annucci affirmed the disciplinary determination. (Dkt. No. 1 at 23.) On October 3, 2014, the DOCCS Commissioner's office received an appeal from Plaintiff. (Dkt. No. 80-1 at ¶ 49.) The DOCCS Commissioner's office received further correspondence from Plaintiff regarding his appeal of the September 23, 2014, Tier III hearing disposition on October 9 and October 17, 2014. *Id*. at ¶ 50. The DOCCS Commissioner's office does not handle appeals of Tier III hearing dispositions, which are delegated to the Office of Special Housing/Inmate Disciplinary Programs. *Id*. at ¶ 51. Annucci had no knowledge of the of the substance of Plaintiff's appeals and no involvement in the determination of the appeal. *Id*. at ¶ 52.

On December 3, 2014, Plaintiff's hearing determination was review by the Office of Special Housing/Inmate Disciplinary Programs and affirmed by Venettozzi. *Id*. at ¶¶ 53-55. Subsequently, on January 20, 2016, Plaintiff's September 23, 2014 Tier III hearing disposition was administratively reversed.[8] *Id*. at ¶ 56.

### D.    The October 14, 2014, Disciplinary Hearing Conducted by Pingotti

Plaintiff alleges that on September 24, 2014, DeGraff and Harrison searched his cell. (Dkt. No. 1 at 24.)  No contraband was discovered during the search. *Id*. at 24-25.  However, DeGraff threatened Plaintiff and told him that he would "make sure you come up dirty for 'K-2'." *Id*. at 25.  Later that day, Plaintiff was ordered to undergo a urinalysis. *Id*.  On September 30, 2014, on the basis of that test, C.O. Strang issued an IMR charging Plaintiff with being under the influence of K2, a synthetic form of marijuana. (Dkt. No. 80-1 at ¶ 57.)  On October 1, 2013, Plaintiff was served a copy of the IMR. *Id*. at ¶ 58.  Plaintiff selected Mr. Chumas to be his assistant. *Id*. at ¶ 59.

On October 1, 2014, Plaintiff met with Mr. Chumas. *Id*. at ¶ 60.  Plaintiff claims that in preparation for this hearing, he requested numerous documents and reports regarding the testing apparatus and protocols, but these requests were denied. (Dkt. No. 1 at 26.)  Plaintiff also requested audio and video of the threats made by DeGraff on September 24, 2014, which were

---

[8] Plaintiff commenced a state court proceeding pursuant to New York CPLR Article 78 to challenge several of the disciplinary hearings at issue in this case. (Dkt. No. 1 at 24.)  In April 2016, the Article 78 proceeding was dismissed as moot, upon the advice of the Attorney General that all of the challenged disciplinary determinations had been administratively reversed and expunged from Plaintiff's record. *Id*.; *see Clark v. State Dep't of Corrections and Community Supervision*, 138 A.D.3d 1331 (N.Y. App. Div. 3d Dep't 2016).  Venettozzi states this hearing was administratively reversed when his office learned that confidential testimony relevant to Plaintiff's mental health status may not have been taken prior to this hearing. (Dkt. 80-17 at ¶ 19.)

also denied. *Id*. at 27. Plaintiff was removed from the hearing prior to its conclusion and claims

he never received a written statement of the disposition. *Id*.

The hearing transcript reflects that Plaintiff's Tier III disciplinary hearing commenced on

October 7, 2014, with Pingotti serving as the hearing officer. (Dkt. No. 80-1 at ¶ 63-64.)

Pingotti read Plaintiff his rights and obligations, which included his right to call witnesses and

present evidence. *Id*. at ¶ 65. Pingotti informed Plaintiff that the company that manufactured the

chemical reagent used in the drug test does not testify at prison disciplinary proceedings. *Id*. at ¶

66.

Plaintiff requested two documents for the hearing on October 7, 2014: a K2 test

reliability assessment and a memorandum regarding disciplinary procedures for K2 written by

DOCCS Deputy Commissioner Joseph Bellnier. *Id*. at ¶ 67. Plaintiff reviewed the requested

documents during an adjournment of the hearing and he had an opportunity to take any notes that

he needed. *Id*. at ¶ 68.

On October 14, 2014, C.O. Strang testified regarding the circumstances of the IMR and

the drug test that he conducted. *Id*. at ¶ 69. At Plaintiff's request, Nurse Scofield also testified.

*Id*. at ¶ 70. However, Pingotti denied Plaintiff's request to call Deputy Commissioner Bellnier

because he had no firsthand knowledge of the drug test conducted by C.O. Strang. *Id*. at ¶ 71.

Pingotti also denied Plaintiff's request for a video recording of his housing block from

September 24, 2014, because it had no relevance to the drug test conducted on September 30,

2014. *Id*. at ¶ 72.

The hearing transcript reflects that Pingotti warned Plaintiff on three occasions not to

speak over him when he spoke. *Id*. at ¶ 73. On October 14, 2014, Plaintiff was removed from

the hearing for being disruptive and noncompliant with Pingotti's directions. *Id*. at ¶ 74. The hearing concluded in Plaintiff's absence. *Id*. at ¶ 75.

Pingotti found Plaintiff guilty of violating prison rule 113.13, as charged by C.O. Strang. *Id*. at ¶ 76. Pingotti imposed penalties of 2 months of SHU confinement, in addition to 2 months loss of packages, commissary, and telephone privileges. *Id*. at ¶ 77. He prepared a written hearing disposition sheet on October 14, 2014, which included a statement of the evidence relied upon which he relied. *Id*. at ¶ 78.

Pingotti directed C.O. North to deliver the written hearing disposition to Plaintiff at his cell, together with a form advising Plaintiff of his right to appeal to the Commissioner within 30 days. *Id*. at ¶ 79. C.O. North documented that he delivered Pingotti's written hearing disposition and appeal form to Plaintiff on October 15, 2014 at 9:45 AM., and that Plaintiff refused to sign a form acknowledging receipt. *Id*. at ¶ 80. In his declaration, Pingotti avers he did not predetermine his decision prior to the conclusion of the Tier III hearing on October 14, 2014. *Id*. at ¶ 81.

Plaintiff claims he appealed the determination, which was affirmed by Smith and Annucci. (Dkt. No. 1 at 28.) On October 17, 2014, the DOCCS' Commissioner's office received Plaintiff's appeal. (Dkt. No. 80-1 at ¶ 82.) On December 12, 2014, the Acting Director of Special Housing, Corey Bedard, signed the appeal affirmance. *Id*. at ¶¶ 84-86. Annucci had no knowledge of the substance of Plaintiff's appeal and had no involvement in the determination of the appeal. *Id*. at ¶ 83. On January 20, 2016, Plaintiff's October 14, 2014, Tier III hearing disposition was administratively reversed. *Id*. at ¶ 87.[9]

---

[9] Venettozzi explains this hearing, like the September 23, 2014, hearing, was administratively reversed when his office learned that confidential testimony relevant to

**E.      The November 17, 2017, Disciplinary Hearing Conducted by Palen**

On October 15, 2014, DeGraff conducted a search of Plaintiff's IPC cell at Shawangunk and observed small hole, approximately one (1) inch in length, in Plaintiff's mattress. (Dkt. No. 80-1 at ¶ 88.) On October 17, 2014, during a subsequent cell search, DeGraff observed that the hole in Plaintiff's mattress had expanded from approximately one (1) inch to six (6) inches in length since October 15, 2014. *Id.* at ¶ 89. DeGraff reached his hand inside the mattress and found pieces of lead wrapped in paper. *Id.* at ¶ 90. He then removed Plaintiff's mattress from the cell to further search it in the sally port area of the cell block. *Id.* at ¶ 91. DeGraff cut open Plaintiff's mattress, removed all of the stuffing, and found copper wire wrapped in paper and pieces of bedsheet. *Id.* at ¶ 92. DeGraff secured all evidence and disposed of the mattress. *Id.* at ¶ 93.

Thereafter, on October 17, 2014, DeGraff issued an IMR charging Plaintiff with possession of contraband and destruction of property. *Id.* at ¶ 94. Plaintiff was served with the IMR on October 18, 2014. *Id.* at ¶ 95.[10]

On October 21, 2014, Plaintiff's Tier II hearing commenced on the October 17, 2014, IMR. *Id.* at ¶ 96. Palen served as the hearing officer. *Id.* at ¶ 97. Plaintiff claims that Palen denied his requests for an assistant and also denied his requests for relevant videos and

---

Plaintiff's mental health status may not have been taken prior to this hearing. (Dkt. 80-17 at ¶ 19.)

[10] Plaintiff claims he had previously filed a grievance complaining about the condition of his mattress and also about the fact that the cell equipment report had not been completed when Plaintiff was first assigned to the cell. (Dkt. No. 1 at 30.) He also verbally complained about his mattress to Smith during rounds. *Id.* DOCCS records indicate Plaintiff filed a grievance numbered SHG-29231-14, entitled "Mattress Needs Replacing," which was received for filing on October 21, 2014, *after* Plaintiff received the October 10, 17, 2014, IMR. (*See* Dkt. No. 80-4 at ¶ 14; *see also id.* at 6-13.)

witnesses. (Dkt. No. 1 at 31.) Plaintiff alleges DeGraff destroyed the mattress (prior to the hearing so its condition could not be examined during the hearing) in retaliation for Plaintiff's grievance activity. *Id*. at 32.

The hearing transcript reflects Palen read Plaintiff his rights and obligations. *Id*. at ¶ 98. Inmates are not provided with employee assistants for Tier II hearings. *Id*. at ¶ 99. Palen informed Plaintiff that he would not have an assigned assistant, but he gave Plaintiff an opportunity to advise him what evidence and witnesses Plaintiff needed for his defense. *Id*. at ¶ 100.

DeGraff testified at the hearing regarding the circumstances of the IMR that he wrote and Plaintiff asked DeGraff questions. *Id*. at ¶ 101. At Plaintiff's request, Sgt. Lutz testified regarding prior complaints made by Plaintiff about his mattress. *Id*. at ¶ 102. Plaintiff requested to view the video recording of his cell block from October 17, 2014, at the time DeGraff removed Plaintiff's mattress from his cell, and Plaintiff reviewed this video in Palen's presence during an adjournment of the haring on October 22, 2014. *Id*. at ¶ 103. Karamanos also testified at the hearing regarding a prior inspection of Plaintiff's cell and Plaintiff asked him questions. *Id*. at ¶ 104.

Plaintiff's Tier II hearing was adjourned from October 30, 2014, through November 17, 2014, while he was housed at Sullivan for mental health observation. *Id*. at ¶ 105. The Office of Special Housing/Inmate Disciplinary Programs granted an extension to continue the Tier II hearing until Plaintiff returned from Sullivan to Shawangunk, and subsequently granted a further extension due to the temporary unavailability of Palen. *Id*. at ¶ 106.

Plaintiff's Tier II hearing recommenced on November 26, 2014. *Id*. at ¶ 107. Plaintiff submitted documentary evidence in his defense, including prior complaints he made to

Shawangunk and DOCCS officials. *Id*. at ¶ 108. Plaintiff requested copies of complaints he claimed to have made to DOCCS' Office of the Inspector General ("OIG") in September and October 2014, and he requested that an OIG investigator, Investigator Russo, testify regarding those complaints. *Id*. at ¶ 109. At Plaintiff's request, Palen contacted the OIG, and he was advised by the OIG that no such complaints existed and, accordingly, Plaintiff's request was denied. *Id*. at ¶ 110. Plaintiff also requested to present his mattress as evidence during the hearing. *Id*. at ¶ 111. However, it was unavailable as DeGraff had disposed of it after cutting it open on October 17, 2014. *Id*.

Plaintiff requested video showing rounds made by the Smith and Sgt. Lutz, but the video did not exist as it was beyond the normal retention period. *Id*. at ¶ 112. Plaintiff requested video showing a previous interaction with DeGraff on September 24, 2014, but the video was unavailable due to an equipment malfunction. *Id*. at ¶ 113. Plaintiff also requested a video of the October 15, 2014, search conducted by DeGraff, which Palen denied as not relevant because it would not have depicted the condition of the mattress inside of the cell. *Id*. at ¶ 114. Plaintiff requested video showing the sally port area of his housing block where DeGraff brought Plaintiff's mattress on October 17, 2014. *Id*. at ¶ 115. Palen denied this request as redundant of the October 17, 2014, video that Plaintiff had already reviewed. *Id*. Lastly, Plaintiff requested video showing the linen exchange on his housing block on three dates prior to October 17, 2014. *Id*. at ¶ 116. Palen denied this request as not relevant because the condition of his linens upon receipt was not at issue in the hearing. *Id*.

Clark requested copies of contraband receipts resulting from cell searches on three dates prior to October 17, 2014. *Id*. at ¶ 117. Palen denied this request as not relevant because any

evidence of contraband confiscated on prior occasions would not be relevant to the October 17, 2014, cell search at issue in the hearing. *Id.*

Plaintiff requested to call as a witness the prior inmate assigned to his cell before him. *Id.* at ¶ 118. Specifically, Plaintiff requested inmate Bey, believing that inmate Bey was the prior inmate assigned to his cell. *Id.* It was determined that inmate Bey was not the prior occupant of Plaintiff's cell, and that two other inmates were assigned to the cell after Bey and prior to Plaintiff. *Id.* at ¶ 119. The inmate identified as the last to occupy the cell prior to Plaintiff refused to testify, and his refusal was documented in the hearing record. *Id.* at ¶ 120.

Plaintiff also requested to call Smith to testify regarding a prior complaint voiced by Plaintiff concerning his mattress. *Id.* at ¶ 121. Palen denied this request, however, as redundant of the testimony given by Sg. Lutz, who was with Smith and already testified about the same conversation. *Id.* at ¶ 121.

Plaintiff's hearing concluded on November 27, 2017. *Id.* at ¶ 122. Palen found Plaintiff guilty of violating prison rules 113.23 and 116.10, as charged by DeGraff. *Id.* at ¶ 123. Palen imposed penalties of 30 days of keeplock[11] confinement, 30 days loss of privileges, and restitution of $65.25 for the cost of the mattress. *Id.* at ¶ 124. Plaintiff was advised of his right to appeal his Tier II hearing disposition to the Superintendent. *Id.* at ¶ 125. He was provided with a written hearing disposition sheet on November 27, 2014, which included a statement of the evidence supporting the determination. *Id.* at ¶ 126. In his declaration, Palen avers he did not predetermine his decision prior to the conclusion of the Tier II hearing on November 27, 2014. *Id.* at ¶ 127.

---

[11] Keeplock is a form of disciplinary confinement whereby an inmate is confined to his own cell for a period of time. *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989).

On December 3, 2014, Pingotti, as Smith's designee, affirmed the disposition. *Id*. at ¶ 128. On December 22, 2014, Plaintiff wrote to Smith to request a limited "re-review" of the timeliness of his Tier II hearing and to complain that DeGraff had disposed of his mattress prior to the hearing. *Id*. at ¶ 129. Smith responded to Plaintiff that the chain of extensions granted by the Office of Special Housing/Inmate Disciplinary Programs was in Order and that all contraband secreted in the mattress had been secured. *Id*. at ¶ 130.

### F.    The December 10, 2014, Disciplinary Hearing Conducted by Gardner

As noted, Plaintiff was temporarily housed at Sullivan from October 30 to November 17, 2014. On November 13, 2014, a social worker at Sullivan issued an IMR charging Plaintiff with threatening to kill a corrections officer on November 12, 2014, and stating that he "know[s] his face." (Dkt. No. 80-1 at ¶¶ 131, 132.) The Office of Special Housing/Inmate Disciplinary Programs granted an extension to commence the hearing until after Plaintiff returned from Sullivan to Shawangunk. *Id*. at ¶ 133.

On November 18, 2014, Plaintiff was served a copy of the IMR at Shawangunk. *Id*. at ¶ 134. The Tier II hearing commenced on November 20, 2014, with Gardner serving as the hearing officer. *Id*. at ¶ 135, 136. Plaintiff claims his request for an employee assistant was denied, as were his requests for relevant documents and witnesses. (Dkt. No. 1 at 38-39.)

The hearing transcript reflects that Gardner read Plaintiff his rights and obligations. (Dkt. No. 80-1 at ¶ 137.) Gardner informed Plaintiff that he would not have an assigned assistant as it was a Tier II hearing, but he told Plaintiff to advise him of what evidence and witnesses he needed to present his defense. *Id*. at ¶ 138.

Plaintiff requested a video recording from November 12, 2014, at Sullivan at the time that a mental health nurse made rounds to his cell. *Id*. at ¶ 139. This request was denied as no

16

such video existed. *Id*. at ¶ 140. Plaintiff requested to call as witnesses inmates who were in neighboring cells to his at Sullivan on November 12, 2014. *Id*. At Plaintiff request, inmates Aviles and Perez testified at the hearing by speakerphone, and Plaintiff had an opportunity to ask questions. *Id*. at ¶ 141. A third inmate, who was located at Great Meadow Correctional Facility at the time of the Tier II hearing, refused to testify and signed a refusal form for the hearing record. *Id*. at ¶ 142.

Plaintiff requested to call the Assistant Commissioner of the New York State Office of Mental Health ("OMH") as a witness. *Id*. at ¶ 143. Gardner denied this request because the Commissioner of OMH was not present during the incidents alleged in the November 13, 2014, IMR. *Id*. Plaintiff requested to call Investigator Russo from DOCCS OIG as a witness. *Id*. at ¶ 145. Gardner denied this request because Investigator Russo was not present during the alleged incidents. *Id*.

Plaintiff also requested copies of his OMH mental health records, stating that he wanted these records to establish the reason why he was at Sullivan for mental health observation. *Id*. at ¶ 146. This request was denied as not relevant because the reason for Plaintiff's mental health observation was not relevant to the incidents alleged in the November 13, 2014, IMR. *Id*. The clinical social worker who authored the November 13, 2014, IMR testified by speakerphone on December 10, 2014, and Plaintiff had an opportunity to ask her questions. *Id*. at ¶ 147.

On December 10, 2014, Lt. Gardner found Plaintiff guilty of violating prison rule 102.10, as charged in the November 13, 2014, IMR. *Id*. at ¶¶ 148, 149. Gardner imposed penalties of 30 days of keeplock confinement and 30 days loss of privileges. *Id*. at ¶ 151. Plaintiff was advised of his right to appeal his Tier II hearing disposition to the Superintendent. *Id*. at ¶ 151.

Gardner provided Plaintiff with a written hearing disposition sheet on December 10, 2014, which included a statement of the evidence relied upon. *Id*. at ¶ 152. In his declaration, Gardner states he did not predetermine his decision prior to the conclusion of the hearing. *Id*. at ¶ 153. Plaintiff alleges Smith affirmed the disciplinary determination. (Dkt. No. 1 at 37.) Defendants assert Pingotti, as Smith's designee, affirmed Plaintiff's Tier II hearing disposition on December 12, 2014. (Dkt. No. 90-1 at ¶ 154.)

### G.    The December 18, 2014, Disciplinary Hearing Conduced by Farah

On October 24, 2014, DeGraff and Karamanos escorted Plaintiff from his IPC cell to a scheduled shower. (Dkt. No. 80-1 at ¶ 155.) The parties disagree as to what happened next. Plaintiff alleges he was assaulted by DeGraff and Karamanos in retaliation for having filed grievances and complaints against these officers. (Dkt. No. 1 at 34.) Specifically, Plaintiff claims DeGraff "aggressively squeezed" Plaintiff's penis "causing him pain" during an "improper" pat frisk, and Karamanos slammed Plaintiff's head into the wall. *Id*.

According to Defendants, DeGraff observed items stuffed in Plaintiff's pocket and initiated a pat frisk. (Dkt. No. 80-1 at ¶ 156.) During the pat frisk, Plaintiff made a sudden movement toward DeGraff. *Id*. at ¶ 158. As a result, Karamanos pushed Plaintiff to the wall to secure him. *Id*. at ¶ 159. After "gaining control" of Plaintiff, DeGraff and Karamanos escorted Plaintiff back to his cell. *Id*. at ¶ 160.

Thereafter, on October 24, 2014, DeGraff issued an IMR charging Plaintiff with refusal to obey a direct order and a movement violation. *Id*. at ¶ 161. Plaintiff was served a copy of the IMR on October 25, 2014. *Id*. at ¶ 162.

A Tier III hearing commenced on October 30, 2014, with Farah serving as the hearing officer. *Id*. at ¶¶ 163, 164. During this hearing, Plaintiff claims he was denied an employee

assistant and was also denied relevant documents and video of the incident.  (Dkt. No. 1 at 35.)  Plaintiff also claims he was improperly removed from the hearing and was not provided with a written statement of Farah's disposition.  *Id.*

The hearing transcript demonstrates Farah commenced the Tier III hearing on October 30, 2014, and read Plaintiff his rights and obligations.  (Dkt. No. 80-1 at ¶ 165.)  Plaintiff informed Farah that he had not met with an assistant prior to the hearing.  *Id.* at ¶ 166.  Farah adjourned the hearing to provide Plaintiff with an opportunity to select and meet with an assistant.  *Id.* at ¶ 167.

On November 18, 2014, Plaintiff met with his selected assistant, Mr. Austin, a Recreation Supervisor.  *Id.* at ¶ 168.  The hearing recommenced on December 1, 2014.  *Id.* at ¶ 169.

Plaintiff was provided with several documents including a Use of Force report, Watch Commander and SHU log book pages, and copies of certain DOCCS Directives.  *Id.* at ¶ 170.

On December 4, 2014, Plaintiff viewed a video recording from the time of the October 24, 2014, incident.  *Id.* at ¶ 171.  Plaintiff requested a second video recording from October 17, 2014; however, that request was denied as not relevant to the October 24, 2014 incident.  *Id.* at ¶ 172.  Plaintiff requested to call three inmates as witnesses.  *Id.* at ¶ 173.  Two of the three inmates requested by Plaintiff refused to testify from the outset.  *Id.* at ¶ 174.  One inmate requested by Plaintiff initially agreed to testify but later refused.  *Id.* at ¶ 175.

Plaintiff requested to call Investigator Russo from DOCCS OSI as a witness and to provide records.  *Id.* at ¶ 176.  However, Farah was advised Investigator Russo could not testify or provide documents due to an ongoing investigation at that time.  *Id.* at ¶ 176.

DeGraff and Karamanos both testified at the hearing.  *Id.* at ¶ 175.  Plaintiff was warned multiple times during the course of the hearing not to speak over Farah and other witnesses when

they spoke.  *Id.* at ¶ 178.  In his declaration, Farah explains Plaintiff was removed from the

hearing partway through DeGraff's testimony because he became extremely disruptive and

noncompliant with his directions.  (Dkt. No. 80-2 at ¶ 179.)  Farah continued questioning

DeGraff and adjourned the hearing.  (*See* Dkt. No. 80-6 at 52-54.)

The hearing resumed on December 15, 2014.  (Dkt. No. 80-1 at ¶ 180.)  But Plaintiff

refused to leave his cell to attend the continuation of the hearing.  *Id.*  Farah, together with C.O.

North and C.O. Vitarius, went to Plaintiff's cell on December 15, 2014, to encourage Plaintiff to

attend the hearing and advised Plaintiff that a penalty may be imposed if he were found guilty.

*Id.* at ¶ 181.  Plaintiff refused to leave his cell.  *Id.* at ¶ 182.

At Farah's direction, C.O. North went to speak to Plaintiff a second time about returning

to the hearing.  *Id.* at ¶ 183.  C.O. North reported to Farah that he asked Plaintiff multiple times if

he wanted to leave his cell to attend the hearing and Plaintiff refused each time.  *Id.* at 184.

Plaintiff signed a form waiving his right to attend the Tier III hearing on December 15, 2014, but

added a handwritten note that he was afraid of retaliation and felt that Farah was unfair.  *Id.* at ¶

185.

On December 18, 2014, Farah found Plaintiff guilty of violating prison rules 106.10 and

109.12, as charged by DeGraff and imposed penalties of 120 days of SHU confinement, and 120

days loss of packages, commissary, telephone, recreation, and television privileges.  *Id.* at ¶¶

186, 187.  Farah prepared a written hearing disposition sheet on December 18, 2014, which

included a statement of the evidence.  *Id.* at ¶ 188.  He directed C.O. North to deliver the written

hearing disposition to Plaintiff at his cell, together with a form advising Plaintiff of his right to

appeal to the Commissioner within thirty (30) days.  *Id.* at ¶ 189.  C.O. North documented that he

delivered the written hearing disposition and appeal form to Plaintiff on December 18, 2014, at

11:35 AM, and that Plaintiff refused to sign a form acknowledging receipt. *Id.* at ¶ 190. In his declaration, Farah states he did not predetermine his decision prior to the conclusion of the Tier III disciplinary hearing on December 18, 2014. *Id.* at ¶ 191.

Plaintiff claims he appealed the disposition, which was affirmed by Smith and Venettozi. (Dkt. No. 1 at 37.) Defendants submit that on December 22, 2014, the Office of Special Housing/Inmate Disciplinary Programs received Plaintiff's appeal. (Dkt. No. 80-1 at ¶ 192.) Staff working in the Office of Special Housing/Inmate Disciplinary Programs reviewed Plaintiff's appeal and recommended that the December 18, 2014, disposition be affirmed. *Id.* at ¶ 193. Venettozzi compared the disciplinary charges to the penalties imposed and signed off the recommended affirmance of the hearing disposition. *Id.* at ¶ 194.

On April 21, 2016, Plaintiff's December 18, 2014, Tier III hearing disposition was administratively reversed pursuant to a court order. *Id.* at ¶ 195; *see Clark v. State Dep't of Corrections and Community Supervision*, 138 A.D.3d 1331 (N.Y. App. Div. 3d Dep't 2016); *see also* Dkt. No. 80-17 at ¶ 19.

### H.    Eighth Amendment Claims

As discussed above, Plaintiff claims he was assaulted by DeGraff and Karamanos on October 24, 2014, during an escort to a scheduled shower. (Dkt. No. 1 at 28.) Specifically, Plaintiff claims DeGraff "aggressively squeezed" Plaintiff's penis "causing him pain" during an "improper" pat frisk, and Karamanos slammed Plaintiff's head into the wall. *Id.*

According to Defendants, DeGraff observed objects stuffed in Plaintiff's pockets and DeGraff ordered Plaintiff to spread his legs and initiated a pat frisk. (Dkt. Nos. 80-5 at ¶ 9.) Plaintiff did not comply with DeGraff's instruction and made a "sudden and aggressive" movement" to his left side towards DeGraff. *Id.* Karamanos then pushed Plaintiff against the

wall once in order to "gain control" of him.  *Id.*  Defendants contend this "minimal amount of force was reasonable and necessary to secure control of plaintiff after his sudden and aggressive movement."  (Dkt. No. 80-10 at ¶ 7.)  DeGraff and Karamanos declare they did not strike Plaintiff or use any further force.  (Dkt. Nos. 80-5 at ¶ 9; 80-10 at ¶ 7.)  They further declare they did not touch Plaintiff in any sexual way.  *Id.*  Defendants state they escorted Plaintiff back to his cell with no further incident.  *Id.*

Plaintiff also claims he was subjected to verbal and physical abuse by DeGraff, McElroy, and Harrison during an escorted trip to Shawangunk's facility hospital.  *Id.* at 29.[12]  Specifically, Plaintiff claims DeGraff pushed Plaintiff up against the wall and "pressed his pelvis and genitals against the Plaintiff," McElroy "punched" Plaintiff in the back of his head, while Harrison stood by and made "intimidating statements."  (Dkt. No. 1 at 29.)  Plaintiff filed a complaint with the "Office of Special Investigations."  *Id.*

In their declarations, DeGraff, Karamanos, McElroy, and Harrison deny having ever struck, physically assaulted, used excessive force on, or improperly touched Plaintiff in any way at any time.  (Dkt. Nos. 80-5 at ¶ 14, 80-9 at ¶ 5, 80-10 at ¶ 12, 80-11 at ¶ 6.)  These Defendants further declare they have never threatened or harassed Plaintiff, verbally or otherwise at any time.  *Id.*  Harrison further states he has never allowed or encouraged any correctional staff to assault an inmate.  (Dkt. No. 80-9 at ¶ 6.)

## I.    First Amendment Claims

As discussed above, Plaintiff claims DeGraff and Karamanos assaulted him on October 24, 2014, in retaliation for Plaintiff having filed inmate grievances regarding their mistreatment of him in violation of the First and Eighth Amendments.  (Dkt. No. 1 at 34.)  Plaintiff also claims

---

[12]  Plaintiff's complaint does not specify the date of this alleged assault.

DeGraff destroyed his mattress (and thereby prevented Plaintiff from presenting a meaningful defense to the October 17, 2014, IMR issued by DeGraff) in retaliation for Plaintiff's grievance activity. *Id*. at 42.

For his part, DeGraff declares that on October 17, 2014, he was unaware of any grievances that Plaintiff may have filed against him or against other correctional staff. (Dkt. No. 80-1 at ¶ 196.) He further states that he disposed of Plaintiff's mattress on that date because it was cut open and unusable, and all contraband had been removed and secured. *Id*. at ¶ 197.

As to the October 24, 2014, incident, DeGraff and Karamanos state that they were unaware of any grievances that Plaintiff may have filed against them or against other correctional staff. *Id*. at ¶¶ 198, 199. Further, as noted above, Defendants aver Plaintiff did not comply with DeGraff's instruction and argue that the "minimal amount of force was reasonable and necessary to secure control of plaintiff after his sudden and aggressive movement." (Dkt. No. 80-10 at ¶ 7.)

### J.      Grievances

Defendants' submissions demonstrate Plaintiff never filed a grievance concerning his claim that DeGraff and Karamanos used excessive force on him on October 24, 2017. (Dkt. No. 80-1 at ¶ 204.) Plaintiff never filed a grievance concerning his claim that DeGraff and Karamanos retaliated against him on October 24, 2017. *Id*. at ¶ 205. He never filed a grievance concerning his claim that DeGraff retaliated against him on October 17, 2014, by disposing of his mattress. *Id*. at ¶ 206. Lastly, Plaintiff never filed a grievance concerning his claim that DeGraff, McElroy, and Harrison used excessive force on him at any time. *Id*. at ¶ 207. In response, Plaintiff argues administrative remedies were unavailable. (Dkt. Nos. 87, 92.)

### III.    LEGAL STANDARD GOVENRING SUMMARY JUDGMENT

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Gourd*, 467 F.3d 263, 272–73 (2d Cir. 2006).  The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin*, 467 F.3d at 273.  In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit has reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).  "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful."  *Id*. (citation and internal quotation marks omitted).  Accordingly, statements "that are

devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

In applying the summary judgment standard, the district court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (credibility issues which are questions of fact for resolution by a jury, are inappropriately decided by a court on a motion for summary judgment).

## IV.    PLAINTIFF'S FAILURE TO COMPLY WITH LOCAL RULE 7.1

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). In opposing Defendants' summary judgment motion, Plaintiff failed to respond to the statement of material facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3).[13]  (Dkt. Nos, 87, 92.)

---

[13]  Local Rule 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts.  Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement to which the plaintiff has not properly responded will be accepted as true (1) to the extent that they are supported by evidence in the record,[14] and (2) provided that the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[15] *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Accordingly, the facts set forth in Defendants' Statement of Material Facts that are supported by record evidence and are uncontroverted by nonconclusory allegations in Plaintiff's verified complaint and verified opposition submissions will be accepted as true. *See McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at *3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert facts in statement of material facts on motion for summary judgment); *Douglas v. Perrara*, No. 9:11-CV-1353 (GTS/RFT), 2013 WL 5437617, at *3 (N.D.N.Y. Sept. 27, 2013) ("Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement of Facts Pursuant to Rule 7.1(a)(3) . . . supplemented by Plaintiff's verified complaint . . . as true."). As to any facts not contained in Defendants' Statement of Material Facts, in light

---

numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." N.Y.N.D. L.R. 7.1(a)(3).

[14] Local Rule 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, *see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[15] Defendants and the Clerk's office provided Plaintiff with the requisite notice of the consequences of his failure to respond to the motion. (Dkt. No. 80 at 2; Dkt. No. 81.)

of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry*, 336 F.3d at 137.

Moreover, the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has reviewed the entire record.

## V.   LEGAL STANDARDS GOVERNING CLAIMS AND DEFENSES

### A.   Fourteenth Amendment Due Process Claims

The Due Process Clause of the Fourteenth Amendment states: "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV § 1. "A liberty interest may arise from the Constitution itself, . . . or it may arise from an expectation or interest created by state laws or polices." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (internal citations omitted). "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

The constitutionally mandated due process requirements for prison disciplinary hearings include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of

his defense, subject to a prison facility's legitimate safety and penological concerns;[16] (3) a

written statement by the hearing officer explaining his decision and the reasons for the action

being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *See*

*Wolff v. McDonald*, 418 U.S. 539, 564-70 (1974); *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir.

2004). Additionally, the hearing officer's findings must be supported by "some" "reliable

evidence." *Sira*, 380 F.3d at 69 (citing *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)) (other

citation omitted).

The due process clause also guarantees that "[a]n inmate subject to a disciplinary hearing

is entitled to . . . an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996)

(citing, *inter alia*, *Wolff*, 418 U.S. at 570-71). The Second Circuit has explained that its

"conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence

and who cannot say . . . how he would assess evidence he has not yet seen." *Patterson v.*

*Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990). "The degree of impartiality required of prison

officials[, however,] does not rise to the level of that required of judges." *Allen*, 100 F.3d at 259.

Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same

standard of neutrality as adjudicators in other contexts." *Id*. (citing *Russell v. Selsky*, 35 F.3d 55,

60 (2d Cir. 1996); *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989)). "A hearing officer may

satisfy the standard of impartiality if there is 'some evidence in the record' to support the

---

[16] The right to call witnesses is not unfettered. *Alicea v. Howell*, 387 F. Supp. 2d 227,
234 (W.D.N.Y. 2005) (citing *Ponte v. Real*, 471 U.S. 491, 495 (1985)). This right may be
limited for security reasons, to keep a hearing within reasonable limits, or on the basis of
irrelevance or lack of necessity. *Id*. (citing, *inter alia*, *Kingsley v. Bureau of Prisons*, 937 F.2d
26, 30 (2d Cir. 1991) (a hearing officer does not violate due process by excluding irrelevant or
unnecessary testimony or evidence)); *see also Eleby v. Selsky*, 682 F. Supp. 2d 289, 291-92
(W.D.N.Y. 2010) (hearing officers have discretion to keep the hearing within reasonable limits,
and "included within that discretion is the authority to refuse to call witnesses whose testimony
the prison official reasonably regards as duplicative or non-probative").

findings of the hearing." *Barnes v. Annucci*, No. 9:15-CV-0777 (GTS/DEP), 2019 WL 1387460, at *11 (N.D.N.Y. Mar. 12, 2019) (citations omitted).

"To state a claim for procedural due process, there must first be a liberty interest which requires protection." *Lewis v. Murphy*, No. 9:12-CV-00268 (NAM/CFH), 2014 WL 3729362, at *7 (N.D.N.Y. July 25, 2014) (citing *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994)). To establish a procedural due process claim under § 1983, a plaintiff must show that he (1) possessed a liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Id.* (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).

As to the first factor, "[t]he prevailing view in this [C]ircuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement." *Liao v. Malik*, No. 9:13-CV-1497 (GTS/DEP), 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (collecting cases). As to the second factor, the plaintiff bears the "burden of proving that the conditions of his confinement constituted an atypical, significant hardship in relation to the ordinary incidents of prison life in order to recover damages" under § 1983. *Vasquez v. Coughlin*, 2 F. Supp. 2d 255, 260 (N.D.N.Y. 1998).

The Second Circuit has instructed that in determining whether an inmate's SHU confinement has imposed an atypical and significant hardship, a court must consider, among other things, both the duration and conditions of confinement. *J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013). Thus, while not dispositive, the duration of a disciplinary confinement is a

significant factor in determining atypicality.  *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted).

Although the Second Circuit has "explicitly avoided" creating "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights," the Court has established guidelines.  *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).

Confinement for 101 days or fewer under typical punitive segregation conditions "generally do[es] not constitute 'atypical' conditions of confinement."  *Bunting v. Nagy*, 452 F. Supp. 2d 447, 456 (S.D.N.Y. 2006) (quoting *Sealey v. Giltner*, 197 F.3d 578, 589 (2d Cir. 1999)).  By contrast, 305 days or more of segregated confinement has been deemed an atypical and significant hardship.  *See Colon*, 215 F.3d at 231-32.  "A period of confinement between 101 and 305 days is considered to be an 'intermediate duration' and could implicate a liberty interest should a detailed record of the conditions of confinement indicate that it was an atypical and significant hardship."  *Bunting*, 452 F. Supp. 2d at 456 (citing *Sealey*, 197 F.3d at 589); *see also Palmer*, 364 F.3d at 64-65.

Additionally, "[o]verlapping disciplinary penalties may, under some circumstances, have to be aggregated for purposes of determining whether a liberty interest was violated."  *Reynoso v. Selsky*, 292 F. App'x 120, 122 (2d Cir. 2008) (summary order).  "Generally, it appears from Second Circuit decisions that separate SHU sentences constitute a 'sustained' period of confinement [that may be aggregated] when (1) they are contiguous *and* (2) they either (a) were imposed by the same disciplinary hearing officer or (b) were based on the same administrative rationale and are executed under the same conditions."  *Taylor v. Artus*, No. 9:05-CV-271 (LEK/GHL), 2007 WL 4555932, at *8 & n.40 (N.D.N.Y. Dec. 19, 2007) (emphasis in original).

### B.    First Amendment Retaliation Claims

"Courts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quotation and other citation omitted). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show . . . '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)).

"Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis*, 320 F.3d at 353 (internal quotation marks and citation omitted). In making this determination, courts are to "bear in mind" that "prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (internal quotation marks and citations omitted). The "test is objective, not subjective, and must be so, since the very commencement of a lawsuit would otherwise be dispositive on the issue of chilling." *Davidson v. Bartholome*, 460 F. Supp. 2d 436, 447 (S.D.N.Y. 2006) (citations omitted).

In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, factors to be considered include: "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior

good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the

defendant concerning his or her motivation." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732

(S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 872-73 (2d Cir. 1995)).  "The causal

connection must be sufficient to support an inference that the protected conduct played a

substantial part in the adverse action."  *Id*.

Upon satisfying his initial burden, "the burden shifts to defendants to establish that the

same adverse action would have been taken even in the absence of the plaintiff's protected

conduct, i.e., 'even if they had not been improperly motivated.'"  *Davidson v. Desai*, 817 F.

Supp. 2d 166, 194 (W.D.N.Y. 2011) (quoting *Graham*, 89 F.3d at 80).  "At the summary

judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have

been taken on a valid basis alone, defendants should prevail."  *Davidson v. Chestnut*, 193 F.3d

144, 149 (2d Cir. 1999); *see also Murray v. Hulihan*, 436 F. App'x 22, 23 (2d Cir. 2011)

("Defendants cannot be liable for First Amendment retaliation if they would have taken the

adverse action even in the absence of the protected conduct.").

### C.    Eighth Amendment Excessive Force Claims

"The Eighth Amendment prohibits the infliction of cruel and unusual punishments . . .

including the unnecessary and wanton infliction of pain."  *Giffen v. Crispen*, 193 F.3d 89, 91 (2d

Cir. 1999) (citation and quotation marks omitted).  An Eighth Amendment excessive force claim

has two elements—"one subjective focusing on the defendant's motive for his conduct, and the

other objective, focusing on the conduct's effect."  *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir.

2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992)).

"The subjective component of the claim requires a showing that the defendant had the

necessary level of culpability, shown by actions characterized by wantonness in light of the

particular circumstances surrounding the challenged conduct." *Harris v. Miller*, 818 F.3d 49, 63

(2d Cir. 2016) (quoting *Wright*, 554 F.3d at 268) (internal quotation marks omitted). The test for

wantonness on an excessive force claim "is whether the force was used in a good-faith effort to

maintain or restore discipline, or maliciously and sadistically to cause harm. *Id*. (quoting *Scott v.

Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (in determining whether defendants acted

maliciously or wantonly, "a court must examine several factors including: the extent of the injury

and mental state of the defendant, as well as the need for the application of force; the correlation

between that need and the amount of force used; the threat reasonably perceived by the

defendants; and any efforts made by the defendants to temper the severity of a forceful

response.") (citation and quotation marks omitted)). The objective component requires a

showing that the "conduct was objectively 'harmful enough' or 'sufficiently serious' to reach

constitutional dimensions." *Harris*, 818 F.3d at 64 (citation omitted).

In addition, a corrections officer who is present while an assault upon an inmate occurs

may bear responsibility for any resulting constitutional deprivation, even if he did not directly

participate in the use of force. *See Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y. May

24, 2010); *Cicio v. Graham*, No. 9:08-CV-534 (NAM/DEP), 2010 WL 980272, at *13

(N.D.N.Y. Mar. 15, 2010). Indeed, an official has an affirmative duty to intervene on behalf of

an individual whose constitutional rights are being violated by other officers in his or her

presence. *Cicio*, 2010 WL 980272, at *13. In order to establish liability under this theory, a

plaintiff must prove that the defendant in question (1) possessed actual knowledge of the use by

another correction officer of excessive force; (2) had a realistic opportunity to intervene and

prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally

refusing or failing to take reasonable measures to end the use of excessive force. *Tafari*, 714 F. Supp. 2d at 342; *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008).

**D.    Personal Involvement**

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.'" *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)). Supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).

Traditionally, to establish supervisory liability in the Second Circuit, a plaintiff must allege that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

*Shaw v. Prindle*, 661 F. App'x 16, 18 (2d Cir. 2016) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). However, the Second Circuit recently held that the *Colon* test was abrogated by the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

The Court held that:

> [A]fter *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676, 129 S. Ct. 1937. "The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue" because the elements of different constitutional violations vary. *Id.* The violation must be established against the supervisory official directly.

*Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (alteration in original).[17]

### E.    Exhaustion

Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined and do so properly. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in

---

[17]   *Tangreti* was decided in the context of an Eighth Amendment deliberate indifference claim against a prison official, and therefore did not specify the "factors necessary" to establish a claim against a supervisor for the types of claims Plaintiff alleges here. *Tangreti*, 983 F.3d 609 at 618.

court." *Id*. at 211.  In New York state prisons, DOCCS has a well-established three-step IGP.

N.Y. Comp. Codes R. & Regs. tit. 7 ("NYCRR"), § 701.5 (2013).

Generally, the IGP involves the following procedure for the filing of grievances.  First, an

inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the

alleged occurrence.  *Id*. § 701.5(a).  A representative of the facility's Inmate Grievance

Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to

informally resolve the issue.  *Id*. § 701.5(b)(1).  If there is no such informal resolution, then the

full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*id*. §

701.5(b)(2)), and issues a written decision within two working days of the conclusion of the

hearing.  *Id*. § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within

seven calendar days of receipt of the IGRC's written decision.  *Id*. § 701.5(c)(1).  If the

grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the

superintendent must issue a written decision within twenty calendar days of receipt of the

grievant's appeal.  *Id*. § 701.5(c)(3)(ii).  Grievances regarding DOCCS-wide policy issues are

forwarded directly to the Central Office Review Committee ("CORC") for a decision under the

process applicable to the third step.  *Id*. § 701.5(c)(3)(I).

Third, a grievant may appeal to CORC within seven working days of receipt of the

superintendent's written decision.  *Id*. § 701.5(d)(1)(I).  CORC is to render a written decision

within thirty calendar days of receipt of the appeal.  *Id*. § 701.5(d)(3)(ii).

Complaints of harassment are handled by an expedited procedure which provides that

such grievances, once it is given a number and recorded by the IGP clerk, are forwarded directly

36

to the superintendent of the facility, after which the inmate may appeal any negative determination to CORC.  *Id.* §§ 701.8(h),(i).

Generally, a plaintiff must properly appeal through all three levels of the IGP before seeking relief in a federal court under § 1983.  *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006).

However, for complaints regarding sexual abuse or sexual harassment, DOCCS has established a different procedure.  *See* DOCCS Directive 4040 § 701.3(i); 7 NYCRR § 701.3(i).  "Revised in 2014 pursuant to the Prison Rape Elimination Act ("PREA"), *see Henderson v. Annucci*, No. 14-CV-445A, 2016 WL 3039687, at *3 (W.D.N.Y. Mar. 14, 2016), Directive 4040 § 701.3(i) creates a relaxed exhaustion requirement for allegations concerning incidents of sexual assault."  *Sheffer v. Fleury*, No. 9:18-cv-1180 (LEK/DJS), 2019 WL 4463672, at *4 (N.D.N.Y. Sept. 18, 2019).  Specifically, "an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy the [PLRA] exhaustion requirement."  7 NYCRR § 701.3(i).  Instead:

> [A]ny allegation concerning an incident of sexual abuse or sexual harassment shall be deemed exhausted if official documentation confirms that: an inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident to facility staff; in writing to Central Office Staff; to any outside agency that the Department has identified as having agreed to receive and immediately forward inmate reports of sexual abuse and sexual harassment to agency officials under the PREA Standards; or to the Department's Office of the Inspector General.

*Id.* (citations omitted).  If an inmate does file a grievance regarding a complaint of sexual abuse or sexual harassment, "[t]he complaint shall be deemed exhausted upon filing."  *Id.*  Finally, "[a] sexual abuse or sexual harassment complaint may be submitted at any time."  *Id.*

Finally, while the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016).  More specifically, § 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted.  42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]") (quotations and citations omitted).  In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotations and internal citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id*. at 1859-60.  First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. at 1859.  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*.  Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1860.

As an affirmative defense, the defendant bear the burden of showing the plaintiff failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216; *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).

### F.    Qualified Immunity

"Government actors are entitled to qualified immunity insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would

have known." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 432-33 (2d Cir. 2009) (internal quotation marks and citation omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 433 (citation omitted). "The principle of qualified immunity ensures that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id*. (internal quotation marks and citation omitted).

## VI.    ANALYSIS

Defendants argue summary judgment is appropriate because: (1) Plaintiff was not deprived of a protected liberty interest sufficient to support a Fourteenth Amendment due process claim; (2) Plaintiff received all of the process he was due in connection with the hearings; (3) Annucci and Venettozzi were not personally involved in the alleged deprivations under the Fourteenth Amendment; (4) Annucci, Venettozzi, and Smith are entitled to qualified immunity; (5) Plaintiff failed to exhaust his administrative remedies with respect to his First Amendment retaliation and Eighth Amendment excessive force claims; (6) Plaintiff's Eighth Amendment excessive force claim against DeGraff, McElory, and Harrison arising from the unspecified incident fails on the merits; and (7) Plaintiff's First amendment retaliation claims against DeGraff and Karamanos fail on the merits. (*See generally* Dkt. No. 80-20, 92.) Plaintiff opposes the motion. (Dkt. Nos. 87, 92.)

### A.    Fourteenth Amendment Due Process Claims

Plaintiff alleges he was denied due process at six disciplinary hearings conducted by Gardner, Pingotti, Palen, and Farah in violation of his rights under the Fourteenth Amendment. (Dkt. No. 1 at 41-42.) Generally, as detailed above, Plaintiff claims he was denied the

opportunity to present a defense, documents, videos, witnesses, and employee assistance.  He claims Defendants were biased and he was removed from two hearings and was not provided with a written statement of the disposition at one hearing.  Plaintiff claims he appealed all of the disciplinary determinations, which were affirmed on administrative appeal by Smith, Venettozzi, and/or Annucci.

Defendants argue the sentences imposed by Gardner, Pingotti, Palen, and Farah at the disciplinary hearings did not implicate a protected liberty interest and that, even if they did, Plaintiff received due process.  (Dkt. No. 80-20 at 32-38.)  According to Defendants, Plaintiff's assertion that he served more than 305 days of consecutive disciplinary confinement is belied by the record.  *Id*. at 34.  Defendants point out that Plaintiff did not actually serve anywhere near the full amount of time in the SHU with which he was sanctioned from the six disciplinary hearings at issue.  *Id*.  Additionally, Defendants argue Plaintiff's claims against Annucci and Venettozzi should be dismissed for lack of personal involvement.  *Id*. at 25-29.  Lastly, Annucci, Venettozzi, and Smith argue they are entitled to qualified immunity.  *Id*. at 29-32.

In his response and sur-reply, liberally construed, Plaintiff suggests that Defendants have "already conceded" that he was denied due process because the disciplinary hearings at issue were administratively revered.  (Dkt. No. 87 at ¶¶ 10, 11.)  As to the length of his disciplinary confinement, Plaintiff asserts that he was always housed in "continuous" "restrictive" confinement, from September 2014 through May/June 2015, including the SHU at Shawangunk and Sullivan and, the "long term confinement unit" at Attica, which is a "secure confinement unit," known as "18 company."  (Dkt No. 87 ¶¶ 12-15; Dkt. No. 92 at ¶ 7.)  Plaintiff further argues Annucci and Venettozzi were personally involved, are liable as supervisors ("someone must stop the buck") and are not entitled to qualified immunity.  (Dkt No. 87 ¶¶ 12-15.)

### 1.    Liberty Interest

As a preliminary matter, Plaintiff had "'no right to due process [at his hearing] *unless* a liberty interest' was infringed." *Palmer*, 364 F.3d at 64 (alternation and emphasis in original). Here, the record evidence demonstrates Plaintiff was housed in disciplinary confinement at Shawangunk during the relevant time period for a total of 46 days in 2014: from August 25, 2014, through September 4, 2014, and from November 18, 2014, through December 23, 2014. (Dkt. No. 80-18 at ¶ 17.)

As detailed above, during the intervening period, Plaintiff was housed in Shawangunk's facility hospital after the September 4, 2014, incident and was then placed under IPC status for his personal safety and for the safety and security of the facility from September 11, 2014, through October 30, 2014. (Dkt. Nos. 1 at 19-20, 80-1 at ¶¶ 7-14.) Thereafter, he was temporarily transferred to Sullivan for mental health observation from October 30, 2014, through November 17, 2014. (Dkt. Nos. 1 at 19-20, 80-1 at ¶¶ 7-14.) Subsequently, Plaintiff was transferred from Shawangunk to Sullivan on December 23, 2014, and then to Attica on January 30, 2015. (Dkt. No. 80-1 at ¶¶ 16, 17.) Plaintiff was housed in the general population at Attica for all of 2015, except for five days in March when he was temporarily relocated to the mental health observation unit. *Id*. at ¶¶ 18-21. He was not housed in the SHU at Attica at any time in 2015. *Id*. at ¶ 22.

Courts routinely find similar disciplinary confinement insufficient to constitute a liberty interest. *See Holmes v. Grant*, No. 03-CIV-3426, 2005 WL 2839123, *5 (S.D.N.Y. Oct. 25, 2005) (finding 60 days in the SHU at Shawangunk is "insufficient to constitute a deprivation of a liberty interest"); *see also Holland v. Goord*, No. 05-CV-6295, 2006 WL 1983382, *7 (W.D.N.Y. July 13, 2006) (finding 77 days in keeplock during which the plaintiff was deprived

of TV, phone, packages, and commissary, and was unable to attend Muslim services and classes, did not constitute a liberty interest); *Pilgrim v. Bruce*, No. 9:05-CV-198, 2008 WL 2003792, *15 (N.D.N.Y. May 7, 2008) (finding 60 days in keeplock failed to establish that he was subject to more severe conditions than in normal restrictive confinement).

Moreover, because the record evidence demonstrates Plaintiff's disciplinary confinement was not "contiguous," the Court agrees with Defendants that aggregation is not appropriate in the case at bar and any disciplinary confinement Plaintiff actually served in connection with his hearings should be evaluated individually. (*See* Dkt. No. 80-2 at 35.)

Where, as in this case, the plaintiff's disciplinary confinement "was not long enough to constitute an atypical and significant deprivation by itself," courts "look to the conditions of confinement" as alleged by plaintiff. *Smith v. Hamilton*, 9:15-CV-0496 (BKS/ATB), 2016 WL 3823395, at *3 (N.D.N.Y. July 12, 2016) (quoting *Palmer*, 364 F.3d at 66). Here, given the absence of any allegations from Plaintiff about unusually harsh or abnormal conditions of his confinement at Shawangunk, the Court finds Plaintiff's liberty interests were not implicated by the disciplinary hearings challenged in this action. *See McEachin v. Selsky*, No. 9:04-CV-0083 (FJS/RFT), 2010 WL 3259975, at *9 (N.D.N.Y. Mar. 30, 2010) ("It is expected that confinement in SHU will be accompanied by a loss of privileges that prisoners in the general population enjoy and such conditions fall 'within the expected parameters of the sentence imposed by a court of law.'") (citations omitted); *see also* Dkt. No. 87 at ¶ 15 (alleging he was "locked into cell housing" for "23 hours[s]" a day).[18]

---

[18]  Inmates in the SHU are subject to, *inter alia*, limitations on personal property, packages, commissary, programs, visits, and telephone calls, and out-of-cell recreation is limited to one hour daily. (Dkt. No. 80-18 at ¶ 11.)

Further, as noted, Plaintiff was not housed in Attica's SHU in 2015.  (Dkt. No. 80-1 at ¶ 22.)  While Plaintiff describes his confinement at Attica as "restrictive" while housed in "18 company," he only claims that his "personal property, i.e., television sets, hot pots, etc." was "confiscated," which fails to implicate an atypical and significant hardship.  (Dkt. No. 87 at ¶ 12.)  Moreover, Plaintiff has not alleged that this "restrictive" confinement differed from other inmates housed in 18 company.  *See id.*

Based on the forgoing, the Court finds Plaintiff has failed to establish a protected liberty interest and, as a result, Plaintiff's Fourteenth Amendment due process claims fail as a matter of law.  Accordingly, the Court recommends granting summary judgment to Gardner, Pingotti, Farah, Palen, Smith, Venettozzi, and Annucci.

### 2.     Due Process

Even assuming Plaintiff demonstrated the existence of material questions of fact as to a protected liberty interest, which, for reasons set forth he did not, Defendants have established their entitlement to summary judgment because Plaintiff was afforded the process he was due. (*See* Dkt. No. 80-20 at 36-38.)

### a.     Gardner

Gardner conducted Plaintiff's disciplinary hearings that concluded on September 23, 2014, and December 10, 2014.  (Dkt. No. 80-8 at ¶¶ 4, 6.[19])  The record shows that at each

---

[19]  As noted, Plaintiff also claims Gardner conducted the August 25, 2014, hearing. Gardner has no recollection of any such hearing.  (Dkt. No. 80-8 at ¶ 4 n.1.)  Defendants have not submitted the transcript of that hearing.  Thus, the Court makes no finding as the process afforded to Plaintiff during that hearing.  Nevertheless, the record shows Plaintiff only was confined in the SHU for 10 days as a result of that hearing, which fails to create a liberty interest. *See Ochoa v. DeSimone*, No. 9:06-CV-119 (DNH/RFT), 2008 WL 4517806, at *4 (N.D.N.Y. Sept. 30, 2008) (holding 30 days SHU and keeplock confinement insufficient to create liberty interest); *Escalera v. Charwand*, No. 9:04-CV-0983 (FJS/DEP), 2008 WL 699273, at *8 (N.D.N.Y. Mar. 12, 2008) (same).

hearing, Plaintiff received advance notice of the charges against him (the IMRs issued September 8, 2014, and November 13, 2014), an opportunity to call witnesses and present evidence, and a written statement of the evidence relied upon at the conclusion of each hearing.  *Id*. at ¶¶ 9-17, 39-44.  Plaintiff was assisted by Mr. Chumas in connection with the September 23, 2014, Tier III hearing and, although he was not assigned an employee assistant for the December 10, 2014, Tier II hearing, Plaintiff made his requests for evidence and witnesses directly to Gardner.  *Id*. at ¶¶ 10, 38.

Upon review of the hearing transcripts, Gardner acted fairly and impartially.  As to the September 23, 2014, hearing, Gardner relied upon the IMR issued by C.O. Algarin, as well as the verbal testimony given at the hearing.  *Id*. at ¶¶ 23, 26.  Similarly, as to the December 10, 2014, hearing, Gardner relied upon the IMR issued by social worked at Sullivan, and upon all of the verbal testimony.  *Id*. at ¶ 49.

### b.    Pingotti

Pingotti conducted the October 14, 2014, Tier III disciplinary hearing.  (Dkt. No. 80-13 at ¶ 4.)  Plaintiff received a copy of the September 30, 2014, IMR, was assisted by Mr. Chumas, and had an opportunity to call relevant witnesses and present evidence.  *Id*. at ¶¶ 9-17.  Plaintiff attended the hearing until just prior to the conclusion, when he was removed due to his disruptive and unruly behavior.  *See id*. at ¶ 18.  Plaintiff was provided with a copy of the written disposition, which included a statement of evidence utilized by Pingotti including the IMR, the documentation regarding Plaintiff's urinalysis result, and all of the verbal testimony given during the course of the hearing.  *Id*. at ¶ 24.  Upon review of the hearing transcript and record, Pingotti acted fairly and impartially.  *Id*. at ¶ 25.

### c. Palen

Palen conducted Plaintiff's November 27, 2014, Tier II hearing regarding the October 17, 2014, IMR.  (Dkt. No. 80-12 at ¶ 6.)  Plaintiff received a copy of the IMR giving him advance notice of the charges against him, an opportunity to call witnesses and present evidence, and a written statement of the evidence Palen considered, which included the IMR and all of the verbal testimony given at the hearing.  *Id.* at ¶ 29.  As this was a Tier II hearing, Plaintiff was not assigned an assistant and was directed to make all requests for the evidence and witnesses he needed to Palen.  *Id.* at ¶ 11.  Upon review of the hearing transcript and record evidence, Palen acted fairly and impartially.  *Id.* at ¶ 30.

### d. Farah

Farah conducted the December 18, 2014, Tier III hearing regarding the October 24, 2014, IMR.  (Dkt. No. 80-6 at ¶ 6.)  Plaintiff received a copy of the IMR giving him advance notice of the charges against him, was assisted by Mr. Austin, was presented with an opportunity to call witnesses and present relevant evidence, and received a written explanation of the disposition.  *Id.* at ¶¶ 9, 15, 36.  In finding Plaintiff guilty, Farah considered the IMR written by DeGraff, the verbal testimony given at the hearing, the documentation regarding the October 24, 2014, incident, as well as the video recording depicting the incident.  *Id.* at ¶ 32.  The three inmate witnesses that Plaintiff requested refused to testify.  *Id.* at ¶¶ 16, 30.  After multiple warnings, Plaintiff was removed during the course of the hearing due to his disruptive behavior.  *See id.* at ¶ 23.  Plaintiff then refused to attend the remainder of the hearing.  *See id.* at ¶¶ 26-29.  Upon review of the hearing transcript and record evidence, Palen also acted fairly and impartially and did not predetermine Plaintiff's guilt.  *Id.* at ¶¶ 30, 37.

For these reasons, summary judgment is also warranted.

3.       **Appeals**

Plaintiff appealed all of the disciplinary determinations at issue, which he claims were

affirmed on administrative appeal by Smith, Venettozzi, and/or Annucci.  However, for reasons

discussed above, Plaintiff has failed to establish a liberty interest and he was afforded due

process.  As such, Plaintiff cannot establish a Fourteenth Amendment due process claim against

these Defendants based on their alleged affirmance of a constitutional disciplinary hearing.  *See*

*Cole v. New York State DOCCS*, No. 9:14-CV-0539 (BKS/DEP), 2016 WL 5394752, at *28

(N.D.N.Y. Aug. 25, 2016); *see also Lopez v. Whitmore*, No. 13-CV-0952 (BKS/ATB), 2015 WL

4394604, at *11 (July 16, 2015).  Thus, summary judgment is also warranted on this basis.[20]

Moreover, since Defendants filed this motion, the Second Circuit has clarified that under

the Supreme Court's ruling in *Iqbal*, "a plaintiff must plead and prove 'that each Government-

official defendant, through the official's own individual actions, has violated the Constitution.'"

*Tangreti*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).  Merely being in the

chain of command is not enough to satisfy this standard.  *See id*.  While "'[t]he factors necessary

to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the

elements of different constitutional violations vary," *id*. (quoting *Iqbal*, 556 U.S. at 676) (second

alteration in original), "[t]he violation must be established against the supervisory official

directly."  *Id*. (emphasis added).  Failing to correct another officer's violation does not suffice.

*Id*. at 617 n.4.  "Indeed, even before *Tangreti*, affirming the outcome of a prison hearing was not

sufficient to establish personal involvement."  *Smart v. Annucci*, No. 19-CV-7908, 2021 WL

---

[20]  As the Court recommends granting summary judgment for reasons discussed above,
the Court declines to address Defendants whether Annucci, Venettozzi, and Smith are entitled to
qualified immunity.  (*See* Dkt. No. 80-20 at 25-32.)

260105, at *5 (S.D.N.Y. Jan. 26, 2021) (citing *Abdur-Raheem v. Selsky*, 598 F. Supp. 2d 367, 370 (W.D.N.Y. 2009) (collecting cases)).

Here, Plaintiff has not alleged, and the record does not demonstrate, that Smith, Venettozzi, or Annucci had any personal involvement during the disciplinary hearings at issue. *See Smart*, 2021 WL 260105, at *5 ("That [defendants] failed to act on plaintiff's complaints, and that [they] denied plaintiff's administrative appeals, cannot support the inference that these [d]defendants, through "[their] own individual actions, [have] violated the Constitution.") (quoting *Tangreti*, 983 F.3d at 615). Thus, summary judgment is also warranted on this basis.[21]

### B. Exhaustion

Defendants argue Plaintiff failed to exhaust his administrative remedies with respect to his First Amendment retaliation and Eighth Amendment excessive force claims. (Dkt. No. 80-20 at 21-25.) To that end, Defendants submit evidence demonstrating Plaintiff did not file any grievances at Shawangunk, Sullivan, or Attica regarding his claims that: (1) DeGraff and Karamanos assaulted him on October 24, 2014, as he was exiting his cell to take a shower; (2) DeGraff and Karamanos retaliated against him on October 24, 2014, by subjecting him to excessive force; (3) DeGraff, McElroy, and Harrison assaulted Plaintiff on another unspecified date while escorting him to the facility hospital; or (4) DeGraff retaliated against him on October 17, 2014, by disposing of his mattress. (Dkt. No. 80-1 at ¶¶ 204-07.) CORC has no record of an appeal filed by Plaintiff related these claims. (Dkt. No. 80-15 at ¶¶ 15-16.) Defendants thus argue summary judgment is warranted.

---

[21] As the Court recommends granting Defendants' motion insofar as it seeks dismissal of Plaintiff's Fourteenth Amendment claims, the Court declines to address whether Annucci, Venettozzi, and Smith are entitled to qualified immunity. (*See* Dkt. No. 80-20 at 29-32.)

Plaintiff counters administrative remedies were unavailable and, alternatively, requests an exhaustion hearing.  (Dkt. No. 87 at ¶¶ 2-7.)  Specifically, Plaintiff claims administrative remedies had become unavailable as to his Eighth Amendment excessive force claims because his "complaints, grievance, etc., were the subject of much tampering, and mishandling."  *Id*. at ¶ 6.  Plaintiff further argues the IGP is "opaque" and "confusing as it applies to what an inmate can do—when his grievance are not making it to the grievance staff, or what a plaintiff can do when his grievances are causing officers to retaliate."  *Id*. at ¶ 7.

### 1.    Excessive Force

As pointed out by Defendants, when questioned about his excessive force claims during his deposition, Plaintiff testified that he did not remember whether he filed a grievance against DeGraff, McElroy, and Harrison and could not recall the date of the alleged incident.  (Dkt. No. 80-2 at 63, 70.)  With respect to the October 24, 2014, incident, Plaintiff also testified that he could not remember whether he filed a grievance against DeGraff or Karamanos.  *Id*. at 60-61.

In his sworn response to Defendants' motion, Plaintiff explains that his memory was "unclear" at the time of his deposition and further states that as to his excessive force claims "a grievance was filed" by "giving said grievance" to a SHU officer at Shawangunk.  (Dkt. No. 87 at ¶ 2.)  The parties agree a grievance was never filed at Shawangunk.

Plaintiff states that he sent a copy of the grievance to Lanny E. Walter, an attorney, whom he claims to have acted as the "custodian and record keeper of [his] grievances," because he was "having a hard time getting grievances against Shawangunk SHU officers filed or even delivered for filing at Shawangunk Inmate Grievance Office/Staff."  *Id*. at ¶¶ 2, 3.[22]

---

[22]  Attorney Walter does not represent Plaintiff in this action.  (*See* Docket Report; *see also* Dkt. No. 87 at 18.)

Plaintiff has submitted a copy of a November 22, 2019, letter from Attorney Walter addressed to Judge Hurd, which in turn identifies "[a] December 14, 2014[,] grievance sent to J. Taylor-Stewart . . . to which are attached pink copies of Inmate Grievance Complaint dated November 26, 2014[,] and December 4, 2014." *Id*. at 1-2, 18.  Plaintiff also submitted photocopies of grievances dated November 26, 2014, and December 4, 2014.  *Id*. at 32-33.  In the November 26, 2014, grievance, Plaintiff states:

> Prior to being sent OMH/OBS I filed this complaint but it was never answered.  While under escort from the dentist on Oct. 15, 2014, Officer DeGraff in an act of retaliation and intimidation put his groin up against my buttocks and grabbed my penis, after which Officer McElroy punched me in the back of the head, while their Supervisor Sgt. Harrison stood by and threatened my (sic) to stop writing complaints to the commissioner, and Superintendent about Captain Bertone.  Then on Oct. 24, 2014, C.O. DeGraff and Karamanos violated facility SHU shower policy and pat frisked me at which time C.O. DeGraff grabbed my penis and Karamanos slammed my head into the wall with his forearm repeatedly.

(Dkt. No. 87 at ¶ 2.)

According to Defendants, this "grievance," which lacks a grievance number, is insufficient to exhaust his Eighth Amendment excessive claims because there is no indication it was *actually filed*.  (Dkt. No. 88 at 4-5.)  The Court agrees.  Defendants further assert that even if Plaintiff may have relayed this "grievance" to Deputy Superintendent Taylor-Stewart, along with a letter complaining of difficulties in the grievance process, it would not substitute for proper exhaustion because "a plaintiff's letters to prison officials or other officials outside the grievance chain of command are insufficient to properly exhaust administrative remedies."  *Id*. at 5 (quoting, *inter alia*, *Cucchiara v. Dumont*, No. 9:18-CV-0182 (GLS/CFH), 2019 WL 2516605, at *5 (N.D.N.Y. Apr. 26, 2019), *report and recommendation adopted*, 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016)).  The Court also agrees.

The Court reaches a different conclusion, however, as to Defendants' contention that Plaintiff's Eighth Amendment excessive force claims are not "salvaged" from the PLRA's exhaustion requirement by his "unsupported assertion that one or more unnamed Shawangunk officers destroyed, mishandled, or otherwise failed to file his grievance or grievances." *Id.* (citing, *inter alia*, *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) ("mere contention or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations"), *report and recommendation adopted*, 2017 WL 2790530 (N.D.N.Y. June 27, 2017)).

Contrary to Defendants' assertion, Plaintiff had not speculated that his grievance was misplaced. (Dkt. No. 88 at 5-6.) In his sworn opposition, Plaintiff states he gave the grievance to a SHU officer and mailed a copy of the grievance to Attorney Walter. (Dkt. No. 87 at ¶¶ 2, 5.) Plaintiff proffers a copy of the November 26, 2014, grievance, and a cover letter from Attorney Walter dated November 22, 2019, which, among other things, references a November 26, 2014, grievance. (Dkt. No. 88 at 18, 32.) "Since the Court is required to draw reasonable inferences in Plaintiff's favor, the Court must infer that the grievance was never filed because prison authorities did not file it, not because Plaintiff did not submit it." *McLean v. LaClair*, No. 9:19-CV-1227 (LEK/ATB), 2021 WL 671650, at *8 (N.D.N.Y. Feb. 22, 2021); *Fann v. Graham*, No. 15-CV-1339 (DNH/CFH), 2018 WL 1399331, at *6 (N.D.N.Y. Jan. 11, 2018) ("Viewing the facts in the light most favorable to plaintiff, the record suggests that plaintiff's grievances were submitted, but were unfiled and unanswered, creating an issue of fact as to whether the grievance process was available and whether plaintiff attempted to exhaust his administrative remedies[.]"), *report and recommendation adopted*, 2018 WL 1399340 (N.D.N.Y. Mar. 19,

2018); *Thaxton v. Simmons*, No. 10-CV-1318, 2013 WL 4806457, at *4 (N.D.N.Y. Sept. 9, 2013) ("[A] question of fact exists as to whether [p]laintiff never filed his initial grievance on April 29, as [d]efendants claim, or that, as [p]laintiff claims, he filed a timely grievance that was lost or tampered with by [d]efendants.  Such credibility assessments are to be resolved by a trier of fact."); *see also Woodward v. Lytle*, No. 9:16-CV-1174 (NAM/DEP), 2018 WL 4643036, at *4-5 (N.D.N.Y. Sept. 27, 2018) (finding an issue of fact as to the availability of the grievance process where plaintiff drafted and submitted a grievance that was never filed or answered) (collecting cases).

Additionally, Defendants' contention that Plaintiff was able to successfully navigate the IGP as to other matters at Shawangunk during the relevant time (*see* Dkt No. 88 at 6) does not necessarily weaken Plaintiff's unavailability argument—his history of filing grievances could also suggest that, absent interference, he was capable of complying with it.  *See Burrell v. Zurek*, No. 9:17-CV-0906 (LEK/TWD), 2019 WL 4051596, at *3 (N.D.N.Y. Aug. 28, 2019).

Based on the foregoing, the Court finds Plaintiff has raised a genuine issue of fact as to the availability of the IGP with respect to his Eighth Amendment excessive force claims and therefore summary judgment is not warranted.

### 2.    Sexual Assault

Rachel Seguin, the Assistant Director of DOCCS IGP, states that "with the exception of the sexual assault allegations," Plaintiff's excessive force and retaliation claims are the proper subject for a grievance.  (Dkt. No. 80-15 at 10.)  Defendants acknowledge that "DOCCS regulations exempt claims of sexual abuse or harassment from the requirement of filing a grievance for exhaustion purposes, so long as the incident is properly reported."  (Dkt. No 80-20 at 25, citing 7 NYCRR § 701.3(i).)

51

Here, Plaintiff testified that he believed his October 29, 2014, letter to DOCCS' Inspector

General obviated the need for a grievance because it implicated PREA. (Dkt. No. 80-2 at 60-

62.[23]) In that letter, Plaintiff states:

> Dear Inspector General: Once again I am to make a request for
> your intervention on my behalf and investigate the ongoing
> retaliation, abuse, and again this inappropriate touching of my
> "penis" genitals by "C.O. D. DeGraff" who work the SHU/PC SD
> Unit here at Shawangunk. Officer DeGraff . . . on Oct. 24, 2014, .
> . . in an act of retaliation, "grabbed my penis" my buttock . . .
> under the guise of a pat frisk that is not a part of the policy at
> Shawangunk before a SHU shower. Please investigate!!

Id. at 191. Moreover, in his declaration, DeGraff states, "I understand that plaintiff filed a

complaint against me concerning the October 24, 2014[,] incident at some point thereafter.

Attached as Exhibit D is a memorandum that I wrote to a different supervisor, Sgt. Lutz, on

December 4, 2014 after plaintiff lodged his complaint. To the best of my knowledge, plaintiff's

complaint was found unsubstantiated and dismissed." (Dkt. No. 80-5 at ¶ 12.) In that

memorandum, DeGraff states:

> At no time have I sexually assaulted inmate Clark, J. 99A0475 or
> any other inmate. I do not have it 'out for him.' I have not 'set up'
> inmate Clark or any other inmate. CO Karamanos and myself
> were involved in a minor use of force on October 24, 2014 with
> inmate Clark. Inmate Clark was being disruptive and failed to
> follow staff direction. A Tier 3 misbehavior report was issued for
> that incident and is still pending. Inmate Clark was out of the
> Facility for an extended period of time after that incident, and there
> have been no incidents since.

(Dkt. No. 80-5 at 13.)

---

[23] Plaintiff also states in the verified complaint that he filed a complaint with the Office
of Special Investigations about the alleged excessive force incident involving DeGraff, McElroy
and Harrison on the way to Shawangunk's facility hospital. (Dkt. No. 1 at 29.)

Nevertheless, Defendants argue DeGraff's alleged conduct does not fall under the purview of the exemption because "'Sexual Contact' does not include touching of the intimate parts of another person *during the performance of a personal search in accordance with Department procedures . . .*" (Dkt. No. 80-20 at 24-25, emphasis in Defendants' memorandum of law.) Defendants also note Plaintiff does not claim Karamanos participated in the alleged sexual touching and, therefore, his excessive force against Karamanos must be "properly grieved for exhaustion purposes." *Id.* at 25.

However, the parties dispute whether the sexual contact was in accordance with Department procedures. *See Hayes v. Dahlke*, 976 F.3d 259, 275 (2d Cir. 2020) ("Prison regulations state that, while '[c]ontact through the clothing with the genitalia, groin, . . . inner thigh, and buttocks is a necessary component of a thorough pat frisk[,] . . . staff must avoid any penetration of the anal or genital opening through the clothing" and "must not lift or otherwise manipulate the genitalia during a pat frisk.") (alterations in original). "Further, while it is true that not all grievances by inmates are covered by Directive 4040, conduct that is specifically related to the act of sexual abuse, such as a failure to intervene and protect that abuse, could be reasonably interpreted by the inmate as being covered by the Directive." *Sheffer v. Fleury*, 2019 WL 3891143, at *4 (N.D.N.Y. Aug. 19, 2019) (finding an "incident" of sexual abuse under § 701.3(i) could include "not only the acts of sexual abuse by an inmate or a corrections officer, but also other events which are necessarily intertwined with such a claim, such as a physical assault during the course of the abuse . . .").

Given the record and considering the evidence in the light most favorable to Plaintiff, the Court finds Defendants have not sustained their burden of demonstrating that Plaintiff's sexual

assault claims, along with the alleged physical assaults, were not properly exhausted under the relaxed procedures found in § 701.3(i).

### 3.    Retaliation

The Court reaches a different result as to Plaintiff's First Amendment retaliations claims. Here, there is no dispute that Plaintiff never filed a grievance concerning his claims that DeGraff or Karamanos retaliated against him for his grievance activity.  Plaintiff does not suggest, and the record does not demonstrate, that Plaintiff's administrative remedies were unavailable under *Ross*.

Based upon the foregoing, the Court finds Plaintiff did not exhaust his administrative remedies with respect to his First Amendment retaliation claims as the PLRA requires and, therefore, recommends granting Defendants' motion and dismissing Plaintiff's First Amendment retaliation claims against DeGraff and Karamanos.

Generally, a dismissal for failure to exhaust administrative remedies is without prejudice, so that the inmate-plaintiff can cure the defect by exhausting his administrative remedies and then reinstituting his suit.  *See Snider v. Melindez*, 199 F. 3d 108, 111-12 (2d Cir. 1999). However, dismissal with prejudice is appropriate where the plaintiff had the opportunity to exhaust administrative remedies, failed to do so, and is unable to cure his failure to exhaust. *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004).  Here, more than several years have passed since Plaintiff should have filed a grievance.  As Plaintiff's failure to exhaust his administrative remedies is incurable at this point, the Court recommends dismissing Plaintiff's First

Amendment retaliation claims with prejudice.  *See Castineiras v. Helms*, No. 9:17-CV-1084 (BKS/ATB), 2019 WL 2870300, at *5-6 (N.D.N.Y. June 6, 2019).[24]

### C.    Excessive Force Claims

As discussed, Plaintiff claims he was physically and sexually assaulted on two separate occasions while confined at Shawangunk.  Defendants only seek summary judgment on the merits as to Plaintiff's Eighth Amendment excessive force claim premised on the incident involving DeGraff, McElroy, and Harrison.  (Dkt. No. 80-20 at 15-17.)

Defendants argue summary judgment is warranted because Plaintiff has never provided a date or time of this alleged incident.  (Dkt. No. 80-20 at 16; *see* Dkt. No. 1 at 29.)  When questioned at his deposition about this alleged incident, Plaintiff testified that he did not remember when it occurred.  (Dkt. No. 80-20 at 16.)  Without such essential information as the date or time, Defendants argue Plaintiff's excessive force claim in connection with this alleged incident should be dismissed.  *Id*., citing, *inter alia*, *Lopez v. City of New York*, No. 05 Civ. 10321, 2009 WL 229956, at *8 (S.D.N.Y. Jan. 30, 2009) (granting summary judgment dismissing an excessive force claim where the plaintiff failed to provide, among other things, a timeframe for the alleged incident).

To be sure, Plaintiff testified that he could not recall the exact date of this incident.  (Dkt No. 80-2 at 63.)  However, Plaintiff recalled the incident and described it taking place within the infirmary area, in the "short corridors leading" to the "emergency room areas and sick-call areas of Shawangunk."  *Id*.  Plaintiff further testified DeGraff "pushed me up against the wall" and "he pressed up against me and talking into my ear and pressing his pelvis, like up against my

---

[24]    In light of this recommendation, the Court does not address the merits of Plaintiff's First Amendment retaliation claims.

buttocks." *Id*. at 64-65.  Although he could not recall what DeGraff said, "it was some perverted stuff[.]" *Id*. at 65.  Plaintiff testified McElroy "punched" him a "couple times"  in the "back area" of his head.  *Id*. at 65-66.  Plaintiff also testified Harrison came up to the side of him and threatened Plaintiff that "it will get rougher."  *Id*. at 65.  When questioned about any witnesses, he suggested the nurses or the "dentist office might have heard it."  *Id*. at 67.  More importantly, in his sworn opposition statement, Plaintiff has now proffered the date of the incident: October 15, 2014.  (Dkt. No. 87 at ¶ 5; *see also* Dkt. No. 87 at 32 ("While under escort from dentist on Oct. 15, 2014, Officer DeGraff in an act of retaliation and intimidation put his groin up against my buttocks and grabbed my penis, after which Officer McElroy punched me in the back of my head, while their supervisor Sgt. Harrison stood by and threatened me . . . .").)

Without question, the evidentiary support for Plaintiff's excessive force claim against these Defendants is thin.  Plaintiff testified that the incident happened quickly, approximately one to two minutes, and the injuries were not extensive in that he had "a little soreness in the back of my head."  (Dkt. No. 80-2 at 67, 69.)  Moreover, DeGraff, McElroy, and Harrison affirmatively deny having ever physically assaulted, used excessive force on, or improperly touched Plaintiff in any way.  (Dkt. No. 80-5 at ¶¶ 5, 14; Dkt. No. 80-9 at ¶ 5; Dkt. No. 80-11 at ¶ 6.)

Nevertheless, on the record before the Court, Plaintiff has also testified and identified the date, location, and described the alleged force and sexual touching.  Since Plaintiff's "allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically," summary judgment is inappropriate. *See Wright v. Goord*, 554 F.3d 255, 269 (2d Cir. 2009); *see also Hayes*, 976 F.3d at 275 ("Indeed, as we explained in *Crawford*, if an "officer intentionally brings his or her genitalia into

contact with the inmate in order to arouse or gratify the officer's sexual desire or humiliate the inmate, a violation is self-evident because there can be no penological justification for such contact.") (quoting *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015)).  The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) ("[t]he Supreme Court has emphasized that the nature of the force applied is the core judicial inquiry in excessive force cases – not whether a certain quantum of injury was sustained.").

Based on the foregoing, the Court recommends denying Defendants' motion as to Plaintiff's excessive force claim against DeGraff, McElroy, and Harrison arising from this incident.

**VII.    CONCLUSION**

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court recommends that Defendants' motion for summary judgment be granted as to all claims, with the exception of the Eighth Amendment excessive force claims against DeGraff, Karamanos, McElroy, and Harrison.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No 80) be **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report.[25]  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72.


Dated:  March 8, 2021
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[25]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 59 of 353
McAllister v. Call, Not Reported in F.Supp.3d (2014)
2014 WL 5475293

KeyCite Yellow Flag - Negative Treatment
Distinguished by  McDonald v. Zerniak,  N.D.N.Y.,  November 4, 2016

2014 WL 5475293
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Charles McALLISTER also known
as Charles McCallister, Plaintiff,
v.
Harold CALL, Vocational Supervisor,
Mohawk Correctional Facility, Defendant.

No. 9:10–CV–610 (FJS/CFH).
|
Signed Oct. 28, 2014.
|
Filed Oct. 29, 2014.

**Attorneys and Law Firms**

Charles McAllister, Westbury, NY, pro se.

Hon. Eric T. Schneiderman, Office of the New York State
Attorney General, The Capitol, Keith J. Starlin, AAG, of
Counsel, Albany, NY, for Defendant.

**ORDER**

SCULLIN, Senior District Judge.

**\*1** Currently before the Court are Magistrate Judge
Hummel's October 9, 2014 Report–Recommendation and
Order, *see* Dkt. No. 81, and Plaintiff's objections thereto, *see*
Dkt. No. 83.

Plaintiff, a former inmate who was, at all relevant times, in
the custody of the New York Department of Corrections and
Community Supervision, commenced this action pursuant
to 42 U.S.C. § 1983. In his original complaint, Plaintiff
asserted claims against Brian Fischer, Lucien J. LeClaire,
Patricia LeConey, Carol Woughter, and John and Jane Does.
Defendants moved for summary judgment. *See* Dkt. No.
49. By Report–Recommendation and Order dated July 6,
2012, Magistrate Judge Homer recommended that this Court
dismiss all claims against the named individuals and direct
Plaintiff to join Harold Call as a Defendant. *See* Dkt. No.

55. This Court accepted the Report and Recommendation and
Order in its entirety and directed Plaintiff to file an amended
complaint to "include only one cause of action a procedural
due process claim in connection with his disciplinary hearing
and one Defendant hearing officer Call ." *See* Dkt. No. 58 at
4–5.

Plaintiff thereafter filed his amended complaint and requested
compensatory and punitive damages. *See* Dkt. No. 64,
Amended Complaint at 4. In this amended complaint, Plaintiff
alleged that Defendant violated his constitutional rights under
the First, Eighth and Fourteenth Amendments. *See* Dkt. No.
64, Amended Complaint at ¶¶ 33, 34, 43.

On May 9, 2014, Defendant filed a motion for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. *See* Dkt. No. 74. In a Report–Recommendation
and Order dated October 9, 2014, Magistrate Judge Hummel
recommended that this Court grant Defendant's motion in
part and deny his motion in part. *See* Dkt. No. 81 at
33. Plaintiff filed objections to Magistrate Judge Hummel's
recommendations. *See* Dkt. No. 83.

Where a party makes specific objections to portions of a
magistrate judge's report and recommendation, the court
conducts a *de novo* review of those recommendations. *See*
*Trombley v. Oneill,* No. 8:11–CV–0569, 2011 WL 5881781,
*2 (N.D.N.Y. Nov. 23, 2011) (citing Fed.R.Civ.P. 72(b)
(2); 28 U.S.C. § 636(b)(1)(C)). Where a party makes no
objections or makes only conclusory or general objections,
however, the court reviews the report and recommendation
for "clear error" only. *See Salmini v. Astrue,* 3:06–CV–
458, 2009 WL 1794741, *1 (N.D.N.Y. June 23, 2009)
(quotation omitted). After conducting the appropriate review,
a district court may decide to accept, reject, or modify those
recommendations. *See Linares v. Mahunik,* No. 9:05–CV–
625, 2009 WL 3165660, *10 (N.D.N.Y. Sept. 29, 2009)
(quoting 28 U.S.C. § 636(b)(1)(C)).

Although Plaintiff's objections are, in most respects, general
or conclusory, given his *pro se* status, the Court has conducted
a *de novo* review of Magistrate Judge Hummel's Report–
Recommendation and Order. Having completed its review,
the Court hereby

**\*2 ORDERS** that Magistrate Judge Hummel's October 9,
2014 Report–Recommendation and Order is **ACCEPTED
in its entirety** for the reasons stated therein; and the Court
further

**ORDERS** that Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that Plaintiff's First Amendment claims, his Eighth Amendment claims, and his challenge to the constitutionality of Directive 4913 are **DISMISSED;** and the Court further

**ORDERS** that, to the extent that Plaintiff has asserted claims against Defendant in his official capacity, those official-capacity claims are **DISMISSED;** and the Court further

**ORDERS** that Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's Fourteenth Amendment due process claims and with respect to Defendant's qualified immunity defense; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Hummel for all further pretrial matters; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION AND ORDER** [1]

[1]     This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Charles McAllister ("McAllister"), a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), [2] brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Harold Call ("Call"), Vocational Supervisor, Mohawk Correctional Facility ("Mohawk"), violated his constitutional rights under the First, Eighth and Fourteenth Amendments. Am. Compl. (Dkt. No. 64) ¶¶ 33, 34; 4. McAllister initially commenced this civil rights action against defendants Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. Dkt. No. 49. By report and recommendation dated July 6, 2012, (1) all claims against identified defendants

were dismissed; and (2) defendant was directed to join Call, who was identified in the motion papers as a John Doe defendant. Dkt. No. 55; Dkt. No. 58. The report and recommendation was accepted in its entirety, and McAllister was directed to file an amended complaint to "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing—and one Defendant —hearing officer Call." Dkt. No. 58 at 4. McAllister thereafter filed his amended complaint wherein he requested punitive and compensatory damages. Am. Compl. at 4. Presently pending is Call's motion for summary judgment on the amended complaint pursuant to Fed.R.Civ.P. 56. Dkt. No. 74. McAllister did not respond. For the following reasons, it is recommended that Call's motion be granted in part and denied in part.

[2]     McAllister is no longer incarcerated and is currently under the supervision of DOCCS.

## I. Failure to Respond

The Court notified McAllister of the response deadline and extended the deadline for his opposition papers on two occasions. Dkt. No. 75; Dkt. No. 77; Dkt. No. 80. Call also provided notice of the consequence of failing to respond to the motion for summary judgment in his motion papers. Dkt. No. 74–1. Despite these notices and extensions, McAllister did not respond.

**\*3** Summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Thus, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Id.* at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted); *see also Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004) (same). The facts set forth in defendant's Rule 7.1 Statement of Material Facts (Dkt. No. 74–2) are accepted as true as to those facts that are not disputed in McAllister's amended complaint. N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly

supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.").

## II. Background

The facts are reviewed in the light most favorable to McAllister as the non-moving party. *See* subsection III(A) *infra*. At all relevant times, McAllister was an inmate at Mohawk. Am. Compl. ¶ 3.

On or about July 15, 2009, nonparty Correction Officer Femia, pursuant to authorization from nonparty Captain Dauphin, searched McAllister's personal property while McAllister was confined in a secure housing unit ("SHU"). [3] Dkt. No. 74–3, Exh. A, at 14; Am. Compl. ¶¶ 5–6. Femia confiscated approximately twenty documents from McAllister's locker, including five affidavits that were signed by other inmates. Dkt. No. 74–3, Exh. A, at 14. As a result of the search, Femia issued McAllister a Tier III misbehavior report, alleging violations of prison rules 113.15 [4] (unauthorized exchange) and 180.17 (unauthorized assistance). [5] *Id.;* Am. Compl. ¶ 7.

[3]   SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b) (1999). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

[4]   Rule 113.15 provides that "[a]n inmate shall not purchase, sell, loan, give or exchange a personally owned article without authorization." 7 NYCRR 270.2.

[5]   Rule 180.17 provides that "[a]n inmate may not provide legal assistance to another inmate without prior approval of the superintendent or designee. An inmate shall not receive any form of compensation for providing legal assistance." 7 NYCRR 270.2.

McAllister was assigned as his inmate assistant nonparty Correction Officer A. Sullivan. Am. Compl. ¶ 7; Dkt. No. 74–3, Exh. A, at 11. McAllister requested five inmate witnesses,

documents, prison directives 4933 and 4982, and a facility rule book. Am. Compl. ¶ 8; Dkt. No. 74–3, Exh. A, at 11. He also asked Sullivan for permission to retrieve documents from his personal property. *Id.* The requested witnesses were those inmates whose signatures were affixed to the five confiscated affidavits. Dkt. No. 74–3, Exh. A, at 14. Sullivan retrieved the requested materials, and all inmate witnesses agreed to testify. *Id.* at 11.

On or about July 21, 2009, a Tier III disciplinary hearing was held before Call, who served as the hearing officer. Am. Compl. ¶ 10. McAllister pleaded not guilty to both alleged violations. Dkt. No. 74–3, Exh. A, at 38. McAllister objected to the misbehavior report as violative of prison directive 4932 because the copy he was given (1) provided insufficient notice of the charges against him and (2) differed from the report that Call read into the record. *Id.* at 39–41. McAllister stated that his copy did not list the names of the inmates to whom the confiscated affidavits allegedly belonged. *Id.* Call acknowledged the difference between the reports but concluded that the misbehavior report informed McAllister of the charges against him and the bases for the charges. *Id.* at 39, 41–42. McAllister also argued that his copy of the misbehavior report referred to confiscation of twenty documents from his cell, but did not identify the papers that were taken. *Id.* at 42. He contended that the misbehavior report's general reference to "legal work" was insufficient to provide him with notice of the documents to which the report was referring because he had several volumes of legal work. *Id.* at 42, 59. In response to this objection, Call recited the body of the misbehavior report, which described the confiscated documents as "[a]rticles of paper which appear to be legal work including some signed affidavits" and asked McAllister, "[t]hat didn't ring a bell for you? How much paperwork did you have that fit that description?" *Id.* at 42. Call also expressed his belief that the affidavits qualified as legal work. *Id.* at 45, 57–58.

**\*4** McAllister next argued that he did not provide unauthorized legal assistance to another inmate in violation of rule 180.17 because the inmate affidavits were used as evidence to prove that the Division of Parole had a "practice" of "fail[ing] to respond to appeals over the last four years .... " Dkt. No. 74–3, Exh. A, at 45–49, 56. These inmates were aware that their affidavits were created for, and to be used solely in support of, McAllister's case and that they were receiving no legal benefit. *Id.* at 48–49. McAllister further contended that he did not need permission from prison personnel to collect the affidavits. *Id.* at 64.

McAllister also argued that rule 113.15 is ambiguous because it does not list the specific items which, if found in an inmate's possession, would violate the rule. Dkt. No. 74–3, Exh. A, at 54. Finally, to the extent it can be determined from the hearing transcript, McAllister objected to the SHU procedures for handling his personal property. *Id.* at 70.

At the conclusion of the hearing, Call informed McAllister that he would be considering testimony from a confidential witness. Dkt. No. 73–3, Exh. A, at 13, 38, 73. McAllister objected to consideration of confidential testimony without being informed of the contents. *Id.* at 74. Finally, McAllister declined to call the inmates that he had requested as witnesses. *Id.* at 37, 71.

Call found McAllister guilty of violating prison rules 113.15 and 180.17. Dkt. No. 74–3, Exh. A, at 8–9, 76. He imposed a penalty of three months in SHU and three months loss of privileges. *Id.* at 8. Call relied upon the misbehavior report, the confidential testimony, the packet of legal work containing the other inmates' affidavits, and McAllister's testimony and statements. *Id.* at 9.

The disciplinary determination was reversed upon administrative appeal on the ground that the evidence failed to support a finding of guilt. Dkt. No. 74–3, Exh. B, at 79; Exh. C, at 81. In May 2010, McAllister commenced this action pursuant to 42 U.S.C. § 1983.

### III. Discussion [6]

[6]   All unpublished decisions referenced herein are appended to this report and recommendation.

McAllister argues that Call violated his rights under (1) the First Amendment, by (a) retaliating against him by finding him guilty and (b) hindering his access to the courts; (2) the Eighth Amendment, by imposing a three-month SHU assignment, plus ten additional days following reversal of the disciplinary hearing; and (3) the Fourteenth Amendment, because (a) he was given insufficient notice of the charges against him, (b) he was denied advance notice of the use of a confidential witness, (c) he was forced to spend approximately fifty-two days in SHU as a result of the misbehavior report, (d) Call failed to follow certain DOCCS directives and prison regulations, (e) Call demonstrated bias

against him during the Tier III hearing and prejudged his guilt, and (f) he was denied equal protection.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*5** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

Where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 63 of 353
McAllister v. Call, Not Reported in F.Supp.3d (2014)
2014 WL 5475293

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191–92 (2d Cir.2008).

### B. Eleventh Amendment

Call argues that he is entitled to Eleventh Amendment immunity relating to McAllister's claims for money damages against him in his official capacity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because McAllister seeks monetary damages against Call for acts occurring within the scope of his duties, the Eleventh Amendment bar applies.

**\*6** Accordingly, it is recommended that Call's motion on this ground be granted.

### C. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered personally involved if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [7] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

[7]    Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N .Y.2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

As to any constitutional claims beyond those surrounding the denial of due process at the Tier III hearing, the undersigned notes that evaluation of such is unnecessary as it is outside

2014 WL 5475293

of the scope set forth in this Court's prior order. Dkt. No. 58 at 4. However, to the extent that Call acknowledges these claims and provides additional and alternative avenues for dismissal, McAllister fails to sufficiently allege Call's personal involvement in impeding his access to the courts, in violation of the First Amendment. McAllister argues that, as a result of Call's determination that he violated rules 113.15 and 180.17, his legal paperwork was confiscated, which impaired his ability to continue to represent himself in pending state and federal court claims. Am. Compl. ¶¶ 38–40. However, McAllister does not suggest that Call was personally involved in either the search and confiscation of paperwork that led to the filing of the misbehavior report nor the subsequent reduction in his paperwork pursuant to directive 4913. To the contrary, McAllister concedes that the paperwork was reduced pursuant to the directive.

McAllister also fails to sufficiently allege Call's personal involvement in the SHU procedures for storing property or in holding him in SHU for ten additional days following the reversal of the Tier III determination. Call stated that hr had no involvment with the storage of property in SHU. Dkt. No. 74–3, at 5. Call also contended that he "was not responsible for plaintiff's being held in SHU for additional days following the August 26, 2009 reversal of the disciplinary hearing decision of July 22, 2009." *Id.* McAllister does not allege Call's involvement in this delay. McAllister's sole reference to the ten-day delay is his claim that he "was not released from Special Housing until September 4, 2009, approximately 10 days after the reversal" Am. Compl. ¶ 43. This conclusory statement is insufficient to demonstrate Call's personal involvement in an extension of his time in SHU following the reversal of the Tier III determination. *Brown,* 647 F.Supp.2d at 200.

**\*7** Accordingly, it is recommended that Call's motion be granted insofar as McAllister alleges that Call: denied him access to the courts in violation of the First Amendment, was at all involved with the storage of his property while he was in SHU, and caused him to be held an additional ten days in SHU following administrative reversal of the Tier III determination.

### D. First Amendment

McAllister appears to argue that, in retaliation for his filing of grievances and lawsuits, Call found him guilty of misconduct in the Tier III hearing and imposed SHU time.

He suggests that his transfer to SHU, as a result of the Tier III determination, triggered enforcement of his compliance with directive 4913, which impeded his ability to proceed with active legal matters and resulted in dismissals. Am. Compl. ¶ 41. Thus, McAllister also argues that he was denied access to the courts. Am. Compl. ¶ 38. As a preliminary matter, McAllister's First Amendment retaliation and access claims are beyond the scope of the prior order of this Court directing McAllister to limit his amended complaint "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing." Dkt. No. 58, at 4. Regardless, McAllister fails to plausibly allege either retaliation or denial of access to the courts.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St., LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). To survive a motion to dismiss, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Taylor v. Fischer,* 841 F.Supp.2d 734, 737 (W.D.N.Y.2012). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *See Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007).

**\*8** Here, McAllister baldly states that Call's disciplinary determination was imposed in retaliation for his filing of grievances and lawsuits; however, McAllister does not identify these grievances and lawsuits nor does he claim that any of these were lodged against Call. *See generally Ciprazi v. Goord,* No. 02–CV–915, 2005 WL 3531464,

at *9 (N.D.N.Y. Dec. 22, 2005) (dismissing the plaintiff's claim of retaliation where the plaintiff could "point to no complaints lodged by him against or implicating the conduct of [the] defendant ... who issued the disputed misbehavior report."). McAllister also provides no time frame for the apparent grievance and lawsuits. Thus, it cannot be discerned whether or how these unnamed grievances and lawsuits were a "motivating factor" in Call's Tier III determination. *Doyle,* 429 U.S. at 287 (internal quotation marks and citation omitted). McAllister's unsupported, conclusory claim fails to plausibly demonstrate that Call's determination was a product of retaliatory animus.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. *Bounds v. Smith,* 430 U.S. 817, 824 (1977); *Lewis v. Casey,* 518 U.S. 343, 350 (1996) ("The right that *Bounds* acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them." *Lewis,* 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). Second, the plaintiff must demonstrate that he suffered an actual injury. *Id.; Monsky v. Moraghan,* 123 F.3d 243, 247 (2d Cir.1997) (internal citations, quotation marks, and alterations omitted) (quoting *Lewis,* 518 U.S. at 329) ("In order to establish a violation of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, *i.e.,* took or was responsible for actions that hindered a plaintiff's effort to pursue a legal claim"). Thus, a plaintiff must allege that the defendant was "responsible for actions that hindered his efforts to pursue a legal claim." *Davis,* 320 F.3d at 351 (internal quotation marks omitted).

Here, there is insufficient evidence to give rise to a genuine dispute of fact regarding either element of a denial of court access claim. As noted, McAllister merely states that, as a result of the property reduction pursuant to directive 4913, his "ability to continue litigation in Federal and State court caused adverse decisions by the court and dismissals." Am. Compl. ¶ 41. This claim is insufficient to demonstrate that Call was responsible for actions that hindered his legal claims. Insofar as McAllister's claim could be read to suggest that Call denied him access to the courts by confiscating his legal documents, as noted *supra,* McAllister fails to present any plausible facts to support a finding that Call was involved in the initial search

of his property or in the later reduction of his property or that it was maliciously imposed by Call. As noted, the initial cell search which led to the misbehavior report was ordered by Captain Dauphin and executed by Correction Officer Femia. Similarly, McAllister concedes that his property was reduced pursuant to directive 4913. Although McAllister suggests that his transfer to SHU as a result of the Tier III hearing triggered the application of directive 4913, he was transferred to SHU on July 9, six days before the initial cell search occurred. *Id.* ¶ 5. Thus, if McAllister were forced to comply with directive 4913 because of his transfer to SHU, he failed to demonstrate that the compliance arose from the SHU term ordered by Call rather than the unknown incident that resulted in his transfer to SHU on July 9. Further, McAllister failed to establish any actual injury because he did not specify which cases were allegedly dismissed as a result of the property reduction. *See Monsky,* 123 F.3d at 247.

 *9 Accordingly, it is recommended that Call's motion for summary judgment be granted on this ground.

### E. Eighth Amendment

In his amended complaint, McAllister references the Eighth Amendment. Am. Compl. ¶ 31. However, McAllister's only reference to the Eighth Amendment is his assertion that Call's use of a confidential witness violated his Eighth Amendment right to be free from cruel and unusual punishment. However, in support of this argument, McAllister states only that this right was violated when Call stated, "[s]o, um there is a lot of stuff going on through my paperwork and I want to bring it to your attention before we move on ..." *Id.* ¶ 33; Dkt. No. 74–3, at 73. When read in context, it becomes clear that Call made this statement immediately before informing McAllister of his consideration of confidential information. Dkt. No. 73–3, at 73. Although, in referencing this portion of the hearing transcript McAllister alleges that he was subject to cruel and unusual punishment, it appears that McAllister intended to assert that the use of a confidential witness was a due process violation. Even if McAllister had intended to argue that use of a confidential witness violates the prohibition of cruel and unusual punishment, such a claim would necessarily fail because the Eighth Amendment protects an inmate's right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 & 837 (1994). As McAllister makes no claim that he faced conditions of confinement imposing a risk to his health or safety and instead focuses

his argument on notice of a confidential witness, giving McAllister due solicitude, his claim regarding the use of a confidential witness will be incorporated as part of the due process analysis below.

### F. **Fourteenth Amendment**

#### 1. **Due Process**

Well-settled law provides that inmates retain due process rights in prison disciplinary hearings." *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (citing cases). However, inmates do not enjoy "the full panoply of rights" accorded to a defendant in a criminal prosecution. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). For a plaintiff to state a claim that he was denied due process at a disciplinary hearing, the plaintiff "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (per curiam) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). To satisfy the first prong, a plaintiff must demonstrate that the deprivation of which he complains is an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted).

#### a. **Denial of Liberty Interest**

 *\*10* In assessing whether an inmate plaintiff was denied procedural due process, the court must first decide whether the plaintiff has a protected liberty interest in freedom from SHU confinement. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). If the plaintiff demonstrates the existence of a protected liberty interest, the court is then to determine whether the deprivation of this interest "occurred without due process of law." *Id.* at 351, citing *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460–61 (1989). Due process generally requires that a state afford an individual "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Although not dispositive, duration of disciplinary confinement is a significant factor in determining

atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000); *Blackshear v. Woodward,* No. 13–CV–1165, 2014 WL 2967752 (N.D.N.Y. July 1, 2014).

McAllister suggests that his confinement in SHU for forty-two to fifty-five days is a sufficient deprivation that requires procedural protections. Freedom from SHU confinement may give rise to due process protections; however, the plaintiff must allege that the deprivation imposed "an atypical and significant hardship." *Sandin,* 515 U.S. at 484; *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001) (concluding that SHU confinement does not give rise to due process protections where inmate failed to demonstrate atypical hardship while confined). Although the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard (*Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999)), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections. *See e.g. Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (holding confinement in SHU exceeding 305 days as atypical); *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999) (concluding confinement for fewer than 101 days in SHU, plus unpleasant but not atypical conditions, insufficient to raise constitutional claim). Although the Second Circuit has generally held that confinement in SHU for 101 or fewer days without additional indicia of atypical conditions generally does not confer a liberty interest (*Smart v. Goord,* 441 F.Supp.2d 631, 641 (2d Cir.2006)), it has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d 60, 65 (2d. Cir.2004) (citing, *inter alia, Ortiz, 323* F.3d at 195, n. 1).

The undersigned notes that it is unclear what portion of McAllister's relatively brief time in SHU is attributable to the Tier III determination, because it appears that McAllister was already in SHU when the instant disciplinary report was filed. Am. Comp. ¶ 5; Dkt. No. 74–3, Exh. A, at 14. The undersigned also notes that there is no indication that McAllister endured unusual SHU conditions. The only reference McAllister makes to his time in SHU is that, upon his transfer to SHU, several bags of his paperwork were confiscated pursuant to directive 4913. *Id.* ¶ 37. However, review of directive 4913 reveals that the personal and legal

property limit set forth in directive 4913 applies to the general prison population and inmates in other forms of segregated confinement. Dkt. No. 49–2, at 5–19. Thus, the fact that McAllister was forced to comply with directive 4913 does not indicate that he was subjected to conditions more severe than the normal SHU conditions or conditions imposed on the general prison population. Dkt. No. 74–3, Exh. A, at 14.

**\*11** Although the record is largely absent of detail of the conditions McAllister faced in SHU, there is also nothing in the record comparing the time McAllister was assigned and spent in disciplinary confinement with the deprivations endured by other prisoners "in the ordinary course of prison administration," which includes inmates in administrative segregation and the general prison population. *Welch v. Bartlett,* 196 F.3d 389, 394 (2d Cir.1999) (holding that, after *Sandin,* "the relevant comparison concerning duration is between the period of deprivation endured by the plaintiff and periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration, including general population prisoners and those in various forms of administrative and protective custody"). Because "[t]he record does not reveal whether it is typical for inmates not being disciplined to spend similar periods of time in similar circumstances," Call's motion for summary judgment should be denied. *Id.* at 394 (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

Accordingly, it is recommended that defendant's motion for summary judgment on this ground be denied.

#### b. **Procedural Due Process**

Assuming a liberty interest exists, it must be determined whether McAllister was denied due process at his Tier III hearing. Where disciplinary hearings could result in SHU confinement or loss of good time credit, "[i]nmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (citing *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999)); *see also Wolff,* 418 U.S. at 556; *Sira v. Morton,* 380 F.3d 57, 59 (2d Cir.2004).

#### i. **Notice**

McAllister first appears to argue that he was denied procedural due process because the misbehavior report (1) violated unnamed DOCCS rules, regulations, and procedures, and (2) failed to provide him with adequate notice of the charges against him because it did not list the five inmates whose affidavits were confiscated and, thus, impacted his ability to prepare a defense to the charges. Am. Compl. ¶¶ 11–13, 16–17. Although inmates are entitled to advance written notice of the charges, "[t]his is not to suggest that the Constitution demands notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct ...." *Sira,* 380 F.3d at 72 (2d Cir.2004) (citing *Wolff,* 418 U.S. at 564). "[T]here must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.*

First, to the extent that McAllister's argues that the differing disciplinary reports violated unspecified DOCCS rules, regulations, and procedures (Am.Compl.¶¶ 12–13), this claim must fail. A section 1983 claim is not the "appropriate forum" in which to seek review of a violation of a prison regulation. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulation or state law ... the allegations asserted must constitute violations of constitutional due process standards."). Next, McAllister fails to plausibly allege the existence of a question of fact whether the difference between the misbehavior reports deprived him of the ability to identify relevant evidence so that he could prepare a defense. Although McAllister's copy of the report was missing the names of the inmates whose affidavits were confiscated, it informed McAllister of the date, time, and location of the alleged violations; the rules alleged to have been violated; and a description of the documents that were confiscated. *Johnson v. Goord,* 305 Fed. Appx. 815, 817 (2d Cir.2009) (concluding where the inmate's copy of misbehavior report included details of alleged violation and charges against him, a sentence missing from the inmate's copy of report did not violate the inmate's due process rights). It is clear that the discrepancy between the misbehavior reports did not affect McAllister's ability to prepare and present a defense. Prior to the hearing, McAllister requested as witnesses the five inmates whose affidavits were found during the property search. Indeed, the record demonstrates that McAllister was able to both identify the

documents referenced in the misbehavior report and address them at the hearing. Dkt. No. 74–3, Exh. A at 45, 47–48.

**\*12** Thus, because he received sufficient notice of the charges against him and was able to prepare and present a defense on his behalf, McAllister fails to raise a question of fact as to whether he was denied sufficient notice of the charges against him.

### ii. Hearing Officer Bias/Pre-determination of Guilt

McAllister also contends that his procedural due process rights were violated because Call was biased against him and prejudged his guilt. The Fourteenth Amendment guarantees inmates the right to the appointment of an unbiased hearing officer to address a disciplinary charge. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). An impartial hearing officer "does not prejudge the evidence" and is not say "how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard"). However, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Nelson v. Plumley,* No. 9:12–CV–422, 2014 WL 4659327, at \*11 (N.D .N.Y. Sept. 17, 2014) (quoting *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911406, at \* 5 (W.D.N.Y. Oct. 5, 2010) (quoting *Waldpole v. Hill,* 472 U.S. 445, 455 (1985)). However, "the mere existence of 'some evidence' in the record to support a disciplinary determination does not resolve a prisoner's claim that he was denied due process by the presence of a biased hearing officer." *See Smith v. United States,* No. 09–CV–729, 2012 WL 4491538 at \*8 (N.D.N.Y. July 5, 2012).

Prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased." *Allen,* 100 F.3d at 259. "Claims of a hearing officer bias are common in [inmate section] 1983 claims, and where they are based on purely conclusory allegations, they are routinely dismissed." *Washington v. Afify,* 968 F.Supp.2d 532, 541 (W.D.N.Y.2003) (citing cases). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez,* No. 09–CV–

626 (FJS/ATB), 2011 WL 7629513, at \*11 (N.D.N.Y. Mar. 1, 2011) (citing *Francis,* 891 F.2d at 46).

McAllister first argues that Call prejudged his guilt. He supports this contention by pointing to moments during the Tier III hearing where Call expressed his belief that McAllister's possession of affidavits signed by other inmates was sufficient to support a violation of prison rules 113.15 and 180.17. Am. Compl., ¶¶ 13, 15, 23–25, 36. Here, however the challenged affidavits were not evidence that Call prejudged because he had the opportunity to review the affidavits and did so at the hearing. Although McAllister disagreed with Call's opinion that possession of such documents would be a *per se* violation of the rules, Call's assertion of belief in this matter was an opinion he reached following his personal review of this evidence. *See Johnson v. Doling,* No. 05–CV–376, 2007 WL 3046701, at \* 10 (N.D.N.Y. Oct. 17, 2007) (holding that where the "[p]laintiff was provided the opportunity to testify, [and] call and question witnesses .... [d]isagreement with rulings made by a hearing officer does not constitute bias"). Thus, it does not appear that Call prejudged this evidence.

**\*13** To support his claim that Call exhibited bias and partiality against him in the Tier III hearing, McAllister points out that, after he objected to the misbehavior report for failing to provide him sufficient notice of the documents confiscated, Call read the portion of the misbehavior report describing the documents as "[a]rticles of paper which appear to be legal work including some signed affidavits," and stated "that didn't ring a bell for you?" *Id.* ¶¶ 19, 32). When read in context, this statement does not establish bias on Call's part, rather it appears to be a genuine question. Though it may be said that Call could have couched this question in a kinder manner, this statement does not demonstrate bias. Moreover, that the Tier III determination was reversed on appeal, without more, is not evidence of bias or other due process violation. *Eng v. Therrien,* No. 04–CV–1146, 2008 WL 141794, at \*2 (N.D.N.Y. Jan. 11, 2008).

Thus, McAllister fails to plausibly allege the existence question of fact whether Call prejudged his guilt or was otherwise biased in the Tier III hearing.

### iii. Failure to Investigate

McAllister next suggests that he was denied procedural due process because Call declined to interview the law library officer. Am. Compl. ¶ 29. Call permitted McAllister to present

testimony on his behalf and afforded him the opportunity call witnesses. Had McAllister wished to hear testimony from the law library officer, he could have requested the law library officer as a witness. *Wolff,* 418 U.S. at 566 (inmates have a right to call witnesses in their defense at disciplinary hearings). That Call found it unnecessary to independently interview the law library officer—especially where McAllister did not demonstrate that his testimony would be relevant—does not result in a denial of due process because "[t]here is no requirement ... that a hearing officer assigned to preside over a disciplinary hearing conduct an independent investigation; that is simply not the role of a hearing officer." *Robinson v. Brown,* No. 9:11–CV–0758, 2012 WL 6799725, *5 (N.D.N.Y. Nov. 1, 2012).

Accordingly, McAllister fails plausibly raise a due process violation based on Call's alleged failure to investigate.

### iv. **Confidential Witness**

To the extent it can be discerned, McAllister contends that he was denied due process because Call relied on confidential witness testimony, yet failed to provide him with advance notice of the confidential witness and refused to inform him of his or her identity or the nature of the testimony. Am. Compl. ¶¶ 30–34. The Second Circuit has held that a hearing officer must perform an independent assessment of a confidential informant's credibility for such testimony to be considered reliable evidence of an inmate's guilt. *Sira,* 380 F.3d at 78 (noting that, "when sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure fairness to the accused inmate is heightened.").

 **\*14** Here, the record provides no indication that Call independently assessed the credibility and reliability of the confidential witness. The confidential witness form merely states that Call "was provided confidential information relating to the misbehavior report ." Dkt. No. 74–3, at 13. Similarly, Call does not provide whether or how he performed an assessment of the witness's credibility. *Id.* at 4. Therefore, there exist questions of fact whether Call deprived McAllister of due process by relying on this testimony without an independent assessment of the witness's credibility.

To the extent that McAllister argues that he was denied due process by Call's decision to refuse to disclose the content of the confidential witness's testimony, the law in

this circuit provides that where a prison official decides to keep certain witness testimony confidential, he or she "must offer a reasonable justification for their actions, if not contemporaneously, then when challenged in a court action." *Sira,* 380 F.3d at 75 (citing *Ponte v. Real,* 471 U.S. 491, 498 (1985)). Although "[c]ourts will not readily second guess the judgment of prison officials with respect to such matters ... the discretion to withhold evidence is not unreviewable...." *Id.* (citations omitted). Here, Call failed to provide his rationale for refraining to share the substance of this testimony, stating merely that McAllister could not be told the substance of the testimony because "it is by definition it is ... confidential." Dkt. No. 74–3, at 74. As Call presented no reason to justify withholding the identity or substance of the confidential witness's testimony, McAllister presents a viable due process claim based on the nondisclosure of this evidence. *Sira,* 380 F.3d at 76.

Accordingly, Call's motion for summary judgment should be denied on this ground.

### v. **Some Evidence**

"Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence which supports the decision of the [hearing officer]." *Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) (citations omitted). In considering whether a disciplinary determination is supported by some evidence of guilt, "the relevant question is whether there is any evidence in the record [before the disciplinary board] that could support the conclusion reached by the disciplinary board." *Superintendent v. Hill,* 472 U.S. 445, 455–56 (1985) (citations omitted); *Sira,* 380 F.3d at 69. The Second Circuit has interpreted the "some evidence" standard to require "reliable evidence" of guilt. *Luna,* 356 F.3d at 488.

In making his determination, Call relied upon McAllister's testimony and statements, testimony of a confidential witness, the misbehavior report, and the legal documents confiscated during the property search. Dkt. No. 74–3, at 4. As noted, based on the record provided, Call did not perform an independent assessment of the witness's credibility. Thus, Call's reliance on confidential testimony would be insufficient to support a finding of guilt. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (determining that reliance on confidential informant's testimony insufficient to provide "some evidence" of guilt where there was no independent

examination of indicia relevant to informant's credibility). The remaining evidence relied upon—McAllister's testimony, the misbehavior report, and the affidavits—does not constitute some evidence of guilt, as required by the Due Process clause.

**\*15** The affidavits alone do not constitute some evidence of guilt because mere possession of affidavits signed by other inmates would not violate prison rules 113.15 and 180.17 were it true that these documents were McAllister's property and drafted solely for his benefit. Similarly, although a written misbehavior report may serve as some evidence of guilt, such is the case where the misbehavior report charges the plaintiff for behavior that the author of the misbehavior report personally witnessed. *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214 (W.D.N.Y.2010) (citations omitted) (misbehavior report drafted by officer who personally observed plaintiff possess and transfer pieces of sharpened metal to another inmate constituted some evidence of guilt). In this case, where a determination of guilt would appear to turn on knowledge of the ownership of the documents and an understanding of the circumstances under which the papers were drafted, a misbehavior report which merely states that papers appearing to be legal work signed by other inmates were found in McAllister's property, it does not establish a per se violation of rules 113.15 and 180.17. *See Hayes v. Coughlin,* No. 87 CIV. 7401, 1996 WL 453071, at \*3 (S.D.N.Y. Aug. 12, 1996) ("if a misbehavior report can serve as 'some evidence' for a hearing decision and thereby insulate a hearing from review, there would be little point in having a hearing"); *see also Williams v. Dubray,* No. 09–CV–1298, 2011 WL 3236681, at \*4 (N.D.N.Y. July 13, 2011) (holding that there were questions of fact whether the determination was based upon some evidence of guilt where the hearing officer relied on misbehavior report that was based on a corrections officer's unsupported accounts, without additional evidence to support its charges). Thus, absent additional evidence that these papers belonged to other inmates or that McAllister drafted the documents for other inmates' use, the fact that the misbehavior report identified these documents as being found in McAllister's secured property does not constitute reliable evidence of guilt.

Finally, McAllister's testimony does not constitute reliable evidence of guilt. In response to the charge of violating rule 113.15, McAllister testified that the affidavits were his property because he drafted them solely as evidence in his personal litigation against the Department of Probation. Similarly, in defense of the charge for violating rule 180.17,

McAllister repeatedly testified that he did not provide legal assistance to the inmates in question because the affidavits were written solely to serve as supporting evidence in his personal action, the inmates were aware that they would receive no legal benefit as a result, and he did not receive any compensation from the inmates. Regardless whether Call considered McAllister's testimony to be credible, without some other reliable evidence, such as, perhaps, a statement from one of the other inmates claiming that he signed the affidavit under the belief that McAllister would provide him with legal assistance, McAllister's testimony denying violations of the charged prison rules would not constitute some evidence of guilt.

**\*16** Accordingly, it is recommended that Call's motion for summary judgment be denied as to McAllister's procedural due process claim.

### c. **Directive 4913**

McAllister further argues that, as a result of the SHU placement, he suffered an unconstitutional deprivation of his legal and personal property because he was required to comply with the limits set forth in directive 4913. This Court has already ruled upon this claim when it was raised at earlier stages. In deciding Call's motion for summary judgment on the McAllister's first complaint, this Court held that the directive did not violate his Fourteenth Amendment rights:

> Directive # 4913 was reasonably related to valid institutional goals given DOCCS' responsibility to provide for the health and safety of its staff and inmates and the alternatives provided to inmates in being able to seek exceptions and choose which four or five draft bags of material would remain with them. Moreover, the rules were neutral and reasonably related to the ultimate goals of the facility, security and safety.

*McAllister v. Fischer,* 2012 WL 7681635, at \*12 (N.D.N.Y. July 6, 2012) (Dkt. No. 55, at 22–23), *Report and Recommendation adopted by* 2013 WL 954961 (N.D.N.Y. Mar. 12, 2013) (Dkt. No. 58), *appeal dismissed* 2d Cir. 13–

111 (Jan. 13.2014). Further, the Court concluded that directive 4913 "did not violate[ ] McAllister's Fourteen Amendment rights" and was "reasonably related to valid institutional goals." Dkt. No. 55, at 23–24; Dkt. No. 58. Thus, any such claim is barred by the law of the case. *Arizona v. California,* 460 U.S. 605, 618 (1983) (citations omitted); *see also United States v. Thorn,* 446 F.3d 378, 383 (2d Cir.2006) (internal quotation marks and citations omitted) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent cogent and compelling reasons ...."); *Arizona,* 460 U.S. at 618 (citations omitted); *Wright v. Cayan,* 817 F.2d 999, 1002 n. 3 (2d Cir.1987) (citations omitted) ("Even when cases are reassigned to a different judge, the law of the case dictates a general practice of refusing to reopen what has been decided.").

Accordingly, it is recommended that defendant's motion for summary judgment be granted on this ground.

### 2. **Equal Protection**

McAllister's only reference to an equal protection violation in the amended complaint is his conclusory claim that Call's reference to a confidential witness during the Tier III hearing was in violation of his right to equal protection. Am. Compl. ¶ 31. Further, in this Court's previous order, McAllister's equal protection claim was dismissed for failure to demonstrate, among other things, that he was part of a protected class or that he was treated differently from any similarly-situated inmates. Dkt. No. 58, at 4; Dkt. No. 55, at 24–25. Thus, any such claim would also be barred by the law of the case. *Thorn,* 446 F.3d at 383. Regardless, McAllister's equal protection claim must also fail for the reasons discussed *infra.*

**\*17** To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). McAllister has not identified, nor does the record disclose, any basis for a reasonable fact-finder to conclude that he was treated differently from similarly-situated individuals. Rather, plaintiffs only support for his equal protection claim is the following:

Call, throughout the entire disciplinary hearing deprive [sic] plaintiff equal protection when he stated: "This is hearing officer Call, this is 2:21 as I was going through my

paperwork I realized something that I wanted to point out to Mr. McAllister."

Defendant Call discriminated against plaintiff when he stated: "I reviewed it this morning the 22nd when it was received again is confidential"

Am. Compl. ¶¶ 31–32. McAllister does not explain how these statements denied him equal protection. McAllister fails to plausibly suggest that he was treated differently from any similarly-situated individuals. Further, even if these statements demonstrate the existence of questions of fact regarding whether McAllister was treated differently from similarly-situated persons, he fails to identify disparity in the conditions "as a result of any purposeful discrimination directed at an identifiable suspect class." *See Dolberry v. Jakob,* No. 11–CV–1018, 2014 WL 1292225, at \*12 (N.D.N.Y. Mar. 28, 2014).

Accordingly, it is recommended that defendant's motion on this ground should be granted.

### G. **Qualified Immunity**

Call contends that, even if McAllister's claims are substantiated, he is entitled to qualified immunity. The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 555 U.S. 223, 244 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna,* 356 F.3d at 490 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)) (internal quotation marks omitted). This assessment is made "in light of the legal rules that were clearly established at the time it was taken." *Wilson,* 526 U.S. at 614; *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." *Phillips v. Wright,* 553 Fed. Appx. 16, 17 (2d Cir.2014) (citing *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013)).

**\*18**  First, as discussed, McAllister presented a viable due process claim that the determination was not based on some evidence of guilt because Call (1) relied on confidential witness testimony without making an independent assessment of the witness's credibility and (2) did not otherwise have sufficient reliable evidence to support his finding of guilt. McAllister has also raised issues of fact whether the remaining evidence relied upon—the misbehavior report, McAllister's testimony and statements, and the confiscated legal papers—provided reliable evidence of guilt.

Addressing the second prong of the analysis, there is a clearly-established right to procedural due process protections, including the right to have a disciplinary determination be based on some evidence of guilt. There is also a clearly-established right to an independent assessment of confidential witnesses performed where a hearing officer relies on the witness's testimony (*Vasquez v. Coughlin,* 726 F.Supp. 466, 472 (S.D.N.Y.1989) (right clearly established by 1986); see also *Sira,* 380 F.3d at 80). Further, although there is no bright-line for what suffices as "some evidence" in every prison disciplinary proceeding (*Woodard v. Shanley,* 505 Fed. Appdx. 55, 57 (2d Cir.2012)), there were questions of fact surrounding the allegedly reliable evidence demonstrating that McAllister was in possession of other inmates' legal documents or that he provided them with unauthorized legal assistance. *Cf. Turner v. Silver,* 104 F.3d 354, at *3 (2d Cir.1996)* (some evidence to support determination that the defendant violated rule against unauthorized legal assistance where documentary evidence indicated the plaintiff received payment from other inmates, author of misbehavior report testified regarding an interview with informant who implicated defendant, prison official testified that inmate told her he had been charged for law library services and inmate testified the same). Call both failed to perform an independent assessment of the confidential witness's credibility and provided no explanation for why both the identity of the witness and the substance of his or her testimony could not be disclosed to McAllister. *Sira,* 380 F.3d at 75 (citing *Ponte,* 471 U.S. at 498).

Thus, given the state of the law regarding the rights to which an inmate is entitled in his disciplinary hearing, it was not objectively reasonable for Call to have believed that (1) he need not perform an independent assessment of the witness credibility or (2) the misbehavior report, confiscated affidavits, and McAllister's consistent testimony

and statements, without more, sufficiently supported a determination that McAllister violated rules 113.15 and 180.17.

Accordingly, defendant's motion for summary judgment should be denied on this ground.

### IV. **Conclusion**

For the reasons stated above, it is hereby **RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 74) be

**\*19**  1. **GRANTED** insofar as:

   a. dismissing plaintiff's First Amendment claims;

   b. dismissing plaintiff's Eighth Amendment claims;

   c. dismissing plaintiff's challenge to the constitutionality of Directive 4913;

   d. defendant's Eleventh Amendment immunity defense;

2. **DENIED** as to:

   a. plaintiff's Fourteenth Amendment procedural due process claims;

   b. defendant's qualified immunity defense.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'v of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: October 9, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5475293

**McAllister v. Call, Not Reported in F.Supp.3d (2014)**

2014 WL 5475293

---

**End of Document**                                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5437617
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David DOUGLAS, Sr., Plaintiff,

v.

PERRARA, Corr. Officer, Great Meadow
C.F.; Lawrence, Corr. Officer, Great
Meadow C.F.; Whittier, Corr. Officer, Great
Meadow C.F.; Mulligan, Corr. Officer,
Great Meadow C.F.; Deluca, Corr. Sergeant,
Great Meadow C.F.; and Russel, Deputy
Superintendent, Great Meadow C.F, Defendants.

No. 9:11–CV–1353 (GTS/RFT).
|
Sept. 27, 2013.

**Attorneys and Law Firms**

David Douglas, Sr., Liverpool, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Colleen D. Galligan, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### *DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this *pro se* civil rights
action filed by David Douglas, Sr., ("Plaintiff") against the
six above-captioned New York State correctional employees,
are the following: (1) Defendants' motion for partial summary
judgment (requesting the dismissal of Plaintiff's claims
against Defendant Russell, and his claims against the
remaining Defendants in their official capacities); and (2)
United States Magistrate Judge Randolph F. Treece's Report–
Recommendation recommending that Defendants' motion be
granted. (Dkt.Nos.70, 80.) Neither party filed an objection
to the Report–Recommendation, and the deadline by which
to do so has expired. (*See generally* Docket Sheet.) After
carefully reviewing the relevant filings in this action, the
Court can find no clear error in the Report–Recommendation:
Magistrate Judge Treece employed the proper standards,
accurately recited the facts, and reasonably applied the law
to those facts. As a result, the Court accepts and adopts the
Report–Recommendation for the reasons stated therein. (Dkt.
No. 80.)

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Treece's Report–
Recommendation (Dkt. No. 80) is ***ACCEPTED*** and
***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for partial summary
judgment (Dkt. No. 70) is ***GRANTED;*** and it is further

**ORDERED** that the following claims are ***DISMISSED*** from
this action: (a) all claims asserted against Defendant Russell,
and (b) all claims asserted against Defendants in their official
capacities only. The Clerk is directed to terminate Defendant
Russell from this action; and it is further

**ORDERED** that the following claims ***REMAIN PENDING***
in this action: (a) Plaintiff's claim that Defendants Whittier,
Mulligan, Perrara and/or Lawrence subjected him to
inadequate prison conditions by depriving him of meals for
approximately five consecutive days in December 2009, in
violation of the Eighth Amendment; (b) Plaintiff's claim
that Defendants Whittier, Mulligan, Perrara and Lawrence
used excessive force against him, and that Defendant Deluca
failed to protect him from the use of that excessive force,
in violation of the Eighth Amendment and New York State
common law; and (c) Plaintiff's claim that Defendant Deluca
was deliberately indifferent to Plaintiff's serious medical
needs (following the assaults) in violation of the Eighth
Amendment; and it is further

**ORDERED** that Pro Bono Counsel be appointed for the
Plaintiff for purposes of trial only; any appeal shall remain
the responsibility of the plaintiff alone unless a motion for
appointment of counsel for an appeal is granted; and it is
further

**ORDERED** that upon assignment of Pro Bono Counsel, a
final pretrial conference with counsel will be scheduled in
this action before the undersigned, at which time the Court
will schedule a jury trial for Plaintiff's remaining claims as set
forth above against Defendants Whittier, Mulligan, Perrara,
Lawrence and DeLuca. Counsel are directed to appear at the
final pretrial conference with settlement authority from the
parties.

*REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*2** *Pro se* Plaintiff David Douglas brought a civil rights Complaint, pursuant to 42 U.S.C. § 1983, asserting that Defendants violated his constitutional rights while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and housed in the Great Meadow Correctional Facility. Specifically, Plaintiff alleges that in early December 2009, he wrote a letter to Defendant Eileen Russell [1] complaining that he had been denied meals for several days. *See* Dkt. No. 1, Compl. at ¶¶ 8, 64, & 66. Plaintiff further alleges that the remaining Defendants violated his constitutional rights when they used excessive force against him on several occasions and denied him medical care in order to treat the injuries he sustained therewith. *See generally id.* And, according to Plaintiff, Defendant Russell's failure to take disciplinary action against these individuals and curtail their "known pattern of physical abuse of inmates" renders her liable for violating his constitutional rights. *Id.* at ¶ 66.

[1]    Although Plaintiff spells this Defendant's name as "Russel," it is clear from Defendants' submissions that the correct spelling of this individual's name is "Russell" and the Court will refer to her accordingly. Compl. at ¶ 8; Dkt. Nos. 10 & 70–3.

Presently pending is Defendants' Motion for Partial Summary Judgment whereby they seek dismissal of Defendant Russell from this action as well as dismissal of all claims against the remaining Defendants in their official capacities. Dkt. No. 70. A response to that Motion was due on February 22, 2013. To date, the Court has not received a response from Plaintiff.

# I. DISCUSSION

## A. Standard of Review

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v.*

*Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), accord, *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Summary judgment is appropriate "[w]here

Douglas v. Ferrara, Not Reported in F.Supp.2d (2013)

2013 WL 5437617

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Pursuant to the Local Rules of Practice for the Northern District of New York, "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file to serve any papers ... shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown." N.D.N.Y.L.R. 7.1(b)(3). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 70–2), supplemented by Plaintiffs' verified Complaint (Dkt. No. 1), as true. *See Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997).

## B. Personal Involvement

As noted above, Plaintiff brings this civil rights action for alleged violations of his constitutional rights during his incarceration in December 2009 at Great Meadow Correctional Facility. Plaintiff claims that in early December 2009, he was subjected to threats and harassment by other inmates and correctional officers. Compl. at ¶ 1. Plaintiff alleges that beginning on December 11, 2009, he was denied several meals for several consecutive days by unnamed individuals, prompting him to file grievances and write two letters to Defendant Russell. *Id.* at ¶¶ 2–8. [2] Thereafter, on December 16, 2009, Plaintiff's meals were delivered to him and, on the following date, he was moved to protective custody. *Id.* at ¶¶ 9–10. The remainder of Plaintiff's Complaint describes a series of events wherein the remaining Defendants are accused of using excessive physical force against him and denying him medical attention.

[2]      Plaintiff alleges that in addition to filing several grievances he submitted sick call requests and sent letters to the Inspector General, all explaining how

his Eighth Amendment rights were being violated. Compl. at ¶¶ 5–8.

**\*4** With regard to the pending, unopposed Motion, the Court notes that there is a paucity of factual allegations contained in the Complaint concerning Defendant Russell. In fact, the only factual allegation that this Court can point to is that Plaintiff wrote two letters to Defendant Russell complaining about being denied meals. Defendant Russell is not named nor referenced throughout the remainder of the Complaint. Nevertheless, in the section of the Complaint where Plaintiff lists his causes of action, he seemingly seeks to hold Defendant Russell liable for her alleged failure to intervene and take disciplinary action against the Defendants in order to curb their known pattern of physical abuse against inmates. *Id.* at ¶¶ 64 & 66.

According to Defendants' uncontroverted submissions, Defendant Eileen Russell is employed by DOCCS and worked at Great Meadow in 2006 as the Assistant Deputy Superintendent for Special Housing assigned to the Behavioral Health Unit. Dkt. No. 70–3, Eileen Russell Decl., dated Feb. 4, 2013, at ¶¶ 1, 3, & 4. During her tenure in that position, Plaintiff neither worked nor was housed as a patient in the Behavioral Health Unit. Russell Decl. at ¶ 11. Russell did not have any responsibilities related to delivery of meals to inmates nor does she have any recollection of speaking with Plaintiff or seeing any correspondence from him. *Id.* at ¶ 13. Furthermore, at no time was she made aware of any assault against Plaintiff by any DOCCS employee. *Id.* at ¶ 15.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted)). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009).

It appears that Plaintiff seeks to hold Defendant Russell liable due to her employment as a supervisor at Great Meadow. The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if she: (1) directly participated

in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. [3] *Colon v. Coughlin,* 58 F.3d at 873 (citations omitted); *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted).

[3] The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), upon the categories of supervisory liability under *Colon v. Coughlin,* 58 F.3d 865 (2d Cir.1995). *See Grullon v. City of NewHaven,* 720 F.3d 133 (2d Cir.2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.,* 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd,* 387 F. App'x 55 (2d Cir.2010), others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five-factor *Colon* test.

**\*5** Here, the evidence shows that Defendant Russell did not directly participate in any constitutional wrongdoing, she was not aware that Plaintiff had been experiencing any problems with other inmates and staff, in her assignment to the Behavioral Health Unit she did not come into contact with the Plaintiff, and, she was not responsible for creating policies or customs nor for rectifying any of the alleged constitutional infirmities Plaintiff is alleged to have been subjected to. Because Plaintiff failed to respond to Defendants' Motion,

he has not created any material issue of fact regarding Russell's non-involvement in any constitutional wrongdoing. Thus, based upon the record before the Court, we find that Defendant Russell was not personally involved in any wrongdoing and should be **dismissed** from this action. *See Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

### C. Eleventh Amendment

By their Motion, Defendants seek dismissal of claims brought against them in their official capacities. Dkt. No. 70. In making this request, the Defendants note that during the pendency of this action, Plaintiff was released from DOCCS's custody, thereby rendering moot any request he has made for injunctive relief. Dkt. No. 70–4, Defs.' Mem. of Law, at pp. 7–8. After reviewing the Complaint, the Court notes that Plaintiff primarily seeks monetary compensation for both compensatory and punitive damages. *See* Compl. at Relief Requested. In addition, he seeks a declaratory judgment that his rights have been violated, but does not seek other injunctive relief. *Id.*

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 98–101; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.,* 915 F.Supp. 525, 539 (N.D.N.Y.1995)

2013 WL 5437617

(citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

*6 However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends also upon the relief sought in the complaint. The Second Circuit has held that in accordance with *Ex parte Young,* 209 U.S. 123 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606 (citations omitted); *see also Rourke v. New York State Dep't of Corr. Servs.,* 915 F.Supp. at 540. While much of the relief sought herein is compensatory and punitive monetary relief, to the extent Plaintiff seeks some form of declaratory relief, such claims against the Defendants in their official capacities could go forward insofar as the Plaintiff seeks prospective relief. However, in light of his release from DOCCS's custody, the Court finds that any request for prospective injunctive relief is moot and the claims against the remaining Defendants in their official capacities should be **dismissed.** *Khalil v. Laird,* 353 F. App'x 620 (2d Cir.2009) (citing *Muhammad v. City of New York Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997)).

## II. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Partial Summary Judgment (Dkt. No. 70) be **GRANTED** and all claims against Defendant Russell be **DISMISSED** and claims against the remaining Defendants in their official capacities be **DISMISSED;** and it is further

**RECOMMENDED,** that if the above recommendations are accepted, this case be set down for a final pre-trial conference with the parties to assess whether this matter is trial ready; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5437617

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 79 of 353
Barnes v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 1387460

2019 WL 1387460
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Arrello BARNES, Plaintiff,

v.

[Anthony ANNUCCI](), et al.,[1] Defendants.

[1]   Defendants' filings indicate that the correct spelling of defendant Ollies is Anthony Olles, the defendant sued as J. Whitford is John Whiteford, and Donald Venetozzi is Donald Venettozzi. *See* Dkt Nos. 97-7, 97-10, 97-12. Accordingly, the clerk of the court will respectfully be directed to modify the court's records to reflect the proper spellings of the names of these three defendants.

Civil Action No. 9:15-CV-0777 (GLS/DEP)
|
Signed 03/12/2019

**Attorneys and Law Firms**

ARRELLO BARNES, Pro Se, 00-A-0597, Elmira Correctional Facility, P.O. Box 500, Elmira, NY 14902.

FOR DEFENDANTS: HON. LETITIA JAMES, New York State Attorney General, OF COUNSEL: [COLLEEN D. GALLIGAN](), ESQ., Assistant Attorney General, The Capitol, Albany, NY 12224.

ORDER, REPORT, AND RECOMMENDATION

[DAVID E. PEEBLES](), CHIEF U.S. MAGISTRATE JUDGE

 **\*1**  This is a civil rights action brought by plaintiff Arrello Barnes, who is proceeding *pro se* and *in forma pauperis* ("IFP"), pursuant to [42 U.S.C. § 1983](), against several individuals employed by the New York State Department of Corrections and Community Supervision ("DOCCS"). Plaintiff alleges that his First and Fourteenth Amendments rights were violated in connection with a series of incidents that resulted in disciplinary proceedings being brought against him while he was incarcerated at four different correctional facilities operated by the DOCCS.

Currently pending before the court are cross motions brought by the parties, both seeking the entry of summary judgment in their favor. For the reasons set forth below, I recommend that plaintiff's cross motion be denied, defendants' motion be granted, and plaintiff's second amended complaint ("SAC") be dismissed in its entirety.

I. BACKGROUND[2]

[2]   In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in the non-movant's favor. *See [Terry v. Ashcroft](), 336 F.3d 128, 137 (2d Cir. 2003).* Because the parties have filed cross motions for summary judgment, the court draws "all factual inferences ... 'against the party whose motion is under consideration.' " *[Tindall v. Poultney High Sch. Dist.](), 414 F.3d 281, 283-84 (2d Cir. 2005)* (quoting *[Boy Scouts of Am. v. Wyman](), 335 F.3d 80, 88 (2d Cir. 2003)* ) (internal quotation marks omitted).

Plaintiff is a New York State prison inmate currently being held in the custody of the DOCCS. *See generally* Dkt. No. 72; *see also* Dkt. No. 97-4 at 6. Although he is presently confined in the Elmira Correctional Facility ("Elmira"), the events giving rise to this suit transpired at various points between 2011 and 2015, while plaintiff was held in the Sullivan Correctional Facility ("Sullivan"), the Attica Correctional Facility ("Attica"), the Clinton Correctional Facility ("Clinton"), and the Great Meadow Correctional Facility ("Great Meadow"). *See generally* Dkt. No. 72. Each of the discrete incidents that give rise to this suit is more fully described below.

A. The 2011 Assault and the 2012 Tier III Disciplinary Hearing

On August 8, 2011, plaintiff's fellow inmate at Sullivan, George Mims, was assaulted with a razor while he was exercising in the West Yard of that facility. Dkt. No. 97-3 at 65; Dkt. No. 97-4 at 15. As a result of the incident, plaintiff was issued an inmate misbehavior report ("MBR") on August 10, 2011 charging him with violating certain inmate behavior rules. Dkt. No. 97-3 at 52; Dkt. No. 102-5 at 3; *see generally* [7 N.Y.C.R.R. § 270.2](). Plaintiff has denied any role in the assault, asserting that he was working in a different area of the facility at the time the assault occurred. Dkt. No. 97-3 at 234 ("[W]hen this took place[,] I was at work").

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 80 of 353

Barnes v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 1387460

Plaintiff was initially found guilty following a disciplinary hearing held on October 25, 2011 at Sullivan. Dkt. No. 97-3 at 58. That determination was ultimately revisited as a result of a court challenge, and a new hearing was ordered to address the charges associated with the stabbing of inmate Mims. Dkt. No. 97-3 at 58-59.

**\*2** Following the administrative expungement, a second hearing was conducted by defendant Raymond Coveny, a corrections captain, in August and September of 2012, while plaintiff was confined to Attica. Dkt. No. 97-3 at 231-92; Dkt. No. 97-9. In his SAC and his cross motion for summary judgment, plaintiff alleges that although he requested that Officer Connors, Officer Zarrias, and inmate Mims be called as witnesses at the second hearing, defendant Coveny denied each of those requests. Dkt. No. 72 at 9; Dkt No. 102-1 at 1; Dkt. No. 102-3 at 1. According to plaintiff,

> [defendant] Coveny told me 'I will not call officers to testify so they can contradict other officers' after [I] requested two [corrections officers] witnesses. He also refused George Mims to be a witness.[3]

Dkt. No. 102-1 at 1; *but see* Dkt. No. Dkt. No. 97-3 at 280, Dkt. No. 102-5 at 4.

[3]    Plaintiff appears to be referring to following statement made by defendant Coveny during the course of the second hearing:

> [O]kay, I am not missing your point and the point was made and I understand[.] [H]owever[,] I reviewed the video with the assistance [of] Lieutenant Maxwell and I am of the opinion that the person I saw in the video is you[.] Lieutenant Maxwell has testified that the person in the video is you[.] ... [S]o to have a staff member come and state that you[ ] weren't in the yard [when] I already have a staff member that [says] that you were[,] and I personally as the hearing officer have viewed the video and I am convinced that it is you that is in the video.... [they're] going to be denied [as] witnesses.

Dkt. No. 97-3 at 280; Dkt. No. 102-5 at 4.

The documentary evidence adduced by the parties reflects that although inmate Mims provided testimony at plaintiff's original disciplinary hearing, *see* Dkt. No. 97-4 at 23, he refused to testify at the second hearing. Dkt. No. 97-3 at 69. When inmate Mims was asked to specify why he refused to

testify, he stated, "[b]ecause I am not doing it." Id.; Dkt. No. 97-3 at 240-41; *see also* Dkt. No. 102-5 at 5. With respect to Officer Connors, when he was contacted, he indicated that he was not working on the date of the assault, and as a result, defendant Coveny denied plaintiff's request for his testimony as irrelevant. Dkt. No. 97-3 at 279; *see also* Dkt. No. 97-3 at 61. Despite plaintiff's allegation to the contrary, there is no indication in the record that plaintiff sought the testimony of Officer Zarrias at the second hearing.[4] *See generally* Dkt. No. 97-3 at 231-92.

[4]    It appears that plaintiff may be conflating the witness requests made in connection with his initial disciplinary hearing with the witness requests made in connection with his second hearing. *See* Dkt. No. 97-4 at 17.

On September 6, 2012, defendant Coveny dismissed one charge, but found plaintiff guilty of all remaining charges. Dkt. No. 97-3 at 49-50, 290-91. As a result, plaintiff was sentenced to two years of disciplinary special housing unit ("SHU") confinement, coupled with the corresponding loss of certain privileges. Dkt. No. 97-3 at 49.

### B. The 2013 "Return to Sender" Letter and the Tier III Disciplinary Hearing

On January 24, 2013, a letter written by plaintiff to a female friend was returned to the mailroom at Attica, with the envelope having been marked "return to sender." Dkt. No. 97-7 at 2; *see also* Dkt. No. 97-3 at 101. Because "return to sender" mail is frequently used by gang members as a method to communicate within the facility and circumvent scrutiny, the letter was confiscated by prison personnel, who then asked defendant Anthony Olles, a corrections officer and member of the Crisis Intervention Unit ("CIU") at Attica, to review the correspondence to determine whether it contained prohibited gang material. Dkt. No. 97-7 at 1-3. Based upon his training and experience, defendant Olles determined that the "return to sender" letter contained gang codes associated with the Hunta Bloods, a subset of the larger Bloods gang, and issued plaintiff an MBR charging him with violating Rule 105.13.[5] Dkt. No. 97-3 at 100-08; Dkt. No. 97-7 at 3.

[5]    Rule 105.13 is part of Rule Series 105, which addresses an inmate's "Unauthorized Assembly or Activity." 7 N.Y.C.R.R. § 270.2(B)(6). Rule 105.13 provides that "[a]n inmate shall not engage in or encourage others to engage in gang activities or

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 81 of 353

Barnes v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 1387460

meetings, or display, wear, possess, distribute or use gang insignia or materials including, but not limited to, printed or handwritten gang or gang related material." 7 N.Y.C.R.R. § 270.2(B)(6).

**\*3** On January 29 and 30, 2013, a Tier III disciplinary hearing was held before defendant John Whiteford, a senior corrections counselor at Attica.[6] Dkt. No. 97-3 at 293-303; Dkt. No. 97-10 at 1-2. During the hearing, plaintiff requested the testimony of Officer Eric Kentzel,[7] whom plaintiff indicated would testify that plaintiff "did[ not] write that letter" and that "another inmate ... [was] throwing [plaintiff's] name" on correspondence. Dkt. No. 97-3 at 295-99, 301-02; Dkt No. 97-4 at 39, 44-45; Dkt. No. 97-10 at 2. Defendant Whiteford denied plaintiff's request, however, because there was no indication that Officer Kentzel had knowledge or information regarding the specific letter that led to the issuance of the MBR. Dkt. No. 97-4 at 46 ("Irrelevancy, I believe."); Dkt. No. 97-10 at 2-3; Dkt. No. 102-1 at 1; Dkt. No. 102-3 at 1; *see also* Dkt. No. 72 at 10.

[6]   Plaintiff continues to assert in his cross-motion that defendant Whiteford violated his procedural due process rights because he was biased during the hearing. However, that claim was previously dismissed by the court, and it was not re-asserted in plaintiff's SAC. Dkt. No. 70 at 33 ("[D]efendant [Whiteford's] statement did nothing more than advise plaintiff that, if evidence was presented on the record that plaintiff violated rule 105.13, he would be found guilty."); *see also* Dkt. Nos. 72, 75.

[7]   The precise spelling of this officer's name is not clear from the record before the court. *See, e.g.,* Dkt. No. 97-1 at 4 ("Kenzel" and "Kinzel"); Dkt. No. 97-4 at 39 ("Kintzel"); Dkt. No. 97-10 at 2("Kentzel").

At the conclusion of the hearing, defendant Whiteford found plaintiff guilty as charged, and plaintiff was sentenced to one year of disciplinary SHU confinement, coupled with the loss of certain privileges. Dkt. No. 97-3 at 86; *see also* Dkt. No. 97-3 at 299-304.

### C. The 2015 Conspiracy, Gang Material, Grievance, and the Tier III Disciplinary Hearing

On January 29, 2015, members of the CIU at Clinton received confidential information that inmate gang members, including plaintiff, were conspiring to assault security staff

at the facility. Dkt. No. 97-8 at 1-2. As a result of an investigation into the matter, Corrections Officer J. Hanson ("C.O. Hanson") issued plaintiff an MBR charging him with violating multiple inmate behavior rules including, *inter alia*, gang activity and threats on staff. Dkt. No. 97-3 at 116; *see generally* 7 N.Y.C.R.R. § 270.2.

After plaintiff was removed from his cell, defendant Richard J. Mahuta, a corrections officer assigned to the CIU, and another officer conducted a cell search. Dkt. No. 97-3 at 117; Dkt. No. 97-8 at 1-2. In his SAC, plaintiff accused defendant Mahuta of confiscating and discarding three of his religious head coverings. Dkt. No. 72 at 11-12. According to defendant Mahuta, during the course of that cell search, he did not remove or throw away any religious head coverings from plaintiff's cell. Dkt. No. 97-8 at 3. Plaintiff counters by alleging that two other inmates overheard defendant Mahuta state, "[i]sn't [plaintiff] a Blood? What is he doing with kufis?" prior to disposing of those head coverings.[8] Dkt. No. 72 at 12; Dkt. No. 97-4 at 56-57; *compare* Dkt. No. 97-8 at 3 *with* Dkt. No. 102-1 at 2; Dkt. No. 102-5 at 24-25.

[8]   A "kufi" is headgear that is associated with the Muslim religion. *Nicholas v. Tucker,* 89 F. Supp. 2d 475, 477 (S.D.N.Y. 2000).

However, during the cell search, defendant Mahuta discovered three handwritten pages of material that he believed to be prohibited gang material. Dkt. No. 97-8 at 3. Those three pages, along with three Bibles and other materials, were confiscated by defendant Mahuta, who had the materials placed inside a contraband locker for further review at a later time. Dkt. No. 97-8 at 3; Dkt. No. 97-3 at 413-14. Defendant Mahuta ultimately determined that only the three handwritten pages constituted prohibited gang material and issued plaintiff am MBR charging him with possession of that material. Dkt. No. 97-3 at 117.

### 1. Plaintiff's Tier III Disciplinary Hearing and Appeals

**\*4** Between February 5, 2015 and February 27, 2015, defendant Kenneth McKeighan, an industrial superintendent at Great Meadow, conducted a Tier III disciplinary hearing with respect to the two MBRs. Dkt. No. 97-5; Dkt. No. 97-6; *see also* Dkt. No. 97-3 at 116-117. At the hearing, plaintiff requested, *inter alia*, the testimony of his brother, Exondus Barnes who, plaintiff asserted, would testify that he was the author of the three handwritten pages of material confiscated

Barnes v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 1387460

during the cell search. Dkt. No. 97-5 at 5; Dkt. No. 97-6 at 8, 17-18; *see also* Dkt. No. 97-3 at 115. Defendant McKeighan denied the request as irrelevant, however, because plaintiff was charged with possession of the materials, and thus the question of authorship was not relevant. [9] Dkt. No. 97-3 at 119; Dkt. No. 97-4 at 66-68; Dkt. No. 97-6 at 33-34; Dkt. No. 97-11 at 3.

[9]     Specifically, defendant Mahuta charged plaintiff with violating Rule 105.13 of the standards of inmate behavior. *See* footnote 5, *supra*; *see also* 7 N.Y.C.R.R. § 270.2(B)(6).

At the hearing, plaintiff also requested copies of the "call outs" or "yard go-arounds" for Clinton, contesting that those materials would demonstrate that he was not in the yard with his co-conspirators during the relevant times. Dkt. No. 97-5 at 5-6. Although defendant McKeighan initially reserved decision regarding plaintiff's request, he ultimately denied it after C.O. Hanson testified that no such document existed at Clinton. Dkt. No 97-6 at 4. Nonetheless, defendant McKeighan obtained "program sheets" for the relevant time, Dkt. No. 97-5 at 126-154, and compiled that information into a spreadsheet, which showed that plaintiff and his co-conspirators were in fact together on the evening of January 19, 2015. [10] Dkt. No. 97-5 at 218; *see also* Dkt. No. 97-6 at 18-19.

[10]     January 19, 2015 is a significant date because it is the day after prison officials at Clinton used force against a suspected Bloods gang member. Dkt. No. 97-8 at 2; Dkt. No. 97-11 at 2. Defendants theorize that plaintiff and fellow inmates attempted to plan the assaults on prison staff in retaliation for the use of force. Dkt. No. 97-5 at 36; Dkt. No. 97-11 at 2, 4.

Plaintiff also requested that video footage from Clinton's North Yard be provided at the hearing, arguing that it would show that he was not in the area during the relevant time, thereby undercutting the claims made by the confidential informant. *See, e.g.*, Dkt. No. 97-5 at 6, 11. Defendant McKeighan's denial of that request was two-fold. First, he noted that the video footage simply did not exist inasmuch as by the time the conspiracy had been uncovered, the video footage had been recorded over. Dkt. No. 97-3 at 397; Dkt. No. 97-5 at 6; Dkt. No. 97-6 at 3. Second, he noted that even if footage of the North Yard existed, that footage would have shown only a general view of the North Yard instead of focusing on any particular group of people, and he believed

the footage likely would have been "inconclusive." Dkt. No. 97-3 at 397; Dkt. No. 97-6 at 3, 10, 12.

At the conclusion of the hearing, defendant McKeighan found plaintiff guilty as charged. Dkt. No. 97-3 at 110-115. Plaintiff was sentenced to 910 days of disciplinary SHU confinement, coupled with the loss of certain privileges. Dkt. No. 97-3 at 110; *see also id.* at 114 ("Due to the nature of the entire incident and the fact your actions would have resulted in the injury to the staff and would have likely disrupted the entire facility and DOCCS in general, I have exceeded the recommended confinement guidelines considerably.").

Following the conclusion of the hearing, plaintiff filed a series of appeals challenging defendant McKeighan's determination. Dkt. No. 97-3 at 340-99; *see also* Dkt. No. 97-12 at 3. On May 12, 2015, defendant Donald Venettozzi, the Director for the DOCCS Special Housing/ Inmate Disciplinary Program, affirmed the finding of guilt, but reduced plaintiff's penalty from 910 days to twelve months of disciplinary SHU confinement. Dkt. No. 97-3 at 341-42; Dkt. No. 97-12 at 4.

**\*5** In addition to addressing one of his appeals to defendant Anthony Annucci, the Acting Commissioner of the DOCCS, *see* Dkt. No. 97-3 at 344, plaintiff also sent defendant Annucci a letter on April 1, 2015, complaining that his due process rights were violated at the hearing. Dkt. No. 97-3 at 348-49; Dkt. No. 97-13 at 2; *see also* Dkt. No. 102-1 at 2. Defendant Annucci did not respond to plaintiff's appeal or letter or undertake any investigation as a result of plaintiff's correspondence. Dkt. No. 97-13 at 2.

## 2. Plaintiff's Grievance

On February 20, 2015, plaintiff filed a grievance in connection with defendant Mahuta's cell search, stating

On 1/29/15, my cell [was] searched by [defendant] Mahuta at [Clinton] ..., and my letters, Bible, etc. were confiscated for review. After the paper [was] review[ed], I received a misbehavior report for only [three] papers. [T]he Bible, address book, etc., were [not deemed] gang material.

I did not receive[ ] my documents [back] as of yet.

Action requested: for my papers, bible, etc. to be return[ed] to me.

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 83 of 353

Barnes v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 1387460

Dkt. No. 97-3 at 403 (errors in original); *see also* Dkt. No. 97-4 at 75. It appears that prison personnel were initially confused with respect to the nature of the relief plaintiff sought, as well as the location of plaintiff's property, because in initially denying plaintiff's grievance, the superintendent stated that "[t]he items in question were deemed to be contraband and as such were properly disposed of." Dkt. No. 97-3 at 404, 442. In his appeal of the grievance determination to the DOCCS Central Office Review Committee ("CORC"), plaintiff explained that he was seeking the return of only those materials that were determined not to constitute gang-related contraband. Dkt. No. 97-3 at 404-05. While plaintiff's appeal was pending before the CORC, the materials that he sought were returned to him, *see* Dkt. No. 97-3 at 400, 413, 418, 442, although plaintiff has denied ever having received those materials back from prison officials. Dkt. No. 97-4 at 77.

II. PROCEDURAL HISTORY

Plaintiff commenced this action on or about June 25, 2015, by the filing of a complaint accompanied by an application for leave to proceed IFP and a motion for a preliminary injunction. Dkt. Nos. 1, 2, 4. Although plaintiff's original IFP application was denied by the court as incomplete, his subsequent motion for leave to proceed without prepayment of fees was granted. Dkt. Nos. 5, 6, 10.

By decision and order dated September 17, 2015, Senior District Judge Gary L. Sharpe denied plaintiff's motion for preliminary injunctive relief. Dkt. No. 10. In addition, he reviewed plaintiff's complaint pursuant to 28 U.S.C. §§ 1915(e), 1915A and dismissed a number of claims and defendants from the action. *See generally id.*

On October 26, 2015, and prior to service upon defendants, plaintiff filed an amended complaint ("FAC"), which was accepted by Judge Sharpe because it was deemed "a pleading which reflects the [c]ourt's rulings in the [initial] order." Dkt. No. 17. In response to plaintiff's FAC, defendants filed a motion on September 21, 2016, seeking its dismissal for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 30.

On July 14, 2017, I issued a report, which recommended the dismissal of various claims and several defendants from the action. *See generally* Dkt. No. 70. In addition, in light of my recommendation that multiple claims and defendants be dismissed from the action, I further recommended that

plaintiff be afforded an opportunity to file a SAC. *Id.* at 41. Although neither party filed any objections to my report, before Judge Sharpe had an opportunity to review it, plaintiff availed himself of my recommendation and filed his SAC on July 24, 2017. Dkt. No. 72. On September 1, 2017, Judge Sharpe issued an order adopting my report and recommendation in its entirety. Dkt. No. 75.

**\*6** Plaintiff's SAC was referred to me for review to determine whether the deficiencies that were discerned in my July 14, 2017 report and recommendation had been cured by the filing of plaintiff's SAC. Dkt. No. 76. Following my review, I issued a report and recommendation on September 22, 2017, recommending that plaintiff's SAC be accepted for filing, but that various of plaintiff's claims be dismissed. Dkt. No. 76. By decision and order dated October 19, 2017, Judge Sharpe adopted my report and recommendation in its entirety over plaintiff's objections. Dkt. Nos. 77, 78. As a result of these rulings, the following four claims survived and proceeded to discovery: (1) Fourteenth Amendment procedural due process claim against defendants Coveny, Whiteford, and McKeighan; (2) First Amendment free speech claim against defendants Olles and Mahuta; (3) First Amendment free exercise claim against Mahuta; and (4) Fourteenth Amendment procedural due process claim against defendants Annucci and Venettozzi in their supervisory capacities. *See id.* at 3.

On January 23, 2018, following the close of discovery, defendants filed a motion for summary judgment, seeking dismissal of plaintiff's claims on various grounds, both procedural and on the merits. Dkt. No. 97. Plaintiff has opposed defendants' motion and cross moved for summary judgment in his favor. Dkt. No. 102. Defendants have submitted papers in opposition to plaintiff's motion and in further support of their motion. Dkt. No. 103. The parties' motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III. DISCUSSION

A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure, which provides that the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material

Case 9:17-cv-00366-DNH-TWD Document 93 Filed 03/08/21 Page 84 of 353

Barnes v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 1387460

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Plaintiff's Failure to Exhaust Administrative Remedies [11]

[11] As will be seen, because I recommend that each of plaintiff's claims be dismissed, have elected not to address defendants' alternative argument that they are shielded by the doctrine of qualified immunity. Dkt. No. 97-4 at 31-33.

*7 Defendants contend that plaintiff failed to fully exhaust his administrative remedies with respect to his First Amendment free speech claim against defendants Olles and Mahuta and his First Amendment free exercise claim against Mahuta. Dkt. No. 97-14 at 12-15. As a result of plaintiff's failure, defendants argue, those claims must be dismissed. *Id.*; *see also* Dkt. No. 103 at 4-5. In his cross motion, plaintiff does

not acknowledge defendants' argument, instead focusing his opposition on the underlying merits of the First Amendment claims defendants Olles and Mahuta. *See generally* Dkt. No. 102.

### 1. Generally

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is mandatory and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed to fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *see also Wilson v. McKenna*, 661 F. App'x 750, 752 (2d Cir. 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007). [12]

[12] While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted) ).

In New York, the DOCCS has instituted a grievance procedure, designated as the Inmate Grievance Program ("IGP"), for use by prison inmates to lodge complaints

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 85 of 353

Barnes v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 1387460

regarding the conditions of their confinement. *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1, 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC") [13] have up to sixteen days after the grievance is filed to informally resolve the issue. 7 N.Y.C.R.R. § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. 7 N.Y.C.R.R. § 701.5(b)(2).

[13]    The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

**\*8** A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal. [14] 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

[14]    Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of the appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

The third and final step of the IGP involves an appeal to the CORC, which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. 7 N.Y.C.R.R. § 701.5(d)(2)(i), (ii).

Where an inmate's grievance complains of employee harassment, the grievance is forwarded directly to the superintendent, bypassing the IGRC review. 7 N.Y.C.R.R. § 701.8(b), (c). The superintendent then has twenty-five days from the date of its receipt to render a decision. 7 N.Y.C.R.R. § 701.8(f). An inmate may appeal the superintendent's decision to the CORC within seven days of its receipt. 7 N.Y.C.R.R. § 701.8(h).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/or superintendent do not timely respond, an inmate is permitted to appeal "to the next step." 7 N.Y.C.R.R. § 701.6(g)(2). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (internal quotation marks omitted) ).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availab[ility] of administrative remedies." (alteration in original) (internal quotation marks omitted) ). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001) ) (internal quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA. [15] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 86 of 353

Barnes v. Annucci, Not Reported in Fed. Supp. (2019)
2019 WL 1387460

15    According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

### 2. Analysis

**\*9** During his deposition, plaintiff testified that he had filed "a lot" of grievances during his time in DOCCS custody. Dkt. No. 97-4 at 71-72; *see* Dkt. No. 97-3 at 28-44. Although he did not believe that the number of grievances that he had filed reached the "triple digits," he speculated that it was approaching fifty to sixty grievances. Dkt. No. 97-4 at 72. Plaintiff expressed a general understanding that the use of the inmate grievance process was necessary to effectively "exhaust [his] remedies." Dkt. No. 97-4 at 78.

During his deposition, plaintiff was asked whether he had filed a grievance regarding the allegation that defendant Olles violated plaintiff's First Amendment right to free speech by his unjustified confiscation of plaintiff's "return to sender" letter in January of 2013. *See* Dkt. No. 72 at 9; Dkt. No. 97-4 at 72-73. In response, plaintiff indicated that he was unable to specifically recall whether he had, but that he did not "see why [he] would" have filed one. Dkt. No. 97-4 at 72-74. Because plaintiff effectively concedes that he did not file a grievance with respect to this incident, I can easily conclude that he failed to exhaust his administrative remedies prior to commencement.

With respect to plaintiff's free exercise and free speech claims against defendant Mahuta, both of which arise out of the January 29, 2015 search of plaintiff's cell, plaintiff acknowledged that he filed only one grievance arising out of that incident on February 20, 2015 (GM 59,129-15). Dkt. No. 97-3 at 403; Dkt. No. 97-4 at 75-76. According to that grievance,

> On 1/29/15, my cell [was] searched by [defendant] Mahuta at [Clinton] ..., and my letters, Bible, etc. were confiscated for review. After the paper [was] review[ed], I received a misbehavior report for only [three] papers. [T]he Bible, address book, etc., were [not deemed] gang material.
>
> I did not receive[ ] my documents [back] as of yet.
>
> Action requested: for my papers, bible, etc. to be return[ed] to me.

Dkt. No. 97-3 at 403 (errors in original). When prison officials appeared to initially misapprehend which materials he sought to have returned, in an appeal to the CORC on August 24, 2015, plaintiff stated:

> If you review the 1/29/15 [inmate misbehavior report], only 3 pages were confiscated, which was the only material I was found guilty on. The contraband list which stated my Bible, letters, phone book, etc. were being review which Dep. Brendel could verify. The review[ed] material was never charged on the misbehavior report.... [T]he I.G.R.C. staffs are merely covering up the fact that grievant['s] property was stolen.

Dkt. No. 97-3 at 404-05 (errors in original). Plaintiff's grievance and appeal to the CORC makes no mention of religious headwear. *See generally id.* Plaintiff's grievance also fails to indicate that he believed the seizure of the three pages of material was in violation of his First Amendment rights. *See generally id.* Instead, plaintiff's grievance solely seeks the return of those materials that prison personnel determined did not constitute gang-related material. *See generally id.*

Consistent with the objectives of the PLRA, "inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson*, 380 F.3d at 697. In determining whether exhaustion has been achieved, the standard for determining the sufficiency of an administrative grievance is analogous to that of notice pleading. *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006) (citing *Johnson*, 380 F.3d at 697).

**\*10** Although it is "appropriate to afford *pro se* inmates a liberal grievance pleading standard, the grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally." *Brownell*, 446 F.3d at 310; *see also Singh v. Lynch*, 460 F. App'x. 45, 47 (2d Cir. 2012); *Turner v. Goord*, 376 F. Supp. 2d 321, 324 (W.D.N.Y. 2005) ("[T]he mere fact that [the] plaintiff filed some grievance, and fully appealed all the decisions on that grievance, does not automatically mean

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 87 of 353

Barnes v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 1387460

that he can now sue anyone who was in any way connected with the events giving rise to that grievance."). Even affording plaintiff the appropriate lenity as a *pro se* litigant, plaintiff's grievance failed to describe any First Amendment concern arising out of defendant Mahuta's cell search.

Although it is true that "a claim may be exhausted when it is closely related to, but not explicitly mentioned in an exhausted grievance," *Simmons v. Robinson*, No. 07-CV-7383, 2011 WL 31066, at *4 (S.D.N.Y. Jan. 4, 2011) (citing *Espinal v. Goord*, 55 8 F.3d 119, 128 (2d Cir. 2009) ), I am unable to conclude that the sole grievance filed by plaintiff provided the facility with sufficient information to permit an investigation of his concerns regarding the disposal of religious headwear or the seizure of three pages of gang-related material. [16] Instead, it is clear from plaintiff's grievance that his primary concern was with securing the return of his non-gang related material. Dkt. No. 97-3 at 403-05. Accordingly, because plaintiff's grievance failed to provide the facility enough information to investigate his free speech and free exercise concerns, plaintiff's February 20, 2015 grievance was not sufficient to exhaust his administrative remedies prior to commencement of this action. *See, e.g., Dailey v. Fuller*, 15-CV-1051, 2016 WL 7732236 *7-*8 (Dec. 5, 2016) (Dancks, M.J.), *report and recommendation adopted by* (N.D.N.Y. Jan 11, 2017) (Sannes, J.); *Wright v. Potter*, No. 14-CV-01041, 2016 WL 5219997, at *5 (Jun. 28, 2016) (Dancks, M.J.), *report and recommendation adopted by* 2016 WL 5173283 (Hurd, J.) (N.D.N.Y. Sept. 21, 2016).

[16]    Copies of all unreported decisions have been appended for the convenience of the *pro se* plaintiff.

This, of course, does not end the court's inquiry with respect to exhaustion. Plaintiff, however, has not claimed that the IGP process was unavailable to him during the relevant times periods. To the contrary, the record evidence indicates that plaintiff was able to successfully navigate the grievance procedure while housed in a SHU at a different facility.

Accordingly, the undisputed facts in this case reveal that with respect to his First Amendment claims, plaintiff failed to fully comply with the IGP prior to the commencement of this action, despite his remedies remaining available to him at all relevant times. I therefore recommend that defendants' motion for summary judgment on this basis be granted on this procedural basis. [17]

[17]    In light of this recommendation, I have elected not to address defendants' alternative argument on the merits.

C. Due Process

Defendants contend that plaintiff was afforded adequate due process during the disciplinary proceedings conducted by defendants Coveny, Whiteford, and McKeighan. Dkt. No. 97-14 at 21-28. In his cross motion, plaintiff disagrees, and asserts that defendants' decisions deprived him of procedural due process in connection with each of his Tier III disciplinary hearings. *See generally* Dkt. No. 102.

1. Generally

To establish a procedural due process claim under section 1983, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). Much like their prior motions, defendants do not seek dismissal of any of plaintiff's due process claims on the basis that he was not denied a constitutionally significant liberty interest, *see generally* Dkt. No. 97-14 at 21-28, and as a result the court will not address that issue. Instead, defendants' argument is focused on whether plaintiff was deprived of a liberty interest without being afforded sufficient process. *See generally id.*

 *11  The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell*, 418 U.S. 539 (1974). In its decision in *Wolff*, the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-69; *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must also garner the support of at least "some evidence." *Superintendent,*

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 88 of 353

Barnes v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 1387460

*Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna*, 356 F.3d at 487-88.

The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to ... an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing, *inter alia, Wolff*, 418 U.S. at 570-71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen*, 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* (citing *Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir. 1996); *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ). "A hearing officer may satisfy the standard of impartiality if there is *'some evidence* in the record' to support the findings of the hearing." *Allred v. Knowles*, No. 06-CV-0456, 2010 WL 3911414, at *5 (W.D.N.Y. Oct. 5, 2010) (emphasis in original) (quoting *Hill*, 472 U.S. at 455).

### a. Defendant Coveny

According to plaintiff, defendant Coveny violated his due process rights during the second hearing by improperly denying his request to call Officer Connors, Officer Zarrias, and inmate Mims as witnesses. Dkt. No. 72 at 9 (first cause of action); *see also* Dkt. No. 102 at 11. Although due process includes the "right of an inmate to call and present witnesses and documentary evidence in his defense before the disciplinary board," that right is not unfettered. *Ponte v. Real*, 471 U.S. 491, 495 (1985). An inmate's right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *See Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991).

In this case, after an exhaustive review of the record evidence, I conclude that no reasonable factfinder could conclude that defendant Coveny violated plaintiff's due process rights at the second hearing. First, with respect to plaintiff's alleged request to call Officer Zarrias, although it appears plaintiff did call him as a witness for the initial hearing, there is no record evidence that plaintiff sought his testimony in connection with the second hearing. Dkt. No. 97-4 at 17-18; *see* Dkt. No. 97-9

at 3. Plaintiff cannot now turn his own lack of diligence into a constitutional deprivation. *See, e.g., Hasan Jamal Abdul Majid v. Henderson*, 533 F. Supp. 1257, 1273 (N.D.N.Y.) (Munson, C.J.) (concluding that due process was not violated where the inmate failed to request witnesses at or before the hearing), *aff'd mem.*, 714 F.2d 115 (2d Cir. 1982).

**\*12** In addition, although plaintiff requested testimony from inmate Mims, who had also testified at the initial hearing, that witness refused to provide testimony at the second hearing and declined to elaborate on the reasons for his refusal beyond "[b]ecause I am not doing it." Dkt. No. 97-3 at 69. Courts in this circuit have routinely held that a hearing officer's failure to call a fellow inmate who refuses to testify does not offend procedural due process. *See, e.g., Caimite v. Venettozzi*, No. 17-CV-0919, 2018 WL 6069458, at *5 (Oct. 29, 2018) (Hummel, M.J.), *report and recommendation adopted by* 2018 WL 6068414 (N.D.N.Y. Nov. 20, 2018) (Sharpe, J.); *Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *6 (S.D.N.Y. Feb. 17, 2015); *Hinton v. Prack*, No. 12-CV-1844, 2014 WL 4627120, at *7 (N.D.N.Y. Sept. 11, 2014) (Kahn, J.) ("The fact that these witnesses refused to testify on [the plaintiff's] behalf does not alter the fact that he was given the opportunity to call witnesses.").

Finally, with respect to the testimony of Officer Connors, the record reveals that plaintiff's request to call him as a witness was initially granted and defendant Coveny contacted him to "make arrangement for [his] testimony." Dkt. No. 97-3 at 234, 241. In response to being contacted to provide "confidential testimony" for the proceeding, however, Officer Connors indicated that "he was not working on the date of [the] alleged incident." Dkt. No. 97-3 at 279. As a result, defendant Coveny properly denied plaintiff's request based upon a finding that the officer could not provide relevant evidence. Dkt. No. 97-3 at 85; *see* Dkt. No. 97-9 at 2-3; *see also Kalwasinski v. Morse*, 201 F.3d 103, 109 (2d Cir. 1999). ("[A] hearing officer does not violate due process by excluding irrelevant or unnecessary testimony.").

Accordingly, because no reasonable factfinder could conclude that defendant Coveny violated plaintiff's procedural due process rights, I recommend that the claim against defendant Coveny be dismissed.

### b. Defendant Whiteford

2019 WL 1387460

Plaintiff alleges that defendant Whiteford violated his due process rights during the January 2013 disciplinary hearing when he denied his request to call Officer Kentzel as a witness. Dkt. No. 72 at 9-10 (third cause of action); *see also* Dkt. No. 102-1 at 1. According to plaintiff, Officer Kentzel would have testified that plaintiff did not write the "return to sender" letter and that there was another inmate that was "throwing [plaintiff's] name" on correspondence. Dkt. No. 97-3 at 295-99, 301-02; *see also* Dkt. No. 97-10 at 2.

During the disciplinary hearing, Sergeant O'Connell stated that he had compared the handwriting and signature on the "return to sender" letter with correspondence known to be written by plaintiff, and concluded that plaintiff was the author of the letter at issue. Dkt. No. 97-3 at 299-300. Sergeant O'Connell's testimony provided defendant Whiteford with a rational basis for concluding that Officer Kentzel's testimony would have been irrelevant or unnecessary. Dkt. No. 97-4 at 46 ("Irrelevancy, I believe."); *see also* Dkt. No. 97-10 at 2-3. Defendant Whiteford believed that Officer Kentzel did not have "any knowledge of the actual letter at issue in the hearing and whether or not it had been authored by plaintiff." Dkt. No. 97-10 at 3.

Based upon the record evidence, no reasonable juror could find that defendant Whiteford violated plaintiff's due process rights by denying his request to call Officer Kentzel. *See Delee v. Hannigan*, 729 F. App'x 25, 31 (2018) ("[D]efendants had the right to refuse to hear irrelevant testimony from witnesses with no personal knowledge.") (citing 7 N.Y.C.R.R. § 253.6(c); *Kingsley*, 937 F.2d at 30 (2d Cir. 1991) ); *see also Kalwasinski*, 201 F.3d at 109. I note moreover, courts have been cautioned not to "second guess" a hearing officer's decision to deny an inmate's witness requests where the hearing officer articulates a basis for his decision. *See Wolff*, 418 U.S. at 566 (explaining that courts "should not be too ready to exercise oversight and put aside the judgment of prison administrators").

**\*13** Because no reasonable factfinder could conclude that defendant Whiteford violated plaintiff's procedural due process rights by refusing to call Officer Kentzel, I recommend that the claim against him be dismissed.

### c. Defendant McKeighan

Plaintiff alleges that defendant McKeighan violated his due process rights in connection with the February 2015

disciplinary proceeding by (1) denying plaintiff's request to call his brother as a witness; (2) permitting the admission of fabricated evidence; and (3) denying plaintiff's request for video footage. Dkt. No. 72 at 10-11 (sixth cause of action); Dkt. No. 102-4 at 12.

First, when the search of plaintiff's cell uncovered three pages of gang-related material, plaintiff was charged with violating Rule 105.13 of the standards of inmate behavior, *see* Dkt. No. 97-3 at 182, which prohibits possessing gang-related material. Although plaintiff wished to call his brother to testify that he was the author of the three pages in question, defendant McKeighan determined that the testimony would be irrelevant in light of the fact that plaintiff was charged with possession—not authorship—of the material in question. Defendant McKeighan's decision to deny plaintiff's request to call his brother as a witness was well within the discretion of the hearing officer, and comports with procedural due process. *See Kalwasinksi*, 201 F.3d at 108-09.

Next, there is no merit to plaintiff's allegation that defendant McKeighan permitted the admission of evidence that was purportedly fabricated, and this allegation evinces plaintiff's misapprehension of the evidence that was provided pursuant to his own request. Plaintiff requested copies of what he referred to as "call outs" or "yard go-arounds" for Clinton which, he asserted, would demonstrate that he was not in the yard with his co-conspirators during the relevant times. Dkt. No. 97-5 at 5-6. After defendant McKeighan determined that no such documents existed, he instead obtained "program sheets" for the relevant period. Dkt. No. 97-5 at 126-154. Defendant McKeighan then compiled the information on the "program sheets" into a spreadsheet, so that he could readily ascertain whether plaintiff and his co-conspirators were together the evening of January 19, 2015. Dkt. No. 97-5 at 218; *see also* Dkt. No. 97-6 at 18-19. The undisputed evidence demonstrates that a meaningful effort was made to locate the information that plaintiff sought, although it was not in the precise form requested.

Finally, to the extent that defendant McKeighan denied plaintiff's request for certain video footage, the record is clear that the evidence did not exist inasmuch as it had been taped over in the normal course of business by the time the conspiracy had been uncovered. Accordingly, because no reasonable factfinder could conclude that defendant McKeighan violated plaintiff's procedural due process rights, I recommend that the claim against him be dismissed.

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 90 of 353

Barnes v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 1387460

D. Supervisory Liability [18]

[18] If the above-described recommendation regarding plaintiff's due process claims is adopted by Senior District Judge Sharpe, there is no remaining underlying cause of action upon which to hold defendants Annucci and Venettozzi liable in their capacities as supervisors. *See Blyden v. Mancusi, 186 F.3d 252, 265 (2d Cir. 1999)* ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation."); *see also, e.g., Caimite v. Venettozzi, 17-CV-0919, 2018 WL 6069458, at \*5 (Oct. 29, 2018)* (Hummel, M.J.), *report and recommendation adopted by 2018 WL 6068414* (Sharpe, J.). However, this ground has not necessarily been advanced by defendants in support of their motion for summary judgment. *See generally* Dkt. No. 97.

**\*14** Defendants argue that plaintiff's supervisory liability claim against defendant Annucci must be dismissed because there is no evidence that he was personally involved in the review or determination of plaintiff's appeals. Dkt. No. 97-14 at 29. Defendants further argue that plaintiff's supervisory liability claims against defendant Venettozzi must be dismissed because there is no proof that he was aware of any alleged underlying constitutional violation. Dkt. No. 97-14 at 30-31. Plaintiff asserts in his cross motion that defendant Annucci "did not remedy the wrong acts" and defendant Venettozzi "affirmed or modified" the procedural due process violations. *See generally* Dkt. No. 102.

1. Supervisory Liability - Generally

It is well-established that a defendant cannot be liable under section 1983 solely by virtue of being a supervisor, " 'and [liability] cannot rest on respondeat superior.' " *Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003)* (quoting *Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003)* ); *see also Wright, 21 F.3d at 501.* To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who

caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty, 490 F.3d 143, 152-53 (2d Cir. 2007)*, *rev'd on other grounds sub nom. Ashcroft v. Iqbal, 556 U.S. 662 (2009)*; *see also Richardson, 347 F.3d at 435*; *Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)*; *Wright, 21 F.3d at 501.* [19]

[19] Subsequent to issuance of the Second Circuit's decision in *Colon*, the Supreme Court addressed the question of supervisory liability in *Ashcroft v. Iqbal, 556 U.S. 662 (2009)*. Although the issue has been discussed, the Second Circuit has declined to squarely address the impact of *Iqbal* upon the categories of supervisory liability addressed in *Colon. See, e.g., Hogan v. Fischer, 738 F.3d 509, 519 n.3 (2d Cir. 2013)* ("We express no view on the extent to which [*Iqbal*] may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations[.]" (citation and internal quotation marks omitted)); *see also Reynolds v. Barrett, 685 F.3d 193, 206 n.14 (2d Cir. 2012)* ("*Iqbal* has, of course, engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in [*Colon*,] ... [b]ut the fate of *Colon* is not properly before us[.]").

2. Defendant Annucci

Plaintiff alleges that he wrote to defendant "Annucci, making him aware of the [c]onstitutional violations, conducted by his subordinates[,]" but that Annucci "failed to remedy the wrong." Dkt. No. 102-1 at 2; *see also* Dkt. No. 72 at 12-14. This allegation is based upon plaintiff having addressed one of his amended appeals, as well as one additional letter that he sent to defendant Annucci. Dkt. No. 97-3 at 344 (amended appeal dated March 9, 2015); Dkt No. 97-3 at 348-49 (letter dated April 1, 2015). There is no dispute that defendant Annucci did not respond to plaintiff's appeal or letter or undertake any investigation as a result of plaintiff's correspondence. Dkt. No. 97-13 at 2.

It is well settled that Annucci's failure to respond to plaintiff's amended appeal and letter, without more, is not sufficient to give rise to personal involvement under section 1983. *Cole v. New York State Dep't of Corr. & Cmty. Supervision*, No. 14-CV-0539, 2016 WL 5394752, at \*22 (Aug. 25, 2016) (Peebles, M.J.*), report and recommendation adopted by 2016*

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 91 of 353

Barnes v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 1387460

WL 5374125 (N.D.N.Y. Sept. 26, 2016) (Sannes, J.); *see also, e.g., Houston v. Schriro*, No. 11-CV-7374, 2014 WL 6694468, at *14 (S.D.N.Y. Nov. 26, 2014) ("[I]gnoring a prisoner's letter or complaint is insufficient to render an official personally liable."); *Parks v. Smith*, No. 08-CV-0586, 2011 WL 4055415, at *14 (N.D.N.Y. March 29, 2011) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement.").

**\*15** For these reasons, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Annucci was personally involved in any of the allegations giving rise to this action.

### 3. Defendant Venettozzi

With respect to defendant Venettozzi, plaintiff alleges that after learning of the violation of his due process rights through his appeal, defendant Venettozzi failed to remedy the wrong. Dkt. No. 102-1 at 2; *see also* Dkt. No. 72 at 13. According to plaintiff, although he alerted defendant Venettozzi as to the constitutional violations by way of a series of appeals, defendant Venettozzi merely affirmed the disposition, while modifying the penalty. Dkt. No. 72 at 13; *see also* Dkt. No. 97-3 at 340-99.

Here, there is no genuine dispute of material fact that Venettozzi received and decided plaintiff's appeal in connection with the February 27, 2015 disciplinary determination that was issued by defendant McKeighan. *See generally* Dkt. No. 97-12. According to defendant Venettozzi,

> After reviewing the entire record of the hearing and considering all the grounds for overturning or modifying the determination asserted in plaintiff's appeal documents, I found that the hearing had been properly conducted, plaintiff had been provided constitutionally adequate due process of law and sufficient opportunity to put on a defense, and the findings of the hearing officer were supported by

the evidence. I affirmed the findings of guilt.

*Id.* at 3-4. As a result, defendant Venettozzi affirmed the finding of guilt, but reduced plaintiff's penalty from 910 days to twelve months of disciplinary SHU confinement. Dkt. No. 97-3 at 12, 341-42; Dkt. No. 97-12 at 4.

As defendants observe, upon plaintiff's appeal defendant Venettozzi did not identify any constitutional violations, including the failure to provide plaintiff with due process of law. Dkt. No. 97-14 at 30-31. Likewise, I have concluded that no reasonable factfinder could conclude that plaintiff's due process rights were violated. *See* Point III.C, *supra*. As a result, because no constitutional violation occurred, and there was no wrong to remedy, no supervisory liability can exist as against defendant Venettozzi. *See, e.g., Martin v. Oey*, No. 16-CV-00717, 2017 WL 6614680, at *10 (Nov. 28, 2017) (Dancks, M.J.), *report and recommendation adopted by* 2017 WL 6611575 (N.D.N.Y. Dec. 27, 2017) (McAvoy, J.); *Toole v. Connell*, No. 04-CV-0724, 2008 WL 4186334, at *1, 7 (N.D.N.Y. Sep. 10, 2008) (Kahn, J.) (supervisory defendant cannot be liable for failing to investigate or correct conduct that has already been found to be not actionable under section 1983); *Lighthall v. Vadlamudi*, 04-CV-0721, 2006 WL 721568, at *13 (N.D.N.Y. Mar. 17, 2006) (Mordue, J.) ("Since no constitutional violation occurred and there was no wrong to remedy, no supervisory liability exists."); *Rambaldi v. City of Mount Vernon*, 2003 WL 23744272, at *10 (S.D.N.Y. Mar. 31, 2003) (concluding that because there was no wrongful conduct, there were "no 'wrongs' to remedy" by the supervisory defendants).

For these reasons, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Venettozzi was personally involved in any of the constitutional deprivations giving rise to this action.

### IV. SUMMARY, ORDER, AND RECOMMENDATION

**\*16** According to plaintiff, following a series of incidents that resulted in disciplinary proceedings being brought against him, defendants violated his First and Fourteenth Amendments rights. Discovery having closed, defendants seek dismissal of plaintiff's claims on a variety of grounds, while plaintiff has cross moved for the entry of summary judgment. Having carefully reviewed the record before the court, defendants are entitled to the entry of summary

**Barnes v. Annucci, Not Reported in Fed. Supp. (2019)**

2019 WL 1387460

judgment dismissing all claims. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 97) be GRANTED, plaintiff's cross motion for summary judgment (Dkt. No. 102) be DENIED, and plaintiff's second amended complaint (Dkt. No. 72) is DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [20] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993). It is further hereby

[20]    If you are proceeding pro se and are served with this order, report, and recommendation by mail, three additional days will be added to the fourteen-day

period, meaning that you have seventeen days from the date the order, report, and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

ORDERED that the clerk of the court is respectfully directed to modify the court's records to change defendant Ollies to "Anthony Olles", defendant J. Whitford to "John Whiteford", and Donald Venetozzi to "Donald Venettozzi", as set forth in footnote number one; and it is further

ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1387460

---

End of Document    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 3729362
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Marc LEWIS, Plaintiff,

v.

MURPHY, Captain, Coxsackie Correctional
Facility; J. Lewis, Corrections Counselor,
Coxsackie Correctional Facility; Matthews, Deputy
Superintendent for Administration, Coxsackie
Correctional Facility; Christopher Miller, Deputy
Superintendent for Security, Coxsackie Correctional
Facility; Eric G. Gutwein, Commissioner
Hearing Officer, N.Y.S., D.O.C.C.S., Defendants.

No. 9:12–CV–00268 (NAM/CFH).
|
Signed July 24, 2014.
|
Filed July 25, 2014.

**Attorneys and Law Firms**

Marc Lewis, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Joshua E. McMahon, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### ORDER

NORMAN A. MORDUE, Senior District Judge.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Christian F. Hummel,
duly filed on the 27th day of June 2014. Following fourteen
(14) days from the service thereof, the Clerk has sent me
the file, including any and all objections filed by the parties
herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report–Recommendation, and no
objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its
entirety.

2. The defendants' motion for summary judgment (Dkt. No.
46) is granted and the Clerk shall enter judgment accordingly.

3. The Clerk of the Court shall serve a copy of this Order upon
all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION AND ORDER [1]

[1]     This matter was referred to the undersigned for
report and recommendation pursuant to 28 U.S.C.
§ 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Marc Lewis ("Lewis"), an inmate currently in
the custody of the New York State Department of Correctional
and Community Supervision ("DOCCS"), brings this action
pursuant to 42 U.S.C. § 1983 alleging that defendants, five
DOCCS employees, violated his rights under the Fourteenth
Amendment. Compl. (Dkt. No. 1). Presently pending is
defendants' motion for summary judgment pursuant to
Fed.R.Civ.P. 56. Dkt. No. 46. Lewis opposes and defendants
replied. Dkt. Nos. 57, 61. For the following reasons, it is
recommended that defendants' motion be granted.

### I. Background

The specific facts of the case are set forth in the Report–
Recommendation and Order filed February 28, 2012,
familiarity with which is assumed. *See* Dkt. No. 39 (Report–
Recommendation); Dkt. No. 43 (Memorandum–Decision and
Order). The facts are related herein in the light most favorable
to Lewis as the non-moving party. At all relevant times,
Lewis was an inmate at Coxsackie Correctional Facility
("Coxsackie").

#### A. November 5, 2011 Letter

On November 5, 2011, Lewis was watching television when
non-party Correctional Officer Whit ("Whit") changed the

channel on the television that Lewis was watching. Dkt. No. 46–9 at 2. Lewis wrote a letter to non-party Superintendent Martuscello ("Martuscello") complaining about the incident and stated that Whit harassed and intimidated him. Compl. ¶ 1. Lewis indicated that he would "blow the whistle on a lot of other wrong doings in this facility if need be." Dkt. No. 46–9 at 4. Lewis further indicated that he feared correctional officers would retaliate against him because he filed this complaint. *Id.* at 3. Lewis sent a copy of this letter to non-party Commissioner Fisher. Lewis Dep. # 1 (Dkt. No. 46–6) at 43:8–14. On November 7, 2011, Lewis was taken from his cell and told by non-party Sergeant Martin that he was being placed under keeplock [2] status for threats Lewis made against someone in the administration building. *Id.* at 27:14–22. At that time, Lewis had yet to receive a copy of the misbehavior report. *Id.* at 28:11–15. Based on the content of the November 5, 2011 letter, Lewis was charged with making threats and attempting to bribe and extort personnel. Dkt. No. 46–9 at 1.

[2]    "Keeplock" is a form of disciplinary confinement where an inmate is confined in his cell for the duration of the disciplinary sanction. *Gittens v. Lefevre,* 891 F.2d 38, 39 (2d Cir.1989) (citing N.Y. COMP.CODES R. & REGS. tit. 7, § 251–1.6 (2012)).

### B. Tier III Disciplinary Hearing

 **\*2**  On November 10, 2011, Lewis was escorted by non-party Correctional Officer Stevenson ("Stevenson") to attend his disciplinary hearing before defendant Captain Murphy ("Murphy"). Lewis Dep. # 1 at 34:8–12, 35:12–13. Murphy started the recording, explained the hearing process, and took Lewis's plea. *Id.* at 35:17–22. Lewis advised Murphy that he had not been served with a copy of the misbehavior report and had not yet been provided inmate assistance. Compl. ¶ 4; Murphy Decl. (Dkt. No. 46–22) ¶ 8. Murphy attested that he immediately stopped the hearing and directed Stevenson to provide Lewis with a copy of the misbehavior report and to arrange for the plaintiff to receive inmate assistance. Murphy Decl. ¶¶ 8, 11. Lewis also objected to Murphy being the officer who reviewed the misbehavior report and authorized Lewis to be placed in keeplock pending a disciplinary hearing, and the hearing officer. *Id.* ¶ 9. According to DOCCS Directive 4932, 251–2.2(f) Murphy could not serve as both the reviewing and hearing officer on the same misbehavior report. Dkt. No. 46–12 at 4. Lewis was then brought back to

his cell to review the misbehavior report and receive inmate assistance. Compl. ¶ 5.

### 1. Inmate Assistance

Defendant Corrections Counselor Jackie Lewis ("Counselor Lewis") was assigned as Lewis's employee assistant. Lewis Decl. (Dkt. No. 46–14) ¶ 4. On November 10, 2011, Counselor Lewis arrived at Lewis's cell to help prepare a defense for his hearing. *Id.* ¶ 7. During the meeting, Lewis requested that Martuscello and Fischer be called as witnesses and asked for the name of the review officer who authorized his keeplock confinement. *Id.* ¶ 8; Lewis Dep. # 1 at 40:8–16. Counselor Lewis indicated that Murphy was the reviewing officer and took note of the witnesses whom Lewis wanted to question. Lewis Dep. # 1 at 40:15–17; Dkt. No. 46–15. Lewis also stated that he requested an explanation of the charges but Counselor Lewis said she was not going to do that because she was trying to go home. Compl. ¶¶ 7–8. Since Counselor Lewis did not meet Lewis's standards for assistance, Lewis did not sign the inmate assistance form and Counselor Lewis left the cell at that time. *Id.* ¶ 8. Counselor Lewis maintains that Lewis never asked her for definitions or an explanation of the charges. Lewis Decl. ¶ 9.

### 2. Hearing Extension

On November 10, 2011, a request for an extension of the Tier III disciplinary hearing was filed because Lewis was going to be in court from November 14, 2011 to November 18, 2011 and no staff was available to conduct the hearing before that time. Dkt. No. 46–17; Compl. ¶ 10. The request indicated that defendant Commissioner's Hearing Officer Gutwein ("Gutwein") was the hearing officer and that the hearing had not commenced. Dkt. No. 46–17. Lewis contends that defendant Deputy Superintendent for Administration Matthews ("Matthews") had filed the request. Compl. ¶ 10. Lewis believes that the request contained false information because Murphy began the hearing on November 10, 2011 and Lewis was only in court from November 14, 2011 to November 16, 2011. *Id.* Matthews attested that Lewis is mistaken about who wrote the report. Matthews Decl. (Dkt. No. 46–16) ¶¶ 8–10. Matthews explained that although the request indicates "Matthew" as the contact person, extension requests are filed by clerical staff in Coxsackie's Discipline Office; thus the reference to "Matthew" refers to someone in that office, and not Matthews. *Id.*

**\*3** Later on November 10, 2011, Lewis wrote a letter to Martuscello explaining his November 5, 2011 letter and objecting to Murphy being the hearing officer. Dkt. No. 46–19. Martuscello directed defendant Deputy Superintendent Miller ("Miller") to respond to the letter. Miller Decl. (Dkt. No. 46–18) ¶ 7. By letter dated November 15, 2011, Miller informed Lewis that Gutwein was assigned as the hearing officer. *Id.;* Dkt. No. 46–20.

### 3. Hearing on November 21, 2011

On November 17, 2011, a second request to extend the date of the disciplinary hearing to November 21, 2011 was filed because no hearing officer was available to conduct the hearing before that time. Dkt. No. 46–13. On November 21, 2011, Gutwein conducted the disciplinary hearing for Lewis. Hr'g Tr. (Dkt. No. 46–10) at 2. [3] Lewis pleaded not guilty to the charges against him. *Id.* at 3. Lewis objected to: (1) Murphy commencing a disciplinary hearing concerning the same misbehavior report on November 10, 2011; (2) Murphy being both the reviewing and hearing officer; (3) Gutwein commencing the hearing more than seven days after placement in keeplock; and (4) Counselor Lewis providing inadequate assistance because she did not fulfill his requests. *Id.* at 4.

[3]     The page numbers following "Hr'g Tr." refer to the pagination of the header numbers generated by CM/ECF, not the individual transcripts.

Lewis requested that Counselor Lewis, Murphy, Stevenson, Fischer, Martin, and Martuscello be called as witnesses. Hr'g Tr. at 8. Lewis also requested that the November 5, 2011 letter be produced as evidence. *Id.* Gutwein noted for the record that the November 5, 2011, letter was placed in the hearing packet and denied Lewis's request to have the log books produced as evidence. *Id.* at 8, 19. Gutwein denied Lewis's request to call Murphy, Stevenson, and Counselor Lewis as witnesses on relevance grounds as Lewis wanted them to testify to the defects of the disciplinary hearing. Gutwein Decl. (Dkt. No. 46–8) ¶ 28; Hr'g Tr. at 19, 20. Since Gutwein called Martin to testify to the misbehavior report, Gutwein declined to call Martuscello and Fischer as witnesses for their testimonies would have been duplicative. Hr'g Tr. at 8, 19, 20.

Gutwein produced Martin and asked him questions concerning the grounds for authoring the misbehavior report.

Hr'g Tr. at 9. Martin explained that Lewis's November 5, 2011 letter contained statements threatening actions if certain demands were not met and Lewis would "blow the whistle if need be." *Id.* Lewis was afforded an opportunity to direct questions at Martin through Gutwein. *Id.* Gutwein denied Lewis's request to have the definitions of bribery, extortion, and threats because the definitions would be irrelevant to the incident in the report. *Id* . at 19.

Gutwein then made a written disposition and found Lewis guilty of the charges based on: (1) the misbehavior report, which stated that Lewis would retaliate if his demands were not met; (2) review of the November 5, 2011 letter stating that Lewis will retaliate by "blowing the whistle on the wrong doings by staff"; (3) Martin's testimony stating that the letters contained an ultimatum; (4) Lewis's Testimony stating that the hearing was commenced previously in an improper and untimely manner; and (5) Lewis's disciplinary history. Hr'g Tr. at 20. Gutwein sentenced Lewis to seven months in the Special Housing Unit ("SHU"), [4] along with seven months without packages, commissary privileges, phone privileges, and loss of good time credits. *Id.* Gutwein's determination and sentence was made to impress upon Lewis that it is a serious violation to threaten employees, which would not be tolerated at the correctional facility and that Lewis should modify his behavior in the future. Gutwein Decl. ¶ 12.

[4]     SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

### C. SHU conditions

**\*4** On November 30, 2011, Lewis received a letter indicating that he had been unsatisfactorily discharged from the Aggression Replacement Training ("ART") Program because he was going to be in SHU for seven months. Compl. ¶ 39. Nevertheless, Lewis was able to complete this program after his release from SHU. Lewis Dep. # 1 (Dkt. No. 46–6) at 69:7–14.

2014 WL 3729362

Since Lewis had his telephone privileges taken away, he was unable to call his sister who was in need of a kidney transplant. Lewis Dep. # 2 (Dkt. No. 46–7) at 12:6–11. Lewis also stated he was in the process of filing paperwork to donate a kidney to his sister but being in SHU prevented him from finishing it. *Id.* at 12:3–5, 13:2–3. By the time Lewis was released from SHU, his sister had received a transplant. *Id.* at 13:4–7.

Lewis was also unable to interact with other inmates by attending group activities such as congregational prayer or group chow during his time in SHU. Compl. ¶ 46. Lewis contends that he was "restrained from practicing the prerequisite [rituals] associated with performing his [religious] prayers" while in SHU because the cells were unsanitary, he had to share a cell, the correctional officers gave him showers whenever they wanted, and he was not given a shower three times a week. Dkt. No. 57 at 15–16. Lewis claims he was prevented from practicing Islam because Muslims must be "in a state of purification in order to pray" and Islamic law states that men must not expose their body from the navel to the knee. Therefore he was restrained from doing "wudu," a ritual where one must wash their whole body in preparation for prayer. *Id.* at 16.

### D. Appeal of the Hearing Disposition

Lewis filed an appeal of the hearing disposition. Compl. ¶ 34. Miller reviewed the appeal and found "the hearing to be without procedural error and the resulting sanctions appropriate." Dkt. No. 46–21. Lewis appealed to non-party Albert Prack, the director of the Special Housing/Inmate disciplinary program, who reversed the guilty determination on the ground that "the evidence used fails to provide enough information to support the charges." Dkt. No. 57 at 49. Therefore, after sixty-nine days, Lewis was released from the SHU. Compl. ¶ 45.

### II. Discussion

Lewis contends that (1) all defendants deprived him of his Fourteenth Amendment rights by denying him procedural due process in connection with the disciplinary hearings at issue and (2) defendants Miller, Matthews, Murphy, and Gutwein conspired against him to cover up Murphy's improper commencement of the hearing.

Defendants seek summary judgment dismissing the complaint in its entirety. Defs.' Mem. of Law (Dkt. No. 46–2) at 3. Defendants specifically move for summary judgment on the grounds that: (1) Lewis failed to establish a due process claim; (2) Lewis failed to establish an actionable conspiracy claim; and (3) defendants are entitled to qualified immunity. *Id.* Additionally, Matthews moves for summary judgment for lack of personal involvement. *Id.*

### A. Legal Standard

**\*5** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent with the *pro se*

2014 WL 3729362

litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by *pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### B. Personal Involvement

**\*6** "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [5] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

[5]  Various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated *Iqbal* 's impact on the five *Colon* factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon* 's personal involvement standard).

Lewis has failed to establish the personal involvement of defendant Matthews in allegedly depriving him of his Fourteenth Amendment due process rights by filing a Tier III hearing extension request. Lewis contends that Matthews filed a Tier III hearing extension form that falsely indicated Gutwein as the hearing officer, the hearing had not yet commenced, and the dates for which Lewis would be out of the facility for an unrelated trial. Compl. ¶ 10. Matthews attested that the notation "Contact: Matthew" on the extension request did not refer to him. Rather, the extension requests are submitted by members of Coxsackie's Discipline Office; hence, it can be inferred that the notation refers to a clerical staff member in the Discipline Office. Therefore, Matthews did not participate directly in the alleged constitutional violation. Matthews Decl. (Dkt. No. 46–16) ¶ 10; Dkt. No. 46–17. Furthermore, Matthews attested that he was not even aware of Lewis's disciplinary hearing or the extension request until after the lawsuit was filed. Matthews Decl. (Dkt. No. 46–16) ¶ 11. Accordingly, Matthews could not have failed to remedy any wrong after he was informed of the violation through a report or appeal, since he was never informed of any violation.

In addition, Matthews did not exhibit deliberate indifference to Lewis's rights by failing to act on information indicating that unconstitutional acts were occurring because Matthews had no information indicating that any wrong was occurring. Matthews also attested that he had no supervisory role over Coxsackie's inmate disciplinary program; consequently, Matthews could not have created or allowed the continuation

of a policy or custom under which unconstitutional practices occurred. Matthews Decl. ¶ 2. Lastly, since Matthews held no supervisory authority over the inmate disciplinary program, he could not have been grossly negligent in supervising subordinates who committed the allegedly wrongful acts. *Id.* Lewis points to no evidence in the record to substantiate his assertions that Matthews created the extension request. Moreover, Lewis testified in his deposition and indicated in his response papers that he voluntarily withdraws his claims against Matthews. Lewis Dep. # 2 (Dkt. No. 46–7) at 28; Resp. (Dkt. No. 57) at 9. It is fair to conclude that a rational finder of fact would determine that these assertions are merely speculative and therefore, Lewis cannot establish the personal involvement of Matthews in the alleged unconstitutional actions.

**\*7** Accordingly, defendants' motion on this ground should be granted.

### C. Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. It is important to emphasize that due process "does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished without due process of the law." *Baker v. McCollan,* 443 U.S. 137, 145 (1979) (internal quotation and citations omitted). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted). An inmate retains a protected liberty interest in remaining free from segregated confinement if the prisoner can satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995).

### 1. Liberty Interest

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *See generally Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) ("[Procedural] due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing

*Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). This standard requires a prisoner to establish that the confinement or condition was atypical and significant in relation to ordinary prison life. *See Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (citations omitted). The Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citations omitted). Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration— between 101 and 305 days—development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required." *Id.* at 64–65 (citing *Colon,* 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may be issued "as a matter of law." *Id.* at 65 (citations omitted). Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality. *Id.* (citing *Colon,* 215 F.3d at 231–32). Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short—e.g. 30 days—and there was no indication [of] ... unusual conditions." *Harvey v. Harder,* No. 09–CV–154 (TJM/ATB), 2012 WL 4093792, at \*6 (N.D.N.Y. July 31, 2012) (citing *inter alia Palmer,* 364 F.3d at 65–66).[6]

[6]    All unpublished opinions cited to by the Court in this Report–Recommendation, unless otherwise noted, attached to this Recommendation.

**\*8** Defendants contend that Lewis has failed to demonstrate that he suffered from atypical and significant confinement and therefore cannot establish a protected liberty interest. The Court considers factors such as the length of time the prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions

of the general prison population" to determine whether the prisoner can establish a liberty interest in remaining free from segregated confinement. *Palmer,* 364 F.3d at 64–65. The length of time in which Lewis spent in confinement was sixty-nine days, which is less than an intermediate amount of time. As such, the length of time itself cannot determine that the confinement was atypical and significant. Therefore, the Court determines if the confinement is atypical and significant by looking at the conditions of the segregated confinement compared to ordinary prison conditions.

Lewis contends that his confinement was atypical and significant because he was deprived of: (1) communications with the outside world; (2) an opportunity to possibly donate a kidney to his sister; (3) religious practices due to the unsanitary conditions of his confinement; (4) participation in the ART program; and (5) interaction with other inmates during activities like group chow and congressional prayer.[7] Dkt. No. 57 at 12–14. In New York, under "normal SHU conditions" an inmate is:

> [7]    Lewis may be attempting to raise First Amendment claims based on the denial of attendance to congregated services and sanitary conditions of his SHU cell. However, these claims were not specifically pled in the original complaint. Moreover, Lewis made no attempt to amend his complaint to include these claims. Therefore, the Court addresses these issues as arguments for establishing a liberty interest for purposes of a Fourteenth Amendment claim.

> placed in a solitary confinement cell, kept in his cell for twenty-three hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited.

*Colon,* 215 F.3d at 230; *see also* N.Y. COMP.CODES R. & REGS. tit. 7, §§ 304.1–.14, 305.1–.6 (setting forth minimum conditions of SHU confinement). Lewis's confinement was of a similar kind, with twenty-three hours a day of isolation, an hour of recreation, and denial of telephone and commissary privileges. Such a claim falls short of establishing a liberty interest as Lewis fails to allege any particular condition or further deprivation outside of those generally applicable to the incidents of

prison life in SHU confinement. *Vasquez,* 2 F.Supp.2d at 259; *Frazier,* 81 F.3d at 317 (explaining that while prisoners in SHU may be deprived of "certain privileges that prisoners in the general population enjoy," there exists no liberty interest in remaining a part of the general prison population); *see also Alvarado v. Halle Hous. Assoc.,* 152 F.Supp.2d 355, 355 (S.D.N.Y.2001) (finding restrictions such as loss of phone privileges, one hour of exercise a day, and three showers per week, fail to meet *Sandin* requirements).

**\*9**  Lewis's inability to communicate with the outside world through phone or post for the purpose of transplanting his kidney to his sister or otherwise is not considered atypical because loss of telephone privileges is an aspect of SHU confinement in New York and courts have held that this would not violate an inmate's constitutional rights. *See Long v. Crowley,* No. 09–CV–456(F), 2012 WL 1202181, at \*11 (W.D.N.Y. March 22, 2012) (sixty days in keeplock with loss of telephone and commissary privileges is not a protected liberty interest); *Borsock v. Early,* No. 03–CV–395 (GLS/RFT), 2007 WL 2454196, at \*9 (N.D.N.Y. Aug. 22, 2007) (GLS/RFT) (finding that a ninety-day confinement in SHU with a ninety-day loss of packages, commissary and telephone privileges is insufficient to raise a liberty interest).

Lewis has failed to show that his unsatisfactory discharge from his ART programming due to his placement in SHU posed an atypical and significant hardship. Compl. ¶ 46; *Thompson v. LaClair,* No. 08–CV–37 (FJS/DEP), 2009 WL 2762164, at \*8 (N.D.N.Y. Jan. 30, 2009) (plaintiff's inability to participate in ASAT, ART, and MAWP programs not atypical and significant hardship); *Deutsch v. U.S.,* 943 F.Supp. 276, 280 (W.D.N.Y.1996) (holding that prisoners do not have a protected liberty interest in rehabilitative programs). Moreover, Lewis was able to complete this program after his release from SHU. Lewis Dep. # 1 at 69:7–14.

Lewis's claim that his exclusion from group activities posed an atypical and significant hardship is also unfounded because SHU confinement usually segregates the inmate from the rest of the prison and therefore, the inmate would be unable to participate in group activities. *Sealey v. Coughlin,* 997 F.Supp. 316, 321 (N.D.N.Y.1998) ("plaintiff's administrative segregation in SHU was not an atypical and significant hardship"); *Edmonson v. Coughlin,* 21 F.Supp.2d 242, 249, 250 (W.D.N.Y.1998) (plaintiff's inability to participate in congregate activities such as group counseling, and religious

services during his eight months of administrative segregation is not a protected liberty interest).

Lastly, in his opposition papers to the instant motion, Lewis claims that the unsanitary conditions of his cell posed an atypical and significant hardship. Lewis contends that he was "restrained from practicing the prerequisite [rituals] associated with performing his prayers" while in SHU because the cells were unsanitary, he had to share a cell, the correctional officers gave him showers at their choosing, and he was not given a shower three times a week. Dkt. No. 57 at 15–16. Lewis contends that his cell always accumulated dirt and dust, was cleaned once a week with a dirty sponge without any germicidal cleaning agents, and the water used was "black from prior use of 20 or more cells." *Id.*

Courts have found that the denial of a clean cell and personal hygiene items, as well as double-celling in SHU, do not constitute an atypical and significant hardship. *See Davidson v. Murray,* 371 F.Supp.2d 361, 364, 369 (W.D.N.Y.2005) (concluding that the denial of hygiene items and cleaning materials is not an atypical and significant hardship); *McNatt v. Unit Manager Parker,* No. 99–CV–1397 (AHN), 2000 WL 307000, at *4, *8 (D.Conn. Jan. 18, 2000) (finding stained, smelly mattresses, unclean cell, no cleaning supplies for toiletries for six days, no shower shoes, and dirty showers during SHU confinement do not constitute a constitutional violation of due process); *Bolton v. Goord,* 922 F.Supp. 604, 630 (S.D.N.Y.1998) (finding double-celling of inmates is not considered an atypical and substantial hardship). Nevertheless, a finder of fact may conclude that Lewis's cell conditions in conjunction with the denial of three showers a week to constitute an atypical and significant hardship that amount to a protected liberty interest. *See, e.g., Welch v. Bartlett,* 196 F.3d 389, 393 (2d Cir.1999) (stating that allegations of "inadequate amounts of toilet paper, soap and cleaning materials, a filthy mattress, and infrequent changes of clothes" may be a constitutional violation). Drawing every inference in Lewis's favor, these conditions were present during the entirety of Lewis's SHU confinement. Moreover, defendants do not specifically address these allegations with argument or evidence. Therefore the Court will proceed as though Lewis has established a protected liberty interest.

## 2. Procedural Due Process

**\*10**  Defendants argue that Lewis was afforded ample due process. While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural due process. *Wolff v.. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner is "entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v.. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted).

### a. Written Notice

In this case, Lewis received proper written notice. An inmate must be provided advance written notice of the charges against him at least twenty-four hours before the disciplinary hearing commences. *Wolff,* 418 U.S. at 563–64. Notice must be written "in order to inform [the inmate] of the charges and to enable him to marshal the facts and prepare a defense." *Id.* at 564. When Lewis was brought to the hearing before Murphy on November 10, 2011, Lewis had not yet received written notice of the charges. Murphy attested that once Lewis stated he did not receive a copy of the misbehavior report or inmate assistance, Murphy stopped the hearing immediately. Murphy attested that no testimony was taken, he did not review any documentary evidence other than the misbehavior report, and did not discuss the statements in the misbehavior report with Lewis. Murphy Decl. ¶ 16. Lewis was then provided a copy of the misbehavior report and inmate assistance on the same day. On November 21, 2011, Gutwein took over Lewis's Tier III disciplinary hearing. Even assuming Murphy had commenced the hearing, the ultimate penalty imposed on Lewis was by Gutwein based on the evidence presented on November 21, 2011. Lewis received a copy of the misbehavior report on November 10, 2011, well in advance of the November 21, 2011 hearing date. As such, Lewis received advanced written notice of the charges against him.

Accordingly, defendants' motion on this ground should be granted.

### b. Opportunity to Call Witnesses and Present Documentary Evidence

Lewis contends that he was deprived of an opportunity to call all his requested witnesses and present some documentary evidence. However, "[i]t is well settled that an official

may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992). With respect to documentary evidence, Lewis requested the admission of the logbooks as evidence to show that he had already been taken for a disciplinary hearing regarding the same misbehavior report. Hr'g Tr. at 19. Gutwein correctly denied this request because they were irrelevant to the charges in the misbehavior report and would not have aided in Lewis's defense to such charges. Gutwein Decl. ¶¶ 33–34. As for the November 5, 2011 letter, Gutwein allowed for a copy of it to be placed in the hearing packet as evidence. Hr'g Tr. at 8.

**\*11** As for witnesses, Gutwein permitted Martin to testify at Lewis's disciplinary hearing but denied the request for Murphy, Stevenson, and J. Lewis on relevance grounds because their testimonies would have concerned the alleged defects in the disciplinary hearing rather than the charges giving rise to the hearing. Gutwein Decl. ¶ 28. Furthermore, since Martin was to testify to the content of the November 5, 2011 letter, Gutwein denied testimonies from Martuscello and Fischer on the grounds that they would be unnecessary and duplicative. *Id.* ¶ 32.

Lewis was provided with an opportunity to question Martin through Gutwein. "While inmates do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials." *Rivera v.. Wohlrab,* 232 F.Supp.2d 117, 125 (S.D.N.Y.2002). Thus, Gutwein retained the authority to administer the questioning in a manner he saw fit. Gutwein did not permit Lewis to ask every question, but Gutwein offered reasoning for the denial of certain questions that Lewis wanted to ask. Hr'g Tr. at 9–18. A review of the hearing transcript shows that Lewis was permitted to question Martin rather extensively until Lewis was finished. *Id.* As such, Lewis was provided an opportunity to call witnesses and present documentary evidence. *Sira,* 380 F.3d at 69.

Accordingly, defendants' motion on this ground should be granted.

### c. Fair and Impartial Hearing Officer

Lewis contends that Gutwein was not an impartial hearing officer because Gutwein had not allowed Lewis to call his requested witnesses and denied him the standard and legal definitions of bribery, extortion, and threats. Prisoners have a constitutional right to a fair and impartial hearing officer. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges ... [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] .." and the Second Circuit has held that the test is whether there was " 'reliable evidence' of the inmate's guilt." *Luna v. Pico,* 356 F.3d 481, 487–88 (2d Cir.2004); *see also Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985).

As discussed *supra,* "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992). Therefore, Gutwein was within his discretion to deny the calling of certain witnesses and the admission of certain evidence.

**\*12** Even though Lewis's guilty determination was reversed, it is not clear evidence that Gutwein was not a fair and impartial hearing officer. The determination was reversed on the grounds that there was insufficient evidence to support the charges, not on any procedural defects. Dkt. No. 57 at 49. The record shows no indication that Gutwein was biased and failed to serve a fair and impartial hearing officer. It is unclear to the Court how the denial of the requested definitions served as evidence of bias on Gutwein's part. Rather, it is clear from the hearing transcript that Gutwein allowed Lewis to state all of his objections for the record and question Martin as much as he needed to. *See generally* Hr'g Tr.

Gutwein had reliable evidence of Lewis's guilt, which is presented in his statement of the evidence relied upon. Gutwein relied on the statements in the November 5, 2011 letter that stated Lewis would 'blow the whistle' on wrongdoings in the facility and Martin's testimony regarding the ultimatums made by Lewis. Hr'g Tr. at 20–21. Lewis had admitted to writing the November 5, 2011 letter. *Id.* at 6. Gutwein's determination was made to impress upon Lewis that it is a serious violation to threaten employees, which would not be tolerated at the correctional facility and that he should modify his behavior in the future. Lewis points to no evidence in the record to show that Gutwein came to his determination improperly. As such, despite Lewis's contentions of bias, the record is clear that there is no

question of material fact regarding the process that Lewis was provided.

Accordingly, defendants' motion on this ground should be granted.

### d. Written Statement of Disposition

It is undisputed that Lewis received a written statement of the hearing disposition. On November 21, 2011, Lewis was present when Gutwein rendered his decision on the misbehavior report. Hr'g Tr. at 20–21. The record indicates that Lewis received a written statement of the evidence relied upon and the reasons for the disciplinary action. *Id.;* Dkt. No. 46–11 at 9. Thus, Lewis was provided with a written statement of the Tier III disciplinary hearing disposition. *Sira,* 380 F.3d at 69.

Accordingly, defendants' motion on this ground should be granted.

### e. Inmate Assistance

"An inmate's right to assistance with his disciplinary hearing is limited." *Neree v. O'Hara,* No. 09–CV–802 (MAD/ATB), 2011 WL 3841551, at *13 (N.D.N.Y. July 20, 2011) (*Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993)). This Circuit has held that an assistant is constitutionally necessary when the plaintiff is confined in SHU and unable to marshal evidence and present a defense. *Id.* (citation omitted). In such a case, the assistant need only perform what the plaintiff would have done but need not go beyond the inmate's instructions. *Lewis v. Johnson,* No. 08–CV–482 (TJM/ATB), 2010 WL 3785771, at *10 (N.D.N.Y. Aug. 5.2010) (citing *Silva,* 992 F.2d at 22). Furthermore, "any violations of this qualified right are reviewed for 'harmless error.' " *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437 (W.D.N.Y.2010) (citing *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir.2009)). Lewis was confined in SHU from November 7, 2011, onward and thus was entitled to an inmate assistant. Dkt. No. 46–12 at 5; N.Y. COMP.CODES R. & REGS. tit. 7 § 251–4.1(a)(4).

**\*13** Lewis alleges that he was deprived of adequate inmate assistance. Lewis first met with his inmate assistant, Counselor Lewis, on November 10, 2011. According to Lewis, Counselor Lewis refused to give him definitions of the charges against him and interview potential witnesses.

Counselor Lewis denies that she was asked to give explanations of the charges and notes that the alleged request is not indicated on the assistant form. Lewis Decl. ¶ 9; Dkt. No. 46–17. Gutwein had also denied Lewis's request for the definitions of threats, bribery, and extortion during the hearing on relevance grounds.

Taking Lewis's version of events as true, even if Counselor Lewis failed to provide such definitions of the charges, Lewis does not demonstrate that he was somehow prejudiced as a result of this error, and does not show that he was unable to present a defense or that the outcome of the hearing would have been different had Counselor Lewis provided such definitions. *Clark v. Dannheim,* 590 F.Supp.2d 426, 429–31 (W.D.N.Y.2008) ("To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing." (citation omitted)).

Furthermore, Lewis was able to present a defense and pose questions to Martin that evinced an understanding of the charges. *See generally* Hr'g Tr. at 5–18. For example, Lewis asked Martin whether the November 5, 2011 letter contained any threats of harm, which suggests that Lewis had some understanding of what constitutes "threat." *Id.* at 9. Lewis then asked "did I—anything of value to or from—Martuscello, yourself or anyone," which shows that Lewis understood the nature of the extortion charge. *Id.* at 10. Lastly, Lewis asked "did I give or attempt to give—money, gifts,—or anything worth—value ... to ... Superintendent Martuscello and—or—administrator ...." This demonstrates that Lewis had an understanding of what bribery meant. *Id.* at 11.

Lewis also alleged that Counselor Lewis failed to interview Martuscello or Fischer but does not show how this would have changed the outcome of the hearing or how this failure prejudiced him as a result. Therefore, any shortcomings in the assistance rendered by Counselor Lewis was harmless error and does not rise to the level of a due process violation. *Hernandez v. Selsky,* 572 F.Supp.2d 446, 455 (S.D.N.Y.2008) (plaintiff failed to show how outcome of hearing would have been different had employee assistant interviewed witnesses, and thus any alleged inadequate assistance was harmless error not warranting denial of summary judgment). Additionally, even though Gutwein failed to provide an explanation of the charges, Lewis was not prejudiced as a result because Gutwein described in his hearing disposition the evidence he relied upon to determine that Lewis was guilty. An

explanation of these charges to Lewis would not have changed the evidence which Gutwein had relied upon. As such, Lewis's due process claim based on inadequate inmate assistance must fail.

**\*14** Accordingly, defendants' motion for on this ground should be granted.

### f. Timeliness

Lewis contends that the Tier III disciplinary hearing concerning the November 7, 2011 misbehavior report was not commenced in a timely manner because his hearing did not begin until November 21, 2011. Where an inmate is confined pending a disciplinary hearing, the hearing must commence within seven days of his initial confinement and conclude within fourteen days of the writing of the misbehavior report. N.Y. COMP.CODES R. & REGS. tit. 7 § 251–5.1(a)(b); [8] Dkt. No. 46–12 at 5–6. The Commissioner of Correctional Services or his designee must authorize any delay beyond those time limits. N.Y. COMP.CODES R. & REGS. tit. 7 § 251–5.1(a)(b); Dkt. No. 46–12 at 5–6.

[8]    Section 251–5.1, states that
       (a) Where an inmate is confined pending a disciplinary hearing or superintendent's hearing, the hearing must be commenced as soon as is reasonably practicable following the inmate's initial confinement pending said disciplinary hearing or superintendent's hearing, but, in no event may it be commenced beyond seven days of said confinement without authorization of the commissioner or his designee.
       (b) The disciplinary hearing or superintendent's hearing must be completed within 14 days following the writing of the misbehavior report unless otherwise authorized by the commissioner or his designee. Where a delay is authorized, the record of the hearing should reflect the reasons for any delay or adjournment, and an inmate should ordinarily be made aware of these reasons unless to do so would jeopardize institutional safety or correctional goals.
       (c) Violation hearings must be completed within seven days of the writing of the misbehavior report.
       N.Y. COMP.CODES R. & REGS. tit. 7 § 251–5.1.

Lewis's Tier III hearing was timely commenced. Although Lewis's hearing was initially required to commence by November 14, 2011, an extension was granted until November 18, 2011 because Lewis was scheduled to be out of the facility from November 14, 2011 through November 18, 2011, and no staff was available to conduct the hearing before that time period. Gutwein Decl. ¶ 21; Dkt. No. 46–13. A second request was made on November 17, 2011 because no hearing officer was available to conduct plaintiff's hearing until November 21, 2011. Gutwein Decl. ¶ 22; Dkt. No. 46–13. DOCCS Central Office Special Housing Unit granted the facility permission to commence Lewis's hearing by November 21, 2011 and the hearing commenced on that date. Dkt. No. 46–13. Therefore, the hearing was commenced in a timely manner in accordance with the pertinent New York regulations.

Accordingly, defendants' motion on this ground should be granted.

### D. Conspiracy

Lewis claims that defendants Murphy, Miller, and Gutwein conspired to deny him procedural due process. To establish a claim under Section 1985(3), a plaintiff must allege that (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff, and (2) an overt act was committed in furtherance of that goal. *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. *Ciambriello,* 292 F.3d at 325. Therefore, the plaintiff must provide some details of the time, place, and the alleged affects of the conspiracy, which would include facts to demonstrate that there was an agreement between the defendants to achieve some unlawful goal. *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted).

In this case, defendants all deny conspiring to cover up the hearing that was allegedly commenced by Murphy. Lewis Dep. # 2 at 1–8; Gutwein Decl. ¶ 39; Miller Decl. ¶ 17; Matthews Decl. ¶ 12; Murphy Decl. ¶ 11. Lewis points to no evidence in the record to show that there was an agreement between the defendants to deprive him of his constitutional rights. Lewis alleges that the defendants conspired to cover up Murphy's attempt to start the Tier III disciplinary hearing because Murphy could not have served as the hearing officer. Murphy stated that he stopped the hearing once he realized

that Lewis had not received a copy of the misbehavior report. Lewis was provided a copy and the hearing commenced on November 21, 2011 with Gutwein as the hearing officer. Therefore, there was no wrongdoing on Murphy's part for the defendants to cover up.

 *15  Lewis alleges that there must have been an agreement to conspire against him because of the alleged discrepancies and false statements in the extension requests, Miller's letter ruling on the appeal, and other prison forms. These allegations are conclusory and do not provide any evidence that the defendants made an actual agreement to deprive Lewis of his constitutional rights. Furthermore, as discussed *supra,* there was no deprivation of Lewis's constitutional rights and therefore there can be no valid conspiracy claim.

Moreover, Lewis's conspiracy claim fails on the grounds that it is barred by the intra-corporate conspiracy doctrine. The doctrine states that "officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Nassau Cnty. Employee "L" v. Cnty. of Nassau,* 345 F.Supp.2d 293, 304 (E.D.N.Y.2004) (internal citations and quotation marks omitted). The doctrine applies when officers and officials are working in the scope of their official duties. *Id.* Although the doctrine began in cases involving corporations, the doctrine has been extended where there are allegations of conspiracy between a public entity and its employees. *Id.; see also Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 76 (E.D.N.Y.2002) (collecting cases). This doctrine would therefore exclude conspiracy claims against employees of DOCCS working within the scope of their employment. *Hartline v. Gallo,* 546 F.3d 95, 99, n. 3 (2d Cir.2008) (citations omitted); *Little v. City of New York,* 487 F.Supp. 426, 441–42 (S.D.N.Y.2007) (citations omitted). There is an exception to the doctrine when the individuals of the conspiracy are "pursuing personal interests that are separate and apart from the entity." *Nassau Cnty. Employee "L",* 345 F.Supp.2d at 304. Furthermore, personal bias is not considered a personal interest and is not within the exception to the intra-corporate conspiracy doctrine. *Everson,* 216 F.Supp.2d at 76 (citations omitted).

In this case, Lewis's allegations of conspiracy are against defendants who were all employees of DOCCS, which is one public entity, who were acting within the scope of their employment when they filed extension requests and other prison forms. Therefore, they are legally incapable of conspiring against each other. Lewis makes no allegation that the defendants were pursuing personal interest apart from their official duties. As such, Lewis's conspiracy claim fails as a matter of law.

Accordingly, defendants' motion on this ground should be granted.

### E. Qualified Immunity

Defendants contend that even if Lewis's § 1983 Fourteenth Amendment and conspiracy claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 F. App'x 146 (2d Cir.2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230.

 *16  Here, the second prong of the inquiry need not be addressed with respect to Lewis's Fourteenth Amendment and conspiracy claims against the defendants because, as discussed *supra,* it has not been shown that defendants violated Lewis's Fourteenth Amendment rights or conspired against Lewis to violate his Fourteenth Amendment rights.

Accordingly, defendants' motion on this ground should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 46) is **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Dated: June 27, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 3729362

---

**End of Document**                                © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Liao v. Malik, Not Reported in Fed. Supp. (2016)

2016 WL 1128245

2016 WL 1128245
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shihsiang LIAO, a/k/a Shih-
Siang Shawn Liao, Plaintiff,

v.

Faisal MALIK,[1] Defendant.

[1]    The remaining defendant in this action is identified in plaintiff's complaint as S. Malik. *Dkt. No. 1 at 3.* It is clear from his motion papers, however, that defendant's first name is "Faisal." See, e.g., *Dkt. No. 41-2 at 1.* The clerk of the court is respectfully directed to adjust the court's records accordingly.

Civil Action No. 9:13-CV-1497 (GTS/DEP)
|
Signed 02/26/2016

**Attorneys and Law Firms**

FOR PLAINTIFF: SHIHSIANG LIAO, Pro se, P.O. Box 472, Wassaic, NY 12592.

FOR DEFENDANT: HON. ERIC T. SCHNEIDERMAN, New York State Attorney General, The Capitol, KEITH J. STARLIN, ESQ., Assistant Attorney General, Albany, NY 12224.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. MAGISTRATE JUDGE

**\*1** This is a civil rights action brought by *pro se* plaintiff Shihsiang Liao, a former New York State prison inmate who has also identified himself as Shih–Siang Shawn Liao, against four employees of the New York State Department of Corrections and Community Supervision ("DOCCS"), including its former commissioner and current acting commissioner, pursuant to 42 U.S.C. § 1983. While his complaint contains additional claims, the sole remaining cause of action in this case is asserted against defendant Faisal Malik based on allegations that he denied plaintiff due process while assisting him in preparing for a disciplinary hearing by failing to interview and obtain witnesses identified by plaintiff.

Currently pending before the court is a motion brought by the defendant Malik requesting the entry of summary judgment dismissing plaintiff's remaining claim. For the reasons set forth below, I recommend that defendant's motion, which plaintiff has not opposed, be granted.

I. *BACKGROUND*[2]

[2]    In light of the procedural posture of this case, the following recitation is derived from the record now before the court, with all inferences and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

Prior to his release from prison in or about September 2014, *Dkt. No. 25,* plaintiff was an inmate held in the custody of the DOCCS.[3] *See generally Dkt. No. 1.* At the times relevant to his remaining claim, plaintiff was confined initially in the Ogdensburg Correctional Facility ("Ogdensburg"), located in Ogdensburg, New York, and later the Gouverneur Correctional Facility ("Gouverneur"), located in Gouverneur, New York. *Id.*; *Dkt. No. 41–6 at 19.*

[3]    It appears that following his release from prison in New York, plaintiff served time in two correctional facilities in Ohio. Dkt. Nos. 25, 30; *see also Dkt. No. 41–6 at 129.*

On November 19, 2010, plaintiff was issued a series of misbehavior reports accusing him of violating prison rules arising from conduct occurring while housed in Ogdensburg. *Dkt. No. 1 at 4,* 21–24; *Dkt. No. 41–7.* The charges set forth in those misbehavior reports accused the plaintiff of (1) soliciting goods or services without consent from the superintendent or his designee; (2) the unauthorized exchange of personal items without authorization; (3) possession of contraband; (4) taking state property; (5) providing incomplete, misleading, and/or false statements or information; (6) impersonation; and (7) providing legal assistance to another inmate without prior approval from the superintendent or his designee. *Dkt. No. 1 at 21–24; Dkt. No. 41–7.* Those charges were based upon a search of plaintiff's cell, conducted on November 19, 2010, and the resulting confiscation of several prohibited items. *Dkt. No. 1 at 4,* 21–24; *Dkt. No. 41–7; see also Dkt. No. 41–6 at 17–19.*

Following the issuance of the misbehavior reports, plaintiff was transferred to a special housing unit ("SHU") in Gouverneur to await a Tier III disciplinary hearing concerning

the pending charges. [4] *Dkt. No. 41–6 at 16*, 19. In preparation for the Tier III hearing, defendant Faisal Malik, who at the time was a vocational instructor at the facility, was assigned to assist plaintiff. *Dkt. No. 1 at 7; Dkt. No. 41–2 at 1*, 6–7. After receiving the assignment, defendant Malik met with plaintiff on November 22, 2010. *Dkt. No. 41–2 at 7; Dkt. No. 41–6 at 28*. While the parties generally disagree as to what occurred after their meeting on November 22, 2010, both plaintiff and defendant appear to agree that plaintiff provided defendant with several names of individuals who he wished to have testify on his behalf at the upcoming disciplinary hearing. *Dkt. No. 1 at 7; Dkt. No. 41–2 at 7; Dkt. No. 41–6 at 21*. One of the individuals was identified by plaintiff as Ronlad Gantt, an inmate in Ogdensburg. *Dkt. No. 41–2 at 7*. Another potential witness was Tom Lawrence, the facility law librarian at Ogdensburg. *Id.*; *see also Dkt. No. 41–6 at 32*. The other witnesses plaintiff identified to defendant Malik during their meeting were (1) May Liao, plaintiff's sister, who lived in Seattle, Washington; (2) Scot Liao, plaintiff's father, who lived in Taiwan; (3) Ronald Abraham, an administrative law judge who lived in Brooklyn, New York; (4) Imam Settles, the Imam assigned to Ogdensburg; and (5) an individual plaintiff indicated worked as a volunteer for an organization called Chan Meditation. *Dkt. No. 1 at 26; Dkt. No. 41–2 at 7; Dkt. No. 41–3*. Plaintiff expected that defendant Malik would contact each of the individuals and ensure that they would be available to testify at the hearing by way of personal appearance, telephone, or written affidavit. *Dkt. No. 41–6 at 40–41*.

[4] The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

**\*2** A Tier III hearing was conducted by Hearing Officer Randy Abar, beginning on November 30, 2010, to address the charges lodged in the misbehavior reports dated November 19, 2010. *Dkt. No. 41–8*. On December 2, 2010, at the close of the hearing, plaintiff was found guilty on all counts, with

the exception of the charge of unlawful soliciting. *Dkt. No. 41–8 at 28*. Based upon that finding, Hearing Officer Abar imposed a penalty that included six months of disciplinary SHU confinement, with a corresponding six-month loss of recreation, packages, commissary, and telephone privileges, and additionally recommended that plaintiff forfeit three months of good time credits. *Id.* The hearing officer's determination was administratively reversed on May 9, 2012, based upon a review by Corey Bedard, the DOCCS's Acting Director of Special Housing/Inmate Disciplinary Program. *Dkt. No. 1 at 38*.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on or about December 5, 2013. *Dkt. No. 1*. As defendants, plaintiff's complaint names K. Trimm, a corrections sergeant; Faisal Malik, a civilian employee; Ann Charlebois, the former DOCCS Acting Superintendent; Brian Fischer, the former DOCCS Commissioner; and Anthony J. Annucci, the Acting DOCCS Commissioner, and sets forth several causes of action against those individuals. *See generally id.* Upon initial review of plaintiff's complaint and accompanying application for leave to proceed *in forma pauperis* ("IFP"), pursuant to 28 U.S.C. §§ 1915(e) and 1915A, Chief District Judge Glenn T. Suddaby issued a decision and order on June 4, 2014, granting plaintiff's IFP application and dismissing all claims with the exception of plaintiff's procedural due process cause of action against defendant Malik. *Dkt. No. 11*.

On July 9, 2015, following the close of discovery, defendant Malik moved for summary judgment, requesting dismissal of plaintiff's remaining claim against him on a variety of grounds. *Dkt. No. 41*. That motion, to which plaintiff has failed to respond, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Plaintiff's Failure to Oppose Defendant's Motion*
Before turning to the merits of defendant's motion, a threshold issue to be addressed is the legal significance of plaintiff's failure to oppose defendant's motion, and specifically whether that failure should be construed as a consent to the dismissal of his complaint.

Pursuant to Local Rule 7.1(b)(3), by failing to oppose defendant's motion, plaintiff has effectively consented to the granting of the relief sought. That rule provides as follows:

> Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y. L.R. 7.1(b)(3); *see also Jackson v. Fed. Express,* 766 F.3d 189, 194 (2d Cir. 2014) (holding that the district courts may enter summary judgment in favor of the moving party where the non-moving party fails to respond in opposition, but not without first "ensur[ing] that each statement of material fact is support by record evidence sufficient to satisfy the movant's burden of production" and "determin[ing] whether the legal theory of the motion is sound").

In this case, plaintiff has not responded to defendant's motion. The motion was properly filed by defendant Malik, and defendant, through his motion, has met his burden of demonstrating entitlement to the relief requested. With respect to the question of whether defendant has met his burden, I note that the "burden of persuasion is lightened such that, in order to succeed, his motion need only be 'facially meritorious.' " *See Rodriguez v. Goord,* No. 04–CV–0358, 2007 WL 4246443, at *1 (N.D.N.Y. Nov. 27, 2007) (Scullin, J., *adopting report and recommendation by* Lowe, M.J.) (finding that whether a movant has satisfied its burden to demonstrate entitlement to a dismissal under Local Rule 7.1(b)(3) "is a more limited endeavor than a review of a contested motion to dismiss" (citing cases)).[5]

[5]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

**\*3** Because defendant has accurately cited both proper legal authority and evidence in the record supporting the grounds on which his motion is based, and plaintiff has failed to respond in opposition to the motion to dismiss, I find that defendant's motion is facially meritorious. *Jackson,* 766 F.3d at 194. Accordingly, I recommend that the court grant defendant's motion on this basis.

It should also be noted that there are additional consequences flowing from plaintiff's failure to file an opposition to defendant's Local Rule 7.1(a)(3) Statement of Material Facts. Local Rule 7.1 provides, in relevant part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in cases where a non-movant has failed to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV–0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's Local Rule 7.1 Statement, *Dkt. No. 41 at* 3, and he has failed to do so, I recommend that the court deem the facts contained in defendant's Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996). As to any facts not contained in defendant's Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry,* 336 F.3d at 137.

### B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant

Liao v. Malik, Not Reported in Fed. Supp. (2016)

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 109 of 353

2016 WL 1128245

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*4** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. *Analysis of Plaintiff's Procedural Due Process Claim*
In his remaining claim, plaintiff contends that defendant Malik deprived him of procedural due process as guaranteed under the Fourteenth Amendment while assisting him in preparing for his Tier III disciplinary hearing. *Dkt. No. 1 at 7– 8.* To prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir. 2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir. 1996).

As to the first element, in *Sandin v. Conner,* 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–84; *Tellier,* 280 F.3d at 79–80; *Hynes,* 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe,* No. 95–CV–2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94–CV– 0985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under Sandin.

Atypicality in a *Sandin* inquiry is normally a question of law. [6] *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker,* 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a court may not need to undergo a detailed analysis of these considerations. *Arce,* 139 F.3d at 336; *Hynes,* 143 F.3d at 658.

6

In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999).

**\*5** As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis,* 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis,* 576 F.3d at 133 (citing *Colon,* 215 F.3d at 232–33 n.5). The

**Liao v. Malik, Not Reported in Fed. Supp. (2016)**
2016 WL 1128245

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 110 of 353

court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis,* 576 F.3d at 134 (quoting *Welch v. Bartlett,* 196 F.3d 389, 392–93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon,* 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

In this instance, although Hearing Officer Abar sentenced plaintiff to six months of disciplinary SHU confinement, plaintiff testified at his deposition that he served approximately five months, or 150 days, in the SHU, having been released early for good behavior. *Dkt. No. 41–6 at 118.* Because this period of disciplinary confinement falls between 101 and 305 days, in order to determine whether plaintiff suffered an atypical hardship, and therefore has been deprived a liberty interest, the court is required "to articulate specific findings of the conditions of the imposed confinement relative to the ordinary prison conditions[.]" *Reynoso v. Selsky,* 292 F. App'x 120, 123 (2d Cir. 2008). While plaintiff's testimony from his deposition suggests that the conditions of his SHU confinement were not extraordinary in any way, [7] defendant has not provided the court any evidence with respect to the conditions of ordinary prison life in support of his motion. Because the court is without this evidence, it cannot undertake the type of specific fact-finding required to determine, on summary judgment, whether plaintiff suffered an atypical and significant hardship during his confinement. *See Reynoso,* 292 F. App'x at 123 (reversing the district court where it had neglected "to articulate findings as to why the 150–day total sentence was not 'atypical and significant' " and commenting that "[s]uch a determination is anything but simple, and cannot be resolved summarily"). For this reason, I have assumed, for purposes of this report, that plaintiff was deprived of a liberty interest by way of his five-month SHU confinement and have proceeded to analyze whether defendant Malik provided plaintiff with constitutionally adequate assistance prior to his disciplinary hearing.

[7]  Plaintiff testified that, while confined in the SHU, he (1) requested legal materials from the law library daily and that they were delivered to him approximately four days later; (2) was permitted to choose non-legal books to read once per week when a corrections officer would do rounds with a cart of books; (3) was permitted to shower three times per week; (4) was provided access to the outdoors for a period of recreation time one hour per day; (5) ate three meals per day; and (6) was allowed to write, send, and receive mail and otherwise correspond with corrections staff by way of "interview slips." *Dkt. No. 41–6 at 119–26.*

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell,* 418 U.S. 539 (1974). In its decision in *Wolff,* the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564–69; *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, it is also required that a hearing officer's disciplinary determination garners the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985); *Luna,* 356 F.3d at 487–88.

**\*6** Plaintiff's only contention against defendant Malik is centered upon the duty under *Wolff* to provide assistance in preparing a defense. As the Second Circuit has noted, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir. 1988). That requirement is particularly acute when an inmate faces obstacles in defending himself, including "being confined full-time to SHU[.]" *Eng,* 858 F.2d at 897. Although the Second Circuit in *Eng* specifically declined to define the extent of an assistant's obligations in helping an inmate to prepare for a disciplinary hearing, it offered the following observation:

> Although this is not the occasion to define the assigned assistant's

Case 9:17-cv-00366-DNH-TWD   Document 93   Filed 03/08/21   Page 111 of 353

Liao v. Malik, Not Reported in Fed. Supp. (2016)

2016 WL 1128245

precise role and the contours of the assistant's obligations, such help certainly should include gathering evidence, obtaining documents and relevant tapes, and interviewing witnesses. At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself.

*Id*. at 898; accord, *Samuels v. Selsky*, 166 F. App'x 552, 556 (2d Cir. 2006).[8]

[8]    The constitutional requirement to provide an assistant to an inmate to aid in preparing for a disciplinary hearing is echoed in New York by regulation. 7 N.Y.C.R.R. §§ 251–4.1, 251–4.2; *see also Brooks v. Prack,* 77 F.Supp.3d 301, 315 (W.D.N.Y.2014); *Fernandez v. Callens,* No. 06–CV–0506, 2010 WL 4320362, at *9 (W.D.N.Y. Oct. 29, 2010).

The scope of the assistance that must be provided to an accused inmate, as contemplated under *Wolff* and *Eng,* is not unlimited, and clearly does not require the assignment of counsel or of the functional equivalent of a private investigator. *See Samuels,* 166 F. App'x at 556 ("The required assistance does not equate to legal counsel."); *Fernandez,* 2010 WL 4320362, at *9 ("The Supreme Court has held that a prisoner's right to assistance as a matter of federal constitutional law is more limited, determining that the institutional concerns implicated in prison administration would not be furthered by entitling inmates to legal counsel in the form of a retained or assigned attorney."); *Gates v. Selsky,* No. 02–CV–0496, 2005 WL 2136914, at *6 (W.D.N.Y. Sept. 2, 2005) (citing cases). The assigned assistant is required only to perform those functions that the plaintiff would have, had he not been hampered through SHU confinement, and need not go beyond the inmate's instructions. *See Silva v. Casey,* 992 F.2d 20, 22 (2d Cir. 1993) ("[A]n assistant must be assigned to the inmate to act as his *surrogate* – to do what the inmate would have done were he able." (emphasis in original)); *accord, Samuels,* 166 F. App'x at 556; *see also Lewis v. Murphy,* No. 12–CV–0268, 2014 WL 3729362, at *12 (N.D.N.Y. July 24, 2014) (Mordue, J., *adopting report and recommendation by* Hummel, M.J.). Significantly, any claim of deprivation of assistance is reviewed for harmless error. *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir. 2009).

In support of his motion, defendant Malik, a vocational instructor who is periodically assigned to assist inmates in connection with disciplinary hearings and has received DOCCS training for serving in that role, has submitted a declaration detailing his efforts to assist plaintiff in mounting a defense to the charges against him. *See generallyDkt. No. 41–2.* According to that declaration, after being assigned to the matter, defendant Milak met with plaintiff on November 22, 2010, to discuss the charges against him. *Dkt. No. 41–2 at 6–7.* After reviewing the charges and insuring that plaintiff understood them, defendant Malik inquired as to what assistance plaintiff desired. *Id.* at 7. Liao identified several witnesses who he contemplated calling as witnesses at the hearing, including inmate Gantt; Ogdensburg Law Librarian Tom Lawrence; May Liao, plaintiff's sister; Scot Liao, plaintiff's father; Ronald Abraham, an administrative law judge; Imam Settles assigned to Ogdensburg; and an unidentified individual who plaintiff referred to as a volunteer at Chan Meditation. *Id.; see alsoDkt. No. 41–3.* Plaintiff told defendant Malik that he would like all of those individuals to testify at the upcoming hearing, either in person or by phone, notwithstanding that plaintiff's sister lived in the State of Washington, plaintiff's father was located in Taiwan, and Ronald Abraham resided in Brooklyn. *Dkt. No. 41–2 at 7.* Uncertain of the extent of his obligation with regard to plaintiff's requested witnesses, defendant Malik contacted the prison disciplinary office and learned that inmate Gantt had been released on November 17, 2010. *Id.* at 8; *see alsoDkt. No. 41–4.* Defendant was informed by the disciplinary officer on duty that employee assistants are not required to track down non-inmate potential witnesses outside of the facility or to arrange for or schedule the testimony of non-inmates who are "outside the correctional facility." *Dkt. No. 41–2 at 8.*

**\*7**    Immediately following his discussion with the disciplinary office, defendant Malik reports that he returned to plaintiff's cell and informed him of Gantt's release from Ogdensburg, and advised plaintiff that he would have to provide contact information for the other desired witnesses who were not inmates and/or working in a DOCCS facility. *Dkt. No. 41–2 at 9.* Defendant Malik informed plaintiff "that he would then have to tell the hearing officer that he wanted them to testify, that the hearing officer would then decide if they could testify, and that if he/she decided to allow them to testify, their testimony would then be scheduled and arranged." *Id.* According to defendant, plaintiff responded by providing defendant Malik the phone number for his sister, and defendant wrote that number down on the assistant form.

Liao v. Malik, Not Reported in Fed. Supp. (2016)

2016 WL 1128245

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 112 of 353

*Id.*; *Dkt. No. 41–3.* Plaintiff also told defendant that he would obtain the contact information for the other witnesses, aside from Tom Lawrence, from his sister. *Dkt. No. 41–2 at 9–10.* Plaintiff "did not tell [defendant Malik] that he needed assistance with anything else," and defendant then asked plaintiff to sign and date the assistant form, and plaintiff complied. *Id.* at 10. Defendant Malik did not hear anything further from plaintiff in connection with his assignment as plaintiff's assistant. *Id.* at 10.

Although plaintiff's version of the interaction with defendant Malik on November 22, 2010, differs to some degree, the factual disputes are not material. Plaintiff contends that defendant Malik forced plaintiff to sign the assistant form at the end of their meeting, which plaintiff alleges lasted only fifteen minutes, by threatening plaintiff with an additional misbehavior report for failing to comply with a direct order. *Dkt. No. 1 at 7–8; Dkt. No. 41–6 at 23.* Additionally, plaintiff alleges that he did not see or speak with defendant Malik again after their first meeting. *Dkt. No. 41–6 at 29.* Defendant Malik disputes these allegations by plaintiff. *Dkt. No. 41–2 at 9–11.*

Even assuming plaintiff's allegations are true – that he was forced to sign the assistant form and did not see or hear from defendant Malik again after their first meeting – there is no record evidence that supports plaintiff's claims that defendant Malik did nothing to assist him. In fact, on the first day of the disciplinary hearing, plaintiff was under the impression that defendant Malik was contacting witnesses for him. *Dkt. No. 41–6 at 58.* While defendant Malik has offered a detailed account of his efforts to provide plaintiff assistance, Dkt. No. 41–2, plaintiff has failed to adduce any evidence, nor is there any in the record, that suggests defendant Malik provided plaintiff with constitutionally inadequate assistance. It is clear from plaintiff's deposition testimony that he expected defendant Malik to undertake the role of plaintiff's advocate by contacting his requested witnesses, explaining plaintiff's circumstances, and arranging for them to testify in person, by phone, or by way of a prepared affidavit. Dkt. No. 41–6 at 34–36, 38–41. Additionally, plaintiff expected defendant Malik to arrange a settlement of the misbehavior report between him and facility security to avoid the need for a disciplinary hearing. *Id.* at 84.

Plainly, plaintiff's expectations for his assigned assistant were unreasonable and exceeded the constitutional requirements under *Wolff* and *Eng.* Both the Supreme Court and courts in this circuit have unequivocally held that the constitution does not require inmate assistants to serve as legal counsel

or investigator for prisoners. *Wolff,* 418 U.S. at 570; *Samuels,* 166 F. App'x at 556; *Gates,* 2005 WL 2136914, at *6. Setting aside plaintiff's unsupported allegations that defendant Malik did not assist him in any way, the uncontroverted record evidence in this case reflects that defendant met with plaintiff ahead of the hearing, explained to him the charges, asked for a list of potential witnesses, clarified his role as plaintiff's assistant with the disciplinary office, and informed plaintiff that he would be responsible for gathering the contact information for the witnesses that were not employed at Ogdensburg and then requesting them as witnesses during the hearing. *See Dkt. No. 41–2.* This conduct satisfies the due process to which plaintiff was entitled. In any event, even assuming defendant Malik's assistance fell short, any error was harmless in light of Hearing Officer Abar's rejection of plaintiff's requests to call the potential witnesses plaintiff alleges defendant Malik should have contacted prior to the hearing. [9] *Dkt. No. 41–6 at 99; Dkt. No. 41–8 at 2, 3, 4, 16, 26.* Based upon the foregoing, I recommend defendant Malik's motion be granted. [10]

[9]    At the hearing, plaintiff did not request to call Imam Settles or the individual referred to by plaintiff as a volunteer at for Chan Meditation as witnesses. *See generally Dkt. No. 41–8.*

[10]    In light of my recommendation that defendant's motion be granted on the merits, I have not addressed the additional arguments set forth in his motion. With respect to whether plaintiff exhausted the available administrative remedies prior to filing this action, however, it is worth noting that there is no dispute that plaintiff failed to file a grievance through the DOCCS's inmate grievance program regarding the alleged inadequate assistance he received from defendant Malik. *Dkt. No. 41–6 at 104.* Plaintiff's vague and unsupported allegations that he did not file a grievance because he "was afraid of retaliation" is not sufficient to excuse that failure. *See, e.g., Baines v. McGinnis,* 766 F.Supp.2d 502, 504 (W.D.N.Y.2011) (citing *McCloud v. Tureglio,* No. 07–CV–0650, 2008 WL 1772305, at *11 (N.D.N.Y. Apr. 15, 2008) (Mordue, J., *adopting report and recommendation by* Lowe, M.J.)). While it is true that an appeal from a disciplinary hearing that raises the precise procedural infirmities asserted in a section 1983 action may be sufficient to exhaust administrative remedies, *LaBounty v. Johnson,* 253 F.Supp.2d

496, 502 n. 5 (W.D.N.Y.2013), there is no record evidence reflecting whether plaintiff raised his claim regarding defendant Malik in his appeal of Hearing Officer Abar's determination that was ultimately reversed. It seems unlikely that plaintiff would have included this ground as a basis for his appeal in light of his insistence that he did not file a grievance through the facility because of a fear of retaliation and that, by naming a particular person in a grievance or complaint, he would be targeted by corrections officers. See *Dkt. No. 41–6 at 138–40,* 156–57, 162. Accordingly, while I do not recommend dismissal of defendant's complaint on this basis, and do not intend to render any findings on this issue, it does appear likely that plaintiff's complaint is procedurally barred based on his failure to exhaust the available administrative remedies prior to filing suit.

## IV. *SUMMARY AND RECOMMENDATION*

**\*8** Defendant has moved for summary judgment dismissing the sole remaining claim in this action, relating to plaintiff's allegation that he was denied procedural due process as a result of defendant's failure to render proper assistance to him in preparing for a disciplinary hearing. Because plaintiff

has failed to oppose defendant's motion, and I find that it is facially meritorious, I recommend that it be granted on this basis. Moreover, the record before the court, including a declaration from defendant Malik detailing his efforts on plaintiff's behalf, demonstrates both that there are no genuine disputes of material fact for trial and that no reasonable factfinder could conclude that defendant deprived plaintiff of procedural due process. Accordingly, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment *(Dkt. No. 41)* be GRANTED and that plaintiff's remaining claim in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1128245

---

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 4555932
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Bashan TAYLOR, Plaintiff,

v.

Dale ARTUS, Superintendent, Clinton Correctional
Facility; Lieutenant Armsteal, Tier Two Hearing
officer; Renown, Correctional Sergeant; Castiron,
Correctional Officer; Christian, Correctional Officer;
and Mahuta, Correctional Officer., Defendants.

No. 9:05-CV-0271 (LEK/GHL).
|
Dec. 19, 2007.

**Attorneys and Law Firms**

Bashan Taylor, Ray Brook, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Jeffrey P. Mans, Esq., Assistant Attorney General,
of Counsel, Albany, NY.

*DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on November 5, 2007, by the
Honorable George H. Lowe, United States Magistrate Judge,
pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the
Northern District of New York. Report-Rec. (Dkt. No. 34).

Within ten days, excluding weekends and holidays, after a
party has been served with a copy of a Magistrate Judge's
Report-Recommendation, the party "may serve and file
specific, written objections to the proposed findings and
recommendations," FED. R. CIV. P. 72(b), in compliance
with L.R. 72.1. No objections have been raised in the allotted
time with respect to Judge Lowe's Report-Recommendation.
Furthermore, after examining the record, the Court has
determined that the Report-Recommendation is not subject to
attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 34)
is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it
is further

**ORDERED,** that Defendants' Motion for summary judgment
(Dkt. No. 32) is **GRANTED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all
parties.

**IT IS SO ORDERED.**

*REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This action has been referred to me for Report and
Recommendation by the Honorable Lawrence E. Kahn,
Senior United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(c) of the Local Rules of Practice
for this Court. Plaintiff Bashan Taylor ("Plaintiff"), currently
an inmate at Adirondack Correctional Facility, commenced
this *pro se* civil rights action pursuant to 42 U.S.C. § 1983.

Liberally construed, Plaintiff's Amended Complaint alleges
that seven employees of Clinton Correctional Facility
("Clinton C.F.")-Superintendent Dale Artus, Correctional
Lieutenant Armsteal, Correction Sergeant Renown, and
Correctional Officers Castiron, Chapman, Christian, and
Mahuta ("Defendants")-violated his rights under the
First, Eighth and Fourteenth Amendments when, between
approximately August 13, 2004, and June 2, 2005, they
committed various acts of misconduct, including (1) issuing
unjustified misbehavior reports charging him with variety of
infractions (e.g., burning incense in his cell, not attending
a mandatory meal, not responding to "call out[s]" to
"attend [ ] law library"), (2) not following the proper
procedures at prison disciplinary hearings, resulting in his
disciplinary convictions, (3) refusing to help him when he
complained about the aforementioned misbehavior reports
and disciplinary convictions, (4) threatening to beat him,
(5) denying him access to the facility's law library, and (6)
depriving him of various pieces of his personal property (e.g.,
taking money out of his facility bank account due to his
"[disciplinary] tickets," and taking various legal papers that
he had been instructed to leave outside a mess hall). (*See
generally* Dkt. No. 9 [Plf.'s Am. Compl.].)

**\*2** Currently pending before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 32.) Despite having been twice advised of the potential consequences of failing to respond to Defendants' motion (Dkt. No. 32, Part 1; Dkt. No. 33), Plaintiff has not responded. For the reasons that follow, I recommend that Defendants' motion be granted. In the alternative, I recommend that the Court revoke Plaintiff's *in forma pauperis* status as having been improvidently granted, and dismiss his Amended Complaint without prejudice to refiling upon payment of the filing fee.

## I. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Unopposed Motion for Summary Judgment Under Rule 56 of the Federal Rules of Civil Procedure

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [1] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [2]

[1]   A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[2]   *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [3] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [4] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [5]

[3]   Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

[4]   Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[5]   *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

What this somewhat complex burden-shifting standard means is that, where a plaintiff has failed to respond to a defendant's motion for summary judgment, "[t]he fact that there has been no response to a summary judgment motion does not ... [by itself] mean that the motion is to be granted automatically." [6] Rather, practically speaking, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the defendants' motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the defendants. [7] However, where a plaintiff has failed to respond to a defendant's statements of material fact contained in its Statement of Material Facts (a/k/a its "Rule 7.1 Statement"), the facts as set forth in that Statement will be accepted as true [8] to the extent that (1) those facts are supported by the evidence in the record, [9] and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. [10] Here, I note that Plaintiff has been *twice* so advised-first by Defendants on or about December 29, 2006, and then by the Court on or about July 3, 2007. [11]

6 *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996).

7 *See Champion,* 76 F.3d at 486 ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]; *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001) (Scullin, C.J.) (stating that, where a plaintiff has failed to respond to a defendant's motion for summary judgment, "[t]he Court must review the merits of Plaintiff's claims"). This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the nonmoving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

8 *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ).

9 *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[W]here the non-movant party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the

citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added]; *Adirondack Cycle & Marine, Inc. v. Am. Honda Motor Co., Inc.,* 00-CV-1619, 2002 U.S. Dist. LEXIS 4386, at *2-3, 2002 WL 449757 (N.D.N.Y. Mar. 18, 2002) (McAvoy, J.) ("Local Rule 7.1 requires a party opposing summary judgment to respond to the statement of undisputed material facts submitted by the movant. To the extent such facts are not controverted, *the properly supported facts* will be taken as true.") [emphasis added; citation omitted]; *cf.* Fed.R.Civ.P. 83(a)(1) ("A local rule shall be consistent with ... Acts of Congress and rules adopted under 28 U.S.C. §§ 2072 and 2075 [which include the Federal Rules of Civil Procedure] ...."); Fed.R.Civ.P. 56(e) (requiring that, "if the non-movant does not ... respond [to a summary judgment motion], summary judgment, *if appropriate,* shall be entered against the non-movant," and requiring that, as a threshold matter, the motion for summary judgment must be "made *and supported* as provided in this rule") [emphasis added].

10 *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

11 (Dkt. No. 32, Part 1, at 1-2 [Defendants' Notice of Motion, filed 12/29/06, specifically advising Plaintiff of consequences of failing to respond to their motion, including the consequences of failing to respond to their Rule 7.1 Statement of Material Facts], *accord,* Dkt. No. 33, at 2-3 [Order of Court, filed 7/3/07, sua sponte giving Plaintiff an additional 30 days in which to respond to Defendants' motion, and advising him of the consequences of failing to oppose their motion, including the consequences of failing to respond to their Rule 7.1 Statement of Material Facts].)

2007 WL 4555932

**\*3** Implied in the above-stated standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se*. [12] However, in the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit. [13] Here, I note that Plaintiffs' Amended Complaint does *not* contains a verification pursuant to 28 U.S.C. § 1746. [14]

[12] *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at \*12-13, 2004 WL 5477530 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at \*1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

[13] *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

[14] (Dkt. No. 1.)

**B. Legal Standard Governing Unopposed Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6) of the Federal Rules of Civil Procedure**

To the extent that a defendant's motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is based solely on the allegations asserted in a plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Rule 12(b)(6). In such a circumstance, "a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." [15] Here, I note that several portions of Defendants' Memorandum of Law argue that various of Plaintiff's claims should be dismissed due to his failure to state a claim upon which relief may be granted. [16]

[15] *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

[16] (*See, e.g.,* Dkt. No. 32, Part 21, at 9-12, 15-20 [Defs.' Mem. of Law].)

Moreover, I note that, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted. [17]

[17] The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Taylor v. Artus, Not Reported in F.Supp.2d (2007)

2007 WL 4555932

For these reasons, it is appropriate to briefly summarize the recently clarified legal standard governing Rule 12(b)(6) motions to dismiss. Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Rule 8(a)(2); [18] or (2) a challenge to the legal cognizability of the claim. [19]

[18]    See 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

[19]    See *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s

requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-02 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Such a statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." [20] The purpose of this rule is to "facilitate a proper decision on the merits." [21] A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [22]

[20]    *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ); *see also Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (quoting *Conley,* 355 U.S. at 47).

[21]    See *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48).

[22]    *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion).

Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [23] However, it is well established that even this liberal notice pleading standard "has its limits." [24] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard. [25]

[23]  *See, e.g., Swierkiewicz,* 534 U.S. at 513-14 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

[24]  2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

[25]  *See, e.g., Bell Atl. Corp. v. Twombly,* ---U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-74, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a] [2]'s liberal requirement, *accord, Dura Pharm.,* 125 S.Ct. at 1634-35, *Christopher v. Harbury,* 536 U.S. 403, 416-22, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-35 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-09 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

**\*4**  Most notably, in the recent decision of *Bell Atl. Corp. v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated a claim upon which relief could be granted, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." --- U.S. ----, ---- - ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007). [26] Rather than turning on the conceivability of an actionable claim, the Court clarified, the Rule 8 standard turns on the "plausibility" of an actionable claim. *Id.* at 1965-74. More specifically, the Court held that, for a plaintiff's complaint to state a claim, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

[26]  The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

Having said that, it should be emphasized that, "[i]n reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's

Taylor v. Artus, Not Reported in F.Supp.2d (2007)

2007 WL 4555932

favor."[27] Moreover, it should be noted that "[t]his standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*"[28] In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are generally to be construed with an *extra* degree of liberality. Indeed, generally "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest."[29] In addition, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."[30] However, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[31] For example, an opportunity to amend should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."[32]

[27] *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

[28] *Hernandez,* 18 F.3d at 136 [citation omitted]; *see also Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

[29] *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

[30] *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

[31] *Stinson v. Sheriff's Dep't of Sullivan County,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz,* 2007 WL 2027912, at *2 (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL

853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.; *Ariola v. Onondaga County Sheriff's Dep't,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins,* 2007 WL 37404, at *4 (Kahn, J., adopting report-recommendation of Lowe, M.J.).

[32] *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

Finally, it is important to observe that "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3). The Court's consideration of whether a movant has met its burden "to demonstrate entitlement" to the relief requested under Local Rule 7 .1(b)(3) is a more limited endeavor than a consideration of a contested motion requesting such relief.[33]

[33] *See, e.g., Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before an unopposed motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious*" ) (emphasis added) (citations omitted); *Race Safe Sys., Inc. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-10 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *see also Wilmer v. Torian,* 96-

CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2, 1997 WL 640982 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b] [3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 WL 589372, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

## II. ANALYSIS

**\*5** Because Plaintiff has failed to respond to Defendants' motion (despite having been twice advised of the adverse consequences of failing to so respond), the task before the Court is to determine whether Defendants have met their lightened burden on their motion. *See, supra,* Parts I.A., I.B. of this Report-Recommendation.

Defendants' motion is premised on the following five legal arguments, which are set forth in their Memorandum of Law: (1) all of Plaintiff's claims should be dismissed because he failed to allege facts plausibly suggesting, and/or failed to adduce any evidence establishing, that he exhausted his available administrative remedies before filing this action in federal court; (2) Plaintiff's due process claim (under the Fourteenth Amendment) should be dismissed because (a) he has adduced no evidence that he had a liberty interest protected by the Fourteenth Amendment, and (b) in any event, he has adduced no evidence that he was not afforded all the process that he was due at his disciplinary hearings; (3) Plaintiff's deprivation-of-property claim (under the Fourteenth Amendment) should be dismissed because (a) he fails to allege facts plausibly suggesting that any Defendant was personally involved in the deprivation of his property, and (b) in any event, he fails to adduce evidence establishing that he availed himself of the state-provided post-deprivation remedy for such a deprivation of property, i.e., the filing of an action in the New York State Court of Claims; (4) Plaintiff's denial-of-access-to-the-courts claim (under the First Amendment) should be dismissed because he has failed to allege facts plausibly suggesting that he suffered any injury as a result of that denial; and (5) any retaliation claim (under the First Amendment) that Plaintiff is attempting to assert should be dismissed because he has failed to allege facts plausibly suggesting that he had been engaging in activity that is protected by the First Amendment before adverse action

had been taken against him. (*See* Dkt. No. 32, Part 21, at 9-20 [Defs.' Mem. of Law].) I will address each of these arguments in turn (to the extent that I need to do so).

### A. Whether Plaintiff's Amended Complaint Should Be Dismissed Due to a Failure to Exhaust His Available Administrative Remedies

Defendants correctly recite the law governing prisoners' exhaustion of available administrative remedies. (*See* Dkt. No. 32, Part 21, at 9-11 [Defs.' Mem. of Law].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e.

The Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 [citation omitted]. Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

### 1. Availability

**\*6** Defendants do not, in their motion papers, offer specific evidence (such as the affidavit of the supervisor or coordinator of the Clinton C.F. Inmate Grievance Program) that, during the time in question, there was a working grievance program specifically *at Clinton C.F.* Granted, in his

*original* Complaint, which was verified, Plaintiff answered "yes" to the question, "Is there a prisoner grievance procedure at [Clinton Correctional Facility]?" (Dkt. No. 1, ¶ 4.a. [Plf.'s Verified Compl., dated 2/22/04].) Ordinarily, a sworn allegation such as this is sufficient to constitute evidence for purposes of a motion for summary judgment.[34] The problem is that, after making this sworn allegation in his original Complaint, Plaintiff filed an Amended Complaint which was not verified (and which, in any event, made no such allegation). It is rather well settled that an amended complaint supersedes the original complaint for all pleading purposes (unless the amended complaint has incorporated a portion of the original complaint by specific reference). However, it appears to be a matter of some dispute whether an *unsworn* amended complaint renders a *sworn* original complaint as without any evidentiary value whatsoever for purposes of a summary judgment motion.[35]

[34]   *See, supra,* note 13 of this Report-Recommendation.

[35]   On the one hand, there are cases holding that an unsworn amended complaint renders a sworn original complaint as without evidentiary value for purposes of a summary judgment motion. *See, e.g., Hatcher v. Fields,* No. 96-7085, 1997 WL 431784, at *2, n. 2 (10th Cir. Aug.1, 1997); *King v. Dogan,* 31 F.3d 344, 346 (5th Cir.1994). On the other hand, there are cases holding that a sworn original complaint retains its evidentiary value, for purposes of a summary judgment motion, even after the filing of an unsworn amended complaint. *See, e.g., Morrison v. Fox,* 05-CV-3394, 2007 U.S. Dist. LEXIS 73328, at *3, n. 1, 2007 WL 2908480 (D.S.C. Oct. 1, 2007) ("[I]n light of the Plaintiff's *pro se* status, the Court considers any factual allegations set forth in the Plaintiff's unverified amended complaint that mirror the allegations set forth in his initial verified complaint as evidence for purposes of evaluating the Defendants' motion for summary judgment."); *White v. Simpson,* 04-CV-0728, 2006 WL 1007527, at *2, n. 4 (N.D.Tex. Apr.18, 2006) (even where plaintiff submitted an unsworn amended complaint, the court relied on his sworn original complaint, for purpose of summary judgment motion); *cf. Hoskins v. Alameda County Sheriff's Deputies,* 96-CV-0428, 1998 U.S. Dist. LEXIS 12404, at *6, 1998 WL 470480 (N.D.Cal. Aug. 5, 1998) ("Because

plaintiff's original complaint was verified ... and he amended his complaint in response to this court's order, this court will liberally construe the amended complaint to be verified as well."), *rev'd on other grounds,* 188 F.3d 513 (9th Cir.Cal.1999). Here, I note that Plaintiff's unsworn Amended Complaint (which was filed in response to the Court's Order, and which alleges that Defendant Artus did not help Plaintiff after receiving one or more writings from Plaintiff) appears consistent with Plaintiff's sworn original Complaint (which specifically alleges that, during the time in question, there was a grievance program available at Clinton C.F.). (*Compare* Dkt. No. 9, ¶ 1 [Plf.'s Am. Compl.] *with* Dkt. No. 1, ¶ 4.a. [Plf.'s Compl.].)

Fortunately for Defendants, the Court need not resolve this issue in order to decide Defendants' motion. This is because, in order for Defendants to meet their modest threshold burden with respect to this first inquiry on a motion for summary judgment, it does not appear that they need to adduce evidence that, during the time in question, there was a working grievance program *specifically at Clinton C.F.* Rather, it appears sufficient for a defendant to adduce evidence merely that, during the time in question, the New York State Department of Correctional Services ("DOCS") had available to inmates, *in general,* an Inmate Grievance Program.[36] Here, Defendants have adduced at least some evidence of such a fact.[37]

[36]   *See, e.g., Wilkinson v. Banks,* 02-CV-0361, 2007 WL 2693636, at *7-8 (W.D.N.Y. Sept.10, 2007) (granting defendants' motion for summary judgment after, *inter alia,* [1] noting that defendants had, through an affidavit of Thomas Eagen, adduced evidence indicating the existence of DOCS' Inmate Grievance Program, and [2] finding that plaintiff had adduced no evidence suggesting that the Program was not available to him during the time in question). Indeed, some authority exists suggesting that this is the sort of fact of which a court might take judicial notice. *See Wegman v. Grimmke,* 03-CV-2345, 2004 WL 2202642, at *4 (W.D.N.Y. Sept.30, 2004) (granting defendants' motion for summary judgment after, *inter alia,* [1] appearing to take judicial notice of the existence of DOCS' Inmate Grievance Program, and [2] finding that plaintiff had adduced no

evidence suggesting that the Program was not available to him during the time in question).

37      (*See* Dkt. No. 32, Part 3, ¶ 1-2 [Affid. of Def. Eagen, swearing that, *inter alia,* he is the "Director of the Inmate Grievance Program of the New York State Department of Correctional Services," that he is the "custodian of the records maintained by the Central Office Review Committee," and that the Committee's computer database contains records of all appeals received from "the facility Inmate Grievance Program Offices" since 1990].)

The steps involved in this Inmate Grievance Program are well established:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

*White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6, 2002 WL 31235713 (S.D.N.Y. Oct. 3, 2002) (citing N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7). DOCS also has a separate and distinct administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

*7  B. For Tier II disciplinary hearings, the appeal is to the facility Superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility Superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

Individual decisions or dispositions regarding inmate misbehavior reports and hearings, or inmate grievances, are not considered grievable matters; however, the policies, rules and procedures of the disciplinary and grievance programs may be the subject of a grievance. *See* 7 N.Y.C.R.R. § 701.3(e) (1), (2); *see also* N .Y. Dep't Corr. Serv. Directive No. 4040 at III.E. Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

In their motion papers, Defendants have adduced evidence establishing that, despite this available grievance procedure, Plaintiff never filed any grievance appeal with CORC during the time in question (or at any time). (Dkt. No. 32, Part 3, ¶ 3 [Affid. of Eagen].) Plaintiff has adduced no record evidence controverting this fact. [38]

38      Indeed, in his original Complaint, which (again) was verified, Plaintiff asserts facts indicating that the highest level of DOCS staff to which he appealed any Inmate Grievance Resolution Committee decision was the office of the Clinton C.F. Superintendent. (Dkt. No. 1, ¶ 4.c.(i) [Plf.'s Verified Compl.].)

As a result, I find that, despite the fact that administrative remedies were indeed available to Plaintiff, he failed to pursue those remedies.

**2. Forfeiture/Estoppel**

I find no evidence in the record that Defendants forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it. (*See* Dkt. No. 28, Part 1, ¶¶ 16-17 [Defs.' Answer, raising exhaustion as a defense].) Nor do I find any evidence in the record that Defendants' own actions somehow inhibited Plaintiff's exhaustion of remedies sufficient to estop one or more of the Defendants from raising Plaintiff's failure to exhaust as a defense. Granted, I acknowledge that, in his Amended Complaint, Plaintiff alleges that, at various points in time, (1) Defendant Castiron "threatened to beat [Plaintiff]," (2) Defendant Renown "threatened" Plaintiff, and (3) Defendant Amsteal "act[ed] crazy." (Dkt. No. 1,

Taylor v. Artus, Not Reported in F.Supp.2d (2007)

2007 WL 4555932

¶¶ 5, 7, 10 [Plf.'s Am. Compl.].) However, Plaintiff has adduced no evidence in support of the alleged actions. The Amended Complaint does not constitute such evidence since it is not verified. And, while the original Complaint is verified, it contains absolutely no factual assertions regarding such actions. (*See* Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.].)

### 3. Special Circumstances

Finally, I find no evidence in the record establishing (or even factual allegations in Plaintiff's Amended Complaint plausibly suggesting) the existence of any special circumstances that would justify Plaintiff's failure to comply with the administrative procedural requirements.

As a result, I recommend that Plaintiff's Amended Complaint be dismissed due to his failure to adduce any evidence that he exhausted his administrative remedies before filing this action in federal court.

### B. Defendants' Other Asserted Grounds for Dismissal

*8  Because I find that Defendants' have met their modest burden with regard to their first ground for dismissal (i.e., Plaintiff's failure to exhaust his available administrative remedies before filing this action in federal court), I need not, and do not, reach the merits of their other arguments, except to make the following two observations.

First, with respect to Defendants' argument that Plaintiff has adduced no evidence that he had a liberty interest protected by the Fourteenth Amendment, Defendants appear to be correct when they argue that, for several *separate* periods of confinement to be considered *together* (for purposes of applying *Sandlin v. Connor,* 515 U.S. 472 [1995] ), those separate periods of confinement must be *consecutive.* (Dkt. No. 32, Part 21, at 12-14 [Defs.' Mem. of Law].) In particular, the precise issue, in such a circumstance, is whether the disciplinary confinements in question constitute a "sustained" period of confinement such that they may be aggregated for purposes of the Due Process Clause.[39] Generally, it appears from Second Circuit decisions that separate SHU sentences constitute a "sustained" period of confinement when (1) they are contiguous *and* (2) they either (a) were imposed by the same disciplinary hearing officer or (b) were based on the same administrative rationale and are executed under the same conditions.[40] Here, Defendants have adduced evidence that the five periods of confinement in question were *not* contiguous or consecutive. (*See* Dkt. No. 32, Parts 10, 12,

14, 16, 18 [Affid. of Jarvis, attaching, as exhibits, Plaintiff's disciplinary hearing dispositions, showing sentences imposed as a result of his disciplinary convictions].) And Plaintiff has adduced no evidence controverting that fact.

39    As the Second Circuit has held, "separate SHU sentences should be aggregated for purposes of the *Sandlin* inquiry when they constitute a *sustained* period of confinement." *Giano v. Selsky,* 238 F.3d 223, 226 (2d Cir.2001) [internal quotations and citations omitted; emphasis added].

40    *See Giano,* 238 F.3d at 226 (aggregating 670 days in administrative segregation at Attica C.F. to 92 days in administrative segregation at Clinton C.F., which segregation *immediately followed* the prior segregation, where it was clear that the subsequent segregation was "simply a continuation" of the prior segregation because "the two periods of confinement were based on the same administrative rationale and ... the conditions of Giano's confinement were ... identical at both facilities"); *Sealey v. Giltner,* 197 F.3d 578, 580, 587-88 (2d Cir.1999) (taking 83-day sentence in SHU imposed by Defendant Giltner at April 16 disciplinary hearing, and aggregating it to 18-day sentence in SHU that plaintiff had served *immediately prior* to April 16 disciplinary hearing, but not aggregating it to sentence that resulted from a subsequent disciplinary hearing conducted by a *different hearing officer* ); *cf. Sims v. Artuz,* 230 F.3d 14, 18-19, 23-24 (2d Cir.2000) (leaving it to district court to explore whether to aggregate any of the 60-day to 360-day sentences from seven disciplinary hearings that occurred within a four-and-one-half-month period, where all of those sentences were contiguous, two of them were administered by the same disciplinary hearing officer, and two others were also administered by the same disciplinary hearing officer).

Second, with respect to Defendants' argument that Plaintiff's denial-of-access-to-the-courts claim (under the First Amendment) should be dismissed because he has failed to allege facts plausibly suggesting that he suffered any injury as a result of that denial, Defendants are correct when they argue that, to be viable, such a claim must allege facts plausibly suggesting that Plaintiff suffered an injury as a result of the denial. It is well settled that inmates have a First Amendment right of access to the courts that

requires states "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." [41]  "However, this right is not 'an abstract, freestanding right to a law library or legal assistance' and cannot ground a Section 1983 claim without a showing of 'actual injury.' ' [42]  As a result, to state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. [43]  It is worth noting that "[t]his actual injury requirement 'is not satisfied by just any type of frustrated legal claim,' because the Constitution guarantees only the tools that 'inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." [44]  ' "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.' " [45]  Here, Plaintiff does not allege facts plausibly suggesting that he suffered any injury as a result of being denied the ability to go to the facility's law library and being deprived of certain of his legal materials. (*See generally* Dkt. No. 9 [Plf.'s Am. Compl.].) Even if he had alleged such facts, he has not adduced any evidence in support of such an allegation.

[41]  *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), *modified on other grounds, Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606, (1996); *see also Bourdon v. Loughren,* 386 F.2d 88, 92 (2d Cir.2004) [citations omitted].

[42]  *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 [1996] ).

[43]  *Lewis,* 518 U.S. at 353; *Renelique v. Duncan,* 03-CV-1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr.12, 2007) (Strom, J.); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

[44]  *Collins,* 423 F.Supp.2d at 415-16 (quoting *Lewis,* 518 U.S. at 355).

[45]  *Id.*

**C. Whether, in the Alternative, the Court Should Revoke Plaintiff's *In Forma Pauperis* Status as Having Been Improvidently Granted, and Dismiss Plaintiff's Amended Complaint Without Prejudice to Refiling Upon Payment of the Filing Fee**

 *9  Finally, in the interest of thoroughness, I think it is appropriate to mention an alternative ground for dismissal of Plaintiff's Amended Complaint. Under the so-called "Three Strikes Rule" set forth in the federal statute governing *in forma pauperis* proceedings, in no event shall a prisoner be permitted to bring an action *in forma pauperis*

> if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it ... fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g). The power of a federal district court to invoke this rule is not limited to the outset of a litigation but extends all throughout the pendency of the proceeding. In other words, specifically, federal district courts have the authority to rescind or revoke the *in forma pauperis* status that it has previously bestowed upon a plaintiff, where it discovers that the status was improvidently granted, even if the courts exercise that authority well into the pendency of the proceedings. [46]

[46]  **Northern District of New York:** *See Flemming v. Goord,* 06-CV-0562, 2007 WL 3036845, at *2 (N.D.N.Y. Oct.16, 2007) (Mordue, C.J., adopting Report-Recommendation by Homer, M.J.); *Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *13-14 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting Report-Recommendation of Lowe, M.J.); *Gamble v. Monette,* 06-CV-0136, 2007 WL 2089697, at *1-4 (N.D.N.Y. July 20, 2007) (Kahn, J., adopting Report-Recommendation of DiBianco, M.J.); *Pettus v. Brown,* 06-CV-0152, 2007 WL 1791120, at *2-3 (N.D.N.Y. June 19, 2007) (Mordue, C.J., adopting Report-Recommendation of Homer, M.J.); *Gill v. Pidlypchak,* 02-CV-1460, 2006 WL 3751340, at

*5 (N.D.N.Y. Dec.19, 2006) (Scullin, J.); *Polanco v. Burge,* 05-CV-0651, 2006 WL 2806574, at *2 (N.D.N.Y. Sept.28, 2006) (Kahn, J., adopting Report-Recommendation by Homer, M.J.).

**Western District of New York:** *See Polanco v. Hopkins,* 03-CV-6661, 2007 WL 914023, at *3-6 (W.D.N.Y. Mar.23, 2007).

**Eastern District of New York:** *See McFadden v. Parpan,* 16 F.Supp.2d 246, 247 (E.D.N.Y.1998); *see also Rolle v. Nassau County Correctional Facility,* 01-CV-2414, Order, at 2 (E.D.N.Y. filed Nov. 17, 2004) ("A court may revoke the *in forma pauperis* status it previously bestowed upon a [plaintiff], where that status is later determined to be 'improvident' ") [citation omitted], *accord, Rolle v. Kurtzrock,* 03-CV-1789, Order (E.D.N.Y. filed June 17, 2004).

**District of Connecticut:** *See Demos v. John Doe,* 118 F.Supp.2d 172, 174 (D.Conn.2000).

Here, the Court granted Plaintiff's request to proceed *in forma pauperis* on July 7, 2005. (Dkt. No. 10, at 3.) However, it is clear from the United States Courts' Public Access to Court Electronic Records ("PACER") Service that, as of July 7, 2005, Plaintiff had already received three "strikes" for purposes of 28 U.S.C. § 1915(g). Specifically, Plaintiff's Complaint in the prisoner civil-rights action of *Taylor v. Goldman,* 04-CV-1212 (E .D.N.Y.), was dismissed by Order of Chief Judge Raymond J. Dearie, of the Eastern District of New York, on April 8, 2004, for failure to state a claim upon which relief may be granted. His Complaint in the prisoner civil-rights action of *Taylor v. Zubizarreta,* 04-CV-1565 (E.D.N.Y.), was dismissed, also by Order of Chief Judge Dearie, on August 12, 2004, for failure to state a claim upon which relief may be granted. And his Complaint in the prisoner civil-rights action of *Taylor v. Goldman,* 04-CV-5121 (E.D.N.Y.), was dismissed, also by Order of Chief Judge Dearie, on December 3, 2004, for failure to state a claim upon which relief may be granted. [47] Finally, I find nothing on the face of the Amended Complaint indicating that Plaintiff is in "imminent danger of serious physical injury." [48]

[47]  I note that, *after* Plaintiff's *in forma pauperis* status was (improvidently) granted in this case on July 7, 2005, he earned at least **four** more "strikes," for purposes of 28 U.S.C. § 1915(g).

*See Taylor v. Second Dept. Appellate Div.,* 05-CV-4791 (E.D.N.Y.) (Dearie, C.J.) (dismissing Plaintiff's Complaint for failure to state a claim on October 17, 2005); *Taylor v. Gemill,* 05-CV-6093 (E.D.N.Y.) (Dearie, C.J.) (dismissing Plaintiff's Complaint for failure to state a claim on January 17, 2006) *Taylor v. Artis,* 05-CV-1569 (N.D.N.Y.) (Sharpe, J.) (dismissing Plaintiff's Complaint for failure to state a claim on May 10, 2006); *Taylor v. Bisceglia,* 06-CV-0277 (N.D.N .Y.) (Mordue, C.J.) (dismissing Plaintiff's Amended Complaint for failure to state a claim on May 10, 2007); *see also Taylor v. Bennett,* 05-CV-10709 (S.D.N.Y.) (Berman, J.) (granting defendants' "motion to dismiss" Plaintiff's Amended Complaint on January 24, 2007, but not indicating grounds for dismissal).

[48]  28 U.S.C. § 1915(g); *see also Malik v. McGinnis,* 293 F.3d 559, 561 (2d Cir.2002) (examining plaintiff's allegations in order to determine if plaintiff's case fell within the exception to the three strikes rule for prisoners in "imminent danger of serious physical injury").

As a result, I recommend that, in the alternative, the Court should revoke Plaintiff's *in forma pauperis* status and dismiss Plaintiff's Amended Complaint without prejudice to refiling upon payment of the filing fee.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 32) be *GRANTED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 4555932

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 980272

2010 WL 980272
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Terry CICIO, Plaintiff,

v.

GRAHAM; Peter M. Sigona; Richard D. Ruston, III;
Phil J. Manna; A. Vega; and Ryerson, Defendants.

No. 9:08-CV-534 (NAM/DEP).
|
March 15, 2010.

**Attorneys and Law Firms**

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General, State of New York, Adrienne J. Kerwin, Esq., of Counsel, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

HON. NORMAN A. MORDUE, Chief Judge.

**\*1** Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brought this action for declaratory and monetary relief under 42 U.S.C. § 1983, claiming excessive use of force, failure to intervene, and denial of adequate medical care stemming from a disturbance involving 17 or more inmates occurring in a "holding pen" or "cage" at Auburn Correctional Facility ("ACF") on March 7, 2006. Plaintiff moved for summary judgment (Dkt. No. 35) and defendants cross-moved for summary judgment (Dkt. No. 38). Upon referral of the motions pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c), United States Magistrate Judge David E. Peebles issued a Report and Recommendation (Dkt. No. 41) recommending that this Court deny plaintiff's motion, grant defendants' motion, and dismiss the action.

Plaintiff has submitted an objection (Dkt. No. 42). Plaintiff states that the Court should have reviewed the transcripts from his disciplinary hearing, because the testimony of defendants

Peter M. Sigona and Richard D. Ruston, III at that hearing "contradicts the reports that [Magistrate Judge Peebles] relied on in making [his] decision." Plaintiff gives no specifics and thus appears to be interposing a general objection directed to the issues of excessive force and failure to intervene. His objection does not refer to the issue of medical indifference.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court reviews *de novo* those parts of a report and recommendation to which a party specifically objects. Where, as here, a party interposes only general objections to a report and recommendation, the Court reviews for clear error or manifest injustice. *See Davis v. Chapple,* 2010 WL 145298, \*2 (N.D.N.Y. Jan.8, 2010), *Brown v. Peters,* 1997 WL 599355,\*2-\* 3 (N.D.N.Y.), *aff'd without op.,* 175 F.3d 1007 (2d Cir.1999). Failure to object to any portion of a report and recommendation waives further judicial review of the matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

The Court accepts and adopts Magistrate Judge Peebles' Report and Recommendation. In view of plaintiff's objection, which, as noted, appears to be directed to the evidence on the issues of excessive force and failure to intervene, the Court briefly revisits these issues. Although plaintiff interposes only a general objection on these issues, in light of his *pro se* status and the nature of the objection, the Court conducts a *de novo* review. Plaintiff requests the Court to obtain the transcript of the disciplinary hearing and contends that the testimony given by Sigona and Ruston at that hearing contradicts the reports relied on by Magistrate Judge Peebles; however, as explained below, the award of summary judgment to defendants is based on plaintiff's own evidence.

The record evidence pertinent to the excessive force and failure to intervene claims is briefly summarized as follows. In a declaration supporting the motion for summary judgment, Sigona, a sergeant at ACF, states:

**\*2** On March 7, 2006, I was supervising the hospital depot area at Auburn. While waiting with a group of inmates in the holding pen in the hospital depot, inmate Baer became disruptive and began threatening staff. Baer ignored several orders by me to cease his behavior. I then entered the holding pen with Officers Manna and Ruston with the intention of removing inmate Baer.

All of the inmates in the pen were ordered to one side of the pen, while Baer remained on the other. Inmate Green refused to move, so I guided him to the side directed.

While I was guiding inmate Green, plaintiff Cicio then lunged at Officer Manna, striking him with a closed fist and knocking him to the ground. I immediately went to Officer Manna's aid and assisted with gaining control of Cicio by taking control of Cicio's right side. Officer Manna and I then escorted a struggling Cicio out of the pen, after which Cicio and Officer Manna fell to the floor. Once Cicio stopped struggling, he was removed from the area and taken to medical for examination.

The declaration from defendant Philip J. Manna, a corrections officer at ACF, is consistent with Sigona's declaration.

Plaintiff's complaint states that defendant Sigona pushed plaintiff into defendant Manna "who then grabbed plaintiff by the hair and began to pull plaintiff towards [the] holding pen door at which point plaintiff was thrown to the floor and kneed in [the] nose." The complaint further states that, after plaintiff was brought to his feet and escorted out of the immediate area, defendant Manna "once again grabbed plaintiff by his hair and pushed plaintiff's face into [the] wall." According to plaintiff, Sigona and Ruston "stood and watched the incident" and did not "intervene[ ] to stop the assault."

Plaintiff testified in his deposition that there were 17 or 18 inmates in the holding pen awaiting transport; that there were no corrections officers in the pen but there were some in the vicinity; that another inmate George Baer started "cursing up a storm" at a corrections officer; and that the sergeant told Baer to "cut it out," to which Baer responded, "No." The sergeant then said, "Take him out of there," ordered Baer to come up front, and ordered everyone else to the back of the pen. Instead of coming up front, Baer "sat down in the middle of the cage." Plaintiff stated that everyone else went to the back of the pen except plaintiff and inmate Green; according to plaintiff, they could not go back because "there was no more room." As plaintiff describes it:

There wasn't any more room. And he [Green] was standing directly in front of Inmate Baer. So they started taking Green out of the holding pen, and that's where everything just a whole jumble of things happened. I ended up getting mixed up in that, because one of officers tried to barge in there and push me into the sergeant, and then I got into a use of force behind it. So a whole lot of events that took place after one move.

*3 * * *

Once they started pulling [Green] out [of the pen], other officers barged into the cage. I don't know if done purposely or not, but I was pushed into the sergeant, and from there I was given an assault charge and taken down.

* * *

... [Baer] was sitting there [in the middle of the pen] when Green was being taken out. After I was pushed to the sergeant, I don't know what happened.

Plaintiff's deposition testimony continued:

Q. Was Green eventually taken out?

A. Yes.

Q. Okay. Now, was he still in the cage when you got pushed into the sergeant?

A. I am not sure.

Q. It was all happening at the same time?

A. Yes.

Q. Did you see any officers go to Baer to get him up and out?

A. Not specifically, because by this time it was just chaos in the cage. I was on the floor somewhere. I don't know where.

Q. How many officers were taking out Green?

A. When I first seen, I only saw one before everything just-

Q. When the sergeant said, "Take him of there," meaning Baer, how many officers entered the pen?

A. At the time, there was about five or six.

Q. They entered at the time just to remove Baer because of the goings on?

A. Yes.

Q. Was one of them the sergeant?

A. Yes. There was a sergeant in there.

Q. So the sergeant and/or three or four officers?

A. Quite a few, yes. Something like that.

Q. Okay. So they enter. Then Green is told to move. He doesn't. Somebody, was it one of those officers that entered that tried to remove Green?

A. The first officer that enters, the one that ... talked to him at first trying to remove him. I don't know which officer that was.

Q. Okay. But no additional officers to deal with Green, it was somebody in there from Baer?

A. Right. Once Green, once they saw an officer pulling Green out of the cage, that's when more officers entered the cage.

Q. So I think, and when I try to recap what you just said, I am not trying to put words in your mouth, but tell me if I am doing it wrong. I am trying to make sure I get it right. You said five or six officers came in to deal with Baer; is that right?

A. Something close to, right.

Q. How many more entered once Green became an issue?

A. I have no idea, because by that time I was into the sergeant and on the floor.

Q. Okay. All right. So somebody, as they are rushing in, whether intentional or not, you don't know, pushed you into the sergeant?

A. Right.

Q. Then what happened?

A. From there, I was taken down. I got kneed in the nose.

Q. Do you know who took you to the floor?

A. I am only going by the reports.

Q. Okay.

A. I don't know specifically. Only in the reports that they wrote do I know any names.

Q. Okay.

A. But other than that, at the time of the incident, I didn't know anything.

Q. Okay. At what point in time did you-at some point in time did you see the report?

 *4  A. I saw the reports after I got my misbehavior report, and I got my assistance, and I asked for the use of force report, and the unusual incident report, and everything else.

Q. Okay. Now, once you were taken to the floor, then what happened? Take me through it totally.

A, Once I was taken to the floor, another CO kneed me in the nose. I don't know who.

Q. You don't think it was the same person that took you to the floor? A. I doubt it.

Q. All right. Okay.

A. And once I was lifted, I was pulled [from] the cage by my hair. At the time I had a lot of hair. I was pulled out [of] the cage by my hair, and then I hit the floor again.

Q. Okay. Now when you hit the floor again, were you taken to the floor? Do you know how that happened, the second hitting of the floor?

A. I am not sure.

Q. Okay.

A. I am not sure.

Q. You ended up on the floor?

A. I just ended up on the floor with a couple C.O.s on top of me. I don't know if they fell, if I fell. I have no idea.

Q. There were other officers on the floor with you?

A. Right.

Plaintiff explained that he was then removed from the scene, taken upstairs to "their SHU" and given a ticket. He was placed in a different holding pen where a nurse came to see him within 15 or 20 minutes. According to plaintiff, he told the nurse that his nose hurt, he had pains in his right wrist, which was swollen, and some of his hair "had got pulled out in back." He was not bleeding. He requested and was denied pain medication, although at some later time he was given ibuprofen. He had headaches "off and on" for two or three weeks and his wrist was swollen for a few days, although it did not limit any of his activities.

When the disputed facts are viewed most favorably to plaintiff and considered in combination with the undisputed facts, the record shows the following: a group of 17 or 18 inmates was confined in the pen; one inmate, Baer, became disruptive and refused to comply with Sergeant Sigona's direction to stop; five or six corrections officers entered the pen to remove Baer; the other inmates were directed to move to the back of the pen; there was not room for Green and plaintiff to do so; Green was told to move but did not do so; and corrections officers began removing Green. The evidence further shows that at that point "just a whole jumble of things happened"; more corrections officers entered the pen; as they were entering, one of them-intentionally or not-pushed plaintiff into Sergeant Sigona; it was "chaos" in the pen; a corrections officer took plaintiff to the floor; and plaintiff then "got kneed in the nose," probably by a different corrections officer. Plaintiff was then pulled out of the pen. In his complaint he states that Officer Manna again grabbed him by the hair and pushed his face into the wall, whereas in his deposition, plaintiff stated that he was pulled out of the pen by his hair and "ended up on the floor again" with a couple of corrections officers on top of him, and added: "I don't know if they fell, if I fell." He was then removed and taken to SHU, where a nurse examined him within 20 minutes.

*5 The Court agrees with Magistrate Judge Peebles that defendants are entitled to summary judgment dismissing plaintiff's claims of excessive force. It is undisputed that the force used on plaintiff on March 7, 2006 occurred in the context of a disturbance involving 17 or 18 inmates in a holding pen. In plaintiff's own word, it was "chaos." Indeed, plaintiff states that when he was pushed into Sergeant Sindona it may have been unintentional, and that, when he went to the floor a second time, it may have been because he and/or the corrections officers fell. In view of this evidence and the minimal nature of plaintiff's injuries, no rational trier of fact could conclude that plaintiff was subjected to force that was malicious or sadistic for the purpose of causing plaintiff harm and not in a good faith effort to maintain discipline. *See Wright v. Goord,* 554 F.3d 255, 268-69 (2d Cir.2009). For the same reason, there is no basis for a claim of failure to intervene. Moreover, no rational trier of fact could find that plaintiff suffered a serious medical need. As to the other issues raised, the Court agrees with the Report and Recommendation. Accordingly, the Court hold that plaintiff has failed to establish that he is entitled to summary judgment; defendants have demonstrated their entitlement to summary judgment; and plaintiff has failed to show the existence of a material question of fact.

In addition to his objection to the Report and Recommendation (Dkt. No. 42), plaintiff has filed what appears to be an appeal from the Report and Recommendation (Dkt. No. 43). Because Magistrate Judge Peebles did not issue any order which could be the subject of the appeal, the appeal is denied. In the event that plaintiff wishes to appeal from this Memorandum-Decision and Order, he should follow the procedure set forth in the Civil Appeals Packet, which will be provided to him with this decision.

It is therefore

ORDERED that United States Magistrate Judge David E. Peebles's Report and Recommendation (Dkt. No. 41) is accepted and adopted; and it is further

ORDERED that the appeal (Dkt. No. 43) from the Report and Recommendation is denied; and it is further

ORDERED that plaintiff's motion for summary judgment (Dkt. No. 35) is denied; and it is further

ORDERED that defendants' cross motion for summary judgment (Dkt. No. 38) is granted and the complaint dismissed on the merits; and it is further

ORDERED that the Clerk is directed to provide plaintiff with a Civil Appeals Packet.

IT IS SO ORDERED.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Terry Cicio, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights. In his complaint plaintiff asserts that he was assaulted by one of the defendants while two others stood by and failed to intervene, and that following the assault medical personnel at the prison facility where the incident took place failed to provide requested medical treatment for his resulting injuries. Plaintiff's complaint seeks both declaratory and monetary relief.

2010 WL 980272

**\*6** Currently pending before the court are cross-motions for summary judgment. Plaintiff initiated the motion process, moving for summary judgment and claiming that the evidence in the record supports a finding in his favor on the issue of liability and that no reasonable factfinder could conclude otherwise. Defendants have responded by both opposing plaintiff's motion and seeking summary judgment dismissing plaintiff's complaint. In their motion defendants assert that based upon the record now before the court no reasonable factfinder could find in plaintiff's favor on any of his claims and that, in any event, they are deserving of qualified immunity from suit under the circumstances presented.

Having carefully reviewed the record considered in light of the arguments of the parties, for the reasons that follow I recommend that defendants' motion be granted and that plaintiff's motion be denied.

I. *BACKGROUND*

The facts forming the basis for plaintiff's claims are not particularly complex, although the parties have given conflicting accounts of the relevant events, particularly with regard to the circumstances surrounding the use of force by prison officials of force against Cicio.

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"); at the times relevant to his complaint, Cicio was housed at the Auburn Correctional Facility ("Auburn"), located in Auburn, New York. *See generally* Complaint (Dkt. No. 1). On March 7, 2006, while plaintiff was among a group of between sixteen and eighteen inmates confined in the Auburn hospital depot awaiting transfer when a disruption occurred involving a fellow prisoner. Complaint (Dkt. No. 1) Statement of Facts ¶ 1; Sigona Decl. (Dkt. No. 38-8) ¶ 3; Manna Decl. (Dkt. No. 38-9) ¶ 3; *see also* Kerwin Aff. (Dkt. No. 38-3) Exh. K (transcript of plaintiff's deposition, conducted on May 15, 2009 and hereinafter cited as "Plaintiff's Dep. Tr." at pp. 8-10). Defendants Sigona, Manna and Ruston, all three of whom are employed as corrections workers at the facility, responded to the incident, entering the cell and ordering all of the inmates to retreat to the back. Complaint (Dkt. No. 1) Statement of Facts ¶ 2, Manna Decl. (Dkt. No. 38-9) ¶ 3; Sigona Decl. (Dkt. No. 38-8) ¶ 3. While those corrections officers attempted to remove the dissident inmate from the cell plaintiff Cicio became involved. It is at this point that the parties' versions of the relevant events significantly diverge.

Plaintiff contends that during the ensuing events he was pushed into defendant Manna, who then grabbed him by the hair and began to pull him toward the cell door, resulting in Cicio being thrown to the floor and kneed in the nose. Complaint (Dkt. No. 1) Statement of Facts ¶ 4; Cicio Decl. (Dkt. No. 40-2) ¶ 4. Plaintiff maintains that after regaining his footing he was again grabbed by the hair and pushed face first into the wall. Complaint (Dkt. No. 1) Statement of Facts ¶ 5. Plaintiff asserts that while this was occurring defendants Sigona and Ruston stood by and watched without coming to his assistance. *Id.*

**\*7** Defendants offer a markedly different version of the relevant events. According to the defendants, while they were attempting to extricate the disruptive inmate from the holding cell Manna issued a direct order to the plaintiff to move to the back of the cage. Plaintiff's Exh. D (Dkt. No. 35-2) Disregarding the order, plaintiff blocked Corrections Officer Manna's path, lunged at him and struck him with a closed fist knocking him to the floor. *Id.; see also,* Manna Decl. (Dkt. No. 38-9) ¶ 4; Sigona Decl. (Dkt. No. 38-8) ¶ 5. Cicio then began yelling to the other inmates in the cage, encouraging them to join in, exclaiming, "let's get them." Plaintiff's Exh. D (Dkt. No. 35-2). At that point, defendants Manna and Sigona attempted to subdue Cicio, who continued to struggle and resist, resulting in Cicio and Officer Manna falling to the floor. Manna Decl. (Dkt. No. 38-9) ¶¶ 4-5; Sigona Decl. (Dkt. No. 38-8) ¶ 5.

As a result of the incident a misbehavior report was subsequently issued by Corrections Officer Manna charging Cicio with disciplinary infractions, including 1) assault on staff; 2) prison takeover; 3) engaging in violent conduct; 4) inciting inmates; 5) disobeying a direct order; 6) physically interfering with an employee; and 7) impeding inmate movement. Mann Decl. (Dkt. No. 38-9) ¶ 7. Following a Tier III disciplinary hearing commenced on March 13, 2006, plaintiff was found guilty of five of the six violations including, *inter alia,* assault on staff. Kerwin Aff. (Dkt. No. 38-3) Exh. I. As a result of that determination plaintiff received a series of sanctions which, after being modified on appeal, included twelve months of confinement in a facility special housing unit ("SHU") with a corresponding loss of packages, commissary, and telephone privileges, and an additional recommendation that plaintiff forfeit twelve months of good time credits. *Id.*

Following the incident plaintiff was immediately removed from the area and taken to be examined by facility medical

personnel. Manna Decl. (Dkt. No. 38-9) ¶ 6. Plaintiff was examined by defendant A. Vega, a registered nurse, within fifteen to twenty minutes after the incident. Cicio Decl. (Dkt. No. 40-2) ¶ 5; Plaintiff's Dep. Tr. at p. 22. During that examination Nurse Vega observed a reddened area on the bridge of plaintiff's nose and noted his reports of minor pain in the nose and head areas. Plaintiff's Dep. Tr. at pp. 25-26; *see also* Kerwin Aff. (Dkt. No. 38-3) Exhs. B and H. Plaintiff was not treated for his injuries nor was he scheduled to see a doctor. Complaint (Dkt. No. 1) Statement of Facts ¶ 8.

Plaintiff claims that following the incident he submitted sick call slips on March 8, 9, 13 and 19, 2006, requesting medical intervention to address his injuries. Complaint (Dkt. No. 1) Statement of Facts ¶¶ 9, 11-12 and 15. Plaintiff contends, however, that those sick call slips were not processed by defendant Ryerson, the nurse administrator at Auburn. *Id.* ¶ 22. Defendant Ryerson denies that allegation and counters that based upon her review of all sick call slips received during the time period involved, there is no record of plaintiff having requested sick call at any time between March 8 and March 20, 2006. Ryerson Decl. (Dkt. No. 38-10) ¶ 4.

**\*8** As is the case with regard to plaintiff's substantive allegations, the parties disagree over the procedural steps taken by the plaintiff to seek internal review of the relevant events. Plaintiff contends that following the incident he filed two separate grievances, filing the first on March 14, 2006, and both related to the failure of prison officials to permit him to attend sick call. Complaint (Dkt. No. 1) Statement of Facts ¶¶ 14, 16. Plaintiff does not assert in his complaint that he filed a grievance regarding the alleged use of force and failure of prison officials to intervene on his behalf, although in an affirmation in opposition to defendants' summary judgment motion Cicio succinctly states "[p]laintiff filed grievances on both incidents, only one was responded to." *See* Cicio Aff. (Dkt. No. 39) ¶ 3. Plaintiff's motion submission also includes a handwritten memorandum, dated March 14, 2006 and addressed to the facility inmate grievance review committee ("IGRC"), citing the events including the alleged assault by prison officials. *See* Plaintiff's Exhs. (Dkt. No. 35-3) p. 24 of 27.

According to the defendants, the sole grievance filed by plaintiff regarding the incident was submitted on March 24, 2006 and was denied by the facility IGRC on April 3, 2006 after plaintiff was transferred out of Auburn. Graham Decl. (Dkt. No. 38-7) ¶ 6. That denial was subsequently affirmed by defendant Graham, the Superintendent at Auburn,

on April 3, 2006. While plaintiff claims to have appealed that determination on June 12, 2006, presumably to the DOCS Central Office Review Committee ("CORC"), the record contains no further indication of whether that appeal was in fact taken, and if so, the result. *See* Complaint (Dkt. No. 1) Statement of Facts ¶ 18. According to prison officials at Auburn, their research of relevant records at the facility failed to disclose additional documents regarding plaintiff's exhaustion of remedies and, significantly, to show that plaintiff appealed to Superintendent Graham from the disposition of his claimed use of force grievance. *See* Graham Decl. (Dkt. No. 38-7) ¶ 4.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on April 28, 2008. [1] As defendants, plaintiff's complaint names Auburn Superintendent Harold D. Graham; Corrections Sergeant Peter M. Sigona; Corrections Officers Richard D. Ruston and Phil J. Manna; Registered Nurse A. Vega; and Nurse Administrator Ryerson. The complaint alleges varying claims against those defendants including for the alleged use of excessive force and failure to protect the plaintiff from the use of force as well as indifference to his medical needs arising from the incident. [2] *See generally* Complaint (Dkt. No. 1).

[1]   This action was filed in the Western District of New York but was subsequently transferred here by order issued on May 2, 2008 by Chief District Judge Richard J. Arcara. Dkt. Nos. 1, 3.

[2]   In his motion submission, plaintiff also claims to have asserted a cause of action for violation of procedural due process, based upon the defendants' alleged failure to process and investigate his grievances. Plaintiff's Memorandum (Dkt. No. 35-3) at p. 2. Such a claim, if indeed present in this action, is nonetheless subject to dismissal, since it is well established that a prison inmate has no cognizable constitutional right of access to the grievance process or to have grievances which have been filed investigated. *Avent v. Doe,* No. 9:05-CV-1311, 2008 WL 877176, at \*8 (N.D.N.Y. Mar.31, 2008) (Scullin, S.J. & DiBianco, M.J.) (citing *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003)).

Issue was initially joined in the action by defendant Manna through his filing of an answer on September 25, 2008. Dkt. No. 23. Following the denial of their pre-answer motion

2010 WL 980272

seeking dismissal of plaintiff's claims against them on a variety of bases, *see* Dkt. Nos. 29, 32, an answer was filed on behalf of the remaining defendants on February 25, 2009. Dkt. No. 30.

**\*9** On July 15, 2009, following pretrial discovery, plaintiff filed a motion for summary judgment in his favor. Dkt. No. 35. While plaintiff's motion appears to focus on the defendants' use of force, it purports to seek summary judgment on all of his claims. *See id* . On September 28, 2009, defendants responded in opposition to plaintiff's motion and in support of a cross-motion requesting judgment dismissing all of plaintiff's claims against them as a matter of law. Dkt. No. 38. In their motion, defendants argue that 1) plaintiff's deliberate medical indifference claim is legally deficient based both upon his inability to establish the existence of a serious medical need and the lack of evidence of indifference on the part of defendants Vega or Ryerson, the two medical personnel against whom the claim appears to have been lodged; 2) plaintiff's claim surrounding the alleged use of a excessive force and failure to intervene lacks merit; 3) plaintiff's claims against Superintendent Graham are subject to dismissal based upon his lack of personal involvement in the constitutional deprivations alleged; and 4) in any event defendants are entitled to qualified immunity from suit. Plaintiff has since responded in opposition to defendants' motion and in further support of his initial summary judgment motion. Dkt. Nos. 38, 39, 40.

The parties' cross-motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77,

82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson).* A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*10** When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

In a case such as this, where parties have interposed cross-motions for summary judgment, each motion must be independently assessed, using this standard as a backdrop. *See Light Sources, Inc. v. Cosmedico Light, Inc.,* 360 F.Supp.2d 432, 434 (D.Conn.2005).

B. *Excessive Force/ Failure To Intervene*

2010 WL 980272

At the heart of plaintiff's complaint is his claim that on March 7, 2006 he was subjected to an unprovoked attack by defendant Manna and that defendants Sigona and Ruston watched and failed to take any measures to end the assault and that, as a result, he suffered physical injuries. Plaintiff claims that the record supports his excessive force and failure to intervene claims as a matter of law. Defendants counter by arguing that no reasonable factfinder could conclude, based upon the record now before the court, that plaintiff's constitutional rights were violated, even assuming the truth of his version of the relevant events.

### 1. *Excessive Force*

Plaintiff's excessive force claim must be analyzed under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998-999, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom ., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

**\*11** Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009)

(citing *Hudson,* 503 U.S. at 7-8, 112 S.Ct. at 999 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy,* however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. --- U.S. - - - - , --- S.Ct. ----, --- L.Ed.2d - - - - , 2010 WL 596513, at \*3 (Feb. 22, 2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a de *minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9-10, 112 S.Ct. 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and

2010 WL 980272

what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated.... This is true whether or not significant injury is evident.' " *Wright,* 554 F.3d at 268-69 (quoting *Hudson,* 503 U.S. at 9, 112 S Ct. at 1000). That is not to say, however, that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

**\*12** Addressing the objective prong of the Eighth Amendment analysis, the fact that Cicio suffered minor though discernable injuries from the use of force distinguishes this case from others in which the lack of injury has justified summary judgment dismissing excessive force claims under the Eighth Amendment. *See, e.g., Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (the fact that the plaintiff, who claims he was "bumped, grabbed, elbowed, and pushed" by the defendants did not rise to a level of constitutional significance since plaintiff did "not maintain that he experienced any pain or injury as a result of the physical contact"); *Cunningham v. Rodriguez,* No. 01 Civ. 1123, 2002 WL 31654960, at \*5 (S.D.N.Y. Nov. 22, 2002).[3] Under the circumstances now presented it would be inappropriate to find, as a matter of law, that objectively plaintiff's injuries were not sufficiently serious to rise to a constitutionally cognizable level.

[3]   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

Turning to the subjective element, the record is devoid of any evidence from which a reasonable factfinder could conclude that this element of plaintiff's excessive force claim against Manna has been met. Rather than representing an unprovoked use of force, by plaintiff's own version, the use of force against the plaintiff occurred during a period of turmoil when one or more disruptive inmates in a group of between sixteen and eighteen combined in a single holding cell became unruly and were being urged to lash out against corrections officers. Plaintiff alleges in his complaint and states in a sworn declaration that he was pushed into a corrections officer

by Sergeant Sigona, pulled out of the holding pen by his hair, and thrown to the floor and kneed in the nose. During his deposition, however, plaintiff testified that five or six corrections officers rushed into the holding pen directing him to move to the back, which he could not do because there was no room. Plaintiff's Dep. Tr. at pp. 16 and 51. From there, plaintiff is not exactly sure what happened; he does not know whether he was pushed intentionally, only that "[he] was taken down ... [and] ... kneed in the nose." *Id.* at p. 16. Additionally, at the time of the incident, plaintiff did not know who the officers involved were, who "took him down," or who kneed him in the nose, and could not say whether there were also officers on the floor with him.[4] *Id.* at pp. 16-17, 52. Plaintiff further testified that after he fell to the floor, he was lifted and pulled out of the cage by his hair, and then he hit the floor again. *Id.* at p. 18. Again, plaintiff admittedly does not know how he ended up on the floor a second time, or whether he fell or the corrections officers fell on him, although he recalls that he was on the floor with a couple of corrections officers on top of him. *Id.*

[4]   Plaintiff later learned the names of the officers he identified in his complaint when he received a copy of the misbehavior report that was issued to him as a result of the incident. Plaintiff's Dep. Tr. at p. 17.

Under the circumstances presented, even accepting as true plaintiff's version of the events, when considering the four factors informing the subjective analysis no reasonable factfinder could conclude that the force applied was malicious or sadistic for the purpose of causing plaintiff harm and not in a good faith effort to maintain discipline. Moreover, considering the extent of the force applied and the relatively minor injuries suffered even by plaintiff's account, coupled with the lack of evidence of malicious motives on the part of the corrections officers involved, I recommend a finding that the use of force was truly *de minimis* and did not abridge plaintiff's Eighth Amendment rights.[5]

[5]   By plaintiff's own account, the injures suffered as a result of the incident were minor. *See* Plaintiff's Dep. Tr. at pp. 21-26.

### 2. Failure to Intervene

**\*13** A corrections worker who, though not participating, if present when an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). It is well-established that a law

enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his or her presence by other officers. *See Mowry v. Noone,* No. 02-CV-6257 Fe, 2004 WL 2202645, at \*4 (W.D.N.Y. Sept.30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted). In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335-36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

Based upon my finding that plaintiff's Eighth Amendment rights were not violated through the actions of defendant Manna, there can be no cognizable claim for liability on the part of defendants Sigona and Ruston for failure to intervene and protect plaintiff from the constitutional violation. *See Curley,* 268 F.3d at 72. I therefore recommend that plaintiff's claims against those defendants be dismissed as well.

### C. Medical Indifference

The second component of plaintiff's complaint alleges that defendants Vega and Ryerson failed to provide him with needed medical treatment. Plaintiff's claim against Nurse Vega apparently stems from her failure, upon examining Cicio immediately following the March 7, 2006 incident, to arrange for him to see a doctor or to prescribe pain medication. The allegations against defendant Nurse Administrator Ryerson result from her alleged failure to process sick call slips submitted on several occasions following the incident by plaintiff. While plaintiff's summary judgment motion does not speak directly to this claim, he apparently seeks summary judgment on the issue of liability on this claim as well. For their part, defendants urge dismissal of plaintiff's medical indifference claims as a matter of law due to his failure to assert the existence of a serious medical need and additionally for lack of any evidence to satisfy the subjective element of the controlling test.

**\*14** Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291 (1976). The Eighth Amendment's prohibition of cruel and unusual punishment proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer); Waldo,* 1998 WL 713809, at \*2 (same).

#### 1. Serious Medical Need

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S.

2010 WL 980272

1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance,* 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 701 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.) (citation omitted).

**\*15** The record in this case fails to establish that plaintiff experienced a serious medical need of constitutional proportions as a result of the incident complained of. Plaintiff alleges that during the incident he suffered from a swollen and painful wrist as well as head pain. Complaint (Dkt. No. 1) Statement of Facts ¶ 6; *see also* Plaintiff's Dep. Tr. at pp. 21-22, 24-26. The record, including plaintiff's submission in support of his summary judgment motion and later opposition to defendants' motion, fails to provide further elaboration and contains no evidence of any extreme pain or degeneration. Instead, the record discloses only injuries of a transitory nature which are insufficient to establish existence of a serious medical need of constitutional proportions. *Ford v. Phillips,* No. 05 Civ. 6646(NRB), 2007 WL 946703, at *12 (S.D.N.Y. Mar.27, 2007) (finding that minor bruising, slight bleeding, and abrasions are no injuries that may produce death, degeneration or extreme pain and that no reasonable juror could find otherwise).

2. *Deliberate Indifference*

In addition to establishing the existence of a serious medical need, to prevail on an Eighth Amendment claim a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291. Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo,* 1998 WL 713809, at *2 (same).

It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of which diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment", and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998) (citation omitted).

The record now before the court fails to substantiate plaintiff's claims of deliberate indifference. Even if plaintiff could establish the existence of a serious medical need, the record does not provide a basis for a reasonable factfinder to conclude that either defendant Vega or defendant Ryerson was deliberately indifferent to such a need. Plaintiff's claim against Nurse Vega is that on one occasion she failed to provide pain medication or to refer the plaintiff to a physician as a result of his injuries. Such an allegation of a single instance of delayed or denied medical care does not establish constitutional claim of medical deliberate indifference. *See Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir.2003).

**\*16** Turning to the allegations against defendant Ryerson, those stem from an alleged failure to process sick call slips on four or five occasions following the March 7, 2006 incident. Even assuming the existence of a serious medical condition prompting the need for medical care and defendant Ryerson's failure to process sick call slips over a brief period of time, these facts alone do not suffice to establish a deliberate indifference claim as against defendant Ryerson since there is no evidence suggesting that the minimal delay caused any significant adverse effect to plaintiff's health. *See Bumpus v. Canfield,* 495 F.Supp.2d 316, 324 (W.D.N.Y.2007). Accordingly, I recommend dismissal of plaintiff's deliberate indifference claim against defendant Ryerson on this alternative basis.

D. *Personal Involvement*

In their motion defendants assert that even if plaintiff could establish a cognizable excessive force or deliberate

2010 WL 980272

indifference claim, his cause of action against defendant Graham, the superintendent at Auburn, is legally insufficient based upon his lack of personal involvement in any conduct forming the basis for those claims.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Importantly, a supervisor like Superintendent Graham cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."). Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007), *rev'd on other grounds, sub nom., Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 2931 (2009); *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

**\*17** In my earlier report and recommendation, addressing a pre-answer dismissal motion filed by certain of the defendants including Superintendent Graham, I recommended against dismissing plaintiff's claim against defendant Graham, finding that the proof at trial could potentially establish that defendant Graham learned, through the appeal of plaintiff's grievance denial, that he was deprived of medical care at a point when he had an opportunity to cure that alleged constitutional deficiency. *See* Report and Recommendation dated February 10, 2009 (Dkt. No. 29) at pp. 17-21. The more fully developed record now before the court, however, firmly establishes that this is not the case. There is no indication that defendant Graham was aware of plaintiff's circumstances prior to plaintiff's appeal on April 12, 2006 of the IGRC's grievance denial. *See* Graham Decl. (Dkt. No. 38-7) ¶ 6. By that point, plaintiff had been transferred out of Auburn, and thus even if defendant Graham was placed on notice of a constitutional deprivation in the form of denial of adequate medical treatment, he was no longer in a position to cure that deficiency. *Id.* Accordingly, because the record fails to disclose any basis on which defendant Graham could be held liable for the constitutional violations alleged, there is an independent, alternate basis for dismissing plaintiff's claims against him.

## IV. SUMMARY AND RECOMMENDATION

The record in this case discloses no basis on which a reasonable factfinder could conclude that plaintiff's constitutional right to be free from cruel and unusual punishment was violated by defendant Manna during the course of the March 7, 2006 incident and that defendants Sigona and Ruston failed to intervene to prevent such a violation. The record similarly discloses no basis on which a reasonable factfinder could conclude that plaintiff suffered injuries of constitutional significance as a result of that incident or that the defendants were subjectively indifferent to the medical needs presented by those injuries. Finally, the record discloses no basis on which a reasonable factfinder could assign liability on the part of defendant Graham, as superintendent of the Auburn Correctional Facility. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 38) be GRANTED and that plaintiff's complaint be dismissed in its entirety, and that based upon that determination plaintiff's summary judgment motion (Dkt. No. 35) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE

2010 WL 980272

TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 980272

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00366-DNH-TWD   Document 93   Filed 03/08/21   Page 140 of 353
Austin v. Pappas, Not Reported in F.Supp.2d (2008)
2008 WL 857528

2008 WL 857528
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Richard AUSTIN, Plaintiff,
v.
Brian PAPPAS, John Does, Yonkers
Police Commissioner Charles C. Coles,
Westchester County, Defendants.

No. 04-CV-7263 (KMK)(LMS).
|
March 31, 2008.

**Attorneys and Law Firms**

Mr. Richard Austin, Stormville, NY, pro se.

Rory Carleton McCormick, Esq., Corporation Counsel, City
of Yonkers, Yonkers, NY, for Defendants.

*ORDER ADOPTING REPORT & RECOMMENDATION*

KENNETH M. KARAS, District Judge.

 **\*1** Richard Austin ("Plaintiff") filed this suit pursuant to
42 U.S .C. § 1983 ("Section 1983") against Yonkers Police
Officer Brian Pappas ("Defendant Pappas"), several John Doe
Yonkers Police Officers ("John Doe Defendants"), former
Yonkers Police Commissioner Charles C. Cola ("Defendant
Cola") (whose name is misspelled in Plaintiff's Complaint
as Charles C. Coles), and Westchester County (collectively,
"Defendants"), alleging violations of Plaintiff's civil rights
under the First, Fourth, Fifth, Eighth, and Fourteenth
Amendments of the United States Constitution, along with
various supplemental state law claims. [1] (Compl.¶¶ 17,
19.) Plaintiff alleged that these violations occurred when
Defendants failed to protect Plaintiff from Franklyn Kelley, a
private individual who physically attacked Plaintiff during the
course of Plaintiff's May 16, 2003 arrest. (*Id.* ¶ 10.) Plaintiff
alleged that Defendant Pappas and the John Doe Defendants
handcuffed him and pinned him to the ground while Franklyn
Kelley repeatedly kicked and punched Plaintiff in the face.
(*Id.* ("The officers did nothing to protect the plaintiff from this
vicious assault, even though plaintiff was helpless and in their
custody [.]").) Defendants moved for summary judgment,
and this Motion was referred by Judge McMahon to Chief

Magistrate Judge Lisa M. Smith for review pursuant to 28
U.S.C. § 636(b)(1). On August 2, 2007, Magistrate Judge
Smith issued a thorough Report and Recommendation ("R
& R"), concluding that this Court should grant Defendants'
Motion for Summary Judgment on the ground that Plaintiff
has failed to demonstrate that there exists a genuine issue
of material fact as to whether his constitutional rights were
violated. Plaintiff was advised of his right to file objections to
the R & R, but he did not do so.

[1]     On August 8, 2005, Plaintiff's claim against
        Westchester County was dismissed by the
        Honorable Gerald E. Lynch, to whom this case was
        initially assigned. On February 28, 2006, the case
        was transferred to White Plains and reassigned to
        Judge Colleen McMahon. The case was reassigned
        to the undersigned on August 6, 2007.

A district court reviewing a report and recommendation "
'may accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate judge.'
" *Donahue v. Global Home Loans & Fin., Inc.,* No. 05-
CV-8362, 2007 WL 831816, at \*1 (S.D.N.Y. Mar. 15, 2007)
(quoting 28 U.S.C. § 636(b)(1)(C)). Under 28 U.S.C. § 636(b)
(1) and Rule 72(b) of the Federal Rules of Civil Procedure,
parties may submit objections to a magistrate judge's report
and recommendation. The objections must be "specific"
and "written," and must be made "within 10 days after
being served with a copy of the recommended disposition."
Fed.R.Civ.P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).

Where a party does not submit an objection, " 'a district court
need only satisfy itself that there is no clear error on the face
of the record.' " *Donahue,* 2007 WL 831816, at \*1 (quoting
*Nelson v. Smith,* 618 F.Supp. 1186, 1189 (S.D.N.Y.1985)). In
addition, a party's failure to object waives that party's right
to challenge the report and recommendation on appeal. *See
Fed. Deposit Ins. Corp. v. Hillcrest Assocs.,* 66 F.3d 566, 569
(2d Cir.1995) ("Our rule is that 'failure to object timely to a
magistrate's report operates as a waiver of any further judicial
review of the magistrate's decision.' " (quoting *Small v. Sec'y
of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989))).

 **\*2** Here, Plaintiff has not filed objections to the R & R.
Accordingly, the Court has reviewed the R & R for clear error
only. In so doing, the Court adopts the conclusion reached in
the R & R that Defendants' Motion for Summary Judgment
should be granted, but the Court does so in part on different
grounds than those relied on in the R & R.

2008 WL 857528

First, the Court agrees with Magistrate Judge Smith that Defendants' noncompliance with Local Civil Rule 56.2 should be overlooked because any prejudice resulting from noncompliance was cured by the following: (i) Magistrate Judge Smith advised Plaintiff of the nature of summary judgment during a March 23, 2007 conference; and (ii) Magistrate Judge Smith annexed a Rule 56.2 notice to the R & R, a document to which Plaintiff was free to file objections. See Narumanchi v. Foster, No. 02-CV-6553, 2006 WL 2844184, at *2 (E.D.N.Y. Sept. 29, 2006) (refusing to deny defendant's motion for summary judgment based on failure of defendant to comply with Local Civil Rule 56.2 because "[a]ny prejudice to pro se plaintiffs [was] cured" by court's actions).

As expressed in the R & R, though Plaintiff did not file any opposition to Defendants' Motion for Summary Judgment, Defendants were still required to meet their burden of demonstrating to the Court that "no material issue of fact remains for trial." See Amaker v. Foley, 274 F.3d 677, 681 (2d Cir.2001). The Court finds no clear error in Magistrate Judge Smith's determination that Defendants satisfied this burden.

With respect to Defendants Pappas and Cola, the Court finds that Plaintiff has failed to offer any evidence demonstrating that they were personally involved in the alleged violation of Plaintiff's constitutional rights. The " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 122 (2d Cir.2004) (quoting McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977)). For purposes of Section 1983 liability, personal involvement can be established by evidence that:

> '(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ...

> by failing to act on information indicating that unconstitutional acts were occurring.'

Id. at 127 (quoting Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995)); accord Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir.2003); Schiller v. City of New York, No. 04-CV-7922, 2008 WL 200021, at *4 (S.D.N.Y. Jan. 23, 2008); Fair v. Weiburg, No. 02-CV-9218, 2006 WL 2801999, at *4 (S.D.N.Y. Sept. 28, 2006). Further, a Section 1983 plaintiff must "allege a tangible connection between the acts of the defendant and the injuries suffered." Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986); see also Fair, 2006 WL 2801999, at *4 (citing Bass ).

**\*3** In support of their Motion for Summary Judgment, Defendants submitted evidence that Defendant Pappas did not directly participate in the arrest of Plaintiff, but he instead arrested Plaintiff's accomplice. For example, on April 8, 2004, at a hearing before the Honorable Richard A. Molea of the Westchester County Court, Defendant Pappas testified that he remained with Plaintiff's accomplice while other officers arrested Plaintiff. (Defs.' Affirmation in Supp., Ex. J, 50-51.) Further, in response to interrogatories served on him by Plaintiff, Defendant Pappas stated that he "did not observe what transpired during the course of plaintiff's arrest." (Id., Ex. L.) Finally, Defendants offer a police report indicating that "Pappas was detaining [Plaintiff's accomplice] in the garage area, as additional units arrived and placed [Plaintiff] into custody." (Id., Ex. C.)

Plaintiff has failed to offer any evidence refuting Defendant Pappas' version of events. In other words, Plaintiff has offered no evidence demonstrating that Defendant Pappas was actually one of the officers who arrested him and allegedly pinned him to the ground while Kelley assaulted him. In fact, during his deposition testimony, Plaintiff admitted that he was not sure whether Defendant Pappas was one of the police officers who arrested him, and that the reason Defendant Pappas was named as a defendant in the present suit was because Plaintiff had seen his name on Plaintiff's felony complaint. (Id., Ex. G, 32-35.) As such, the unrefuted evidence before the Court demonstrates that Defendant Pappas was not one of the officers directly involved in Plaintiff's arrest. Plaintiff therefore has failed to satisfy a prerequisite to liability under Section 1983-namely that Defendant Pappas had personal involvement in the alleged violation of Plaintiff's constitutional rights.

*See Back,* 365 F.3d at 122. Thus, Plaintiff's claim against Defendant Pappas must be dismissed.

Plaintiff alleged that Defendant Cola, Yonkers Police Commissioner at the time of Plaintiff's 2003 arrest, violated Plaintiff's constitutional rights by "authoriz[ing], tolerat[ing], as institutionalized practices, and ratif[ying] the misconduct [of Defendant Pappas and John Doe Defendants]." (Compl.¶ 14.) More specifically, Plaintiff charges Defendant Cola with failure to properly: (1) discipline subordinate officers; (2) take adequate precautions in hiring subordinate officers; (3) report criminal acts by police personnel to the Westchester County District Attorney; and (4) establish a system for dealing with complaints about police misconduct. (*Id.*) Plaintiff does not assert that Defendant Cola directly participated in the violation of his constitutional rights; instead, Plaintiff urges the Court to find Defendant Cola liable under Section 1983 based on his role as supervisor of Defendant Pappas and the John Doe Defendants.

"It is well settled, however, that the doctrine of respondeat superior standing alone does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity." *See Hayut,* 352 F.3d at 753 (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978)). Instead, it is necessary to establish a supervisory official's personal involvement in the alleged constitutional violation. *See id.; Fair,* 2006 WL 2801999, at *4.

**\*4** Plaintiff has failed to provide the Court with any evidence from which a reasonable jury could conclude that Defendant Cola was personally involved in the alleged violation of Plaintiff's constitutional rights. Plaintiff has offered no evidence demonstrating that Defendant Cola was aware of and failed to remedy constitutional violations by subordinate officers, or that he acted in a grossly negligent or deliberately indifferent manner in supervising or training subordinate officers. There is also no evidence in the record to support a theory that Defendant Cola created a policy or custom that fostered and led to the alleged violation of Plaintiff's rights. *See Hayut,* 352 F.3d at 754 (finding as fatal to plaintiff's Section 1983 claim the fact that there existed "no evidence that, after becoming aware of the alleged harassment, any of the [supervisory officials] failed to respond or remedy the situation, that any of these [supervisory officials] created or allowed a policy to continue under which alleged harassment could occur, or that they were grossly negligent in monitoring [the alleged harasser's] conduct"); *Harris v. City of New York,* No. 01-CV-6927, 2003 WL 554745, at *6 (S.D.N.Y. Feb. 26, 2003) ("[P]laintiff has put forth no evidence pointing to defendant ['s] personal involvement in plaintiff's alleged deprivation of rights .... Plaintiff's conclusory allegations regarding defendant['s] alleged supervisory role, without more, cannot withstand summary judgment."). Further, nothing in the record, even drawing all inferences in Plaintiff's favor, suggests any tangible connection between Defendant Cola's training or supervision of subordinate officers and the alleged violation of Plaintiff's rights. In fact, the record contains no evidence with regard to Defendant Cola whatsoever. Without such evidence, no reasonable jury could conclude that Defendant Cola had personal involvement in the alleged violation of Plaintiff's constitutional rights, which means that Plaintiff has failed to satisfy a prerequisite to Section 1983 liability, and therefore that Defendant Cola is entitled to summary judgment in his favor. *See Davis v. Kelly,* 160 F.3d 917, 921 (2d Cir.1998) ("After an opportunity for discovery, undisputed allegations that [a] supervisor lacked personal involvement will ultimately suffice to dismiss that official from the case.").

In sum, the Court finds that Plaintiff has failed to establish the personal involvement of Defendants Pappas and Cola in the alleged violation of his rights. For reasons set forth more fully in the R & R, the Court also dismisses the Complaint as to the John Doe Defendants because Plaintiff's time limit to amend the Complaint in order to substitute in named defendants has lapsed. Therefore, the Court finds it unnecessary to reach the question of whether Plaintiff has adequately established an underlying violation of his constitutional rights. Finally, having determined that no cognizable federal claims exist, the Court will follow Magistrate Judge Smith's recommendation in declining to exercise jurisdiction over the state law claims.

**\*5** Accordingly, it is hereby:

ORDERED that the Report and Recommendation dated August 2, 2007, is ADOPTED on the grounds set forth in this Order; and it is further

ORDERED that Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 is GRANTED.

The Clerk of Court is respectfully directed to enter judgment in favor of Defendants, to terminate Defendant's Motion (Dkt. No. 28), and to close this case.

SO ORDERED.

2008 WL 857528

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 857528

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 9:17-cv-00366-DNH-TWD   Document 93   Filed 03/08/21   Page 144 of 353

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)
2016 WL 3039687

KeyCite Yellow Flag - Negative Treatment
Distinguished by Animashaun v. Afify, W.D.N.Y., July 2, 2020

2016 WL 3039687
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Thomas Adam HENDERSON, Plaintiff,

v.

Anthony ANNUCCI, et al., Defendants.

14-CV-445A
|
Signed 03/14/2016

**Attorneys and Law Firms**

Thomas Adam Henderson, Alden, NY, pro se.

Christopher L. Boyd, NYS Attorney General's Office, Buffalo, NY, for Defendants.

### REPORT, RECOMMENDATION AND ORDER

JEREMIAH J. MCCARTHY, United States Magistrate Judge

**\*1** This case has been referred to me by Hon. Richard J. Arcara for supervision of pretrial proceedings, including the preparation of a Report and Recommendation on dispositive motions. [23]. [1] Plaintiff Thomas Adam Henderson brought this action pursuant to 42 U.S.C. § 1983 claiming that his civil rights were violated when the defendants allegedly assaulted him on September 10, 2013, October 22, 2013 and May 16, 2014. Complaint [1], pp. 11,13. Before me are defendants' motion to dismiss [22], plaintiff's motion to amend the complaint [31], and plaintiff's motion for appointment of counsel [32].

[1]     Bracketed references are to the CM/ECF docket entries.

For the reasons stated below, I recommend that defendants' motion to dismiss be granted in part and denied in part, the plaintiff's motion to amend be granted in part and denied in part, and that plaintiff's motion for the appointment of counsel be denied.

### BACKGROUND

Plaintiff commenced this civil rights action pursuant to 42 U.S.C. § 1983 alleging that while he was incarcerated at the Attica Correctional Facility, Correction Officer Dunford sexually assaulted him during a frisking on September 10, 2013. He asserts that after being cut down from a suicide attempt, Officer Dunford pulled up the waistband of his underwear so as to give him a "wedgie", and then swiped his fingers between plaintiff's butt cheeks "roughly pressing" against his anus. Complaint [1], p. 11. After complaining about this conduct, plaintiff states that he was informed that this procedure is known as a "credit card check", performed to determine if an inmate is hiding weapons. Id. at 11, 13, 14, 17. Plaintiff argues that the procedure constitutes a sexual assault.

He also asserts that the "credit card check" procedure was performed on him twice during a pat frisk on October 22, 2013 by Corrections Officer J. Hoinski. [2] Id. at p. 13. Finally, plaintiff alleges that Correction Officer B. Naab performed the "credit card check" on him on May 16, 2014. Id. at pp. 16-17.

[2]     The allegations in the plaintiff's original complaint attribute this conduct to "John Doe Number 1". Id. at 13. John Doe Number 1 was later identified as Officer Hoinski. See Decision & Order of Hon. Elizabeth A. Wolford dated December 29, 2014 [11].

Plaintiff claims that he complained to New York State Department of Corrections and Community Supervision ("DOCCS") Commissioner Anthony Annucci, DOCCS Chief Inspector General Vernon J. Fonda, Attica Correctional Facility Superintendent Mark L. Bradt, and others about the conduct which he considered to be sexual assaults. Id. at pp. 12, 15. He argues that these supervisory defendants failed to properly investigate and respond to his complaints in violation of his Eighth Amendment rights. Id. at 12. [3]

[3]     Plaintiff's original complaint asserted various other claims against numerous defendants which did not survive the initial screening in this case. Plaintiff's claims that defendants failed to comply with the requirements of the Prison Rape Elimination Act of 2003 ("PREA") were dismissed because PREA does not create a private right of action.

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 145 of 353

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

2016 WL 3039687

Decision and Order of Hon. Richard J. Arcara filed November 17, 2014 ("November 17, 2014 Decision & Order") [7], p. 7. Also, plaintiff's claims based upon a failure to investigate, failure to intercede, harassment, retaliation, and failure to provide medical treatment against defendants Superintendent Dale Artus, Capt. Brown Lieut.Kaczmarek, Sgt.Olles, Sgt. Brown, Sgt.Diehl, Officer Higgins, Officer Andrews, Officer Sippel, and Nurse Kekich were all dismissed. Id. at pp. 11-19.

**\*2** In his original complaint, plaintiff stated that he did not file a grievance as to any of the incidents because he did not believe he had to file a grievance. Instead, he contended that he complied with DOCCS Directive 4028A. Id. at pp. 5, 19. The defendants move to dismiss on the grounds that plaintiff failed to exhaust his administrative remedies. Motion to Dismiss [22-1], p. 4. Subsequently, the plaintiff sought leave to amend his Complaint to allege that he did, in fact, file a grievance regarding one of the three "credit card check" incidents. Plaintiff's Motion to Amend [31], p.3. The defendants oppose that motion.

## DISCUSSION

### A. Standard of Review

The defendants move to dismiss the claims in the Complaint pursuant to Rule 12 of the Federal Rules of Civil Procedure. The court accepts the material facts alleged in the complaint as true and draws all reasonable inferences in favor of the plaintiff and against the defendants. *See* Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998). However, legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness. Albany Welfare Rights Org. Day Care Center, Inc. v. Schreck, 463 F.2d 620 (2d Cir. 1972). The court is required to read the complaint broadly and with great latitude on a motion to dismiss. Yoder v. Orthomolecular Nutrition Institute, 751 F.2d 555, 558 (2d Cir. 1985). The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

The Supreme Court has clarified the pleading standard required to withstand a motion to dismiss. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states

a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense". Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (internal citation omitted). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief". Id.; *see also* Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 565-66 (2007) (factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)). Under Iqbal, factual allegations must be sufficient to support necessary legal conclusions. Iqbal, 556 U.S. at 680-81. "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth' ". Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). The court must then consider the factual allegations in the complaint to determine if they plausibly suggest an entitlement to relief. Iqbal, 556 U.S. at 681; *see also* Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009).

Thus, while the pleading standard under Fed. R. Civ. P. ("Rule") 8 does not require detailed factual allegations, it demands more than unadorned, conclusory accusations. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action is not sufficient. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility requirement is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. Iqbal, 556 U.S. at 681.

### B. Exhaustion of Administrative Remedies

**\*3** The Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a), states in relevant part, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted". 42 U.S.C. § 1997e(a). This administrative

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 146 of 353

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

2016 WL 3039687

exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong". Porter v. Nussle, 534 U.S. 516, 532 (2002).

"Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case". Nussle, 534 U.S. at 524-25. The act's "dominant concern [is] to promote administrative redress, filter out groundless claims, and foster better prepared litigation of claims aired in court" (id. at 528), and clarify the contours of the controversy once it is litigated. Id. at 525. In Woodford v. Ngo, 548 U.S. 81, 83-84, 90, 126 (2006), the Court held that the exhaustion requirement of the PLRA cannot be satisfied by an "untimely or otherwise procedurally defective administrative grievance or appeal", and that the PLRA requires "proper exhaustion", which "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)".

Although exhaustion under the PLRA is an affirmative defense, not a jurisdictional requirement, see Jones v. Bock, 549 U.S. 199, 211 (2007), a demonstrated failure to exhaust warrants dismissal of the plaintiff's claims. Jones, 549 U.S. at 216; see also Wilson v. Yussuff, 2015 WL 77433, *5 (E.D.N.Y. 2015) (holding that court must dismiss action where inmate did not exhaust administrative remedies).

However, the exhaustion requirement may be excused under the following circumstances: "(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement". Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006).

**C. Available Grievance Procedure**

DOCCS maintains a three-tiered administrative review and appeals system for prisoner grievances. See N.Y. Comp. Codes R. & Regs. § 701.5. Prior to pursuing a § 1983 action in federal court, a prisoner in the DOCCS system must exhaust all three levels. See Porter, 534 U.S. at 524. First, an inmate may file an inmate grievance complaint form or a written grievance (if forms are not available) with the

Inmate Grievance Resolution Committee ("IGRC"). See 7 N.Y.C.R.R. § 701.5(a). Second, if the inmate is dissatisfied with the IGRC decision, he may appeal to the prison superintendent. Id., § 701.5(c). Finally, DOCCS permits an inmate to appeal the superintendent's written decision to the Central Office Review Committee ("CORC"). Id., § 701.5(d).

On May 15, 2014, DOCCS amended Directive 4040, relating to sexual abuse and sexual harassment complaints. As revised, Directive 4040 states:

> "The Department has zero tolerance for sexual abuse and sexual harassment. Consistent with this policy and the Prison Rape Elimination Act (PREA) Standards (28 C.F.R. § 115.52(a)), an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy the [PLRA] exhaustion requirement (42 U.S.C. § 1997e(a)) before bringing a lawsuit regarding an allegation of sexual abuse as long as the matter was reported as set forth below."

**\*4**  See DOCCS Directive 4040, Plaintiff's Opposition to Motion to Dismiss, [27], Exhibit B, p.1.

Under the revised procedure, an allegation of sexual abuse shall be deemed exhausted for purposes of the PLRA "if official documentation confirms that:

> (1) An inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident to facility staff; in writing to Central Office staff; to any outside agency that the Department has identified as having agreed to receive immediately forward inmate reports of sexual abuse and sexual harassment to agency officials under the PREA Standards (28 C.F.R. § 115.51(b)); or to the Department's Office of the Inspector General; or

> (2) A third-party reported that an inmate is the victim of sexual abuse and the alleged victim confirmed the allegation upon investigation."

Id.

**D. Plaintiff's Efforts to Exhaust as to Defendants Dunford, Hoinski and Nabb**

The defendants' motion to dismiss is based entirely on the argument that plaintiff failed to exhaust his administrative remedies by filing grievances relating to the three "credit card check" incidents set forth in the complaint. Defendants' Motion to Dismiss [22]. As noted above, plaintiff's original

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 147 of 353

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

2016 WL 3039687

complaint states that he did not utilize the three-tiered administrative grievance procedure to complain about the September 10, 2013, October 22, 2013 and May 16, 2014 incidents. Complaint [1], pp. 5, 19. Instead, plaintiff argued that he was not required to utilize the grievance procedure because of Directive 4028A. Id. In response to the motion to dismiss, plaintiff also points to the revised language of Directive 4040 as eliminating the need to follow the inmate grievance procedure. Plaintiff's Opposition to Motion to Dismiss [27], p. 5.

Directive 4028A addresses sexual abuse prevention and intervention (staff on inmate). The argument that Directive 4028A eliminated the need to utilize the inmate grievance procedure was asserted, but rejected, in Omaro v. Annucci, 68 F. Supp.3d 359 (W.D.N.Y. 2014).[4] In that case, Omaro's claim that he was sexually assaulted in connection with the pat-frisk procedure was remarkably similar to the claims asserted in this case. Id. at p. 361. In response to the defendant's motion that plaintiff failed to exhaust his administrative remedies, Omaro argued that pursuant to PREA and Directive 4028A, he was not required to utilize the grievance procedure with respect to his sexual assault claim. Id. at 364-65. The court held that nothing in the text or legislative history of PREA suggested that it was intended to abrogate the PLRA's exhaustion requirement. Id. at 364 citing Porter v. Howard, 531 Fed. Appx. 792, 793 (9th Cir. 2013) (plaintiff provides no support for his contention that he was excused from the requirement that he file an administrative grievance by operation of PREA).

[4]    The plaintiff in Omaro was an Attica inmate Derrick R. Omaro, 92A0608. Omaro, 68 F. Supp. 3d. at 359. Henderson, identifies inmate Omaro as one of his witnesses in this case. Complaint [1], p. 19.

Similarly, the court in Omaro determined that nothing in the text of Directive 4028A suggested that it was intended to limit or abrogate the administrative remedies available to an inmate who alleged sexual misconduct by a staff member. Omaro, 68 F. Supp. 3d at 365. The court found that Directive 4028A addressed the manner in which a complaint of staff-on-inmate sexual misconduct may be initiated and obligations of the staff following such a complaint, but did not establish or address an inmate's administrative remedies once such a complaint has been made. Id. at p. 366.[5] Thus, the court held that the plaintiff's unexhausted claims were precluded by the PLRA. Id. at p. 368.

[5]    Plaintiff argues that because claims of sexual abuse are sensitive and should be dealt with confidentially, he should be excused from the exhaustion requirement. Plaintiff's Memorandum of Law [27], pp. 4-6. He provides no authority in support of this proposition. While the interests of confidentiality may have motivated the revision of Directive 4040, as discussed in Omaro, prior to the May 15, 2014 revision the plaintiff was required to utilize the inmate grievance process. Omaro, 68 F. Supp. 3d. at p. 367.

**5** Unlike Omaro, however, this case involves the application of the revised language in Directive 4040, and to that extent, appears to be a case of first impression. Omaro did not discuss the revised language of Directive 4040, which was raised for the first time in this case by the plaintiff in response to the defendants' motion to dismiss. Plaintiff's Opposition to Motion to Dismiss [27], Exhibit B. Neither party has presented authority interpreting the revised language of Directive 4040. In their reply, defendants do not dispute that Directive 4040, as revised, alleviates an inmate's need to exhaust the normal grievance procedure with respect to sexual assault and sexual harassment claims. Instead, the defendants argue that the revised language of Directive 4040 does not apply here because the plaintiff's allegations are insufficient to constitute a sexual assault under PREA. Defendants Reply in support of Motion to Dismiss [28], pp. 3-4. Defendants construe plaintiff's claims as merely challenging the "pat-frisk" procedure, and argue that such a claim would have to be pursued in the inmate grievance process through exhaustion to satisfy the PLRA. Id. at pp. 5-6.

Plaintiff's claims relating to the "credit card check" procedure as set forth in the complaint, however, are presented as sexual assault claims. For example, plaintiff alleges that "Defendant Dunford's sexual abuse cause[d] me pain, suffering and mental distress". Complaint [1], p. 11, ¶ 2. He claims that he complained to defendant Annucci and others regarding the "sexual misconduct of staff-on-inmate sexual abuse". Id. at p. 12, ¶6. Plaintiff characterizes the defendants' conduct as constituting sexual assault or sexual abuse throughout his complaint. Id. at p. 13, ¶¶10, 13, 14, 15; p. 14, ¶¶ 16, 17, 18, 19, 21; p. 15, ¶¶ 22, 23, 24, 26, 27; p. 16, ¶¶ 29, 30, 31; p. 18, ¶¶ 43, 44, 45, 46. The conduct being challenged involves corrections staff contacting plaintiff's genitals, which, depending upon the manner in which performed, could arguably fall within the scope of conduct that can be construed as "sexual" in nature.

Case 9:17-cv-00366-DNH-TWD   Document 93   Filed 03/08/21   Page 148 of 353

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)
2016 WL 3039687

Whether these allegations by plaintiff are sufficient to establish a "sexual assault" or "sexual harassment" under PREA (or the Fourth and Eighth Amendments) is not currently before me. The defendants' motion to dismiss raised solely the issue of whether plaintiff had exhausted the inmate grievance procedure. Defendants' Motion to Dismiss [22]. The defendants did not put plaintiff on notice that their argument in support of dismissal was based upon the fact that plaintiff's allegations were insufficient to constitute sexual conduct under PREA. In any event, while I take no position as to whether the plaintiff's allegations allege sexual conduct sufficient to state a claim under the Fourth or Eighth Amendments, [6] inasmuch as they are presented as "sexual assault" claims, the revised language of Directive 4040 applies. [7] An inmate would be placed in an untenable position if he were required to adjudicate whether his allegations of sexual assault were sufficient under PREA prior to relying upon the language in Directive 4040 alleviating the need to utilize the normal grievance procedure. [8] Here, plaintiff presented his claims as sexual assault claims. Although the sufficiency of those claims is uncertain, the language in Directive 4040 clearly states that an inmate need not utilize the grievance procedure to exhaust such claims prior to bringing a federal court action for redress.

[6]     With respect to the plaintiff's pat-frisk claims, Judge Arcara dismissed the claims to the extent that they were asserted under PREA, but allowed them to proceed as asserted under the Fourth and Eighth Amendments. November 17, 2014 Decision & Order [7], p. 7. The defendants are free to file a motion to dismiss or for summary judgment challenging the sufficiency of the plaintiff's allegations with respect to any surviving Fourth and Eighth Amendment claims.

[7]     Although the revised language in Directive 4040 refers to PREA, assuming notice was provided as set forth in the directive, Directive 4040 states that "an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy [the PLRA] exhaustion requirement ... before bringing a lawsuit regarding an allegation of sexual abuse". Plaintiff's Opposition to Motion to Dismiss [27], Exhibit B. Thus, this language applies to sexual assault claims

brought by an inmate under the Fourth and Eighth Amendments.

[8]     It is likely that by the time there was a resolution, either administrative or judicial, as to whether the plaintiff's claims qualify as a "sexual assault" under PREA, an inmate's time to commence the typical grievance process would have passed.

**\*6** Directive 4040 was revised with respect to sexual assault claims on May 15, 2014. Plaintiff's Opposition to Motion to Dismiss [27], Exhibit B. Although the defendants note that the amendment has not been incorporated into the New York Code, Rules and Regulations (*see* 7 N.Y.C.R.R. 701, *et seq.*), they do not argue that the revision is not in effect. Indeed, defendants acknowledge that if the revised language of Directive 4040 applies, plaintiff's claim against defendant Nabb involving the May 16, 2014 incident has been exhausted. Defendants' Reply in Support of Motion to Dismiss [28], p. 6. Because plaintiff reported the May 16, 2014 incident involving defendant Nabb to the facility staff in a letter dated May 19, 2014 (Complaint [1], Exhibit P), this claim is deemed exhausted pursuant to Directive 4040.

Because the September 10, 2013 and October 22, 2013 incidents preceded the revision of Directive 4040, plaintiff was required to exhaust the typical inmate grievance process with respect to those incidents. [9] Plaintiff makes no attempt to argue that he exhausted the inmate grievance process with respect to his September 10, 2013 claim. That claim against defendant Dunford should be dismissed with prejudice. [10] In his motion to amend the complaint [31], plaintiff asserts that he did, in fact, exhaust the inmate grievance process with respect to his claim relating to the October 22, 2013 involving defendant Hoinski. As discussed below, the plaintiff will be allowed to amend the complaint to assert the exhaustion of that claim.

[9]     The plaintiff argues that the revision of Directive 4040 eliminated the deadline for reporting sexual abuse, and therefore, he can cure the failure to exhaust his claims by reporting the incidents now under the terms of the directive. Plaintiff's Opposition to Motion to Dismiss [27], p.11. As discussed more fully below, plaintiff has presented no authority suggesting that the revisions in Directive 4040 apply retroactively to incidents prior to the effective date. To the contrary, the case law suggests that Directive 4040 is applied

Case 9:17-cv-00366-DNH-TWD Document 93 Filed 03/08/21 Page 149 of 353

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

2016 WL 3039687

as it was in effect at the time of the incident at issue. *See* Smith v. Kelly, 985 F. Supp. 2d 275, 285 (N.D.N.Y. 2013) (referring to the version of Directive 4040 that was in effect at the time in question); Goodson v. Silver, 2012 WL 4449937, *8 (N.D.N.Y. 2012) (court decision based upon the version of DOCCS' Directive 4040 in effect during the time in question).

[10]    Plaintiff asserts, generally, that his failure to exhaust any of his claims can be cured. Plaintiff's Reply in Support of Motion to Amend [37], p. 9. However, plaintiff's time to file a grievance relating to the September 10, 2013 incident has long passed. Although plaintiff cites Bridgeforth v. Barlett, 686 F. Supp.2d 238 (W.D.N.Y. 2010) in support of his right to cure, that case actually supports the dismissal of plaintiff's claim with prejudice. Bridgeforth, 686 F. Supp.2d, at 240 ("Since the time limits for plaintiff to file an administrative appeal have long since passed, administrative remedies are no longer available to him, as a result of his own inaction. This case, then, is precisely the kind of case that the PLRA was intended to foreclose. It is therefore dismissed with prejudice").

### E. Failure to Exhaust as to Defendants Annucci, Fonda, Bradt and Hughes

Defendants also seek to dismiss the claims against defendants Annucci, Fonda, Bradt and Hughes because plaintiff has not exhausted administrative remedies by naming those defendants in any grievance relating to the "credit card check" incidents. Defendants' Reply in Support of Motion to Dismiss [28], p.8-10. These claims survived the initial screening only to the extent that they alleged that the defendants "were made aware of the sexually assaultive pat-frisks but failed to remedy them or take any corrective action". November 17, 2014 Decision & Order [7], pp. 10, 22. [11]

[11]    Judge Arcara cited Colon v. Coughlin, 58 F.3d 865, 873 (2nd Cir. 1995) for the proposition that a prison official who is made aware of a violation but fails to remedy the wrong may be determined to be "personally involved" and subject to § 1983 liability. However, he noted that "[r]eceiving *post hoc* notice does not constitute personal involvement in the unconstitutional activity and cannot be said to have proximately caused the

damage suffered by the inmate. Therefore, a supervisor may be liable for her failure to remedy a violation only in those circumstances where the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it. Similarly, liability may attach when a supervisor fails to act on reports of a staff member's previous assaults on the plaintiff and the plaintiff is assaulted again by that same staff member". November 17, 2014 Decision & Order [7], p.10 *citing* Rahman v. Fisher, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009). Given the preliminary stage of the litigation, Judge Arcara allowed these claims to proceed to service. Id. at p. 11. The plaintiff's exhaustion of these claims was not addressed in that decision.

**\*7**  The plaintiff does not argue that he has exhausted his claims against defendants Annucci, Fonda, Bradt or Hughes by naming them in any grievance. In response to the motion to dismiss, plaintiff asserts generally that, because the revisions to Directive 4040 stated that a "sexual abuse or sexual harassment complaint may be submitted at any time", he can cure any failure to exhaust by now filing a complaint under Directive 4040. Plaintiff's Opposition to Motion to Dismiss [27], p. 11. Initially, it is not clear that the revised procedure set forth in Directive 4040, which eliminates the need to follow the typical inmate grievance procedure with respect to sexual assault and sexual harassment claims, applies to claims against supervisory officials for failing to remedy or take corrective action regarding such a claim.

In any event, as noted above, plaintiff has not cited, and I have not found, any authority supporting the retroactive application of a revised DOCCS directive. Instead, although not discussed in depth, the courts in Smith and Goodson expressly applied the version of Directive 4040 which was in effect at the time of the incidents in question in those cases.

As a general rule, a new statutory provision does not apply retroactively to conduct that occurred prior to the provision's enactment. As the Supreme Court has noted, "the presumption against retroactive legislation is deeply rooted in our jurisprudence" Landgraf v. USI Film Products, 511 U.S. 244, 265, (1994). For example, the revision of § 1997e(a) which instituted the mandatory exhaustion requirement of the PLRA, was not applied retroactively. Shariff v. Coombe, 2002 WL 1392164, *3 (S.D.N.Y. 2002).

2016 WL 3039687

This is not a case where the revision of Directive 4040 merely clarified ambiguous language of the prior regulation. *See* [Leshinsky v. Telvent GIT, S.A., 873 F. Supp.2d 582 (S.D.N.Y. 2012).](#) Instead, the revision of Directive 4040 sets forth a new procedure relating to the reporting and processing of sexual abuse and sexual harassment claims. The new procedure bypasses the previously required inmate grievance procedure altogether and institutes an expedited process for the lodging and investigation of a sexual abuse or sexual harassment claim. The revised language does not expressly or indirectly suggest that it is to be applied in a retroactive manner to incidents predating the revision. The parties have submitted no authority suggesting that DOCCS intended the revision to apply retroactively to conduct occurring years earlier.

Since the record does not reflect any intention that the revision of Directive 4040 be applied retroactively, I find that it does not apply to incidents predating the date of the revision. With respect to the post-revision "credit card check" incident of May 16, 2014, the plaintiff's letters dated May 19, 2014 and May 20, 2014 (Complaint [1], Exhibits P and Q) relating to this incident do not name or discuss the conduct of defendants Annucci, Fonda, Bradt or Hughes. Thus, even if the procedure set forth in Directive 4040, as revised, applied to claims against supervisory officials, it was not utilized by plaintiff to complain of conduct by these defendants.

Because plaintiff has failed to exhaust his administrative remedies with respect to defendants Annucci, Fonda, Bradt and Hughes, the claims against these defendants should be dismissed with prejudice.

## F. Motion to Amend Complaint

Plaintiff moves to amend his complaint, principally to modify the assertion in his original complaint that he did not exhaust his administrative remedies. Plaintiff's Motion to Amend [31], p. 3. He states that because he had been transferred between facilities and or prison cells several times since the underlying incidents, he misplaced or lost various legal documents. Id. at p. 4. Further, he asserts that because he was reprocessed at one point and provided with a new inmate number, some of the documentation related to these claims was filed under a previous inmate number. Id. Thus, plaintiff seeks to amend the complaint to assert that he has administratively exhausted the grievance process with respect to the October 22, 2013 incident and his claim against Hoinski. Id. at pp. 3-4. Attached as exhibits to plaintiff's motion are documents supporting plaintiff's utilization of the

inmate grievance process with respect to the October 22, 2013 incident. Id., Exhibits A-D.

**\*8** Plaintiff's proposed amended complaint is substantively identical to his original complaint except that he has modified his allegations regarding the exhaustion of administrative remedies and has removed some of the allegations and claims previously dismissed by Judge Arcara. [12]

[12]    Plaintiff's proposed amended complaint is type-written, as opposed to the original hand written complaint. Proposed Amended Complaint [37-1]. Under the heading "Defendant's Information", plaintiff did not include information relating to the previously dismissed defendants with the exception of Dale Artus., Id., p.2. The proposed amended complaint eliminated ¶5 of the original complaint, making the paragraph numbers of the proposed amended complaint one off from those in the original complaint. Paragraph numbers between the two documents re-synchronized at ¶42 after plaintiff split the substance of the original ¶40 into two paragraphs (¶¶40-41) of the proposed amended complaint. Plaintiff's amended complaint identified the "John Doe" defendant as Hoinski (¶¶ 10-14, 20, 24, 29, 30, 35-36). Plaintiff's amended complaint also occasionally included expanded or enhanced allegations without changing the substance of his claims (*see* i.e. ¶ 30).

Rule 15(a) provides that leave to amend should be "freely given when justice so requires". [New York State National Organization for Women v. Cuomo, 182 F.R.D. 30, 36 (S.D.N.Y. 1998);](#) *see also* [Forbes & Wallace, Inc. v. Chase Manhattan Bank, 79 F.R.D. 563, 565 (S.D.N.Y. 1978).](#) It has long been "well-established that 'outright dismissal for reasons not going to the merits is viewed with disfavor in the federal courts.' " [Harrison v. Enventure Capital Group, Inc., 666 F. Supp. 473, 479 (W.D.N.Y. 1987).](#) For this reason, "dismissals for insufficient pleadings are ordinarily with leave to replead". [Stern v. General Electric Co., 924 F.2d 472, 477 (2d Cir. 1991).](#) Leave to amend a pleading need not be granted, however, if it would be futile to do so. *See* [O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 69 (2d Cir. 2002).](#)

Defendants oppose the motion to amend on several grounds. Defendants' Opposition to Motion to Amend [34]. First, defendants argue that plaintiff's motion should be denied because he failed to attach a proposed amended complaint

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

2016 WL 3039687

to the motion papers. Defendant's Opposition to Motion to Amend [34] p., 2. "A movant's failure to submit a proposed amended complaint constitutes sufficient grounds to deny a motion to amend". Murray v. New York, 604 F.Supp.2d 581, 588 (W.D.N.Y. 2009) (citing LaBarbara v. Ferran Enterprises Inc., 2009 WL 367611, *3 (E.D.N.Y. 2009) ("In order to meet the requirements of particularity in a motion to amend, a complete copy of the proposed amended complaint must accompany the motion so that both the court and the opposing party can understand the exact changes sought.")). Where, however, "the movant's papers adequately explain the basis for, and nature of, the proposed amendment, ... the failure to attach a proposed amended complaint to the motion is not necessarily fatal". Murray, 604 F.Supp.2d at 588.

The determination whether to deny a motion to amend based upon such a failure the subject to the discretion of the court. Id. Here, plaintiff's motion papers sufficiently articulated the basis for his motion to amend such that the defendants were able to respond to the substance of the proposed changes. Moreover, plaintiff attached a proposed amended complaint to his Memorandum of Law in reply to defendant's opposition. See Proposed Amended Complaint attached to Plaintiff's Reply in Support of Motion to Amend [37-1]. Under these circumstances, plaintiff's failure to attach a proposed amended complaint to his initial motion papers is not fatal to the motion.

 **\*9** Defendants also argue that plaintiff's motion to amend the complaint should be denied based upon "futility, bad-faith, undue delay or undue prejudice to the opposing party". Defendants' Opposition to Motion to Amend [34], p. 3.[13] Defendants state that they made the motion to dismiss based upon plaintiff's affirmative statements in the complaint that he had not exhausted the inmate grievance process with respect to his claims. Defendants claim that they would not have filed a motion to dismiss "[h]ad plaintiff not made these affirmative statements in his complaint" and that allowing plaintiff to amend the complaint would prejudice the defendants because they would be required to bring another motion to dismiss. Id. Defendants allege that the "striking reversal" as to exhaustion by the plaintiff "suggests the possibility of bad-faith". Id.

[13]  Although defendants mention "futility" in their opposition, they do not assert the insufficiency of the plaintiff's allegations of sexual assault as a basis to deny the proposed amended complaint. Defendants' Opposition to Motion to Amend [34].

The prejudice alleged by the defendants is insufficient to warrant denial of plaintiff's motion to amend the complaint. Initially, it should be noted that defendants had access to plaintiff's inmate grievance records, and could have checked those records prior to filing any motions regarding exhaustion in this case. The plaintiff has asserted that he had lost or misplaced much of the documentation relating to his claims due to a series of transfers between correctional facilities or jail cells. Defendants have not rebutted this contention, which plaintiff offers as his explanation as to why his original complaint contained an "erroneous statement" regarding exhaustion. Plaintiff's Motion to Amend [31], p. 3-4. Defendants have not articulated a sufficient basis to conclude that the plaintiff's allegations in the original complaint were made in bad faith. Finally, defendants' claim of prejudice is undermined by the fact that this motion to dismiss will result in my recommendation that several of plaintiff's claims be dismissed.

Defendants also argue that plaintiff's motion to amend should not be granted because plaintiff has not alleged that he has received a final decision from the Central Office Review Committee ("CORC") with respect to his grievance relating to the October 22, 2013 incident. Defendants Opposition to Motion to Amend [34], p. 4-5. This argument is also unpersuasive. Plaintiff has submitted documentation from the Director of the Inmate Grievance Program, dated January 24, 2014, stating that his grievance was still pending before CORC. Plaintiff's Motion to Amend [31], Exhibit D. This correspondence was in response to plaintiff's January 20, 2014 letter noting that his grievance had already been pending before CORC for more than 60 days without a decision. Id., Exhibit C.

It appears by this documentation, the validity of which has not been challenged by the defendant, that plaintiff has been waiting for more than *two years* for a decision from CORC with respect to this grievance. Defendants cannot rely upon CORC's refusal to render a decision with respect to plaintiff's grievance for two years as support for an argument that plaintiff has failed to exhaust his administrative remedy because he has not been provided with a final decision. As discussed in Rossi v. Fischer, 2015 WL 769551, *4-5 (S.D.N.Y. 2015):

"A number of federal circuit courts have held that a failure to respond to a grievance within the time limit prescribed by the prison grievance process renders an administrative remedy unavailable for purposes of exhaustion.... While the Second Circuit has not directly addressed this issue,

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 152 of 353

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

2016 WL 3039687

it has treated [cases holding that such a failure renders the administrative remedy unavailable] favorably. *See* [Hemphill v. New York],380 F.3d 680, 686 n. 6 (2004) (noting that when an inmate does not receive a response to a grievance there may be a question as to whether administrative remedies were available); Giano v. Goord, 380 F.3d 670, 677 (2d Cir. 2004) (citing favorably to [Underwood v. Wilson, 151 F.3d 292, 295 (5th Cir. 1998)] and [Foulk v. Carrier, 262 F.3d 687, 698 (8th Cir. 2001] with regard to availability of administrative remedies)). The Second Circuit in [Abney v. McGinnis, 380 F.3d 663, 668 (2nd Cir. 2004)] cited to Hemphill for the proposition that 'exhaustion may be achieved in situations where prison officials fail to timely advance the inmate's grievance'. 380 F.3d at 667."

**\*10** *See also* Peoples v. Fischer, 2012 WL 1575302, \*6 (S.D.N.Y. 2012) *on reconsideration in part,* 898 F.Supp.2d 618 (S.D.N.Y. 2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has neglected to issue a final administrative determination"); Dimick v. Baruffo, 2003 WL 660826, \*4 (S.D.N.Y. 2003) (holding that plaintiff's claims were properly exhausted where CORC rendered an untimely decision and plaintiff filed his complaint almost two months after CORC had been required to respond pursuant to the prison grievance procedures). [14]

[14]   *But see* Bennett v. Wesley, 2013 WL 1798001, \*6 (S.D.N.Y. 2013) ("[T]he Court of Appeals has not adopted the position that a delay in responding to a grievance demonstrates *per se* unavailability.") (*quoting* Mateo v. O'Connor., 2012 WL 1075830, \*7 (S.D.N.Y. 2012)); Rivera v. Anna M. Kross Ctr., 2012 WL 383941, \*4–5 (S.D.N.Y. 2012) (asserting that the Second Circuit has declined to hold that administrative remedies are deemed unavailable when a plaintiff receives no response from prison authorities within the prescribed time limits.). Also, some courts have questioned whether the equitable exclusions from exhaustion set forth in Hemphill remain viable after the Supreme Court's decision in Woodford. The Second Circuit has declined to address this question. *See* Amador et al. v. Andrews et al., 655 F.3d 89, 102–03 (2nd Cir. 2011). In Woodford, plaintiff's grievance was administratively rejected

because it was filed beyond the 15-day limitations period. The district court granted summary judgement on the grounds that plaintiff failed to exhaust his administrative remedies. The Ninth Circuit reversed finding that plaintiff had exhausted his remedies because no such remedies remained available to him. The Supreme Court vacated that decision, holding that "proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings". Woodford, 548 U.S. at 90-91. Here, unlike Woodford, the failure to achieve complete exhaustion is due to the inaction by the prison grievance officials, not because of any failure on the part of plaintiff. In any event, I do not believe that Woodford stands for the proposition that CORC can frustrate or unduly delay an inmate's ability to bring a federal claim to address an alleged constitutional violation by refusing to issue a final decision for several years so as to preclude exhaustion under the PLRA.

Since plaintiff has been awaiting a decision from CORC for more than two years with respect to his grievance relating to the October 22, 2013 incident, such an administrative remedy is no longer available to him for purposes of exhaustion under the PLRA. Plaintiff's motion to amend the complaint is granted to the extent plaintiff seeks to assert allegations that he exhausted his administrative remedies with respect to the October 22, 2013 incident involving defendant Hoinski. Plaintiff's motion to amend is denied to the extent the amended complaint seeks to reassert claims against Dale Artus (or any other defendants) which were previously dismissed by Judge Arcara.

In light of the age of this case, and to expedite further proceedings in this matter, I direct that the Clerk of the Court separately file the Proposed Amended Complaint [37-1] as the Amended Complaint in this matter. The Amended Complaint does not add any new claims or parties. All of the defendants in this case are represented by counsel. By virtue of its attachment to the plaintiff's motion papers, and by the filing directed above, the defendants will have received a copy of the Amended Complaint. The defendants shall answer, or otherwise respond, to the Amended Complaint within 30 days of the date it is filed by the Clerk of the Court as directed above.

## G. Motion for Appointment of Counsel

**\*11** Plaintiff also moves for the appointment of counsel [32]. There is no constitutional right to appointed counsel in civil cases. However, under 28 U.S.C. § 1915(e), the Court may appoint counsel to assist indigent litigants. *See* Sears, Roebuck & Co. v. Charles W. Sears Real Estate, Inc., 865 F.2d 22, 23 (2d Cir. 1988). Assignment of counsel in this matter is clearly within the judge's discretion. In re Martin-Trigona, 737 F.2d 1254 (2d Cir. 1984).

The factors to be considered in deciding whether or not to assign counsel include the following: (1) whether the indigent's claims seem likely to be of substance; (2) whether the indigent is able to investigate the crucial facts concerning his claim; (3) whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder; (4) whether the legal issues involved are complex; and (5) whether there are any special reasons why appointment of counsel would be more likely to lead to a just determination. Hendricks v. Coughlin, 114 F.3d 390, 392 (2d Cir. 1997).

In considering a motion for the appointment of counsel, the court may also consider the merits of the plaintiff's claim. The Second Circuit has held that "every assignment of a volunteer lawyer to an undeserving client deprives society of a volunteer lawyer available for a deserving cause." Cooper v. A. Sargenti Co., Inc., 877 F.2d 170, 172 (2d Cir. 1989). Therefore, the court must first look to the "likelihood of merit" of the underlying dispute, Cooper, 877 F.2d at 174, and "even though a claim may not be characterized as frivolous, counsel should not be appointed in a case where the merits of the ... claim are thin and his chances of prevailing are therefore poor." Carmona v. United States Bureau of Prisons, 243 F.3d 629, 632 (2d Cir. 2001) (denying counsel on appeal where petitioner's appeal was not frivolous but nevertheless appeared to have little merit). See also Smolen v. Corcoran, 2013 WL 4054596 (W.D.N.Y.,2013) (In deciding whether to grant a request to appoint pro bono counsel, district courts should evaluate several factors, including the merits of the claim, the factual issues and complexity of the case, plaintiff's ability to present the case, and the plaintiff's inability to obtain counsel.).

I have reviewed the facts presented herein in light of the factors required by law as discussed above. At this time, it does not appear the legal issues presented are unduly complex. Plaintiff's filings in this case reflect that he understands the issues presented and can adequately

articulate his factual and legal arguments. Plaintiff's motion for appointment of counsel is denied at this time without prejudice, subject to renewal at a later date. It is plaintiff's responsibility to retain an attorney or press forward with this lawsuit *pro se.* 28 U.S.C. § 1654.

## CONCLUSION

For these reasons, I recommend that defendant's motion to dismiss [22] be granted in part and denied in part as follows: the motion should be granted as to plaintiff's claim against defendant Dunford relating to the September 10, 2013 incident, and plaintiff's supervisory claims against defendants Annucci, Fonda, Bradt and Hughes, but denied as to plaintiff's claims against defendants Nabb and Hoinski. Also, plaintiff's motion [31] to amend the complaint is granted in part and denied in part such that plaintiff may amend the complaint to assert that he has exhausted administrative remedies with respect to the October 22, 2013 incident involving defendant Hoinski, but may not reassert previously dismissed claims and is otherwise denied. Plaintiff's motion for appointment of counsel [32] is denied.

**\*12** Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by March 31, 2016 (applying the time frames set forth in Rules 6(a)(1)(C), 6(d), and 72(b) (2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely ... waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection ... supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining

2016 WL 3039687

why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3039687

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4463672
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joshua SHEFFER, Plaintiff,

v.

Correction Officer FLEURY, et al., Defendants.

9:18-CV-1180 (LEK/DJS)

|

Signed 09/18/2019

**Attorneys and Law Firms**

Joshua Sheffer, Marcy, NY, pro se.

Konstandinos D. Leris, New York State Attorney General, Albany, NY, for Defendants.

### DECISION AND ORDER

Lawrence E. Kahn, U.S. District Judge

### I. INTRODUCTION

**\*1** Pro se plaintiff Joshua Sheffer brought this action under 42 U.S.C. § 1983 alleging, inter alia, that officials at New York's Upstate Correctional Facility ("Upstate") violated his Eighth Amendment rights when they failed to protect him from a series of sexual assaults by his bunkmate in September 2017. Dkt. No. 1 ("Complaint"). After a sufficiency review by the Court pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, Plaintiff's failure-to-protect claims proceeded against the following defendants: Correction Officer Travis Bond ("Bond"), Correction Sergeant John Doe ("Doe"),[1] Correction Officer Nicholas Fleury ("Fleury"), New York State Department of Corrections and Community Supervision ("DOCCS") Deputy Commissioner for Administration Daniel Martuscello, III ("Martuscello"), DOCCS Director of Special Housing Units Albert Prack ("Prack"), Offender Rehabilitation Counselor Luann Smith ("Smith"), and DOCCS Policy and Complaint Review Chairperson Frances Sullivan ("Sullivan").[2] Dkt. No. 8 ("November 2018 Decision and Order"). In the same order, the Court dismissed Plaintiff's failure-to-protect claims against DOCCS, Correction Officer Chase, and acting Upstate Superintendent Donald Uhler, and dismissed Plaintiff's sexual harassment claims brought against only two defendants, Doe and Correction Officer Labarge. Nov. 2018

Decision and Order. Bond, Fleury, Martuscello, Prack, and Smith then moved for summary judgment under Federal Rule of Civil Procedure 56(a), arguing that Plaintiff had failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e. See Defs.' Mem. at 9; Dkt. No. 30 ("Defendants' Reply") at 9–10. In the alternative, Defendants requested an opportunity to depose Plaintiff on the limited issue of exhaustion followed by an evidentiary hearing pursuant to Messa v. Goord, 652 F.3d 305 (2d Cir. 2011), and Martuscello, Prack, and Smith moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for lack of personal involvement. Defs.' Mem. at 9. Plaintiff does not oppose the motion to dismiss by Prack and Martuscello, but opposes the remainder of the motions. Dkt. No. 31-3 ("Plaintiff's Response") at 10. The Honorable Daniel J. Stewart, United States Magistrate Judge, issued a Report-Recommendation and Order in response to Defendants' motions, Dkt. No. 39 ("Report-Recommendation"), to which Defendants timely objected, Dkt. No. 40 ("Objections"). For the following reasons, the Court approves and adopts the Report-Recommendation in its entirety.

[1]     Doe was subsequently identified as Correction Sergeant Michael Walantus. Dkt. No. 14.

[2]     Doe and Sullivan have not yet been served or appeared in this action, see Dkt. No. 24-9 ("Defendants' Memorandum") at 3, n.1, n.2; Dkt. No. 14; Dkt. No. 19, and take no part in the motions that are the subject of this Decision and Order. Therefore, when the Court writes generally of "Defendants" in this Decision and Order, it refers to Bond, Fleury, Martuscello, Prack, and Smith. When discussing an individual defendant's motion, the Court refers to the defendant by name.

### II. BACKGROUND

**\*2** The facts and allegations in this case were detailed in the November 2018 Decision and Order and the Report-Recommendation. See Nov. 2018 Decision and Order at 3–6; R. & R. at 2–4. Familiarity is assumed.

#### A. Magistrate Judge Stewart's Report-Recommendation

Magistrate Judge Stewart recommended: (1) denying Defendant's Motion for Summary Judgment because Plaintiff had exhausted his administrative remedies under the Prison Rape Elimiation Act ("PREA"), 34 U.S.C. § 30301, et seq.,

2019 WL 4463672

and DOCCS Directive 4040 § 701.3(i), which establishes the exhaustion requirements for inmate complaints of sexual abuse or harassment; (2) denying Smith's Motion to Dismiss because Plaintiff had pled sufficient facts to demonstrate Smith's personal involvement in the alleged Eighth Amendment violation; and (3) granting the Motion to Dismiss by Prack and Martuscello, which Plaintiff did not oppose. R. & R. at 17. Magistrate Judge Stewart did not address Defendants' request to depose Plaintiff nor their request for a Messa hearing. Id.

### B. Defendants' Objections to the Report-Recommendation

With regard to their Motion for Summary Judgment, the Court reads Defendants' Objections to argue that Plaintiff has failed to exhaust his administrative remedies because the exhaustion procedure for incidents of sexual assault found in § 701.3(i) does not apply to Plaintiff's claims. Objs. at 2–5. Specifically, Defendants object that § 701.3(i) does not apply to Plaintiff's failure-to-protect claim because the claim is not "necessarily intertwined" with the underlying sexual assault allegation, as Magistrate Judge Stewart held it was. Id. at 4. Additionally, Defendants take issue with a factual finding by Magistrate Judge Stewart that Plaintiff told Bond on September 25, 2017 that he feared he would be "sexually assaulted" by his bunkmate. Id. at 2 (citing R. &. R. at 3.) They argue that Plaintiff failed to produce evidence proving that he told any defendant at any time about his fears of sexual assault. Objs. at 3.

As for the Motion to Dismiss, Smith objects generally that Plaintiff pled insufficient facts to plausibly show that Smith was personally involved in the events underlying this dispute. Id. at 5. More specifically, Smith argues that Plaintiff never alleged that he told her he was afraid of being sexually assaulted by his bunkmate, and she questions Magistrate Judge Stewart's "reliance" on two letters Plaintiff alleges he sent to Smith regarding his fears. Id. at 5–6. Thus, Smith argues, Plaintiff has not plausibly alleged that Smith was personally involved in the alleged failure to protect Plaintiff from his bunkmate.

### III. STANDARD OF REVIEW

#### A. Review of Report-Recommendation

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If objections are timely filed, a court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). However, if no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-857, 2013 WL 1121353, at *1 (N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–07 (N.D.N.Y. 2008), abrogated on other grounds, Widomski v. State Univ. of N.Y. at Orange, 748 F.3d 471 (2d Cir. 2014); see also Machicote v. Ercole, No. 06-CV-13320, 2011 WL 3809920, at *2 (S.D.N.Y. Aug. 25, 2011) ("[E]ven a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal...."). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." § 636(b).

#### B. Legal Standard for Summary Judgment

**\*3** Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any," that there is no genuine issue of material fact. F.D.I.C. v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial and cannot rest merely on allegations or denials of the facts submitted by the movant. Fed. R. Civ. P. 56(c); see also Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525–26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... [sworn statements] are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion," and the credibility of such statements is better left to a trier of fact. Scott, 344 F.3d at 289 (citations omitted).

"[T]he trial court's task at the summary judgment stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir. 1994). When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir. 1998). Furthermore, where a party is proceeding pro se, the court must "read his supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994); accord *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

### C. Legal Standard for Motion to Dismiss

To survive a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6),* "a complaint must contain sufficient factual matter ... 'to state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In assessing whether this standard has been met, courts "must accept all allegations in the complaint as true and draw all inferences in the light most favorable to the non-moving party[ ]...." *In re NYSE Specialists Sec. Litig.,* 503 F.3d 89, 95 (2d Cir. 2007) (internal citation omitted). Where, as here, the complaint was filed pro se, it must be construed liberally with "special solicitude" and interpreted "to raise the strongest claims that it suggests." *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir. 2011) (internal quotation marks and citation omitted). Nonetheless, a pro se complaint must state a "plausible claim for relief." See *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009).

### IV. ANALYSIS

As an initial matter, and before turning to the balance of the Report-Recommendation, the Court notes that Plaintiff has not opposed the motion to dismiss by Martuscello and Prack. Pl.'s Resp. at 9. The Court finds no clear error in Magistrate Judge Stewart's recommendation that the claims against Martuscello and Prack be dismissed, R. & R. at 12–13, and adopts the recommendation.

**\*4** Turning to Defendants' Motion for Summary Judgment and Smith's Motion to Dismiss, after reviewing the papers and the Report-Recommendation, the Court finds no clear error in the unobjected-to portions of the Report-Recommendation. And, after reviewing de novo the portions of the Report-Recommendation to which Defendants object, the Court finds no error. Magistrate Judge Stewart employed the proper legal standards, accurately recited the facts alleged, and correctly applied the law to those facts. As a result, the Court accepts and adopts the Report-Recommendation for the reasons stated therein. The Court adds the following discussion.

### A. Denial of Defendants' Motion for Summary Judgment

Defendants moved for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies through the DOCCS Inmate Grievance Program ("IGP"), as was required under the PLRA. Defs.' Mem. at 7–11; Defs.' Reply at 4–8. The PLRA provides that "[n]o action shall be brought with respect to prison conditions under *section 1983* of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *42 U.S.C. § 1997e(a).* Exhaustion in prisoner cases covered by *§ 1997e(a)* is mandatory, *Ross v. Blake,* 136 S. Ct. 1850, 1856 (2016), and must be "proper," which means using all steps of the agency's administrative process and complying with "deadlines and other critical procedural rules," *Woodford v. Ngo,* 548 U.S. 81, 94 (2006).

To satisfy the PLRA's exhaustion requirement, an inmate-plaintiff in DOCCS' custody must typically follow the IGP's three-step process, which involves filing an initial grievance with the IGP clerk at the prison where the inmate is incarcerated and, in the case of an adverse ruling, two subsequent levels of appeals. See DOCCS Directive 4040 § 701.5; *N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5; Carleton v. Annucci,* No. 17-CV-245, 2018 WL 7917921, at *5–6 (N.D.N.Y. Nov. 21, 2018), report and recommendation adopted, 2019 WL 422530 (N.D.N.Y. Feb. 4, 2019) (describing three-step process in detail). Generally, a plaintiff must properly appeal through all three levels of review before seeking relief in a federal court under *§ 1983.* See *Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 176 (2d Cir. 2006).

However, for complaints regarding sexual abuse or harassment, DOCCS has established a different procedure. See DOCCS Directive 4040 § 701.3(i); N.Y. Comp. Codes R. & Regs. tit. 7, § 701.3(i). Revised in 2014 pursuant to the Prison Rape Elimination Act ("PREA"), see Henderson v. Annucci, No. 14-CV-445A, 2016 WL 3039687, at *3 (W.D.N.Y. Mar. 14, 2016), Directive 4040 § 701.3(i) creates a relaxed exhaustion requirement for allegations concerning incidents of sexual assault. Specifically, "an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy the [PLRA] exhaustion requirement." Directive 4040 § 701.3(i) (citations omitted). Instead,

> [A]ny allegation concerning an incident of sexual abuse or sexual harassment shall be deemed exhausted if official documentation confirms that: an inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident to facility staff; in writing to Central Office Staff; to any outside agency that the Department has identified as having agreed to receive and immediately forward inmate reports of sexual abuse and sexual harassment to agency officials under the PREA Standards; or to the Department's Office of the Inspector General.

Id. (citations omitted). If an inmate does file a grievance regarding a complaint of sexual abuse or sexual harassment, "[t]he complaint shall be deemed exhausted upon filing." Id. Finally, "[a] sexual abuse or sexual harassment complaint may be submitted at any time." Id.

**\*5** Magistrate Judge Stewart found that Plaintiff had properly exhausted his remedies under the relaxed procedures found in § 701.3(i). The Magistrate Judge held that an "incident" of sexual abuse under § 701.3(i) could include "not only the acts of sexual abuse by an inmate or a corrections officer, but also other events which are necessarily intertwined with such a claim, such as a physical assault during the course of the abuse; the failure of correctional staff to intervene to stop the rape; or acts or failures to act making

a jail official legally accountable for the sexual abuse." R. & R. at 8–9 (citing Abreu v. Miller, 2018 WL 5660409, at *4 (N.D.N.Y. Aug. 16, 2018)), report and recommendation adopted, 2018 WL 4502007 (N.D.N.Y. Sept. 20, 2018), order amended and superseded on reconsideration on other grounds, 2019 WL 761639 (N.D.N.Y. Feb. 21, 2019) (finding that allegations that an inmate was a victim of a "non-sexual physical assault" could be subject to § 701.3(i)'s relaxed exhaustion requirement where, at the summary judgment stage, it was not clear "that the physical assault was discrete from the sexual assault"). Because Plaintiff grieved that DOCCS employees failed to protect him from sexual abuse by his bunkmate, Magistrate Judge Stewart held that Plaintiff's failure-to-protect claim was necessarily intertwined with the underlying sexual assault and, thus, subject to § 701.3(i)'s relaxed exhaustion requirement. R. & R. at 8–9. And because "[t]here appears to be no question that Plaintiff alleged to prison officials that he was the victim of a sexual assault ... [Plaintiff's] report was [thus] documented as required" and "was sufficient to exhaust his administrative remedies." R. & R. at 8 (citing Medina v. Kaplan, 2018 WL 797330, at *5 (S.D.N.Y. Feb. 8, 2018)). On this basis, the Magistrate Judge recommended denying Defendants' Motion for Summary Judgment. R. & R. at 9.

Defendants appear to raise two objections to this recommendation. First, they dispute Magistrate Judge Stewart's determination that Plaintiff's failure-to-protect allegations against Defendants are necessarily intertwined with the sexual assault committed by Plaintiff's bunkmate. Second, they object to the Magistrate Judge's factual finding that Plaintiff informed DOCCS employees that he was in fear of sexual assault. [3] The Court addresses these objections in turn.

[3]     The Court has reversed the order of Defendants' objections for analytical clarity.

### 1. Plaintiff's Failure-to-Protect Claim Is Necessarily Intertwined with His Claim that His Bunkmate Sexually Assaulted Him

The crux of Defendants' objection is that "plaintiff[']s] alleg[ations] that defendants failed to protect him from being sexually assaulted by another inmate" are "not necessarily intertwined with the alleged sexual assault or harassment committed by Plaintiff's bunkmate." Objs. at 4. The Court disagrees. [4]

4

Defendants' objection on this point is not a model of clarity. For example, Defendants state that "[w]hile the alleged underlying assault on plaintiff by his bunkmate was sexual in nature, the defendants object because the nature of the assault, in this circumstance, is not subject to the sexual abuse provisions of Directive 4040." Objs. at 4. It is unclear to the Court how "the nature of the assault" perpetrated by Plaintiff's bunkmate—an assault that Defendants do not dispute involved coerced sexual acts—could *not* be subject to "the sexual abuse provisions of Directive 4040." Additionally, Defendants argue that "plaintiff was required to utilize the three-step grievance procedure with respect to his claims of harassment and threats against defendants," Objs. at 4, without explaining which "claims of harassment and threats" they mean. It is possible to read the objection to refer to Plaintiff's claims in his grievance that, inter alia, Correction Officer Chase stated "he will get [Plaintiff], one way or the other," Compl. ¶ 23, or that certain correction officers tampered with Plaintiff's clothes and food and prevented him from accessing his "legal work," "religious articles," and the law library, see generally Dkt. No. 24-4 at 1–2, Dkt. No. 31-1 at 1 (together, the "October 1 Grievance"), claims that either were never at issue or have already been dismissed from this case, see generally Compl.; Nov. 2018 Decision and Order. Or, the objection could refer specifically to allegations, such as Fleury's threat to lodge Plaintiff with the "perfect bunkie," Compl. ¶ 22; Oct. 1 Grievance at 1, that are directly relevant to the failure-to-protect claim at issue. Despite this lack of clarity, the Court has construed Defendant's objections as generously as possible, and it still finds them wanting.

**\*6** As an initial matter, Defendants did not object to Magistrate Judge Stewart's interpretation that claims "necessarily intertwined" with an underlying sexually abusive act fall under § 701.3(i)'s relaxed exhaustion requirements. Objs. at 4 ("[D]efendants assume, for the purposes of this motion, that allegations that are 'necessarily intertwined' with sexual assault or sexual harassment are encompassed within [the § 701.3(i)] exception of the exhaustion requirement."). As such, the Court reviews this determination only for clear error, and it finds none. 5

5

The Court notes that case law interpreting the 2014 revisions to Directive 4040 is limited. See Abreu, 2018 WL 5660409, at \*2; Fox v. Lee, No. 15-CV-390, 2018 WL 8576600, at \*10 (N.D.N.Y. Dec. 18, 2018), report and recommendation adopted, 2019 WL 1323845 (N.D.N.Y. Mar. 25, 2019); Lewis v. Martinez, No. 15-CV-55, 2018 WL 7917916, at \*7 (N.D.N.Y. Nov. 9, 2018), report and recommendation adopted, 2019 WL 642678 (N.D.N.Y. Feb. 15, 2019), reconsideration denied, 2019 WL 2105562 (N.D.N.Y. May 14, 2019); Allen v. Graham, No. 16-CV-47, 2017 WL 9511168, at \*6–7 (N.D.N.Y. Sept. 26, 2017), report and recommendation adopted, 2017 WL 5957742 (N.D.N.Y. Dec. 1, 2017); McCray v. City of Albany, No. 13-CV-949, 2017 WL 1433336, at \*2 (W.D.N.Y. Apr. 24, 2017); Henderson, 2016 WL 3039687, at \*3–4; Medina, 2018 WL 797330, at \*5. A review of this case law reveals no rulings contrary to Magistrate Judge Stewart's interpretation.

Turning to Defendants' objection, to the extent the objection is a general one—that a "failure-to-protect" claim can never be necessarily intertwined with an underlying sexual assault—such an interpretation does not comport with the language of § 701.3(i). When explaining which allegations are subject to § 701.3(i)'s special exhaustion requirements, the section cites to Directive 4027A, "Sexual Abuse *Prevention* & Intervention – Inmate-on-Inmate" and Directive 4028A, "Sexual Abuse *Prevention* & Intervention – Staff-on-Inmate." Directive 4040 § 701.3(i) (emphasis added). In turn, Directive 4027A "provides information concerning ... the prevention of ... allegations of inmate-on-inmate sexual abuse ..." and states that, "[all] allegations of sexual abuse, sexual harassment, or retaliation against ... an inmate ... will be thoroughly investigated." Directive 4027A. This suggests that § 701.3(i) was intended to cover allegations that DOCCS employees failed to prevent inmate-on-inmate sexual abuse, exactly the issue raised in this case. Moreover, the Court agrees with Magistrate Judge Stewart that reading § 701.3(i) to encompass failure-to-protect claims "is not only consistent with its language, but also comports with its purpose in attempting to prevent [sexual assault]." R. & R. at 9.

Defendants also object specifically that Plaintiff's "allegations against the defendants in this case are not necessarily intertwined" with the underlying sexual assault. Objs. at 4. In making this objection, Defendants rely on a letter

2019 WL 4463672

Plaintiff received from the IGP supervisor at Upstate, "advising [Plaintiff] that the PREA portions of his complaint were deemed exhausted and the additional allegations of harassment, retaliation, and threats by staff" were under investigation. Id. (citing Dkt. No. 29-1 (the "IGP Letter") at 6). Defendants claim that there "is no ambiguity" that the "PREA portions" of Plaintiff's complaint referenced in the letter included only "his complaint that he was assaulted by his cellmate on three occasions." Objs. at 4. Defendants thereby suggest that Plaintiff's failure-to-protect claim falls within the "additional allegations of harassment, retaliation, and threats by staff" referenced in the IGP Letter and imply that such treatment by the IGP supervisor is dispositive. Id. ("[T]he portions of [Plaintiff's] grievance subject to the PLRA's exhaustion requirements – his complaints of harassment and threats against the defendants – were forwarded to the Superintendent [in accordance with DOCCS' standard appeals procedure] ... thus, it is respectfully submitted that plaintiff was required to utilize the three-step grievance procedure with respect to his claims of harassment and threats against defendants.").

**\*7** Assuming, *arguendo*, DOCCS' treatment of an inmate grievance were binding upon this Court, this argument fails on its own terms. The portions of the record Defendants cite to support their claim that there is "no ambiguity about which part [of Plaintiff's] grievance was deemed exhausted" are far from unambiguous. See IGP Letter (stating without further explanation that "your PREA allegations will be deemed exhausted upon filing...."); see generally Oct. 1 Grievance (describing in detail Plaintiff's experience at Upstate and listing grounds for complaint, including, inter alia, that correction officers tampered with Plaintiff's clothes, failed to provide him with a mattress and necessary toiletries when he first arrived at Upstate, prevented him from accessing his "legal work," "religious articles," and the law library, and that Correction Officer Chase threatened to "make [Plaintiff's] breakfast tray special and Defendant Fleury threatened to lodge Plaintiff with the "perfect bunkie"). [6] Given the litany of allegations contained in Plaintiff's grievance, Magistrate Judge Stewart correctly noted that Plaintiff could "reasonably interpret" the "PREA allegations" referenced in the IGP Letter to encompass his failure-to-protect claim, and the "additional allegations of harassment, retaliation, and threats" to refer to his claims about the correction officers tampering with his food, clothes, and possessions. See R. & R. at 9. The IGP Letter was ambiguous enough that "it would be justifiable for [Plaintiff] to rely" on the IGP Letter's statement "that his PREA allegations had been deemed exhausted." Id.

[6]    Because Defendants submitted an incomplete copy of Plaintiff's grievance in support of their Motion for Summary Judgment, the October 1 Grievance is found in two places in the record: Docket Number 24-4 at pages one to two and Docket Number 31-1 at page one. For purposes of clarity in pagination, this Decision and Order treats Docket Number 24-4 as pages one and two, and Docket Number 31-1 as page three.

For these reasons, the Court agrees with Magistrate Judge Stewart's holding that Plaintiff's failure-to-protect claim is necessarily intertwined with his underlying allegation of sexual assault by his bunkmate, that § 701.3(i) therefore encompasses Plaintiff's failure-to-protect claim, and that Plaintiff successfully exhausted this claim pursuant to the § 701.3(i) procedure when he filed a grievance with DOCCS officials.

*2. The Factual Finding that Plaintiff Told Bond About His Fear of "Sexual Assault"*

In describing the facts of this case, Magistrate Judge Stewart wrote that "Plaintiff informed Bond that he feared he would be sexually assaulted." R. & R. at 3. Defendants object to this statement, arguing that "there is nothing in the record to suggest that plaintiff complained to any ... defendant[ ] at any time that he was in fear of being sexually abused." Objs. at 2. In doing so, Defendants urge the Court to read Plaintiff's Complaint narrowly. The Court declines.

As an initial matter, while Defendants' objection on this point is certainly relevant to the merits of Plaintiff's failure-to-protect claim, [7] it is less obviously relevant to the question of exhaustion. Under § 701.3(i)'s relaxed exhaustion procedure, which the Court has already determined governs Plaintiff's claim, filing an official grievance ex post regarding a failure-to-protect from sexual assault is sufficient to exhaust administrative remedies. See 701.3(i) ("Any inmate grievance filed regarding a complaint of sexual abuse or sexual harassment shall ... be deemed exhausted upon filing for PLRA purposes."). Here, there is no dispute that Plaintiff filed such a grievance, explicitly naming Fleury and Smith. Defs.' Mem. at 5 ("[P]laintiff filed a grievance with the Upstate grievance office against defendants C.O. Fleury and Smith relating to his failure to protect claims."); Dkt. No. 24-2 ("Declaration of Donna Wilcox in Support of Defendant's

2019 WL 4463672

Motion for Summary Judgment"] ¶ 14 (same). And while the grievance does not name Bond, see Oct. 1 Grievance at 2 ("On September 25, 2017 ... I told the C.O. that walked by that I can't live [with my bunkmate]...."); *cf.* Compl ¶ 26 ("On or about September 25, 2017 ... Plaintiff told defendant Bond ... that he cannot live in this cell...."), it was not required to, *see* Shepherd v. Lempke, No. 10-CV-1524, 2016 WL 8732639, at *6 (N.D.N.Y. Oct. 28, 2016), report and recommendation adopted in part, rejected in part, 2017 WL 1187859 (N.D.N.Y. Mar. 30, 2017) ("[I]nmate-plaintiffs need not identify each and every defendant implicated in a civil rights lawsuit in grievances that predate the lawsuit.") (citing Jones v. Bock, 549 U.S. 199, 217 (2007)). Therefore, by filing this grievance, Plaintiff properly exhausted his remedies under § 701.3(i). Since Defendants have moved for summary judgment solely on the basis of a failure to exhaust remedies, Defs.' Mem. at 3; Defs.' Reply at 1, other issues not germane to exhaustion are not before the Court at this time.

7      See Green v. Leubner, No. 07-CV-1035, 2009 WL 3064749, at *6 (N.D.N.Y. Sept. 22, 2009) (Kahn, J.) (describing how a failure-to-protect claim requires a prison official to have "sufficient culpable intent," which occurs when the official has "knowledge that an inmate faces a risk of serious harm and ... disregards that risk by failing to take reasonable measures to abate the harm").

**\*8** Yet, entertaining this objection, the Court sees no error in the recitation of the facts found in the Report-Recommendation. Magistrate Judge Stewart found, and the record demonstrates, that Plaintiff attempted to express his fears to DOCCS employees on at least four occasions. *See* R. & R. at 2–3. On September 18, 2017, Plaintiff told Smith "I fear for my safety and ... I am being harassed by the staff." Oct. 1 Grievance at 1–2; *see also* Dkt. No. 31-1 at 2–4 ("Amended Grievance") ("[I] told [Defendant Smith] that I fear for my life and safety."). Later that day, Plaintiff mailed letters to Martuscello, Prack, Smith, and Sullivan expressing the same concerns. Compl. ¶ 25. Then, on September 25, 2017, after Plaintiff received his new bunkmate, he told Bond that he "can't live" with his new bunkmate, Oct. 1 Grievance at 2; Am. Grievance at 3, and that he feared being "assaulted." Compl. ¶ 26. That same day, Plaintiff was sexually assaulted by his bunkmate, Compl. ¶ 27; Oct. 1 Grievance at 1–2; Am. Grievance at 3, after which he placed letters to Martuscello, Prack, and Smith in the feed up slot to his cell door informing them of the assault, Compl. ¶ 28.

Defendants bear the burden of proving a failure to exhaust. *See* Grant v. Kopp, No. 17-CV-1224, 2019 WL 368378, at *4 (N.D.N.Y. Jan. 3, 2019), report and recommendation adopted, 2019 WL 367302 (N.D.N.Y. Jan. 30, 2019) ("[T]he failure to exhaust administrative remedies is an affirmative defense and ... the party asserting failure to exhaust ... typically bears the ultimate burden of proving its essential elements.") (citing Jones, 549 U.S. at 216). However, they have submitted no evidence contradicting Plaintiff's allegations. *See generally* Defs.' Mem.; Defs.' Reply. Instead, they point out that nowhere in his grievance letters or in his Complaint does Plaintiff use the precise words "sexual assault" when he describes his communications with the guards at Upstate, or with any other DOCCS official. Objs. at 2–3. Thus, Defendants argue, "plaintiff did not complain to Bond that he was in fear of being sexually[ assaulted rather than merely assaulted," nor did he "advise[ ] any defendant that he was in fear of being sexually assaulted by his bunkmate." Objs. at 3. The Court declines to read Plaintiff's evidence so narrowly.

While the Court acknowledges that Plaintiff's pleadings and the available record evidence do not conclusively indicate that Plaintiff voiced an explicit fear of *sexual* assault to any defendant, at this stage of the litigation, it is reasonable to infer that Plaintiff did. Defendants do not dispute that Plaintiff told Bond he feared being "assaulted" by his bunkmate. Objs. at 3; *see also* Compl. ¶ 26. Additionally, the record indicates that, throughout this period, Plaintiff was concerned about his risk of sexual abuse and harassment because of "several of [Plaintiff's] personal characteristics," Defs.' Mem. at 4 (citing Compl. ¶¶ 34, 36), including his sexual orientation and his previous sexual victimization, Oct. 1 Grievance at 2; Am. Grievance at 2–3. It also appears that Plaintiff was concerned about sexual violence when he reported to Smith on September 18, 2017 how Doe had misrepresented Plaintiff's history of sexual victimization on Plaintiff's 3278RC form, which is used to determine if an inmate is susceptible to being sexually abused while in prison. Compl. ¶ 24; Oct. 1 Grievance at 1–2.

Given these contextual factors, and in light of the liberal reading afforded to a pro se litigant's papers, Burgos, 14 F.3d at 790, the Court finds it reasonable to infer that when Plaintiff told Bond he feared "assault" and Smith he feared for his safety, these conversations encompassed Plaintiff's fear of sexual assault. *See also* Hailey v. N.Y. City Transit Auth., 136 F. App'x. 406, 407–08 (2d Cir. 2005) ("The rule favoring liberal construction of pro se submissions is especially applicable to civil rights claims."). The legal

definition of "assault" is capacious, see Assault, Black's Law Dictionary (11th ed. 2019) (listing definitions and noting that "assault" is popularly defined as "any attack"), and encompasses Plaintiff's sexual assault by his bunkmate. It would be unreasonable to expect a non-lawyer, pro se litigant to appreciate the legal niceties that distinguish the different forms of assault. For these reasons, and "[r]esolv[ing] all ambiguities and draw[ing] all reasonable inferences in favor of the non-movant," as the Court must do on a motion for summary judgment, Berhanu v. New York State Ins. Fund., 13 F. App'x 30, 31 (2d Cir. 2001), it is reasonable to infer that Plaintiff related his fear of sexual assault to DOCCS employees. Therefore, the Court adopts Magistrate Judge Stewart's factual findings in their entirety.

**B. Denial of Smith's Motion to Dismiss**

**\*9** In recommending that the Court deny Smith's motion to dismiss, Magistrate Judge Stewart concluded that Plaintiff had pled sufficient facts to plausibly show that Smith was "personally involved" in the failure to protect Plaintiff from sexual assault by his bunkmate. R. & R. at 15–16. Smith objects to this conclusion.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)). An official may implicate her or himself in "constitutional wrongdoing if [she or] he ... 'exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring' or would occur." Tubbs v. Venettozzi, No. 19-CV-126, 2019 WL 2610942, at \*3 (N.D.N.Y. June 26, 2019) (Kahn, J.) (quoting Vincent v. Yelich, 718 F.3d 157, 173 (2d Cir. 2013)); see also Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006) (deliberate indifference "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result."). Moreover, the § 1983 plaintiff must show a "tangible connection" between the acts of the defendant and the plaintiff's injuries. Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986). By contrast, a mere "linkage" to the unlawful conduct through "the prison chain of command" is insufficient to show a defendant official's personal involvement in that unlawful conduct. Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003).

Smith argues that Plaintiff never alleged that he told her he was afraid of being sexually assaulted by his bunkmate, either in their September 18, 2017 conversation or in the letter Plaintiff sent to Smith later that day. Smith appears to suggest that if she did not know Plaintiff was at risk or in fear of sexual assault, she could not be personally involved in failing to protect him. See Green, 2009 WL 3064749, at \*6 (quotations omitted) ("In the failure-to-protect context, a prison official ... has sufficient culpable intent if [s]he has knowledge that an inmate faces a risk of serious harm and [s]he disregards that risk by failing to take reasonable measures to abate the harm."). Yet as described above, and in light of the liberal pleading requirements due pro se litigants, see Hill, 657 F.3d at 122, Plaintiff has pled sufficient facts to support the reasonable inference that when he told—and wrote to—Smith that he was in "fear[ ] for his life and safety, because of the threats made by defendant[ ] Fleury," Compl. ¶ 24, that fear encompassed sexual assault.

Further, Smith argues that Plaintiff has alleged no facts indicating that she failed to respond to a second letter Plaintiff allegedly sent her the day he was sexually assaulted by his bunkmate. Objs. at 5. She points out that the day after Plaintiff wrote this letter, he was placed in a new cell without a bunkmate. Id. at 5–6 (citing Compl. ¶ 30). Though Smith does not spell out the implication of this point, the Court reads it to suggest that she might have stepped in to protect Plaintiff from his bunkmate and that, therefore, Magistrate Judge Stewart's "reliance" on the letter was misplaced. Objs. at 5–6. However, the Court does not read the Report-Recommendation as relying unduly on this or any other letter. Instead, Magistrate Judge Stewart considered the letters in conjunction with the conversation Plaintiff had with Smith on September 18 and gave the letters their appropriate weight. R. & R. at 13–16. And while it is possible the Complaint could be read to suggest that, after receiving the second letter, Smith stepped in to arrange Plaintiff's transfer to a new bunk, such a reading would be inappropriate on a motion to dismiss. See NYSE Specialists Sec. Litig., 503 F.3d at 95 (on a motion to dismiss, the Court must "draw all inferences in the light most favorable to the non-moving party...."). Nor would it address the earlier letter or conversation, which alone are adequate to support Magistrate Judge Stewart's recommendation. See, e.g., Ferrer v. Fischer, No. 13-CV-31, 2014 WL 1763383, at \*3 (N.D.N.Y. May 1, 2014) (plaintiff's allegations that he sent multiple letters to a named defendant, the defendant was "fully aware" of his situation, and the defendant failed to respond to the letters or take appropriate action was sufficient to defeat defendant's motion to dismiss); Whitley v. Ort, 2018 WL 4684144, at \*7 (S.D.N.Y. Sept. 28, 2018) (nurse allegedly failed to provide plaintiff with medical treatment and take

2019 WL 4463672

action under the PREA after plaintiff told nurse in person he had been sexually assaulted).

**\*10**  Smith relies on Price v. Oropallo, No. 13-CV-563, 2014 WL 4146276 (N.D.N.Y. Aug. 19, 2014) to argue that, where an inmate-plaintiff sends a letter to prison officials regarding the inmate's fear of a bunkmate, and where the officials had no "knowledge of, or personal involvement in" placing the bunkmates together, nor were the officials "aware of" the bunkmate's dangerousness, the plaintiff's case cannot survive summary judgment. See Defs.' Mem. at 12 (citing Price at *9-10). However, Price is distinguishable.

Price was decided on summary judgment rather than, as here, a motion to dismiss, a distinction that matters because "personal involvement is a question of fact." See Grullon v. City of New Haven, 720 F.3d 133, 140 (2d Cir. 2013). In Grullon, the Second Circuit reversed the district court's dismissal of an inmate's § 1983 claim because an earlier case "invoked by the district court" in granting the defendant prison warden's motion to dismiss, Sealey v. Giltner, 116 F.3d 47 (2d Cir. 1997), "did not involve a dismissal pursuant to Rule 12(b)(6) for failure to state a claim," but instead "was dismissed on summary judgment." Id. The Second Circuit had affirmed Sealey on summary judgment because "the record ... showed that [the Sealey defendant] had in fact taken steps to have the prisoner's grievance resolved." Id. By contrast, since there was no equivalent factual record in Grullon itself, and thus no evidence as to whether the Grullon defendant had responded to the inmate's complaints, the Second Circuit reversed the district court's finding of no personal involvement. Id. Here, there is likewise no evidence as to what action Smith may or may not have taken in response to Plaintiff's communications with her.

Further, solely at issue in Price was the defendant prison officials' failure to protect the plaintiff from a physical assault by his cellmate. But, in this case, Plaintiff also alleges that Smith failed to protect him from retaliatory action by other correction officers, which took the form of putting Plaintiff in harm's way for sexual assault. See Compl. ¶ 24 ("Plaintiff told defendant, [sic] Smith that he fears for his life and safety, because of the threats made by defendant[ ] Fleury...."); see also Hayes v. Dahkle, 2018 WL 7356343, at *18–19 (N.D.N.Y. Dec. 11, 2018), report and recommendation adopted, 2019 WL 689234 (N.D.N.Y. Feb. 19, 2019) (finding personal involvement at the motion to dismiss stage where plaintiff expressed his fear regarding a

certain correction officer to defendant prison official). Under these circumstances, Price is inapposite.

Smith's remaining objections largely restate points raised in Defendants' Motion for Summary Judgment and Reply. Compare Objs. at 5–6 ("Plaintiff did not allege that defendant Smith: (1) knew plaintiff was going to be placed with a bunkmate that would sexually assault him; (2) made the decision to place plaintiff's bunkmate in his cell with him; (3) was ever informed who plaintiff's bunkmate was; or (4) was aware of whether his bunkmate had any prior record of violence or sexual assault.") with Defs. Mem. at 12 ("[T]here are no allegations in the Complaint which plausibly suggest that defendant[ ] Smith ...: (1) made the decision to place plaintiff's bunkmate in his cell with him; (2) were ever informed who plaintiff's bunkmate was; or (3) were aware of whether his bunkmate had any prior record of violence or sexual assault.") and Reply at 9 ("[P]laintiff has not alleged any facts plausibly suggesting that defendant Smith: (1) made the decision to place plaintiff's bunkmate in his cell with him; or (2) was aware of whether his bunkmate had any prior record of violence or sexual assault."). Accordingly, the Court reviews these portions of the Report-Recommendation only for clear error and—for the reasons stated above and in the Report-Recommendation—finds none.

### C. Defendant's Requests to Depose Plaintiff and for an Evidentiary Hearing
**\*11**  The Federal Rules of Civil Procedure require that a party obtain leave of court when seeking to depose an individual "confined in prison." Fed. R. Civ. P. 30(a)(2)(B). Additionally, because "exhaustion is a matter of judicial administration," a plaintiff "is not entitled to a jury trial relating to his exhaustion of administrative remedies." Woodward v. Lytle, No. 16-CV-1174, 2018 WL 6179427, at *3 (N.D.N.Y. Nov. 27, 2018) (citing Messa, 652 F.3d at 308–10). For this reason, "the court, not a jury, determines factual disputes regarding an inmate's alleged failure to exhaust." Id.

The Report-Recommendation does not address Defendants' request for "an opportunity to depose Plaintiff on the limited issue of exhaustion followed by an evidentiary hearing pursuant to Messa v. Goord, 652 F.3d 305 (2d Cir. 2011)," in the event their summary judgment motion is denied. See generally R. & R. Presumably, this is because such a deposition and hearing would be unnecessary. As Magistrate Judge Stewart explains in the Report-Recommendation:

There appears to be no question that Plaintiff alleged to prison officials that he was the victim of a sexual assault and that he received notice from the IGP Supervisor stating his PREA claim has been exhausted for PLRA purposes, and thus his report was documented as required. Pursuant to DOCCS Directive 4040 that was sufficient to deem his claims regarding the alleged sexual assault exhausted. This was sufficient to exhaust his administrative remedies.

R. & R. at 8 (citations omitted). The Court agrees with this explanation and finds that a deposition and Messa hearing on exhaustion issues are unnecessary at this time. Should Defendants submit evidence calling into question whether Plaintiff "allege[d] being the victim of sexual abuse or sexual harassment [and] reported the incident to facility staff," Directive 4040 § 701.3(i), they are free to renew the request then.

## V. CONCLUSION
Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 39) is **APPROVED and ADOPTED in its entirety**; and it is further

**ORDERED**, that Defendants' Motion for Summary Judgment (Dkt. No. 24) is **DENIED**; and it is further

**ORDERED**, that Defendants Martuscello and Prack's Motion to Dismiss (Dkt. No. 24) is **GRANTED**; and it is further

**ORDERED**, that the Clerk shall terminate Defendants Martuscello and Prack from this action; and it is further

**ORDERED**, that Defendant Smith's Motion to Dismiss (Dkt. No. 24) is **DENIED**; and it is further

**ORDERED**, that Defendants' request to depose Plaintiff on the limited issue of exhaustion of remedies followed by an evidentiary hearing pursuant to Messa v. Goord, 652 F.3d 305 (2d Cir. 2011) (Dkt. No. 24) is **DENIED** with leave to renew upon the submission of sufficient evidence; and it is further

**ORDERED**, that the Clerk serve a copy of this Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 4463672

---

2005 WL 2839123
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Brandon HOLMES, Plaintiff,

v.

Correction Officer J. GRANT, et al., Defendants.

No. 03CIV3426RJHRLE.

|

Oct. 25, 2005.

REPORT AND RECOMMENDATION

ELLIS, Magistrate J.

## I. INTRODUCTION

**\*1** Plaintiff Brandon Holmes brings this *pro se* action under 42 U .S.C. § 1983 for alleged First, Eighth, and Fourteenth Amendment violations. Holmes asks the Court to transfer him to a correctional facility proximate to New York City, grant him injunctive and declaratory relief against the New York State Department of Correctional Services ("DOCS") for unconstitutional practices, and grant him compensatory and punitive damages for defendants' conspiracy to violate his constitutional rights. Holmes alleges that defendants confined him in the special housing unit ("SHU"), and sentenced him to keeplock (cell confinement) in retaliation for challenging a disciplinary hearing determination in the Shawangunk Correctional Facility ("Shawangunk"). Defendants contend that Holmes's confinement in keeplock and the SHU was disciplinary.

This case was referred to the undersigned on June 11, 2003. On January 16, 2004, defendants moved to change venue to the Northern, or Western District of New York pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1404(a), and to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rule of Civil Procedure. The undersigned recommends that defendants's motion to dismiss the complaint be GRANTED.

## II. BACKGROUND

On June 29, 2000, while confined at Shawangunk, in the Northern District, Holmes was involved in an altercation that resulted in the issuance of an inmate misbehavior report ("IMR") for property damage and possession of stolen property. Amended Complaint ("Am.Compl."), ¶ 20. In addition, Holmes received a second IMR for staff assault, possession of contraband, fighting, refusal to obey a direct order, and refusal to submit to a search. *Id.* As a result of the IMRs, Correction Captain William C. Connolly issued a mechanical restraint, and an exercise deprivation order. *Id.* at ¶ 23. A Tier III disciplinary hearing was held on July 5, 2000, on the administrative charges. *Id.* at ¶ 21. Over Holmes's objections, Connolly was designated as the presiding officer at the hearing. *Id.* at ¶ 25. Connolly found Holmes guilty, and sentenced him to five years in the SHU. *Id.* at ¶ 41.

On August 30, 2000, while serving the SHU sentence, Holmes was transferred to the Southport Correctional Facility ("Southport"), a SHU facility in the Western District. *Id.* at ¶ 46. At Southport, Holmes was required to wear full mechanical restraints during recreation. *Id.* at ¶ 48. Holmes further alleges that he was denied all exercise, and recreation privileges after an altercation with a correction officer. *Id.* at ¶ 50.

On September 18, 2000, after serving fifty days in the SHU, the Shawangunk Tier III hearing determination was reversed. *Id.* at ¶ 31-33. Holmes, however, remained in disciplinary confinement because he was issued two new IMRs while serving the Shawangunk sentence. *Id.* at ¶ 45. Holmes served a thirty-day SHU sentence that commenced on September 18, 2000. Defendants' Memorandum of Law in Support of their Motion to Change Venue and/or Dismiss the Complaint ("Def.Mem.") at 2. From September 25, 2000, to October 18, 2000, Holmes served his SHU sentence in the Eastern Correctional Facility ("Eastern"). *Id.* at ¶ 52. He also served a thirty-day keeplock sentence at Eastern that commenced on October 18, 2000. Holmes maintains that conditions at Eastern contravene the Eighth Amendment's provision against cruel and unusual punishment. Am. Compl., ¶ 52-61. For security purposes, Eastern has a "nightlight policy" that entails twenty-four hour lighting. *Id.* Holmes alleges that Eastern's lighting policy resulted in "fatigue ... loss of appetite, vomiting, migraine headaches, anxiety, elevation of blood pressure ... and a violent aggravation of rashes." *Id.* Holmes also asserts that the lighting conditions so interfered with his mental state as to function as a violation of due process. *Id.* As a result of the Shawangunk incident, criminal felony assault charges were filed against Holmes by multiple

2005 WL 2839123

defendants. Holmes claims that the allegations were false, and a result of malicious prosecution. *Id.* at 99-102. Holmes was acquitted on June 22, 2001. *Id.* In addition, he alleges that Eastern's lighting policy impaired his appearance before a grand jury. On November 7, 2000, Holmes was transferred to the Sing Sing Correctional Facility ("Sing Sing"), in the Southern District, to complete his keeplock sentence. Def. Mem. at 5. Holmes was released from keeplock on November 17, 2000. Am. Compl., ¶ 126.

 **\*2** One month after his release from keeplock, Holmes received an IMR at Sing Sing charging him with loss/damage of property, no identification card, messhall violation, and impersonation. *Id.* at ¶ 130-31. Although Holmes admits that he did not have his identification card, and that he received food from a neighbor, he contends that the IMR was the result of a conspiracy against him. *Id.* On December 22, 2000, a Tier III hearing was held, and Holmes was sentenced to "counsel and reprimand." *Id.* at ¶ 132. On March 1, 2001, Holmes received an IMR as a result of an altercation with inmate LaFontaine. *Id.* at ¶ 138. Holmes maintains that the charges were fabricated, *Id.* at ¶ 139-47, and that this sequence of events was a direct result of appealing the Shawangunk Tier III determination. At the Tier III hearing, Holmes was found guilty, and sentenced to ninety days in keeplock, and the loss of nine months of good-time credit. *Id.* at 147. On March 19, 2001, he was transferred from Sing Sing to the Upstate Correctional Facility ("Upstate"), a SHU facility in the Northern District. *Id.* at ¶ 72. Holmes claims that the transfer was another element in the retaliatory conspiracy against him. He maintains that, based on his successful appeal of the Shawangunk hearing, he was subject to harassment and threats at Upstate, including not having access to his personal property, and having his personal property vandalized. *Id.* at ¶ 72-74. He was also served meals with food missing. *Id.* In response to his inquiries, Holmes was asked why he "assault [ed] staff." *Id.* He interprets this as a reference to Shawangunk.

On May 17, 2001, Holmes was transferred from Upstate to the Five Points Correctional Facility ("Five Points"), in the Western District. *Id.* at ¶ 156. At Five Points, Holmes was involved in an altercation with inmate LaFontaine, the same person with whom he had fought at Sing Sing. *Id.* at ¶ 157-58. Because of this incident, Holmes received a new IMR. *Id.* Holmes alleges that the subsequent Tier III disciplinary hearing contained numerous due process violations. *Id.* at ¶ 160-66. On May 25, 2005, Holmes was found guilty of violent conduct, and sentenced to ninety days in the SHU, and loss of

ninety days of good time credits. *Id.* On July 13, 2001, after serving almost sixty days in the SHU, this determination was reversed. *Id.*

On July 23, 2001, Holmes was scheduled to be transferred from Upstate to Clinton Correctional Facility ("Clinton"). *Id.* at ¶ 83. Holmes maintains that upon his arrival at Clinton, important legal material was missing from his personal property. *Id.*

### III. DISCUSSION

#### A. Rule 12(b)(6) Standard

The Court may dismiss a complaint, pursuant to Rule 12(b)(6), if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Thomas v. City of New York,* 143 F.3d 31, 36-37 (2d Cir.1998) (citation omitted). The Court must determine whether the complaint is legally sufficient. *See Goldman v. Selden,* 754 F.2d 1059, 1067 (2d Cir.1985). In accessing the sufficiency of the pleadings, the Court must accepts all factual allegations in the complaint as true. *Id.* The Court must also "resolve all ambiguities and draw all reasonable inferences against the moving party." *Forsyth v. Fed'n of Employment & Guidance Serv.,* 409 F.3d 565, 569 (2d Cir.2005) (citation omitted).

#### B. Exhaustion of Administrative Remedies

 **\*3** Defendants contend that this action should be dismissed in its entirety because Holmes has only exhausted administrative remedies for some, but not all of his claims. The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), requires Holmes to exhaust "such administrative remedies as are available." *Booth v. Churner,* 532 U.S. 731, 733-34 (2001). In this case, Holmes was required to seek administrative relief under the Inmate Grievance Program ("IGP"). *See Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004). Under the IGP an inmate must first file a complaint with the Inmate Grievance Resolution Committee ("IGRC") within fourteen days of the alleged occurrence. *See* 7 N.Y.C.R.R. § 701.7(a)(1). After a hearing, an inmate may appeal to the superintendent within four working days after receipt of the IGRC's response. Upon receipt of the superintendent's response, an inmate may then appeal to the Central Office Review Committee ("CORC") within four days. Once the inmate appeals to the CORC, the IGP appeal process is exhausted.

The record shows that Holmes is familiar with the IGP, and that he has filed numerous grievances. Nevertheless, he failed to exhaust administrative remedies for a number of claims in his petition. Holmes makes no allegation that he attempted to file a grievance concerning: 1) defendants's alleged use of excessive force during the June 29, 2000 incident at Shawangunk, Def. Mem. at 14; 2) defendants's alleged use of falsified records in the Shawangunk Tier III hearing, *id.* ¶ 45; 3) his malicious prosecution, *id.* ¶¶ 97-116; and 4) the receipt of two IMRs at Shawangunk for allegedly asserting his constitutional rights, *id.* ¶ 45. Holmes contends that he did not file grievances because he feared for his safety, and that defendants conspired to obstruct his access to court. In light of Holmes's repeated use of the IGP to appeal Tier III hearing determinations, the Court finds these arguments unpersuasive. The record shows that his grievances were addressed, and that as a result of his grievance efforts, two Tier III determinations were reversed. Accordingly, I recommend that the Court dismiss all of Holmes's unexhausted claims.

## C. Conspiracy Claim

Holmes alleges that there is a conspiracy to retaliate against him for his successful appeal of the Shawangunk Tier III determination. He must "proffer more than conclusory allegations in order to support a civil rights conspiracy complaint." *Hyman v. Holder,* 2001 WL 262665, at *5 (S.D.N.Y. Mar. 15, 2001) (citation omitted). He must also demonstrate an agreement between defendants. *See Whitfield v. Forest Electrical Corp.,* 772 F.Supp. 1350, 1353 (S.D.N.Y.1991). Holmes has failed to meet this standard. The record does not show that an agreement existed between defendants to harass or confine Holmes, or that he suffered adverse actions as a result of such agreement. Rather, the record shows that Holmes's confinement was disciplinary. Defendants had a good faith basis for discipline regardless of alleged conspiratorial intent.

 *4 In support of his conspiracy claim, Holmes maintains that correction officers made conspiratorial admissions. He asserts that in response to an inquiry a "correction sergeant ... told [him] [he] pissed someone off by vindicating [his] rights and conceded the correctness of [his] argument (against excessive confinement)." Am. Compl. at 127. Even assuming *arguendo* that these unconfirmed admissions of guilt are true, there is no indication that discoverable evidence exists. The Court cannot give great weight to unsupported allegations of conspiratorial admissions. *See Salahuddin v. Cuomo,* 861 F.2d 40, 43 (2d Cir.1988). I recommend, therefore, that the Court dismiss the conspiracy claims.

## D. Retaliation Claim

Holmes maintains that he was subject to adverse treatment in retaliation for challenging the Shawangunk Tier III hearing determination, and that defendants transferred him in retaliation for exercising his constitutional rights. In order for the retaliation claim to survive dismissal, Holmes must advance non-conclusory allegations demonstrating that: 1) the conduct, or speech was protected; 2) that defendants took adverse action against him; and 3) that there was a causal connection between the protected conduct, and the adverse action. *See Diesel v. Town of Lewisboro,* 232 F.3d 92, 107 (2d Cir.2000); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citation omitted). Moreover, "retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Id.* (citation omitted). The record shows that Holmes's extended confinement in the SHU and keeplock was the result of his conduct-namely, involvement in altercations with other inmates, and violation of DOCS's rules. Defendants had a good faith basis for confining him. "New York prison regulations permit inmates to be confined in SHU for disciplinary confinement, administrative segregation, protective custody, detention, keeplock confinement and for any other reason, with the approval of the deputy commissioner of facility operations." *Baker v. Finn,* 2001 WL 1338919, at *4 (S.D.N.Y. Oct. 31, 2001) (citation omitted). Holmes's retaliation claim against defendants is, therefore, without merit, and should be dismissed by the Court.

## E. Denial of Due Process

Holmes alleges that his Tier III disciplinary hearing at Sing Sing violated his due process rights. Holmes lost nine months of good time credit as a result of the Sing Sing determination. *See* Am. Compl. at ¶ 147. Although Holmes does not seek the restoration of his good time credits, his claim, if successful, would invalidate his disciplinary hearing. The Court cannot entertain Holmes's claim. *See Pittman v. Forte,* 2002 WL 31309183, at *2 (N.D.N.Y. July 11, 2002); *see also Heck v. Humphrey,* 512 U.S. 477 (1994). Since the Sing Sing Tier III determination has not been reversed, "judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id.* at 487. I recommend, therefore, that this claim be dismissed.

**\*5** Holmes also contends that his due process rights were violated at the Shawangunk and Five Points Tier III hearings. Unlike Sing Sing, both the Shawangunk and Five Points Tier III hearing determinations were reversed, and Holmes's claims are not precluded by *Heck v. Humphrey.* However, Holmes must demonstrate that his treatment was atypical, and that he endured a significant deprivation of a liberty interest in relation to the ordinary incidents of prison life. *See Sandin v. Conner,* 515 U.S. 472, 486 (1995). Holmes must also establish that, "[t]he state has granted its inmates, by regulation or statute, a protected liberty interest in remaining free from confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). If a prisoner satisfies both of these elements, then he or she must prove that "the deprivation of the liberty interest occurred without due process of law." *Williams v.. Goord,* 111 F.Supp.2d 280, 288 (S.D.N.Y.2000) (citation omitted).

The record does not show that Holmes endured a deprivation of due process at either Shawangunk or Five Points. The length of his confinement at both Shawangunk and Five Points is insufficient to constitute a deprivation of a liberty interest. At Five Points, Holmes served only forty-nine days in the SHU before the administrative determination was reversed. Am. Compl. ¶ 160-66. At Shawangunk, he served a total of eighty-one days in the SHU. *See* Def. Mem. at 22. However, for twenty-one days Holmes was administratively confined pending a disciplinary determination for the Shawangunk altercation. Administrative confinement is authorized and not punitive. *See Torres v. Mazzuca,* 246 F.Supp.2d 334 (S.D.N.Y.2003). Holmes, therefore, only served sixty days in the SHU at Shawangunk before his administrative determination was reversed. "Although there is no bright-line rule for what length of confinement would constitute an atypical and significant hardship, and although this determination requires a fact-intensive inquiry by the district court, the decisions in this Circuit generally require that the duration of SHU confinement be at least 100 days in order to be considered an atypical and significant hardship." *Palmer v. Goss,* 2003 WL 22327110, at \*6 (S.D.N.Y. Oct. 10, 2003); *see also Cox v. Malone,* 199 F.Supp.2d 135 (S.D.N.Y.2002). The length of Holmes's confinement at Shawangunk and Five Points is, therefore, insufficient to constitute a deprivation of a liberty interest. I recommend that his due process claims, arising from his Tier III hearings at Shawangunk and Five Points, be dismissed.

**F. Conditions of Confinement**

Holmes contends that the confinement conditions in the Shawangunk SHU violate the Eighth Amendment. "Disputes about conditions may not be resolved over summary judgment, but where the conditions are undisputed, the Sandin issue should be resolved by the Court as a matter of law." *Palmer v. Richards,* 364 F.3d 60, (2d Cir.2004) (citation omitted). Since Holmes failed to substantiate his allegation, I recommend that this claim be dismissed.

**\*6** Holmes alleges that the placement of two inmates per cell at Five Points is a violation of the Eighth Amendment's provision against cruel and unusual punishment. This argument has no merit. Confinement in a double-occupancy cell is a part of normal conditions in the general population or the SHU. *See Scott v. Gardner,* 287 F.Supp.2d 477, 494 (S.D.N.Y.2003). This policy, therefore, does not rise to the level of a constitutional violation, and this claim should be dismissed.

Holmes further contends that he was forced to exercise with mechanical restraints at Southport. However, there is no evidence that he filed a grievance to address this claim. Since Holmes failed to exhaust administrative remedies, I recommend that the Court dismiss this claim.

Holmes has also alleged injuries resulting from the twenty-four hour lighting policy at Eastern. Am. Compl. at ¶ 55. He claims that Eastern's lighting policy is a violation of the Eighth Amendment. *See Id.; see also Amaker v. Goord,* 2002 WL 523371 at \*6 (S.D.N.Y. Mar. 29, 2002). To succeed on this claim, Holmes must "demonstrate exposure to [harm] that poses an unreasonable risk of serious damage to future health, and that the risk is not one that today's society chooses to tolerate." *Zaire v. Artuz,* 2003 WL 230868 at \*4 (S.D.N.Y. Feb. 3, 2003) (citation omitted). He has failed to substantiate his allegations, and the Court should dismiss this claim.

**G. Due Process and Access to Court**

Holmes alleges that he was denied access to court. He maintains that defendants lost important documents-including DOCS grievances and trial transcripts-as part of the retaliatory conspiracy against him. Holmes has a constitutional right to reasonable access to the courts. *See Dugar v. Coughlin,* 613 F.Supp. 849, 853 (S.D.N.Y.1985) (citation omitted). However, since Holmes failed to exhaust administrative remedies, I recommend that the Court dismiss this claim.

## H. Malicious Prosecution

As a result of the Shawangunk incident, criminal felony assault charges were filed against Holmes by multiple defendants. Holmes claims that the allegations were false, and a result of malicious prosecution, a state law claim. Am. Compl., ¶ 99-102. Holmes was acquitted on June 22, 2001. Defendants argue that the Court does not have jurisdiction over Holmes's state law claims. Relying on New York State Correction Law § 24, defendants maintain that state law claims attached to a § 1983 action must be dismissed. *See Baker v. Coughlin,* 77 F.3d 12, 16 (2d Cir.1996). The Court disagrees. By its terms § 24 shields defendants acting "within the scope of [their] employment and in the discharge of [their] duties." *Ierardi v. Sisco,* 119 F.3d 183, 187 (2nd Cir.1997). Defendants' decision to file criminal felony assault charges against Holmes after the Shawangunk incident is clearly not "within the scope of their official duties as correction officers." *Id.* at 187-9. By electing to proceed outside of the DOCS, defendants acted beyond the scope of the public policy protections of § 24. Defendants contention that this Court lacks jurisdiction over Holmes's malicious prosecution claim is, therefore, without merit.

**\*7** Nevertheless, examining Holmes's malicious prosecution claim in light of defendants' motion to dismiss, I recommend that the claim be dismissed. "To succeed on a claim for malicious prosecution, the plaintiff must show that a prosecution was initiated against him, that it was brought with malice but without probable cause to believe that it could succeed and that the prosecution terminated in favor of the accused plaintiff." *Boyd v. City of New York,* 336 F.3d 72, 76 (2d Cir.2003). Although eventually acquitted, the record shows that Holmes was indicted on two charges by a grand jury. Accordingly, there was probable cause to lead "a reasonably prudent person to believe the plaintiff guilty." *Id.* Holmes's Fourth Amendment claim regarding the alleged malicious prosecution, should be dismissed.

## I. Malicious Abuse of Process

The gist of an action for abuse of process is the improper use of process after it is issued. *See Tedeschi v. Smith Barney,* 548 F.Supp. 1172, 1174 (S.D.N.Y.1982). Holmes does not allege that defendants misused the process, but claims an improper motive for filing the suit. A bad motive alone cannot support a claim for abuse of process. *Perry v. Manocherian,* 675 F.Supp. 1417, 1429 (S.D.N.Y.1987) (citation omitted). Moreover, Holmes has not demonstrated a cognizably injury.

The abuse of process must result in actual or special damages. *Id.* Enduring mechanical restraints is not a cognizable injury, but rather a normal aspect of prison life. The abuse of process claim should be dismissed.

## J. Motion to Change Venue

If Holmes's complaint is not dismissed, defendants ask the Court to grant a change of venue. Def. Mem. at 11-13. Holmes alleges that this action is properly venued in the Southern District because of the events at Sing Sing, which are a part of a broader department-wide conspiracy to retaliate against him for the Shawangunk incident. Holmes's Memorandum of Law in Opposition to defendant's Motion to Dismiss And/Or Change of Venue ("Holmes's Mem .") at 23. Defendants contend that the events at Sing Sing are not a substantial part of the experience giving rise to the claims. Under 28 U.S.C. § 1404(a), the Court has discretion in deciding a motion for change of venue. In considering a motion for transfer, the courts consider: 1) whether the action could have been brought in the transferee forum; 2) the convenience of witnesses and parties; 3) the interest of justice. *Id.; see also Thomas v. Coombe,* 1998 WL 391143 at \*6 (S.D.N.Y. July 13, 1998). The record shows that the alleged cause of the conspiracy-namely, the incident at Shawangunk-occurred in the Northern District. Further, most defendants are in the Northern District, and Holmes is currently confined in a facility in the Western District. It is counterintuitive for the Court to order the vast majority of parties, including Holmes, to appear in the Southern District to litigate a dispute that arose primarily in the Northern District. *See Alexander v. Selsky* 2004 WL 941803, at \*4 (W.D.N.Y. Mar. 24, 2004). I recommend that if the Court does not dismiss Holmes's complaint in its entirety, that defendant's motion for a change of venue be GRANTED, and any remaining claims be transferred to the Northern District.

## IV. CONCLUSION

**\*8** The undersigned recommends that defendants's motion to dismiss the complaint be GRANTED. Alternatively, if the Court does not dismiss Holmes's complaint in its entirety, I recommend that defendant's motion for a change of venue be GRANTED, and any remaining claims be transferred to the Northern District. Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have ten (10) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such

2005 WL 2839123

objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Richard J. Howell, 500 Pearl Street, Room 1950, and to the chambers of the undersigned, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 142 (1985); *Small v. Sec'y of Health & Human Serv.,* 892 F.2d 15, 16 (2d Cir.1989) (*per curiam* ); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 2839123

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 1983382
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Darryl HOLLAND, Plaintiff,
v.
Glenn GOORD, Thomas Schoellkopf,
Anthony F. Zon and J. Barbara, Defendants.

No. 05-CV-6295.
|
July 13, 2006.

**Attorneys and Law Firms**

Darryl Holland, Romulus, NY, pro se.

Tamara B. Christie, A.A.G., New York State Attorney General's Office, Rochester, NY, for Defendants.

DECISION and ORDER

SIRAGUSA, J.

## INTRODUCTION

*1 This prisoner civil rights case, brought pursuant to 42 U.S.C. § 1983 (2003), is before the Court on defendants' motion to dismiss plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND

In his form complaint filed on April 3, 2005, plaintiff makes only one claim: that his Constitutional rights under the First, Eighth and Fourteenth Amendments were violated. However, the Court will divide his one claim into three separate causes of action for the analysis of defendants' motion.

As to a first cause of action, plaintiff, who is a practicing Muslim, alleges that he was ordered to undergo a urinalysis by defendant Corrections Officer J. Barbara ("Barbara") on February 5, 2004 at Wende Correctional Facility. (Compl. at 7.) Plaintiff maintains that he was unable to provide a sample because of the fasting requirements of the Islamic holiday of Ramadan. *Id.* In that regard, plaintiff asserts that observance of Ramadan requires that Muslims not eat food or drink water from sunrise to sunset. (Motion in Opposition to Motion to Dismiss (# 12) ("Pl.'s Response"), at 11.) Additionally, plaintiff maintains that Muslims observing Ramadan are forbidden to expose any private part of their bodies during daytime. (*Id.* at 6.) Consequently, plaintiff states that when he was offered water, he refused to undergo a urinalysis. (Compl. at 7.) Plaintiff was then put in keeplock for violating rule 180.14 (urinalysis testing violation). (*Id.* at 13.) Plaintiff contends that while under keeplock, he was unable to attend Muslim services and classes, and that he was unable to celebrate the end of Ramadan. (*Id.*)

As to a second cause of action, plaintiff alleges that on November 23, 2003, he was subjected to a disciplinary hearing. (*Id* .) Plaintiff asserts he attempted to call the Imam [1] as a witness in this hearing. (Pl.'s Response, at 11.) Plaintiff contends that he wanted the Imam to testify that the observance of Ramadan required Muslims to fast and that prohibited them from showing their private parts during the daylight hours. (*Id.*) The hearing resulted in a guilty verdict, and, as a consequence, plaintiff served seventy-seven days in keeplock. (Defs.' Mem. of Law (# 10), at 1.) On January 21, 2004, Superintendent Zon accepted plaintiff's appeal in part, determining that the urinalysis could have been taken after dark, after the fast had ended. (Comp. at 19.)

[1] An Imam is defined as "a prayer leader of the mosque." Webster's Dictionary 600 (9th ed.1991).

As to a third cause of action, plaintiff alleges that the above-stated punishments imposed upon him constituted cruel and unusual punishment. (Compl. at 7.) He does not further elaborate on this Eighth Amendment claim.

In their motion to dismiss, defendants argue that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Specifically, they state that: (1) defendants were acting in their official capacity, and all claims against defendants in their official capacity are barred by the Eleventh Amendment, (2) the claims against defendants Goord and Zon should be dismissed because they had no personal involvement; and (3) there was no Due Process violation because plaintiff's confinement did not rise to an atypical and significant hardship required to implicate the Fourteenth Amendment.

**STANDARDS OF LAW**

### *Section 1983*

**\*2** Plaintiff brings this action pursuant to 42 U.S.C. § 1983. In order to state a claim under § 1983, plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993).

### *Rule 12(b)(6) Standard*

In considering a motion for dismissal under Rule 12, defendant must show that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See H.J. Inc. v. Northwest Bell Telephone Co.,* 492 U.S. 229, 249 (1989); *see also* 2 MOORE'S FEDERAL PRACTICE, § 12.34[1][a] (Matthew Bender 3d ed.). "In considering a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir., 1991).The Court must view the complaint, and draw all reasonable inferences, in the light most favorable to the non-moving party. *Id.; see also* 2 MOORE'S FEDERAL PRACTICE, § 12.34[1] [b] (Matthew Bender 3d ed.) (court must accept plaintiff's factual allegations as true). Under the modern rules of pleading, a plaintiff need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), and that "all pleadings shall be so construed as to do substantial justice," Fed.R.Civ.P. 8(f). On a Rule 12(b)(6) motion, the issue before the Court "is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claim." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995).

Finally, while the plaintiff need not set out in detail the facts upon which he bases a claim, he must provide the "defendant fair notice of the nature of the claim and the grounds upon which it rests." *Washington v. James,* 782 F.2d 1134, 1140 (2d Cir.1986) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). Where the allegations are so baldly conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff complains, they are meaningless as a practical matter and legally insufficient to state a claim. *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987)(*citing Ostrer v. Aronwald,*

567 F.2d 551, 553 [2d Cir.1977]; *Koch v. Yunich,* 533 F.2d 80, 85 (2d Cir.1976); *Powell v. Jarvis,* 460 F.2d 551, 553 [2d Cir.1972] ).

*Parisi v. Coca-Cola Bottling Co.,* 995 F.Supp. 298, 300-01 (E.D.N.Y.1998).

Complaints prepared by pro se plaintiffs should be construed liberally and held to " 'less stringent standards than formal pleadings drafted by lawyers.' " *Scott v. Gardner,* 287 F.Supp.2d 477, 483 (S.D.N.Y.2003) (citations omitted). *Pro se* complaints should thus be interpreted " 'to raise the strongest arguments that they suggest.' " *Knight v. Keane,* 247 F.Supp.2d 379, 383 (S.D.N.Y.2002) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). However, the complaint " 'must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple and conclusory statements are insufficient to state a claim under § 1983.' " *Torres,* 246 F.Supp.2d at 338 (quoting *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987)).

### *First Amendment Standard*

**\*3** Plaintiff alleges that his First Amendment right to freely exercise his religion has been infringed. As the Second Circuit Court of Appeals held almost thirty years ago in *Burgin v. Henderson,* 536 F.2d 501 (1976):

> it is now common ground that a convicted defendant still has constitutional rights when the prison gate closes behind him .... And in the last decade or so, law suits by prisoners of various faiths have resulted in a number of decisions defining their rights .... Four years ago, this court held that limitations upon freedom of religion can be imposed only if the state regulation has an important objective and the restraint of religious liberty is reasonably adapted to achieving that objective.

*Burgin,* 536 F.2d at 502-03 (quoting *LaReau v. MacDougall,* 473 F.2d 974, 979 (1972)) (other internal citations omitted). More recently, the Court of Appeals held that,

2006 WL 1983382

The reasonableness of a prison regulation is measured by the three-step analysis outlined by the Supreme Court in *Turner [v. Safley,* 482 U.S. 78], 89-91 [1987] .... First, we ask "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective." *Thornburgh v. Abbott,* 490 U.S. 401, 414 (1989). Second, we look to see "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 417 (citations and internal quotation marks omitted). Third, we examine "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison." *Id.* at 418.

*Shakur v. Selsky,* 391 F.3d 106, 113 (2d Cir.2004) (some citations omitted).

The United States Supreme Court addressed the question of what constitutes a religion for purposes of the First Amendment in the case of *Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707 (1981). The Court stated:

> the determination of what is a "religious" belief or practice is more often than not a difficult and delicate task, as the division in the Indiana Supreme Court attests. However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.

*Thomas,* 450 U.S. at 714 (footnote omitted).

### Eighth Amendment Standard

The standard for an Eighth Amendment violation claim is well settled. See *Romano v. Howarth,* 998 F.2d 101 (2d Cir.1993). In that case, the court stated that Eighth Amendment claims comprise both an objective and subjective component. Objectively, plaintiff must establish that the injury is sufficiently serious or harmful enough to reach

constitutional dimensions. *Id.* at 104. Subjectively, plaintiff must prove that defendants acted wantonly. *Id.*

**\*4** On the objective issue, not every contact is serious enough to reach constitutional dimensions. *See Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973). As Judge Friendly wrote in *Glick,* "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Id.* "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind." *Hudson v. McMillian,* 503 U.S. 1, 9-10 (1982) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106 (1976)).

With regard to the subjective component of the test, plaintiff must prove that the defendants acted maliciously. *See Romano v. Howarth,* 998 F.2d 101, 104-05 (2d Cir.1993). In other words, plaintiff must show that defendants acted wantonly and sadistically to cause harm. *See Brown v. Busch,* 954 F.Supp. 588, 594 (W.D.N.Y.1997). As the Second Circuit advised in *Romano v. Howarth,*

> To determine whether the defendants acted maliciously, a jury should consider the following factors: the extent of the plaintiff's injuries; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response. If an evaluation of these factors leads the jury to conclude that the defendants acted maliciously, wantonness has been established. And an Eighth Amendment violation has occurred. If, on the other hand, reflection upon these factors leads the jury to find that the defendants acted in a good-faith effort to maintain and restore discipline, no constitutional violation has occurred because the subjective component of the claim has not been satisfied.

*Romano v. Howarth,* 998 F.2d at 105.

### Procedural Due Process Standard

The Court need not conduct an analysis of whether the protective procedures afforded to plaintiff at his disciplinary hearing passed constitutional muster "unless 'there exists a liberty or property interest which has been interfered with by the State.' "[2] *Carter v. Carriero,* 905 F.Supp. 99, 103 (W.D.N.Y.1995) (quoting *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460 (1989)). Whether a prison inmate has received procedural due process involves a "two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest in not being confined ... and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996); *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997). Moreover, in *Sandin v. Conner,* 515 U.S. 472 (1995), the Supreme Court held that a prisoner cannot claim a protected liberty interest unless he demonstrates that he was subjected to "atypical and significant hardship[s] ... in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484. To meet the *Sandin* atypical and significant hardship standard, a disciplinary sanction must be clearly "onerous." *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d. Cir.1999).

[2]    Pursuant to 42 U.S.C. § 1997e(a) (2003), "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner ... until such administrative remedies as are available are exhausted." This section has been interpreted as an affirmative defense, one which is waived if not raised by defendants. See *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999); accord *Perez v. Wisconsin Department of Corrections,* 182 F.3d 532, 536 (7th Cir.1999). Defendants have not raised this issue by way of a motion to dismiss, or in their answer, or by the summary judgment motion now before the Court. Thus, the Court finds defendants have waived the exhaustion requirement.

*5 Although Special Housing Unit ("SHU") confinement may impose hardships that are atypical or significantly different from the burdens of ordinary prison confinement, SHU confinement in New York "generally does not impose [an] atypical and significant hardship because it remains within the normal range of prison custody." *Trice v. Clark,* No. 94-CV-6871 (SAS), 1996 U.S. Dist. LEXIS 6644 at

*8 (S.D.N.Y. May 16, 1996); *Frazier v. Coughlin,* 81 F.3d 313 (2d Cir.1996) (plaintiff's sentence fell within expected parameters of sentence imposed by court); *Carter,* 905 F.Supp. 99 (no protected liberty interest in not being assigned to SHU). The Second Circuit has not established a bright-line rule regarding the length or type of disciplinary sanction that meets the *Sandin* standard. However, the Circuit has suggested that SHU confinement for a period of less than 101 days would not meet the standard, and emphasized that when undertaking a *Sandin* analysis, a court must examine "the extent to which the conditions of the disciplinary segregation differ from other routine conditions and ... the duration of the disciplinary segregation imposed compared to discretionary confinement." *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998); *Colon v. Howard,* 215 F.3d 227, 231-32 (2d Cir.2000).

### Eleventh Amendment Standard

Defendants raise an Eleventh Amendment defense. The Supreme Court held that a claim for damages against state officials in their official capacity is considered to be a claim against the State and is therefore barred by he Eleventh Amendment. *Kentucky v. Graham,* 473 U.S. 159, 165-167 n. 14 (1985).

### Personal Involvement of Supervisory Officials

For a claim against state officials in their personal capacity to survive, a plaintiff must demonstrate "personal involvement of defendants in alleged constitutional deprivations ...." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted); see also *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.1973) ("The rule in this circuit is that when monetary damages are sought under § 1983, the general doctrine of respondeat superior does not suffice and a showing of some personal responsibility of the defendant is required.").

Personal involvement of a supervisory official may be established:

> [B]y evidence that: (1) the [official] participated directly in the alleged constitutional violation, (2) the [official], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the [official] created a policy or custom under which unconstitutional practices occurred, or

allowed the continuance of such a policy or custom, (4) the [official] was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the [official] exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring.

**\*6** *Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 254 (2d Cir.2001) (alterations in original) (quoting *Colon,* 58 F.3d at 873).

### DISCUSSION

In their motion to dismiss, defendants argue that because plaintiff has sued all defendants in their official capacities only, plaintiff's claims are barred by the Eleventh Amendment. Plaintiff responds that although he listed defendants with their names and titles, he did not specify the capacity in which he was suing them. (Pl.'s Resp. at 5.) Even though it appears that plaintiff has sued defendants in their official capacities only, and would therefore be precluded from recovery under § 1983, the Court has an obligation to give a liberal reading to pro se pleadings. Accordingly, the Court will consider plaintiff's claims to have been made against defendants in both their official and personal capacities. The claims against defendants in their official capacities are dismissed as barred by the Eleventh Amendment, and the Court will consider plaintiff's claims against defendants in their individual capacities on the merits. *See Lovelace v. Peters,* No. 85-cv-8724, 1988 U.S. Dist. LEXIS 5598 at * 3 (N.D. Ill. June 6, 1988).

Defendants Goord and Zon argue that plaintiff's complaint fails to allege specific facts showing that they had personal responsibility for the alleged actions. As discussed above, there are five separate ways to establish personal involvement. First, a plaintiff may assert that the defendants participated directly in the alleged constitutional violation. *Johnson,* 239 F.3d at 254. Here, plaintiff has not stated that either Zon or Goord had any direct participation in a claimed constitutional violation. Second, a plaintiff may assert that the defendants, after being informed of the violation through a report or appeal of the disciplinary action, failed to remedy the wrong. *Id.* Here, upon being informed of the alleged violation

through plaintiff's appeal of his disciplinary hearing, Zon accepted plaintiff's grievance in part, resulting in a reversal and expungement. (Compl. at 21.) Plaintiff has not alleged that Goord was informed of the violation. Third, a plaintiff may assert that the defendants created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom. *Id.* Here, plaintiff has not advanced that either Zon or Goord created a policy or custom under which the allegedly unconstitutional practices occurred. Fourth, a plaintiff may assert that the defendants were grossly negligent in supervising subordinates who committed the wrongful acts. *Id.* Here, plaintiff does not allege any facts suggesting that either Zon or Goord was grossly negligent. Fifth, a plaintiff may assert that the defendants exhibited deliberate indifference to the rights of others by failing to act on information indicating that unconstitutional acts were occurring. *Id.* Here, Zon did act on information of the allegedly unconstitutional act by accepting plaintiff's grievance in part. As to Goord, as indicated above, there is no allegation that he was ever informed of the conduct of which plaintiff complains. Consequently, since plaintiff has failed to allege personal involvement by either Goord or Zon through any of the five avenues available, his § 1983 claims against them are dismissed.

**\*7** Next, defendants claim plaintiff has failed to plead a Due Process violation. (Defs.' Mem. of Law, at 4.) As previously indicated, the Second Circuit has suggested that SHU confinements shorter than 101 days are not, in and of themselves, enough to show that conditions suffered by a plaintiff constitute an "atypical and significant hardship" on an inmate in relation to the ordinary incidents of prison life. *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Here, plaintiff was sentenced to seventy-seven days in keeplock (Compl. at 7). However, time is not the only factor. The conditions of confinement are an equally important consideration in determining whether a confinement in SHU rises to the level of an "atypical and significant hardship." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004). Plaintiff claims the time served in keeplock deprived him of "all privileges (TV, phone, packages and commissary)." (Compl. at 7.) He states he was also unable to go to Muslim services and classes and unable to celebrate the end of Ramadan. *(Id.)* Recent case law has helped define what conditions of confinement rise to the level of an "atypical and significant hardship." In *Sealey,* 197 F.3d at 581, the plaintiff alleged that he was confined in SHU to his cell for twenty-three hours per day, could take no more than three showers per week, had limited library privileges and no telephone privileges.

Case 9:17-cv-00366-DNH-TWD Document 93 Filed 03/08/21 Page 176 of 353
Holland v. Goord, Not Reported in F.Supp.2d (2006)
2006 WL 1983382

Furthermore, he alleged that there was no quiet bell in the SHU, so it was noisy most of the time and on occasion, inmates threw feces at other inmates. *Id.* The *Sealey* court held that these conditions did not rise to a level of "atypical and significant hardship." *Id.* at 589. Likewise, in *Arce v. Walker,* 139 F.3d 329, 332 (2d Cir.1998) the Second Circuit held that deprivation of exercise and access to communal religious services did not rise to a level of "a typical and significant hardship." Therefore, the Court finds that the allegations in the case at bar do not rise to the standard of "atypical and significant hardship [s]." *McEachin v. Selsky,* No. 9:04-CV-0083, 2005 U.S. Dist. LEXIS 40898 at *33 (N.D.N.Y. March 23, 2005) (loss of packages, commissary and phone are acceptable and normal SHU conditions and not considered unusual and unduly harsh); *Valentino v. Jacobson,* No. 97 Civ. 7615(WK), 1999 U.S. Dist. LEXIS 368 at *6 (S.D.N.Y. January 14, 1999) (inmate put for 57 days in punitive segregation and denied access to religious services did not amount to an atypical and significant hardship). Accordingly, plaintiff's Due Process claim is also dismissed.

Plaintiff's Eighth Amendment claim is likewise dismissed. Plaintiff alleges no facts which would satisfy either the objective or subjective prong of the standard stated above.

Finally, defendants' alleged limitations upon plaintiff's freedom of religion implicate the First Amendment. As discussed above, defendants must show that the collection of plaintiff's urine sample met an important and neutral objective, that no alternative means were available to meet that objective and that an accommodation would have negatively impacted others (guards and inmates) in the prison. *Shakur,* 391 F.3d at 113. First, defendants make no arguments concerning the governmental objective underlying the uranalysis. Second, defendants had alternative means of collecting plaintiff's urine merely by waiting until sunset, as conceded by Zon in his ruling on plaintiff's appeal to his disciplinary hearing. (Compl. at 19.) Finally, defendants do not contend that an "accommodation would have negatively impacted others (guards and inmates) in the prison." *Shakur,* 391 F.3d at 113. Therefore, the Court finds defendants have not shown that plaintiff can prove no set of facts in support

of his First Amendment claim that would entitle him to relief. Their motion to dismiss that claim is therefore denied.

**\*8** Upon granting a motion to dismiss for failure to state a claim upon which relief can be granted, it is within the discretion of the district court to allow leave to replead. *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991); *see Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198 (2d Cir.1990); *Devaney v. Chester,* 813 F.2d 566, 569 (2d Cir.1987); *Pross v. Katz,* 784 F .2d 455, 459-60 (2d Cir.1986). If there is a chance that "the defect can be cured and there is no prejudice to the defendant, leave to amend at least once should normally be granted as a matter of course." *Oliver Schools, Inc. v. Foley,* 930 F.2d 248, 253 (2d Cir.1991). Although plaintiff's complaint fails to adequately plead a Due Process and Eighth Amendment violation, the possibility exists that plaintiff could allege sufficient facts to support such claims. Further, this case is in its early stages and no answer has been filed. Accordingly, this Court grants plaintiff leave to replead. However, plaintiff is cautioned that if the amended complaint does not adequately plead constitutional violations, the insufficiently pleaded claims may be dismissed with prejudice.

## CONCLUSION

Defendants' motion (# 9) to dismiss is granted in part. All claims against defendants in their official capacities are dismissed. Additionally, plaintiff's Due Process and Eighth Amendment claims are dismissed, without prejudice. Plaintiff may have until August 7, 2006, to file an amended complaint repleading those claims if he so chooses. Plaintiff is reminded that an amended complaint is meant to **completely replace** the pending complaint, and thus, he must include his First Amendment claim in any amended complaint he files with the Court.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1983382

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 177 of 353

2008 WL 2003792
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Prince PILGRIM, Plaintiff,

v.

P. BRUCE, Correction Officer, Great Meadow
C.F.; Murphy, Sergeant, Great Meadow C.F.;
Harvey, Hearing Officer, Great Meadow C.F.;
Gary Greene, Superintendent, Great Meadow
C.F.; Glenn Goord, Commissioner of Docs;
and Donald Selsky, Director of Docs Special
Housing/Inmate Discipline Program, Defendants.

Civil Action No. 9:05-cv-198 (GLS/GHL).
|
May 7, 2008.

**Attorneys and Law Firms**

Prince Pilgrim, Dannemora, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, Steven H. Schwartz, Assistant Attorney General,
of Counsel, Albany, NY, for Defendants.

*ORDER*

GARY L. SHARPE, District Judge.

 **\*1** The above-captioned matter comes to this court
following a Report-Recommendation by Magistrate Judge
George H. Lowe, duly filed February 21, 2008. Following
ten days from the service thereof, the Clerk has sent the file,
including any and all objections filed by the parties herein.

No objections having been filed, and the court having
reviewed the Magistrate Judge's Report-Recommendation for
clear error, it is hereby

ORDERED, that the Report-Recommendation of Magistrate
Judge George H. Lowe filed February 21, 2008 is
ACCEPTED in its entirety for the reasons state therein, and
it is further

ORDERED, that Plaintiff's cross-motion (Dkt. No. 41) is
DENIED to the extent that it requests relief that is dispositive

in nature such as the voluntary dismissal without prejudice of
plaintiff's "defamation of character" and "[loss of] religious
services" claims, and it is further

ORDERED, that Defendants' motion for summary judgment
(dkt.No.38) is GRANTED and that all of the claims
asserted in Plaintiff's Amended Complaint (Dkt. No. 9) is
DISMISSED with prejudice, and it is further

ORDERED, that the court certifies in writing, for the
purposes of 28 U.S.C. § 1915(a)(3), that any appeal taken
from this order in this action would not be taken in good faith,
and it is further

ORDERED, that the Clerk enter judgment in favor of the
defendants against the plaintiff.

IT IS SO ORDERED

*ORDER and REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action has been referred
to the undersigned for Report and Recommendation by
the Honorable Gary L. Sharpe, United States District
Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule
72.3(c) of the Local Rules of Practice for this Court.
Currently pending before the Court is Defendants' motion
for summary judgment, and Plaintiff's cross-motion for
an Order (1) reopening the discovery period in this
action so that Plaintiff may serve interrogatories on
Defendants, (2) adjourning the Court's decision regarding
Defendants' motion, pending Plaintiff's receipt their responses
to his referenced interrogatories, as well as responses
to various outstanding discovery demands, (3) imposing
sanctions against Defendants for intentionally failing to
provide Plaintiff with the discovery mandated by the
Court's discovery order of March 14, 2007, and (4)
permitting Plaintiff to withdraw his claims of defamation and
interference with his right to participate in religious services.
(*Id.*) (Dkt.Nos.38, 41.) For the reasons set forth below, I deny
Plaintiff's cross-motion to the extent that it requests non-
dispositive relief, I recommend that the Court deny Plaintiff's
cross-motion to the extent that it requests dispositive relief,
and I recommend that the Court grant Defendants' motion for
summary judgment with regard to all of the claims asserted
in Plaintiff's Amended Complaint.

2008 WL 2003792

## I. BACKGROUND

### A. Plaintiff's Claims

**\*2** Prince Pilgrim ("Plaintiff") filed his Complaint in this action on February 14, 2005, and his Amended Complaint on July 18, 2005. (Dkt.Nos.1, 9.) Generally, in his Amended Complaint, Plaintiff alleges that, while he was incarcerated at Great Meadow Correctional Facility ("Great Meadow C.F.") between December of 2003 and June of 2004, six employees of the New York State Department of Correctional Services ("DOCS")[1] violated his constitutional rights in a variety of ways, all revolving around a false and retaliatory misbehavior report that was filed against Plaintiff which, after an allegedly procedurally defective disciplinary hearing, resulted in a disciplinary conviction and punishment. (*See generally* Dkt. No. 9, Part 1 [Plf.'s Am. Compl.].)

[1]    These six employees are as follows: (1) Phillip Bruce, a correction officer at Great Meadow C.F., (2) B. Murray, a sergeant at Great Meadow C.F., misidentified by Plaintiff as Sergeant "Murphy," (3) Andrew Harvey, a hearing officer at Great Meadow C.F ., (4) Gary Greene, the Great Meadow C.F. Superintendent, (5) Glenn Goord, the DOCS Commissioner, and (6) Donald Selsky, the Director of the DOCS Special Housing/Inmate Grievance Program. (Dkt. No. 9, Part 1 [Plf.'s Am. Compl.]; Dkt. Nos. 16, 17, 19 [Acknowledgments of Service for Defs. Harvey, Murray, and Bruce].)

More specifically, Plaintiff alleges as follows:

(1) **Defendant Phillip Bruce** (a correctional officer) violated Plaintiff's rights under the First, Fifth, Eighth and Fourteenth Amendments by (1) refusing to permit Plaintiff "to go to [a] notary" on December 23, 2003, (2) "singl[ing]" Plaintiff out of a group of inmates going to recreation on February 22, 2004, (3) "conspir[ing]" with and "instruct[ing] a co-worker to harass Plaintiff through the disguise [sic] of a pat-frisk" on March 10, 2004, (4) "singl[ing]" him out of a group of inmates going to mess hall in order to subject him to a harassing and retaliatory pat-frisk on March 11, 2004, and (5) filing a false misbehavior report against Plaintiff on March 11, 2004, in retaliation against him for having filed grievances against Defendant Bruce on December 23, 2003, February 22, 2004, and March 10, 2004 (*id.* at ¶¶ 1, 5, 8-11, 13, 27);

(2) **Defendant B. Murray** (a correctional sergeant, misidentified by Plaintiff as Sergeant "Murphy") violated

Plaintiff's rights under the Fifth, Eighth and Fourteenth Amendments by deliberately failing to provide Plaintiff with adequate legal assistance before, and during, Plaintiff's disciplinary hearing on March 22, 2004, and March 26, 2004 (*id.* at ¶¶ 13-16, 19-20, 29);

(3) **Defendant Andrew Harvey** (a hearing officer) violated Plaintiff's rights under the Fifth, Eighth and Fourteenth Amendments by (a) failing to ensure that Defendants provided Plaintiff with all documents necessary to marshal a defense at his disciplinary hearing, (b) failing to grant him an extension of time to prepare for the hearing, (c) failing to dismiss the charges against Plaintiff due to the lack of legal assistance he had received, (d) failing to conduct a hearing within seven days of the incident, (e) fabricating an "extension request," which falsely stated that Plaintiff had requested an extension of time before the hearing so that he could meet with his legal assistant, (f) failing to conduct a fair and impartial hearing on March 22, 2004, and March 26, 2004, (g) failing to sustain Plaintiff's objection to the use of Defendant Bruce as a witness at the hearing, (h) wrongfully convicting Plaintiff of the offenses with which he had been charged, and (i) imposing on Plaintiff an overly harsh disciplinary sentence (*id.* at ¶¶ 19-20, 22-24, 31);

**\*3** (4) **Defendant Gary Greene** (the Great Meadow C.F. Sperintendent) violated Plaintiff's rights under the Fifth, Eighth and Fourteenth Amendments by (a) "refus[ing] to intervene" in the "foreseeable conflict" between Defendant Bruce and Plaintiff, despite knowing of some or all of Plaintiff's grievances against Defendant Bruce, (b) failing to protect Plaintiff from the filing of a false and retaliatory misbehavior report by Defendant Bruce, and (c) "engaging [in] and influencing a predetermination of guilt[ ]" with respect to disciplinary charges pending against Plaintiff by "moving [him] unlawfully to long term keep lock housing" on March 19, 2004 (three days before his disciplinary hearing commenced), or at least failing to rectify that unjustified transfer after learning about it through a letter from Plaintiff (*id.* at ¶¶ 1-2, 6-7, 12, 16-19, 21, 33);

(5) **Defendant Glenn Goord** (the DOCS Commissioner) violated Plaintiff's rights under the Fifth, Eighth and Fourteenth Amendments by (a) "refus[ing] to intervene" in the "foreseeable conflict" between Defendant Bruce and Plaintiff, despite knowing of some or all of Plaintiff's grievances against Defendant Bruce, (b) failing to protect Plaintiff from the filing of a false and retaliatory misbehavior report by Defendant Bruce, and (c) failing to reverse

Case 9:17-cv-00366-DNH-TWD   Document 93   Filed 03/08/21   Page 179 of 353
Pilgrim v. Bruce, Not Reported in F.Supp.2d (2008)

2008 WL 2003792

Plaintiff's disciplinary conviction on appeal (*id.* at ¶¶ 5, 8, 12, 25, 35); and

(6) **Defendant Donald Selsky** (the Director of the DOCS Special Housing/Inmate Grievance Program) violated Plaintiff's rights under the Fifth, Eighth and Fourteenth Amendments by failing to reverse Plaintiff's disciplinary conviction on appeal (*id.* at ¶¶ 25, 37).

Finally, Plaintiff alleges that each of the six Defendants, through their various forms of misconduct, caused Plaintiff to suffer, *inter alia,* "defamation of character" and "[loss of] religious services." (*Id.* at ¶¶ 27, 29, 31, 33, 35, 37.)

### B. Defendants' Motion and Plaintiff's Cross-Motion

Defendants filed their motion for summary judgment on August 30, 2007. (Dkt. No. 38.) Generally, Defendants' motion for summary judgment is premised on eight grounds: (1) Plaintiff's asserted failure to exhaust his available administrative remedies with regard to various of his claims prior to filing this action in federal court; (2) Plaintiff's asserted failure to state an actionable claim of defamation; (3) Plaintiff's asserted failure to state an actionable claim of the denial of his right to participate in religious services; (4) Plaintiff's asserted failure to state an actionable claim of conspiracy; (5) Plaintiff's asserted failure to allege facts plausibly suggesting, or adduce evidence establishing, the personal involvement of Defendant Greene (a supervisor) in any of the constitutional violations alleged; (6) the protection from liability that Defendants Goord, Greene, Selsky, Harvey and Murphy assertedly enjoy under the circumstances, pursuant to the doctrine of qualified immunity; (7) Plaintiff's asserted failure to state an actionable due process claim due to his failure to allege facts plausibly suggesting that he enjoyed a protected liberty interest in remaining free from the disciplinary confinement alleged; and (8) Plaintiff's asserted failure to adduce evidence establishing a claim of retaliation by Defendant Bruce. (Dkt. No. 38, Part 15, at 2-25 [Defs.' Memo. of Law].)

**\*4** Defendants' motion included a detailed notification of the consequences of failing to respond to their motion. (Dkt. No. 38, Part 1.) Plaintiff clearly read, and understood, this notification since he requested (and was granted) a liberal extension of the deadline by which he had to respond to Defendants' motion. (Dkt. No. 40 [Request and Order granting Plf. a 54-day extension of the response deadline].) Moreover, Plaintiff, who is no stranger to the court system, had (when he filed his response papers in

this action) previously faced at least five motions for summary judgment, and responded to at least four of those motions, in other prisoner civil rights cases. [2] Moreover, when Plaintiff received a copy of Defendants' motion for summary judgment, he was (and is still) incarcerated in a New York State correctional facility whose law library contains a copy of both the Local Rules of Practice for this Court and this District's *Pro Se* Manual, both of which advise *pro se* prisoner-plaintiffs of the consequences of failing to properly oppose a defendant's motion for summary judgment.

[2]    *See, e.g., Pilgrim v. Wright,* 01-CV-0098 (N.D.N.Y.) (*pro se* civil rights action in which Plaintiff responded to defendants' motion for summary judgment on 9/23/02); *Pilgrim v. Brown,* 01-CV-0700 (N.D.N.Y.) (*pro se* civil rights action in which Plaintiff had to, but failed to, respond to defendants' motion for summary judgment by 1/31/03); *Pilgrim v. Luther,* 01-CV-8995 (S.D .N.Y.) (*pro se* civil rights action in which Plaintiff responded to defendants' two motions for summary judgment on 5/24/02, 7/16/02, and 10/14/04); *Pilgrim v. Wolczyl,* 02-CV-0901 (N.D.N.Y.) (*pro se* civil rights action in which Plaintiff responded to defendants' motion for summary judgment on 4/29/05).

Despite having received this detailed notice and liberal deadline-extension, Plaintiff failed to respond to the substance of Defendants' motion for summary judgment. Rather, on November 41, 2007, Plaintiff filed "response" papers that contained a cross-motion. (Dkt. No. 41.) The cross-motion requested four types of relief from the Court: (1) the reopening of the discovery period in this action so that Plaintiff may serve interrogatories on Defendants; (2) an adjournment of the Court's decision regarding Defendants' motion, pending Plaintiff's receipt of their responses to his referenced interrogatories, as well as responses to various outstanding discovery demands; (3) the imposition of sanctions against Defendants for intentionally failing to provide Plaintiff with the discovery mandated by the Court's discovery order of March 14, 2007; and (4) the withdrawal of his claims of defamation and interference with his right to participate in religious services. (*Id.*)

## II. ANALYSIS

### A. Plaintiff's Cross-Motion

2008 WL 2003792

**1. Request for Reopening of Discovery**

Plaintiff requests to reopen discovery in this action so that he can file various interrogatories. (Dkt. No. 41.) I deny that request based on the fact that Plaintiff has failed to show the sort of cause that is required to support the granting of such a request under Fed.R.Civ.P. 7, 16, 26 and/or 33.

Among other things, Plaintiff has not identified (1) what information he would attempt to elicit from Defendants through his interrogatories (*see* Dkt. No. 41), (2) why he needs that information (*id.*), or (3) why he delayed in making a motion to reopen discovery until now–approximately *ten months* after the close of discovery in this action, which occurred on April 14, 2007 (*see* Dkt. No. 26 [Order filed 10/30/06, resetting deadline for close of discovery as 1/17/07]; Dkt. No. 32[Order filed 3/14/07, directing Defs. to respond to Plf.'s discovery requests by 4/14/07]; Dkt. No. 33 [Defs.' Status Report filed 4/12/07, attaching copies of discovery provided to Plf.] ).

 **\*5** I note that the one-page letter that Plaintiff submitted to the Court on or about August 30, 2007, requesting an extension of 60 days by which to file a motion to compel Defendants to produce documents in response to Plaintiff's outstanding discovery demands did *not* constitute a motion to reopen discovery in this action so that Plaintiff could serve interrogatories on Defendants. (Dkt. No. 39.)

**2. Request for Stay of Decision Regarding Summary Judgment Motion**

Plaintiff also requests an adjournment of the Court's decision regarding Defendants' motion for summary judgment pending Plaintiff's receipt of his outstanding discovery demands. (Dkt. No. 41.) I deny this request based on the fact that Plaintiff has failed to show the sort of cause that is required to support the granting of such a request under Fed.R.Civ.P. 56(f).

Rule 56(f) provides as follows:

> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit

> affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f). "To request discovery under Rule 56(f), a party must file an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful." *Gualandi v. Adams,* 385 F.3d 236, 244 (2d Cir.2004) [citation omitted], *accord, Concourse Rehab. & Nursing Ctr. Inc. v. Whalen,* 249 F.3d 136, 146, n. 3 (2d Cir.2001) [citation omitted].

Here, Plaintiff has failed to satisfy the first, second, and third requirements. First, Plaintiff has failed to demonstrate precisely which of his discovery demands are allegedly outstanding. (*See* Dkt. No. 41) I have *sua sponte* compared Defendants' supplemental discovery responses and my discovery Order of March 14, 2007, and I am unable to find any reason to believe that Defendants' supplemental discovery responses were deficient in any regard. (Compare Dkt. No. 33, Parts 3-6 [Defs.' Status Report] *with* Dkt. No. 32 [Order].) I note that, taking into account the 89 pages of documents that Defendants provided to Plaintiff on April 12, 2007, Defendants have now provided Plaintiff with some 171 pages of documents in response to his discovery demands. (*See* Dkt. No. 33, Parts 4, 6.) Despite his possession of these documents, he has adduced no evidence in opposition to Defendants' motion for summary judgment.

Second, Plaintiff has not demonstrated how the (unidentified) information sought is reasonably expected to create a genuine issue of material fact on any of the issues presented by Defendants' on their motion. An opposing party's "mere hope" that further evidence may develop to create a genuine issue of fact is an insufficient basis upon which to justify the granting of such a stay. *Contemporary Mission, Inc. v. USPS,* 648 F.2d 97, 107 (2d Cir.1981) [citation omitted]; *accord, Sanders v. Quickstak, Inc.,* 889 F.Supp. 128, 132 (S.D.N.Y.1995); *Witter v. AbbellHowe Co.,* 765 F.Supp. 1144, 1150 (W.D.N.Y.1991); *Dixon v. Bowen,* 126 F.R.D. 483, 486 (S.D.N.Y.1989). Here, a "mere hope" of such further evidence is all that Plaintiff has offered.

 **\*6** Moreover, I note that Defendants' motion-although it is submitted as a "motion for summary judgment" under Fed.R.Civ.P. 56-is almost entirely based on arguments that

2008 WL 2003792

Plaintiff's Amended Complaint *fails to state a claim upon which relief may be granted* under Fed.R.Civ.P. 12(b) (6). (*See generally* Dkt. No. 38, Part 15, at 2-25 [Defs.' Memo. of Law].) Of course, such arguments are entirely permissible under Fed.R.Civ.P. 56,[3] and the issues presented by such arguments are purely legal in nature and in no way evidentiary in nature (all material facts alleged in Plaintiff's Amended Complaint being accepted as true, and all reasonable inferences construed in Plaintiff's favor).[4] As a result, it would appear *extremely* unlikely that any further evidence developed by Plaintiff during discovery could defeat the vast majority of Defendants' arguments, which, again, are based on the factual assertions contained within the four corners of Plaintiff's Amended Complaint.

[3]    *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) ("Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment.") [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

[4]    *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted], *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

Third, Plaintiff has failed to explain why he delayed approximately four-and-a-half months in complaining about the discovery responses Defendants sent Plaintiff on April 12, 2007, causing Defendants to go to the effort and expense of preparing and filing a motion for summary judgment on August 30, 2007. (*See* Dkt. No. 41; *compare* Dkt. No. 33, Part 2 [Defs.' Status Report filed 4/12/07, attaching Declaration of Service.] *with* Dkt. No. 39 [Plf.'s Request dated 8/30/07, asking for an "extension" of the deadline by which he must file a motion to compel].) I note that the docket is conspicuously absent of any motion to compel, or motion for sanctions, by Plaintiff during the referenced four-and-a-half-month period. (*See generally* Docket Sheet.)

### 3. Request for Sanctions

Plaintiff also requests the imposition of sanctions against Defendants for intentionally failing to provide Plaintiff with the discovery mandated by the Court's discovery order of

March 14, 2007. (Dkt. No. 41.) I deny this request based on the fact that Plaintiff has failed to show the sort of cause that is required to support the granting of such a request under Fed.R.Civ.P. 16, 26, and/or 37. I note that, as explained above in Part II.A.2. of this Order and Report-Recommendation, Plaintiff has not even shown that Defendants indeed failed to provide Plaintiff with the discovery mandated by the Court's discovery order of March 14, 2007. He certainly has not shown that any such failure was willful. Under the circumstances, I find that this request is so lacking in merit as to be frivolous.

### 4. Request to Withdraw Two Claims

Finally, Plaintiff requests the withdrawal of his claims of defamation and interference with his right to participate in religious services. (Dkt. No. 41.) The relief requested in this portion of Plaintiff's cross-motion (i.e., dismissal) is dispositive in nature. However, the dismissal requested by Plaintiff is *voluntary* in nature. Authority exists for the proposition that a magistrate judge may decide such a request without issuing a report-recommendation.[5] However, out of an abundance of caution, I will express my conclusion with regard to this request as part of a recommendation to District Judge Sharpe, rather than as an Order.

[5]    *See* 28 U.S.C. § 636(b)(1)(A) (providing that a district judge "may designate a magistrate to hear and determine any pretrial matter," with certain enumerated exceptions-including a decision on a motion "to *involuntarily* dismiss an *action*" ).

**\*7** Plaintiff's request, which is more properly construed as one for voluntary dismissal of these two claims without prejudice, is governed by, or at least guided by, Fed.R.Civ.P. 41(a). I say "guided" because Fed.R.Civ.P. 41(a) speaks of the dismissal of "actions," not "claims." In any event, under the principles set forth by that Rule, since Defendants have already filed an Answer in this action, Plaintiff may not obtain the dismissal of the two claims without either (1) a stipulation of dismissal signed by all parties who have appeared in the action (which he has not filed), or (2) an Order of the Court issued "upon such terms and conditions as the court deems proper." Fed.R.Civ.P. 41(a)(1),(2).

Simply stated, I do not believe it would be at all proper to permit Plaintiff to expressly assert claims of "defamation of character" and interference with his right to "religious services,"[6] sit idly by as Defendants defend themselves

2008 WL 2003792

against those claims, [7] and then snatch those claims from the jaws of Defendants' properly filed and facially meritorious motion for summary judgment, just so that this extremely litigious plaintiff may again assert them in another action. The claims have been litigated and should be decided.

[6]      In his Amended Complaint, filed on June 18, 2005, Plaintiff expressly alleges that each of six Defendants, through their various forms of misconduct, caused Plaintiff to suffer, *inter alia,* "defamation of character" and "[loss of] religious services." (Dkt. No. 9, Part 1, ¶¶ 27, 29, 31, 33, 35, 37 [Plf.'s Am. Compl.].)

[7]      I note that in their Answer, filed on February 16, 2006, Defendants interposed defenses regarding, *inter alia,* Plaintiff's Amended Complaint to the extent that it asserted "state law claims" and claims for "mental or emotional injury." (Dkt. No. 21, Part 1, ¶¶ 15, 23 [Defs.' Answer to Plf.'s Am. Compl.].) Even if Plaintiff did not appreciate the reasonable meaning of the words he expressly used in his Amended Complaint, these defenses should have alerted him as to the way in which Defendants were reasonably interpreting those words, and the effort and expense to which the words would put them during discovery. I note also that the discovery period in this action was more than a year long. (*Compare* Dkt. No. 23 [Pretrial Scheduling Order filed 4/10/06, initially setting discovery deadline as 10/30/06] *with* Dkt. No. 32 [Order filed 3/14/07, extending deadline by which Defs. had to respond to Plf.'s outstanding discovery demands to 4/14/07].)

For these reasons, I recommend that the Court deny that request based on the fact that Plaintiff has failed to show the sort of cause that is required to support the granting of such a request under Fed.R.Civ.P. 7(b) and 41(a)(2).

**B. Defendants' Motion for Summary Judgment**

**1. Legal Standard Governing Unopposed Motion for Summary Judgment**

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [8] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [9]

[8]      A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[9]      *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [10] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [11] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [12]

[10]      Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

[11]      Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Pilgrim v. Bruce, Not Reported in F.Supp.2d (2008)

2008 WL 2003792

12   *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

What this burden-shifting standard means when a plaintiff has failed to properly respond to a defendant's motion for summary judgment is that "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." [13] Rather, practically speaking, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the defendants' motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the defendants. [14] However, the plaintiff's failure to respond to the defendant's motion for summary judgment lightens the defendant's burden on the motion.

13   *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996).

14   *See Champion,* 76 F.3d at 486 ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]; *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001) (Scullin, C.J.) (stating that, where a plaintiff has failed to respond to a defendant's motion for summary judgment, "[t]he Court must review the merits of Plaintiff's claims"). This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

*8 More specifically, where a plaintiff has failed to respond to a defendant's statement of material fact contained in its Statement of Material Facts (a/k/a its "Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as true [15] to the extent that (1) those facts are supported by the evidence in the record, [16] and (2) the non-

moving party, if he is proceeding *pro se,* has been specifically advised of the consequences of failing to respond to the movant's motion for summary judgment. [17]

15   *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ) [emphasis in original].

16   *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[W]here the non-movant party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met its burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added]; *Adirondack Cycle & Marine, Inc. v. Am. Honda Motor Co., Inc.,* 00-CV-1619, 2002 U.S. Dist. LEXIS 4386, 2002 WL 449757 at *2-3 (N.D.N.Y. Mar. 18, 2002) (McAvoy, J.) ("Local Rule 7.1 requires a party opposing summary judgment to respond to the statement of undisputed material facts submitted by the movant. To the extent such facts are not controverted, the *properly supported facts* will be taken as true.") [emphasis added; citation omitted]; *cf.* Fed.R.Civ.P. 83(a)(1) ("A local rule shall be consistent with ... Acts of Congress and rules adopted under 28 U.S.C. §§ 2072 and

2075 [which include the Federal Rules of Civil Procedure] ....."); Fed.R.Civ.P. 56(e) (requiring that, "if the non-movant does not ... respond [to a summary judgment motion], summary judgment, *if appropriate,* shall be entered against the non-movant," and requiring that, as a threshold matter, the motion for summary judgment must be "made *and supported* as provided in this rule") [emphasis added].

17      *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

Similarly, where a plaintiff has failed to respond to a defendant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the plaintiff is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court. 18 Stated another way, where a defendant has properly filed a memorandum of law (in support of a properly filed motion for summary judgment), and the plaintiff has failed to respond to that memorandum of law, the only remaining issue is whether the legal arguments advanced in the defendant's memorandum of law are *facially meritorious.* 19 A defendant's burden in making legal arguments that are facially meritorious has appropriately been characterized as "modest." 20

18      N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown ."); N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a memorandum of law); *cf.* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response* ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if

appropriate, shall be entered against the adverse party.") [emphasis added]; *see, e.g., Beers v. GMC,* 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.,* 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov.29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

19      *Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, 2003 WL 22143709, at *7-8 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord, Topliff v. Wal-Mart Stores East LP,* 04-CV-0297, 2007 U.S. Dist. LEXIS 20533, 2007 WL 911891, at *28 & n. 43 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05-CV-0380, 2007 U.S. Dist. LEXIS 24356, at *5-6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04-CV-1311, 2007 U.S. Dist. LEXIS 26583, 2007 WL 951447, at *28-29 & n. 40 (N .D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03-CV-0170, 2006 U.S. Dist. LEXIS 95065, 2006 WL 3940592, at *5 & n. 2 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

20      *See Ciaprazi v. Goord,* 02-CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd,

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 185 of 353
Pilgrim v. Bruce, Not Reported in F.Supp.2d (2008)

2008 WL 2003792

J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at \*17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *cf. Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-1110 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at \*2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at \*2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at \*3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

Implied in the above-stated standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.* [21]

[21]    *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at \*12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, 2006 WL 395269, at \*1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment; *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

### 2. First Ground for Dismissal of Plaintiff's Amended Complaint: Facial Merit of Defendants' Unopposed Motion for Summary Judgment

As an initial matter, I find that Defendants' motion papers were "properly filed" for purposes of Local Rule 7.1(b)(3). N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown."). For example, their Statement of Material Facts-to the extent one is even needed to decide Defendants' arguments that Plaintiff has failed to state a claim upon which relief may be granted-contains 16 assertions of fact, each of which is supported by an accurate record citation. (*See* Dkt. No. 38, Part 2 [Defs.' Rule 7.1 Statement].) Moreover, Defendants' motion is, as it must be, supported by a memorandum of law that contains a table of contents and citations to legal authorities, and that does not exceed 25 pages in length. (Dkt. No. 38, Part 15 [Defs.' Memo. of Law].)

Moreover, I find that Plaintiff was advised of the consequences of failing to properly respond to Defendants' motion for summary judgment and, clearly, he understood those consequences, for the reasons stated above in Part I.B. of this Order and Report-Recommendation. However, despite having received this detailed notice and liberal deadline-extension, Plaintiff failed to respond to the substance of Defendants' motion for summary judgment. (Dkt. No. 41.)

**\*9** As a result, the only issue remaining before the Court is whether the legal arguments advanced in Defendants' Memorandum of Law are *facially meritorious.* [22] After reviewing these legal arguments, and the undisputed facts upon which they rely, I find that each of these legal arguments is, at the very least, facially meritorious, for the reasons stated by Defendants in their Memorandum of Law. (*See* Dkt. No. 38, Part 15, at 2-25 [Defs.' Memo. of Law].) I note that several cases exist from this District granting summary judgment against a *pro se* litigant based on a similar facial analysis of Defendants' unopposed motion papers. [23]

[22]    *See, supra,* note 19 of this Order and Report-Recommendation.

Case 9:17-cv-00366-DNH-TWD Document 93 Filed 03/08/21 Page 186 of 353
Pilgrim v. Bruce, Not Reported in F.Supp.2d (2008)

2008 WL 2003792

23     *See, e.g., Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-1110 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], and recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N .D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

For these reasons, I recommend that the Court grant Defendants' motion for summary judgment.

### 3. Alternative Ground for Dismissal of Plaintiff's Amended Complaint

Because I have already found that an adequate ground exists upon which to base a recommendation that Plaintiff's Amended Complaint be dismissed, I do not believe there is a need to proceed to a more in-depth analysis of Defendants' arguments in favor of dismissal. Furthermore, I recommend that the Court decline to *sua sponte* conduct such a detailed analysis, especially given the backlog of prisoner civil rights cases on its docket. [24] However, in the interest of aiding the Court should it decide to conduct such an analysis, I have subjected Defendants' legal arguments to the more rigorous scrutiny that would be appropriate on a contested motion, and I find that I am persuaded by those legal arguments, which I list and discuss below. (*See* Dkt. No. 38, Part 15, at 2-25 [Defs.' Memo. of Law].)

24     I note that the Second Circuit had, between 2000 and 2005, the longest median time to disposition for prisoner civil rights cases, among the twelve circuits (including the D.C. Circuit)-specifically, 9.8 months, as compared to a national average of 5.7 months.

### (i) Plaintiff's Asserted Failure to Exhaust His Available Administrative Remedies with Regard to

### Various of His Claims Prior to Filing this Action in Federal Court

Defendants accurately describe the Prison Litigation Reform Act's exhaustion requirement, and New York State DOCS' formal grievance process. (*See* Dkt. No. 38, Part 15, at 2-5 [Defs.' Memo. of Law] .) For the sake of brevity, I will not repeat these well-known points of law. I will only add that the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. [25] *First,* "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [26] *Second,* if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [27] *Third,* if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [28]

25     *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).

26     *Hemphill,* 380 F.3d at 686 (citation omitted).

27     *Id.* [citations omitted].

28     *Id.* [citations and internal quotations omitted].

**\*10** Here, Defendants essentially argue that administrative remedies were available to Plaintiff, but he failed to pursue (and exhaust) them. (Dkt. No. 38, Part 15, at 6-8 [Defs.' Memo. of Law].) Defendants further argue that no special circumstances exist justifying this failure. (*Id.* at 8.)

Although I agree with the main thrust of this argument (i.e., that several of Plaintiff's claims should be dismissed due to Plaintiff's failure to exhaust his available administrative remedies before filing this action in federal court), I disagree somewhat with Defendants' reasoning. Specifically, I disagree with Defendants' argument to the extent that it is based simply on the allegations of Plaintiff's Amended Complaint (i.e., on a failure-to-state-a-claim analysis).

2008 WL 2003792

For some years now, it has been the majority rule (followed by the Second Circuit) that a prisoner's fulfillment of his duty to exhaust his available administrative remedies under the Prison Litigation Reform Act ("PLRA") is not a fact that the prisoner had to plead in order to state a claim under 42 U.S.C. § 1983 but a fact that may be challenged by a defendant through an affirmative defense (such as on a motion for summary judgment pursuant to Fed.R.Civ.P. 56, or a motion to dismiss for lack of subject-matter jurisdiction pursuant to Fed.R.Civ.P. 12[b][1]) established by the PLRA. *See, e.g.,* Jenkins v. Haubert, 179 F.3d 19, 28-29 (2d Cir.1999) ("Because, under the PLRA, a prisoner must exhaust administrative remedies before filing a § 1983 suit ..., a defendant in a prisoner § 1983 suit may also assert as an affirmative defense the plaintiff's failure to comply with the PLRA's requirements."); Snider v. Melindez, 199 F.3d 108, 114 (2d Cir.1999) ("A court may not dismiss for failure to exhaust administrative remedies unless the court determines that such remedies are available. Snider's answers [on a form complaint] cannot establish that.").

Last year, the Supreme Court upheld this interpretation of the exhaustion requirement, prohibiting circuits (such as the Sixth, Tenth and Eleventh Circuits) from using exhaustion as a heightened pleading requirement in prisoner civil rights case. *See* Jones v. Block, 549 U.S. 199, 127 S.Ct. 910, 914-915, 918-923, 166 L.Ed.2d 798 (2007). A prisoner has no independent *duty* to plead facts plausibly suggesting that he exhausted his available administrative remedies, in order to state an actionable claim under 42 U.S.C. § 1983. Block, 127 S.Ct. at 919-21. "[T]his is not to say that failure to exhaust cannot be a basis for dismissal for failure to state a claim." *Id.* at 921. If a prisoner *chooses* to plead facts regarding exhaustion, and those facts plausibly suggest that he failed to exhaust his available administrative remedies, then his Complaint may be dismissed for failure to state a claim. *Id.* at 920-21.

Simply stated, if a prisoner says nothing or little about exhaustion in his *pro se* civil rights complaint, he is likely protected from a Fed.R.Civ.P. 12(b)(6) motion to dismiss premised on failure to exhaust. However, if he says too much about exhaustion in that complaint so that his non-exhaustion is readily apparent, he may "plead himself out of court," as the saying goes. I find that this is *not* what has happened here. While Plaintiff alleges that he sent various officials letters of complaint about certain actions (allegedly) taken by Defendant Bruce, Plaintiff (an experienced litigant and drafter

of pleadings) has remained reticent or outright silent about any efforts he did or did not take to appeal the denial of any grievance or complaint to CORC. (*See* Dkt. No. 9, Part 1 [Plf.'s Am. Compl.].)

**\*11** Fortunately for Defendants, they also assert an argument based on the uncontroverted record evidence in this action (i.e., on a summary-judgment analysis). Specifically, they argue that the uncontroverted record evidence in this action establishes that Plaintiff never appealed to CORC the denial of any grievances regarding several of his claims against Defendant Bruce. (*See* Dkt. No. 38, Part 15, at 6-8 [Defs.' Memo. of Law].) In support of this argument, Defendants have adduced the Declaration of Karen R. Bellamy, the Director of the Inmate Grievance Program for the New York State DOCS. (Dkt. No. 38, Part 9 [Decl. of Bellamy].) Exhibit 1 to that Declaration attaches a computer printout demonstrating that Plaintiff never appealed to CORC the denial of any grievances regarding the following four claims: (1) Defendant Bruce's (alleged) refusal to permit Plaintiff "to go to [a] notary" on December 23, 2003; (2) Defendant Bruce's (alleged) "singl[ing]" Plaintiff out of a group of inmates going to recreation on February 22, 2004; (3) defamation by any Defendant; and (4) interference, by any Defendant, with Plaintiff's right to participate in religious services. (*Id.* at ¶ 3 [citing, and attaching, Ex. 1 to Decl. of Bellamy].) [29]

[29]    As for Plaintiff's claims regard the (allegedly) harassing pat-frisks on March 10 and 11, 2004, the computer printout provided by Ms. Bellamy does indicate that, on March 13, 2003, Plaintiff filed a grievance at Great Meadow C.F. (GM-34283-03) entitled "Moorish Pat Frisk." (*Id.* at 4 [Ex. 1 to Decl. of Bellamy].) Of course, I am giving Plaintiff the benefit of the doubt here, since the title of his grievance suggests that the pat frisk at issue was objectionable because of it was due to Plaintiff's apparent Muslim religion, and not due to Plaintiff's having filed grievances against Defendant Bruce.

I note that the computer printout establishes that, during the 2002-2003 period, the grievance procedure at Great Meadow C.F. was working properly so as to be *available* to Plaintiff. I note also that no record evidence (nor even a conclusory allegation) exists suggesting that any Defendant in this matter, through his own actions, inhibited Plaintiff's exhaustion of remedies so as to *estop* that Defendant from raising Plaintiff's failure to exhaust as a defense. Finally, I note also that

no record evidence exists supporting a conclusion that any *special circumstances* existed that justified any attempts by Plaintiff to appeal the denial of any complaint to *Defendant Goord* rather than to *CORC*, as is required by 7 N.Y.C.R.R. §§ 701.5(d), 701.8(g),(h). [30]

[30]     (*See, e.g.,* Dkt. No. 38, Part 7, at 10-11 [Ex. E to Defs.' Motion, attaching Plf.'s letter of 2/22/04 to Def. Goord regarding Defendant Bruce's alleged misconduct on 2/22/04]; Dkt. No. 38, Part 8, at 3-4 [Ex. F to Defs.' Motion, attaching Plf.'s letter of 3/11/04 to Def. Goord regarding "harassment & unlawful discrimination" by Def. Bruce].)

Based on the current record, I find that the uncontroverted record evidence establishes that, before filing this action in federal court, Plaintiff failed to exhaust his available administrative remedies regarding the following four claims: (1) Defendant Bruce's (alleged) refusal to permit Plaintiff "to go to [a] notary" on December 23, 2003; (2) Defendant Bruce's (alleged) "singl[ing]" Plaintiff out of a group of inmates going to recreation on February 22, 2004; (3) defamation by any Defendant; and (4) interference, by any Defendant, with Plaintiff's right to participate in religious services. As a result, I recommend that the Court dismiss those four claims with prejudice.

### (ii) Plaintiff's Asserted Failure to State an Actionable Claim of Defamation

Under even the most liberal of constructions, Plaintiff's Amended Complaint has failed to allege facts *plausibly suggesting* [31] that any Defendant in this action defamed Plaintiff during the relevant time period. (*See* Dkt. No. 9, Part 1, ¶¶ 27, 29, 31, 33, 35, 37 [Plf.'s Am. Compl.].) Moreover, as Defendants argue, even if Plaintiff had stated a claim for defamation, no reason exists for the Court to assert supplemental jurisdiction over that claim, under the circumstances. (*See* Dkt. No. 38, Part 15, at 8-10 [Defs.' Memo. of Law].) As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's defamation claim with prejudice.

[31]     *See Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (holding that, for a plaintiff's complaint to state a claim upon which relief might be granted under Fed.R.Civ.P. 8 and 12, his "[f]actual allegations must be enough to raise a right to relief above

the speculative level [to a plausible level]," or, in other words, there must be "plausible grounds to infer [actionable conduct]"), *accord, Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly]* is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in original].

### (iii) Plaintiff's Asserted Failure to State an Actionable Claim of the Denial of His Right to Participate in Religious Services

**\*12** Under even the most liberal of constructions, Plaintiff's Amended Complaint has failed to allege facts plausibly suggesting that any Defendant in this action interfered with Plaintiff's right to participate in religious services. (*See* Dkt. No. 9, Part 1, ¶¶ 27, 29, 31, 33, 35, 37 [Plf.'s Am. Compl.].) As a result, I recommend that, in the alternative, the Court dismiss this claim with prejudice.

### (iv) Plaintiff's Asserted Failure to State an Actionable Claim of Conspiracy Against Defendant Bruce

As explained above in Part I.A. of this Order and Report-Recommendation, among Plaintiff's claims against Defendant Bruce is a claim that he "conspir[ed]" with and "instructed a co-worker to harass Plaintiff through the disguise [sic] of a pat-frisk" on March 10, 2004, at Great Meadow C.F. (*See* Dkt. No. 9, Part 1, ¶ 8 [Plf.'s Am. Compl.].)

Defendants challenge the pleading sufficiency of this claim to the extent that it alleges a conspiracy by Defendant Bruce. (*See* Dkt. No. 38, Part 15, at 11-12 [Defs.' Memo. of Law].) I agree. Under even the most liberal of constructions, Plaintiff's Amended Complaint has failed to allege facts plausibly suggesting that Defendant Bruce engaged in a conspiracy with the unidentified corrections officer to harass Plaintiff by subjecting him to a pat-frisk on March 10, 2004. (*See* Dkt. No. 9, Part 1, ¶ 8 [Plf.'s Am. Compl.].)

Moreover, I find that Plaintiff's claim fails to the extent he alleges that Defendant Bruce was personally involved in any constitutional violation that occurred with regard to the pat-frisk. As an initial matter, I note that, generally, prisoners retain only a limited Fourth Amendment privacy interest in being free from such searches when they walk

2008 WL 2003792

through the prison doors.[32] Plaintiff does not allege that the pat-frisk violated his right to privacy under the Fourth Amendment. Rather, Plaintiff claims that the search was retaliatory in nature, and thus violated his First Amendment rights. The problem is that Plaintiff has alleged no facts in support of his conclusory allegation that Defendant Bruce "instructed" the unidentified corrections officer to perform the pat-frisk. Nor does Plaintiff alleges any facts plausibly suggesting that the pat-frisk (which occurred in a maximum-security correctional facility) would not have occurred even without such an instruction. Thus, Plaintiff fails to allege facts plausibly suggesting the second and third elements of a retaliation claim (i.e ., the taking of adverse action against the plaintiff *by the defendant,* and a *causal connection* between the plaintiff's protected speech or activity and the taking of the adverse action).[33]

[32]   *See Bell v. Wolfish,* 441 U.S. 520, 556-57, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("[G]iven the realities of institutional confinement, any reasonable expectation of privacy that a detainee retain[s] necessarily [is] of a diminished scope.").

[33]   To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill v. Pidylpchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

I note that, under the circumstances, the Court has the power (and duty) to *sua sponte* address the pleading sufficiency of Plaintiff's other claims, under two authorities: (1) 28 U.S.C.

§ 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S .C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

**\*13**  For these reasons, I recommend that the Court dismiss with prejudice both Plaintiff's conspiracy claim regarding the pat-frisk on March 11, 2004, and the retaliation claim regarding that pat-frisk.

### (v) Plaintiff's Asserted Failure to Allege Facts Plausibly Suggesting, or Adduce Evidence Establishing, the Personal Involvement of Defendant Greene (a Supervisor) in any of the Constitutional Violations Alleged

Defendants accurately recite the law regarding the personal involvement of supervisory officials in constitutional violations alleged in prisoner civil rights actions. (*See* Dkt. No. 38, Part 15, at 12-14 [Defs.' Memo. of Law].) For the sake of brevity, I will not repeat these well-known points of law.

In arguing that Defendant Greene was not personally involved in any of the constitutional violations alleged, Defendants employ alternative arguments: (1) Plaintiff has failed to allege facts plausibly suggesting that Defendant Greene was personally involved in any of the constitutional violations alleged; and (2) Plaintiff has failed to adduce any evidence establishing that Defendant Greene was personally involved in any of the constitutional violations alleged. (*Id.*)

I have some reservation accepting the first argument given Plaintiff's allegations in his Amended Complaint that he submitted written complaints to Defendant Greene on three occasions regarding various of the claims at issue in this action, and that Defendant Greene responded in writing to Plaintiff on four occasions. (*See* Dkt. No. 9, Part 1, ¶¶ 1, 2, 5, 6, 7, 12, 17, 18 [Plf.'s Am. Compl., alleging that he submitted written complaints to Def. Greene on or about 12/23/03, 2/22/04 and 3/19/04, and that Def. Greene sent written responses to Plf. on or about 12/26/03, 3/1/04, 3/8/04 and 3/19/04].)

However, I have no reservation accepting the second argument, given the undisputed record on Defendants' motion for summary judgment. More specifically, I find that no rational fact-finder could conclude from Plaintiff's written communications to Defendant Greene that Defendant Greene was notified that any constitutional violations were occurring. [34] Nor could a rational fact-finder conclude from Defendant Greene's (or his subordinates') written communications to Plaintiff that Defendant Greene's response was in any way reckless or even negligent. [35] It bears emphasizing that, following his receipt of Plaintiff's letters, Defendant Greene rather promptly assigned the matter to a subordinate officer for investigation, notified Plaintiff of that assignment, and then relied on the results of that subordinate officer's investigation. Defendants have accurately cited authorities supporting the (correct) point of law that a superintendent's adoption of a recommendation by an investigating officer cannot by itself demonstrate that he failed to remedy misconduct. *Shabazz v. Lee,* 03-CV1520, 2007 WL 119429, at *7, n. 4 (N.D.N.Y. Jan.10, 2007) (Homer, M.J.) [citations omitted]. Finally, I note that the fact that Defendant Greene did not reverse Plaintiff's disciplinary conviction (a conviction, by the way, that was not subsequently overturned on appeal) [36] is not evidence of any constitutional violation by Defendant Greene.

[34]    (Dkt. No. 38, Part 6, at 10-11 [Ex. D to Defs.' Motion, attaching Plf.'s letter of 12/23/03 to Def. Greene regarding Def. Bruce's statement to Plf. on 12/23/04 that no notary was available]; Dkt. No. 38, Part 7, at 6-8, 11-13 [Ex. E to Defs.' Motion, attaching Plf.'s letter of 2/22/04 to Def. Greene regarding his "harassment & unlawful discrimination" against Plaintiff by [1] singling Plaintiff out of a group of inmates going to recreation on 2/22/04, thus preventing him from going to recreation, [2] "illegally" posting a sign on a menu board reading "Bruce Almighty," and [3] "over stepping his duties into another officers' duties," for example, by "commanding two posts" when he is only assigned to one such post; and stating, "[I]f I am attacked by this officer, I will defend my life" and requesting that action be taken "before something serious incidents [sic] occur with myself, this officer, or co-worker"].)

[35]    (Dkt. No. 38, Part 6, at 9 [Ex. D to Defs.' Motion, attaching Def. Greene's memorandum of

12/26/03 to Plf., stating "Your 12/23/04 letter to me complaining about security staff has been forwarded to DSS Vanguilder for his investigation and response to you"]; Dkt. No. 38, Part 6, at 2 [Ex. D to Defs.' Motion, attaching Captain Kelly's memorandum of 2/6/04 to Plf., reporting that "Superintendent Greene has referred your recent communication regarding the above subject to me for an investigation and response," and that, following a thorough investigation of Plf.'s complaint about the notary issue, it has been concluded that there was no malfeasance by Def. Bruce on 12/23/04]; Dkt. No. 38, Part 7, at 5 [Ex. E to Defs.' Motion, attaching Def. Greene's memorandum of 3/1/04 to Plf., stating "Your 2/22/04 letter to me complaining about C.O. Bruce has been forwarded to DSS Vanguilder for his investigation and response to you. I resent the statement made by you that I or members of the Executive Team have condoned inappropriate behavior. I did not see a sign 'Bruce Almighty' posted in the Mess Hall Foyer and, if I had, I would have assumed it listed the movie to be shown to you by that title. You are extremely paranoid and this latest letter to me borders on threats by you. If I continue to believe you to be a threat here, I will address that issue."]; Dkt. No. 38, Part 7, at 2 [Ex. E to Defs.' Motion, attaching P. Vanguilder's memorandum of 3/12/04 to Plf., reporting that, following a thorough investigation of Plf.'s complaint about the notary issue, it has been concluded that there was no harassment by Def. Bruce on 2/22/04] )

[36]    (*See* Dkt. No. 38, Part 5, at 2 [Ex. C to Defs.' Motion, attaching appellate decision dated 6/8/04, by Def. Selsky regarding Plf.'s disciplinary conviction].)

 *14  For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's claims against Defendant Greene based on his lack of personal involvement in any of the constitutional violations alleged.

**(vi) The Protection from Liability that Defendants Goord, Greene, Selsky, Harvey and Murphy Assertedly Enjoy Under the Circumstances, Pursuant to the Doctrine of Qualified Immunity**

2008 WL 2003792

Defendants accurately recite the legal standard governing the application of the doctrine of qualified immunity. (*See* Dkt. No. 38, Part 15, at 14-17 [Defs.' Memo. of Law].) For the sake of brevity, I will not repeat this well-known legal standard.

Applying that legal standard to the record before the Court on Defendants' motion for summary judgment, I find that no rational fact-finder could conclude from the current record that Defendants Goord, Greene, Selsky, Harvey or Murphy violated a clearly established statutory or constitutional right of which a reasonable corrections officer would have known, for the reasons stated by Defendants in their Memorandum of Law. (*Id.* at 15-17.)

Stated more simply, "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996); *Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]. As the Supreme Court explained,

> [T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law .... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341.

For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's claims against Defendants Goord, Greene, Selsky, Harvey and Murphy based on the doctrine of qualified immunity.

**(vii) Plaintiff's Asserted Failure to State an Actionable Due Process Claim Due to His Failure to Allege Facts Plausibly Suggesting that He Enjoyed a Protected Liberty Interest in Remaining Free from the Disciplinary Confinement Alleged**

Defendants accurately recite the legal standard governing Plaintiff's due process claim regarding the manner in which his prison disciplinary hearing was conducted. (*See* Dkt. No. 38, Part 15, at 17-21 [Defs.' Memo. of Law].) For the sake of brevity, I will not repeat this well-known legal standard other than to emphasize that, in order to establish that he possessed a protected liberty in remaining free from the disciplinary confinement at issue, Plaintiff must establish that the confinement imposed on him *an atypical and significant hardship in relation to the ordinary incidents of prison life.*

Applying this legal standard to the allegations of Plaintiff's Amended Complaint, I agree with Defendants that Plaintiff has failed to allege facts plausibly suggesting that he enjoyed a protected liberty interest in remaining free from the disciplinary confinement alleged, for the reasons stated by Defendants in their Memorandum of Law. (*Id.* at 20-21.) Plaintiff alleges that his disciplinary conviction resulted in a sentence of sixty (60) days of keep-lock confinement and a corresponding loss of privileges. (*See* Dkt. No. 9, Part 1, ¶¶ 24 [Plf.'s Am. Compl.].) More specifically, Plaintiff alleges that the conditions of his keep-lock confinement subjected Plaintiff to the following:

> **\*15** [L]ost telephone privileges, commissary privileges, package privileges, special events privileges, regular visits, 23-hour confinement, one (1) Exercise period, three ten-minute showers weekly, deprivation of access to Law library, deprivation of Access to the Courts, Lost [sic] of Sao Shop Industry Program earnings [of] 42 cents an hour, deprivation of paying Court fees, deprivation of paying for copies of legal material, injuring eligibility for constructive transfer, defamation of character, [denial of] liberty interest and religious services, and that such lost [sic] was malicious, cruel and unusual punishment ....

(*Id.* at ¶¶ 27, 29, 31, 33, 35, 37.)

Both the Supreme Court and Second Circuit have made clear that a "short" period of disciplinary confinement (i.e., under 101 days) under generally "normal" conditions (i.e.,

even if some of those conditions are harsher than those in disciplinary confinement or the general population) usually does not rise to the level of atypicality. [37] Here, setting aside the often-conclusory nature of Plaintiff's allegations, the allegations generally state the *ordinary* conditions of disciplinary confinement in a correctional facility within the New York State DOCS. *See Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (describing the following conditions as "normal" conditions of SHU confinement in New York: "Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day ..., limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited. As to duration, Colon was required to serve 305 days of the 360-day sentence imposed.") (citing N.Y.C.R.R. §§ 304.1-304.14). For example, conspicuously missing from this litany are any allegations that, while in keeplock confinement, Plaintiff was denied food, clothing, bedding, heat, running water, toiletries, or medicine. (*Id.* at ¶¶ 27, 29, 31, 33, 35, 37.)

[37]     *See, e.g., Sandlin v. Conner,* 515 U.S. 472, 475-476, 486, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (30 days of disciplinary confinement in SHU under conditions that mirrored those of normal administrative segregation "with insignificant exceptions" did not rise to the level of atypicality); *Sealey v. Giltner,* 197 F.3d 578, 589-590 (2d Cir.1999) (101 days of disciplinary confinement in SHU under conditions that were "doubtless unpleasant and somewhat more severe than those of general population" did not rise to the level of atypicality).

For these reasons, I recommend that, in the alternative, the Court dismiss with prejudice Plaintiff's due process claims.

**(viii) Plaintiff's Asserted Failure to Adduce Evidence Establishing a Claim of Retaliation by Defendant Bruce**

As explained above in Part I.A. of this Order and Report-Recommendation, Plaintiff asserts five discrete instances of retaliation by Defendant Bruce: (1) refusing to permit Plaintiff "to go to [a] notary" on December 23, 2003; (2) "singl[ing]" Plaintiff out of a group of inmates going to recreation on February 22, 2004; (3) "conspir[ing]" with and "instruct[ing]

a co-worker to harass Plaintiff through the disguise [sic] of a pat-frisk" on March 10, 2004; (4) "singl[ing]" Plaintiff out of a group of inmates going to mess hall in order to subject him to a harassing and retaliatory pat-frisk on March 11, 2004; and (5) filing a false misbehavior report against Plaintiff on March 11, 2004, in retaliation against him for having filed grievances against Defendant Bruce on December 23, 2003, February 22, 2004, and March 10, 2004. (*id.* Dkt. No. 9, Part 1, ¶¶ 1, 5, 8-11, 13, 27 [Plf.'s Am. Compl.].) [38]

[38]     I note that Defendants characterize these five discrete claims as *four* discrete claims, after combining the fourth and fifth claims described above into one claim. (Dkt. No. 38, Part 15, at 23-24 [Defs.' Memo. of Law].

 **\*16** Defendants accurately recite the legal standard governing Plaintiff's claim of retaliation by Defendant Bruce. (*See* Dkt. No. 38, Part 15, at 21-23 [Defs.' Memo. of Law].) For the sake of brevity, I will not repeat this well-known legal standard other than to emphasize two facts a plaintiff must prove by a preponderance of the evidence in order to prevail on a First Amendment claim. First, the plaintiff must prove that the defendant (as opposed to some third-person) took "adverse action" against the plaintiff [39] Second, the plaintiff must prove that there was a causal connection between the protected speech in which the plaintiff was engaging and the adverse action allegedly taken against him-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. [40] Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. [41]

[39]     *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill v. Pidylpchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ).

[40]     *Mount Healthy City Sch. Dist. Bd. of Educ.,* 429 U.S. at 287; Gill, 389 F.3d at 380.

[41]     *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) [citations omitted].

Applying that legal standard to the record before the Court on Defendants' motion for summary judgment, I find that no rational fact-finder could conclude from the current record

that Defendant Bruce retaliated against Plaintiff, for the reasons stated by Defendants in their Memorandum of Law. (*Id.* at 23-25.) In particular, Defendants have adduced record evidence establishing, among other things, that (1) no notary was on duty at Great Meadow C .F. on December 23, 2003, (2) Defendant Bruce was not present at Great Meadow C.F. when Plaintiff went to recreation at or after 2:30 p.m. on February 22, 2004, (3) Defendant Bruce (a correctional officer, not a correctional sergeant or lieutenant) possessed no authority to instruct a co-worker to pat-frisk Plaintiff on March 10, 2004 (or at any time), (4) Defendant Bruce's personal pat frisk of Plaintiff on March 11, 2004 would have occurred even without the improper motive alleged, and (5) Defendant Bruce would have filed a misbehavior report against Plaintiff on March 11, 2004, even without the improper motive alleged. (*Id.* at 23-24 [providing accurate citations to record evidence].) Furthermore, Plaintiff has failed to adduce evidence creating a genuine issue with regard to these facts.

For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's retaliation claim against Defendant Bruce.

### 4. Miscellaneous Issues

#### (i) Whether Any Claims Remain

I have carefully compared my detailed summary of the claims asserted in Plaintiff's Amended Complaint (*see, supra,* Part I.A. of this Order and Report-Recommendation) with Defendants' meritorious arguments in favor of dismissal (*see, supra,* Part II .B.3. of this Order and Report-Recommendation), and I report that, should the Court adopt this Report-Recommendation, all of the claims asserted in Plaintiff's Amended Complaint would be dismissed from this action. Indeed, several of those claims would be dismissed on two or more alternative grounds.

#### (ii) Whether Plaintiff Should Be Afforded Another Chance to Amend

*17 Generally, when addressing a *pro se* complaint, a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [42]

[42] *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also*

*Fed.R.Civ.P. 15(a)* (leave to amend "shall be freely given when justice so requires").

For the sake of brevity, I will set aside the fact that one of the reasons for this rule is that the *pro se* plaintiff should be afforded special leniency due to his lack of experience with the court system and litigation process, and here Plaintiff need be afforded no such special leniency because he is experienced with the court system and litigation process (having filed at least 11 other federal or state court actions or appeals regarding his imprisonment). [43]

[43] *See, e.g., Pilgrim v. Keane,* 97-CV1517 (E.D.N.Y.); *Pilgrim v. Wright,* 01-CV-0098 (N.D.N.Y.); *Pilgrim v. Brown,* 01-CV-0700 (N.D.N.Y.); *Pilgrim v. Luther,* 01-CV-8995 (S.D.N.Y.); *Pilgrim v. Wolczyl,* 02-CV-0901 (N.D.N.Y.); *Pilgrim v. Artus,* 07-CV-1001 (N.D.N.Y.); *Pilgrim v. Wright,* No. 03-0086 (2d Cir.); *Pilgrim v. Greene,* Index No. 505332/2003 (N.Y. Sup.Ct., Washington County); *Pilgrim v. Greene,* No. 95400 (N.Y.App.Div., 3d Dept.); *Pilgrim v. Greene,* Nos. 3-10, 526 (N.Y.); *Pilgrim v. New York,* UID 2001-005-512, Claim No. 103678 (N.Y.Ct.Cl.).

Rather, the problem with applying this leave-to-amend rule to Plaintiff under the circumstances is that granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading. [44] Here, Plaintiff has already had such a chance to amend his pleading. (*See* Dkt. No. 9, Part 1 [Plf.'s Am. Compl.] .)

[44] *Cagle v. Perry,* 04-CV-1151, 2007 WL 3124806, at *6, n. 45 (N.D.N.Y. Oct.24, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Savage v. Brue,* 05-CV-0857, 2007 WL 3047110, at *5, n. 35 (N.D.N.Y. Oct.18, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3, n. 13 (N.D.N.Y. Sept.26, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2, n. 14 (N.D.N.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5, n. 34 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,*

04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4, n. 30 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v. Cent. Office Review Comm.,* 03-CV-0407, 2006 WL 2794415, at *5, n. 18 (N.D.N.Y. Sept., 26, 2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver,* 03-CV-0912, 2006 WL 2799417, at *4, n. 16 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

Moreover, even when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [45] In particular, an opportunity to amend should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [46] Here, the problems with Plaintiff's causes of action are substantive, not merely formal. Simply stated, if Plaintiff (an experienced, prolific litigant) could have alleged sufficient facts to state viable claims, he would have done so.

[45] *Stinson v. Sheriff's Dep't of Sullivan County,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz,* 2007 WL 2027912, at *2 (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins,* 2007 WL 37404, at *4 (Kahn, J., adopting report-recommendation of Lowe, M.J.).

[46] *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

For all of these reasons, I recommend that the dismissal of Plaintiff's Amended Complaint be *with prejudice.*

### (iii) Whether the Court Should Permit Plaintiff to Supplement the Record on Any Appeal to District Court from this Report-Recommendation

In light of Plaintiff's prolific nature as a litigant, I anticipate that, during his likely objections to this Report-Recommendation, he will attempt to supplement the record on Defendants' Motion for Summary Judgment. I respectfully recommend that the Court, in exercising its discretion on the matter, decline to permit him to so supplement the record.

The Second Circuit recognizes that the decision of whether or not to accept new evidence as resting in the sound discretion of the district court: "Considerations of efficiency and fairness militate in favor of a full evidentiary submission for the Magistrate Judge's consideration, and we have upheld the exercise of the district court's discretion in refusing to allow supplementation of the record upon the district court's *de novo* review." *Hynes v. Squillance,* 143 F.3d 653, 656 (2d Cir.1998) (affirming decision by Scullin, J., of the Northern District of New York) [citations omitted].

The Fifth Circuit has *suggested* four factors that a court might consider in deciding whether to accept additional evidence after a magistrate judge's recommendation has been issued:

> **\*18** (1) the moving party's reasons for not originally submitting the evidence; (2) the importance of the omitted evidence to the moving party's case; (3) whether the evidence was previously available to the non-moving party when it responded to the summary judgment motion; and (4) the likelihood of unfair prejudice to the

non-moving party if the evidence is accepted.

*Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.,* 322 F.3d 847, 862 (5th Cir.2003) [citation omitted].

Here, I find that these four factors-particularly the third and fourth factors-weigh against permitting Plaintiff to supplement the record on Defendants' motion for summary judgment during any appeal to the District Court from this Report-Recommendation. This action has been pending now since February 14, 2005, past the eighteen months envisioned by Congress when the Civil Justice Reform Act of 1990 was passed. [47] Plaintiff has had a full and fair opportunity to be heard on his claims, including a full and fair opportunity to (1) conduct discovery in this matter, (2) object to any (allegedly) deficient responses to his discovery demands, and (3) respond with evidence and argument to Defendants' motion for summary judgment. For whatever reason, he chose not to do so, perhaps because he was too busy litigating other actions, or more probably because the evidence simply did not support his claims. In any event, Defendants are entitled to have their motion decided within a reasonable time frame and on a level playing field (based on evidence and arguments to which they could properly reply).

[47]   *See Adelman v. Hobbie,* 03-CV-0032, 2006 WL 2639359, at *8 (N.D.N.Y. Sept.13, 2006) (Sharpe, J., adopting Report-Recommendation by Treece, M.J.) (dismissing *pro se* civil rights action for failure to prosecute under Rule 41[b] in part because "[o]ver three years has passed since this litigation was commenced, well past the eighteen months envisioned by Congress when the Civil Justice Reform Act of 1990 was instituted").

For these reasons, I recommend that the Court, in exercising its discretion on the issue, deny any request by Plaintiff to supplement the record on Defendants' motion for summary judgment, during any objections to this Report-Recommendation.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's cross-motion (Dkt. No. 41) is **DENIED** to the extent that it requests relief that is non-dispositive in nature (i.e., the reopening of the discovery period in this action, the adjourning of the Court's decision regarding Defendants' motion, and the imposition of sanctions against Defendants); and it is further

**RECOMMENDED** that Plaintiff's cross-motion (Dkt. No. 41) be **DENIED** to the extent that it requests relief that is dispositive in nature (i.e., the voluntarily dismissal without prejudice of Plaintiff's "defamation of character" and "[loss of] religious services" claims); and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 38) be **GRANTED,** and that all of the claims asserted in Plaintiff's Amended Complaint (Dkt. No. 9) be **DISMISSED** with prejudice; and it is further

**RECOMMENDED** that the Court **DENY** any request by Plaintiff to supplement the record on Defendants' motion for summary judgment during any appeal to the District Court from this Report-Recommendation; and it is further

 **\*19  RECOMMENDED** that the Court certify in writing, for purposes of 28 U.S.C. § 1915(a)(3), that any appeal taken from the Court's final judgment in this action would not be taken in good faith.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2003792

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 196 of 353

Smith v. Hamilton, Not Reported in Fed. Supp. (2016)

2016 WL 3823395

2016 WL 3823395
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jason SMITH, Plaintiff,

v.

M. HAMILTON, Correctional Officer; Riverview
Correctional Facility, et al, Defendants.

9:15 -CV-0496 (BKS/ATB)
|
Signed July 11, 2016
|
Filed 07/12/2016

**Attorneys and Law Firms**

Jason Smith, New York, NY 10027, Plaintiff, pro se.

Oriana L. Carravetta, Esq., Hon. Eric T. Schneiderman, Office
of New York State Attorney General, The Capitol, Albany,
NY 12224, Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, U. S. District Judge

**\*1  I. Introduction**

Plaintiff pro se Jason Smith brought this action against
defendants under 42 U.S.C. § 1983 alleging violations of his
constitutional rights while he was an inmate at Riverview
Correctional Facility. Dkt. No. 1. In a July 27, 2015 Decision
and Order, the Court determined that the following claims
survived sua sponte review under 28 U.S.C. §§ 1915(e)(2)
(B) and 1915A(b), and required a response: (1) the Fourteenth
Amendment due process claims against defendants A. Rufa,
Albert Prack and C. Hillenbrand; (2) the First Amendment
retaliation claim against defendant M. Hamilton; and (3) the
supervisory claim against defendant John Doe. Dkt. No. 5, p.
18.

On November 6, 2015, defendants filed a motion for
partial summary judgment under Fed. R. Civ. P. 56 on
the First Amendment retaliation claim for failure to exhaust
administrative remedies, and for partial dismissal under Fed.
R. Civ. P. 12(b)(6) of the due process claims for failure to state

a claim on which relief may be granted. Dkt. No. 12. Plaintiff
filed a response in opposition. Dkt. No. 23.

This matter was assigned to United States Magistrate Judge
Andrew T. Baxter, who issued a Report-Recommendation
and Order on April 1, 2016, recommending that the
motion be granted in part and denied in part. Dkt. No.
27. Magistrate Judge Baxter recommended that defendants'
motion for summary judgment as to the First Amendment
retaliation claim be granted, based upon the failure to
exhaust administrative remedies, and that the complaint be
dismissed in its entirety as to defendant Hamilton and as to
a First Amendment retaliation claim. Dkt. No. 27, pp. 23-24.
Magistrate Judge Baxter recommended that the motion to
dismiss the due process claims against defendants Rufa, Prack
and Hillenbrand be denied. Dkt. No. 27, at 23-24. Magistrate
Judge Baxter advised the parties that under 28 U.S.C. § 636(b)
(1) and Local Rule 72.1(c), they had fourteen days within
which to file written objections to the report, and that the
failure to object to the report within fourteen days would
preclude appellate review. *Id.*

Plaintiff did not file an objection to the Report-
Recommendation. [1] Defendants filed an objection to the
Report-Recommendation, objecting to Magistrate Judge
Baxter's determination that the Plaintiff had alleged a
sufficient liberty interest for his due process claim. Dkt.
No. 29. For the reasons set forth below, the Report-
Recommendation is adopted in its entirety.

[1]     The Report-Recommendation was served on
        Plaintiff at Auburn Correctional Facility on April
        1, 2016. On April 5, 2016, Plaintiff filed a notice
        of change of address with the Court. Dkt. No. 28.
        The Clerk resent the Report-Recommendation to
        Plaintiff at his new address on April 6, 2016.

**II. Standard of Review**

This court reviews *de novo* those portions of the Magistrate
Judge's findings and recommendations that have been
properly preserved with a specific objection. *Petersen v.
Astrue*, 2 F. Supp. 3d 223, 228-29 (N.D.N.Y. 2012); 28 U.S.C.
§ 636(b)(1)(C). Findings and recommendations as to which
there was no properly preserved objection are reviewed for
clear error. *Id.*

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 197 of 353
Smith v. Hamilton, Not Reported in Fed. Supp. (2016)
2016 WL 3823395

**\*2** To survive a motion to dismiss a complaint "must plead 'enough facts to state a claim to relief that is plausible on its face.' " *J.S. v. T'Kach*, 714 F.3d 99, 103 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While the "court must accept as true all of the allegations contained in a complaint ... [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint that is filed *pro se* must be construed liberally, "interpreting it to raise the strongest claims that it suggests." *J.S. v. T'Kach*, 714 F.3d at 103.

### III. Discussion

The Court has reviewed Magistrate Judge Baxter's determination that plaintiff failed to exhaust his administrative remedies as to his First Amendment retaliation claim for clear error, and found none. The Court accordingly adopts Magistrate Judge Baxter's Report-Recommendation in its entirety as to Defendants' motion for partial summary judgment under Fed. R. Civ. P. 56 as to the First Amendment retaliation claim and as to defendant Hamilton.

With respect to Plaintiff's due process claim, Defendants have objected to Magistrate Judge Baxter's rationale for concluding that Plaintiff has alleged a sufficient liberty interest. Dkt. No. 29, p. 1. Specifically, Defendants argue that: (1) Plaintiff has failed to allege atypical and significant hardship for a 90-day confinement in Special Housing Unit ("SHU"); (2) the loss of conditional release or merit board eligibility does not implicate a liberty interest; and (3) Plaintiff's allegation that he suffered "extreme emotional distress due to the evil intentions, willful and malicious conduct, and retaliation, [and] discrimination" is conclusory and irrelevant to the liberty interest analysis. (Dkt. No. 29, pp. 1-2). [2]

[2]    In light of the Court's ruling regarding the sufficiency of the allegations of atypical conditions of confinement, and its adoption of the Report-Recommendation on that basis, the Court has not considered Defendants' other objections. The Court notes that, as Magistrate Judge Baxter found, it is not clear what Plaintiff means when he states that he "lost" his "Merit Board" and his "Conditional Release." Dkt. No. 27, p. 21; *see* Dkt. No. 1, pp.8-10. The Court recognizes that inmates do not have a constitutional right to conditional release

from prison prior to the expiration of a valid sentence. *Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 422 U.S. 1, 7 (1979); *see Abed v. Armstrong*, 209 F.3d 63, 66-67 (2d Cir. 2000) ("Although inmates have a liberty interest in good time credit they have already earned, no such interest has been recognized in the opportunity to earn good time credit where ... prison officials have discretion to determine whether an inmate or class of inmates are eligible to earn good time credit.") (citation omitted); *Scarola v. Goord*, 266 A.D.2d 598, 599, 698 N.Y.S. 2d 60 (3d Dep't 1999) (finding that enactment of merit time legislation, N.Y. Corr. Law § 803, did not create a constitutionally protected liberty interest); *Lighthall v. Vadlamudi*, No. 9:04-CV-0721, 2006 WL 721568, \*\*14-15, 2006 U.S. Dist. LEXIS 74734, \*47 (Feb. 6, 2006) (same), *report recommendation adopted by* 2006 U.S. Dist. LEXIS 74737, (N.D.N.Y. March 17, 2006).

As Magistrate Judge Baxter noted, to establish a due process claim Plaintiff had to show: "(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001) (citation and internal quotation marks omitted); Dkt No. 27 p. 18. In this case Plaintiff challenges the due process procedures regarding a disciplinary hearing that resulted in a 90-day SHU sentence. Dkt. No. 1, pp. 4-5. [3]

[3]    The Court adopts and incorporates herein the facts set forth in the Report-Recommendation, none of which were the subject of an objection.

**\*3** A prisoner "has a liberty interest that is implicated by SHU confinement if it 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *J.S. v. T'Kach*, 714 F.3d at 106 (quoting *Sandin v. Conner*, 515 U.S. 472, 484, (1995)); *see also Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). In making this determination courts are to consider, "among other things, the duration and conditions of confinement." *J.S., 714 F. 3d at 106; Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009). The conditions of confinement are to be considered "in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Davis*, 576 F.3d at 134; *Palmer*, 364 F.3d at 66 n.4.

2016 WL 3823395

Although the Second Circuit has "explicitly avoided" creating "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights," the Court has established guidelines. *Palmer*, 364 F.3d at 65. Where the plaintiff is confined for "an intermediate duration –between 101 and 305 days – 'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required.' " *Id.* (quoting *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000)). [4] While confinements for less than 101 days "under normal SHU conditions may not implicate a prisoner's liberty interest," such confinements "could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealy* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer*, 364 F.3d at 65; *see Davis*, 576 F.3d at 133. [5] "Disputes about conditions may not be resolved on summary judgment." *Davis*, 576 F.3d at 134 (quoting *Palmer*, 364 F.3d at 65). The district court may determine the issue of atypicality of confinement as a matter of law "[o]nly when the conditions are uncontested." *Id.*

[4]    A longer confinement under normal SHU conditions is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections." *Palmer*, 364 F.3d at 65.

[5]    The Second Circuit has noted that "[i]n the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short – less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." *Palmer*, 364 F.3d at 65-66; *see Davis*, 576 F.3d at 133. Absent allegations in the complaint that the conditions of confinement were in some way atypical, however, many courts in this Circuit have granted motions to dismiss claims by plaintiffs with confinement exceeding thirty days when the plaintiffs failed to allege that the conditions of confinement were in some way atypical. *See, e.g.*, *Acevedo v. Fischer*, No. 12-CV-6866 RA, 2014 WL 5015470 at *15, 2014 U.S. Dist. LEXIS 139057, at *48 (S.D.N.Y. Sept. 29, 2014) (citing cases involving confinements of between forty and fifty days which were dismissed for failure to allege

a protected liberty interest because there were no allegations of unusual confinement).

In this case, the duration of the confinement, 90 days, "was not long enough to constitute an atypical and significant deprivation by itself," and the Court therefore must "look to the conditions of confinement." *Palmer*, 364 F.3d at 66; *see also Davis*, 576 F.3d at 133. Although there are no allegations regarding the conditions of Plaintiff's confinement in the body of the verified Complaint, Plaintiff detailed conditions of his confinement in his prayer for relief, in connection with his claim for damages. Dkt. No. 1, p. 10. Plaintiff alleges that he "was confined for 23 hours a day in a cell roughly 60 feet square for approximately 90 days with a cell mate who you must share 10 minute showers with, with no shower curtain, share an open toilet and sink and deprived of most of my personal property as well as the ability to work, attend mandatory program, watch television, attend out door [sic] recreation in a congregated setting with the ability to engage in sports and other congregate recreational activities, associate with other prisoners, attend meals with other prisoners, attend Jumah services, and extreme emotional distress suffered by him due to the evil intentions, willful and malicious conduct, retaliation, discrimination as well as being denied basic rights to due process of law." Dkt. No. 1, p. 10.

**\*4**  Defendants argue, without citation, that the conditions described "are simply normal SHU conditions." Dkt. No. 29, p. 2 While the Court agrees that some of the conditions are normal SHU conditions, *see* N.Y. Comp. Codes R. & Regs. tit. 7, §§ 304.1-.14, 305.1-.6 (2016); *Palmer*, 364 F.3d at 65 n.3, the Court cannot make a determination at this stage of the litigation regarding the atypicality of Plaintiff's confinement. It is not clear, for example, that the "deprivation of most of [plaintiff's] personal property" was a normal SHU condition. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 302.2 (e); *see also Palmer*, 364 F.3d at 62, 66 n.4 (affirming district court's denial of defendant's motion for summary judgment in a case involving SHU confinement for seventy-seven days when the plaintiff alleged that he was "not permitted any personal property (including his personal food, clothing and grooming and hygiene products), and was placed in restraints whenever he was escorted outside his cell" and was terminated from a program through which he had extended visits with his family).

Construing the pro se complaint liberally and to raise the strongest arguments it suggests, the Court concurs in Magistrate Judge Baxter's determination that "at this stage of the litigation, the court cannot determine whether a liberty

interest was created based on the complaint alone," and that Defendant's motion to dismiss should be denied. Dkt. No. 27, p. 23. In so ruling, the Court expresses no opinion about whether this claim can withstand a properly filed motion for summary judgment.

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Baxter's Report-Recommendation (Dkt. No. 27) is **ADOPTED** in all respects; and it is further

**ORDERED** that defendants' motion for partial summary judgment under Fed. R. Civ. P. 56 and for partial dismissal under Fed. R. Civ. P. 12(b)(6) (Dkt. No. 12) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that defendants' motion for summary judgment as to the First Amendment retaliation claim against defendant Hamilton is **GRANTED,** and that the complaint is dismissed as against defendant Hamilton and insofar as it alleges a First Amendment retaliation claim; and it is further

**ORDERED** that defendant Hamilton is dismissed from this case; and it is further

**ORDERED** that defendants' motion to dismiss the due process claims against defendants Rufa, Prack and Hillenbrand is **DENIED;** and it is further

**ORDERED** that the Clerk of Court shall provide Plaintiff with copies of the unpublished decisions cited in this Memorandum-Decision and Order; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3823395

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3259975
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Guy McEACHIN, Plaintiff,

v.

Donald SELSKY; Jeff Minnerly; [1] Virginia Androsko; Porten, Corrections Officer, Defendants.

[1]    Defendants have submitted documents to the Court which bring to light the correct spelling of this Defendant's name as "Minerly," and not "Minnerly;" the Court will refer to this individual by the correct spelling. *See, e.g.,* Dkt. No. 55, Jeff Minerly Decl., dated May 12, 2009.

Civ. No. 9:04–CV–0083 (FJS/RFT).
|
March 30, 2010.

**Attorneys and Law Firms**

Guy McEachin, Comstock, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Gary M. Levine, Esq., Assistant Attorney General, Rochester, NY, for Defendants.

*REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*1** *Pro se* Plaintiff Guy McEachin, currently incarcerated at Great Meadow Correctional Facility, brings a civil rights action, pursuant to 42 U.S.C. § 1983, claiming violations of his rights protected by the First, Fifth, Eighth, and Fourteenth Amendments. Dkt. No. 1, Compl. Throughout the protracted litigation history of this lawsuit, certain claims have survived, while others have met their demise. Pending before this Court is Defendants' Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56.[2] Dkt. No. 51–58 & 79. Plaintiff opposes the Motion. Dkt. Nos. 76 & 78. For

the reasons that follow, it is recommended that Defendants' Motion be **granted** and the entire Complaint be **dismissed.**

[2]    Approximately one month after Defendants filed their Motion for Summary Judgment, all deadlines were stayed to allow for the Honorable Victor Bianchini, Recalled United States Magistrate Judge, to preside over a mediation session. Dkt. No. 59. When that effort proved unsuccessful, the matter was referred back to this Court to address the pending Motion. Dkt. No. 64.

**I. BACKGROUND**

**A. Underlying Facts** [3]

[3]    The Court notes that many of the essential facts are not truly contested. Instead, the parties diverge as to the interpretation of these facts and whether constitutional rights were trespassed upon.

At all times relevant to the issues raised in the Complaint, Plaintiff was under the custody of the New York Department of Correctional Services (DOCS) and was housed at Auburn Correctional Facility. Dkt. No. 52, Defs.' Statement of Material Facts (hereinafter "Defs.' 7.1 Statement") at ¶ 1. At the core of this litigation are two Misbehavior Reports (MR), which according to Plaintiff, set off a series of constitutional affronts.

The first MR was issued on January 5, 2001, by Defendant Corrections Officer (CO) Jeffrey Porten. *Id.* at ¶ 2. The January MR, which charges Plaintiff with violating Disciplinary Rules 106.10 (refusal to obey a direct order), 116.10 (inmates shall not misuse any type of state property), 102.10 (inmates shall not make any threats spoken, in writing or by gesture), and 107.11 (inmates shall not harass employees verbally or in writing), states the following:

On [January 5, 2001] and approximate time of 9:00 am while doing a round in A-tank on SHU–D south side[,] I passed by A–3 cell and noticed the inmate's blanket on the floor being used as a rug. I then gave [I]nmate McEachin, G. 00–A–5257 a direct order to pick the blanket up off the floor. Inmate McEachin, G. just stood there in the cell staring at me. At that time I continued my rounds on the SHU–D south side. Later on while doing another round on SHU–D south side passing through A-tank I looked into A–

3 cell and observed inmate McEachin G.'s blanket still on the floor being used as a rug. I then gave inmate McEachin, G. another direct order to pick up the blanket off the cell floor. Inmate McEachin, G. then looked at me and said, "Fuck you! You white piece of shit, get away from my cell before kick [sic] your ass!" Inmate McEachin then stated, "You better watch yourself when I come out of here." At that time, I continued my rounds on the south side and notified the area supervisor of the incident at the end of the round. Later at approximately 2:00 pm while doing another round on the south side, upon entering A-tank I noticed A–3 cell was open and the blanket still [illegible] on the floor. At that time I confiscated the state blankets and returned them to SHU–D P-tank property room without further incident.

  **2** Dkt. No. 56, Jeffrey Porten Decl., dated May 29, 2009, Ex. A.

Though the MR addresses events occurring at different times throughout that day, the "incident time" reflected on the MR is 2:00 p.m.

On January 11, 2001, Defendant Jeff Minerly, Plant Superintendent, conducted a Tier III Disciplinary Hearing on the January MR. Dkt. No. 55, Jeff Minerly Am. Decl., dated May 12, 2009, Ex. B. In support of his "not guilty" plea, Plaintiff attacked the MR as non-conforming to DOCS Directives because the time reflected on the Report as the "incident time," 2:00 p.m., was not the correct time for all of the allegations and charges therein. As an example, Plaintiff noted the allegation of verbal harassment was not alleged to have occurred at 2:00 p.m. *Id.* At the conclusion of the Hearing, Defendant Minerly found Plaintiff guilty of all charges and sentenced him to 120 days in a special housing unit (SHU) with corresponding loss of privileges and a recommendation of 180 days loss of good time credits. *Id,* Ex. A. On February 20, 2001, McEachin's disciplinary sentence was affirmed on appeal by Defendant Donald Selsky, Director of Special Housing/Inmate Disciplinary Program. *Id.*

The second MR was issued by Defendant Nurse Virginia Androsko on June 9, 2001.[4] Dkt. No. 54, Virginia Androsko Decl., dated May 18, 2009, Ex. A. The June MR, which charges Plaintiff with violating Disciplinary Rules 107.10 (inmates shall not verbally obstruct or interfere with an employee) and 107.11 (inmates shall not verbally harass employees), states the following:

[4] In their 7.1 Statement, Defendants erroneously list "May 8, 2001" as the date Androsko wrote her MR. Defs.' 7.1 Statement at ¶ 6. In fact, the actual MR reflects the incident date as June 9, 2001, a point clarified by Defendants' counsel at Plaintiff's Deposition. *See* Dkt. No. 58–3, Gary Levine Decl., dated June 5, 2009, Ex. A, McEachin Dep., dated Dec. 2, 2008, at p. 22.

When attempting to do sick call in K tank in SHU D Inmate McEachin was yelling about how he wants copies of sick call procedures and how they are to be done. He was very loud preventing this writer to hear [sic] any requests for sick call. During his tirade he was calling me a "fucking bitch and a mother fucker." Sick call was ended in K-tank due to his interference and harassment.
*Id.*

The June MR bears the signatures of Nurse Androsko and Sergeant Martins, who is not a named party in this litigation. *Id.*

On June 18, 2001, Joseph Wolczyk, who is not a named party in this litigation,[5] conducted a Tier III Disciplinary Hearing on the June MR. Defs.' 7.1 Statement at ¶ 7; *see also* Dkt. No. 58–2, Joseph Wolczyk Decl., dated Mar. 10, 2009, Exs. A & B. During the Hearing, Plaintiff claimed that the MR was false, as evidenced by the fact that there was no sick call on the date in question (purportedly a weekend day) and because his copy of the MR lacked a necessary second signature, without which, he claimed, Defendant Androsko lacked the authority to issue the Report. Wolczyk Decl., Ex. B at pp. 4, 9–10, & 15–17. At the conclusion of the Hearing, Officer Wolczyk found Plaintiff guilty of both charges and sentenced him to forty (40) days in SHU with corresponding loss of privileges and a recommendation of two months loss of good time credit. *Id.,* Ex. A. On September 6, 2001, Defendant Selsky affirmed the Plaintiff's disciplinary sentence. Dkt. No. 58–3, Gary Levine Decl., dated June 5, 2009, Ex. C, Notice to Admit, Ex. F. On January 9, 2002, Plaintiff's request for reconsideration of his appeal was similarly denied by Defendant Selsky. *Id.*

[5] In his Opposition to Defendants' Motion, Plaintiff repeatedly refers to Officer Wolczyk as "Defendant Wolczyk," however, this individual was not named in his Original Complaint, nor has Plaintiff at any time attempted to amend his Complaint to add Wolczyk as a party to this litigation. *Compare* Dkt. No. 76, Pl.'s Opp'n, at pp. 3, 6, & 11 (consistently

making reference to "Defendant Wolczyk" *with* Compl. at pp. 1–2 (omitting Wolczyk's name from the listed parties) & 5 (no mention of Wolczyk by name nor any implication that the Hearing Officer violated his rights at the June Hearing).

## B. Procedural History

**\*3** This action, which began on January 23, 2004, with the filing of Plaintiff's civil rights Complaint, has traversed certain procedural obstacles, including a dispositive motion and an appeal to the Second Circuit. We feel it necessary to recite certain aspects of this procedural history to ensure an understanding of what causes of action survived those procedural mileposts.

### 1. Plaintiff's Claims

We begin with a recitation of the causes of action raised in Plaintiff's Complaint.[6] Dkt. No. 1, Compl. As a result of the above described incidents, Plaintiff brought the instant action against Donald Selsky, Jeff Minerly, Virginia Androsko, and Jeffrey Porten asserting violations of his First, Fifth, Eighth, and Fourteenth Amendment rights. Succinctly, Plaintiff accuses Defendant Porten of falsifying the January MR in retaliation for an altercation that occurred on December 30, 2000, between McEachin and other COs at Auburn, and the grievances Plaintiff filed regarding that incident. Compl. at ¶¶ 6C–6D; Dkt. No. 76, Pl.'s Resp. in Opp'n to Defs.' Mot. at p. 7. McEachin asserts he not only filed grievances against the COs involved in the December 30th incident, but he also initiated a federal civil rights suit against them and others in this District, *McEachin v. Goord, et al.,* Civ. No. 9:01–CV–259 (LES/GJD). Pl.'s Resp. in Opp'n to Defs.' Mot. at p. 7. Porten's January MR was issued six days after Plaintiff's altercation with the other COs. Compl. at ¶¶ 6A, 6B, & 6F; Pl.'s Resp. in Opp'n to Defs.' Mot. at p. 7. According to McEachin, Porten's MR, and Minerly's refusal to dismiss the false claims, resulted in violations of his First and Fourteenth Amendment rights. Compl. at ¶¶ 6C–6G. McEachin also claims that Minerly violated his Fifth and Eighth Amendment rights. *Id.* at ¶ 6G. As for Defendant Androsko, McEachin claims she had no authority to issue the June MR, which he also charges was false, and that, in authoring the MR, she violated the *Milburn* Consent Decree issued in the Southern District of New York in the class action case *Milburn v. Coughlin,* Civ. No. 79–CV–5077 (RJW), as well as Plaintiff's

Eighth and Fourteenth Amendment rights. *Id.* at ¶ 6J. As for Defendant Selsky, Plaintiff claims that because he affirmed the appeals of both Disciplinary Hearing Dispositions, he shares responsibility for whatever constitutional rights were affronted. *Id.* at ¶ 6L.

[6] The factual allegations underlying Plaintiff's claims are fleshed out more fully in his Response in Opposition to the Defendants' Motion for Summary Judgment. In light of his *pro se* status, we utilize all of his submissions to present a complete discourse of his claims for relief. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 472 & 475 (2d Cir.2006) (noting that *pro se* submissions should be construed liberally and interpreted so as to raise the strongest arguments that they suggest") (internal quotation marks, alterations, and citations omitted).

### 2. Magistrate Judge's and District Judge's Decisions

On June 25, 2004, Defendants filed a Motion to Dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief may be granted. Dkt. No. 14. After Plaintiff submitted his Opposition to the Motion, Dkt. No. 16, this Court issued a Report–Recommendation and Order on March 23, 2005. Dkt. No. 19 (hereinafter "RRO"). Contained in that decision are the following recommendations:

1) **Eleventh Amendment:** All claims against the Defendants in their official capacity should be dismissed pursuant to the Eleventh Amendment (RRO at pp. 5–6);

**\*4** 2) **Exhaustion of Remedies:** Plaintiff properly exhausted his Fourteenth Amendment claims through his administrative appeals of the Disciplinary Hearings, however, he failed to exhaust his Fifth and Eighth Amendment claims, and it was unclear whether he exhausted his First Amendment claim (RRO at pp. 6–13). Despite the mixed exhaustion action, the Court opted to proceed to the merits of each claim;

3) **Fifth Amendment:** Plaintiff's Fifth Amendment claims are not cognizable and should be dismissed (RRO at pp. 25–26);

4) **Eighth Amendment:** Plaintiff's allegations concerning the Eighth Amendment violations are conclusory and should be dismissed (RRO at pp. 26–28);

5) **Personal Involvement:** Defendant Selsky should be dismissed for lack of personal involvement (RRO at pp. 13–14);

6) **Fourteenth Amendment Due Process—Androsko June MR:**

a) The *Milburn* Consent Decree did not create a constitutional cause of action as a basis for § 1983 relief, and, in any event, it was only applicable to Green Haven Correctional Facility (RRO at p. 16);

b) Under New York Regulations, N.Y. COMP.CODE. R. & REGS., tit. 7 § 251–3.1(a) & (b), Nurse Androsko was permitted/directed to file a MR when appropriate (RRO at p. 16);

c) Plaintiff has no constitutional right to be free from being falsely accused absent an allegation of retaliation (RRO at p. 17);

d) Plaintiff does not allege any problem with the hearing procedure or the process received (RRO at p. 17);

e) Plaintiff's punishment of forty days in SHU fails to give rise to a liberty interest under *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (RRO at pp. 18–20; [7]

[7]
    As mentioned above, Plaintiff did not name Joseph Wolczyk as a Defendant, even though he presided over the Disciplinary Hearing concerning the June MR. *See supra* note 5. In any event, our recommendation of dismissal would have extended to any due process claim against Mr. Wolczyk given the absence of a liberty interest. *See infra* Part II.B.1.

Thus, it was recommended that Defendant Androsko be dismissed from the action; 7) **Fourteenth Amendment Due Process—Minerly Disciplinary Hearing:** Concerning the due process claims stemming from Porten's January MR, Plaintiff's punishment of 120 days in SHU, without more, did not give rise to a liberty interest under *Sandin,* thus the claims against Defendant Minerly should be dismissed (RRO at pp. 18–20);

8) **Retaliation:** The retaliation/substantive due process claim against Defendant Porten should survive because a colorable suspicion of retaliation is set forth in the Complaint (RRO at pp. 21–24); and

9) *Heck* **Rule:** Because both Disciplinary Proceedings resulted in sanctions that affect the duration of Plaintiff's confinement, *vis-a-vis* recommendations for loss of good time credits, Plaintiff's due process claims (both procedural and substantive) and First Amendment retaliation claim are barred by *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) and *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), thus, the only claim that would have survived the Motion, retaliation, should be dismissed on this basis (RRO at pp. 24–25).

Upon reviewing this Court's RRO, and the Plaintiff's Objections thereto, the Honorable Frederick J. Scullin, Jr., Senior United States District Judge, issued a Memorandum Decision and Order, dated August 30, 2005, dismissing the entire case. Dkt. No. 22 (hereinafter MDO). Within that Order, Judge Scullin noted the following:

**\*5** 1) **Eleventh Amendment:** With no specific objection from Plaintiff, the claims against Defendants in their official capacity are dismissed pursuant to the Eleventh Amendment (MDO at pp. 5–6)

2) **Exhaustion of Remedies:** With no specific objection from Plaintiff, claims of Eighth Amendment violations were not exhausted and are dismissed (MDO at p. 9);

3) **Fifth Amendment:** With no objection from Plaintiff, the Fifth Amendment claims are dismissed (MDO at pp. 6–7);

4) **Eighth Amendment:** With no objection from Plaintiff, and despite the ruling of failure to exhaust, the Eighth Amendment claims are dismissed (MDO at pp. 9–11);

5) *Heck* **Rule:** All due process and retaliation claims against all Defendants are barred by *Heck* and *Edwards,* thus the Court declines to consider the underlying merits of any of these claims (MDO at pp. 11–14).

Of particular importance, because Judge Scullin ruled that *Heck* and *Edwards* barred Plaintiff's due process and retaliation claims, he did not rule on this Court's recommendations regarding the merits of these claims.

Thereafter, a Judgment was entered in favor of Defendants and this case was closed. Dkt. No. 23.

### 3. Plaintiff's Appeal to the Second Circuit

Plaintiff subsequently appealed that MDO to the Second Circuit on September 26, 2005. Dkt. No. 24. During the pendency of McEachin's appeal of Judge Scullin's MDO, the Second Circuit issued its decision in *Peralta v. Vasquez,* 467 F.3d 98 (2d Cir.2006), which had direct implications for this case. The *Peralta* case concerned the situation, like ours, wherein an inmate attempts to challenge a disciplinary proceeding that resulted in mixed sanctions—those that affect the conditions of his confinement, such as a sentence of SHU confinement and/or loss of privileges, and those that affect the duration of his confinement, such as recommendations for loss of good time credit. *Peralta v. Vasquez,* 467 F.3d at 99–100. The inclusion of the latter sanction typically invoked *Heck's* "favorable termination rule," resulting in dismissal of the entire due process challenge.[8] The Second Circuit ruled that a prisoner who received mixed sanctions at a prison disciplinary hearing could proceed with a challenge to the sanctions, as long as the inmate agrees to waive for all time any challenge to the sanction affecting the length of his confinement. *Id.* at 104.

[8] The "favorable termination rule" set forth in *Heck v. Humphrey,* 512 U.S. 477, 486–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), directs that if a determination favorable to the plaintiff in a § 1983 action would "necessarily imply the invalidity of [the inmate's] conviction or sentence," there must first be a showing that the conviction or sentence had been reversed on direct appeal or declared invalid in order to recover damages for an allegedly unlawful conviction under § 1983. In *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), the Supreme Court stated that the "favorable termination rule" is applicable to challenges made under § 1983 to procedures used in disciplinary proceedings that deprived a prisoner of good time credits.

On May 31, 2007, in ruling on McEachin's appeal, the Second Circuit determined that McEachin had presented a "mixed sanction" claim, much like what was presented in *Peralta,* and therefore vacated the District Court's judgment dismissing his claims under *Heck* and *Edwards.* Upon remand, the District Court was directed to provide Plaintiff with the opportunity to waive all claims relating to sanctions affecting the duration of his confinement so that he may proceed with claims challenging the sanctions affecting the conditions of his confinement. Dkt. No. 30.[9] Because McEachin did not challenge any other ruling rendered by Judge Scullin, those portions were affirmed. *Id.*

[9] As an aside, the Court notes that McEachin's appeal had been dismissed by the Circuit on September 29, 2006, due to McEachin's failure to comply with the Second Circuit's Scheduling Order. Dkt. No. 28. In viewing the Second Circuit's docket report for the appeal, it appears that McEachin moved for reinstatement of his appeal, which was duly granted on November 17, 2006. *McEachin v. Selsky, et al.,* 06–PR–1230 (2d Cir.). The Circuit did not issue its Mandate regarding the remand order until August 13, 2007. *Id.* Thereafter, McEachin moved for a rehearing *en banc,* which was denied on May 7, 2008, and issued as a Mandate on July 16, 2008. *Id.; see also* Dkt. No. 43.

### 4. Remand to District Court

**\*6** In conformity with the Second Circuit Mandate, this Court issued an Order, dated September 26, 2007, advising Plaintiff of his opportunity to pursue his due process and retaliation claims if he was willing to forego any challenge to the sanctions affecting the duration of his confinement; such waiver was to be in writing. Dkt. No. 31. Eventually, after multiple extensions of time were provided, Plaintiff filed a letter, dated June 10, 2008, indicating his intention to waive any challenge to the sanction affecting the length of his confinement. Dkt. No. 40. Accordingly, Judge Scullin issued an Order dismissing Plaintiff's claims regarding the loss of his good time credits, and allowing Plaintiff to proceed with his retaliation claim and other challenges to those sanctions affecting the conditions of his confinement. Dkt. No. 41 at p. 3.

After answering the Complaint and engaging in discovery, the Defendants filed the Motion for Summary Judgment currently under review. Dkt. No. 51. In his Opposition to Defendants' Motion, in addition to defending his case on the merits, Plaintiff seems to attack the written waiver he previously submitted to the Court. *See* Dkt. No. 76 at p. 13, McEachin Aff., dated Oct. 23, 2009. Within his Affidavit, Plaintiff postulates that he was "force[d] into agreeing into an unlawful

waiver to waive any claim against [his] recommended loss of good behavior credit," and, further decries that as a felon, he is somehow precluded by the Uniform Commercial Code into entering into a contract. *Id.* at ¶¶ 1–2. We will not comment on the validity of Plaintiff's understanding regarding his capability to enter into a contract as it may or may not relate to his written waiver. What concerns us, however, is whether by his Affidavit, Plaintiff seeks to rescind his written waiver. Dkt. No. 40. To the extent that he is seeking recission, we recommend that the prior dismissal of all claims be reinstated and this action **dismissed.** *Peralta v. Vasquez,* 467 F.3d at 104. Notwithstanding, because it is unclear to this Court what Plaintiff intended by this Affidavit, and in light of his *pro se* status, we will consider the merits of his underlying claims.

## II. DISCUSSION

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*7** To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing [that there is] a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than

mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### B. Surviving Claims

After carefully reading both Judge Scullin's MDO and the Second Circuit's Remand Order, this Court concludes that the following claims were not reinstated via the Remand, and thus, remain dismissed: 1) official capacity claims against all Defendants; 2) Eighth Amendment claims; and 3) Fifth Amendment claims. Therefore, the only claims requiring our review are as follows: 1) due process claims against Defendant Androsko; 2) due process claims against Defendant Minerly; 2) due process and retaliation claims against Defendant Porten; and 4) supervisory liability claims against Defendant Selsky. We now consider each of these claims *seriatim.*

*1. Due Process Claims Against Defendant Androsko*

2010 WL 3259975

In our March 2005 RRO, prior to rendering a ruling on *Heck* and *Edwards,* we addressed Plaintiff's claims against Defendant Androsko on the merits. We reiterate that analysis herein.

**\*8** The Complaint alleges that Defendant Androsko, a nurse, did not have legal authorization to issue an MR against him. Compl. at ¶¶ 6(J)-(O) & 7. McEachin's underlying premise for why Androsko lacked proper authorization is purportedly found in Chapter XIV of the *Milburn* Consent Decree, dated August 1, 1991, which states, in part, "[i]n any case where disciplinary action is taken against an inmate for an interaction with a health care provider, the disciplinary report shall be written by security staff and not by the health care provider." *See* Levine Decl., Ex. B, *Milburn* Consent Decree, dated Aug. 1, 1991, at p. 24. McEachin's reliance upon the *Milburn* case is fatally flawed. *Milburn* was a class action brought in the Southern District of New York to address several grievances at Green Haven Correctional Facility. *Milburn v. Coughlin,* 79 Civ. 5077(RJW). From that litigation, a series of Consent Decrees were issued that govern the provision of health care services at Green Haven. However, the *Milburn* Consent Decree is not universal as McEachin presumes, but rather, is restricted solely to the health care services at Green Haven, and thus is inapplicable to this case since the circumstances giving rise to Plaintiff's claims occurred at Auburn. *Candelaria v. Coughlin,* 1994 WL 707004, at \*8 (S.D.N.Y. Dec.19, 1994) (ruling that the plaintiff did not have any rights under the Consent Decree because he had been moved out of Green Haven). More problematic for McEachin is the fact that the *Milburn* Consent Decrees do not create constitutional causes of action and thus do not provide a basis for a § 1983 claim for damages. *Id.* at \*7–8 (citing *Green v. McKaskle,* 788 F.2d 1116, 1123 (5th Cir.1986) & *DeGidio v. Pung,* 920 F.2d 525, 534 (8th Cir.1990) for the proposition that "[r]emedial court orders *per se* ... cannot serve as a substantive basis for a § 1983 claim for damages because such orders do not create rights, privileges, or immunities secured by the Constitution and laws") (internal citations omitted)). Since *Milburn* has a limited remedial effect as to health services at Green Haven, and has no implication for this case, we must turn next to the appropriate rules and regulations that govern which DOCS employees may file an MR.

The governing regulations are not merely permissive but, rather, mandatory in that "[e]very incident of inmate misbehavior ... must be reported, in writing, as soon as practicable. The misbehavior report shall be made *by*

*the employee who has observed the incident* or who has ascertained the facts of the incident." N.Y. COMP.CODE. R. & REGS., tit. 7 § 251–3.1(a) & (b) (emphasis added). Defendant Androsko, a DOCS employee, is not only permitted, but directed to file an MR when appropriate, even though she is not security staff.

Since Androsko has authority to register an MR against McEachin, we proceed to assess his due process claim. At the conclusion of the June Disciplinary Hearing, Plaintiff was sentenced to forty (40) days in SHU with corresponding loss of privileges. [10] We note that Plaintiff has not sued the Hearing Officer who presided over the Disciplinary Hearing regarding Androsko's June MR. *See supra* notes 5 & 7. Nevertheless, to the extent Plaintiff attempts to attribute due process violations to Defendant Androsko, he has many hurdles to overcome.

[10]    He further received a recommendation of sixty (60) days loss of good time credits, which is no longer at issue in this litigation.

**\*9** First and foremost, to state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). Inmates' liberty interests are derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.* With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners[,]' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)), and limited to freedom from restraint that "exceed[ ] the sentence in ... an unexpected manner[,]" *Sandin v. Conner,* 515 U.S. 472, 478, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In this case, Plaintiff has not described the environment in SHU or so heinous as to invoke the protections afforded by the Due Process Clause itself. We find that his confinement in SHU for forty (40) days, under normal SHU conditions, did not implicate any liberty interest derived directly from the Due Process clause. *See, e.g., Black v. Selsky,* 15 F.Supp.2d 311, 314 (W.D.N.Y.1998).

Turning to liberty interests created by the state, the Supreme Court states that such liberty interests shall be limited solely to those deprivations which subject a prisoner to "atypical and

significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. at 484; *see also Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citing *Sandin* ); *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999). In determining whether a confinement imposes an atypical and significant hardship, courts are directed to look at both the duration and conditions of the confinement. *Ortiz v. McBride,* 380 F.3d 649, 654–55 (2d Cir.2004) (citations omitted); *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citation omitted). With regard to duration, the Second Circuit cautions there is no bright line rule stating that a certain duration of confinement in SHU automatically implicates a liberty interest. *Palmer v. Richards,* 364 F.3d at 64; *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (citations omitted). Nevertheless, courts within the Second Circuit tend to rule, as a matter of law, that "disciplinary keeplock or SHU confinement to 60 days or less in New York prisons is not an atypical or significant hardship in relation to the ordinary incidents of prison life." *Edmonson v. Coughlin,* 1996 WL 622626, at \*4–5 (W.D.N.Y. Oct.4, 1996) (citing cases).

During his Deposition, Plaintiff was asked to expound upon the conditions he endured while serving his forty-day sentence in SHU. Levine Decl., Ex. A, Pl.'s Dep. at pp. 28–29. Plaintiff described nothing more than normal SHU conditions. *Id.* Though confined to his cell most of the day, he admitted he was provided meals, mail, legal materials, medical care, and recreation, though he claimed, without substantiation or specifics, that he was occasionally denied recreation time. *Id.* at pp. 30–32. It is expected that confinement in SHU will be accompanied by a loss of privileges that prisoners in the general population enjoy and such conditions fall "within the expected parameters of the sentence imposed by a court of law." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) (quoting *Sandin v. Connor,* 515 U.S. at 485 for the proposition that loss of commissary, recreation, package, and telephone privileges does not amount to an atypical and significant deprivation). Accordingly, we find that Plaintiff's forty-day confinement to SHU under normal SHU conditions did not implicate a state created liberty interest, thus no due process violation is assessed.

**\*10** With regard to Plaintiff's claim that the June MR was untrue, we note that the filing of a false MR by itself does not create a liberty interest as McEachin believes. Similarly, prisoners have no constitutional right to be free from false claims, so long as they are provided due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) (holding that prison

inmates do not have a "constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest[ ]"). Thus, as long as the prison officials provided the inmate with procedural due process requirements, *i.e.,* a hearing and an opportunity to be heard, "the filing of unfounded charges d[oes] not give rise to a *per se* constitutional violation actionable under section 1983." *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1988) (quoting *Freeman v. Rideout,* 808 F.2d at 953); *see also Wolff v. McDonnell,* 418 U.S. 539, 564–66, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). McEachin does not charge Androsko with authoring a false report as retaliation for his engagement in constitutionally protected activity. Nor, for that matter, does he claim that the Hearing itself was flawed. Nevertheless, based upon his allegation of falsity, we look to the process he received to ensure its adequacy.

The Supreme Court has set forth the Due Process requirements prisoners must be afforded in disciplinary hearings. *See Wolff v. McDonnell,* 418 U.S. at 564–66. In sum, prisoners must be afforded (1) advanced written notice of the charges against them at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, call witnesses, and present rebuttal evidence; and (3) a written statement as to the evidence relied upon and the reasons for the disciplinary action. *Id.; see also Freeman v. Rideout,* 808 F.2d at 953.

In our case, notwithstanding his conclusory allegations, it is clear that McEachin was provided all the process he was due in the form of advance written notice of the charges, help in preparing his defense, receipt of evidence requested, opportunity to be heard and present witnesses, and receipt of a written statement of the reasons for the conviction, which was affirmed on appeal. *See generally* Wolczyk Decl., Exs. A & B. Accordingly, McEachin's blanket claim of a false misbehavior report, in and of itself, does not state a cognizable claim that his due process rights were violated and it is clear that he was provided constitutionally adequate process during the June Hearing. In sum, we recommend that all claims against Defendant Androsko be **dismissed.**

### 2. Due Process Claims Against Defendant Minerly

In our March 2005 RRO, prior to rendering a ruling on *Heck* and *Edwards,* we addressed Plaintiff's claims against Defendant Minerly on the merits. We reiterate that analysis herein.

Following the January MR issued by Defendant Porten, Defendant Minerly conducted a Disciplinary Hearing wherein he found Plaintiff guilty of all charges and sentenced him to 120 days in SHU with corresponding loss of privileges. [11] Minerly Decl., Ex. A. Plaintiff accuses Minerly of being biased during the Hearing and violating his due process rights by finding him guilty of charges in the patently false and retaliatory MR authored by Defendant Porten.

[11]     Plaintiff also received a recommendation of 180 days loss of good time credits, which is no longer at issue in this litigation.

 *11  We incorporate the above standard regarding liberty interests and add the following to the discussion. In *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998), the Second Circuit ruled that in order to endure an atypical and significant hardship a court must measure the "extent to which the conditions of the disciplinary segregation differ from the other routine prison conditions" and the duration of the disciplinary segregation imposed." This is particularly true where the SHU confinement falls within an intermediate duration between 101 and 365 days. *Palmer v. Richards,* 364 F.3d at 64–65 (citing *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) for the proposition that any SHU confinement longer than an intermediate duration may be a sufficient departure from the ordinary incidents of prison life).

Nowhere within his Complaint, nor in other portions of the record, does McEachin assert that his conditions in SHU were outside the expected realm of ordinary incidents of prison life. *Sandin v. Conner,* 515 U.S. at 484–85. The loss of packages, commissary, and phone privileges are acceptable and normal SHU conditions and not considered unusual or unduly harsh. Yet, even if we were to find a liberty interest was implicated, it is clear that, like in his June Disciplinary Hearing, McEachin was afforded the minimum requirements of due process in that he received advanced written notice of the charges against him, aid in rendering a defense, opportunity to be heard, and a written disposition of the decision and basis for guilt determination. *Wolff v. McDonnell,* 418 U.S. at 556; *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001); Minerly Am. Decl., Exs. A & B. Therefore, as to Defendant Minerly, we recommend that any claim against him be **dismissed.**

*3. Retaliation Claims Against Defendant Porten*

Plaintiff claims that Defendant Porten issued him a false MR as retaliation for Plaintiff having submitted grievances over an altercation with prison staff that occurred six days prior to his alleged confrontation with Porten. In rendering our March 2005 RRO on the Defendants' Motion to dismiss, we noted that we were obligated to take the Plaintiff's allegations as true and assess whether his retaliation claim was plausible. Under that standard, we determined that the temporal proximity of the alleged constitutionally protected activity and the Porten MR gave a thin colorable suspicion of wrongdoing, thus entitling Plaintiff to some discovery on this issue. Now, at the summary judgment stage, we are able to look at the matter more globally to assess whether Plaintiff has interjected a material issue of fact, thus precluding summary judgment.

*a. Exhaustion of Retaliation Claim*

We start with an issue we left undecided in March 2005—whether Plaintiff properly exhausted his retaliation claim. In our March RRO, we stated the following standard with regard to exhaustion:

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that for actions brought by prisoners under 42 U.S.C. § 1983, the inmate must first exhaust his or her administrative remedies. The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Exhaustion is similarly required even if the prisoner asserts futility as an excuse. *See Booth v. Churner,* 531 U.S. 731, 741 n. 6 (2001) (refusing to "read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise") (cited in *Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001))....

 *12  In New York State, the administrative remedies consist of a three-step review process. First, a grievance is submitted to the Inmate Grievance Review Committee ("IGRC"), a committee comprised of both inmates and facility employees. [12] The IGRC reviews and investigates the formal complaints and then issues a written determination. Second, if the IGRC decision is appealed, the superintendent of the facility reviews the IGRC's determination and issues a decision. Finally, if the superintendent's decision is appealed, the Cental

Office Review Committee ("CORC") makes the final administrative determination. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7. Upon exhaustion of these three levels of review, a prisoner may seek relief pursuant to § 1983 in federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing *Sulton v. Greiner,* 2000 WL 1809284, at \*3 (S.D.N.Y. Dec.11, 2000)); *Petit v. Bender,* 2000 WL 303280, at \*2–3 (S.D.N.Y. Mar.22, 2000).

12    The IGRC is a five-member body consisting of two voting inmates, two voting staff members, and a non-voting chair (who may be an inmate, staff member of volunteer). N.Y. COMP.CODES R. & REGS tit. 7, § 701.4.

March RRO at pp. 6–7.

We then noted, *inter alia,* Plaintiff's diametrically opposing accounts of his exhaustion efforts with regard to his retaliation claim against Defendant Porten. On the one hand, Plaintiff claimed that his retaliation claim was not a grievable issue, which was juxtaposed against his alternate justification wherein he claimed that he complained to prison authorities by "fil[ing] an administrative appeal with Defendant Selsky ... and fil[ing] a Reconsideration to Defendant Selsky." RRO at pp. 8–9 (referencing Plaintiff's Complaint at ¶ ¶ 4(b)(ii) & 4(c)(i)). Some of the confusion was created by Plaintiff when he lumped his First Amendment claims with his Fourteenth Amendment due process claims in his Complaint. After disabusing McEachin of the fallacy of his understanding of grievable/non-grievable issues, we analyzed Plaintiff's second explanation of exhaustion through the administrative appeal process. *Id.* at pp. 9–10. At that time, without the full record to assess the viability of this claim, and giving Plaintiff the proper reasonable inferences, we found that a question of fact existed as to whether he properly exhausted his First Amendment claim. *Id.* at pp. 11–12.

Now, with a comprehensive record before us, it remains dubious whether Plaintiff actually exhausted his administrative remedies with regard to his retaliation claim. In support of summary judgment, Defendants submit a Declaration from Chris Lindquist, Assistant Director of Inmate Grievance Program of DOCS. Dkt. No. 58, Chris Lindquist Decl., dated May 12, 2009. Mr. Lindquist states he is one of the custodians of the records maintained by the Central Office Review Committee (CORC), and submitted a printout of CORC appeals filed by McEachin from Auburn in 2001. *Id.,* Ex. A. Amongst the listed appeals are two Grievances filed on January 5, 2001, the same date Defendant

Porten authored the January MR; the Grievances are as follows: 1) AUB–34251–01, Denied Proper Amount of Food; and 2) AUB–34253–01, Assaulted at Strip Frisk. *Id.* Because we do not have the actual Grievances, we do not know whether Plaintiff included his retaliation allegations therein, though it appears at least from the title of the Grievances that retaliation is not the major complaint listed therein. While Plaintiff continues to maintain that he submitted grievances on this issue, he failed to produce any copies of any such grievance, or, for that matter, copies of his Hearing Appeals so we could assess whether he included the complaints therein. One thing we have before us is the transcript from the January Hearing, and, pointedly, at no point during that Hearing does Plaintiff allege retaliatory animus on Porten's part. In fact, the only thing McEachin attacks during the Hearing is whether the "incident time" on the MR is accurate. *See* Minerly Decl., Ex. B. Based upon the record before us, coupled with Plaintiff's conflicting explanations and lack of evidence to create an issue of material fact, we find that McEachin has not properly exhausted his First Amendment retaliation claim and it should be **dismissed** for that reason.

 **\*13**  In the alternative, as explained below, we find that Plaintiff's retaliation claim should be dismissed on the merits.

*b. Merits of Retaliation Claim*

It is well settled, as noted above, that prisoners have no constitutional right to be free from being falsely accused. *Freeman v. Rideout,* 808 F.2d at 951. As long as prison officials provided the inmate with procedural due process requirements, *i.e.,* a hearing and an opportunity to be heard, "the filing of unfounded charges d[oes] not give rise to a *per se* constitutional violation actionable under section 1983." *Franco v. Kelly,* 854 F.2d at 587 (quoting *Freeman v. Rideout,* 808 F.2d at 953); *see also Wolff v. McDonnell,* 418 U.S. at 564–66).

We have already assessed that Plaintiff received all the process due in conjunction with the January MR. Notably, however, there are substantive due process rights, rather than procedural, which cannot be obstructed "even if undertaken with a full panoply of procedural protections," such as the right of access to courts or to be free from retaliation for exercising a constitutional right. *See Franco v. Kelly,* 854 F.2d at 589 (citation omitted). Thus, if a prisoner alleges false disciplinary reports were filed against him in retaliation for exercising a valid constitutional right, the prisoner's claim

may survive a dispositive motion by properly alleging his substantive due process rights were violated. *See id . at 590.*

The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d at 589–90. To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002), *abrogated on other grounds by Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)); *see also Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002) (alleging false disciplinary report).

No evidence has been submitted in this case regarding the protected conduct Plaintiff alleges to have engaged in, thereby provoking the purported retaliatory wrath of Defendant Porten. To ensure a complete record, the Court takes judicial notice of documents submitted in Plaintiff's civil rights case regarding the December 30th altercation. [13] *See McEachin v. Goord, et al.,* Civ. No. 9:01–CV–259 (LES/GJD). These documents were submitted by Assistant Attorney General Maria Moran in support of the defendants' motion for summary judgment and were relied upon by all parties and the District Judge. *Id.,* Dkt. No. 30, Maria Moran Affirm., dated July 15, 2002 (with exhibits attached, but separately filed as Dkt. No. 32). Of specific relevance to our case is McEachin's inmate grievance, dated January 3, 2001, which was stamped "received" on January 5, 2001. *Id.,* Ex. C. The grievance contains the number "34253–01" and relays an altercation between Plaintiff and COs during a strip frisk on December 30, 2000. *Id.* Incidentally, this grievance is also listed on the printout provided to the undersigned by Mr. Lindquist as Grievance Number AUB–34253–01, filed on January 5, 2001, entitled "Assault at Strip Frisk." Dkt. No. 58–1, Lindquist Decl., Ex. A. Further substantiation is found in the companion case with the "Use of Force Report" and "Misbehavior Report" generated after the December 30th incident. *McEachin v. Goord, et al.,* Civ. No. 9:01–CV–259, Moran Affirm., Exs. A & B.

13    *Federal Rule of Evidence 201(b)* provides that "a judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Furthermore, a court may take judicial notice on its own initiative at any stage of the proceeding. FED.R.EVID. 201(c) & (f). The documents filed in a court satisfy prong two, and therefore can be considered by this Court in considering the Motion for Summary Judgment. *See Sea Tow Servs. Int'l, Inc. v. Pontin,* 607 F.Supp.2d 378, 384 n. 10 (E.D.N.Y.2009) (citing cases); *Desclafani v. Pave–Mark Corp.,* 2008 WL 3914881, at *5 n. 7 (S.D.N.Y. Aug.22, 2008) (citing cases). Furthermore, these records to which we take judicial notice are prison records which fall into the business records exception to the hearsay rule, found in Federal Rule of Evidence 803(6), since they are "kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation." Indeed, all parties and the District Judge relied upon the documents submitted by Assistant Attorney General Maria Moran in that case, which ultimately went to trial. These same exhibits were admitted at the trial as well. *See McEachin v. Goord, et al.,* Civ. No. 9:01–CV–259 (LES/GJD) Dkt. Nos. 75–1, Defs.' List of Exs., & 101, Ct.'s List of Exs. returned to Defs.

**\*14** In light of this judicially noticed information, we may for the moment concede that Plaintiff engaged in constitutionally protected conduct and satisfies the first prong of his retaliation claim. *See United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) (noting that the right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights"); *Franco v. Kelly,* 854 F.2d at 589 (holding that, within the prison context, "inmates must be permit[ted] free and uninhibited access ... to both administrative and judicial forums for the purpose of seeking redress of grievances against state officers.") (internal quotation marks and citation omitted). And, we can easily find that the issuance of the MR is an adverse action since it is "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights[.]" *Davis v. Goord,*

2010 WL 3259975

320 F.3d 346, 353 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d at 493). Thus satisfying the second prong of the retaliation claim. But our analysis does not end there, for Plaintiff must satisfy the third prong by linking the adverse action to the protected activity.

To satisfy the third prong, a prisoner must present evidence that the defendant acted with an improper motive. Such evidence includes: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) plaintiff's prior good disciplinary record; (3) plaintiff's vindication at his disciplinary hearing; and (4) defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin,* 58 F.3d 865, 872–73 (2d Cir.1995). A plaintiff may meet this burden by presenting circumstantial evidence of a retaliatory motive, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d 133, 139 (2d Cir.2003). Furthermore, in satisfying the causal connection requirement, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Dawes v. Walker,* 239 F.3d at 492 (internal quotation marks and citations omitted) (cited in *Davis v. Goord,* 320 F.3d at 353).

The plaintiff bears the initial burden in showing that the defendant's actions were improperly motivated. In situations where the defendant's actions are the result of both retaliatory and legitimate reasons, the burden shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citing, *inter alia, Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (cited in *Carpio v. Walker,* 1997 WL 642543, at \*6 (N.D.N.Y. Oct.15,1997)). The Second Circuit has noted that retaliation claims are prone to abuse, therefore courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d at 872 (citation omitted); *Dawes v. Walker,* 239 F.3d at 491 ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." (citation omitted)); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

**\*15** As noted above, Plaintiff proffers that the January MR was false and retaliatory. During the Hearing, he only attacked the time indicated on the MR. In this litigation, through his Complaint, during his Deposition, and in his Opposition papers, Plaintiff expounds upon his theory of

retaliation and asserts he was not present in his cell during the time stated in the MR, thus, it is clearly false and could only have been issued for retaliatory purposes. *See* Compl. at ¶¶ 6A, B, & F; Levine Decl., Ex. A, Pl.'s Dep. at pp. 13 & 18–19; Dkt. No. 76 at pp. 2, 6, & 8. Plaintiff is correct in stating he was not in his cell at 2:00 p.m. on January 5, 2001, the time the MR was written. In fact, from judicially noticed evidence, it is clear that Plaintiff was attending a disciplinary hearing in conjunction with the December 30th incident. *See McEachin v. Goord,* Civ. No. 9:01–CV–259, Dkt. No. 32, Exs. D & E (records from Plaintiff's Tier III Disciplinary Hearing certifying his attendance at the hearing, which commenced on January 5, 2001, at 1:49 p.m.). Indeed, the Porten Decl. corroborates Plaintiff's absence at the two o'clock hour. Porten Decl., Ex. A ("Later at approximately 2:00 pm ... I noticed [McEachin's] cell was open and the blanket still on the floor."). Clearly, Plaintiff was absent from his "open" SHU cell at that time. Plaintiff, however, does not claim he was absent during the other times identified in the MR, like the altercation allegedly occurring at 9:00 a.m., and soon thereafter. *Id.* From the documents submitted to the Court, including a redacted copy of the log book, it is clear that McEachin had a brief call-out in the morning for an x-ray at 8:25 a.m. and returned at 8:45 a.m., just in time for the 9:00 a.m. altercation. Minerly Am. Decl., Ex. B. Furthermore, Defendant Porten declares under penalty of perjury that the MR was based upon his "observed conduct" of Plaintiff and without retaliatory animus. He also avers to have been unaware of the December 30th altercation and the related grievance. And, further dwindling Plaintiff's ability to connect his protected activity with the adverse MR is the fact that the grievance at issue was submitted by Plaintiff on the very same date the MR was written, making it unlikely that Porten would have been aware of it when he simultaneously wrote his MR.

Based on the above analysis, we find that Plaintiff has not raised sufficient material facts with regard to the causal connection between his protected activity and the adverse action taken against him. Thus, his retaliation claim against Defendant Porten should be **dismissed** on this basis as well.

### *4. Supervisory Liability of Defendant Selsky*

Plaintiff seeks to hold Defendant Selsky liable solely for his role in affirming the appeals of his Disciplinary Hearings.

2010 WL 3259975

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), and furthermore, the doctrine of respondeat superior is inapplicable to § 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (citing *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *see also Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987) ("[I]t is well settled that to state a civil rights claim under § 1983, a complaint must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983") (citations omitted).

 **\*16** The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted). Pointedly, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)); *see also Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (defendant may not be held liable simply because he holds a high position of authority).

Because, as explained fully above, no constitutional violations befell Plaintiff, there can be no supervisory liability

assessed against Defendant Selsky. Thus, any claim against Selsky should be **dismissed.**

## III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that, to the extent Plaintiff rescinds his explicit, written waiver of his challenge to the sanctions affecting the duration of his confinement (Dkt. No. 40), the prior dismissal of all claims should be reinstated and the entire Complaint **dismissed;** and it is further

**RECOMMENDED,** in the alternative, after reviewing the merits of the underlying claims, the Defendants' Motion for Summary Judgment (Dkt. No. 51) should be **granted** and the entire Complaint be **dismissed;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

## All Citations

Not Reported in F.Supp.2d, 2010 WL 3259975

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 5394752
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ronnie COLE, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, et al., Defendants.

Civil Action No. 9:14-CV-0539 (BKS/DEP)
|
Signed 08/25/2016

**West Codenotes**

**Recognized as Unconstitutional**

N.Y. Correct. Law § 24

**Attorneys and Law Firms**

FOR PLAINTIFF: RONNIE COLE, Pro Se, 91-A-9212, Five
Points Correctional Facility, Caller Box 119, Romulus, NY
14541.

FOR DEFENDANTS: HON. ERIC T. SCHNEIDERMAN,
New York State Attorney General, 615 Erie Boulevard West,
Suite 102, OF COUNSEL: KEVIN M. HAYDEN, ESQ., Ass't
Attorney General, Syracuse, NY 13204-2465.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

**\*1** *Pro se* plaintiff Ronnie Cole has commenced this action
asserting civil rights claims arising out of his confinement in
the custody of the New York State Department of Corrections
and Community Supervision ("DOCCS") pursuant to 42
U.S.C. § 1983. Plaintiff's claims, which are multi-faceted,
arise out of events occurring at two separate DOCCS
facilities.

Currently pending before the court is a motion filed by
defendants requesting the entry of summary judgment
dismissing plaintiff's claims on a variety of grounds. For the
reasons set forth below, I recommend that defendants' motion
for summary judgment be granted in part, but otherwise
denied.

I. BACKGROUND [1]

[1]     The record herein contains few undisputed facts.
        Plaintiff and defendants disagree on many of
        the events that transpired and provide conflicting
        accounts of the circumstances surrounding the
        relevant incidents. In light of the procedural posture
        of the case, the following recitation is derived
        from the record now before the court, with all
        inferences drawn and ambiguities resolved in the
        plaintiff's party's favor. *Terry v. Ashcroft*, 336
        F.3d 128, 137 (2d Cir. 2003). To the extent
        that plaintiff's deposition testimony is at odds
        with his memorandum of law or submissions in
        his statement of facts, the court will follow the
        rule that "a party may not create an issue of
        fact by submitting an affidavit in opposition to
        a summary judgment motion that, by omission
        or addition, contradicts the affiant's previous
        deposition testimony." *Raskin v. Wyatt Co.*, 125
        F.3d 55, 63 (2d Cir. 1997).

Plaintiff is a prison inmate currently being held in the
custody of the DOCCS at the Five Points Correctional
Facility ("Five Points"). Dkt. No. 54-1 at 1. [2] Plaintiff is
serving a sentence for robbery, possession of stolen property,
criminal possession of a weapon, and promoting prison
contraband. Dkt. No. 45-15 at 1. Plaintiff's claims, however,
arise out of his previous confinement at the Walsh Regional
Medical Unit ("Walsh") and the Upstate Correctional Facility
("Upstate"). [3] *Id.* at 2.

[2]     Citations to page numbers refer to the pagination
        generated by CM/ECF, not the page numbers
        generated by the parties.

[3]     Upstate is a maximum security prison comprised
        exclusively of special housing unit ("SHU") cells
        in which inmates are confined for twenty-three
        hours each day, primarily for disciplinary reasons.
        *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL
        31040370, at \*4 n.11 (S.D.N.Y. Sept. 12, 2002).

A. Use of Force Incidents at Walsh
On October 29, 2013, defendant Corrections Officer Anthony
M. Durante entered plaintiff's room to conduct a strip frisk
of plaintiff and a search of his area. Dkt. No. 29-1 at 15. [4]
At the time, plaintiff was in his pajamas and seated in his
wheelchair. Dkt. No. 45-3 at 27. Plaintiff maintains that

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 214 of 353

defendant Sergeant John A. Wagner followed Durante into plaintiff's room in the E-Wing and blocked the door. [5] *Id.* Plaintiff asserts that he attempted to comply with Durante's orders and began to unbutton his shirt. *Id.* at 29. Plaintiff claims that Durante said "Happy Anniversary," and struck plaintiff on the right side of his face. *Id.* at 30, 32. Plaintiff maintains that defendant Stephen M. LoRusso entered the room and joined defendants Durante and Wagner as they repeatedly hit, kicked, and punched plaintiff in the head, face, and neck. Dkt. No. 45-3 at 38-56. Defendants Durante and LoRusso then pulled plaintiff out of his wheelchair, lifted him overhead, and "slammed" him into the floor causing plaintiff to land on his abdomen. *Id.* at 52-56. As a result, plaintiff's urine bag broke. *Id.* at 53. Plaintiff asserts that restraints were applied and the assault terminated when the medical staff and other officers entered the room. Dkt. No. 45-3 at 57-59.

[4]     The record does not contain an affidavit authenticating or supporting the admissibility of the records annexed to plaintiff's amended complaint. Regardless, the court considers these records because defendants rely upon the records in support of their motion for summary judgment. *See Goris v. Breslin,* 2010 WL 376626, at *10, n.1 (E.D.N.Y. Jan. 26, 2010) (collecting cases).

[5]     Wagner claims that he was supervising the "suspicion search" that was ordered based upon information obtained by defendant Lieutenant Raymond Judway from a confidential informant. Dkt. No. 29-1 at 16.

**\*2** Defendant Durante, by contrast, has executed a sworn affidavit in which he denies having assaulted the plaintiff. [6] *See* Durante Aff. (Dkt. No. 45-14) ¶3. Durante claims that plaintiff became agitated during the search and began swinging his closed fists at Durante. *Id.* Plaintiff struck Durante on the right side of his head and Durante responded by pushing the plaintiff. *Id.* ¶1, 3. As a result, plaintiff fell backwards into a locker. *Id.* Durante avers that a violent struggle ensued during which plaintiff bit him and grabbed his testicles. *Id.* ¶4. Plaintiff was ultimately subdued, and defendants Wagner and LoRusso placed him in mechanical restraints. Dkt. No. 45-14 ¶4; Dkt. No. 29-1 at 16.

[6]     That affidavit, which is included with defendants' motion, was given by defendant Durante in connection with a matter brought by the plaintiff in the New York Court of Claims.

Plaintiff also alleges that on or around December 16, 2013, he was assaulted in a room in the A-Wing at Walsh. Dkt. No. 45-3 at 125-26. Plaintiff claims that three officers "waterboarded" him while defendant Lieutenant Timothy Michaels was present. [7] *Id.* at 126.

[7]     Plaintiff's amended complaint neither names the three officers nor asserts a claim against them.

B. Facts Related to Plaintiff's Medical Treatment at Walsh [8]

[8]     In their motion, defendants offer a sworn affidavit from Nurse Administrator Kelly Rabideau, as well as certified copies of medical records submitted under seal. Dkt. No. 45-10; Dkt. No. 46. Defendants also offer a video recording that allegedly contains relevant facts. Dkt. No. 48. The video is certified, and plaintiff does not challenge its object to the authenticity. Dkt. No. 45-6.

On October 29, 2013, shortly after the use of force incident, plaintiff attempted to hang himself. Dkt. No. 45-15 at 3; Dkt. No. 54-1 at 4. He was examined by defendant Nurse Priscilla Peterson, who noted observing a swollen and reddened area over plaintiff's left eyebrow, neck, and left ankle. Dkt. No. 46 at 3. Plaintiff was thereafter placed on suicide watch. Dkt. No. 45-3 at 71; Dkt. No. 46 at 5; Dkt. No. 54-1 at 5. While plaintiff was on a "one-on-one" suicide watch, his behavior was documented every ten minutes. Dkt. No. 46 at 5-11.

On November 1, 2013, defendant Deputy Superintendent Amy A. Tousignant issued a property deprivation order depriving plaintiff of "all property." Dkt. No. 45-9 at 30-34. Tousignant noted that plaintiff refused to follow directions, and thus posed a threat to the safety and security of staff. Dkt. No. 45-9 at 30. The order remained in effect until November 14, 2013. Id. at 34.

It is at this point that the parties' versions of the relevant events again diverge. Defendants maintain that while on watch, plaintiff received a mattress, a clean urine bag, and was able to shower. Dkt. No. 54-1 at 5. Defendants claim that plaintiff refused to accept meals, medication, blood work, and lab tests. Id. at 5-11. Conversely, plaintiff maintains that when he returned to his room, it was equipped with only a mat, and the toilet was padlocked. Dkt. No. 45-3 at 74, 85. Plaintiff alleges that defendants refused to provide him with meals, a urine bag, or medication. Id. at 74-85. Plaintiff maintains that

2016 WL 5394752

he was not informed that any blood work or lab tests were necessary. Dkt. No. 54-1 at 7.

On October 31, 2013, plaintiff was examined by defendant Dr. Raja Mara for complaints of pain in his left eye. Dkt. No. 46 at 1. Dr. Mara's findings were benign for a left eye injury. *Id.* Plaintiff took his prescribed medications on that date and the following day, spoke with personnel from the Office of Mental Health, and was removed from the watch. [9] Dkt. No. 46 at 10; Dkt. No. 54-1 at 8-9.

[9]     The record does not indicate what prescribed medications were administered.

**\*3** The parties offer conflicting accounts of plaintiff's subsequent medical treatment. Defendants claim that Dr. Mara examined plaintiff on November 5, 2013, and that Cole reported that his left eye was "good." Dkt. No. 46 at 1. Defendants allege that a physical therapist attempted to examine plaintiff on November 18, 2013, but plaintiff refused to comply and demanded a wheelchair. Dkt. No. 46 at 107. Defendants further contend that plaintiff refused to attend an audiology consultative appointment and refused to allow defendant Nurse Rebecca Dutch to conduct an annual physical examination. Dkt. No. 46 at 26, 104.

Plaintiff counters by claiming that Dr. Mara did not examine him on November 5, 2013, and that he was not informed that he had an appointment with an audiologist or Nurse Dutch. Dkt. No. 54-1 at 9. Plaintiff also claims that he did not attend any examination by a physical therapist on November 18, 2013. Dkt. No. 54-1 at 9-10.

On December 17, 2013, plaintiff was examined by an audiologist based upon a referral from Dr. Mara and defendant Facility Health Service Director Yogendra Sharma. Dkt. No. 45-15 at 11; Dkt. No. 46 at 106; Dkt. No. 54-1 at 22. The audiologist reported that plaintiff had bi-lateral hearing aids and that plaintiff's left hearing aid was cracked and needed to be sent for repair. Dkt. No. 46 at 106. The estimated cost for the repair was $189.00. *Id.* Plaintiff was told that he was responsible for the cost of the repair, but refused to pay. *Id.* The left hearing aid was relinquished to the medical staff at Walsh. *Id.*

C. Facts Related to Medical Treatment at Upstate
Plaintiff was transferred, with a wheelchair, to Upstate on December 19, 2013. Dkt. No. 54-1 at 11. Upon arrival, plaintiff was evaluated by a nurse who noted that he presented

with a history that included urethral stricture, a MRSA infection, anti-social behavior, neuropathy, and "TB." Dkt. No. 46 at 99. Defendants contend that plaintiff told staff to "get the [expletive] away from me" while "swinging his urine bag around, picking at his wounds, and pulling at his catheter and dressings." Dkt. No. 46 at 90. Plaintiff was placed on a "watch" to be monitored for self-harm. Dkt. No. 46 at 90; Dkt. No. 54-1 at 12. Defendants assert that while plaintiff was on a "one on one" watch, he refused to accept meals or medication, show his wounds to staff, or have his dressings changed. Dkt. No. 46 at 90, 91.

Plaintiff maintains that he was physically unable to pull at his catheter because he was in full restraints with waist chains and leg irons. Dkt. No. 54-1 at 12. Plaintiff claims that he did not threaten self-harm and disputes the assertions that he refused to comply with medical staff directives. Dkt. No. 54-1 at 12-13. Plaintiff asserts that defendants confiscated his wheelchair and provided an inadequate replacement. Dkt. No. 45-3 at 136-141. Plaintiff also claims that he was denied showers and meals from December 20, 2013 through December 24, 2013. Dkt. No. 45-3 at 146; Dkt. No. 54-1 at 14.

On December 24, 2013, plaintiff was transferred from the Upstate infirmary to a cell, via wheelchair. Dkt. No. 46 at 97. A sick call response was prepared, directing that: (1) medications would be issued three times daily; (2) Ensure would be issued four time each day; (3) the catheter would be changed monthly; and (4) dressing supplies would be provided on a daily basis. *Id.* at 98. A medical permit was also issued for the plaintiff providing for (1) a single cell, bottom bunk; (2) braces for plaintiff's right and left leg; (3) bilateral hearing aids; (4) gauze; (5) a catheter and drainage bag, (6) jock strap; and (7) dentures. *Id.* at 14.

1. Medications and Supplies
**\*4** From December 30, 2013 through April 4, 2014, plaintiff received replacement batteries for his hearing aid. Dkt. No. 46 at 32, 37, 95; Dkt. No. 54-1 at 22. Plaintiff also received urine bags (with straps), [10] knee sleeves, a jock strap, dressing supplies, gauze, tubular dressings for his arms, Bacitracin, Clobetasol ointment, and a back brace. Dkt. No. 46 at 13, 28, 33, 34, 38, 39, 40, 42, 43, 53, 62, 67, 71. A medical permit was issued allowing plaintiff to use his wheelchair and occupy a handicapped cell. Dkt. No. 46 at 13, 67. Plaintiff was additionally prescribed various medications, including Zantac (used to treat ulcers), Oxybutynin (used to treat overactive bladder), vitamin-C, a multi-vitamin, Celexa

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 216 of 353

2016 WL 5394752

(an anti-depressant), Ativan (used to treat anxiety), Prilosec, Omeprazole, Ranitidine (used to treat ulcers), Flunisolide spray, Hydroxyzine (used to treat anxiety), Diphenhydramine (an antihistamine), and Ensure formula. Dkt. No. 46 at 35, 42, 51, 59, 64, 94-95. Plaintiff also received 25 mg of Atarax, prescribed to treat his skin disorder. *Id.* at 64, 69.

10    On February 25, 2014, plaintiff refused to accept a new urine bag and dressing and demanded an "extender" for the bag. Dkt. No. 46 at 37. The technician advised the plaintiff that "no such thing" exists. *Id.*

From January 1, 2014 through April 4, 2014, plaintiff repeatedly refused to accept his dressing supplies, meals, and medications. Dkt. No. 46 at 35, 41, 47, 49, 55-56, 67, 71, 123-130, 132, 133, 134, 136, 139, 140, 142-147, 153-156, 158, 159, 161; Dkt. No. 54-1 at 23. Plaintiff's prescriptions for medications and Ensure formula were discontinued due to non-compliance. Dkt. No. 46 at 34, 43, 45, 46.

### 2. Examinations and Consultations

On January 2, 2014, plaintiff was examined by Defendant Dr. G. Schroyer, and was diagnosed with neurodermatitis. Dkt. No. 46 at 68, 70. Dr. Schroyer prescribed two rolls of cling wrap for each extremity and a tubular retainer. *Id.* Dr. Schroyer also examined plaintiff's scrotum and noted that it was "intact with [a] thin layer of skin." *Id.* at 68. Plaintiff was directed to apply ointment daily and use a jock strap, "to be changed as needed." *Id.* Dr. Schroyer also ordered plaintiff's catheter to be changed monthly. Dkt. No. 46 at 68. Defendants contend that plaintiff refused all medications and dressings. Dkt. No. 45-15 at 12. Plaintiff claims that he did not receive the supplies or medications. Dkt. No. 54-1 at 23-24.

On January 6, 2014, plaintiff was transported to the nurses' office for a catheter change. Dkt. No. 46 at 62. When plaintiff saw the catheter that the nurse intended to use, he stated, "I can't use that kind, it'll give me an infection." *Id.* The nurse called the pharmacy technician to request a clear catheter, and was advised that one would need to be located. *Id.* Plaintiff refused the catheter change and said he would wait for a new one to arrive. *Id.* The nurse told plaintiff to apply ointment to the area under his scrotum. Dkt. No. 46 at 62. The notations in plaintiff's records indicate that two packets of ointment were issued, although plaintiff claims that he never received the ointment. Dkt. No. 46 at 62; Dkt. No. 54-1 at 27.

Plaintiff was scheduled for physical therapy consultations on January 8, 2014 and February 10, 2014. Dkt. No. 46 at 103, 108. The therapist noted, however, that plaintiff refused to attend on those dates. *Id.* Plaintiff claims that security issues prevented his attendance. Dkt. No. 54-1 at 29. On March 24, 2014 and April 43, 2014, plaintiff refused to attend physical therapy sessions. Dkt. No. 46 at 31, 73.

On January 14, 2014, plaintiff submitted a request for a reasonable accommodation. Dkt. No. 46 at 12. In it he asked for a wheelchair that "fits" with a cushioned seat and a shower chair. *Id.* On January 23, 2014, Dr. Schroyer denied plaintiff's request for a new wheelchair, noting that "current wheelchair meets pts needs." *Id.* at 12.

**\*5** On January 17, 2014, plaintiff was treated by a nurse for complaints of swelling in his left leg. Dkt. No. 46 at 53. The nurse did not detect any swelling, but observed very dry skin with open areas and "scant bloody drainage." *Id.* Plaintiff received cream for use on his arm and legs and was advised to treat the open areas with Bacitracin. *Id.*

Defendant Nurse Practitioner Mary Kowalachuk ("Kowalachuk") diagnosed plaintiff on February 4, 2014, with atopic dermatitis. Dkt. No. 46 at 42. On March 4, 2014, Kowalachuk attempted to change plaintiff's catheter. *Id.* at 34. While plaintiff was advised that he must be on the examination table for the nurse to perform the procedure, he refused to stand from his wheelchair. *Id.*

Defendant Facility Health Service Director V. Mandalaywala sent plaintiff to Alice Hyde Medical Center on March 22, 2014, after plaintiff accidentally pulled out his catheter while attempting to transfer from his wheelchair to the shower. Dkt. No. 46 at 76-84. Plaintiff was transported to the hospital for a procedure to reinsert his catheter. *Id.* at 32, 76-84. The procedure was successful and plaintiff returned to Upstate. *Id.*

On April 7, 2014, plaintiff was transferred to Five Points. Dkt. No. 46 at 30.

### D. Disciplinary Hearings

On November 1, 2013, plaintiff was issued a misbehavior report charging him with assault on staff, engaging in violent conduct, refusing a direct order, and failure to comply with a frisk search. Dkt. No. 29 at 14. A Tier III hearing was commenced on November 4, 2013 with defendant Captain Joseph Corey presiding, to address these charges. [11] Dkt. No.

45-9 at 40. On November 15, 2013, plaintiff was removed from the hearing allegedly due to disruptive conduct. Dkt. No. 29-1 at 31. Plaintiff was ultimately found guilty of all charges. [12] *Id.* at 41-42. Cole was sentenced on November 20, 2013, to serve eighteen months of disciplinary confinement in the facility's special housing unit ("SHU"), with a loss of privileges, and a recommended loss of good time credits. *Id.* at 40.

[11]   The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

[12]   Plaintiff disputes the assertion that he was disruptive or that he pled guilty to the violent conduct charge, as defendants maintain.

Plaintiff appealed the disciplinary determination on November 20, 2013. *Id.* at 27-32. Defendant Director of Special Housing Albert Prack modified plaintiff's sentence on January 14, 2014. Dkt. No. 29-1 at 44. On February 11, 2014, Prisoners' Legal Services of New York forwarded correspondence to defendant Prack, on plaintiff's behalf, requesting reconsideration of the modification. Dkt. No. 29-1 at 46. Defendant Prack later reviewed and administratively reversed defendant Corey's decision on March 4, 2014. *Id.* at 59. Plaintiff was advised that a complete rehearing would commence "within 14 days of receipt of [that] notice." Dkt. No. 29-1 at 59.

**\*6** On March 20, 2014, defendant Hearing Officer Steven Bullis conducted a rehearing with respect to plaintiff's misbehavior report. Dkt. No. 29 ¶78. At the conclusion of that hearing plaintiff was found guilty of all charges. *Id.* Prack reversed Bullis' findings on June 2, 2014, noting that, "[t]he circumstances surrounding the incident required the hearing officer to get a mental health assessment." Dkt. No. 45-13 at 10.

As a result of the misbehavior report and two hearings, plaintiff remained in disciplinary SHU confinement for a total of 170 days. Dkt. No. 29 ¶28.

II. PROCEDURAL HISTORY

Plaintiff commenced this action with the filing of a complaint, accompanied by an application for leave to proceed in forma pauperis ("IFP"), on May 8, 2014. Dkt. Nos. 1, 2. Following an initial review of the complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A, District Judge Mae A. D'Agostino issued an order granting plaintiff's IFP application and approving the filing of his complaint subject to dismissal of claims that arose under the Americans With Disabilities Act, as amended ("ADA"), 42 U.S.C. § 12,101 *et seq.*, and claims for money damages pursuant to 42 U.S.C. § 1983 against the DOCCS and the defendants in their official capacities. *See generally* Dkt. No. 5. On June 16, 2015, the court granted plaintiff's subsequent motion to amend his complaint to assert section 1983 claims against the defendants in their individual capacities and an ADA claim against the DOCCS. *See generally* Dkt. No. 28.

On November 13, 2015, following the close of discovery, defendants moved for the entry of summary judgment seeking dismissal of the complaint on multiple grounds, including (1) failure to exhaust administrative remedies with respect to Eighth Amendment claims against defendants LoRusso and Michaels; (2) the absence of any evidence from which a reasonable factfinder could conclude that plaintiff sustained anything other than *de minimis* injuries as a result of the October 29, 2013 incident; (3) the lack of record evidence to give rise to a genuine dispute of material fact regarding whether defendants were deliberately indifferent to plaintiff's serious medical needs; (4) plaintiff's failure to demonstrate either the deprivation of a protected liberty interest or procedural due process associated with any such deprivation; (5) the lack of record evidence to give rise to a genuine dispute of material fact regarding whether defendants retaliated against plaintiff in violation of his First Amendment constitutional rights; (6) the lack of personal involvement of the supervisory defendants; (7) the failure to state a cause of action under the ADA; and (8) qualified immunity. Dkt. No. 45. Plaintiff filed his response in opposition to the motion on December 28, 2015. Dkt. No. 54. Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3( c). *See* Fed. R. Civ. P. 72(b).

2016 WL 5394752

## III. DISCUSSION

### A. Legal Standard Governing Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**\*7** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Exhaustion of Administrative Remedies

As a procedural matter, defendants contend that plaintiff is precluded from judicial pursuit of his Eighth Amendment claims against defendants LoRusso and Michaels based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a). Dkt. No. 45-16 at 16-18.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley*, No. 04-CV-4587, 2007 WL 389003, at \*5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). [13] This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[l[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock*, 549 U.S. 199, 204 (2007) (citations omitted); *see Woodford*, 548 U.S. at 91-92; *see also Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

[13] All unreported cases cited to in this decision have been appended to this report for the convenience of the *pro se* plaintiff.

The failure of a prisoner to satisfy the PLRA's exhaustion requirement gives rise to an affirmative defense that must be affirmatively raised by a defendant in response to an inmate suit. [14] *Jones*, 549 U.S. at 212. In the event the defendant establishes that the inmate plaintiff failed to "fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639063, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical

Case 9:17-cv-00366-DNH-TWD Document 93 Filed 03/08/21 Page 219 of 353

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

procedural rules." *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir. 2007).

14    Defendants have interposed an exhaustion defense in their answer. Dkt. No. 34 &18.

**\*8** New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCCS, which is recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir. 1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident. 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC, which makes the final administrative decision. §§ 701.4(b), 701.5(b), 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at \*3 (S.D.N.Y. Dec. 11, 2000)).

Despite the PLRA's mandate concerning exhaustion, there are circumstances under which the requirement can be excused. In its recent decision in *Ross v. Blake,* 136 S. Ct. 1850 (2016), the Supreme Court noted that the requirement hinges upon internal remedies being actually available to a plaintiff inmate. *Ross,* 136 S. Ct. 1859. When internal administrative remedies are unavailable to an inmate, the PLRA's exhaustion requirement does not preclude commencement of an action. *Id.*

In *Ross,* the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available. Under the first, "an administrative procedure is unavailable when (despite what regulations are guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross,* 136 S. Ct. at 1859. In addition, "an administrative scheme might be so

opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that "[i]n this situation, some mechanism exists to provide relief, that no ordinary prisoner can discern or navigate it. *Id.* The Court went on to identify a third situation under which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Since the Supreme Court's decision in *Ross,* the Second Circuit has weighed in on the issue in a case involving a district court's determination that a plaintiff's complaint should be dismissed for failure to exhaust remedies where the inmate claimed to have submitted a grievance concerning misconduct by corrections officers but received no response to the grievance, and took no further action with respect to it. *Williams v. Priatno,* ___ F.3d ____, No. 14-1477, 2016 WL 3729383 (2d Cir. July 12, 2016). In *Williams,* plaintiff alleged that on December 31, 2012, while confined in the Downstate Correctional Facility ("Downstate"), his personal items were searched, his legal papers were confiscated, and he was assaulted by corrections officers. *Id.* at \*2. Plaintiff claimed that on January 15, 2013, while still at Downstate and confined in an SHU cell, he drafted a grievance detailing the misconduct and gave it to a corrections officer to forward to the grievance office. *Id.* One week later, not having received a response to the grievance, the plaintiff inquired of the facility superintendent, who was making rounds in the SHU, concerning the grievance, and was told that the superintendent had no knowledge of the grievance but would look into it. *Id.* Shortly after that conversation, plaintiff was transferred into another facility. Plaintiff never received a response to the grievance, nor did he ever appeal to the superintendent and/or the CORC.

**\*9** After discussing the Supreme Court's decision in *Ross,* the Second Circuit in *Williams* reversed the dismissal of plaintiff's complaint, concluding that the pertinent provisions of the IGP, providing recourse in situations such as those presented, were opaque, therefore making the grievance process unavailable to the plaintiff. *Williams,* 2016 WL 3729383, at \*5-6. Although not the centerpiece of its decision in *Williams,* the Second Circuit went on to note that the ambiguity associated with the prescribed mechanism for appealing a grievance that was never officially filed and answered was compounded by plaintiff's transfer and concluded that the procedures available to the plaintiff were so opaque and confusing as the incapable of use, thereby making the administrative remedies unavailable to the plaintiff. *Id.* at \*7.

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 220 of 353

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

The initial burden of demonstrating non-exhaustion rests with the defendants. Once the defendants meet this burden, however, "it then becomes incumbent upon the plaintiff to counter with a showing of unavailability...". *See, e.g., Murray v. Palmer*, No. 03-CV-1010, 2010 WL 1235591, at *4 & n. 17 (N.D.N.Y. Mar. 31, 2010) (Suddaby, J.); *see also Calloway v. Grimshaw*, No. 09-CV-1354, 2011 WL 4345299, at *5 & n. 5 (N.D.N.Y. Aug. 10, 2011) (Lowe, M.J.) (citing cases), *report and recommendation adopted by* 2011 WL 4345296 (N.D.N.Y. Sept. 15, 2011) (McAvoy, J.); *Cohn v. KeySpan Corp.*, 713 F.Supp.2d 143, 155 (E.D.N.Y. 2010) (finding that, in the employment discrimination context, the defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense).

### 1. Claims Against Defendant LoRusso

While acknowledging that plaintiff did file grievances generally addressing the October 2013 incident, defendant LoRusso maintains that the grievances fail to include or reference his claim that the officer used excessive force. Rather, defendant LoRusso contends that plaintiff's grievances against him related only to the destruction of property and, as such, do not suffice to meet the applicable exhaustion requirements. Dkt. No. 45-16 at 17.

Undeniably, there is no specific requirement within the IGP or otherwise that an inmate identify all persons alleged to be responsible for the acts giving rise to his or her constitutional claims. *Espinal v. Goord*, 558 F.3d 119, 126 (2d Cir. 2009). A grievance, however, must be sufficiently precise and illuminating in order to place defendants on notice of what, substantively, is claimed in order to permit a proper investigation. *Johnson*, 380 F.3d at 697 (quoting *Strong v. David*, 297 F.3d 646, 650 (2d Cir. 2002)).

In this instance, defendant LoRusso's argument lacks merit, as it overlooks both the fact that defendant LoRusso is named in plaintiff's grievances, and case law which firmly establishes that this alone does not necessarily provide a basis to conclude that a claim is unexhausted. *See Brownell v. Krom*, 446 F.3d 305, 311 n.1 (2d Cir. 2006). The undisputed record reveals that plaintiff filed several grievances related to the events that transpired at Walsh on October 29, 2013. [15] Dkt. No. 29-1 at 33; Dkt. No. 45-9 at 5, 7, 9, 10, 11, 12. Plaintiff claimed that

he was assaulted on October 29, 2013 and complained that various DOCCS employees, including defendant LoRusso, failed to adhere to DOCCS policies related to searches and property. *Id.* While the use of excessive force by defendant LoRusso was not directly raised in plaintiff's grievances, defendant LoRusso does not dispute that he was present in plaintiff's cell on the day of the incident. As part of the investigation into the incident, LoRusso submitted a statement and reported that he responded to plaintiff's room and "immediately grabbed Cole's left arm with hands and forced it to the small of his back despite much resistance from Cole. I then placed mechanical restraints on his left wrist and then assisted in rolling Cole on his left side." Dkt. No. 29-1 at 17. According to the November 14, 2013 use of force report prepared in connection with the incident, LoRusso applied force against the plaintiff, including in the form of a body hold and mechanical restraints. Dkt. No. 45-9 at 46, 50, 51. LoRusso "maintained his hold on Cole's left hand and then forced it backward to Cole's lower back and assisted Sgt. Wagner in putting it in mechanical restraints." *Id.* at 15 46, 51. LoRusso then "rolled Cole onto his left side." *Id.*

[15]    The grievances were consolidated and referenced as Grievance No. MHK 12505-13.

**\*10**  Having carefully examined the exhaustion issue in light of defendants' arguments, I cannot find as a matter of law that plaintiff has failed to fully exhaust available administrative remedies related to defendant LoRusso prior to filing this action. At best, drawing all inferences in plaintiff's favor, there is a triable issue as to whether plaintiff's grievance provided the requisite notice of the conduct at issue with respect to his claims against defendant LoRusso. *See Brownell*, 446 F.3d at 310-11. Accordingly, I recommend against dismissal of plaintiff's complaint on this basis.

### 2. Claim Against Defendant Michaels

Defendants contend that plaintiff is barred from pursuing a claim based upon a "failure to protect" theory against defendant Michaels based upon Cole's failure to file a grievance relating to that claim. Dkt. No. 45-16 at 18. Plaintiff asks the court to excuse his failure to exhaust the available administrative remedies prior to commencing this action and including a failure to protect claim against defendant Michaels because (1) he forwarded a grievance to Upstate regarding the waterboarding incident but the grievance was returned with the explanation that plaintiff "needed to send

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 221 of 353

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

the grievance to the facility responsible for the waterboard action," and (2) plaintiff sent a grievance to Walsh/Mohawk C.F. regarding the incident but did not receive a response. Dkt. No. 54-2 at 16-17.

As was previously noted, despite an inmate's entitlement in most instances to file and pursue a grievance in accordance with the IGP, there are circumstances under which the grievance procedure nonetheless is deemed not to have been available to an inmate plaintiff. *See Ross*, 136 S. Ct. at 1859-60. Thus, for example, exhaustion may be considered unavailable where the "plaintiff filed his initial grievance with the wrong facility, and he did not explicitly ask for additional time to file it properly," but the IGP Supervisor failed "to advise plaintiff of his ability to ask for an extension". *Brooks v. Rock*, No. 11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *11 (N.D.N.Y. March 28, 2014).

When, as in this case, an inmate asserts that his or her resort to the grievance process was deterred, the question of whether a sufficient basis to negate a finding of "availability" has been established entails an objective inquiry, focusing upon whether " 'a similarly situated individual of ordinary firmness' [would] have deemed them available." *Hemphill, 380 F.3d at 688* (citing *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). In opposition to defendants' motion, plaintiff asserts that he attempted, twice, to file a grievance against defendant Michaels, but his grievances were rejected. The record contains a January 6, 2014 letter from plaintiff to Mr. J. Lovelace, Senior Investigator at the Office of the Inspector General. Dkt. No. 29-1 at 101. In that correspondence, plaintiff advises that he forwarded a letter on December 24, 2013 regarding "crimes committed against my person" on December 19, 2013 "before ... administrative draft out." *Id.* at 101. In it, plaintiff refers to being "beat" and "drowning." *Id.* Plaintiff enclosed a grievance based upon the December 19, 2013 assault. *Id.* The record also contains a memorandum dated January 6, 2014 from the IGP Office informing plaintiff that Grievance No. UST 53210-14 related to harassment/misconduct was being investigated. Dkt. No. 29-1 at 100. The record, however, does not contain a copy of that grievance.

Based upon the record, this court cannot conclude that plaintiff did not properly submit a timely initial grievance regarding defendant Michaels' alleged violation of plaintiff's rights at Walsh, and that the IGP was available to him. Mindful that a court should not resolve credibility issues when deciding a motion for summary judgment, and that the defendants bear the ultimate burden of proving that plaintiff did not exhaust his administrative remedies, I conclude that there appears to be a material issue of fact as to whether plaintiff filed a timely initial grievance regarding his claim against defendant Michaels or whether his failure to do so should be excused under *Ross*.

## C. Excessive Force Claims

**\*11** Plaintiff claims that defendants Durante, Wagner, and LoRusso violated his Eighth Amendment rights through their use of excessive force against him. Dkt. No. 29 ¶100. Defendants argue that there is no medical evidence by which plaintiff can substantiate this claim, and that any injury he suffered was *de minimis*. Dkt. No. 45-16 at 15-16.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (quotation marks omitted); *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992); *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6 (quotation marks omitted); *accord, Blyden*, 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases, rather than "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness.[16] *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9.

16    This notwithstanding, "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 222 of 353

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

constitutional rights." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (quotation marks omitted); *see also Griffin*, 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quotation marks omitted).

"The objective component [of the excessive force analysis] ... focuses on the harm done, in light of 'contemporary standards of decency.' " *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see also Blyden*, 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency' "). In assessing this element, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *accord Hudson*, 503 U.S. at 8; *see also Wright*, 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, "contemporary standards of decency always are violated. This is true whether or not significant injury is evident.' " *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9) (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated[.]" *Wilkins*, 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Romano*, 998 F.2d at 105.

**\*12**  In support of defendants' motion, they have included an affidavit from defendant Durante, in which he denies plaintiff's allegations and explains the necessity of applying force in order to maintain discipline. Dkt. No. 45-14. Durante avers that he entered plaintiff's room at approximately 9:40 a.m. to conduct a search. Dkt. No. 45-14 at 1. Plaintiff became agitated, jumped out of his chair, and swung his closed fists at Durante, striking the officer in the head. *Id.* Durante pushed plaintiff away, causing him to fall into a locker. *Id.* Durante recounts that during a violent struggle, plaintiff grabbed his testicles and bit Durante's left hand. Dkt. No. 45-15 at 2. Durante forced plaintiff onto the floor, chest first, and maintained pressure on plaintiff's shoulders. *Id.* Defendants Wagner and LoRusso then applied mechanical restraints. *Id.*

As was discussed earlier, an investigation was conducted regarding the incident, during which defendants LoRusso and Wagner provided statements. According to defendant LoRusso, he responded to plaintiff's room and "immediately grabbed Coles left arm with both hands and forced it to the small of his back despite much resistance from Cole. I then placed mechanical restraints on his left wrist and then assisted in rolling Cole on his left side." Dkt. No. 29-1 at 17. Additionally, defendant Wagner reported plaintiff did not comply with Durante's directives and that, "[f]orce had to be used to gain control of Inmate Cole." Dkt. No. 45-9 at 47.

While defendants explain that the use of force was necessary because plaintiff refused to comply with their efforts to conduct a search and attacked him, plaintiff disputed their version of the events when he testified during his deposition that defendants used forced against him for reasons unrelated to restoring or maintaining discipline. Plaintiff testified that during an illegal cell search and strip search, defendants choked, kicked and punched him in the head, neck, face, legs, back and abdomen. Dkt. No. 45-3 at 32, 38, 40-43. He claims that the defendants pulled him out of his wheelchair, picked him up by his arms and "slammed" him to the ground on two occasions causing plaintiff's urine bag to break when he landed on his abdomen. *Id.* at 52-54. Plaintiff contends that the attack was in retaliation for filing grievances and lawsuits. Dkt. No. 45-3 at 25, 30, 50.

In further support of their motion, defendants also rely upon a surveillance video recording from Walsh.[17] Dkt. No. 48 (traditionally filed, not electronically filed). The video recording does not depict the use of force incident or any of the events surrounding the excessive force claim. Instead, it simply begins with plaintiff being escorted from his cell to another cell following the incident. Dkt. No. 48. As such, the court is unable to resolve any factual issues surrounding the use of force or determine which version of events to credit. *See Comeaux v. Sutton*, 496 Fed.Appx. 368, 372 (5th Cir. 2012) (holding that while the video depicted the plaintiff's injuries, the videotape did not offer any proof as to the need for or circumstances of force and thus, the court could not hold that the plaintiff's version of events was inconsistent with his injuries).

17    The video is not date or time stamped. The date on which it was recorded, however, is referenced in the audio portion of the video.

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 223 of 353
Cole v. New York State Department of Corrections and..., Not Reported in Fed....
2016 WL 5394752

Plaintiff claims that as a result of the incident he sustained two black eyes and suffered bruising, swelling, and pain in his face, back, abdomen and wrist. Dkt. No. 45-3 at 66, 68. Defendants argue that plaintiff's injuries were *de minimis* because the medical records associated with the treatment administered by Walsh personnel and the video recording do not support plaintiff's allegations concerning the extent of his injuries. *See generally* Dkt. No. 45-2. Defendants ignore the fact, however, that plaintiff's injuries are but one factor to consider in the excessive force analysis. *See Wilkins*, 559 U.S. at 38 (finding that the extent of an inmate's injuries is but one factor to consider in determining whether a defendant's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated"). Although none of plaintiff's medical records reveal that he suffered anything but minimal injuries as a result of the alleged uses of force by the defendants, the dispositive inquiry is whether defendants used force in a malicious and sadistic manner, rather than in a good-faith effort to maintain or restore order. On a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *See Wright*, 554 F.3d at 269 (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the Amedical records after the ... incident with [that officer] indicated only a slight injury") (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)).

**\*13** Based on the record now before the court, there exists a dispute of fact as to the basis for defendants' use of force. From the conflicting accounts given by the parties, this case would appear to squarely present an issue of credibility not appropriately resolved on motion for summary judgment. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citing, *inter alia, Anderson*, 477 U.S. at 255, 106 S. Ct. 2513). Accordingly, I recommend that defendants' motion be denied to the extent that it seeks dismissal of this claim.

D. Failure to Protect Claim Against Defendant Michaels
In their motion defendants argue that plaintiff's claim against defendant Michaels for failing to protect him from harm at the hands of three unidentified corrections officers is subject to dismissal on the merits. A plaintiff asserting a failure to protect claim must prove that the defendant against whom the claim is asserted actually knew of and disregarded an

excessive risk of harm to his health and safety. *Hayes v. New York City Dep't of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996). This "reckless disregard" to a plaintiff's health and safety can be proven by evidence establishing "a pervasive risk of harm to inmates ... and a failure by prison officials to reasonably respond to that risk." *Knowles v. N.Y. City Dep't of Corrs.*, 904 F. Supp. 217, 222 (S.D.N.Y. 1995) (quotation marks omitted). To establish liability on the part of a defendant under this theory, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle*, No. 10-CV-0456, 2011 WL 5975027, at \*4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson*, 540 F.Supp.2d 501, 512 (S.D.N.Y. 2008)).

Plaintiff claims that three officers, who are not named as defendants in this action, "held" him in the "A-Wing holding closet" at Walsh and "play[ed] there [sic] game of water boarding." Dkt. No. 29 at 16; *see also* Dkt. No. 45-3 at 126, 129. Plaintiff maintains that those unnamed individuals restrained him and placed a towel over his face while they poured water on him in an attempt to choke him. Dkt. No. 45-3 at 128-130. According to the plaintiff, defendant Michaels was present during the assault. *Id.* at 126. Defendants argue that this claim is "wild and unsupported," but do not offer any affidavit from defendant Michaels or any substantive argument in support of their request for dismissal of this claim. Dkt. No. 45-16 at 18. I therefore recommend against the entry of summary judgment dismissing plaintiff's claim against defendant Michaels for failure to protect him from harm.

E. Deliberate Medical Indifference Claim
In his complaint, plaintiff asserts claims addressed to the sufficiency of the medical care and treatment received by him at the relevant times. In their motion defendants also seek dismissal of this claim as a matter of law.

1. Legal Standard Governing
Deliberate Medical Indifference Claims

While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128

Case 9:17-cv-00366-DNH-TWD   Document 93   Filed 03/08/21   Page 224 of 353

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 102-03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

*\*14* A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by neglecting to provide adequate medical care must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F.Supp.2d 344, 356 (E.D.N.Y. 2010). The Second Circuit has noted the following with respect to the objective requirement:

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care .... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (citations omitted).

The second inquiry of the objective test requires a court to examine the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). "Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition

significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation mark and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the inmate's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer*, 511 U.S. at 837); *see also Leach v. Dufrain*, 103 F.Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.); *Waldo v. Goord*, No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., adopting report and recommendation by Homer, M.J.). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

*\*15* It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of what diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment" and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293; *Chance*, 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin*, 10 F.Supp.2d 261, 264 (W.D.N.Y. 1998) (citation omitted). Accordingly, mere disagreement with prison officials regarding a course of

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

treatment does not implicate a constitutional right or support a deliberate indifference claim under section 1983. *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864, 867 (2d Cir. 1970) (citation omitted).

2. Analysis

Addressing the first objective element of the governing test, defendants argue that plaintiff has failed to establish that he suffered from any serious injury and contend that there is no evidence that plaintiff suffered from a MRSA infection while confined at Walsh or Upstate. Dkt. No. 45-16 at 15. Plaintiff's medical records, submitted in support of defendants' summary judgment motion, however, belie defendants' argument. Those records indicate that plaintiff attempted suicide, was positive for a MRSA infection suffered from asthma, urethral stricture, hearing loss, and neuropathy, and displayed an anti-social personality. Dkt. No. 46 at 99. Accordingly, a reasonable factfinder could conclude that plaintiff suffered from a serious medical need. *See McCluskey v. Vincent,* 505 Fed.Appx. 199, 202 (3d Cir. 2012) (holding that MRSA is a serious medical need); *Miller v. Ramineni,* No. 14-CV-1351(DNH/CFH), 2016 WL 1253684, at *4 (N.D.N.Y. Feb. 29, 2016), *report and recommendation adopted,* 2016 WL 1261125 (N.D.N.Y. Mar. 30, 2016) ("Several courts have concluded that MRSA constitutes a sufficiently serious medical condition.") (collecting cases); *see also Zimmerman v. Burge,* No. 06 CV 0176 (GLS/GHL), 2009 WL 9054936, at *6 (N.D.N.Y. April 20, 2009) (finding that objective element was satisfied because plaintiff attempted suicide and was diagnosed with depression).

a. Claims Against Walsh Defendants

Plaintiff claims that defendants Mara, Regional Medical Director Marshall Trabout, Dutch, Peterson, Health Care Assistant Joseph Henderson, and Nurse Administrator D. Williamson ignored his medical needs. In his deposition, plaintiff provided greater detail concerning this claim, testifying that defendants (1) refused to assess and treat his injuries after the excessive force incident; (2) failed to provide medication and medical supplies including Depends and urine bags; and (3) failed to repair his hearing aids.[18] See Dkt. No. 45-3 at 77, 97-105. Defendants assert that plaintiff refused to allow medical staff to administer blood tests and declined to attend scheduled appointments.

18    Defendants incorrectly summarize plaintiff's deliberate medical indifference claims against the Walsh defendants. Dkt. No. 45-10 at 2. They contend that as a result of the use of force incident, plaintiff sustained only minor injuries that were not sufficiently serious medical conditions requiring constitutional protections. Dkt. No. 45-16 at 12. However, plaintiff's Eighth Amendment claims are not limited to a failure to treat the injuries allegedly sustained by the plaintiff as a result of the October 29, 2013 incident.

The evidence before the court establishes that defendant Peterson examined plaintiff following the alleged assault, and documented her findings. Dkt. No. 29-1 at 12. From October 29, 2013 through November 1, 2013, plaintiff was monitored every ten minutes while on a "suicide watch." Dkt. No. 46 at 5-11. After plaintiff was discharged from the watch, he was examined by defendant Mara, received medications and medical supplies, and attended a consultation with an audiologist. Dkt. No. 45-3 at 79-82.

*16  While there is a dispute regarding whether defendants failed to advise plaintiff of scheduled appointments, even viewing the evidence in a light most favorable to plaintiff, the failure to advise plaintiff of scheduled appointments does not constitute deliberate indifference. *See Johnson v. Woods,* No. 07-CV-1018 (DNH/DRH), 2010 WL 2039164, at *13 (N.D.N.Y. March 2, 2010). There is no evidence from which a rational factfinder could conclude that defendants knew that plaintiff would suffer serious harm if they failed to advise him of blood tests, an appointment with an audiologist, a consultative appointment with a physical therapist, or the need for an annual physical examination. At best, plaintiff's allegations state claims of negligence and medical malpractice which are not cognizable under 42 U.S.C. § 1983. *See, e.g., Farmer,* 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."); *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir. 2003) ("A showing of medical malpractice is ... insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness."); *Morris v. Hoke,* No. 87-CV-7812, 1992 WL 310792, at *2 (S.D.N.Y. Oct. 21, 1992) ("[T]he [plaintiff's allegations] would underlie, at best, a state claim of negligence or medical malpractice, not cognizable under 42 U.S.C.1983.").

With regard to plaintiff's allegations related to his hearing aids, the record reveals that on December 17, 2013, he attended a consultative appointment with an audiologist

Case 9:17-cv-00366-DNH-TWD   Document 93   Filed 03/08/21   Page 226 of 353
Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

and was advised that his left hearing aid was cracked and needed repair. Dkt. No. 46 at 106. Plaintiff refused to pay the cast of the needed repair. *Id.* The record does not contain any evidence related to plaintiff's right hearing aid, and specifically whether it was functional at that time. On December 30, 2013, plaintiff received new batteries for his hearing aids. *Id.* at 95. Even assuming that plaintiff was deprived of his hearing aids for any period of time, his claim is deficient based upon his failure to provide any evidence establishing that he was unable to function due to the deprivation. *See Alster v. Goord*, 745 F.Supp.2d 317, 334 (S.D.N.Y. 2010) (finding that the plaintiff's allegations related to uncomfortable or inadequate hearing aids failed to rise to the level of a constitutional violation) (citations omitted); *see also Fate v. Goord*, 2012 WL 3104884, at *7 (S.D.N.Y. July 31, 2012) (holding that the "short waiting period" before receiving hearing aids cannot be considered deliberate indifference).

In further support of his inadequate medical care claim, plaintiff recites facts related to the conditions of his cell. Plaintiff claims that the cell did not have a bed, his toilet was padlocked, he was denied meals, and he was forced to sleep on the floor. Dkt. No. 45-3 at 73-76. Even assuming these conditions existed, the evidence does not establish that plaintiff's medical conditions deteriorated due to those conditions. Moreover, this portion of his claim is also subject to dismissal since the record before the court does not establish that any named defendant was personally responsible for the conditions of plaintiff's cell, or that any named defendant possessed the authority to remedy those conditions. *See Savage v. Brue*, No. 05-CV-0857 (GLS/GHL), 2007 WL 3047110, at *12 (N.D.N.Y. Oct. 18, 2007) (holding that cell conditions were immaterial to Eighth Amendment medical claim because the complaint lacked allegations establishing that defendants were involved in decisions related to supplies or suggesting that the conditions contributed to plaintiff's serious medical condition).

The evidence now before the court also fails to disclose the precise involvement on the part of defendant D. Williamson in the alleged deprivation of treatment, and lacks factual assertions plausibly establishing that this defendant both knew of and disregarded an excessive risk to plaintiff's health or safety. Plaintiff vaguely testified that D. Williamson "failed to provide adequate medical care." Dkt. No. 45-3 at 183-84. This conclusory allegation is insufficient to establish defendant D. Williamson's role in the medical indifference alleged. *See Schwartz v. Dennison*, 518 F.Supp.2d 560, 573

n. 11 (S.D.N.Y. 2007) ("Plaintiff's complaint contained no allegations from which it can be inferred that defendants created, or allowed to continue, an unconstitutional policy."); *Graham v. Poole*, 476 F.Supp.2d 257, 261 (W.D.N.Y. 2007) ("Plaintiff's conclusory allegation that Poole failed to provide him with adequate medical care is also insufficient to state a claim.").

**\*17** In sum, plaintiff alleges deliberate indifference against Walsh defendants in only a skeletal and conclusory fashion and, for the most part, fails to point to specific deprivations that could rise to a level of constitutional significance. Aside from plaintiff's vague and unsupported deposition testimony, there is no evidence that defendants were deliberately indifferent to plaintiff's medical needs. Accordingly, I recommend that this portion of defendants' motion be granted, and that plaintiff's medical indifference claims against defendants Mara, Trabout, Dutch, Peterson, Henderson and D. Williamson be dismissed.

### b. Claims Against Upstate Defendants

Plaintiff alleges that defendants Mandalaywala, Dr. Schroyer, Kowalachuk, Smith, Michaels, and Nurse M. Williamson were also deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment. Specifically, plaintiff claims that those defendants (1) failed to treat his MRSA infection and wounds; (2) improperly discontinued medications; (3) confiscated plaintiff's wheelchair and denied his request for a suitable replacement; (4) attempted to provide a catheter that would have caused infection; and (5) failed to provide examinations or consultations with specialists. Dkt. No. 29 ¶65, 104, 105; Dkt. No. 45-3 at 159-167; Dkt. No. 54-2 at 10-11. Defendants contend that plaintiff's care at Upstate was appropriate, and that he was non-compliant with his treatment. Dkt. No. 45-16 at 11-15.

Having carefully reviewed the record, I conclude that no reasonable factfinder could find that the Upstate medical defendants were deliberately indifferent to plaintiff's medical needs. Between December 2013 and April 2014, plaintiff was treated by prison medical staff on virtually a daily basis for a variety of ailments. Plaintiff received vitamins, dietary supplements, and various medications to treat his skin disorder, ulcer, overactive bladder, depression, and anxiety. Dkt. No. 46 at 35, 42, 51, 59, 64, 94-95. Plaintiff also received dressing supplies including gauze, sleeves, tubular dressing, Bacitracin and Clobetosol ointment. *See generally*

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

Dkt. No. 46. Plaintiff was examined by Dr. Schroyer, as well as members of the nursing staff, and was referred to a hospital to have his catheter reinserted. Dkt. No. 29-1 at 62-69. Plaintiff received a permit for a wheelchair, braces, and knee sleeves. Plaintiff's dissatisfaction with his treatment, type of wheelchair, and defendants' choice of a latex catheter rather than a silicone catheter falls short of establishing that defendants acted with a sufficiently culpable state of mind.

Addressing the discontinuance of medications, defendants explain that the decision to halt plaintiff's medications was based upon his non-compliance with staff directives and his continued refusal to accept medication. Plaintiff's deliberate indifference claims are undermined by his admission that he was not denied meals or medication, but rather, refused for fear it "would cause him more harm." Dkt. No. 54-2 at 10; see *Mortimer Excell v. Fischer*, No. 08-CV-0945 (DNH/RFT), 2009 WL 3111711, at *5 (N.D.N.Y. Sept. 24, 2009) (dismissing the plaintiff's Eighth Amendment claim because the plaintiff was provided with food but refused to eat it for fear that it was drugged). Even assuming that defendants acted improperly in discontinuing plaintiff's medication, at most the error constitutes negligence, which is not actionable under 1983. *Johnson v. Connolly*, No. 07-CV-0158 (LEK/GHL), 2008 WL 724167, at *5 (N.D.N.Y. March 17, 2008) (holding that allegations that medications were improperly discontinued amounts to negligence, not deliberate indifference).

*18 As to plaintiff's claim that he should have been referred to a urologist, a plaintiff's disagreement over the decision of whether an evaluation by a specialist is warranted in any particular case is the very kind of treatment decision which, courts have recognized, does not alone support a cognizable claim under the Eighth Amendment. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293; *Chance*, 143 F.3d at 703. There is no evidence in the record to suggest that an examination by a urologist was medically necessary, or that any different treatment would have eventuated as a result of such a visit. Simply stated, plaintiff's disagreement regarding the need for referral to a urologist does not state a claim against the defendants for deliberate indifference to his serious medical needs.

In sum, the record lacks any facts demonstrating that defendants' conduct exposed plaintiff to an excessive risk of harm, or that his condition deteriorated because of the defendants' actions. Accordingly, no reasonable factfinder could conclude that the Upstate defendants were deliberately indifferent to plaintiff's medical needs. Plaintiff's medical

indifference claim against the Upstate defendants is therefore also subject to dismissal as a matter of law.

### F. Due Process Claims Against Defendants Tousignant and Michaels

Plaintiff claims that defendant Tousignant issued a deprivation order confiscating Cole's property, bed, braces and "anything in his cell" in violation of his Fourteenth Amendment rights.[19] Dkt. No. 45-3 at 119. Plaintiff also alleges that defendant Michaels issued an order depriving plaintiff of the use of his wheelchair without affording plaintiff his due process rights. Dkt. No. 29 ¶ 58; Dkt. No. 45-3 at 125.

[19]   Defendants have not submitted any argument in response to this claim.

In the prison context, it is will established that the alleged destruction or loss of a plaintiff's personal property will not support a claim redressable under § 1983, provided that adequate post-deprivation remedies are available. *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The deprivation of property does not constitute a Fourteenth Amendment violation because New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prisoners. *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996).

Here, plaintiff does not allege a destruction or loss of any personal property. Instead, he claims that he was temporarily deprived of access to his personal property and wheelchair. Even assuming the record supported plaintiff's allegations, there was an adequate post-deprivation remedy available to the plaintiff before the New York State Court of Claims. *See Davis v. New York*, 311 Fed.Appx. 397, 400 (2d Cir. 2009). Accordingly, I recommend dismissal of plaintiff's due process claims related to his deprivation of property.

### G. Due Process Claims Associated With the October 29, 2013 Misbehavior Report

Plaintiff claims that defendants Corey and Bullis deprived him of due process when presiding over his disciplinary hearings.[20] Dkt. No. 29 at ¶103. Defendants argue that plaintiff's due process claim is deficient as a matter of law. Dkt. No. 45-16 at 23-26.

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 228 of 353

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

20    Plaintiff also asserts supervisory claims against Prack related to his disciplinary hearings. Those claims are discussed below. *See* pp. ___ − ____, *post.*

To successfully state a claim under 42 U.S.C. § 1983 for a denial of procedural due process, a plaintiff must show that he 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir. 1996).

### 1. Liberty Interest

**\*19** As to the first element, in *Sandin v. Conner,* 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483-84; *Tellier,* 280 F.3d at 79-80; *Hynes,* 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe,* No. 95-CV-2617, 2001 WL 1658245, at \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-0985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin.*

Atypicality in a *Sandin* inquiry is normally a question of law. [21] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker,* 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions of that

confinement, however, a court may not be required to undergo a detailed analysis of these considerations. *Arce,* 139 F.3d at 336; *Hynes,* 143 F.3d at 658.

21    In cases where there is a factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999).

As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis,* 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis,* 576 F.3d at 133 (citing *Colon,* 215 F.3d at 232-33 n.5). In those circumstances the court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis,* 576 F.3d at 134 (quoting *Welch v. Bartlett,* 196 F.3d 389, 392-93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon,* 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin.*").

Defendants concede that as a result of the two disciplinary hearings and determinations, plaintiff served 170 days of SHU disciplinary confinement, but allege that he was not deprived of a liberty interest because during that time, "he was offered daily medical attention and meals, which he claims to have refused to eat because he did not 'trust it.' " Dkt. No. 45-16 at 24. The record confirms that plaintiff spent 170 days in an SHU setting. Dkt. No. 29. Because this period of disciplinary confinement falls between 101 and 305 days, in order to determine whether plaintiff suffered an atypical hardship, and therefore has been deprived a constitutional significant liberty interest, the court is required "to articulate specific findings of the conditions of the imposed confinement relative to the ordinary prison conditions[.]" *Reynoso v. Selsky,* 292 Fed.Appx. 120, 123 (2d Cir. 2008). While plaintiff's testimony from his deposition suggests that the conditions of his SHU confinement were

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

extraordinary,[22] defendants have not adduced any evidence with respect to the conditions of ordinary prison life in support of their motion. Because this evidence is lacking, the court cannot undertake the type of specific fact-finding required to determine, on a motion for summary judgment, whether plaintiff suffered an atypical and significant hardship during his disciplinary confinement. *See Reynoso*, 292 Fed.Appx. at 123 (reversing the district court where it had neglected "to articulate findings as to why the 150-day total sentence was not 'atypical and significant' " and commenting that "[s]uch a determination is anything but simple, and cannot be resolved summarily"). For this reason, I have assumed, for purposes of this report, that plaintiff was deprived of a liberty interest during the course of his 170 day SHU confinement, and will proceed to analyze whether defendants provided plaintiff with constitutionally adequate safeguards in connection with his disciplinary hearings.

22        Plaintiff testified that, while confined in the SHU, he was denied showers, food, and water. Dkt. No. 45-3 at 145-150. Plaintiff also claimed that he remained on the "floor the whole time." *Id.* at 147.

### 2. Sufficiency of Process Associated with the October 29, 2013 Misbehavior Report and Ensuing Disciplinary Hearing

**\*20** The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally significant liberty interest are well-established, the contours of the requisite protections having been articulated by the Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80, 41 L.Ed.2d 935 (1974). Under *Wolff*, the constitutionally-mandated due process requirements include (1) written notice of the charges; (2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1988). In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination also must garner the support of at least "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

#### a. False Misbehavior Reports

Plaintiff alleges that defendants Corey and Bullis violated his due process rights when they conducted hearings based upon a false misbehavior report. Dkt. No. 54-2 at 25. The mere allegation of the issuance of a false misbehavior report to an inmate is not cognizable under section 1983. *See Boddie v. Schneider*, 105 F.3d 857, 862 (2d Cir. 1997) ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report."). Similarly, an inmate does not possess a due process right to be free from having a hearing officer rely upon an alleged false misbehavior report at a disciplinary hearing. *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982, 108 S.Ct. 1273 (1988) ("It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report."). This general rule recognizes that an inmate's procedural due process rights are adequately safeguarded by the opportunity to challenge and present evidence to rebut the false accusations at a disciplinary hearing. *Freeman*, 808 F.2d at 953.

#### b. November 2013 Hearing

##### i) Whether Plaintiff's Claims Relating To His First Disciplinary Hearing Are Negated By The Reversal And Subsequent Second Hearing

Defendants claim that the issue of whether plaintiff's due process rights were violated during the first hearing is a nullity due to the subsequent reversal of the resulting determination and commencement of a second hearing. Dkt. No. 45-16 at 25. In support of that position, they rely upon the Second Circuit's decisions in *Horne v. Coughlin*, 155 F.3d 26 (2d Cir. 1998). The underlying facts in *Horne* are strikingly similar to those in the case at bar. In that case, a first disciplinary hearing was conducted on December 19, 1984, resulting in a finding of guilt and a sentence of one year of SHU disciplinary confinement. *Horne*, 155 F. 3d at 28. That determination was ultimately reversed in May 1985. *Id.* A second hearing was conducted on May 9, 1985. *Id.* At the conclusion of that hearing, plaintiff was again found guilty and sentenced to serve three hundred days in SHU confinement, although that penalty was administratively modified to six months of SHU confinement. *Id.* Plaintiff in that case was credited with

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 230 of 353

all of the time served as a result of the first hearing, and was released thirteen days after the modification on May 28, 1985, after having served six months of SHU confinement, including the time spent as a result of the first hearing.[23] *Id.* Under these circumstances, the Second Circuit concluded that it was unnecessary to address plaintiff's procedural due process claims arising out of the first hearing since "it became a nullity." *Id.* at 31.

[23]     That time spent in disciplinary confinement as a result of the first hearing was credited to the penalty ultimately dispensed after the second hearing is made clear in a footnote of the court's decision in *Horne,* in which it stated:

> It should be clear from the discussion in the dissenting opinion that *Horne* did not spend five months of administrative confinement waiting for his second hearing. The 5 – month period he spent in SHU pursuant to his first disciplinary sentence (before it was voided), and the few days spent thereafter awaiting the second hearing, were all credited to the service of his eventually six – month sentence. As a result his 6 months were completed and he was released from SHU thirteen days after the six – month sentence was imposed on May 28, 1985 [sic]. Thus, the six months to which *Horne* was ultimately sentenced was the only time he spent in the SHU.

*Horne,* 155 F. 3d at 31, n. 4.

**\*21**  In this matter, as in *Horne,* the record establishes that plaintiff was confined in the SHU as a result of penalties imposed following the November 2013 hearing, and remained in SHU confinement until and after the second hearing commenced on March 20, 2014, at which he was again found guilty. Accordingly, based upon the Second Circuit's decision in *Horne,* it is unnecessary to determine whether plaintiff was afforded due process in connection with his first hearing, and his claims against defendant Corey are subject to dismissal on this basis.

### ii) Plaintiff's Arguments Regarding The First Hearing

Even assuming *arguendo* that the plaintiff's first hearing was not rendered a nullity, for purposes of the plaintiff's procedural due process claims, I will address his substantive arguments. In connection with the first hearing, plaintiff claims that defendant Corey precluded him from questioning witnesses and improperly removed him from the first hearing. Dkt. No. 29 ¶103; Dkt. No. 54-2 at 26-27. Plaintiff argues that Hearing Officer Corey's failure to call an inmate, nurses, and Imam Muhammad violated his Fourteenth Amendment rights. *Id.* Plaintiff claims that Muhammad was present in his room after the assault, and would have offered testimony concerning his injuries. Dkt. No. 45-3 at 109-110.

#### aa. Right to Call Witnesses

Among the due process violations cited by plaintiff in support of his procedural due process claim with regard to the first hearing is a deprivation of his right to call witnesses. While the Fourteenth Amendment guarantees an inmate's right to call witnesses and present evidence in his defense before being deprived of a cognizable liberty interest, that right is not without bounds; the law requires only that an inmate be permitted to present witness testimony only where "permitting him [or her] to do so will not be unduly hazardous to institutional safety or correctional goals." *Hill v. Selsky,* 487 F.Supp.2d 340, 342 (W.D.N.Y. 2007) (citing *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2979). "[A] prisoner's request for a witness can be denied on the basis of irrelevance or lack of necessity." *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir. 1991). "Prison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify." *Ponte v. Real,* 471 U.S. 491, 497 (1985). "The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but upon the official to prove the rationality of his position." *Fox v. Coughlin,* 893 F.2d 475, 478 (2d Cir. 1990).

During the first hearing, defendant Corey permitted plaintiff to call defendants Peterson and Judway as witnesses. Dkt. No. 45-9 at 42. On November 20, 2013, defendant Corey completed the required Form 2176 with an explanation of his decision not to call RN Hart, RN Schram, and Imam Muhammad as witnesses. Dkt. No. 29-1 at 22. Corey noted that Hart, Schram, and Muhammad did not witness the alleged assault, and were not involved in the incident that precipitated the hearing. *Id.* The fact that plaintiff was not present to execute the witness interview form reflecting the hearing officer's denial of plaintiff's request to call those three witnesses does not give rise to a due process violation.[24] "[A]s long as a hearing officer articulates a reason for not calling a witness that is logically related to correctional goals, due process does not require that he do so during the hearing."

*Brooks v. Rock*, No. 11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *29 (N.D.N.Y. Mar. 28, 2014) (citation omitted).

24    Plaintiff does not dispute that he received the form. While the record does not clearly establish when plaintiff received the form, he was provided with the form at some point, as is evidenced by the fact that it was annexed as an exhibit to his amended complaint. Dkt. No. 29-1 at 22.

**\*22** Defendant Corey's decision not to call the requested witnesses was reasonable. It is clear from plaintiff's testimony that those witnesses were not present during the alleged assault, and the record of plaintiff's injuries and treatment adequately addressed their scope and extent. *See Wolff*, 418 U.S. at 466 (citing "lack of necessity" as a proper ground for refusing to call a potential witness at a disciplinary hearing). Finally, a careful review of the record does not suggest that the result of plaintiff's hearing would have been any different had defendant Corey permitted these witnesses to testify. *See Lewis v. Murphy*, No. 12-CV-0268 (NAM/CFH), 2014 WL 3729362, at *13 (N.D.N.Y. July 25, 2014) (holding that the plaintiff alleged that his counselor failed to interview witnesses but did not show how this shortcoming prejudiced the results).

bb. Removal from Hearing

Plaintiff claims that defendant Corey improperly ordered his removal from the hearing. Dkt. No. 54-2 at 26. Defendants contend that even if the court determines plaintiff's Fourteenth Amendment rights were violated when excluded from the hearing, defendant Corey is entitled to qualified immunity. Dkt. No. 45-16 at 27.

The Second Circuit has not conclusively resolved whether an inmate has a due process right to be present at disciplinary proceedings, and district courts within the circuit have issued varying opinions regarding the issue. *See Vogelfang v. Capra*, 889 F. Supp. 2d 489, 514 (S.D.N.Y. 2012) ("[T]his Court finds it to be an open question in the Second Circuit whether there is an independent right of a prisoner to be present at all times during a disciplinary hearing, or whether such a right to be present exists only insofar as it is required to enable the prisoner to exercise his or her rights to call witnesses or present documentary evidence."); *Clark v. Dannheim*, No. 02-CV-6525L, 2011 WL 2973687, at *1 (W.D.N.Y. July 21, 2011) (collecting cases) ("[W]here an inmate disrupts a

hearing, a hearing officer has discretion to order the inmate removed, particularly if the prisoner has been warned that continued unruly behavior may result in his expulsion."); *Mims v. Ufland*, No. 07 CIV. 1926, 2008 WL 2986497, at *5 (S.D.N.Y. Aug. 1, 2008) (citations omitted) (holding that the limited right to be present at the hearing is not absolute, and can be waived if the inmate engages in disruptive conduct). In this district, courts have reasoned that the Supreme Court's decision in *Wolff* affords an inmate the limited right to be physically present at disciplinary hearings in order to exercise basic due process rights. *Johnson v. Doling*, No. 05 CV 376 (TJM/RFT), 2007 WL 3046701, at *8-9 (N.D.N.Y. Oct. 17, 2007) (citations omitted). That right is "necessarily be limited by penological interests;" however, the "per se denial of such right would undermine the requirement that disciplinary hearings be held 'at a meaningful time and in a meaningful manner.' " *Id.* (citing, *inter alia Wolff*, 418 U.S. at 566 (stating "we must balance the inmate's interest ... against the needs of the prison, and some amount of flexibility and accommodation is required")).

Defendants contend that plaintiff was removed from the hearing due to his "beligerent [sic] and disruptive" behavior. Dkt. No. 45-9 at 42-44. Plaintiff maintains that he was improperly removed from the hearing because defendant Corey "didn't like the questions I was asking." Dkt. No. 45-3 at 111. Plaintiff avers that he did not yell, or struggle but "conduct[ed] [himself] as they were conducting themselves." *Id.* at 112. While a hearing officer retains the right to remove a disruptive inmate based on safety concerns, *see Ponte*, 471 U.S. at 495, the evidence before the court does not conclusively establish that plaintiff was disruptive during the hearing. The transcript of that disciplinary hearing is not part of the record before this court. Accordingly, there are genuine issues of fact as to whether plaintiff's due process rights were violated when defendant Corey removed him from the disciplinary hearing. Having made that determination, I must turn to the issue of whether Corey is entitled to qualified immunity with respect to this claim.

**\*23** "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the

Case 9:17-cv-00366-DNH-TWD Document 93 Filed 03/08/21 Page 232 of 353

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler,* 689 F.3d at 174 (citing *Saucier v. Katz,* 533 U.S. 194, 206 (2001), abrogated on other grounds by (*Pearson,* 555 U.S. 223)). Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* 555 U.S. at 231 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff,* 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry is informed by whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso,* 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle,* 132 S.Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Terebesi,* 764 F.3d at 230 (quoting *al-Kidd,* 131 S.Ct. at 2083). However, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

In this instance, even assuming plaintiff is able to establish a constitutional violation, I recommend a finding that defendant Corey is entitled to qualified immunity based upon my conclusion that it was objectively reasonable for him to believe that his conduct did not violate plaintiff's constitutional rights. As a threshold matter, at the time of the disciplinary hearing, "the contours" of the right, or limited right, of an inmate to be present at his disciplinary hearing were not clearly established. *Webb v. Selsky,* No. 01-CV-149S, 2008 WL 796179, at *7-8 (W.D.N.Y. Mar. 24, 2008). In any event, a person in defendant Corey's position could have reasonably concluded that excluding plaintiff from the hearing would not violate any clearly established constitutional right. Accordingly, I recommend a finding that defendant Corey is entitled to qualified immunity.

c. March 20, 2014 Hearing

**\*24** Plaintiff contends that the second disciplinary hearing, which was conducted on March 20, 2014 by defendant Steven Bullis, was untimely as it did not commence within the fourteen days prescribed by the decision on appeal and 7 N.Y.C.R.R. § 251-5.1. Dkt. No. 54-2 at 25, 30. It is well-established that the violation of a state regulation is not cognizable under 42 U.S.C. § 1983. *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) (collecting cases). Plaintiff's claim of undue delay is instead subject only to overarching constitutional considerations, which require only that the hearing be held within a "reasonable time" and not within any prescribed number of days. *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir. 1990) ("Federal constitutional standards rather than state law define the requirements of procedural due process."); *Donato v. Phillips,* No. 04-CV-1160, 2007 WL 168238, at *6 (N.D.N.Y. Jan. 18, 2007) (McAvoy, J.) (hearing that started nine days after plaintiff's confinement in the SHU was reasonable). Here, the undisputed record establishes that second hearing was commenced one day beyond the allotted time. Plaintiff has failed to produce any evidence suggesting that his procedural due process rights were violated by this brief delay.

During his deposition, plaintiff claimed that defendant Bullis refused to allow him to question witnesses and denied him due process when the hearing officer called witnesses before plaintiff was brought into the room. Dkt. No. 45-3 at 114. Plaintiff does not identify the witnesses in question or provide any argument related to the substance of the testimony. "It is not a violation of due process at a disciplinary hearing to take the testimony of a witness outside the presence of an inmate." *Kalwaskinski v. Morse,* 201 F.3d 103, 109 (2d Cir. 1999) (citations omitted). "Nor does an inmate have a constitutional right of confrontation." *Id.* (citations omitted). Accordingly,

Case 9:17-cv-00366-DNH-TWD Document 93 Filed 03/08/21 Page 233 of 353
Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

I recommend that plaintiff's due process claims related to the second disciplinary hearing be dismissed.

### H. Retaliation

In their motion, defendants also seek dismissal of retaliation claims asserted by the plaintiff. When prison officials take adverse action against an inmate, motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment, a section 1983 retaliation claim may be sustained. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). The Second Circuit has cautioned, however, that, because of "the ease with which claims of retaliation may be fabricated, courts should examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2013).

To establish a claim under section 1983 for unlawful retaliation, a plaintiff must prove that (1) he engaged in protected conduct, (2) the defendants took adverse action against him, and (3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007). "[P]rison officials' conduct constitutes an 'adverse action' when it would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Alicea v. Howell*, 387 F.Supp.2d 227, 237 (W.D.N.Y. 2005) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)).

As to the first element of the plaintiff's retaliation claim, it is well settled that the filing of grievances and lawsuits constitutes protected activity for purposes of a First Amendment retaliation analysis. *See Johnson v. Eggersdorf*, 8 Fed.Appx. 140, 144 (2d Cir. 2001) ("It is undisputed that retaliation by prison officials against an inmate for the filing of a grievance can act as a deprivation of a constitutionally protected right."). Turning to the second element of the retaliation claim, plaintiff must establish that he suffered an adverse action. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999). To establish the requisite connection between protected speech and adverse action, in order to satisfy the third element, the plaintiff must prove that the protected conduct was a "substantial and motivating factor to the adverse action taken by prison officials." *Bennett v. Goord*, 343 F.3d at 133, 137 (2d Cir. 2003).

**\*25** With respect to the third, causation element of a retaliation claim, several factors may be considered in determining whether the requisite nexus exists between the plaintiff's protected activity and a prison official's actions, including "(1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his ... motivation." *Jean-Laurent v. Lane*, No. 11-CV-0186, 2013 WL 600213, at *8 (N.D.N.Y. Jan. 24, 2013). While the chronology of events may favor the finding of a causal connection, a plaintiff may not rely upon temporal proximity alone to defeat summary judgment. *Faulk v. Fisher*, 545 Fed.Appx. 56, 58 (2d Cir. 2013) (finding that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation). The evidence relating to the causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action. *Baskerville v. Blot*, 224 F.Supp.2d 723, 732 (S.D.N.Y. 2002).

Plaintiff has asserted retaliation claims against defendants Durante, Wagner, LoRusso, Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, Kowalachuk, and Corey. Defendants argue that plaintiff cannot support retaliation claims with the "speculative" assertion that those defendants were motivated, in general, by plaintiff's litigious behavior. Defendants contend that plaintiff's failure to cite to any specific grievances or complaints as the basis for his retaliation claim warrants an award of summary judgment. Dkt. No. 45-16 at 22-23.

#### 1. Defendant Durante

Plaintiff alleges that defendant Durante used excessive force in retaliation for plaintiff filing grievances and a lawsuit. Dkt. No. 54-2 at 14. The record before the court contains evidence that plaintiff filed complaints in September 2010 and October 2010 related to threats, harassment, and assaults involving Durante. Dkt. No. 29-1 at 1. In September 2010, plaintiff filed a complaint in this district against "DOCS" and various employees related to his confinement at Mohawk C.F. [25]
*See Cole v. New York State Dep't of Corr. Servs.*, No. 10-

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 234 of 353

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

CV-1098 (NAM/TWD) (Dkt. No. 1) ("*Cole I*"). On March 23, 2011, plaintiff's amended complaint in that case was accepted for filing. *Id.* (Dkt. No. 16). In his amended complaint, plaintiff claimed, *inter alia*, that defendant Durante retaliated against him and violated his Eighth Amendment rights with harassment, threats, and excessive force claims arising from assaults that occurred in September 2010 and October 2010. *Id.* (Dkt. No. 16 ¶70, 74). On April 21, 2011, Durante acknowledged service of the amended complaint in that action. *Id.* (Dkt. No. 28). Plaintiff subsequently forwarded a letter to defendant Superintendent Paul M. Gonyea on July 16, 2012, accusing defendants LoRusso and Durante of harassment. Dkt. No. 29-1 at 7-10. Based upon these circumstances, I find that plaintiff engaged in protected conduct with the filing of complaints, grievances, and a lawsuit involving defendant Durante.

25      The DOCCS was formerly known as the Department of Correctional Services, or "DOCS."

As to the second element of the plaintiff's retaliation claim, it is clear that "an assault by corrections officers is sufficient to 'chill a person of ordinary firmness from continuing to engage in his First Amendment activity.' "[26] *Rivera v. Goord*, 119 F.Supp.2d 327, 339-40 (S.D.N.Y. 2000). While defendants do not present any further arguments in support of dismissing plaintiff's retaliation claims, implicit in their motion is the suggestion that the record lacks evidence to establish the requisite nexus between the protected conduct and adverse action that is, that the protected conduct was a "substantial" or "motivating factor" in defendant Durante's decision to use force against plaintiff.

26      In their motion, defendants do not dispute that plaintiff suffered adverse actions.

**\*26** Plaintiff asserts that immediately before being assaulted by defendant Durante, the officer stated, "Happy Anniversary" in reference to prior assaults and a lawsuit that resulted from those assaults. Dkt. No. 45-3 at 30. Plaintiff also testified that defendant Durante told him that the assault was "payback" for grievances. Dkt. No. 45-3 at 54. While plaintiff has offered proof of his complaints and the filing of a lawsuit against Durante, the gap between the protected conduct asserted and the defendant's alleged retaliatory act is tenuous. *See Butler v. Raytel Med. Corp.*, 150 Fed.Appx. 44, 47 (2d Cir. 2005) (holding that a one year gap between complaint and adverse employment action is insufficient to support an inference of a causal relationship). However, when coupled with the statements attributed to Durante,

which, if true, strongly suggest that he was motivated to assault plaintiff for filing the lawsuit, these circumstances present genuine issues of material fact concerning the nexus element of the retaliation test, thereby precluding the entry of summary judgment in connection with plaintiff's retaliation claim. *See Roland v. McMonagle*, No. 12-CV-6331, 2015 WL 5918179, at \*6 (S.D.N.Y. Oct. 9, 2015) (finding an issue of fact as to retaliation despite the gap in time between the protected conduct and alleged attack as the plaintiff presented evidence that the defendants were aware of the complaints and mocked him for filing grievances during the attack). For this reason, I recommend against the entry of summary judgment dismissing plaintiff's retaliation claim against defendant Durante.

### 2. Defendant LoRusso

As it relates to defendant LoRusso, the record before the court does not contain any evidence that plaintiff filed a grievance against defendant LoRusso prior to the October 2013 incident, and LoRusso was not a named defendant in *Cole I.* For this report, I assume that plaintiff engaged in protected conduct, as it relates to defendant LoRusso, based upon the July 2012 letter to defendant Gonyea. What is lacking, however, are any allegations of fact that connect the letter and the October 2013 incident. Plaintiff cannot rely solely upon the temporal proximity of the complaint and the alleged acts of misconduct by defendant LoRusso to survive summary judgment. Temporal proximity alone is insufficient to carry plaintiff's burden of proof beyond the pleading stage. *Ethier v. City of Cohoes*, No. 02-CV-1584, 2006 WL 1007780, at \*7 (N.D.N.Y. Apr. 18, 2006) (McAvoy, S.J.) (citing cases); *Freeman v. Goord*, No. 02 Civ. 9033, 2005 WL 3333465, at \*7 (S.D.N.Y. Dec. 7, 2005). Moreover, the thirteen months that elapsed between the alleged protected conduct, in July 2012, and the October 2013 incident, without more is insufficient to support a finding of the requisite nexus. *See, e.g., Nicastro v. N.Y. City Dep't of Design & Constr.*, 125 Fed.Appx. 357, 358 (2d Cir. 2005) (concluding that the plaintiff could not, at the summary judgment stage, establish even a *prima facie* case of retaliation where the adverse employment action occurred "almost ten months after" the plaintiff engaged in protected conduct and there was no other evidence of causation); *Figueroa v. Johnson*, 109 F. Supp. 3d 532, 552 (E.D.N.Y. 2015). Accordingly, I recommend that plaintiff's retaliation claim against defendant LoRusso be dismissed

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 235 of 353
Cole v. New York State Department of Corrections and..., Not Reported in Fed....
2016 WL 5394752

3. Defendants Sharma, Trabout, Mara, J. Henderson,
P. Henderson, Tousignant, M. Williamson,
Smith, Kumar, Schroyer, and Kowalachuk

Plaintiff also claims that defendants Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, and Kowalachuk retaliated against him when they confiscated his wheelchair and hearing aids, refused to provide Depends, pajamas, or soap, failed to treat his MRSA infection, and were deliberately indifferent to his medical needs. Dkt. No. 29 at ¶105; Dkt. No. 45-3 at 174. Plaintiff asserts that their retaliatory conduct was motivated by plaintiff's prior grievances and lawsuit.

Based upon the record before the court, no reasonable factfinder could conclude that plaintiff suffered any significant adverse action. While, plaintiff was dissatisfied the medical treatment received from prison officials, the record establishes a willingness on defendants' part to respond to plaintiff's medical needs. Moreover, as was discussed in depth above, plaintiff was not denied adequate or timely medical attention. Under these circumstances plaintiff did not suffer any adverse action as a result of defendants' medical treatment and thus, as a matter of law, cannot sustain a retaliation claim based upon that treatment.

**\*27** I note, moreover, that even assuming plaintiff suffered any negative consequences from defendants' medical treatment, he has not cited to any evidence which would support the requisite nexus between his protected conduct and the adverse action. On July 26, 2012, plaintiff filed a grievance (MHK-12773-12) complaining of inadequate medical treatment, harassment, food tampering, and conspiracy. [27] *Id.* at 11. The record also establishes that plaintiff filed grievances in July 2012 and November 2013 related to his medical care at Walsh. Dkt. No. 29-1 at 11; Dkt. No. 45-9 at 9, 11. Plaintiff also filed numerous grievances related to his medical care at Upstate. *Id.* at 50, 51, 57, 96. However, the record does not contain any proof from which a reasonable factfinder could conclude that any action by these defendants was motivated by plaintiff's filing of grievances or the commencement of *Cole I.* These defendants were not named as defendants in *Cole I,* and are not referenced anywhere in plaintiff's amended complaint in that action. *See Cole I* (Dkt. No. 16). There is no evidence of any connection between these defendants and defendant Durante or the prior grievances nor, indeed, is there any record evidence that these defendants were even aware that plaintiff filed grievances or a

lawsuit. The evidence now before the court fails to establish a connection between these defendants and plaintiff's grievance and lawsuit. Simply stated, the record is devoid of any evidence from which a reasonable factfinder could conclude that these defendants retaliated against plaintiff for the filing of grievances and a lawsuit.

[27]      The record contains a copy of a CORC decision dated February 20, 2013, resolving a grievance filed on July 26, 2012. Dkt. No. 29-1 at 11. The names of the Walsh medical staff and corrections officers identified in the grievance were redacted, however, and the record does not contain a copy of the original grievance.

4. Defendants Wagner and Corey

With regard to defendants Wagner and Corey, plaintiff has failed to adduce any facts indicating that he engaged in protected conduct as it relates to these two defendants. The grievances at issue did not involve these defendants, and plaintiff has failed to offer any facts indicating these defendants knew that he had engaged in protected conduct. Indeed, plaintiff testified that he never saw defendant Wagner before the day of the alleged assault, and never filed any grievance against defendants Corey or Wagner. Dkt. No. 45-3 at 48-49; 120-121.

Plaintiff claims that defendant Corey was aware of his prior grievances and complaints regarding harassment based upon his position as Deputy Superintendent of Security. This contention, however, is unsupported by the record or any competent evidence, and instead appears to be the product of sheer surmise on plaintiff's part. Because the record contains no evidence from which a reasonable factfinder could conclude that there exists a causal connection between plaintiff's grievances, complaints and lawsuit and adverse action by defendant Wagner or defendant Corey, I recommend that the court grant this portion of defendants' motion and dismiss plaintiff's retaliation cause of action as against these two defendants.

I. Personal Involvement/Supervisory Liability
Plaintiff asserts claims against defendants Judway, Upstate Deputy Superintendent of Administration Sandra Danforth, Sharma, Gonyea, Prack, and DOCCS Acting Commissioner Anthony Annucci. Those claims appear to be based solely upon their supervisory positions and plaintiff's contention

that those defendants were aware of ongoing constitutional violations and failed to prevent them from continuing. *See, e.g.* Dkt. No. 29 at ¶102; Dkt. No. 54-2 at 18-19; Dkt. No. 45-3 at 122, 159, 168, 170. Plaintiff also maintains that defendant Annucci failed to transfer him out of Walsh after plaintiff settled his prior lawsuit. Dkt. No. 54-2 at 12. Defendants argue that the record before the court fails to establish their involvement in any constitutional violations.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [42 U.S.C.] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). As the Supreme Court has noted, a defendant may only be held accountable for his own actions under section 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009) ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

**\*28** It is well-established that individuals who are sued in their capacities as supervisors, cannot be liable for damages under section 1983 solely by virtue of being a supervisor. *See Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("[L]iability ... cannot rest on respondeat superior."); *Wright*, 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

In the face of defendants' summary judgment motion, in which they assert the insufficiency of plaintiff's allegations against the aforementioned supervisory defendants, plaintiff must offer evidence which would implicate their personal involvement in the constitutional violations.

### 1. Defendant Judway

Plaintiff claims that defendant Judway was personally involved in the use of force incident, and cites to Judway's testimony during the November 2013 disciplinary hearing as support for that allegation. Plaintiff maintains that Judway testified that he authorized defendants Durante and Wagner to "get Cole by any means necessary." Dkt. No. 45-3 at 66. Unfortunately, the record now before the court does not contain either a transcript from that hearing or an affidavit from defendant Judway. Though admittedly tenuous, assuming there was a constitutional violation related to the use of force incident, it is conceivable that a reasonable factfinder could credit plaintiff's claim and conclude that defendant Judway was personally involved. This could suffice to potentially support a finding of the requisite personal involvement on the part of defendant Judway to support a finding of liability against him. For this reason, I have recommended a finding that plaintiff has raised genuine questions of material fact regarding defendant Judway's personal involvement, sufficient to avoid summary judgment on this basis.

### 2. Defendant Gonyea

Plaintiff alleges that defendant Gonyea received notice that defendants Durante and LoRusso were threatening and harassing plaintiff in July 2012. Defendants' motion does not contain any declaration or affidavit from defendant Gonyea. Rather, defendants summarily state, without reference to the July 2012 letter, that Gonyea is being sued solely due to his position in the prison hierarchy. The court finds that defendants have failed to sustain their initial burden of proving that there are no material issues of fact with respect to Gonyea's personal involvement. Accordingly, I recommend defendants' motion with respect to defendant Gonyea be denied.

### 3. Defendant Prack

Case 9:17-cv-00366-DNH-TWD Document 93 Filed 03/08/21 Page 237 of 353
Cole v. New York State Department of Corrections and..., Not Reported in Fed....
2016 WL 5394752

Plaintiff's claims against defendant Prack arise from the two disciplinary hearings conducted to address the November 1, 2013 misbehavior report, and his role in reviewing the resulting determinations. Plaintiff appealed the disciplinary determinations by defendants Corey and Bullis, and defendant Prack responded to those internal appeals. Dkt. No. 29-1 at 44, 59; Dkt. No. 45-13 at 10; Dkt. No. 54-2 at 18. With respect to the first disciplinary hearing, for the same reasons cited in support of my recommendation that plaintiff's claims against defendant Corey be dismissed, I also recommend dismissal of all claims against defendant rack arising out of that first disciplinary hearing. Turning to the second hearing, I have found no basis to conclude that the second hearing was conducted in a manner that failed to comport with due process. Accordingly, I recommend the court also grant defendants' motion with respect to plaintiff's due process claim asserted against Prack arising from the second hearing. *See, e.g., Lopez v. Whitmore*, No. 13-CV-0952 (BKS/ATB), 2015 WL 4394604, at *11 (July 16, 2015) (dismissing due process claim against defendant Prack "[b]ecause his only involvement in plaintiff's claims was to affirm the results of a disciplinary hearing that th[e] court ... found comported with due process").

#### 4. Defendants Danforth and Sharma

**\*29** Plaintiff asserts supervisory liability claims against defendant Sharma based upon his position as the Health Service Director at Walsh. Dkt. No. 45-3 at 170. Plaintiff also claims that defendant Danforth was responsible for investigating plaintiff's complaints against the medical staff. *Id.* at 159. As was discussed above, I have recommended a finding that plaintiff failed to raise an issue of material fact with respect to his Eighth Amendment medical indifference claims, and that they are subject to dismissal. Accordingly, for the reasons set forth in Part III(I)(3) above, I recommend that the portion of defendants' motion for summary judgment seeking dismissal of plaintiff's supervisory claims against defendants Danforth and Sharma be granted.

#### 5. Defendant Annucci

At his deposition, plaintiff testified that he is suing Acting Commissioner Annucci in this action for four reasons, alleging that Annucci (1) is at the top of the chain of command as Deputy Commissioner of DOCCS; (2) failed to investigate the alleged assault on plaintiff; (3) failed to respond to letters

from plaintiff; and (4) failed to transfer plaintiff out of Walsh after becoming aware of the prior lawsuit. Dkt. No. 45-3 at 121-122; Dkt. No. 54-23 at 12.

With regard to the failure to transfer plaintiff, "[a] supervisor's failure to transfer a prisoner out of a facility may constitute deliberate indifference where the supervisor 1) knows that the conditions of confinement expose the prisoner to serious risk of harm, and 2) the supervisor has the authority to transfer the prisoner to another facility." *Kane v. Pierce*, No. 106-CV-01564, 2009 WL 189955, at *3 (E.D. Cal. Jan. 26, 2009), *report and recommendation adopted*, 2009 WL 674127 (E.D. Cal. Mar. 16, 2009) (citations omitted).

Plaintiff's claims against Annucci are based upon plaintiff's unsupported assumption that Annucci received plaintiff's letters. Dkt. No. 45-3 at 123 ("I wrote him several times. He would refer back to the facility. He did nothing."). Indeed, there is no record evidence, including any testimony from plaintiff, regarding where, when, or by what means plaintiff forwarded a letter or complaint directly to Annucci. In any event, even assuming that Annucci received plaintiff's letters, Annucci's failure to respond to them is not sufficient to give rise to personal involvement under section 1983. *Parks v. Smith*, No. 08-CV-0586 (TJM/GHL), 2011 WL 4055415, at *14 (N.D.N.Y. March 29, 2011) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement.").

For these reasons, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Annucci was personally involved in any of the allegations giving rise to this action.

#### J. Defendant Judway

Plaintiff claims that defendant Judway failed to adhere to DOCCS policy when he authorized a strip search of the plaintiff without preparing the appropriate paperwork. Dkt. No. 29 at 49-51; Dkt. No. 45-3 at 66. The allegations in plaintiff's amended complaint related to defendant's failure to adhere to DOCCS's regulations or policies do not give rise to a cognizable claim under section 1983. *See Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal constitutional rights."); *Barnes v. Henderson*, 628 F.Supp.2d 407, 411 (W.D.N.Y. 2009) ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation."). I therefore recommend

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 238 of 353

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

the dismissal of plaintiff's claims against defendant Judway based upon his alleged failure to comply with DOCCS policies and procedures.

K. ADA Claims [28]

[28]    Plaintiff does not specify what portions of the ADA are triggered by defendants' actions. Reading his amended complaint liberally, it appears that he brings this complaint under Title II of the Act.

**\*30**  Title II of the ADA prohibits discrimination on the basis of disability by public entities, providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 45 (2d Cir. 2002). The protections offered under Title II extends to inmates in state correctional facilities like Upstate. *See Pa. Dep't of Corrs. v. Yeskey,* 524 U.S. 206, 213 (1998) ("[T]he plain text of Title II of the ADA unambiguously extends to state prison inmates[.]").

To establish a violation under the ADA, a plaintiff must demonstrate that (1) he is a qualified individual with a disability; (2) the defendant is subject to the ADA; and (3) he was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of a disability. *Henrietta D.,* 331 F.3d at 272. The ADA defines a "disability" in part as a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(A). A "qualified individual with a disability" is one "who, with or without reasonable modifications to rules, policies or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

Plaintiff claims that his hearing impairment was diagnosed by prison officials and known to all defendants, and constitutes a disability. Dkt. No. 54-2 at 20; Dkt. No. 29-1 at 79-81. Defendants argue that the issue of whether plaintiff's hearing loss is a disability for the purposes of the ADA has already been resolved by the United States District Court for the Southern District. Dkt. No. 45-16 at 20. In *Cole v. Goord, et. al.,* No. 05 Civ 2902 (S.D.N.Y. filed August 29, 2009) ("*Cole*

II"), the court dismissed ADA claims brought by the plaintiff, finding that he did not have a hearing disability. *See Cole v. Goord,* 2009 WL 2601369, at *8 (S.D.N.Y. Aug. 25, 2009). In doing so the court reasoned:

> Defendants acknowledge that Cole has some difficulty hearing and has been diagnosed with non-significant bilateral hearing loss by the audiologists who have examined him. (*See* Def. Rule 56.1 Statement, & 8.) But Cole has not demonstrated that this hearing loss "substantially limits" a major life activity as required by the ADA. With the hearing aids which defendants provided for him and which he wears daily, Cole can hear "clear[ly and] pick[ ] up everything." Because measures taken to correct or mitigate a physical impairment are relevant to whether an impairment substantially limits a major life activity, *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 482-83, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *see also Fall v. New York State United Teachers,* 289 Fed. Appx. 419, 421 (2d Cir. 2008) (finding that plaintiff did not assert, or support with credible evidence, the proposition that her hearing loss was substantial when the corrective measures were employed), Cole has no hearing disability for purposes of the ADA.

*Id.* (internal citations omitted).

Issue preclusion, often referred to as collateral estoppel, bars a party that had a full and fair opportunity to litigate an issue of fact or law from relitigating the same issue once it has been decided against that party. *Proctor v. LeClaire,* 715 F.3d 402, 414 (2d Cir. 2013); *McKithen v. Brown,* 481 F.3d 89, 105 (2d Cir. 2007), *cert denied,* 552 U.S. 1179, 128 S.Ct. 1218, 170 L.Ed.2d 59 (2008). Issue preclusion applies when

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 239 of 353

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

**\*31** (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

*Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (quotation marks omitted); *accord, Proctor*, 715 F.3d at 414; *see also McKithen*, 481 F.3d at 105.

The burdens applicable to the factors informing the issue of collateral estoppel are variously allocated. The party seeking to invoke issue preclusion bears the burden of demonstrating that the nature of the issues are identical, and "they were necessarily decided in the prior action." *Kulak v. City of N.Y.*, 88 F.3d 63, 72 (2d Cir. 1996). The burden of demonstrating that the prior action did not afford a full and fair opportunity to litigate the issue, however, rests with the party opposing application of the doctrine. *Kulak*, 88 F.3d at 72. The determination of whether the previous action provided a full and fair opportunity to litigate requires consideration of several factors, including

the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, the competence and expertise of counsel, the availability of new evidence, the differences in the applicable law and the foreseeability of future litigation.

*Shell v. Brun*, 362 F.Supp.2d 398, 400 (W.D.N.Y. 2005) (quoting *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 500, 501 (1984)).

From the record now before the court, it is clear that plaintiff raised the claim now being asserted in *Cole II*, and that the precise issue now presented – that is, whether his hearing

loss constitutes a disability under the ADA – was decided against him. There is nothing to suggest that plaintiff was not afforded a full and fair opportunity to litigate that claim in the prior proceeding. Even though *Cole II* was brought against different defendants, because the Southern District concluded that plaintiff did not suffer from a hearing disability for the purposes of the ADA, that determination is entitled to full faith and precludes plaintiff from mounting a challenge in this court. *See Garrett v. Angelone*, 940 F.Supp. 933, 940-41 (W.D. Va. 1996) ("Because the factual issue of discrimination on the basis of handicap at Deep Meadow was litigated and decided by the Eastern District in the previous action, [the plaintiff] is estopped from rearguing this factual issue in any later litigation."). Moreover, there is nothing in the record to suggest that plaintiff's hearing loss has materially deteriorated. Indeed, in opposition to defendants' motion, plaintiff relies solely upon medical evidence from 2004 and 2009. Dkt. No. 29-1 at 79-81. Accordingly, I find no basis to disagree with the Southern District's determination, and on this basis I recommend granting defendants' motion for summary judgment dismissing plaintiff's ADA claims under the doctrine of collateral estoppel.

### L. Negligence Claims

Plaintiff claims that defendants Mandalaywala, Kowalachuk, Smith, Schroyer, and Danforth were negligent when they failed to order "follow-up examinations" and provide plaintiff with treatment by a urologist. Dkt. No. 29 ¶106.

**\*32** By statute, New York vests state employees, including correctional employees, with immunity from suits for damages arising from conduct performed within the scope of their employment. N.Y. Corr. Law § 24. The relevant statute provides as follows:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, which for purposes of this section shall include members of the state board of parole, in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 240 of 353
Cole v. New York State Department of Corrections and..., Not Reported in Fed....
2016 WL 5394752

and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24; *see also Ierardi v. Sysco*, 119 F.3d 183, 186-87 (2d Cir. 1997). Section 24 thus precludes claims against corrections personnel brought against them in any court in their personal capacities arising out of the discharge of their duties. *Baker v. Coughlin*, 77 F.3d 12, 14-15 (2d Cir. 1996). Because "a federal court applying pendent jurisdiction is forced to apply state substantive law to a state claim, this would result in inmates being prohibited from advancing such pendent claims along with their federal claims in federal court." *O'Diah v. Fischer*, No. 08-CV-0941, 2012 WL 987726, at *21 (N.D.N.Y. Feb. 28, 2012) (Homer, M.J.), *report and recommendation adopted by* 2012 WL 976033 (N.D.N.Y. Mar. 22, 2012) (McAvoy, J.). Additionally, because the New York State Court of Claims is one of "limited jurisdiction," hearing only claims against New York State, "[section] 24 amounts to a grant of immunity for corrections officers sued in their personal capacities for claims arising out of the discharge of their duties." *Rucano v. Koenigsmann*, No. 12-CV-0035, 2014 WL 1292281, at *15 (N.D.N.Y. Mar. 31, 2014) (D'Agostino, J.).[29]

[29]    To be sure, the immunity afforded under section 24 is by no means absolute. Actions taken by corrections employees occurring during the course of their employment but wholly outside of their scope of employment, for example, lack the protection of that provision. The circumstances presented in *Ierardi*, for example, involving a claim of sexual harassment by a special education teacher employed by the DOCCS against a corrections officer assigned to the same facility, serve to aptly illustrate the type of situation in which section 24 would not afford protection. *Ierardi*, 119 F.3d at 188-89.

In 2009, the Supreme Court held that section 24 violates the Supremacy Clause to the extent it delegates to the New York State Court of Claims jurisdiction to adjudicate civil rights cases arising under section 1983. *Haywood v. Drown*, 556 U.S. 729, 734-36 (2009). While the Supreme Court concluded that section 24 violates the Supremacy Clause as it applies to claims brought under section 1983, it did not find the statute unconstitutional when applied to claims arising under New York State law. Accordingly, "courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS employees and have

continued to dismiss those claims under Corrections Law § 24." *Rounds v. Thompson*, No. 12-CV-0953, 2013 WL 3187074, at *4 (N.D.N.Y. June 20, 2013) (Sharpe, J.); *see also May v. Donneli*, No. 06-CV-0437, 2009 WL 3049613, at *5 (N.D.N.Y. Sept. 18, 2009) (Sharpe, J., adopting report and recommendation by Treece, M.J.) ("A claim brought pursuant to state law does not implicate the Supremacy Clause, and therefore, the Haywood decision does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim.").

**\*33**    To determine whether section 24 is applicable to a corrections officer's alleged misconduct, "courts generally look at the factors associated with New York's scope of employment analysis." *Ierardi*, 119 F.3d at 187 n. 3 (citing *Johnson v. N.Y. State Dep't of Corr. Servs. & Cmty. Supervision*, No. 11-CV-0079, 2013 WL 5347468, at *3 (W.D.N.Y. Sept. 23, 2013)). Those factors include:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

*Johnson*, 2013 WL 5347468, at *3 (citing *Riviello v. Waldron*, 391 N.E.2d 1278, 128 (N.Y. 1979)). Ultimately, "an employee will be considered within the scope of his employment so long as he is discharging his duties, no matter how irregularly, or wi what disregard of instructions." *Cepeda v. Coughlin*, 513 N.Y.S.2d 528, 530 (N.Y. 1987) (quotation marks omitted).

In this case, all of plaintiff's allegations against the defendants now under consideration stem from events that occurred at Upstate while all defendants were on duty. Because each defendant in this case was "discharging his [or her] duties" relating to plaintiff's medical treatment, I find that the allegations in the amended complaint plausibly suggest that defendants were acting within the scope of their employment as DOCCS employees while undertaking the conduct alleged

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 241 of 353

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

by plaintiff *Cepeda*, 513 N.Y.S.2d at 530. For this reason, I recommend that plaintiff's negligence claims arising under New York law be dismissed.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's amended complaint in this action contains an amalgamation of claims against various defendants ranging from the Acting Commissioner of the DOCCS down to corrections officers and medical personnel employed at the facilities in which he was confined at the relevant times. All of plaintiff's claims relate to or stem from the alleged use of excessive force at Walsh and plaintiff's medical treatment at Walsh and Upstate. Having thoroughly reviewed the record now before the court, I find that the record discloses the existence of fact issues regarding whether plaintiff failed to exhaust his administrative remedies with respect to his claims against defendants LoRusso and Michaels. Turning to the merits of plaintiff's claims, I find the existence of genuine issues of material fact precluding the entry of summary judgment dismissing plaintiff's excessive force cause of action against defendants Durante, LoRusso, and Wagner; failure to protect claim against defendant Michaels; and retaliation claims asserted against defendant Durante.[30]

[30]    As the foregoing indicates, I have found that if the November 2013 were not viewed as a nullity, summary judgment dismissing that claim as against defendant Corey would be precluded based upon the finding of material issues of fact surrounding plaintiff's removal from that proceeding. I nonetheless recommended a finding, however, under the circumstances of this case, that defendant Corey is entitled to qualified immunity since no reasonable person in his circumstances would conclude that removing plaintiff from the disciplinary hearing would clearly violate established constitutional principles.

**\*34** Turning to plaintiff's claims against defendants Gonyea and Judway, I find that plaintiff has demonstrated a sufficiently plausible basis for finding the requisite degree of personal involvement in the actions taken by these two defendants to avoid summary judgment. I also find, however, that neither plaintiff's amended complaint nor the record before the court discloses any basis for finding personal involvement on the part of defendants Annucci and Prack in the constitutional deprivations alleged.

I further find that plaintiff's claims of deliberate indifference against Walsh and Upstate employees are deficient because, even when accepted as true and interpreted in his favor, the evidence fails to reflect deliberate indifference to his condition, instead merely reflecting a disagreement and plaintiff's dissatisfaction with the course of his treatment. Additionally, I conclude that plaintiff's due process claims against Tousignant, Michaels, and Bullis; retaliation claims against LoRusso, Wagner, Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, Kowalachuk, and Corey; ADA claims; and claims that defendant Judway violated DOCCS rules and policy are deficient as a matter of law, and thus I recommend that summary judgment be entered dismissing those claims. I also recommend a finding that plaintiff's state law negligence claims are subject to dismissal based on N.Y. Correction Law § 24.

It is therefore hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 45) be GRANTED, in part, and that plaintiff's claims against defendants DOCCS, Annucci, Prack, Bullis, Corey, Tousignant, Sharma, Trabout, Mara, Dutch, Peterson, P. Henderson, D. Williamson, J. Henderson, Danforth, Mandalaywala, Schroyer, Kowalachuk, Smith, and M. Williamson be DISMISSED and that plaintiff's retaliation claims against LoRusso and Wagner be DISMISSED, but that the motion otherwise be DENIED in all respects, and that the matter proceed with regard to plaintiff's excessive force claims against defendants Durante, Wagner, and LoRusso; retaliation claims against defendant Durante; supervisory claims against defendants Judway and Gonyea; and failure to protect claim against defendant Michaels based upon events occurring at Walsh.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated: August 25, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5394752

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Morehouse v. York,  N.D.N.Y.,  January 7, 2016

2015 WL 4394604
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edgardo L. LOPEZ, Plaintiff,

v.

N. WHITMORE, et. al., Defendants.

No. 9:13–CV–952 (BKS/ATB).
|
Signed July 16, 2015.

**Attorneys and Law Firms**

Edgardo L. Lopez, Last Known Address, Syracuse, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Christopher W. Hall, Assistant Attorney General, The Capitol, Albany, NY, for Defendants.

**ORDER**

Hon. BRENDA K. SANNES, District Judge.

**\*1** Plaintiff Edgardo L. Lopez, a former New York State inmate, commenced this civil rights action under 42 U.S.C. § 1983 raising federal and state claims against New York State Department of Correction officials arising out of plaintiff's confinement at Marcy Correctional Facility. Dkt. Nos. 1, 32. On October 9, 2014, defendants filed a motion for summary judgment which was referred to United States Magistrate Judge Andrew T. Baxter. Dkt. Nos. 69, 83. On May 20, 2015, Judge Baxter issued a Report–Recommendation, recommending that defendants' motion for summary judgment be granted, and that plaintiff's First Amendment and Eighth Amendment claims be dismissed without prejudice to refiling and that plaintiff's due process and state law claims be dismissed with prejudice. Dkt. No. 83, p. 24. Judge Baxter advised the parties that:

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have

fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72.

Dkt. No. 83, p. 24. A copy of the Report–Recommendation was mailed to Lopez's last known address via certified mail. Dkt. No. 83. Lopez's copy of the Report–Recommendation was returned to the Court marked "Return to sender, unable to forward." Dkt. No. 85.

On June 8, 2015, Lopez filed a notice of change of address and a request for an extension of time to respond to the Report–Recommendation. Dkt. Nos. 86–87. Lopez noted that he received the Report–Recommendation that day at the public counter in the courthouse. Dkt. No. 87. The Court granted Lopez's request for an extension of time and, in a text order dated June 8, 2015, extended the due date for filing objections to June 22, 2015. The text order was mailed to Lopez's last known address. Lopez's copy of the text order was returned to the Court marked "Return to sender, not deliverable as addressed, unable to forward." Dkt. No. 89.

In a Decision and Order on June 29, 2015, the Court reminded Lopez of his obligation to notify the Court of any change in address, *see* Local Rule 10.1(c)(2), and provided Lopez an additional fourteen days to file his current address and any objections to the Report and Recommendation. Dkt. No. 90, pp. 2–4. The Court advised Lopez that if he failed to comply with the Decision and Order, the Court would "consider the Report and Recommendation as unopposed and review for clear error only." Dkt. No. 90, p. 4. The Decision and Order was served on Lopez via certified mail at his last known address. Dkt. No. 90. On July 8, 2015, the Court received an executed return receipt of delivery. Dkt. 91. Lopez has not, to date, filed any objections to the Report–Recommendation.

**\*2** Accordingly, as no objections to the Report–Recommendation have been filed and the time for filing objections has expired, the Court reviews the Report–

2015 WL 4394604

Recommendation for clear error. *See Glaspie v. N.Y.C. Dep't of Corr.,* No. 10 CV 00188(GBD)(JCF), 2010 WL 4967844, at *1, 2010 U.S. Dist. LEXIS 131629, at *2–3 (S.D.N.Y. Nov. 30, 2010) (explaining that when no objections to report and recommendation are made, "the Court may adopt [it] if there is 'no clear error on the face of the record.' ") (quoting *Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 253 (S.D.N.Y.2005)). Having reviewed the Report and Recommendation in its entirety and having found no clear error, it is hereby:

**ORDERED** that the Report–Recommendation (Dkt. No. 83) is **ADOPTED in its entirety** for the reasons stated therein; and it is further

**ORDERED** that the defendants' motion for summary judgment (Dkt. No. 69) is **GRANTED;** and it is further

**ORDERED** that plaintiff's due process and state law claims are **DISMISSED with prejudice;** and it is further

**ORDERED** that plaintiff's remaining claims under 42 U.S.C. § 1983 relating to assault and retaliation are **DISMISSED without prejudice to refiling;** and it is further

**ORDERED** that the Clerk of the Court shall close this case; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Order as well as the Report–Recommendation (Dkt. No. 83) upon all parties in accordance with the local rules.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N .Y. 72.3(c) by the Honorable Brenda K. Sannes, United States District Judge.

In this civil rights action, plaintiff claims that in May 2013, several correctional officers assaulted him during his confinement at the Marcy Correctional Facility ("Marcy") in retaliation for filing a grievance, and then issued several false disciplinary charges against plaintiff to cover up their actions.

(Amended Compl ., Dkt. No. 32, ¶¶ 26–55). Plaintiff amended his complaint in November 2013 to further allege that the disciplinary hearing related to these charges violated his due process rights. (*Id.* ¶¶ 60–74). Plaintiff also raises several state law tort claims in connection with the alleged assault. (*Id.* ¶ 77, 80, 82).

Presently before the court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 (Dkt. No. 69). Plaintiff has opposed the motion. (Dkt. No. 73) [1] . Defendants did not submit a reply.

[1]    Plaintiff requested oral argument on defendant's motion. That request is denied, and this court will make its report and recommendation based upon the parties' papers and the record.

For the reasons set forth below, this court recommends that defendants' summary judgment motion be granted. Plaintiff's claims should be dismissed because no rational fact finder could conclude that he exhausted his administrative remedies as to the assault and retaliation claims as required before filing an action under 42 U.S.C. § 1983, or that plaintiff failed to receive all the process that he was due during his disciplinary hearing. Plaintiff's state law claims, raised pursuant to the court's supplemental jurisdiction, should also be dismissed.

### *DISCUSSION*

### I. Summary Judgment

**\*3**  Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106

S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc. .,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin,* 467 F.3d at 272.

To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint must not be conclusory or overly general. *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at *3 & n. 10 (N.D.N .Y. Apr. 24, 2006). Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Id.,* 2006 WL 1133247, at *3 & n. 11 (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.")).

## II. Exhaustion of Administrative Remedies

**\*4** Plaintiff has alleged that he was the victim of two separate assaults by Marcy Correctional Officers on the morning of May 7, 2013. (Amended. Compl., Dkt No. 32, ¶¶ 31–38, 43). Plaintiff further alleges that the assaults were in retaliation for a prior grievance which he had submitted against one or more of the defendants, and that the defendants then issued him disciplinary tickets for failing to obey orders and possessing a weapon in order to cover up their actions[2] . (*Id.* ¶ 55). Based on the record discussed below, the court concludes that no reasonable fact finder could conclude that the plaintiff

had completed the administrative grievance process for these claims prior to commencing this federal proceeding. Accordingly, this court recommends that plaintiff's First Amendment retaliation claims and Eighth Amendment cruel and unusual punishment claims be dismissed for failure to exhaust administrative remedies.

[2]      Defendants assert that plaintiff has failed to state a claim in connection with the misbehavior reports, since plaintiff's allegations of retaliation are conclusory and defendant was found guilty based upon the evidence at his disciplinary hearing. (Def. Mem. of Law, Dkt. No. 69–4, at 8–10). In his response, plaintiff has requested that the court dismiss the claim for retaliatory misbehavior reports in order to focus on the assault claim. (Pl.'s Mem of Law, Dkt. No. 73–1, at 9). Because I am recommending that defendants be granted summary judgment on the retaliation claim due to plaintiff's failure to exhaust administrative remedies, I do not need to address whether summary judgment should be granted on the merits on this claim.

### A. Legal Standards

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (exhaustion requirement applies, *inter alia,* to excessive force claims)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court held that, in order to properly exhaust an inmate's administrative remedies, he must complete

the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the superintendent of the relevant facility. *Id.* § 701.5(c). Adverse decisions at the superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

**\*5** At the same time that the Second Circuit decided *Giano,* it also decided four related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused.[3] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.* Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some discussion.[4] Although the Second Circuit has not explicitly held that *Hemphill* remains good law, it has applied the three-part inquiry in post-*Woodford* cases. *See, e.g., Messa v. Goord,* 652 F.3d 305, 309 (2d Cir.2011); *Davis v. State of New York,* 311 F. App'x 397, 399 (2d Cir.2009).

3      *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

4      See, e.g., *Newman v. Duncan,* 04–CV–395 (TJM/DRH), 2007 WL 2847304, at * 2 n. 4 (N.D.N.Y. Sept. 26, 2007); *Shariff v. Coombe,* 655 F.Supp.2d 274, 285–86 n. 7 (S.D.N.Y.2009).

**B. Application**

Plaintiff filed a grievance on June 17, 2013, after being transferred to Downstate Correctional Facility ("Downstate"), alleging that on May 7, 2013, certain Marcy Correctional Officers verbally and physically abused him following a pat-down frisk while plaintiff was en route from the Marcy housing unit to the facility's infirmary. (Def. Statement of Material Facts, Dkt No. 69–1, ¶ 4; Pl's Resp. to Def. Statement of Material Facts, Dkt No. 73, 4). This grievance was acknowledged and forwarded for investigation by IGRC on June 19, 2013. (Dkt. No. 73–2, Pl's Ex. 3(B)). On September 17, 2013, the Downstate Superintendent denied plaintiff's grievance. (Hall Aff, Dkt. No. 69–3, Ex. 3; Dkt No. 73–2, Pl's Ex. 3(C)). On September 23, 2013, Plaintiff appealed this determination to the Central Office Review Committee. *Id.* On June 11, 2014, CORC issued its decision denying the grievance, the final step in the administrative process. (Dkt. No. 73–2, Pl's Ex. 3(D)).

While the administrative grievance process was ongoing, Plaintiff commenced this litigation on August 12, 2013, alleging essentially the same facts as his grievance. (Dkt. No. 1, Compl.). Plaintiff later submitted an Amended Complaint dated November 3, 2013 which restated the assault and retaliation claims and added a due process claim arising out of the related disciplinary hearing. (Dkt. No. 32, Amended Compl.)

In their motion for summary judgment, defendants argue that plaintiff failed to exhaust his administrative remedies relating to his assault and retaliation claims prior to commencing this federal litigation [5]. Plaintiff argues that his administrative remedies were exhausted upon filing his grievance on June 17, 2013, and that "[i]t is common knowledge that one not need to wait on the CORC decision in order to file a civil action against New York State Department of Corrections and Community Supervision (N.Y.SDOCCS) employees for committing such brutally physical body harm upon plaintiff." (Pl's Mem. of Law, Dkt. No. 73–1, at 7). Plaintiff also asserts that his administrative grievance was not resolved within a reasonable time, as it took three months to receive the Downstate Superintendent's determination, and another ten months before the CORC determination was issued. (*Id.* at 8).

[5]    Defendants had previously raised the failure to exhaust administrative remedies as an affirmative defense in their answer to the Amended Complaint. (Dkt. No. 37, Def.Answer, 12).

**\*6** "The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532. Plaintiff did not complete the state administrative grievance process for the assault and retaliation claims before commencing this litigation, and therefore failed to exhaust his administrative remedies in accordance with the PLRA. The only excuse offered by plaintiff, that the administrative grievance process took an unreasonably long time, is unavailing. (Pl's Mem. of Law, Dkt. No. 73–1, at 8). If the superintendent failed to timely respond to plaintiff's grievance, Plaintiff needed to appeal that failure to the CORC before commencing this litigation. "If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA." *Croswell v. McCoy,* 01–CV–0547, 2003 WL 962534, at \*4 (N.D.N.Y. Mar.11, 2003) (Sharpe, M.J.). [6]

[6]    The New York regulations specifically state that if a grievance is not decided within the time limits provided, the inmate may appeal to the next step. 7 N.Y.C.R.R. § 701.6(g)(ii)(2). In *Pacheco v. Drown,* 9:06–CV–20, 2010 WL 144400, at \*19 & n. 21 (N.D.N.Y. Jan.11, 2010), U.S. District Judge Glenn Suddaby held that the failure by the IGRC or the

Superintendent to timely respond to a grievance or first level appeal may be appealed to the next level, including the CORC, in order to properly complete the grievance process. *Accord, Murray v. Palmer,* 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, \*2 & nn. 4, 6 (N.D.N.Y. March 31, 2010).

In applying the Second Circuit's three-party inquiry, plaintiff has offered no evidence to suggest that the grievance process was unavailable to him, that the defendants are estopped from asserting the defense of failure to exhaust, or that there are any other special circumstances under *Hemphill* and its progeny that would excuse plaintiff's failure to exhaust his administrative remedies.

In support of defendants' motion, Jeffrey Hale, the DOCCS Assistant Director of the Inmate Grievance Program ("IGP") and the custodian of records for CORC, which maintains files of grievance appeals by inmates, submitted a declaration based upon his review of those records. (Dkt. No. 69–2). Ass't Dir. Hale certified that CORC records contained five separate grievances filed by plaintiff for the period between September 2012 and May 2014. (Hale Decl., Dkt. No. 69–2, ¶¶ 6–7, 10, and Ex. B).

During his August 26, 2014 deposition, plaintiff acknowledged that he was familiar with the DOCCS grievance process and understood that CORC is the final administrative step for deciding an inmate grievance. (Hall Aff, Dkt No. 69–3, Ex. 1 at 18). While plaintiff asserts that he was discouraged from reporting the alleged assaults immediately afterwards by threats from one or more of the defendants, plaintiff not only filed a detailed administrative grievance, but also raised the assault and retaliation allegations during his disciplinary hearing. *See, e.g., Black v. Fischer,* No. 12 Civ. 2341, 2013 WL 1314940, at \*8–9 (S.D.N.Y. Mar. 28, 2013) (the plaintiff's claim that he was deterred from pursuing grievances by threats from a defendant was overcome by the fact that plaintiff filed other grievances and complaints during the relevant time period).

It is true that under certain circumstances, an inmate may exhaust his administrative remedies by raising his claim during a related disciplinary proceeding. *Giano,* 380 F.3d at 678–79; *Johnson,* 380 F.3d at 697. However, such exhaustion is essentially limited to instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing, and (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison

officials the time and opportunity to thoroughly investigate that claim. *Murray,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *3 (collecting cases). Here, where plaintiff filed a grievance eleven days after the hearing, there is no indication that he reasonably believed that the disciplinary hearing was his only available remedy. In addition, the disciplinary hearing officer, defendant Cavaleri, informed plaintiff that his testimony regarding the assault was "not credible," and plaintiff declined to call any witnesses or question any witnesses. (Hall Aff., Dkt. No. 69–3, Ex. 4). No rational fact-finder could conclude that plaintiff had articulated or pursued his claim in a manner that afforded prison officials an opportunity to investigate his claim.

**\*7** During the pendency of this litigation, plaintiff received a decision by the CORC, dated June 11, 2014, upholding the Superintendent's denial of the grievance. (Dkt. No. 73–2, Pl's Ex. 3(C)). While it is true that this decision means that plaintiff has now exhausted his administrative remedies, the Second Circuit has held that a plaintiff must exhaust his remedies ***before*** filing his federal action, and that the court must dismiss plaintiff's complaint notwithstanding his subsequent exhaustion. *Neal v. Goord,* 267 F.3d 116, 122–23 (2d Cir.2001).

Because plaintiff failed to exhaust his administrative remedies by failing to wait for the CORC's decision, this court is constrained to recommend dismissing this complaint without prejudice. Plaintiff may immediately re-file his action on the First and Eighth Amendment claims because he has now exhausted his remedies. As in *Neal,* plaintiff may find that requiring him to initiate a new law suit is "judicially inefficient." *Id.,* 267 F.3d at 123. However, the Second Circuit specifically rejected such an argument, finding that "if during the pendency of a suit, the administrative process were to produce results benefitting plaintiff, the federal court will have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset." *Id.*

## II. Due Process–Disciplinary Hearing

### A. Plaintiffs Request for Voluntary Dismissal

Plaintiff amended his complaint in November 2013 to add a due process cause of action alleging deficiencies in the disciplinary hearing arising out of the incidents at Marcy. (Dkt. No. 32). The Amended Complaint was filed after plaintiff's administrative appeal was denied, and therefore plaintiff has exhausted his administrative remedies as to

the due process issue. *See Chavis v. Goord,* No. 9:00–CV–1418 (LEK/DEP), 2007 WL 2903950 (N.D.N.Y.2007) (citing *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). Defendants seek summary judgment on the merits of this claim, arguing that plaintiff was afforded all process that was due.

In response, plaintiff has requested that the court dismiss his due process claim, in order to focus on the alleged assault. However, since plaintiff's request for dismissal comes after the defendants have answered (Dkt. No. 37) and moved for summary judgment (Dkt. No. 69), and the parties have not stipulated to dismissal, plaintiff has no right to a voluntary dismissal. Fed.R.Civ.P. 41(a)(1). Instead, dismissal lies in the discretion of the court. *See* Fed.R.Civ.P. 41(a)(2) ("Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper."); *see also Lebewohl v. Heart Attack Grill LLC,* 890 F.Supp.2d 278, 304 (S.D.N.Y.2012) ("A trial court has great discretion in considering whether to grant a motion for voluntary dismissal under the rule.").

The circumstances of this case weigh heavily in favor of denying plaintiff's motion for voluntary dismissal and deciding defendants' motion for summary judgment on the due process claim. These claims have been pending since 2013, and the parties have engaged in discovery, including the deposition of plaintiff. (Hall Aff., Dkt. No. 69–3, Ex. 1). Defendants filed a summary judgment motion, fully supported by numerous affidavits and exhibits, to dismiss plaintiff's claims with prejudice, in October 2014. (Dkt. No. 69). Plaintiff, who requested permission in November 2013 specifically to add the due process claims, provides no justification for withdrawing these claims, other than stating that his "complaint is not about the Tier Hearing nor Due Process regarding the tier hearing, but the factual facts that the defendants physically assaulted plaintiff...." (Pl.'s Mem. of Law, Dkt. No. 73–1, at 3).

**\*8** At this stage of the proceedings, it would be unfair and unduly prejudicial to the defendants to allow plaintiff to withdraw his due process claim, particularly given the potential that plaintiff may re-file this litigation in order to raise the now administratively exhausted assault claims. *See, e.g., Murray v. Fischer,* No. 9:11–CV–225 (GLS/ATB), 2015 WL 457693, at *2–3) (denying prisoner's motion to dismiss certain claims without prejudice and granting defendants' motion for summary judgment instead); *Emory v. New York,* No. 11–CV–1774, 2013 WL 1881009, at *3 (E.D.N.Y. May

6, 2013) (denying plaintiffs' motion to dismiss action without prejudice where plaintiffs failed to proffer reasons why their "voluntary" dismissal came so late in the litigation, and only after the defendants marshaled strong arguments in favor of dismissal in substantive motions, both because it reflects plaintiffs' lack of diligence and because it may subject defendants to the burden of relitigating these same claims); *Krivchenko v. Clintondale Aviation, Inc.,* No. 1:13–CV–820 (TJM), 2014 WL 4684808, at *4 (N.D.N.Y. Sept.18, 2014) (denying voluntary motion to dismiss action, filed without adequate explanation after defendant filed a motion for summary judgment motion, because it indicates an "an undue vexatiousness" and could potentially subject the defendants to the burden of unnecessary relitigation). The court will now address the merits of plaintiff's due process claims.

### B. Legal Standards

In order to begin a due process analysis, the court first determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determines whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ...., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–84.

The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit automatically gives rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin." Colon,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

*9 The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). The hearing officer's findings must be supported by "some reliable evidence." *Id.* (*citing, inter alia, Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)).

In certain cases, an inmate has a limited right to assistance with his disciplinary hearing. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). An assistant has been held to be constitutionally necessary in cases in which a plaintiff is confined in SHU, illiterate, or unable to grasp the complexity of the issues, and therefore, unable to marshal evidence and present a defense. *Id.* (citation omitted). In those cases, the assistant must do what the plaintiff would have done if he were able, but need not go beyond the inmate's instructions. *Id.*

### C. Application

Since the disciplinary hearing resulted in a one year sentence to the special housing unit ("SHU"), plaintiff is considered to have a liberty interest subject to due process protection. Plaintiff alleges that defendants issued him fabricated disciplinary tickets to cover up the alleged retaliatory assault, leading to procedural due process and privacy violations. It is well established that fabricated or false disciplinary charges do not violate an inmate's due process rights, so long as an inmate received a proper disciplinary hearing, with a determination based upon "some evidence." *See Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Therefore, the analysis focuses on the disciplinary hearing itself, and this court recommends that defendants' motion for summary judgment be granted.

### 1. Adequacy of Assistance at the Hearing

Because he was transferred to the SHU after disciplinary charges relating to the threatening notes were filed against him, plaintiff was entitled to assistance in preparing for his hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citing *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988)). Plaintiff alleges that he requested assistance, but that the employee

assistant, who is not named as a defendant, refused to help plaintiff locate relevant documents and threatened physical violence. (Amended Compl., Dkt. No. 32, ¶ 68).

At the beginning of the disciplinary hearing, defendant Cavaleri inquired about the pre-hearing assistance, and asked whether plaintiff wanted to identify any witnesses or make any other requests before the hearing commenced. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 4). At the close of the hearing, plaintiff was also given an opportunity to raise any issues on the record. (*Id.* at 36). Plaintiff declined to raise any issues before or after the hearing about the quality or conduct of his pre-hearing assistant. Plaintiff's bare allegations in the Amended Complaint, which do not identify the offending officer, are not sufficient to overcome defendants' motion for summary judgment. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case"). Moreover, even assuming for purposes of this motion that plaintiff's allegations are accurate, plaintiff waived any objection to inadequate assistance when he failed to raise the issue during the disciplinary hearing. *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (plaintiff waived right to object to allegedly inadequate assistance when he did not raise the issue when questioned by hearing officer); *Hailey v. Provost,* No. 94–CV–1616 (RSP/DS), 1997 WF 627547 at *2 & n. 3 (N.D.N.Y., Oct. 9, 1997) (inmate waived right to effective employee assistance by specifically answering "no sir" after hearing officer asked if he needed any additional assistance).

## 2. Use of OMH Information

**\*10** Plaintiff alleges that defendant Cavaleri's consideration of testimony from State Office of Mental Health ("OMH") staff regarding plaintiff's psychiatric and medical history violated his due process right to privacy. (Amended Compl., Dkt. No. 32, 71). Defendant Cavaleri advised plaintiff during the hearing that such testimony was admitted and would be considered, but did not disclose the contents of that evidence. Following policy, the OMH testimony was heard without the plaintiff present. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 36).

In the United States Constitution, there exists a right to privacy, protecting an individual's interest in avoiding the disclosure of personal matters. *Doe v. City of New York,* 15 F.3d 264, 267 (2d Cir.1994) (citing *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)). This right is protected by the Due Process Clause. *O'Connor v.*

*Pierson,* 426 F.3d 187, 201 (2d Cir.2005) (citing *Whalen,* 429 U.S. at 598–600). The right to privacy has also been "characterized as a right to 'confidentiality,' which 'includes the right to protection regarding information about the state of one's health.' " *Matson v. Bd. of Ed. of City School Dist. of New York,* 631 F.3d 57, 64 (2d Cir.2011) (quoting inter alia *Doe,* 15 F.3d at 267).

With respect to the "disclosure" of medical information, an inmate's privacy right varies with the inmate's condition, with a greater interest in preventing the disclosure of highly sensitive conditions. *Id.* (citations omitted). Prison officials may impinge upon the inmate's privacy right only to the extent that their actions are "reasonably related to legitimate penological interests." *Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir.1999).

The Second Circuit has concluded that the OMH policy of offering such testimony outside the patient's presence during a prison disciplinary proceeding is constitutionally valid and does not violate any due process right. *See Powell v. Coughlin,* 953 F.2d 744, 749 (2d Cir.1991). As the disclosure of unfavorable mental health evaluations in an inmate's presence will likely impair the inmate-clinician relationship, and the disclosure of favorable evaluations may encourage inmates to "act out" in order to obtain such findings, the policy of hearing mental health testimony outside the inmate's presence, followed in this case, is reasonably related to legitimate penological interests and is an appropriate measure. *Id.*

## 3. "Some" Evidence Standard

Plaintiff alleges that defendant Cavaleri was biased, that plaintiff's guilt was not based upon reliable evidence, and that Cavaleri failed to consider plaintiff's testimony, particularly about injuries following the alleged assault. (Amended Compl., Dkt. No. 32, 74). Defendants argue that the disciplinary hearing transcript shows that defendant Cavaleri explained plaintiff his rights, read him the charges and took his not guilty plea. (Def. Mem. of Law at 10–12). Plaintiff was allowed to offer testimony, and given the opportunity to call and question witnesses. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 8–22). Plaintiff declined to propose questions for any witness. (*Id.*). When the witness testimony was concluded, plaintiff was given an opportunity to rebut their statements. (*Id.* at 26–30). After plaintiff raised the issue of injuries suffered in the alleged assault, defendant Cavaleri reviewed plaintiff's medical records with the assistance of a physician's assistant. (*Id.* at 35). When issuing his disposition,

defendant Caveleri noted the consistent testimony of seven witnesses, and the lack of any evidence that would support plaintiff's testimony (*Id.* at 39).

**\*11** As the hearing officer, Defendant Cavaleri was authorized to make credibility determinations. *See Lewis v. Johnson,* No. 9:08–CV–482 (TJM/ATB), 2010 WL 3785771, at \*11 n. 25 (N.D.N.Y. Aug.5, 2010) ("the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing"), *Rep't. Rec. adopted,* 2010 WL 3762016, at \*1 (N.D.N.Y. Sept.20, 2010). It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Alien v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

The constitutional standard for sufficiency of evidence in a prison disciplinary hearing is whether there is "some" or "a modicum" of evidence to support the hearing officer's determination. *Sira v. Morton,* 380 F.3d 57, 76 (2d Cir.2004) (citing *Superintendent v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). In this case, there was sufficient evidence supporting the hearing officer's determination. Defendant Cavaleri specifically noted the consistent testimony of seven witnesses, and the lack of evidence to support plaintiff's testimony, which was deemed not credible.

The record evidence supports the conclusion that plaintiff's due process rights were satisfied in his disciplinary hearing. Accordingly, this court recommends that defendants' motion for summary judgment as to plaintiff's due process claims against defendant Cavaleri be granted. Because his only involvement in plaintiff's claims was to affirm the results of a disciplinary hearing that this court has found comported with due process, summary judgment should also be granted with respect to defendant Prack [7].

[7]  The court notes that if plaintiff had stated a valid due process claim, the fact that defendant Prack affirmed the disciplinary finding could constitute sufficient personal involvement. *See Thomas v. Calero,* No. 09–CV–5209, at \*11–18 (S .D.N.Y.

Mar. 17, 2011) (Rep't.-Rec.) (lengthy discussion of personal involvement as it relates to the affirmance of a disciplinary hearing and determination that such a claim would survive a motion to dismiss); *Rodriguez v. Selsky,* No. 9:07–CV–432, 2011 WL 1086001, at \*4–7 (N.D.N.Y. Jan.25, 2011) (Rep't–Rec.), *adopted,* 2011 WL 830639 (N.D.N.Y., Mar.3, 2011).

### III. State Law Claims

Plaintiff asserts a number of tort claims including assault and battery, invasion of privacy, sexual harassment, infliction of mental, emotional and physical distress and negligence in connection with the incidents at Marcy, all arising out of New York State statutory and common law. (Am. Compl., Dkt No. 32, 77, 79, 80, 82). Defendants have moved for summary judgment dismissing these claims, arguing that pursuit of such tort claims in this action is statutorily precluded pursuant to New York Corrections Law § 24. (Def. Mem. of Law, Dkt. No. 69–4, at 12–13). Plaintiff counters that the United States Supreme Court ruled Corrections Law § 24 unconstitutional, and that, in any case, state law immunity does not extend to excessive force claims, which fall outside the ordinary scope of a correctional officer's employment duties. (Pl.'s Mem. of Law, Dkt. No. 73–1, at 9–12).

**\*12** New York Corrections Law § 24 precludes "the assertion of claims against corrections officers in any court, including the federal courts," by designating the New York State Court of Claims as the only available venue to bring a claim for damages arising out of the acts committed by corrections officers within the scope of their employment." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996).

In *Haywood v. Drown,* 556 U.S. 729, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009), cited by plaintiff in his response (Pl's Mem. of Law, Dkt. No. 73–1, at 11), the Supreme Court held that New York Corrections Law § 24 was unconstitutional to the extent that it precludes inmates from pursuing § 1983 actions in state or federal court. However, plaintiff overstates the scope of *Haywood* as it pertains to this litigation.

Although the *Haywood* decision found New York Corrections Law § 24 to be in violation of the Supremacy Clause, it did so only with respect to claims brought under federal law, such as § 1983. In applying supplemental jurisdiction, federal courts are bound to apply state substantive law to claims brought pursuant to state statute or common law. *Baker,* 77 F.3d at 15. The courts of this district have unanimously held that

2015 WL 4394604

the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS officials. *See, e.g., Rucano v. Koenigsmann,* No. 9:12–CV–35 (MAD/RFT), 2014 WL 1292281, *16 (N.D.N.Y., Mar.31, 2014); *Rounds v. Thompson,* No. 9:12–CV–953, 2013 WL 3187074 at *4 (N.D.N.Y.2013) (collecting cases). If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court must not allow that claim to be appended to a federal law claim in federal court. *Baker,* 77 F.3d at 15.

Plaintiff alleges that he was assaulted during a pat-down by correctional officers as he traversed a prison walkway, and then again while being transported and questioned about the incident. (Amended Compl. Dkt No. 32, ¶ 24–43). Transporting an inmate and subduing that individual, should a disciplinary issue arise, is 'common conduct by a DOCCS officer or sergeant.' " *Crosby v. Russell,* No. 9:10–CV–595, 2014 WL 3809129, *5 (N.D.N.Y.2014) (quoting *Johnson v. N.Y. State Dep't of Corr. Servs. & Cmty. Supervision,* No. 11–CV–0079, 2013 WL 5347468, at *3 (W.D.N.Y. Sept. 23, 2013)). Ultimately, "an employee will be considered within the scope of his employment so long as he is discharging his duties, 'no matter how irregularly, or with what disregard of instructions.' " *Id.,* 2014 WL 3809129, *6 (quoting *Cepeda v. Coughlin,* 128 A.D.2d 995, 996, 513 N.Y.S.2d 528 (3d Dep't 1987)). Therefore, based upon the allegations in the amended complaint, this court recommends that defendants' motion for summary judgment as to plaintiff's state law claims be granted, without leave to amend.

Even if New York Corrections Law § 24 did not apply, this court would still recommend dismissal of plaintiff's state law claims in light of the recommendations of dismissal of all federal causes of action in plaintiff's amended complaint. *See* 28 U.S.C. § 1367(c)(3) (the district court may decline to exercise supplemental jurisdiction over a claim if all other claims over which the court has original jurisdiction have been dismissed); *City of Chicago v. International College of Surgeons,* 522 U.S. 156, 172, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997); *Pitchell v. Callan,* 13 F.3d 545, 549 (2d Cir.1994).

**\*13  WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 69) be **GRANTED,** and that plaintiff's First Amendment and Eighth Amendment Claims be **DISMISSED WITHOUT PREJUDICE TO REFILING,** and that plaintiff's due process and state law claims be **DISMISSED WITH PREJUDICE.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed May 20, 2015

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4394604

---

**End of Document**                                   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Cucchiara v. Dumont, Not Reported in Fed. Supp. (2019)

2019 WL 2516605

2019 WL 2516605
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Gregory CUCCHIARA, Plaintiff,

v.

C.O. DUMONT,[1] Defendant.

[1] Dumont is the only remaining Defendant in this matter. Therefore, the caption includes only Dumont.

9:18-CV-0182 (GLS/CFH)
|
Signed 04/26/2019

**Attorneys and Law Firms**

Gregory Cucchiara, 16-A-0922, Elmira Correctional Facility, P.O. Box 500, Elmira, New York 14902, Plaintiff pro se.

OF COUNSEL: RYAN L. ABEL, ESQ., Assistant Attorney General, Attorney General for the State of New York, The Capitol, Albany, New York 12224-0341, Attorney for Defendants.

**REPORT-RECOMMENDATION AND ORDER**[2]

[2] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff pro se Gregory Cucchiara ("Cucchiara"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 against Defendant C.O. Dumont ("Defendant" or "Dumont") for violations of his rights under the Eighth Amendment. Dkt. No. 2 ("Compl."). Presently before the Court is Defendant's motion for summary judgment. Dkt. No. 34. Cucchiara opposed the motion, and Defendant submitted a reply. Dkt. Nos. 36, 37. For the following reasons, it is recommended that Defendant's motion for summary judgment be granted.

**I. Background**

**A. Facts**

In support of the motion, Defendant filed a Statement of Material Facts.[3] See Dkt. No. 34-1. The facts are reviewed in the light most favorable to Cucchiara as the non-moving party. See subsection II (A) infra. At the time of the incident described in the Complaint, Cucchiara was confined at Great Meadow Correctional Facility ("Great Meadow C.F."). See generally, Compl.

[3] Local Rule 7.1(a)(3) states:
Summary Judgment Motions
Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.
The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.
N.D.N.Y. L.R. 7.1(a)(3).

Plaintiff alleges that on February 26, 2017, he and Defendant were involved in a use of force incident. Compl. at 4. At approximately 6:00 p.m., as plaintiff was leaving the mess hall to return to his housing block, an officer ordered him to place his hands on the wall of the rotunda. Id.; Dkt. No. 34-3 at 49-53. Cucchiara complied and Defendant searched his pockets. Dkt. No. 34-3 at 53, 63. Defendant removed an empty medicine bottle from Cucchiara's right pocket. Id. at

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 254 of 353
**Cucchiara v. Dumont, Not Reported in Fed. Supp. (2019)**
2019 WL 2516605

53, 58-59. When Cucchiara yelled out, Defendant punched him in the back of his head. Id. at 53. Defendant continued to punch Cucchiara and "slammed" him to the floor. Id.; Compl. at 4. Another officer arrived and kicked Cucchiara's hip while Defendant continued to "beat" his ribs. Dkt. No. 34-3 at 53-54; Compl. at 4. As a result of the incident, Cucchiara suffered injuries to his left hip. Compl. at 4; Dkt. No. 34-3 at 32.

**\*2** In April 2017, Cucchiara was transferred out of Great Meadow C.F. Dkt. No. 34-5 at ¶ 10; Dkt. No. 34-7 at ¶ 12.

### B. Procedural History

On January 19, 2018, the United States District Court for the Southern District of New York ("Southern District") received the Complaint in the within action.[4] Dkt. No. 2. By Order filed on January 24, 2018, Chief United States District Judge Colleen McMahon of the Southern District transferred this action to the Northern District of New York ("Northern District"). Dkt. No. 4 ("Transfer Order"). On review of the Complaint, the Court directed Defendant to respond to the Eighth Amendment claim. Dkt. No. 12. On May 3, 2018, Defendant filed an Answer to the Complaint.[5] Dkt. No. 17. On November 30, 2018, Cucchiara appeared at a deposition. Dkt. No. 34-3. On March 13, 2019, Defendant filed the within motion pursuant to Fed. R. Civ. P. 56 seeking judgment as a matter of law with respect to Cucchiara's Eighth Amendment claim. Dkt. No. 24.

[4]    Cucchiara was confined at Auburn Correctional Facility at the time he filed the Complaint.

[5]    In the Answer, Defendant pleaded, inter alia, the affirmative defense that Cucchiara failed to exhaust his administrative remedies. Dkt. No. 17 at ¶ 14.

## II. Discussion[6]

[6]    All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

### A. Legal Standards

#### 1. Motion for Summary Judgment

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. See id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

**\*3** Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions

Cucchiara v. Dumont, Not Reported in Fed. Supp. (2019)

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 255 of 353

2019 WL 2516605

themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law ....

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### 2. N.D.N.Y. Local Rule 7.1(a)(3)

Local Rule 7.1(a)(3) requires a party moving for summary judgment to file and serve a Statement of Material Facts. See N.D.N.Y. L.R. 7.1(a)(3). "The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue." Id. The opposing party is required to file a response to the Statement of Material facts "admitting and/or denying each of the movant's assertions in matching numbered paragraphs." Id. "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." Id. (emphasis omitted).

In response to Defendant's motion, plaintiff filed a one-page letter that failed to respond to Defendant's Statement of Material Facts. Dkt. No. 36. Defendant argues that because plaintiff has failed to file a response to his Statement of Material Facts, the facts set forth therein must be deemed admitted. Dkt. No. 37 at 4. The undersigned is not required to "perform an independent review of the record to find proof of a factual dispute." Prestopnik v. Whelan, 253 F. Supp 2d 369, 371 (N.D.N.Y. 2003) (concluding that the "plaintiff's suggestion that the transcript and videotape of the [incident] be reviewed to support her Statement of Material Facts Not in Dispute does not cure her failure to comply with Rule 7.1(a)(3)."). Although the defendant argues, and the Local Rules provide, that the Court shall deem admitted any facts the nonmoving party fails to "specifically controvert," pro se plaintiffs are afforded special solicitude in this District and within the Second Circuit. N.D.N.Y. L.R. 7.1(a)(3); Dkt. No. 37 at 6; see subsection II.A. supra.

Even in the absence of a response, Defendant is entitled to judgment only if the material facts demonstrate his entitlement to judgment as a matter of law. See Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996); FED. R. CIV. P. 56(c). A copy of Cucchiara's deposition transcript was annexed as an exhibit to Defendant's motion. Dkt. No.

34-3. Additionally, the undersigned notes that "[a] verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist...." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (citations omitted). Here, Cucchiara's Complaint was properly verified by declaration under 28 U.S.C. § 1746. Compl. at 10; see LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 65-66 (2d Cir. 1999) (holding that use of the language "under penalty of perjury" substantially complies with 28 U.S.C. § 1746). As such, the facts set forth in Defendant's Rule 7.1 Statement of Material Facts are accepted as true to the extent that they are not disputed by Cucchiara's sworn deposition testimony or facts set forth in the verified Complaint. N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.") (emphasis omitted).

### B. Exhaustion

**\*4** Defendant contends that the motion for summary judgment must be granted because Cucchiara failed to exhaust his administrative remedies through available grievance procedures. See Dkt. No. 34. The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. 983. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Id. at 524, 122 S.Ct. 983. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). The Supreme

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 256 of 353

Cucchiara v. Dumont, Not Reported in Fed. Supp. (2019)

2019 WL 2516605

Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, — U.S. —, 136 S. Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). Thus, the "special circumstances" exception in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016). [7]

[7]    In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See Williams, 829 F.3d at 123. The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." Id. (citing Ross, 136 S. Ct. at 1858-59).

Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

If it is found that the plaintiff has not exhausted all available administrative remedies, his or her case should be dismissed without prejudice. See Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec's. Dealers, Inc., 560 F.3d 118, 124 (2d Cir. 2009) (citation omitted). Since "[f]ailure to exhaust administrative remedies is often a temporary, curable procedural flaw," and "[i]f the time permitted for pursuing administrative remedies has not expired, a prisoner ... can cure the defect by exhausting [the available remedies] and reinstating his suit." Berry v. Kerik, 366 F.3d 85, 87 (2d Cir. 2004) (quoting Snider v. Melindez, 199 F.3d 108, 111-12 (2d Cir. 1999)).

**1. Did Plaintiff Exhaust his Administrative Remedies?** [8]

[8]    First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii). Parties do not dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5.

**\*5** In support of the motion for summary judgment, Defendant provided the Declaration of Shelley Mallozzi ("Mallozzi"), the Director of the Inmate Grievance Program ("IGP") for DOCCS. Dkt. No. 34-5. Mallozzi avers that "[a]n allegation of excessive force may be the subject for the three step grievance process[.]" Dkt. No. 34-5 at ¶ 8. Mallozzi reviewed Central Office Review Committee ("CORC") records for determinations upon grievance appeals brought by Cucchiara and found no grievance appeals from 2017 to the present. Id. at ¶ 9. Defendant also submitted the Declaration of Alexandra Mead ("Mead"), the IGP Supervisor at Great Meadow C.F. Dkt. No. 34-7. Mead reviewed Great Meadow C.F. records and found no grievances filed by Cucchiara related to allegations of excessive force on or around February 26, 2017. Id. at ¶ 13.

**Cucchiara v. Dumont, Not Reported in Fed. Supp. (2019)**
2019 WL 2516605

Case 9:17-cv-00366-DNH-TWD   Document 93   Filed 03/08/21   Page 257 of 353

Cucchiara testified that he did not file a grievance related to the incident.[9] Dkt. No. 34-3 at 84. During the deposition Cucchiara was asked the following questions and gave the following responses:

> Q. Did you file a grievance with respect to this incident at issue here?
>
> A. No. all -- all I did was -- was say that they beat me up for nothing, that's it.
>
> Q. Who did you say that to?
>
> A. Sergeant Boiling, I think.

Dkt. No. 34-3 at 84.

> Q. Okay. So you never filed anything in writing regarding this prior to commencing the lawsuit itself?
>
> A. I told a whole bunch of people. I told -- I told -- there's a --
>
> Q. Okay.
>
> A. -- a mental counsel -- counselor or you see some type of shrink or something like that. His -- his name -- his name is Ford --

Dkt. No. 34-3 at 86.

[9]    In the Complaint, Cucchiara claims that he filed a grievance at Auburn C.F. related to religious claims. Compl. at 6-7. The record does not indicate when this grievance was filed and Cucchiara does not allege that the grievance addressed the 2017 use of force incident.

In opposition to Defendant's motion, Cucchiara provided a submission that is at odds with his deposition testimony. To wit, Cucchiara claims that he wrote "several times about the [ ] incident" to the Superintendent and did not receive a response. Dkt. No. 36. Cucchiara also maintains that he wrote "a dozen times" to the Inspector General and "on several occasions" to "Albany." Id.

As an initial matter, the undersigned notes that "[a] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." Raskin v. Wyatt Co., 125 F.3d 55, 63 (2d Cir. 1997).

Here, with regard to plaintiff's alleged letters, even assuming Cucchiara wrote to the Inspector General and "Albany," it is well-settled in this Circuit that a plaintiff's letters to prison officials or other officials outside the grievance chain of command are insufficient to properly exhaust administrative remedies. See Geer v. Chapman, No. 9:15-CV-952 (GLS/ATB), 2016 WL 6091699, at *5 (N.D.N.Y. Sept. 26, 2016), report and recommendation adopted, 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016) (citing Macias v. Zenk, 495 F.3d 37, 44-45 (2d Cir. 2007) ("It is well-settled that writing letters to prison officials, or other officials, is insufficient to properly exhaust administrative remedies.")). Thus, to the extent that Cucchiara did send letters,[10] these letters are insufficient to constitute proper exhaustion.

[10]    Cucchiara has not proffered evidence of such letters.

With respect to letters plaintiff alleges that he sent to the Superintendent, construing his submission liberally, Cucchiara argues that he exhausted the remedies available to him related to excessive force because he utilized the expedited administrative process.

Where the grievance involves allegations of employee excessive force, as alleged by Cucchiara, there is an expedited administrative process. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8; see Torres v. Carry, 691 F. Supp. 2d 366, 369-70 (S.D.N.Y. 2009). Complaints and grievances of this nature are forwarded directly to the superintendent of the facility. See Bell v. Napoli, No. 9:17-CV-850 (ATB), 2018 WL 6506072, at *2 (N.D.N.Y. Dec. 11, 2018). In such cases the superintendent is required to order an investigation and render a decision within twenty-five (25) days. N.Y.C.R.R., title 7, § 701(a)-(f). If the superintendent fails to respond within the required twenty-five (25) time limit the inmate may appeal his grievance to the CORC. Disagreement with the superintendent's decision in the expedited review process also requires an appeal to the CORC. See id. § 701.8(g)-(h); see also Espinal v. Goord, 588 F.3d 119,125 (2d Cir. 2009) (explaining IGP and the expedited procedure for harassment claims and its appeal mechanism through the CORC). The Second Circuit has long recognized this procedure as an "available remedy" for purposes of the PLRA. See Hall v. Cnty. of Saratoga, No. 10-CV-1120 (NAM/CFH), 2013 WL 838284, at *1-2 (N.D.N.Y. Mar. 6, 2013).

Case 9:17-cv-00366-DNH-TWD  Document 93  Filed 03/08/21  Page 258 of 353
**Cucchiara v. Dumont, Not Reported in Fed. Supp. (2019)**
2019 WL 2516605

**\*6**  Cucchiara did not provide any evidence of a complaint, grievance, or any subsequent appeal. [11] Even assuming that Cucchiara forwarded letters to the Superintendent and that the letters were received, as discussed supra, DOCCS records do not show any grievances that were appealed regarding an excessive force incident. See Dkt. No. 34-5. Cucchiara testified that he did not appeal to CORC because he "didn't even know [CORC] existed." Dkt. No. 34-3 at 86. To the extent that Cucchiara contends that he was unaware of the grievance procedures, a plaintiff's "failure to exhaust his remedies cannot be excused merely because he did not know there were any other steps in the grievance procedure." Cobbs v. Lamare, No. 9:14-CV-96 (MAD/TWD), 2015 WL 2452323, at \*6 (N.D.N.Y. May 21, 2015) (citation and internal quotation marks omitted). Accordingly, plaintiff's letters do not constitute proper exhaustion.

[11]   See Footnote 8, supra.

Furthermore, insofar as Cucchiara argues that he sufficiently exhausted his administrative remedies because he verbally complained to several officials, "[t]he law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA." Timmons v. Schriro, No. 14-CV-6606, 2015 WL 3901637, at \*3 (S.D.N.Y. June 23, 2015) (citation omitted). Additionally, here, where Cucchiara's litigation history indicates that he was fully aware that verbal complaints do not excuse an inmate from pursuing the grievance procedure, such a claim is not reasonable. During the deposition, Cucchiara testified that he previously commenced a civil action in the Southern District alleging violations of his constitutional rights while he was in the custody of the New York City Department of Corrections. Dkt. No. 34-3 at 8, 31; see Cucchiara v. Hollingsworth, et al., No. 15-CV-314, 2016 WL 6068193 (S.D.N.Y. Oct. 14, 2016). In that action, Cucchiara claimed that his "grievances and complaints to 'capt[a]ins and staff' were 'ignored.' " Id. at \*7. In a 2016 Decision and Order on the defendants' motion for summary judgment on the issue of exhaustion, the Court dismissed the claims against certain defendants explaining that Cucchiara's verbal complaints, "do[ ] not excuse his failure to pursue all four steps of the IGRP — he was still required to timely request a formal hearing before the IGRC, to appeal to the commanding officer, and ultimately, to the CORC." Id. (citation omitted).

Because Cucchiara's letters and verbal complaints, outside of the grievance process, are insufficient to exhaust his administrative remedies, there is no genuine dispute that Cucchiara failed to exhaust administrative remedies related to the 2017 use of force incident.

## 2. Availability of Administrative Remedies

Construing the Complaint liberally, Cucchiara urges the Court to excuse his failure to exhaust because he feared retaliation. [12] Compl. at 7-8. Specific threats of retaliation or intimidation by prison employees can render administrative remedies unavailable. See Ross, 136 S. Ct. at 1860 & n.3. However, a generalized fear of retaliation is insufficient to overcome a failure to exhaust administrative remedies. See Salmon v. Bellinger, No. 9:14-CV-0827 (LEK/DJS), 2016 WL 4411338, at \*5 (N.D.N.Y. July 5, 2016).

[12]       In the Complaint, as a "reason[ ] why [he] did not file a grievance," Cucchiara stated, "I was left susceptible [sic] attack through practical magic with the lack of my amulet." Compl. at 7.

Here, Cucchiara testified that, on two prior occasions, when he filed grievances, "they almost got [him] killed." Dkt. No. 34-3 at 85. Cucchiara claims that corrections officers ordered other inmates to beat him, denied him medical treatment, and stole his property. Compl. at 7-8. Cucchiara does not state how any specific threat impacted his ability to exhaust administrative remedies related to the events that occurred on February 26, 2017. On review of the record, the undersigned concludes that much of Cucchiara's fear is generalized. Indeed, Cucchiara offers no evidence establishing that he was threatened by any officers after the February 26, 2017 incident. See Salmon, 2016 WL 4411338, at \*5 (stating there must be affirmative actions or specific instances of physical assault or threats of retaliation for plaintiff to show unavailability of the grievance process); Harrison v. Stallone, No. 9:06-CV-902(LEK/GJD), 2007 WL 2789473, at \*5 (N.D.N.Y. Sept. 24, 2007) ("It has been held that a 'general fear' of retaliation is not sufficient to excuse the exhaustion requirement ... If an inmate could simply state that he feared retaliation, there would no point in having a grievance procedure.") (citations omitted) (emphasis omitted). Moreover, insofar as Cucchiara suggests that he feared physical retaliation if he were to file a grievance, such a claim is further countered by the fact that the Complaint fails to mention any fear of retaliation.

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 259 of 353
Cucchiara v. Dumont, Not Reported in Fed. Supp. (2019)
2019 WL 2516605

\*7  In sum, because Cucchiara fails to plausibly present questions of fact regarding his failure to exhaust his remedies, it is recommended that Defendant's motion for summary judgment be granted.

### III. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendant's motion for summary judgment (Dkt. No. 34) be: **GRANTED**; and it is further

**RECOMMENDED**, that the Complaint be **DISMISSED without prejudice**; and it is further

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72. [13]

[13]    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

### All Citations

Not Reported in Fed. Supp., 2019 WL 2516605

---

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 260 of 353

Geer v. Chapman, Not Reported in Fed. Supp. (2016)

2016 WL 6090874

2016 WL 6090874
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Pakenauth GEER, Plaintiff,

v.

Officer CHAPMAN et al., Defendants.

9:15-cv-952 (GLS/ATB)
|
Signed 10/18/2016

**Attorneys and Law Firms**

FOR THE PLAINTIFF: PAKENAUTH GEER, 05-A-1952, BUFFALO FEDERAL DETENTION FACILITY, 4250 Federal Drive, Batavia, New York 14020.

FOR THE DEFENDANTS: HON. ERIC T. SCHNEIDERMAN, New York State Attorney General, The Capitol, OF COUNSEL: MICHAEL G. MCCARTIN, Assistant Attorney General, Albany, New York 12224.

## **ORDER**

Gary L. Sharpe, Senior District Judge

**\*1** The above-captioned matter comes to this court following an Report-Recommendation by Magistrate Judge Andrew T. Baxter, duly filed on September 26, 2016. (Dkt.

No. 32.) Following fourteen days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Report-Recommendation for clear error, it is hereby

**ORDERED** that the Report-Recommendation (Dkt. No. 32) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 23) be **GRANTED**; and it is further

**ORDERED** that the plaintiff's amended complaint, (Dkt. No. 6), is **DISMISSED IN ITS ENTIRETY**; and it is further

**ORDERED** that the Clerk is directed to close the case; and it is further

**ORDERED** that the clerk of the court serve a copy of this order upon the parties in accordance with this court's Local Rules.

**IT IS SO ORDERED.**

October 18, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6090874

---

End of Document                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 261 of 353

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)

2017 WL 2791063

KeyCite Yellow Flag - Negative Treatment
Distinguished by  Sawyer v. Locy,  N.D.N.Y.,  December 16, 2020

2017 WL 2791063
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Edy RODRIGUEZ, Plaintiff,
v.
J. CROSS, Sergeant, Clinton
Correctional Facility; et al., Defendants.

No. 15-CV-1079 (GTS/CFH)
|
Signed 05/09/2017

**Attorneys and Law Firms**

Edy Rodriguez, East Elmhurst, NY, pro se.

Ryan E. Manley, Harris, Conway & Donovan, Christopher J. Hummel, New York State Attorney General, Albany, NY, for Defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff pro se Edy Rodriguez ("Plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that Sergeant ("Sgt.") J. Cross, Sgt. R. Furnia, Correction Officer ("C.O.") G. Falcon, and C.O. J. Roberts (collectively "Defendants") violated his constitutional rights under the First and Eighth Amendments. Dkt. No. 1 ("Compl."). [2]

[2]    On March 27, 2017, this Court granted plaintiff an extension until May 1, 2017 to file a motion to amend his complaint. Dkt. No. 38. The deadline

has expired and plaintiff has not filed a motion to amend his complaint.

Presently pending is defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(a) for plaintiff's failure to exhaust administrative remedies before commencing this action. Dkt. No. 26. Plaintiff filed a response in opposition to defendants' motion. Dkt. No. 34. Defendants filed a reply. Dkt. No. 39.

**I. Background**

The facts are reviewed in the light most favorable to plaintiff as the non-moving party. See subsection II(A) infra. At the relevant times giving rise to plaintiff's claims, plaintiff was an inmate incarcerated at Clinton Correctional Facility ("Clinton").

On July 10, 2014, plaintiff wrote a letter to Sgt. Cross "complaining about being harassed" by staff at Clinton. Compl. at 4. Plaintiff further alleges that he was taken out of his cell on July 14, 2014, brought to the second floor of the facility's hospital, and subjected to a "beating" by defendants. Compl. at 4-5. Sgt. Cross grabbed him by the hair; Sgt. Furnia punched him; and C.O. Falcon and C.O. Roberts punched him in the face, back, and neck. Id. at 4. Plaintiff alleges "each one of the blows" he suffered was from the named defendants, as well as other officers he cannot identify by name. Id. at 5-6. After the alleged incident, plaintiff was seen by a nurse with "about ten" officers present in the room, where he admits "having no choice," but to tell the nurse that officers had just beat him up. See Affirmation of Christopher J. Hummel ("Hummel Aff."), Dkt. No. 26-1, Exhibit ("Exh.") A [3] at 59-60. [4]

[3]    Exhibit A to the Affirmation of Christopher J. Hummel is a transcript of plaintiff's deposition, held on September 19, 2016 at Great Meadow Correctional Facility. See Dkt. No. 26-1.

[4]    When citing documents within the record, the Court uses the page numbers generated by CM/ECF.

While at Clinton, plaintiff filed five grievances. See Declaration of Christine Gregory ("Gregory Decl."), Dkt. No. 26-3 Exh. A at 6. Only one grievance was appealed. Declaration of Jeffrey Hale ("Hale Decl."), Dkt. No. 26-2 ¶¶ 12-13. The subject matter of the single appealed grievance

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 262 of 353

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)

2017 WL 2791063

does not concern the matter before the Court. Id. ¶ 12. The only grievance filed that is pertinent to the pending motion was filed on July 29, 2014. See Gregory Decl. Exh. B at 8. This grievance alleges that plaintiff suffered "an assault by (C.O.)" and, following the assault, did not receive appropriate medical care. Id. The investigation into the July 29, 2014 grievance concluded that plaintiff saw his medical provider, and medicine was given to him without any further action. Id. at 10. The investigation did not mention anything about an assault. Id.

**\*2** Plaintiff alleges that he filed a grievance regarding the incidents described in his complaint, but an unidentified Sergeant destroyed the grievance. Compl. at 2. He also alleges that he was beaten by correction staff for filing the grievance. Id. Plaintiff also states that he filed a handwritten grievance (not on a grievance form) on July 19, 2014, regarding the July 14, 2014 incident. See Hummel Aff. Exh. A at 93. Plaintiff alleges that he sent a copy of this grievance to his mother and instructed her to send it directly to Clinton "[f]rom outside." Id. at 94. Defendants have no record of this grievance being filed. See Gregory Decl. Exh. A at 6. Plaintiff never inquired further about the July 19, 2014 grievance, but maintains that he has handwritten copies of the grievance since he did not have access to carbon paper when he originally drafted this grievance. See Hummel Aff. Exh. A at 94-95, 96-97. The July 19, 2014 grievance was drafted while plaintiff was in keeplock. Id. at 93.

Plaintiff further alleges, in his response to defendants' motion for summary judgment, that defendants have total control over facility mail and any failure to exhaust administrative remedies occurred because defendants strategically removed grievances from the mailbox to cover up their use of excessive force against plaintiff. See Dkt. No. 34 at 4. Plaintiff further alleges a general belief that there is a pattern of prison officials threatening and retaliating against inmates for filing grievances, thus making administrative remedies unavailable. Id. at 6. Lastly, plaintiff alleges that there is an "unwritten posture" at Clinton where inmates are not given grievance forms unless they provide a clear description of their complaint, or the complaint does not involve staff misconduct. Id. at 8.

## II. Discussion[5]

5    All unpublished opinions cited to by the Court in this Report-Recommendation and Order are, unless otherwise noted, attached to this Report-Recommendation and Order.

Plaintiff alleges that defendants retaliated against him in violation of the First Amendment, used excessive force against him in violation of the Eighth Amendment, and violated his Due Process rights under the First and Fourteenth Amendments. See Compl. at 7. Defendants argue that plaintiff's complaint should be dismissed in its entirety as plaintiff failed to exhaust his administrative remedies with respect to the causes of action outlined in the Complaint. See Defendants' Memorandum of Law, Dkt. No. 26-5 at 3.

### A. Legal Standard For Motions
### Pursuant to Fed. R. Civ. P. 56(a)

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "In determining whether summary judgment is appropriate, [the Court] will resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Carey, 923 F.2d at 19. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v.

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 263 of 353
Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)
2017 WL 2791063

Prudential Services, Ltd. Partnership, 22 F.3d, 1219, 1224 (2d Cir. 1994).

**\*3** Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law" ....

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191–92 (2d Cir. 2008).

### B. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006). The exhaustion requirement applies " 'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " Mauldin v. Kiff, No. 11-CV-107-A, 2014 WL 2708434, at \*4 (W.D.N.Y. June 16, 2014) (quoting Porter, 534 U.S. at 532). Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Porter, 534 U.S. at 524. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). Until recently, courts in this District followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused if a plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, the Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, 136 S. Ct. 1850, 1862 (2016). As such, the special circumstances exception previously promulgated by the Second Circuit in Hemphill is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

**\*4** Although the Supreme Court's decision in Ross eliminates the "special circumstances" exception promulgated by Hemphill, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

Here, there is no genuine dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5. First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. Id. at § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. at § 701.5(b)(1). If no informal resolution occurs, the Inmate Grievance Review Committee ("IGRC") must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may

Case 9:17-cv-00366-DNH-TWD   Document 93   Filed 03/08/21   Page 264 of 353
**Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)**
2017 WL 2791063

appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to the Central Office Review Committee ("CORC") within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

### 1. Application

First, the Court will address whether there is any genuine dispute that plaintiff failed to exhaust his administrative remedies. Courts in the Second Circuit have consistently held that any informal resolutions or relief outside of the administrative procedures do not satisfy exhaustion requirements. See, e.g., Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007) (holding that regardless of whether prison officials know of plaintiff's complaints in a "substantive sense," procedural exhaustion of remedies must still occur); Ruggiero v. Cty. of Orange, 467 F.3d 170, 177-78 (2d Cir. 2006); Perez v. City of N.Y., No. 14 CIV. 07502(LGS), 2015 WL 3652511, at *4 (S.D.N.Y. June 11, 2015) ("Plaintiff's allegation that he advised others of his grievance does not excuse his failure to exhaust the administrative process.").

Here, subsequent to the alleged events giving rise to the matter before the Court, plaintiff states he and family members contacted the Inspector General's Office to complain about prison conditions and concerns of plaintiff's safety. See Hummel Aff. Exh. A at 89, 90. Such correspondence does not satisfy exhaustion and falls outside of the grievance procedures. See Geer v. Chapman, No. 9:15-CV-952(GLS/ATB), 2016 WL 6091699, at *5 (N.D.N.Y. Sept. 26, 2016), report and recommendation adopted, No. 9:15-CV-952 (GLS/ATB), 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016) ("It is well-settled that writing letters to prison officials, or other officials, is insufficient to properly exhaust administrative remedies."); Salmon v. Bellinger, No. 9:14-CV-0827(LEK/DJS), 2016 WL 4411338, at *4 (N.D.N.Y. July 5, 2016), report and recommendation adopted by, No. 9:14-CV-0827(LEK/DJS), 2016 WL 4275733 (N.D.N.Y. Aug. 12, 2016) (holding that letters sent to the Inspector General do not satisfy exhaustion procedures).

*5 After the alleged incident of excessive force, plaintiff was seen by a nurse in a room with "about ten" officers present, where he admits "having no choice" but to tell the nurse that the officers had beat him up. Hummel Aff. Exh. A at 59-60. Plaintiff alleges filing grievances on July 19, 2014 and July 29, 2014 that mention the assault. See id. at 93; Gregory Decl. Exh. B at 6, 8-10. Defendants state that there is no record of appeal on any grievances pertaining to the alleged assault. Gregory Decl. ¶ 15. While plaintiff's complaints were aired verbally and in writing, plaintiff failed to utilize the procedures required to exhaust administrative remedies. Timmons v. Schriro, No. 14-CV-6606(RJS), 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015) ("[T]he law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA."). Thus, there is no genuine dispute that plaintiff failed to exhaust administrative remedies.

As a result, the Court must determine whether administrative remedies were in fact available to plaintiff. See Ross, 136 S. Ct. at 1858 ("An inmate ... must exhaust available remedies, but need not exhaust unavailable ones"); Mena v. City of New York, No. 13-cv-2430(RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016) (citing Ross, 136 S. Ct. at 1862) ("[T]he lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are 'available' to him."). Plaintiff sets forth three factual arguments as to why administrative remedies were not available to him. First, plaintiff alleges that the grievance procedures were unavailable to him because he was denied access to paper and writing instruments. See Compl. at 3. Next, plaintiff alleges that he was physically beaten when he attempted to take steps to utilize the grievance process. Id. Lastly, plaintiff suggests that he never received a response to his grievance, his mail was tampered with, and his letters were not delivered. See Hummel Aff. Exh. A at 91-92, 94.

### a. Lack of Paper and Pen to Complete Grievance Procedures

The third prong of Ross is triggered by plaintiff's argument that he was denied access to pen and paper, as it shows an alleged attempt to stop him from taking part in the grievance process. When a plaintiff-inmate asserts that a defendant-facility withheld pens, courts have granted

Case 9:17-cv-00366-DNH-TWD Document 93 Filed 03/08/21 Page 265 of 353
Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)
2017 WL 2791063

summary judgment against a plaintiff when "the record does not show that "[p]laintiff indicated to prison officials that he needed a pen so he could file a grievance or that prison officials refused to provide him a pen for this purpose." Mena v. City of N.Y., No. 12 CIV. 6838(GBD), 2013 WL 3580057, at *2 (S.D.N.Y. July 10, 2013). When an inmate argues that a correction officer denies him access to pen or paper, even assuming the allegations are true, courts examine whether the inmate was drafting other documents during the same time period, or whether they were able to access materials from other sources. See Williams v. Ramos, No. 13 CV 826(VLB), 2015 WL 864888, at *3 (S.D.N.Y. Feb. 9, 2015) ("It is unclear how plaintiff was able to submit [other] grievances if defendants took his pens and paper and threatened him ... Moreover, when defendants allegedly stole his pens and papers, plaintiff testified he was able to file grievances on his commissary sheet."); Lahoz v. Orange Cty. Jail, No. 08 CIV. 4364(RWS), 2010 WL 1789907, at *3 (S.D.N.Y. Apr. 29, 2010) (stating that an inmate was not deprived of writing materials when he drafted a handwritten letter during the same time period as the grievance process).

Here, the Court notes contradictory statements within the complaint pertaining to plaintiff's access to writing instruments or paper. When prompted as to why facts relating to the complaint were not presented in the grievance program, plaintiff asserts that he was denied a paper or pen. Compl. at 3. However, plaintiff also states that he wrote a grievance, the grievance was destroyed by a Sergeant, and he was beaten in retaliation for writing the grievance. See id. at 2. The only time plaintiff asserts that he was denied a paper and pen was when he was taken to the Special Housing Unit ("SHU") [6] on July 14, 2014 after the alleged incident. See id. at 3; Hummel Aff. Exh. A at 68. In fact, records indicate that plaintiff filed grievances on July 19, July 29, August 4, and November 19 of that same year. [7] Gregory Decl. Exh. A at 6. Plaintiff does not allege any difficulties obtaining a pen and paper after the July 2014 SHU stay, but rather, admits having "a piece of paper that an inmate had and a pen" on at least one occasion. See id. at 94.

[6]　　SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP. CODES R. & REGS. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or

security reasons, or in other circumstances as required. Id. at pt. 301.

[7]　　Both the August and November grievances are unrelated to the cause of action before the Court. Gregory Decl. Exh. A at 6.

*6 Lastly, in his response to defendants' motion for summary judgment, plaintiff alleges that there is an "unwritten posture" at Clinton where inmates are not given grievance forms unless they provide a clear description of their complaint, or if their complaint does not involve staff misconduct. Dkt. No. 34 at 8. Such general allegations without any factual support are insufficient to show that procedures were unavailable, coupled with the fact that, grievances can and have been submitted by plaintiff on plain paper. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1) ("If this form is not readily available, a complaint may be submitted on plain paper."); see Veloz v. N.Y., 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004), aff'd, 178 Fed.Appx. 39 (2d Cir. 2006) (granting summary judgment where plaintiff does not allege that any specific officer thwarted his efforts to timely file a grievance); Hummel Aff. Exh. A at 94.

Even if the Court assumes that plaintiff was denied access to pen and paper while in the SHU, the grievances filed in July 2014 were filed within the twenty-one calendar days required, and his subsequent failure to exhaust administrative remedies regarding those grievances is unaffected by any denial of pen and paper that occurred in the past. Thus, the Court rejects plaintiff's argument as there is no genuine dispute of fact that administrative remedies were unavailable due a lack of writing instruments or paper.

### b. Allegation that Grievance Was Not Received and Mail Tampering

Courts have long held that where an inmate does not receive a response to a written grievance, the inmate must appeal to the next level of review. See Khudan v. Lee, No. 12-cv-8147(RJS), 2015 WL 5544316, at *5 (S.D.N.Y. Sept. 17, 2015) (dismissing a plaintiff's complaint where plaintiff failed to appeal to the next level of review after not receiving a response to his filed grievance); see also Veloz v. New York, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004), aff'd, 178 Fed.Appx. 39 (2d Cir. 2006) ("[P]laintiff's allegation that these particular grievances were misplaced or destroyed by correctional officers ultimately does not relieve him of the requirement to appeal these claims to the next level once it

2017 WL 2791063

became clear to him that a response to his initial filing was not forthcoming.").

However, recent decisions by courts in the Second Circuit have addressed the availability of administrative remedies when an inmate's grievance is unfiled and unanswered. These cases have focused on the second prong of the Ross test, where a grievance process becomes unusable for an inmate. Ross, 136 S. Ct. at 1859. In Williams v. Priatno, the Second Circuit held that when an inmate's grievance is not filed, "the regulations plainly do not describe a mechanism for appealing a grievance." See 829 F.3d at 126. Thus, "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." Id. The Williams ruling relied upon a scenario where an inmate is housed in a SHU and personally gives a grievance to a correction officer, as required by grievance procedures. Id. at 120-21. Additionally, adding to the "opaque" nature of the procedures, the plaintiff in Williams followed up when he did not receive a response after a week, but was subsequently transferred one week later without any resolution or knowledge of his grievance being filed. Williams, 829 F.3d at 120-21. Ultimately, the Williams Court held that "in giving his grievance to the correction officer, [the plaintiff] exhausted all administrative remedies that were available to him." Id. at 126.

Here, in his September 19, 2016 deposition, plaintiff sets forth facts suggesting prison staff filtered his mail and "when they [saw] grievances" they were thrown to the side, not delivered, "and were never [ ] seen." See Hummel Aff. Exh. A at 91-92. The grievance that plaintiff allegedly filed on July 19, 2014 was sent to the Clinton grievance office by his mother. Id. at 94. Plaintiff never received a response on the grievance or followed up on the status of the grievance. Id. Without concrete facts, plaintiff states that his grievance was not resolved because "no civilian ... picks up your grievances. It's officers." Id. at 91. Plaintiff's allegations of mail tampering are conclusory and weakened by the fact that other correspondence, including complaints, were sent and received during the general time period material to the issues before the Court. Johnson v. Fraizer, No. 16-CV-6096(CJS), 2016 WL 7012961, at *4 (W.D.N.Y. Dec. 1, 2016) ("Plaintiff makes only a conclusory statement that his mailing was not allowed to leave the facility[,] ... his contention ... is belied by his admission that he was able to send other complaints about the matter to various New York State officials at around the same time."); see Hummel Aff. Exh. A at 89, 94 (providing

an example where plaintiff successfully sent legal mail to his mother).

**\*7** In plaintiff's response in opposition to defendants' motion for summary judgment, he raises general complaints about defendants having total control over facility mail and defendants strategically removing grievances from the mailbox to cover up their excessive use of force against plaintiff and other inmates. See Dkt. No. 34 at 2. Plaintiff's bare assertions do not excuse exhaustion requirements. Courts in this Circuit have continuously held that mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations. Khudan, 2016 WL 4735364, at *6 (citations omitted) (holding that under Ross, mere stand alone contentions of mail tampering without support and particularity cannot deem administrative remedies unavailable); Veloz, 339 F. Supp. 2d at 516 (holding that summary judgment is proper where the plaintiff contends that officers misplaced his grievances, but offers no evidence to support his claim). In Khudan, the court did not consider or rely upon conclusory allegations when plaintiff attested he "was informed by other [unnamed] inmates that grievances routinely go 'missing.' " Khudan, 2016 WL 4735364, at *6. This is similar to plaintiff's conclusory theory of injustice and displeasure with mail procedures, and other "recurrent pattern[s]" in New York correctional facilities. Dkt. No. 34 at 2, 4; see Khudan, 2016 WL 4735364, at *6 ("Plaintiff's accusations, which 'stand alone' and are 'unsupported,' are insufficient to withstand summary judgment.") (quoting Bolton v. City of N.Y., No. 13-CV-5749(RJS), 2015 WL 1822008, at *2 (S.D.N.Y. Apr. 20, 2015)).

Courts have denied a defendant's motion for summary judgment when faced with an unanswered and unfiled grievance drafted in SHU. See, e.g., Juarbe v. Carnegie, No. 9:15-CV-01485(MAD/DEP), 2016 WL 6901277, at *1, 4 (N.D.N.Y. Nov. 23, 2016). This is distinguishable from plaintiff's alleged July 19, 2014 grievance drafted in keeplock.[8] Such a difference in inmate housing supports the notion that, "the Second Circuit's decision hinged on the 'extraordinary circumstances' specific to the case before it." Mena v. City of N.Y., No. 13-CV-2430(RJS), 2016 WL 3948100, at *5 (S.D.N.Y. July 19, 2016) (quoting Williams, 829 F.3d at 119); see N.Y. COMP. CODES R. & REGS. tit. 7, § 701.7 (explaining that there are different grievance filing procedures for an inmate housed in the SHU). Inmates not housed in the SHU are in a different position to SHU inmates when determining if grievance procedures are "essentially

Case 9:17-cv-00366-DNH-TWD   Document 93   Filed 03/08/21   Page 267 of 353

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)

2017 WL 2791063

unknowable" or unavailable. Id. at *5 (quoting Ross v. Blake, 136 S. Ct. at 1859).

[8]   "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3s 189, 192 (2d Cir. 1995); N.Y. COMP. CODES R. & REGS. tit. 7, § 301.6.

Plaintiff never followed up on the July 19, 2014 grievance. Hummel Aff. Exh. A at 94-95. However, on July 29, 2014, he filed a grievance in the facility that included medical complaints, but also a reference to the alleged assault on July 14, 2014. See Gregory Decl. Exh. B at 8. The Clinton grievance department received and responded to this grievance. Id. This grievance was not appealed. Id. ¶ 15. Even assuming, as the Court must on this motion, that plaintiff's allegations of mail tampering are true, he did not exhaust his administrative remedies when he failed to appeal the July 29, 2014 grievance to the next level of review. The fact that this grievance was subsequently filed and not appealed within close proximity to the July 19, 2014 grievance, coupled with three unrelated grievances filed within the next year, demonstrates that plaintiff's situation does not rise to the level where the grievance process is "opaque," unavailable, or unascertainable. See Hill v. Tisch, No. 02CV3901(DRH/AYS), 2016 WL 6991171, at *7 (E.D.N.Y. Nov. 29, 2016) (finding that the plaintiff failed to demonstrate that the grievance "procedures were essentially unknowable"); Gregory Decl. Exh. A at 6.

### c. Allegation that Plaintiff Suffered Retaliation and Physical Beatings

Plaintiff's pleadings also suggest an inquiry under the third prong of Ross, whether "machination, misrepresentation, or intimidation" occurred. See Ross, 136 S. Ct. at 1860. Specifically, plaintiff alleges that he did not comply with the grievance procedures because he was subjected to physical beatings, retaliation, and intimidation after complaining about conditions at Clinton. See Compl. at 3, 4, 7. For these reasons, he believed the grievance procedures were unavailable. See id. at 2-3.

*8   Specific threats of retaliation or intimidation by prison employees can render administrative remedies unavailable. Ross, 136 S. Ct. at 1860 & n.3. However, a generalized fear of retaliation is insufficient to overcome a failure to exhaust administrative remedies. Salmon, 2016 WL 4411338, at *5. Estoppel is found where "verbal and physical threats of retaliation, physical assault, denial of grievance forms or writing implements, and transfers" occur showing that defendants acted affirmatively to prevent an inmate from availing him or herself of the grievance procedures. Id. at *5 (quoting Amador v. Andrews, 655 F.3d 89, 103 (2d Cir. 2011)). In Riles, the Second Circuit affirmed a district court's ruling that prison officials' alleged threats did not interfere with exhaustion efforts when plaintiff stated he was threatened "if he pushed the issue," but then subsequently filed a grievance in spite of the alleged threats. See Riles v. Buchanan, 656 Fed.Appx. 577, 581 (2d Cir. 2016) (summary order).

Relying on Ross, courts have carved out factual limitations to the third prong of unavailability concerning fear of retaliation. See, e.g., Aviles v. Tucker, No. 14-CV-08636(NSR), 2016 WL 4619120, at *3-4 (S.D.N.Y. Sept. 1, 2016) (citing Ross, 136 S. Ct. at 1860). In Aviles, the court noted a longstanding rule that general beliefs of retaliation or fears do not excuse the exhaustion requirement. Aviles, 2016 WL 4619120, at *4 (citations omitted). Circumstances that have met the threshold of unavailability by means of intimidation have included widespread beatings with assertions of fear for one's life, in conjunction with the plaintiff withholding all complaints until he was transferred to a different facility. See, e.g., id. (quoting Thomas v. Cassleberry, No. 03-cv-6394L, 2007 WL 1231485, at *2 (W.D.N.Y. Apr. 24, 2007)). Allegations of threats are conclusory where a plaintiff's allegation "does not indicate who threatened him, when he was threatened, or how he was threatened." See Johnson v. Fraizer, No. 16-CV-6096(CJS), 2016 WL 7012961, at *5 (W.D.N.Y. Dec. 1, 2016). In contrast, this Court has denied a summary judgment motion when a plaintiff alleged he was threatened by a specific correction that the officer would "break [plaintiff's] bones," and another specific correction officer threatened to beat plaintiff "a [sic] inch from life" if he filed a grievance. Galberth v. Durkin, No. 914CV115(BKS/ATB), 2016 WL 3910270, at *3 (N.D.N.Y. July 14, 2016).

Here, plaintiff offers conclusory allegations in his complaint that "[he] was beaten" while attempting to access Clinton's grievance program. Compl. at 2, 3. Plaintiff offers no information of when or how he was threatened or beaten after the July 14, 2014 incident. Some instances of threats alleged by plaintiff refer to a time period before he filed a grievance and he does not state how any specific threat or

**Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)**
Case 9:17-cv-00366-DNH-TWD   Document 93   Filed 03/08/21   Page 268 of 353
2017 WL 2791063

subsequent act of violence impacted his ability to exhaust administrative remedies related to the events that occurred on July 14, 2014. See Aviles, 2016 WL 4619120, at *4 (finding grievance procedures available where plaintiff offers conclusory allegations of fear and does not substantiate what specific fears or past acts preclude him from advancing in grievance procedures); Harrison v. Stallone, No. 9:06-CV-902(LEK/GJD), 2007 WL 2789473, at *5 (N.D.N.Y. Sept. 24, 2007) ("It has been held that a 'general fear' of retaliation is not sufficient to excuse the exhaustion requirement.... If an inmate could simply state that he feared retaliation, there would no point in having a grievance procedure.") (citations omitted); see, e.g., Hummel Aff. Ex. A at 58. Much of plaintiff's fear is generalized. For instance, he notes that corrections officers become agitated when they see legal mail and "that's when harassment comes." Hummel Aff. Ex. A at 92. By his own admission, plaintiff denies any actual physical force being used against him that prohibited him from taking part in the grievance program. Hummel Aff. Ex. A at 99; see Salmon, 2016 WL 4411338, at *5 (stating there must be affirmative actions or specific instances of physical assault or threats of retaliation for plaintiff to show unavailability of the grievance process).

**\*9** The Court notes that plaintiff directly contradicted allegations in his complaint by statements made in his deposition. While the complaint alleges conclusory instances of being "beaten by staff," plaintiff admits that other than being cut on his face by an inmate in the yard on October 5, 2015, there has not been any other physical force used against him by inmates or correction officers since July 14, 2014. Hummel Aff. Ex. A at 99; Compl. at 3. This statement contradicts plaintiff's allegations of being beaten by staff. See Williams v. Doe, No. 12-CV-1147(HKS), 2016 WL 4804057, at *5 (W.D.N.Y. Sept. 14, 2016) (granting a motion for summary judgment after noting that any triable issue of fact on exhaustion of administrative remedies can be eliminated when plaintiff's prior representations to the court are "flatly contradict[ed]").

Further, this Court finds that plaintiff's failure to follow the grievance procedures cannot be excused by fears or intimidation, when he simultaneously made his complaints known through other means. After the alleged incident, plaintiff was seen by a nurse in a room with "about ten" officers, where he admits "having no choice," but to tell the nurse that they had beaten him. Hummel Aff. Exh. A at 57-58. Plaintiff also aired his complaints and concerns in writing outside of the grievance procedures, clearly identifying his complaints in full substance, including the identification of those who committed acts against him. See, e.g., Hummel Aff. Exh. A at 93; Gregory Decl. Exh. A at 8. Similarly in Johnson v. Fraizer, the Court rejected plaintiff's argument that administrative remedies were unavailable where the plaintiff alleged he was threatened by correction officers but continued to make and send formal complaints to prison officials and other New York State officials. Johnson v. Fraizer, No. 16-CV-6096 (CJS), 2016 WL 7012961, at *5 (W.D.N.Y. Dec. 1, 2016). By plaintiff's own admission, it is clear that he sought to file the initial grievance and tell others about his complaints, which disprove any claim of intimidation or fear of retaliation. Quick v. Omittee, No. 14-CV-1503(TJM/CFH), 2016 WL 5219732, at *4 (N.D.N.Y. Aug. 11, 2016), report and recommendation adopted, No. 914CV1503 (TJM/CFH), 2016 WL 5107125 (N.D.N.Y. Sept. 20, 2016) (holding that fear of physical retaliation or assaults does not deem grievance procedures unavailable when plaintiff continuously sought to file complaints with officials). Like in Quick, where the plaintiff filed formal internal grievances and the grievance procedures were deemed available, here the plaintiff alleges drafting two internal grievances outlining the alleged July 14, 2014 incident. See id. at * 4; Hummel Aff. Exh. A at 93; Gregory Decl. Exh. B at 8. Thus, plaintiff has not shown that administrative remedies were unavailable due to intimidation and threats.

In conclusion, the Court finds that defendants have met their burden in showing that there is no genuine issue of material fact as to plaintiff's failure to exhaust administrative remedies. Accordingly, the Court recommends that defendants' motion be granted.

### III. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 26) on plaintiff Edy Rodriguez's complaint (Dkt. No. 1) be **GRANTED**; and it is further

**RECOMMENDED** that plaintiff Edy Rodriguez's complaint (Dkt. No. 1) be **DISMISSED** in its entirety, without prejudice; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties in this action, pursuant to local rules.

**Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)**
2017 WL 2791063

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F. 2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F. 2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2791063

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)

2017 WL 2790530

2017 WL 2790530
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Edy RODRIGUEZ, Plaintiff,

v.

J. CROSS, Sergeant, Clinton Corr. Fac.; R.
Furnia, Sergeant, Clinton Corr. Fac.; G. Falcon,
Corr. Officer, Clinton Corr. Fac.; and J. Roberts,
Corr. Officer, Clinton Corr. Fac., Defendants.

9:15-CV-1079 (GTS/CFH)
|
Filed 06/27/2017

**Attorneys and Law Firms**

EDY RODRIGUEZ, No. 8951602009, Anna M. Kross
Center, 18-18 Hazen Street, East Elmhurst, New York 11370,
Pro Se.

HON. ERIC T. SCHNEIDERMAN, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ. Assistant Attorney
General, The Capitol Albany, New York 12224, Attorney
General for the State of New York, Counsel for Defendants.

### DECISION and ORDER

HON. GLENN T. SUDDABY, Chief United States District
Judge

**\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Edy Rodriguez ("Plaintiff")
against the four above-captioned employees of the New
York State Department of Corrections and Community
Supervision at Clinton Correctional Facility in Dannemora,
New York ("Defendants"), are Defendants' motion for
summary judgment seeking dismissal of Plaintiff's Complaint
for failure to exhaust his administrative remedies, and United
States Magistrate Judge Christian F. Hummel's Report-
Recommendation recommending that Defendants' motion be
granted and that Plaintiff's Complaint be dismissed in its
entirety without prejudice. [1] (Dkt. Nos. 26, 40.) Plaintiff has
not filed an Objection to the Report-Recommendation despite
having received an extension of the filing deadline, which has
expired. (Dkt. No. 42.)

[1]     The Court notes that Assistant Attorney General
Christopher J. Hummel is of no relation to U.S.
Magistrate Judge Christian F. Hummel.

After carefully reviewing the relevant papers herein,
including Magistrate Judge Hummel's thorough Report-
Recommendation, the Court can find no clear-error in
the Report-Recommendation. [2] Magistrate Judge Hummel
employed the proper standards, accurately recited the facts,
and reasonably applied the law to those facts. (Dkt. No.
40.) As a result, the Report-Recommendation is accepted
and adopted in its entirety for the reasons set forth therein;
Defendants' motion for summary judgment is granted; and
Plaintiff's Complaint is dismissed in its entirety without
prejudice.

[2]     When no objection is made to a report-
recommendation, the Court subjects that report-
recommendation to only a clear error review. Fed.
R. Civ. P. 72(b), Advisory Committee Notes: 1983
Addition. When performing such a "clear error"
review, "the court need only satisfy itself that there
is no clear error on the face of the record in order to
accept the recommendation." *Id.*; *see also Batista
v. Walker*, 94-CV-2826, 1995 WL 453299, at *1
(S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am
permitted to adopt those sections of [a magistrate
judge's] report to which no specific objection is
made, so long as those sections are not facially
erroneous.") (internal quotation marks omitted).

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Hummel's Report-
Recommendation (Dkt. No. 40) is **ACCEPTED** and
**ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment
(Dkt. No. 26) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is
**DISMISSED** in its entirety without prejudice; and it is further

**ORDERED** that the Clerk of the Court shall enter Judgment
for Defendants and close this action.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2790530

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 271 of 353

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)

2017 WL 2790530

**End of Document**                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 671650
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jermell MCLEAN, Plaintiff,

v.

Darwin LACLAIR, et al., Defendants.

9:19-CV-1227 (LEK/ATB)
|
Signed 02/22/2021

**Attorneys and Law Firms**

Jermell McLean, Malone, NY, pro se.

Lauren Rose Eversley, New York State Attorney General, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Lawrence E. Kahn, Senior U.S. District Judge

## I. INTRODUCTION

 **\*1**  Pro se plaintiff Jermell McLean brings this action against several state officials at Franklin Correctional Facility ("Franklin C.F."), asserting Eighth Amendment claims related to the alleged denial of his medical needs while he was incarcerated there. Dkt. No. 9 ("First Amended Complaint" or "FAC").[1] Defendants filed a combined motion for summary judgment and motion to dismiss. Dkt. Nos. 17 ("Motion"); 17-3 ("Tavernier Declaration"); 17-4 ("Seguin Declaration"); 20 ("Response"); 21 ("Reply"). In a Report-Recommendation issued on August 5, 2020, the Honorable Andrew T. Baxter, United States Magistrate Judge, granted Defendants' motion for summary judgment on exhaustion grounds, while also reaching the substance of Plaintiff's claim against Defendant Darwin LaClair, dismissing it for failure to state a claim. Dkt. No. 22 ("Report-Recommendation"). Plaintiff filed objections. Dkt. No. 23 ("Objections"). For the reasons that follow, the Court rejects the Report-Recommendation with respect to exhaustion, while adopting its conclusion regarding Plaintiff's claim against LaClair.

[1]  Plaintiff refers to this document as his "First Amended Complaint"; thus, the court will do the same.

## II. BACKGROUND

### A. Factual Background

*1. Medical Transport Incident*

The facts are detailed in the Report-Recommendation, familiarity with which is assumed. For convenience, the Court summarizes facts relevant to this Memorandum-Decision and Order, while noting factual disputes.

On July 29, 2019, Plaintiff was transported by Correction Officers Theodore Harris and Todd Raymond to Alice Hyde Hospital for a surgical procedure to repair the torn anterior cruciate ligament in his left knee. FAC ¶ 10.[2] Harris and Raymond remained with Plaintiff "the entire time, during pre-operative preparation, surgery, recovery, and post-operative discharge examination and instructions." Id. ¶ 11. "Both Harris and Raymond were present when the hospital staff gave [P]laintiff specific instructions to not bear any weight on [his left] leg, to allow the surgical adhesive time to cure and to allow the ligament to knit back together." Id. ¶ 12.

[2]     Because Plaintiff has sworn to the allegations in his First Amended Complaint on penalty of perjury, the Court treats the First Amended Complaint as the legal equivalent of an affidavit, for evidentiary purposes. See Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e)."). The Court does so even though the First Amended Complaint is not notarized. See, e.g., Franco v. Kelly, 854 F.2d 584, 587 (2d Cir. 1988) (noting that documents sworn under penalty of perjury may suffice for summary judgment purposes even if they do not meet all of the formal requirements of a notarized affidavit (citing Pfeil v. Rogers, 757 F.2d 850, 859, 859 n.15 (7th Cir. 1985)); Tolbert v. Koenigsmann, No. 13-CV-1577, 2018 U.S. Dist. LEXIS 36451, at *6 n.8 (N.D.N.Y. Mar. 2, 2018) ("Although plaintiff's amended complaint is not notarized, in light of his pro se status, I have considered it as the legal equivalent of an affidavit for purposes of the pending summary

judgment motion."); BMS Entm't/Heat Music LLC v. Bridges, No. 04-CV-2584, 2005 WL 2482493, at *2 n.1 (S.D.N.Y. Oct. 7, 2005) (accepting as a declaration under 28 U.S.C. § 1746 an affidavit that was not notarized but "certified" that "each of the statements contained herein is true to the best of my information and belief" and contained a "penalty of perjury" clause).

**\*2** Following the surgery, hospital staff attempted to provide Plaintiff with metal crutches. See id. ¶ 13. However, one of the correction officers, citing a rule of Superintendent Darwin LaClair, told the hospital staff that Plaintiff "could not have metal crutches, and ... would be given a pair of [permitted] crutches ... when he arrived at the facility." See id. Plaintiff left the hospital at approximately 3:35 p.m. Id. ¶ 14.

For "reasons unknown to [Plaintiff]," his transport van, upon arriving back at Franklin C. F., was unable to enter the prison complex through the "Truck-Trap, which is the way prisoners are commonly transported and returned." Id. ¶ 22. Had the van been able to proceed through this entrance, it could have dropped Plaintiff off at the medical unit. See id. ¶ 23. Upon realizing that he would not receive pay for waiting until the Truck-Trap accepted the van, Raymond remarked, "We have to get [Plaintiff] to medical fast so we can get the hell out of here." Id. ¶ 17. Harris replied, "[Y]eah, I'm not staying here any longer if I am not getting paid for it." Id. Harris and Raymond then parked the van in Franklin C. F.'s front parking lot and told Plaintiff he had to walk to the prison. See id. ¶ 24.

Before exiting the van, Plaintiff "protest[ed] about being made to walk on [his] recently repaired leg in direct contradiction of the discharge instructions." Id. ¶ 25. In response to Plaintiff's concerns, Raymond stated, " 'Come on, you can make it with my help,' and Harris added that Raymond "was giving [Plaintiff] a 'direct order[.]' " Id.

As Plaintiff exited the van, Raymond "did not brace the plaintiff to prevent him from bearing weight on the leg," because the handcuffs on Plaintiff's wrists, which were affixed to a "[b]lack [b]ox" and a "[b]elly [c]hain," prevented Raymond from physically supporting Plaintiff's arm. See id. ¶¶ 26–27 (internal quotation marks omitted). Instead, Raymond "merely 'guided' plaintiff's arm" as Plaintiff stepped down from the van. See id. ¶ 26. Harris and Raymond then "forced the plaintiff to walk on his left leg, without the aid of any crutches, cane or a wheelchair, through the Administration Building, to a holding area, a distance of between 500-1000 feet." Id. ¶ 24 (emphasis in original).

As Plaintiff entered the prison, he "felt something snap, and immediately felt an intense heightened pain, and burning in the surgery area ... shooting up into his hip and down to his foot." Id. ¶ 30. Once Plaintiff reached a metal bench on the other side of the Administration Building, a non-party correction officer arrived at the scene and "call[ed] medical [to] have them bring a wheelchair for the rest of plaintiff's journey to the medical unit[.]" See id. at ¶ 28.

Since his return from the hospital, Plaintiff "has suffered and continues to suffer constant pain and burning sensations in [his] knee, trouble sleeping, w[a]lking, standing, and performing every day tasks." Id. ¶ 32. Plaintiff has also "developed a mold-like rash covering the skin on his left hip, which was not there prior to the surgery." Id. ¶ 33.

Plaintiff avers that he might not have been harmed had LaClair: (1) instituted a policy that allowed Plaintiff to bring metal crutches into Franklin C. F.; (2) "properly trained" Harris and Raymond on how to handle inmates in Plaintiff's condition; and (3) instituted a policy that paid Harris and Raymond for waiting with Plaintiff until the Truck-Trap accepted the van. See id. at p. 2,[3] ¶¶ 21, 46.

[3]    While the First Amended Complaint is largely organized in numbered paragraphs, some allegations appear in an introductory section prior to the first numbered paragraph.

**\*3** Plaintiff brings medical indifference claims against Harris, Raymond, and LaClair. See Dkt. No. 11 ("April 2020 Order") at 7.

### 2. Grievance Process

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. Id. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). Id. § 701.5(d).

As the magistrate judge notes, in the First Amended Complaint and Response, Plaintiff provides a detailed account of his attempts to file grievances and appeals

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 274 of 353

2021 WL 671650

regarding the incident in question. See R. & R. at 9. As summarized in the Report-Recommendation:

> Plaintiff states that on July 29, 2019, the same day of the incident in question, and while he was in the infirmary, he wrote a grievance on plain paper because he did not have a grievance form. (FAC ¶ 35). Plaintiff states that he placed the grievance in an envelope, addressed it to the IGP Supervisor, sealed the envelope, and gave it to a corrections officer to place in the mail because there is no mail box or "grievance box" in the infirmary. (Id.) Plaintiff states that he wrote the grievance "quickly" because he did not know how many days he would be in the infirmary. (Id.) In the FAC, he states that he kept a copy of the grievance, and he has submitted it as an exhibit to his opposition papers. (FAC ¶ 36 & Dkt. No. 20, Ex. A).

> Plaintiff states that he received no response to this grievance. (FAC ¶ 36). Plaintiff states that, on August 14, 2019, he mailed a letter to the IGP Supervisor, along with a copy of the grievance, explaining that he had not received a response, and he was "construing the failure or refusal to respond as a denial and appealing to the Superintendent." (FAC ¶ 37). Plaintiff has attached a copy of this letter to his opposition papers. ( [Resp.], Ex. B).

> Plaintiff claims that he received no response to his August 14, 2019 letter. (FAC ¶ 38). As a result, plaintiff states that he wrote another letter to the IGP Supervisor at Franklin, dated September 3, 2019. (FAC ¶ 38). Plaintiff states that he attached another copy of the July 29, 2019 grievance to the September 3rd letter. (Id.) Plaintiff claims that in the September 3rd letter, he "explain[ed] that he was construing the subsequent failure or refusal to answer the appeal letter as a denial of same, and appealing to the CORC by said letter." (Id.) Plaintiff has not included a copy of this letter in his opposition papers.

> Plaintiff then states that he did not receive a response to the September 3rd letter. (FAC ¶ 39). He claims that on September 27, 2019, he had one of his family members contact the CORC in Albany. (Id.) Plaintiff states that his "family member" spoke to "a Ms. Mary Furcinetti (phonetic)," who was "very nice," and who "looked in the computer," and verified that no grievance, written by plaintiff, had been filed "by the IGP Supervisor," nor was it ever forwarded to the CORC. (FAC ¶ 40).

**\*4**  R. & R. at 9–11.

### B. The Motion, Response, Report-Recommendation, and Objections

#### *1. Motion*

Defendants move for summary judgment on exhaustion grounds and move to dismiss Plaintiff's claim against LaClair. Regarding exhaustion, they argue that Plaintiff failed to file or appeal any grievance pertaining to the events giving rise to his claims. See Mot. at 6–10. In support of this contention, Defendants offer the following evidence. Inmate Grievance Program ("IGP") Coordinator Judy Tavernier attests that upon a review of all grievances filed at Franklin C.F. between January 1, 2016 the date she signed her declaration, June 10, 2020, she uncovered no grievances filed by Plaintiff. See Tavernier Decl. ¶¶ 10, 15. IGP Assistant Director Rachel Seguin attests that upon a review of all grievance appeals for the current year and the four previous calendar years, she did not uncover any grievance appeal filed by Plaintiff. See Seguin Decl. ¶¶ 8, 12. Attached as an exhibit to her declaration is a computer print-out from the CORC database, dated June 4, 2020, which shows no appeals filed by Plaintiff. See id., Ex. A.

Defendants also argue that LaClair lacks personal involvement in the alleged constitutional violations. See id. at 10–12. Defendants do not address the merits of Plaintiff's claims against Harris or Raymond. See generally id.

#### *2. Response*

In his Response, Plaintiff argues that the factual contentions that he submitted his grievance and that he submitted his appeals are consistent with Defendants' contentions that they have no record of the grievance or appeals having been filed. See Resp. at 2. Plaintiff asks the Court to infer that prison officials somehow thwarted the filing of his grievance and appeals after Plaintiff attempted to submit them. See id. at 3. On this basis, Plaintiff argues that he should be excused from the exhaustion requirement, as the grievance process was "unavailable." See id. at 2–3; see also Riles v. Buchanan, 656 F. App'x 577, 580 (2d Cir. 2016) ("An administrative procedure is unavailable when ... 'prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.' ") (quoting Ross v. Blake, 136 S.Ct. 1850, 1859–60 (2016)).

Plaintiff presents the following evidence supporting his factual claim that he submitted his grievance and appeals: (1) his sworn complaint, in which he attests that he did so, *see* FAC ¶¶ 35–40; (2) a copy of his grievance, Resp. Ex. A; and (3) a copy of his August 14, 2019 letter to the IGP Supervisor appealing his grievance to the Superintendent, Resp. Ex. B.

Plaintiff does not address Defendants' arguments regarding the merits of Plaintiff's claims against LaClair. See generally Resp.

### 3. Report-Recommendation

The magistrate judge recommended granting summary judgment on exhaustion grounds. In doing so, the magistrate judge relied on a string of lower court cases in this Circuit doing the same when a plaintiff offered only "bare" or "unsupported" assertions that he submitted a grievance but that it was never filed. See R. & R. at 12–15 (citing Davis v. Grant, No. 15-CV-5359, 2019 WL 498277, at *10 (S.D.N.Y. Feb. 8, 2019) ("Plaintiff's bare assertions that he submitted his grievances but never received a response fall squarely into the category of assertions that courts in the Second Circuit have found do not excuse the exhaustion requirement."); Engles v. Jones, No. 13-CV-6461, 2018 WL 6832085, at *10 (W.D.N.Y. Dec. 28, 2018) ("Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact."); Scott v. Kastner Smith, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018) ("[C]ourts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement.") (internal quotation marks omitted); Mims v. Yehl, No. 13-CV-6405, 2014 WL 4715883, at *4 (W.D.N.Y. Sept. 22, 2014) (inmate's "unsupported statement" that he has submitted a grievance is "insufficient at the summary judgment stage"); Veloz v. New York, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) ("[An] inmate's unsupported claims that his grievances were lost at the Grievance Committee Office or destroyed by officers ... fails to excuse [the] inmate from fully grieving remedies[.]") (internal citation omitted)).

**\*5** Regarding the merits of Plaintiff's claim against LaClair, the magistrate judge determined that Plaintiff's allegations were too vague and conclusory to establish supervisory liability under any of the routes recognized in Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995). See id. at 16–19.

### 4. Objections

In his Objections, Plaintiff reiterates an argument from his Response regarding exhaustion. Namely, he clarifies that, while he does not dispute that his grievance was never filed, he, in fact, gave the grievance to the officer on duty at the infirmary and asked him to submit it: "I gave my grievance to the officer that was working that day. I don't know why it was never filed and why it's not in their system. But I know I put one in." Objs. at 1.

Regarding his claim against LaClair, Plaintiff restates his allegation that in denying Plaintiff metal crutches, Harris and Raymond were following a facility policy instituted by LaClair. Id. at 1–2. [4]

[4]  Plaintiff also offers arguments relevant to Harris and Raymond's liability. See id. The Court disregards these arguments, because Defendants did not move for dismissal or summary judgment on grounds related to the merits of those claims.

## III. STANDARDS OF REVIEW

### A. Report-Recommendation

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If objections are timely filed, a court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). However, if no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-857, 2013 WL 1121353, at *1 (N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–07 (N.D.N.Y. 2008), abrogated on other grounds by Widomski v. State Univ. of N.Y. at Orange, 748 F.3d 471 (2d Cir. 2014). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." § 636(b).

### B. Summary Judgment

Federal Rule of Civil Procedure 56 instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is " 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

*6 The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Hence, "a court's duty in reviewing a motion for summary judgment is 'carefully limited' to finding genuine disputes of fact, 'not to deciding them.' " Macera v. Vill. Bd. of Ilion, No. 16-CV-668, 2019 U.S. Dist. LEXIS 169632, at *26 (N.D.N.Y. Sept. 30, 2019) (Kahn, J.) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

## IV. DISCUSSION

As Plaintiff's Objections reiterate arguments he has already presented, the Court reviews the Report-Recommendation for clear error.[5] Having done so, the Court concludes that the magistrate judge committed clear error in his

exhaustion analysis, by straying from well-established summary judgment principles.

5     Since Plaintiff did not respond to Defendants' motion to dismiss Plaintiff's claims against LaClair, Plaintiff's arguments with respect to that claim could be construed, alternatively, as "new" arguments improperly introduced in objections. See Ross v. Koenigsmann, No. 14-CV-1321, 2016 WL 5408163, at *2 (N.D.N.Y. Sept. 28, 2016) ("[A] district court will ordinarily refuse to consider an argument that could have been, but was not, presented to the magistrate judge in the first instance."). Either way, the Court would review this aspect of the Report-Recommendation for clear error. See Barnes, 2013 WL 1121353, at *1.

The magistrate judge placed a greater evidentiary burden on Plaintiff than he is required to meet to survive summary judgment. With respect to the parties' factual disagreement over whether Plaintiff submitted his initial grievance, the Court notes that this dispute essentially boils down to a clash of sworn statements. Plaintiff attests that he gave his grievance to the correction officer on duty at the infirmary on July 29, 2019, FAC ¶ 35, and Defendants submit a sworn statement indicating that a review of their records revealed that no grievance was filed, see Tavernier Decl. ¶¶ 10, 15. To the extent that these statements are in contradiction, the Court cannot resolve this contradiction at the summary judgment stage, because the Court is prohibited from making credibility determinations. See, e.g., Gen. Elec. Capital Corp. v. NET Transportation, Inc., No. 04-CV-316, 2006 WL 8447262, at *3 (D. Conn. May 4, 2006) ("In ruling on summary judgment, the Court cannot credit averments made in plaintiff's affidavit over that of the defendants."); Lupyan v. Corinthian Colleges, Inc., 761 F.3d 314, 320-321 (3d Cir. 2014) ("[A] single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment. This remains true even if the affidavit is 'self-serving.' ") (internal citations omitted); Curry v. City of Syracuse, 316 F.3d 324, 333 (2d Cir. 2003) (noting that "credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment").

*7 The magistrate judge cites a number of cases in which courts granted summary judgment when a plaintiff offered only "bare" or "unsupported" assertions that he submitted a grievance but that it was never filed. See R. & R. at 12–15.

But Plaintiff's factual contention that he gave his grievance to a correction officer *is* supported—by a sworn statement based on personal knowledge. See *supra* note 2; Fed. R. Civ. P. 56(c)(4). This is sufficient in itself to enable Plaintiff to survive summary judgment. The Court notes, however, that Plaintiff's factual contention is also supported by a dated, handwritten copy of his grievance. See Resp., Ex. A. The magistrate judge apparently determined that this piece of evidence should be discounted in determining whether Plaintiff meets his burden on summary judgment, citing one other case in this District for support. See R. & R. at 13 (citing Means v. Olmstead, No. 17-CV-746, 2019 WL 4395289, at *7 (N.D.N.Y. June 3, 2019), report and recommendation adopted, 2019 WL 3451127, at *2 (N.D.N.Y. July 31, 2019)). But Means offers no reasoning or legal authorities to support this legal conclusion, see id., which appears to entail the improper weighing of evidence and assessment of credibility, see Curry, 316 F.3d at 333. Especially given that Defendants in this case have not even addressed the authenticity of Plaintiff's copy of his grievance, it is improper for the Court to discount Plaintiff's claim that this is a genuine, contemporaneous copy.

The magistrate judge appears to have applied a burden-shifting framework that courts in this District generally employ in adjudicating PLRA exhaustion at the summary judgment stage. As Judge Suddaby has explained:

> [T]he defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. See, e.g., Howard v. Goord, No. 98-CV-7471, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999). However, once a defendant has produced reliable evidence that such remedies were generally available, and the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then counter the defendant's proof by showing that, as to him or her, the remedy was unavailable. Smith v. Kelly, 985 F.Supp.2d 275, 284 (N.D.N.Y. 2013). "As a result, practically speaking, while the burden on this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it." Id. ... [W]hile the burden of production may shift to a plaintiff when a court considers whether the grievance process was unavailable, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant. [6]

Coleman v. Nolan, No. 15-CV-40, 2018 WL 4732778, at *4 (N.D.N.Y. Oct. 2, 2018) (other internal quotation marks omitted).

[6]    Citing Bailey v. Fortier, No. 09-CV-0742, 2012 WL 6935254, at *5-6 (N.D.N.Y. Oct. 4, 2012), report and recommendation adopted, 2013 WL 310306 (N.D.N.Y. Jan. 25, 2013); Nelson v. Plumley, No. 12-CV-422, 2015 WL 4326762, at *7-8 (N.D.N.Y. July 14, 2015), report and recommendation adopted, 2013 WL 1305338 (N.D.N.Y. Mar. 18, 2013).

This burden-shifting framework does not ultimately mandate a greater evidentiary showing from Plaintiff than would otherwise be required at summary judgment. A presumption is not a form of super-evidence that heightens the opposing party's evidentiary burden in rebuttal. Indeed, a presumption is not evidence at all, but rather merely "an assumption of fact resulting from a rule of law which requires such fact to be assumed from another fact or group of facts found or otherwise established in the action." 21B Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5124 (2d ed. 2005); see also Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 n.10 (1981) (describing presumption as "legally mandatory inference"); Emhart Industries, Inc. v. Universal Instruments Corp., No. 89-CV-6, 1992 U.S. Dist. LEXIS 13458, at *10 (N.D.N.Y. June 22, 1992) ("[A] presumption is not evidence.") (quoting A.C. Aukerman Co. v. R.L. Chaides Construction Co., 960 F.2d 1020, 1037–38 (1992)). A presumption's "only effect is to require the party contesting it to produce enough evidence substantiating the presumed fact's absence to withstand a motion for summary judgment[.]" Lupyan, 761 F.3d at 320; see also ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 149 (2d Cir. 2007) ("Courts and commentators are in general agreement that proffered evidence is sufficient to rebut a presumption as long as the evidence could support a reasonable jury finding of the nonexistence of the presumed fact.") (collecting authorities) (internal quotation marks omitted). "[A] presumption vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact." Punchgini, Inc., 482 F.3d at 148 (internal quotation marks omitted).

**\*8**  In other words, once Defendants introduced evidence that they generally operated a functioning grievance system, see Seguin Decl. ¶¶ 5–6, Plaintiff could not have survived summary judgment simply by pointing to Defendants' failure to introduce evidence that this process was available to him specifically. Rather, in order to make the presumption of availability "vanish," Plaintiff had to produce competent evidence supporting unavailability. But once he did so, by

2021 WL 671650

submitting a sworn statement that he gave his grievance to a correction officer, he was not then required to produce a greater quantum of evidence than normally required of a non-movant at the summary judgment stage. Since a sworn statement based on personal knowledge is generally sufficient when opposed only by a movant's conflicting sworn statement, Plaintiff's evidence is sufficient here.

Moreover, all of the Court's foregoing analysis rests on an assumption that is unjustifiably charitable to Defendants—namely, that there is a conflict between Plaintiff's sworn statement that he gave his grievance to a correction officer for submission and Defendants' statement that the grievance was never filed. As Plaintiff correctly argues, these competing sworn statements are not necessarily inconsistent. See Resp. at 2–3; Objs. at 1. Since the Court is required to draw reasonable inferences in Plaintiff's favor, the Court must infer that the grievance was never filed because prison authorities did not file it, not because Plaintiff did not attempt to submit it. See Zulu v. Barnhart, No. 16-CV-1408, 2019 WL 2997226, at *13 (N.D.N.Y. Apr. 22, 2019) ("Defendants' evidence is largely consistent with plaintiff's claim that, for whatever reason, the timely grievances that he attempted to submit while confined to the SHU at Marcy were not filed. The absence of any official records of plaintiff's initial attempts to grieve the incident comports with plaintiff's assertion that once he handed a grievance through the feed-up hatch in the SHU, it was out of his possession and it was not filed."), report and recommendation adopted, No. 16-CV-1408, 2019 WL 2150628 (N.D.N.Y. May 17, 2019). Defendants have, thus, failed to demonstrate the absence of a material factual dispute.

The Court reaches the same conclusion with respect to Plaintiff's appeals. Plaintiff attests that, on August 14, 2019, he mailed a letter to the IGP supervisor, along with a copy of his grievance, explaining that he had not received a response and that he was "construing the failure or refusal to respond as a denial and appealing to the Superintendent." FAC ¶ 37. Plaintiff has submitted a copy of this letter. Resp., Ex. B. Plaintiff additionally attests that he wrote another letter to the IGP Supervisor on September 3, 2019, explaining "that he was construing the subsequent failure or refusal to answer the appeal letter as a denial of same, and appealing to the CORC by said letter." Id. ¶ 38. Plaintiff has not submitted a copy of the September 3, 2019 letter. Seguin attests that upon a review of all grievance appeals for the current year and the four previous calendar years, she did not uncover any grievance appeals filed by Plaintiff. See Seguin Decl. ¶¶ 8, 12. Attached as an exhibit to her declaration is a computer print-out from the CORC database, dated June 4, 2020, which shows no appeals to the CORC filed by Plaintiff. See id., Ex. A.

Here, there is again a clash of sworn statements: Plaintiff attests that he attempted to submit the appeals, and Defendants attest that they were never filed. As discussed, the Court cannot credit Defendants' sworn statements over Plaintiff's. See Joshi v. Ashcroft, 389 F.3d 732, 735 (7th Cir. 2004) ("Most letters are delivered, but some aren't, and so if there is a sworn denial of receipt the trier of fact has to weigh the credibility of the denial in light of the fact that the vast majority of letters are delivered and that the intended recipient has a strong incentive to lie."). [7] Defendants additionally present documentary evidence that Plaintiff's appeals were not filed, namely the CORC print-out. See Seguin Decl., Ex. A. Importantly, while Defendants state in conclusory fashion that they infallibly maintain records of all grievances and appeals, they do not specifically represent that the CORC print-out is a log of all incoming mail, or describe Defendants' mail-processing practices in a manner that would support an inference that the absence of a record of Plaintiff's appeals being filed reliably indicates non-receipt of any letters. See Seguin Decl. ¶ 8 ("[T]he CORC computer database contains records of appeals of grievances received from facility Inmate Grievance Program offices[.]"); Tavernier Decl. ¶ 10 ("All documents ... related to a particular grievance ... are stored in the Franklin grievance office in the regular course of that office's activities as they are created or received."); cf. Lupyan, 761 F.3d at 322 ("When the intended recipient is a commercial or legal entity, it may be routine business practice to log incoming mail. In such cases, the absence of an entry in a mail log near the time that mail would likely have arrived, can be used to establish that mail was not received."); Guerra v. CONRAIL, 936 F.3d 124, 137 (3d Cir. 2019) ("OSHA's denial of receipt is strengthened by its practice of tracking correspondence and its unavailing search for a trace of Guerra's letter."). As before, there is no necessary inconsistency between Plaintiff's claim that he mailed the appeals and Defendants' claim that they were never filed; and the Court must grant Plaintiff the favorable inference that his grievance was sent and received, but not filed, for reasons out of his control. [8]

[7]

> In a variety of legal contexts, Courts adjudicate disputes over whether a letter was sent or received by employing the "mailbox rule," according to which "[a] rebuttable presumption of receipt

[arises] on evidence that a properly addressed piece of mail is placed in the care of the postal service." Witt v. Roadway Express, 136 F.3d 1424, 1429–30 (10th Cir. 1998); see also Godfrey v. United States, 997 F.2d 335, 338 (7th Cir. 1993); Anderson v. United States, 966 F.2d 487, 491 (9th Cir. 1992). Plaintiff's sworn statement that he mailed the letters would establish his entitlement to this presumption, which Defendants would have the burden to rebut. See, e.g., United States v. Ekong, 518 F.3d 285, 287 (5th Cir. 2006) ("A sworn statement is credible evidence of mailing for the purposes of the mailbox rule."); Schikore v. BankAmerica Supplemental Ret. Plan, 269 F.3d 956, 964 (9th Cir. 2001) (same); Witt, 136 F.3d at 1430 ("Because the presumption is rebuttable ... evidence denying receipt creates a credibility issue that must be resolved by the trier of fact.") (citing Rosenthal v. Walker, 111 U.S. 185, 193–94 (1884); Anderson, 966 F.2d at 491–92; 9 Wigmore, Evidence § 2519).

8    Defendants also argued that, even assuming arguendo that Plaintiff had properly filed his grievance and appeals, his claims should be denied for failure to exhaust, because he did not file his complaint in this action after waiting thirty days from his final appeal. See Reply at 2–3. In addition to being improperly raised for the first time in a reply, this argument is meritless, because the complaint was filed on October 4, 2019, Docket, which is more than thirty days after September 3, 2019, the date on which Plaintiff attests he filed his final appeal, FAC ¶ 38.

*9    Accordingly, Defendants have failed to demonstrate the absence of a material factual dispute as to whether the grievance process at Franklin C.F. was "unavailable" due to the machinations or misrepresentations of prison officials who inhibited the filing of Plaintiff's submissions. See Riles, 656 F. App'x at 580; see also Gill v. Frawley, No. 02-CV-1380, 2006 U.S. Dist. LEXIS 101694, at *44 (N.D.N.Y. May 9, 2006) (noting that "[s]ome courts have suggested that an inmate has exercised a reasonable effort to exhaust his administrative remedies when he has tried to properly file a grievance and that grievance has been lost or destroyed by a prison official," and collecting cases); Fann v. Graham, No. 15-CV-1339, 2018 WL 1399331, at *6 (N.D.N.Y. Jan. 11, 2018) ("Viewing the facts in the light most favorable to plaintiff, the record suggests that plaintiff's grievances were submitted, but were unfiled and unanswered, creating an issue

of fact as to whether the grievance process was available and whether plaintiff attempted to exhaust his administrative remedies[.]"), report and recommendation adopted, No. 15-CV-1339, 2018 WL 1399340 (N.D.N.Y. Mar. 19, 2018); Thaxton v. Simmons, No. 10-CV-1318, 2013 WL 4806457, at *4 (N.D.N.Y. Sept. 9, 2013) ("[A] question of fact exists as to whether [p]laintiff never filed his initial grievance on April 29, as [d]efendants claim, or that, as [p]laintiff claims, he filed a timely grievance that was lost or tampered with by [d]efendants. Such credibility assessments are to be resolved by a trier of fact.").

In order to determine whether Plaintiff properly exhausted administrative remedies, the Court must hold a hearing, at which a fact-finder can assess the credibility of witnesses and the relative weight of the evidence the parties present. See, e.g., Woodward v. Lytle, No. 16-CV-1174, 2019 WL 2527342, at *8 (N.D.N.Y. May 24, 2019), report and recommendation adopted, No. 16-CV-1174, 2019 WL 2524756 (N.D.N.Y. June 19, 2019) (issuing a decision on exhaustion subsequent to a hearing); see also Messa v. Goord, 652 F.3d 305, 310 (2d Cir. 2011) (affirming the constitutionality of adjudicating PLRA exhaustion issues by bench trial).

With respect to the magistrate judge's conclusion that the claim against LaClair should be dismissed due to his lack of personal involvement, the Court concurs and finds no clear error.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 22) is **REJECTED in part and ADOPTED in part**. Defendant's Motion (Dkt. No. 17) is denied as to exhaustion and granted as to Plaintiff's Eighth Amendment claim against LaClair; and it is further

**ORDERED**, that the Clerk **TERMINATE** LaClair from the docket; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

2021 WL 671650

**All Citations**

Slip Copy, 2021 WL 671650

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 281 of 353

Fann v. Graham, Not Reported in Fed. Supp. (2018)
2018 WL 1399331

2018 WL 1399331
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jermaine FANN, Plaintiff,
v.
H. GRAHAM, Superintendent Auburn
Correctional Facility, et al., Defendants.

No. 9:15-CV-1339 (DNH/CFH)
|
Signed 01/11/2018

**Attorneys and Law Firms**

Jermaine Fann, 430 Main Street, Apt. 306, Dunkirk, New York 14048, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, OF COUNSEL: WILLIAM A. SCOTT, ESQ., NICOLE E. HAIMSON, ESQ., Assistant Attorneys General, The Capitol, Albany, New York 12224, Attorney for Defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Christian F. Hummel, U.S. Magistrate Judge

*1  Plaintiff pro se Jermaine Fann ("plaintiff"), a former inmate who was, at all relevant times, in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants Superintendent ("Supt.") H. Graham, Deputy Superintendent ("DSS") Fagan, Lieutenant ("Lieut.") Ouimetto, Sergeant ("Sgt.") Ederer, Corrections Officer ("C.O.") M. Cornell, C.O. Lovejoy, C.O. Steinberg, C.O. C. Thomas, and C.O R.F. Schramm—who, at all relevant times, were employed at the Auburn Correctional Facility ("Auburn")—violated his constitutional rights under the First, Fourth, and Fourteenth Amendments. Dkt. No. 79. ("Am. Compl."). Presently pending before the Court are plaintiff's Motion for Summary Judgment and defendants' Motion for Summary Judgment, both filed pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 56. Dkt Nos. 119,

120. Plaintiff and defendant opposed the respective motions, and defendant filed a reply. Dkt. Nos. 124, 125, 126. For the following reasons, it is recommended that defendants' motion be granted in part and denied in part, and plaintiff's motion be denied.

**I. Arguments**

**A. Plaintiff's Motion for Summary Judgment**

In support of his Motion for Summary Judgment, plaintiff filed a Statement of Material Facts. [2] On review of plaintiff's Motion for Summary Judgment, the facts will be related herein in the light most favorable to defendants as the nonmoving party. See subsection II (A) infra; Rattner v. Netburn, 930 F.2d 204, 209 (2d Cir. 1991) ("In assessing the record ... to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought."). On May 10, 2015, plaintiff filed a grievance against C.O. Thomas for denying him the right to attend morning breakfast. Dkt. No. 119-2 ¶¶ 7-8. On June 6, 2015, C.O. Thomas approached plaintiff regarding the May 10, 2015 grievance. Id. ¶ 10. The next day, C.O. Thomas informed plaintiff that he was confined to his cell because of the grievance plaintiff filed against him. Id. ¶ 11. C.O. Thomas then issued plaintiff a false misbehavior report because of plaintiff's May 10, 2015 grievance against him. Id. ¶ 12. On June 12, 2015, plaintiff received thirty days confinement and loss of all privileges pursuant to C.O. Thomas' June 7, 2015 misbehavior report. Id. ¶ 13.

[2]    Local Rule 7.1(a)(3) states:
Summary Judgment Motions
Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

Case 9:17-cv-00366-DNH-TWD Document 93 Filed 03/08/21 Page 282 of 353

Fann v. Graham, Not Reported in Fed. Supp. (2018)

2018 WL 1399331

> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

**\*2** On June 3, 2015, C.O. Cornell and C.O. Steinberg performed an "unreasonable" visual body cavity search— also known as a "strip frisk" or "strip search"—on plaintiff "under filthy prison conditions." Dkt. No. 119-2 ¶¶ 14-15, 17. The strip frisk room "was filthy, bug infested, and extremely cold." Id. ¶ 16. Supt. Graham, who has worked at Auburn for ten-and-a-half years, knew Auburn corrections officers were conducting unreasonable searches. Id. ¶ 18-19. The same day, plaintiff filed a grievance against C.O. Cornell and C.O. Steinberg alleging an unreasonable strip frisk. Id. ¶ 20. On June 13, 2015, C.O. Cornell "responded to the plaintiff's [ ] grievance." Id. ¶ 21. On July 8, 2015, C.O. Cornell confronted plaintiff regarding the June 3, 2015 grievance plaintiff filed against him. Id. ¶ 22. On July 9, 2015, Sgt. Ederer authorized C.O. Cornell to perform a visual body cavity search on plaintiff. Id. ¶¶ 29, 32. During the strip frisk, C.O. Cornell "made statements" to plaintiff regarding the June 3, 2015 grievance plaintiff filed against him. Id. ¶ 28. C.O. Cornell was not supervised during the strip frisk, nor did he conduct the search in a "suitable and comfortable location." Id. ¶¶ 30, 31.

The same day, C.O. Cornell and C.O. Lovejoy conducted a cell search of plaintiff's cell. Dkt. No. 119-2 ¶ 33. During the search, C.O. Cornell, C.O. Lovejoy, and C.O. Schramm destroyed plaintiff's legal materials and medication. Id. ¶ 34. C.O. Lovejoy escorted plaintiff to the hospital for a urine test. Id. ¶ 35. C.O. Lovejoy and C.O. Schramm "harassed and threatened the plaintiff for his grievance activities." Id. ¶ 36. C.O. Cornell "planted drugs on the plaintiff for filing [a] grievance." Id. ¶ 37. On July 10, 2015, C.O. Cornell issued plaintiff a misbehavior report in retaliation for his June 3, 2015 grievance that plaintiff filed against him. Id. ¶¶ 38-39. On July 28, 2015, "plaintiff was found guilty of the false misbehavior report written by [C.O.] Cornell." Id. ¶ 40.

On October 1, 2015, "Albany" reversed the July 28, 2015 disciplinary decision. Id. ¶ 41.

In opposition, defendants argue that the Court should deny plaintiff's motion because plaintiff's motion papers "affirmatively demonstrate" that his claims are without merit, and, therefore, should be dismissed. Dkt. No. 124-1 at 6.

### B. Defendants' Motion for Summary Judgment

In support of their Motion for Summary Judgment, defendants filed a Statement of Material Facts. Dkt. No. 120-1. The facts relating to defendants' Motion for Summary Judgment are related herein in the light most favorable to plaintiff as the nonmoving party. See subsection II (A), infra; Rattner, 930 F.2d at 209 ("In assessing the record ... to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought."). On June 3, 2015, plaintiff alleges that C.O. Cornell and C.O. Steinberg strip frisked him. Dkt. No. 120-1 ¶ 11. C.O. Cornell conducted a pat frisk on that date, but did not perform a strip frisk. Id. ¶ 12. C.O. Steinberg did not perform a pat frisk or strip frisk on plaintiff on June 3, 2015. Id. ¶ 13.

On June 7, 2015, C.O. Thomas issued plaintiff a Tier II disciplinary ticket for sleeping during morning count. Dkt. No. 120-1 ¶ 18. On June 12, 2015, Lieut. Ouimette commenced a Tier II disciplinary hearing. Id. ¶ 19. During the hearing, Lieut. Ouimette denied plaintiff's request to call Supt. Graham as a witness because he did not issue the disciplinary ticket, and was not present during the incident that resulted in the ticket. Id. ¶¶ 20-21. Although Lieut. Ouimette denied plaintiff's request, he allowed plaintiff to testify that he had filed a prior grievance against C.O. Thomas. Id. ¶¶ 22, 23. Lieut. Ouimette found plaintiff guilty, and sentenced him to thirty days keeplock. [3]

[3]    "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. COMP. CODES R. & REGS. tit. 7, § 301.6.

**\*3** On July 9, 2015, Sgt. Ederer authorized C.O. Cornell and C.O. Lovejoy to conduct a cell search of plaintiff's cell.

Fann v. Graham, Not Reported in Fed. Supp. (2018)

2018 WL 1399331

Dkt. No. 120-1 ¶ 27. In conjunction with the cell search, C.O. Cornell performed a pat frisk of plaintiff. Id. ¶ 28. During the pat frisk, C.O. Cornell found a "green leafy substance" on plaintiff that was later found to be marijuana, along with a "suspicious lump" in plaintiff's "groin area." Id. ¶ 29. C.O. Cornell requested permission to conduct a strip frisk. Id. ¶ 30. C.O. Cornell found no further contraband during the strip frisk. Id. ¶ 31. C.O. Cornell was the only officer present during plaintiff's strip frisk. Id. ¶ 32. C.O. Lovejoy completed the search of plaintiff's cell and found no other contraband. Id. ¶ 34. Because plaintiff possessed marijuana, Auburn staff took plaintiff to the hospital for urine sample testing. Id. ¶ 35. Plaintiff tested positive for marijuana use. Id. ¶ 36. C.O. Cornell issued plaintiff a misbehavior report for possession and use of marijuana. Id. ¶ 37.

On July 14, 2015, Lieut. Ouimette commenced a Tier III disciplinary hearing regarding the July 9, 2015 misbehavior report. Dkt. No. 120-1 ¶ 38. At the outset, Lieut. Ouimette dismissed the drug use charge because plaintiff had already tested positive for marijuana use within the past thirty days, and the July 9, 2015 test results could not be validated. Id. ¶¶ 39-40. Lieut. Ouimette found plaintiff guilty of drug possession, and sentenced him to ninety days keeplock. Id. ¶ 41. The disciplinary disposition was reversed on appeal, and plaintiff served approximately sixty days in keeplock. Id. ¶ 42.

In opposition, plaintiff argues that the Court should deny defendants' motion because: (1) he exhausted his administrative remedies; and (2) he has stated claims against the defendants. Dkt. No. 125. In reply, defendants contend that plaintiff failed to exhaust his administrative remedies. Dkt. No. 126.

## II. Discussion [4]

[4]  All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

### A. Legal Standards

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing

the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

**\*4**  [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

Case 9:17-cv-00366-DNH-TWD Document 93 Filed 03/08/21 Page 284 of 353
Fann v. Graham, Not Reported in Fed. Supp. (2018)
2018 WL 1399331

### B. Exhaustion

As a threshold matter, defendants contend that plaintiff has failed to exhaust his administrative remedies. Dkt. No. 120-4 ("Def. Mem. of Law") at 10-13. Defendants argue that because plaintiff failed to exhaust his administrative remedies as to Supt. Graham, DSS Fagan, Sgt. Ederer, C.O. Lovejoy, and C.O. Schramm, any claims involving those defendants should be dismissed. Def. Mem. of Law at 13. Defendants further argue that plaintiff failed to exhaust his administrative remedies as to the July 9, 2015 incident. Id. [5] Plaintiff contends that he properly filed a grievance regarding the July 9, 2015 incident. Dkt. No. 125 at 7-8. Plaintiff also claims that he was aware "of the facility attitude toward the grievance program" and "properly followed all steps to exhaust his claims." Id. at 8. Plaintiff argues that "the [d]efendants failure to properly deliver and or have a program where grievances are safe and secure does not fall at [his] feet, [and] should not be an escape route for claims to be dismissed." Id. In reply, defendants argue that plaintiff supports his "conclusory allegation" that he exhausted his administrative remedies with "handwritten letters that, by [p]laintiff's own acknowledgement [sic], were never acknowledged as received by DOCCS." Dkt. No. 126 at 4. Defendants contend that plaintiff's prior grievance filings and Jeffery Hale and Cheryl Parmiter's declarations invalidate plaintiff's claim of unavailability. Id.

[5]     Defendants concede that plaintiff exhausted his administrative remedies regarding C.O. Cornell and C.O. Steinberg's June 3, 2015 strip frisk, and C.O. Thomas' June 7, 2015 misbehavior report. Def. Mem. of Law at 13.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. 983. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Id. at 524, 122 S.Ct. 983. To exhaust administrative remedies, the inmate

must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, ––– U.S. ––––, 136 S.Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). Thus, the "special circumstances" exception in Hemphill v. New York, 680 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016). [6]

[6]     In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See Williams, 829 F.3d at 123. The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." Id. (citing Ross, 136 S.Ct. at 1858-59).

 *5  Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S.Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates.'" Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 285 of 353
Fann v. Graham, Not Reported in Fed. Supp. (2018)
2018 WL 1399331

**1. Did Plaintiff Exhaust his Administrative Remedies?**

Although plaintiff seems to suggest that the Auburn grievance process was unavailable, there is no genuine dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5.[7]

[7]  First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

**a. DSS Fagan**

Plaintiff concedes that he did not exhaust his administrative remedies as to claims against DSS Fagan, and that summary judgment should be granted. Dkt. No. 125 at 9. Accordingly, it is recommended that defendants' Motion for Summary Judgment, insofar as it relates to claims against DSS Fagan, be granted.

**b. Supt. Graham and Lieut. Ouimetto**

Insofar as plaintiff seeks relief against Supt. Graham for supervisory liability and Lieut. Ouimetto for Fourteenth Amendment due process, plaintiff has failed to exhaust his administrative remedies. DOCCS records establish that plaintiff did not name either Supt. Graham or Lieut. Ouimetto in grievances pertaining to the conduct at issue. See Dkt. No. 120-30; Dkt. No. 120-29 ("Hale Decl.") at 4 (detailing plaintiff's subject grievances). Notably, in opposition, plaintiff does not allege that he exhausted his administrative remedies as to Supt. Graham or Lieut. Ouimetto, and does not claim that defendants prevented or obstructed him from filing grievances against Supt. Graham or Lieut. Ouimetto. Further, there is nothing in the record indicating that Supt. Graham, Lieut. Ouimetto, or any other defendant prevented him from filing grievances. See Dkt. No. 125 at 8 (noting, in plaintiff's exhaustion section, that he "properly exhausted" claims against defendants Cornell, Lovejoy, Ederer, and Schramm).[8] Therefore, because plaintiff failed to exhaust his administrative remedies as to Supt. Graham and Lieut. Ouimetto, it is recommended that defendants' Motion for Summary Judgment, insofar as it relates to claims against Supt. Graham and Lieut. Ouimetto, be granted.

[8]  Plaintiff testified that he filed a grievance against Supt. Graham for failure to release him from keeplock, such conduct—by plaintiff's own admission—is not related to the instant case. Dkt. No. 120-3 ("Pl. Dep.") at 125, 222; Dkt. No. 120-34.

**c. July 9, 2015 Incident**

*6  Plaintiff claims that on July 14, 2015, he filed a grievance regarding the July 9, 2015 "retaliatory cell search, visual body cavity search, urine test, verbal threats, harassment, and the false misbehavior report." Am. Compl. ¶ 169. Plaintiff testified that he handed this grievance to the "rounds officer" while he was on keeplock confinement. Dkt. No.120-3 ("Pl. Dep.") at 213. On July 17, 2015, after he did not receive a copy of the grievance or a grievance number, plaintiff filed a second grievance. Am. Compl. ¶ 171. Plaintiff testified that he handed the second grievance to the sergeant on duty. Pl. Dep. at 217. On August 13, 2015, after not receiving a response from Auburn's IGRC, plaintiff filed a notice of appeal "in accordance with the rules and regulations" requesting that his grievance be sent to CORC. Am. Compl. ¶ 177.

Case 9:17-cv-00366-DNH-TWD Document 93 Filed 03/08/21 Page 286 of 353

Fann v. Graham, Not Reported in Fed. Supp. (2018)

2018 WL 1399331

Defendants contend that plaintiff never filed a grievance with respect to the July 9, 2015 strip frisk by C.O. Cornell, cell search by C.O. Cornell, C.O. Lovejoy, C.O. Schramm, and Sgt. Ederer, destruction of property by C.O. Cornell and C.O. Schramm, and a falsified misbehavior report. Def. Mem. of Law at 12-13. Auburn's IGP Supervisor Cheryl Parmiter declared that a search of the DOCCS database confirms that, although plaintiff filed six grievances while housed at Auburn, five were filed prior to July 9, 2015. Dkt. No. 120-35 ("Parmiter Decl.") at 3. The grievance filed after July 9, 2015 does not relate to the wrongdoings plaintiff alleged occurred on July 9, 2015. Id. at 4. DOCCS' Assistant Director of IGP Jeffery Hale declared that a search of the CORC database confirms that "plaintiff filed a number of grievance appeals with CORC, but none of those appeals concern matters stemming from incidents of an allegedly improper strip frisk, an allegedly improper cell search, or the issuance of an allegedly false misbehavior report on July 9, 2015." Hale Decl. at 4. However, plaintiff has proffered a copy of the July 17, 2015 grievance alleging that "several officers" [9] subjected him "to an unnecessary pat frisk, strip, frisk, cell search, verbal threats, and an [sic] urine test and false report." Dkt. No. 125-2 at 18. Plaintiff further provides his August 13, 2015 notice of appeal to CORC, which details plaintiff's attempts to exhaust his administrative remedies and expresses his desire to further "appeal to the next level of review." Id. [10]

[9]     In New York State, the IGP regulations do not require that an inmate's grievance contain the name of the offending corrections officer. See Espinal v. Goord, 558 F.3d 119, 126 (2d Cir. 2009). "[T]he IGP regulations offer the general guidance that a grievance should 'contain a concise, specific description of the problem,' ... and the complaint form does not instruct the inmate to name the officials allegedly responsible for misconduct." Id. (internal citations omitted). Therefore, an inmate "is not required to name responsible parties in a grievance in order to exhaust his administrative remedies." Id.

[10]    Plaintiff's July 2015 grievance involves staff misconduct or harassment, which follows an expedited procedure and is immediately sent to the superintendent for review. See N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8(a), (b); Dkt. No. 125-2 at 18.

Viewing the facts in the light most favorable to plaintiff, the record suggests that plaintiff's grievances were submitted, but were unfiled and unanswered, creating an issue of fact as to whether the grievance process was available and whether plaintiff attempted to exhaust his administrative remedies as to C.O. Cornell, C.O. Lovejoy, C.O. Schramm, and Sgt. Ederer in relation to the July 9, 2015 incident. See Williams, 829 F.3d at 126 (concluding that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it."); Thaxton v. Simmons, No. 9:10-CV-1318 (MAD/RFT), 2013 WL 4806457, at *4 (N.D.N.Y. Sept. 9, 2013) ("[A] question of fact exists as to whether [p]laintiff never filed his initial grievance on April 29, as [d]efendants claim, or that, as [p]laintiff claims, he filed a timely grievance that was lost or tampered with by [d]efendants. Such credibility assessments are to be resolved by a trier of fact."). Accordingly, the undersigned recommends that defendants' Motion for Summary Judgment on plaintiff's claims arising from the July 9, 2015 incident be denied, without prejudice and with the opportunity to renew by way of an exhaustion hearing, should defendants request such a hearing.

### C. Fourth Amendment

**\*7** Plaintiff alleges that C.O. Cornell and C.O. Steinberg violated his Fourth Amendment rights during a June 3, 2015 strip search. Dkt. No. 119-3 ("Pl. Mem. of Law") at 4-5. Defendants argue that the strip frisk never occurred, and in the alternative, neither C.O. Cornell nor C.O. Steinberg had physical contact with plaintiff. Def. Mem. of Law at 19. The Fourth Amendment establishes that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures[ ] shall not be violated." U.S. CONST. amend. IV. However, inmates are generally not afforded the same privacy rights as non-inmates because "[l]oss of ... privacy [is an] inherent incident[ ] of confinement." Bell v. Wolfish, 441 U.S. 520, 536, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); Perez v. N.Y.S. Dep't of Corr. Servs., No. 9:08-CV-1031, 2010 WL 1235637, at *5 (N.D.N.Y. Mar. 17, 2010). "Strip frisks pass constitutional muster, even if the strip frisk is conducted without probable cause, so long as the search is reasonable and not abusive." Shabazz v. Pico, 994 F.Supp. 460, 473 (S.D.N.Y. 1998) (citing Bell, 411 U.S. at 558-60, 93 S.Ct. 1713). In assessing reasonableness under the Fourth Amendment, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 287 of 353

Fann v. Graham, Not Reported in Fed. Supp. (2018)

2018 WL 1399331

is conducted." Bell, 441 U.S. at 558, 99 S.Ct. 1861. C.O. Cornell concedes that he pat frisked plaintiff on June 3, 2015, but denies conducting a strip frisk. Def. Mem. of Law at 19; Dkt. No. 120-18 ("Cornell Decl.") ¶ 4. C.O. Steinberg denies strip frisking plaintiff on June 3, 2015. Def. Mem. of Law at 19; Dkt. No. 120-21 ("Steinberg Decl.") ¶ 4. C.O. Steinberg further states that he did not witness C.O. Cornell pat frisk plaintiff on June 3, 2015. Steinberg Decl. ¶ 4.

The record contains disputed issues of material fact as to whether the June 3, 2015 strip frisk occurred, and if it did occur, whether the strip frisk was reasonable under the Fourth Amendment. However, even assuming the strip frisk occurred as plaintiff alleges, and occurred without probable cause, plaintiff fails to establish that the June 3, 2015 strip frisk was unreasonable. Plaintiff testified that the June 3, 2015 search was illegal, in part, because C.O. Cornell conducted it in a "racist manner" by forcing plaintiff to "have [his] hands above [his] head, strapped to some bars, standing naked." Pl. Dep. at 222-23. DOCCS Directive 4190 states that a corrections officer may require an inmate to "lift[ ] his arms to expose his armpits" during a strip frisk. Dkt. No. 120-8 at 6. Plaintiff has not further demonstrated how standing with his "hands above [his] head, strapped to some bars" constitutes racist conduct on behalf of C.O. Cornell or C.O. Steinberg. Pl. Dep. at 222-23. Moreover, there is no indication that C.O. Cornell or C.O. Steinberg exceeded the scope of the strip frisk, as plaintiff concedes that neither C.O. Cornell or C.O. Steinberg made physical contact with him during the frisk. Pl. Dep. at 152. Insofar as plaintiff suggests that C.O. Cornell and C.O. Steinberg violated DOCCS Directive 4190 by conducting the strip search in the alleged unsanitary area at issue in C-Block, C.O. Cornell and C.O. Steinberg's failure to follow a DOCCS directive does not amount to a constitutional violation. See Burroughs v. Petrone, 138 F.Supp.3d 182, 219 (N.D.N.Y. 2015); Sanders v. Gifford, No. 11-CV-0326, 2014 WL 5662775, at *4 (N.D.N.Y. Nov. 4, 2014). Therefore, viewing the facts in the light most favorable to plaintiff, plaintiff fails to establish that the June 3, 2015 strip frisk was unreasonable. Accordingly, it is recommended that plaintiff's Motion for Summary Judgment as to the June 3, 2015 strip search be denied, and defendants' Motion for Summary Judgment be granted.

### D. First Amendment

Plaintiff claims that C.O. Thomas subjected him to a false misbehavior report in retaliation for filing a grievance against him. Pl.'s Mem. of Law at 6-7. Defendants argue that plaintiff "has no viable claim for Officer Thomas' filing of a false misbehavior report [because] [h]e was granted a hearing on the charges and does not raise any viable claim that such hearing failed to provide him due process." Def.'s Mem. of Law at 20. Moreover, defendants argue that the only evidence plaintiff offers of C.O. Thomas' retaliation are the inadmissible declarations of inmates who purported to have overheard conversations between C.O. Thomas and plaintiff. Dkt. No. 124-1 at 8-9.

**\*8** Courts are to "approach [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]' " See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). A retaliation claim under Section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds by Swierkiewicz, 534 U.S. at 560, 122 S.Ct. 999).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal, 558 F.3d at 128. The Second Circuit has concluded that use of the prison grievance system constitutes a protected activity. See Gill, 389 F.3d at 384; Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988) ("Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (alteration and internal quotation marks omitted); see also Roseboro v. Gillespie, 791 F.Supp.2d 353, 367 (S.D.N.Y. 2011) (finding that the filing of a grievance is a protected activity); Mateo v. Fischer, 682 F.Supp.2d 423, 433 (S.D.N.Y. 2010) (same). Plaintiff states that he filed a grievance against C.O. Thomas on May 10, 2015. Pl.'s Mem. of Law at 6-7; Dkt. No. 119-4 at 4. Thus, plaintiff satisfies the first prong of the test as he has engaged in a protected activity. See id.; Gill, 389 F.3d at 384.

2018 WL 1399331

A defendant's retaliatory filing of a falsified misbehavior report that results in disciplinary segregated confinement constitutes adverse action. See Gill, 389 F.3d at 384 (finding that a false misbehavior report that resulted in the plaintiff's placement in keeplock constituted adverse action); Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (emphasis added) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983."). "[T]he mere allegation that a false misbehavior report has been issued to an inmate, standing alone, does not rise to [a] level of constitutional significance." Reed v. Doe No. 1, No. 9:11-CV-0250 (TJM/DEP), 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (citing Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997)). However, a plaintiff's allegation that a defendant issued a false misbehavior report in response to the plaintiff's protected activity can support a claim of unlawful retaliation. Id. (citing Franco v. Kelly, 854 F.2d 584, 589 (2d. Cir. 2008)). The plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle, 313 F.3d at 682.

> In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation.

*9 Baskerville v. Blot, 224 F.Supp.2d 723, 732 (S.D.N.Y. 2002). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." Id. In assessing temporal proximity, the Second Circuit has held that, generally, to establish a temporal proximity sufficient to support an inference of causal connection, there may be no more than six months between the temporal proximity and the adverse action. See Espinal, 558 F.3d at 129.

Plaintiff alleges that on May 10, 2015, he filed a grievance against C.O. Thomas. Pl.'s Mem. of Law at 6-7; Dkt. No. 119-4 at 4. On June 6, 2015, C.O. Thomas submitted a memorandum to the Auburn IGP denying the allegations set forth in the grievance. Dkt. No. 119-4 at 6. The following day, C.O. Thomas confined plaintiff to his cell. Pl.'s Mem. of Law at 7. When plaintiff questioned why he was confined, C.O. Thomas stated, "you filed [a] grievance, this is what you had asked for." Id. C.O. Thomas issued plaintiff a misbehavior report for failure to comply with facility count procedures (112.21) and refusing a direct order (106.10) stemming from plaintiff's failure to wake up during morning count. Id.; Dkt. No. 119-4 at 15. Lieut. Ouimette conducted a disciplinary hearing on June 12, 2015 and sentenced plaintiff to thirty days keeplock. Id. at 17.

Defendants argue that plaintiff "provides no admissible evidence in support of this claim and Officer Thomas has specifically denied the allegations of retaliation." Dkt. No. 124-1 at 8. Defendants also discredit plaintiff's reliance on Kenneth Boyd's Declaration, which they contend is "insufficient and inadmissible as it is based upon his own supposition regarding Officer Thomas' mental state and his alleged conversations with the Plaintiff." Id. at 9. Although defendants are correct that "[a]ffidavits submitted in support of or in opposition to the summary judgment motion must 'be made on personal knowledge, ... [and] set forth facts as would be admissible in evidence,' " plaintiff's submission of the Boyd Declaration is not fatal to his claim. Patterson v. County of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004) (quoting FED. R. CIV. P. 56(e)). Indeed, the record establishes that plaintiff has presented sufficient circumstantial and direct evidence to raise a material question of fact whether C.O. Thomas retaliated against him.

Plaintiff has suggested facts supporting two of the factors set forth in Baskerville. Baskerville, 224 F.Supp.2d at 732. Plaintiff filed a grievance against C.O. Thomas on May 10, 2015. Pl.'s Mem. of Law at 6-7; Dkt. No. 119-4 at 4. On June 6, 2015, C.O. Thomas submitted a memorandum to the Auburn IGP in conjunction with the grievance investigation denying the allegations against him. Dkt. No. 119-4 at 6. The next day, C.O. Thomas filed an allegedly false misbehavior report. Pl.'s Mem. of Law at 7; Dkt. No. 119-4 at 15. C.O. Thomas learned of plaintiff's grievance, at the latest, on June 6, 2015, and issued the misbehavior report on June 7, 2015; therefore, the temporal proximity sufficiently supports an inference of causal connection. See Washington v.

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 289 of 353
Fann v. Graham, Not Reported in Fed. Supp. (2018)
2018 WL 1399331

Afify, 681 Fed.Appx. 43, 46 (2d Cir. 2017) (summary order) (finding that the defendant's questioning of the plaintiff about a grievance he filed, and subsequently filing an allegedly false misbehavior report against the plaintiff two days later supports an inference of causal connection). Moreover, upon confining plaintiff in his cell, C.O. Thomas stated, "you filed [a] grievance, this is what you had asked for." Pl.'s Mem. of Law at 7. In support of that contention, plaintiff has proffered the sworn affidavit of inmate Rodolfo Casiano, who testified that he was housed in a neighboring cell and witnessed the conversation between plaintiff and "the officer that worked that day." Dkt. No. 119-4 at 8. Mr. Casiano states that he heard C.O. Thomas make the abovementioned comment, as well as the statement, "it's funny how things work." Id. Although C.O. Thomas denies issuing the misbehavior report in retaliation for plaintiff's grievance, affording plaintiff special solicitude, a question of material fact is raised as to whether C.O. Thomas had retaliatory intent. See Washington, 681 Fed.Appx. at 46. Defendants do not argue that plaintiff would have been issued a misbehavior report but for the exercise of his First Amendment rights. See Gayle, 313 F.3d a 682 ("The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation."). Arguably, defendants may be suggesting that plaintiff received a misbehavior report because he slept through the morning facility count; however, as plaintiff denies this conduct, a material fact is in dispute. See Dkt. No. 119-4 at 15. Because a genuine issue of material fact exists with regard to C.O. Thomas' retaliatory intent, it is recommended that plaintiff's Motion for Summary Judgment be denied, and defendants' Motion for Summary Judgment be denied as to plaintiff's First Amendment claim against C.O. Thomas.

### III. Conclusion

*10 **WHEREFORE**, for the reasons stated herein, it is hereby

**RECOMMENDED**, that plaintiff's Motion for Summary Judgment (Dkt. No. 119) be **DENIED**; and it is further

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 120) be **GRANTED IN PART**:

(1) Insofar as it seeks dismissal of plaintiff's supervisory liability claims against Deputy Superintendent Fagan;

(2) Insofar as it seeks dismissal of plaintiff's supervisory liability claim against Supt. Graham;

(3) Insofar as it seeks dismissal of plaintiff's Fourteenth Amendment due process claim against Lieut. Ouimette;

(4) Insofar as it seeks dismissal of plaintiff's Fourth Amendment unreasonable search claim against C.O. Cornell and C.O. Steinberg,

the motion be **GRANTED**, and the claims be **DISMISSED** with prejudice; and it is further

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 120) be **DENIED IN PART**:

(1) Insofar as it seeks dismissal of plaintiff's First Amendment retaliation claim against C.O. Thomas, the motion be **DENIED**,

(2) Insofar as it seeks dismissal of plaintiff's First and Fourth Amendment claims against C.O. Cornell, C.O. Lovejoy, C.O. Schramm, and Sgt. Ederer for the incidents occurring on July 9, 2015, the motion be **DENIED**, without prejudice, to defendants renewing this argument and requesting a hearing to assess whether plaintiff exhausted his administrative remedies, and it is further,

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72. [11]

[11]    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed

**Fann v. Graham, Not Reported in Fed. Supp. (2018)**

2018 WL 1399331

to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1399331

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00366-DNH-TWD   Document 93   Filed 03/08/21   Page 291 of 353

Fann v. Graham, Not Reported in Fed. Supp. (2018)

2018 WL 1399340

2018 WL 1399340
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jermaine FANN, Plaintiff,

v.

H. GRAHAM, Superintendent Auburn Correctional Facility; Lt. Ouimette [1], Lieutenant, Auburn Correctional Facility; Sgt. Ederer, Sergeant, Auburn Correctional Facility; M. Cornell, Correctional Officer, Auburn Correctional Facility; Lovejoy, Correctional Officer, Auburn Correctional Facility; Steinberg, Correctional Officer, Auburn Correctional Facility, formerly known as Stienberg; C. Thomas, Correctional Officer, Auburn Correctional Facility; R. F. Schramm, Correctional Officer and Certified Drug Tester, Auburn Correctional Facility, formerly known as R. F. Shramm; and Fagan, Deputy Superintendent of Security, Auburn Correctional Facility, in his official capacity, Defendants.

[1]     The Clerk is directed to amend the docket to reflect the correct spelling of Lt. Ouimette's name.

9:15-CV-1339 (DNH/CFH)
|
Signed 03/19/2018

**Attorneys and Law Firms**

JERMAINE FANN, 430 Main Street-Apt. #306, Dunkirk, NY 14048, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, OF COUNSEL: WILLIAM A. SCOTT, ESQ., NICOLE E. HAIMSON, ESQ., Ass't Attorneys General, The Capitol, Albany, NY 12224, Attorney for Defendants.

**DECISION and ORDER**

DAVID N. HURD, United States District Judge

**\*1** Pro se plaintiff Jermaine Fann brought this civil rights action pursuant to 42 U.S.C. § 1983. On January 11, 2018, the Honorable Christian F. Hummel, United States Magistrate Judge, advised by Report-Recommendation that defendants' motion for summary judgment be granted in part and denied in part, and plaintiff's motion for summary judgment be denied in its entirety. Plaintiff and defendants filed timely objections to the Report-Recommendation, and defendants submitted an additional though untimely response to plaintiff's objections.

Based upon a careful review of the Report-Recommendation and the portions to which the parties objected, the Report-Recommendation is accepted in whole. See 28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Plaintiff's motion for summary judgment is DENIED in its entirety;

2. Defendants' motion for summary judgment is GRANTED in part and DENIED in part;

3. Plaintiff's supervisory liability claims against defendants Fagan and Graham are DISMISSED with prejudice;

4. Plaintiff's Fourteenth Amendment due process claim against defendant Ouimette is DISMISSED with prejudice;

5. Plaintiff's Fourth Amendment unreasonable search claims against defendants Cornell and Steinberg are DISMISSED with prejudice;

6. Defendants' motion for summary judgment is DENIED as to plaintiff's First Amendment retaliation claim against defendant Thomas; and

7. Defendants' motion for summary judgment is DENIED without prejudice as to plaintiff's First and Fourth Amendment claims against defendants Cornell, Lovejoy, Schramm, and Ederer for the incidents occurring on July 9, 2015, to defendants renewing this argument and requesting a hearing to assess whether plaintiff exhausted his administrative remedies.

IT IS SO ORDERED.

2018 WL 1399340

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1399340

---

**End of Document**                                                                     © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

2013 WL 4806457
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronnie THAXTON, Plaintiff,

v.

A. SIMMONS, Corrections Officer, Upstate
Correctional Facility, Bush, Corrections Officer,
Upstate Correctional Facility, K. Garneau, Nurse,
Upstate Correctional Facility, John Doe, Corrections
Officer, Upstate Correctional Facility, Defendants.

No. 9:10–CV–1318 (MAD/RFT).
|
Sept. 9, 2013.

**Attorneys and Law Firms**

Ronnie Thaxton, Ossining, NY, pro se.

Office of the New York State Attorney General, Christopher
W. Hall, AAG, of Counsel, Albany, NY, for Defendants.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Christopher W. Hall, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

**\*1** *Pro se* plaintiff, Ronnie Thaxton, brought this civil
rights action pursuant to 42 U.S.C. § 1983 alleging (1)
Defendant Simmons retaliated against Plaintiff because of
past grievances he filed, (2) Defendants Bush and Doe
deprived Plaintiff of nutritional meals, and (3) Defendant
Garneau violated Plaintiff's First and Eighth Amendment
rights by his deliberate indifference to Plaintiff's serious
medical needs. *See* Dkt. No. 60 at 1. Defendants have moved
for summary judgment on the grounds that (1) Plaintiff failed
to exhaust the available administrative remedies regarding his
claims against Defendants Bush and Garneau, (2) Defendants
Bush and Simmons were not personally involved in the
claimed constitutional violations, and (3) Plaintiff did not
suffer a serious injury to support his medical deliberate

indifference claim against Defendant Garneau. *See* Dkt. No.
50–5. In a May 23, 2013 Report–Recommendation and Order,
Magistrate Judge Treece recommended that Defendants'
motion for summary judgement be granted.

Currently before the Court are Plaintiff's objections to
Magistrate Judge Treece's Report–Recommendation and
Order.

**II. BACKGROUND**

Plaintiff's claims arose from events between January 12,
2009, and April 28, 2009, while he was in the custody
of the New York State Department of Corrections and
Community Supervision ("DOCCS") as an inmate in the
Upstate Correctional Facility ("Upstate C.F."). *See* Dkt. No.
50–1 at ¶ 1.

On January 12, 2009, Plaintiff filed a grievance, which
the parties have agreed implicated Defendant Simmons,
complaining about receiving his meals later than other
prisoners. *See id.* at ¶¶ 2–3. On April 6, Defendant Simmons
delivered Plaintiff's evening meal which contained several
strands of hair. *See id.* Plaintiff complained to Defendant
Simmons about the hair and he promptly gave Plaintiff
another tray of food. *See* Dkt. No. 50–3 at 25. [1] Plaintiff
did not see anyone place the hair in his meal, did not see
Defendant Simmons remove the plastic wrap from the meal,
and Defendant Simmons stated that he had not "played"
with Plaintiff's food. *See id.* at 26, 28. Plaintiff contends that
Defendant Simmons placed the hair in the food as a means of
retaliating against him for the January 12 grievance. *See id.*
at 31.

[1]     To avoid confusion, any time the Court references a
specific page number for a document on the docket,
the Court will cite to the page number assigned by
the Court's electronic filing system.

On April 28, 2009, Defendants Bush and Doe served Plaintiff
his evening meal containing a piece of metal in his sardines.
*See* Dkt. No. 50–1 at ¶¶ 16–17, 25. Defendant Doe did not
touch the food and only delivered Plaintiff his Kool–Aid and
hot water. *See* Dkt. No. 50–3 at 39. Plaintiff did not see
Defendant Bush tamper with the food and discovered the
piece of metal when he bit into his sardine sandwich. *See id.*
at 38. Plaintiff "noticed drops of blood in the food" after the

piece of metal cut his mouth, at which point he called for medical attention. *See id.* at 45.

Defendant Nurse Garneau and Sergeant Lombard came to Plaintiff's cell within twenty minutes of his request for medical attention. *See id.* at 34. Defendant Garneau did not inspect Plaintiff's mouth, but stated that there was not much damage and that Plaintiff should not "be a cry baby." *See id.* at 34. Plaintiff's bleeding completely stopped within an hour and was not "actually a cut anymore" within three or four days. *See id.* at 50. Plaintiff experienced slight difficulty eating and sleeping directly after the incident, but was able to get the "right amount" of food and sleep. *See id.* at 54, 56. Plaintiff requested sick call at the Attica Correctional Facility ("Attica C.F.") about a week after the incident. *See id.* at 54. There, he saw another nurse and a dentist and neither reported any lasting injuries or effects from the incident. *See id.*

**\*2** In a May 23, 2013 Report–Recommendation and Order, Magistrate Judge Treece recommended that the Court grant Defendants' motion for summary judgment and close this case. *See* Dkt. No. 60. In his objections to the Report–Recommendation and Order, Plaintiff generally just reiterates arguments he made in opposing the motion for summary judgment. *See* Dkt. No. 61. Specifically, Plaintiff presents the following arguments: (1) the metal placed in his sardine sandwich deprived him of the "minimal civilized measures of life's necessities which was nutritionally adequate food that is 'prepared' and 'served' under conditions which do not present imminent danger to health and well being of inmates who consume it;" (2) Defendant Garneau violated his Eighth Amendment rights when she refused to examine or treat his injuries; and (3) that the injury to his mouth lasted approximately thirty days and he was prescribed Tylenol for the injury, which shows that it was more than a *de minimis* injury. *See* Dkt. No. 61 at 2–4.

## III. DISCUSSION

### A. Standard of review

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations

for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011)* (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36– 37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**\*3** "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (qquoting *Traguth v. Zuck,* 710 F.2d 90,

95 (2d Cir.1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, * 1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence" is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

## B. Exhaustion

The Prison Litigation Reform Act ("PLRA") states that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e(a). This exhaustion requirement applies to all suits brought by inmates regarding aspects of prison life. *See Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

New York State has a three-step administrative review process. First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC") which reviews and investigates the formal complaint before issuing a written determination. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 701.5(b). Second, if the IGRC decision is appealed, the superintendent of the facility issues a decision after reviewing the IGRC's determination. *See id.* at § 701.5(c). Third, if the superintendent's decision is appealed, the final administrative decision is made by the Central Office Review Committee ("CORC"). *See id.* at § 701.5(d). If all three of these levels of review are exhausted, then the prisoner may seek relief in federal court pursuant to § 1983. *See Bridgeforth v. Bartlett,* 686 F.Supp.2d 238, 239 (W.D.N.Y.2010) (citing *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)).

In determining whether a prisoner has failed to exhaust all available administrative remedies, the Second Circuit has instructed the district courts to consider:

> "(1) whether administrative remedies were actually available, (2) whether the defendants forfeited their right to raise the affirmative defense or by their own actions precluded the plaintiff

from using administrative grievance procedures, and (3) whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements."

**\*4** *Singh v. Goord,* 520 F.Supp.2d 487, 495–96 (S.D.N.Y.2007) (quoting *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

In the current case, Defendants claim that Plaintiff failed to exhaust all available administrative remedies in his claims against Defendants Bush and Garneau for meal tampering and deliberate indifference because he did not file a timely grievance with the IGRC. *See* Dkt. No. 50–5 at 10. Plaintiff contends that he filed a timely grievance and that special circumstances prevented him from complying with the administrative procedural requirements. *See* Dkt. No. 54 at 11–13.

Plaintiff claims that on April 29, 2009, he filed a grievance for both incidents and sent the superintendent a letter describing the events. Plaintiff has provided a copy of both the grievance and the letter to support his claim. *See* Dkt. No. 55 at 4–5, 8–9. On June 1, 2009, Plaintiff followed up his grievance by requesting an update on its status and received notice on June 8 stating "there is no grievance on file" concerning his complaints allegedly filed on April 29, and that "[Plaintiff's] complaint is being returned to [him] to file at [his] present facility." *See id.* at 7. On June 16, 2009, Plaintiff filed another grievance with the IGRC at Lakeview Correctional Facility about the April 28 incidents which was denied because of untimely service. *See id.* at 8, 10. Plaintiff then appealed this decision to the superintendent, who affirmed the IGRC decision. *See id.* at 10. On June 22, Plaintiff made a final appeal to the CORC who affirmed the superintendent's decision. *See id.* at 13.

While an untimely grievance does not properly exhaust available administrative remedies under the PLRA, a question of fact exists as to whether Plaintiff never filed his initial grievance on April 29, as Defendants claim, or that, as Plaintiff claims, he filed a timely grievance that was lost or tampered with by Defendants. Such credibility assessments are to be resolved by a trier of fact. Accordingly, the Court finds that a material issue of fact exists as to whether Plaintiff's failure to exhaust administrative remedies should be excused

due to special circumstances. Therefore, Defendants' motion for summary judgment is **DENIED** on exhaustion grounds.

## C. Personal Involvement

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Further, in regards to § 1983, "the doctrine of *respondeat superior* cannot be applied ... to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* No. 97 CIV. 2419, 1997 WL 576038, *2 (S.D.N.Y. Sept.15, 1997). Therefore, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556, U.S. 662, 676 (2009).

### 1. Defendant Simmons

**\*5** Plaintiff contends that, on April 6, Defendant Simmons delivered him a tray of food covered with hair in retaliation for a grievance Plaintiff had previously filed. Plaintiff did not see Defendant Simmons place hair on the food or see him remove the plastic wrap from the food. *See* Dkt. No. 50–3 at 26. According to plaintiff, Defendant Simmons stated that he did not play with Plaintiff's food, and if he did, "[Plaintiff] would know it." *See id.* Plaintiff further testified that "the only reason why I held [Simmons] responsible is because he's the one that's giving me the tray." *See id.* at 28.

Based upon the evidence presented, no rational juror could conclude that Defendant Simmons was personally involved in tampering with Plaintiff's food on April 6 merely because he served the food that day. Therefore, Defendants' motion for summary judgment on this matter is **GRANTED,** and Plaintiff's claim against Defendant Simmons is **DISMISSED.**

### 2. Defendant Bush

Similar to the claims against Defendant Simmons, Plaintiff claims Defendant Bush contaminated his food by placing a piece of metal in the meal served on April 28. *See id.* at 38. Plaintiff testified that Defendant Bush delivered his meal on this date, but Plaintiff did not see Defendant Bush tamper with the food. *See id* . Plaintiff assumed Defendant Bush was responsible for the metal because of "the relationship of ... the officers and when I told him that I had the metal in there, the smirk, the look that he had, that's what made me think he purposely put it in there, because he was smirking like it was a joke or something." *See id.*

Based upon the evidence presented, no rational juror could conclude that Defendant Bush was personally involved in contaminating Plaintiff's food simply because he delivered the meal and then "smirked" after Plaintiff complained of the metal. Therefore, Defendants' motion for summary judgment on this claim is **GRANTED,** and Plaintiff's claim against Defendant Bush is **DISMISSED.**

## D. Deliberate Indifference

In order for a plaintiff to effectively state an Eighth Amendment claim for denial of adequate medical care, he must demonstrate that the prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). This does not mean that every prisoner that has not received adequate medical attention has an Eighth Amendment claim, but rather the alleged conduct must be "repugnant to the conscience of mankind" and constitute "an unnecessary and wanton infliction of pain." *Id.* at 105–06.

The deliberate indifference standard for denial of medical care requires demonstration of (1) a sufficiently serious depravation, and (2) deliberate indifference with a "sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citation omitted). The first element is an objective standard to assess the seriousness of a prisoner's medical condition. *See Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (citation omitted). This standard includes consideration of "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Id.* (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)) (other citation omitted). The Second Circuit has recognized that dental injuries may require unique attention due to the likelihood of continuing pain and discomfort, however, "not all claims regarding improper dental care will be constitutionally cognizable." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). While the decision of whether or not to treat a prisoner's injury may rely on an assessment of its seriousness at the moment it occurs, "in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith v. Carpenter,* 316 F.3d 178, 187 (2d Cir.2003).

**\*6** The second element of the deliberate indifference standard is a subjective test requiring the plaintiff to show that the defendant acted with the requisite culpable state of mind. This state of mind is similar to criminal recklessness and requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

In this case, it is uncontroverted that Defendant Garneau responded to Plaintiff's cell after he cut his mouth biting into a piece of metal on April 28, 2009. It is also uncontroverted that Defendant Garneau did not inspect Plaintiff's mouth and told him not to "be a cry baby." *See* Dkt. No. 50–3 at 34. Plaintiff testified that he experienced "pain in [his] teeth" and that, while he "was not leaking blood, [he] was cut, you know in the mouth." *See id.* at 49. The bleeding in Plaintiff's mouth completely stopped within one hour and the cut healed without medical attention within three or four days. *See id.* at 50. Plaintiff experienced some mild difficulty eating and sleeping directly after the incident but was still able to get the "right amount" of food and sleep. *See id.* at 54, 56. About a week after the incident, when Plaintiff requested sick call, his injury was "no longer a cut" and a subsequent examination by a dentist revealed no dental injuries. *See id.* at 54.

While Plaintiff claims that his injury was sufficiently serious to require medical care, "[t]he mere fact that plaintiff disagrees with defendants about the nature of his condition does not give rise to a genuine issue of material fact." *Tindal v. Goord,* 530 F.Supp.2d 465, 467 (W.D.N.Y.2008) (citing *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998)). Based on the evidence presented, no reasonable juror could conclude that Plaintiff's injury, which stopped bleeding within an hour and completely healed on its own accord within three or four days, was objectively a sufficiently serious injury. Since the Court finds that Plaintiff did not suffer a sufficiently serious medical injury, the Court need not determine if Defendant Garneau's actions of ignoring medical complaints and calling Plaintiff a "cry baby" rise to the requisite culpable state of mind of deliberate indifference. Therefore, Defendants' motion for summary judgment on this claim is **GRANTED** and the claims against Defendant Garneau are **DISMISSED.**

**E. Defendant Doe**
In Plaintiff's October 31, 2010 complaint, he named a John Doe Defendant. While the Court has reminded Plaintiff several times that he must ascertain the true identity of, and

serve the Doe Defendant, Plaintiff has failed to do so. Rule 4 of the Federal Rules of Civil Procedure states that the plaintiff is responsible for service of the summons and complaint on each defendant within 120 days of filing the complaint. *See* FED. R. CIV. P. 4(c)(1), (m). The Northern District of New York requires that the plaintiff must effectuate service within sixty days. The Court may, upon motion or its own initiative, dismiss a case without prejudice as to any defendant that has not been properly served. *See id.* at 4(m). Since Plaintiff has failed to timely identify and serve the John Doe Defendant and no valid cause of action has been asserted, all claims against Defendant John Doe are **DISMISSED.**

**IV. CONCLUSION**

**\*7** After carefully considering Magistrate Judge Treece's Report–Recommendation, Plaintiff's objections thereto, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Treece's May 23, 2013 Report–Recommendation and Order is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **GRANTED** in its entirety; and the Court further

**ORDERS** that the Defendant John Doe is **DISMISSED** due to Plaintiff's failure to timely identify and serve him; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

***REPORT–RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Ronnie Thaxton brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that (1) Defendant Simmons retaliated against him for grievances

Plaintiff filed against him, (2) Defendants Bush and Doe deprived him of nutritional meals, and (3) Defendant Garneau was deliberately indifferent to his serious medical needs, in violation of his First and Eighth Amendment rights. *See* Dkt. No. 1, Compl. [1] Defendants have moved for Summary Judgment on the grounds that (1) Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendants Bush and Garneau, (2) Defendants Simmons and Bush were not personally involved in any constitutional violations, and (3) Plaintiff did not suffer a sufficiently serious injury to support his medical deliberate indifference claim against Defendant Garneau. *See generally* Dkt. No. 50–5, Defs.' Mem. of Law. We recommend that Defendants' Motion be **GRANTED**.

[1]     Plaintiff's Complaint contained additional claims and Defendants. However, the claims and Defendants outlined above are all that remain after the Court's initial review of the Complaint and Defendants' Motion to Dismiss. *See* Dkt. Nos. 6, Mem.-Dec. and Order, dated Mar. 29, 2011, & 31, Rep.-Rec. and Order, dated Jan. 5, 2012.

## I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [ Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*8** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d

Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## II. DISCUSSION

### A. Summary of Facts

The following facts are uncontroverted.

Plaintiff's claims arise out of events which occurred while he was an inmate at Upstate Correctional Facility ("UCF"), in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 50–1, Defs.' Statement of Material Facts Pursuant to Local Rule 7.1(A)(3) (hereinafter "Defs.' 7.1 Statement"), at ¶ 1; *see generally* Compl.

Thaxton v. Simmons, Not Reported in F.Supp.2d (2013)

2013 WL 4806457

On January 12, 2009, Plaintiff filed a grievance, complaining that he was getting his meals later than other prisoners; although not mentioned by name, it is agreed by the parties that this grievance implicated Defendant Simmons. Defs.' 7.1 Statement at ¶¶ 2 & 3. On April 6, Plaintiff found several strands of hair in the evening meal that Defendant Simmons had delivered to him. He talked to Defendant Simmons about the hair and Defendant Simmons stated that he had not "played" with Plaintiff's food, and if he had that Plaintiff "would know it." *Id.* at ¶¶ 7–10. Plaintiff did not see Defendant Simmons tamper with his meal. *Id.* at ¶ 13. After Plaintiff complained, Defendant Simmons gave him another food tray. *Id.* at ¶ 15.

**\*9** On April 28, 2009, Defendants Bush and Doe served Plaintiff his dinner meal. *Id.* at ¶¶ 16 & 25. Plaintiff later found a piece of metal in his food when he bit into his sardine sandwich. *Id.* at ¶ 17. Plaintiff "noticed drops of blood in the food," and requested medical attention. *Id.* at ¶¶ 17 & 31. Defendant Bush then left to get a sergeant and a nurse. *Id.* at ¶ 23. Plaintiff did not see Defendant Bush nor Defendant Doe tamper with his meal. *Id.* at ¶¶ 20 & 25.

Thereafter, Defendant Nurse Garneau and Sergeant Lombard [2] appeared at Plaintiff's cell. *Id.* at ¶ 27. Plaintiff requested that Defendant Garneau examine his mouth, to which Defendant Garneau stated that "she did not see much damage," that Plaintiff should not "be a cry baby," and then "walked off" without examining Plaintiff's mouth. *Id.* at ¶¶ 29–30.

[2]     Sergeant Lombard was dismissed as a Defendant in this action. Dkt. No. 32.

### B. Exhaustion

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (citations omitted). Exhaustion

is similarly required even if the prisoner asserts futility as an excuse. *See Booth v. Churner,* 531 U.S. 731, 741 n. 6 (2001) (refusing to "read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise") (cited in *Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001)). Accordingly, the exhaustion requirements apply even where the grievance process does not permit an award of money damages and the prisoner seeks only money damages, provided the grievance tribunal has the authority to take some responsive action. *See Thomas v. Wright,* 2002 WL 31309190, at \*5 (N.D.N.Y. Oct.11, 2002) (citing *Booth v. Churner,* 531 U.S. 731 (2001)).

In New York State, the administrative remedies consist of a three-step review process. First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. [3] N.Y. COMP.CODES R. & REGS. tit. 7, § 701.5(b). The IGRC reviews and investigates the formal complaints and then issues a written determination. *Id.* Second, if the IGRC decision is appealed, the superintendent of the facility reviews the IGRCs determination and issues a decision. *Id.* at § 701.5(c). Finally, if the superintendent's decision is appealed, the Cental Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to § 1983 in federal court. *Bridgeforth v. .Bartlett,* 686 F.Supp.2d 238, 239 (W.D.N.Y.2010) (citing, *inter alia, Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)); *see also Neal v. Goord,* 267 F.3d 116, 121 (2d Cir.2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12.

[3]     The IGRC is a five-member body consisting of two voting inmates, two voting staff members, and a non-voting chair (who may be an inmate, staff member of volunteer). N.Y. COMP.CODES R. & REGS tit.7, § 701.4.

**\*10** In determining whether a prisoner has failed to exhaust all available administrative remedies, the Second Circuit has instructed district courts to ask: "(1) whether administrative remedies were actually available, (2) whether the defendants forfeited their right to raise the affirmative defense or by their own actions precluded the plaintiff from using administrative grievance procedures, and (3) whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements."

*Singh v. Goord,* 520 F.Supp.2d 487, 495–96 (S.D.N.Y.2007) (quoting *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

Here, Defendants argue that Plaintiff's claims against Defendant Bush, for meal tampering, and Defendant Garneau, for deliberate indifference, were not properly exhausted because Plaintiff failed to timely file a grievance regarding the events of April 28, 2009. Defs.' Mem. of Law at pp. 8–11. Plaintiff alleges that certain special circumstances justify his failure in this regard. Dkt. No. 54, Pl.'s Mem. of Law, at pp. 5–7. Because we find that a material issue of fact exists as to whether Plaintiff's failure to exhaust should be excused, we recommend that Defendants' Motion for Summary Judgment be **DENIED** on exhaustion grounds.

Plaintiff's claims against Defendants Bush and Garneau arise out of Plaintiff's allegations that on April 28, 2009, Defendant Bush put metal in his food in which he bit into causing him to injure his mouth, and that thereafter, Defendant Garneau refused to treat his injury. *See* Compl. at ¶ 6, pp. 3–4. Plaintiff claims that on April 29, 2009, he grieved both of these events and sent the superintendent a letter describing these events. Pl.'s Mem. of Law at p. 5. In support of this claim Plaintiff has produced a copy of both the grievance and the letter. *See* Dkt. No. 55, Pl.'s Exs., at (unnumbered) pp. 4–5, Lt., dated Apr. 28, 2009, & Grievance, dated Apr. 28, 2009. Defendants maintain that no such grievance was ever filed. Defs.' Mem. of Law at pp. 9–10; Dkt. No. 50–4, Grievance R.

On or about May 3, Plaintiff was transferred to Attica Correctional Facility ("ACF"). Dkt. No. 50–3, Ronnie Thaxton Dep., dated Aug. 3, 2012, at p. 50. On June 1, 2009, Plaintiff wrote to UCF's Superintendent inquiring about the status of his April 28, 2009, grievance. *Id.* at (unnumbered) p. 3, Lt., dated June 1, 2009. On June 8, 2009, while Plaintiff was incarcerated at Lakeview Correctional Facility ("LCF"), Plaintiff received a response to his June 1 letter, informing him that "there is no grievance on file ... with a written date of 4/28/09 concerning metal being put in your food .... [and that i]n accordance with [DOCCS] Directive # 4040 .... your complaint is being returned to you to file at your present facility." *Id.* at (unnumbered) p. 7, Mem., dated June 8, 2009. On June 15, 2009, Plaintiff filed a grievance at LCF about the incidents which occurred on April 28, 2009, and further complained that his grievance was tampered with in retaliation for previous grievances he filed. That grievance was rejected as untimely. It is uncontroverted that Plaintiff appealed the determination that his June 15, 2009 grievance

was untimely through each and every level of administrative appeal that was available to him. *Id.* at (unnumbered) pp. 8–13; Dkt. No. 50–4, Grievance R.; Defs.' Mem. of Law at pp. 8–11; Pl.'s Mem. of Law at pp. 5–7.

**\*11** Although it is true that filing an untimely grievance does not properly exhaust an issue for purposes of the PLRA, *see Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), a question of fact exists as to whether or not Plaintiff actually filed a timely grievance on April 29, 2009, and whether it was lost or tampered with by Defendants. If Defendants lost or tampered with Plaintiff's April 29 grievance, then this Court would be inclined to recommend that Defendants' actions bar them from asserting the affirmative defense of exhaustion. *See Singh v. Goord,* 520 F.Supp.2d at 495–96. However, given that both sides have produced documentary evidence, in order to reach such a determination we would have to make credibility assessments that would be improper at the summary judgment stage. *See Scott v. Coughlin,* 344 F.3d at 287–89. Because such a determination can only be made by a trier of fact, we recommend that Defendants' Motion for Summary Judgment be **DENIED** on this ground.

## C. Personal Involvement

Plaintiff claims that Defendant Simmons put hair in his food on April 6, 2009, in retaliation for a grievance that he filed against Defendant Simmons on January 12, 2009, and that Defendant Bush deprived him of adequate nutrition by giving him a tray of food contaminated with a piece of metal on April 28, 2009. Compl. at ¶ 7, Third and Fourth Causes of Action. Defendants argue that Plaintiff cannot prove that Defendant Simmons or Defendant Bush were personally involved in either incident. Defs.' Mem. of Law at pp. 5–7.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at \*2 (S.D.N.Y. Sept.15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution."

*Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

### i. Defendant Simmons

Plaintiff claims that on April 6, Defendant Simmons delivered him a tray of food that was covered in hair. Compl. at ¶ 6, p. 1. According to Plaintiff's Deposition testimony, the meals at UCF are served in styrofoam containers that are assembled in the kitchen, completely wrapped in cellophane, and then brought to the inmates in their cells on a cart. The cellophane is then removed from the styrofoam and the meal is given to the inmate through the feed up slot in the cell door. Thaxton Dep. at pp. 25–26. It is uncontroverted that on April 6, the cellophane wrapper was removed from Plaintiff's meal before it was given to him, however, it is also uncontroverted that Plaintiff did not see Defendant Simmons either remove the cellophane wrapper nor tamper with his food. *Id* . at p. 26–27. Plaintiff alleges that he confronted Defendant Simmons, asking him why "it seems like he always had an attitude and a problem when dealing with [his] food," and Defendant Simmons stated "I don't play with your food. I wouldn't play with your food. If I did, you would know it." *Id.* at p. 19. Plaintiff testified that "the only reason why I held him responsible is because he's the one that's giving me the tray." *Id.* at p. 27.

**\*12** Based upon the evidence presented, no rational juror could conclude that Defendant Simmons tampered with Plaintiff's food on April 6, 2009, merely because he happened to deliver it that day and made a statement denying he had done so. Therefore, we recommend that Defendant Simmons be **DISMISSED.**

### ii. Defendant Bush

Likewise, based on the record, no reasonable juror could conclude that Defendant Bush contaminated Plaintiff's food with a piece of metal on April 28, 2009. Just as above, it is uncontroverted that Plaintiff did not see Defendant Bush tamper with his food. Thaxton Dep. at pp. 36–37. Moreover, when asked how he knows that Defendant Bush was responsible for placing the piece of metal in his food, Plaintiff admitted that he assumed Defendant Bush was responsible "because of his reaction with the smirk on his face." *Id.* at p. 37. And stated further that "I believe it because the relationship of, you know, the officers and when I told

him that I had the metal in there, the smirk, the look that he had, that's what made me think he purposely put it in there, because he was smirking like it was a joke or something." *Id.*

Because no rational juror could conclude that Defendant Bush was personally involved in contaminating Plaintiff's food merely because Defendant Bush delivered Plaintiff's meal and then smirked at Plaintiff, we recommend that Defendant Bush be **DISMISSED.**

### D. Eighth Amendment

Plaintiff claims that Defendant Garneau was deliberately indifferent to his serious medical needs in contravention of the Eighth Amendment when she failed to examine or treat him for injuries he claims he sustained after biting into a piece of metal concealed in his anchovy sandwich. Compl. at ¶ 7, Second Cause of Action. Defendants argue that Plaintiff cannot establish such a claim because he did not suffer from a sufficiently serious medical condition. Defs.' Mem. of Law at pp. 11–13. We agree.

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06).

To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834–35, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain ." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects

2013 WL 4806457

an individuals' daily activities; or the existence of chronic and substantial pain.*" *Chance v. Armstrong,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)). The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

**\*13** It is uncontroverted that Defendant Garneau responded to Plaintiff's cell on April 28, 2009, in response to his claims that he had injured his mouth by biting down on a piece of metal concealed in his food. It is also uncontroverted that she neither examined the inside of Plaintiff's mouth nor provided him with any treatment. With regards to the extent of his injury Plaintiff maintains that while "I was not leaking blood, I was cut, you know in the mouth. It was a little bit on the side of my jaw and it was more to my teeth. The pain in [his] teeth was more actually than the blood was." And that, within an hour the bleeding stopped. Thaxton Dep. at p. 49. Thereafter, Plaintiff experienced some continuing pain, an inability to eat on the right side of his mouth, paranoia, and some sleeplessness. *Id.* at pp. 52–55. Three or four days after the incident, Plaintiff was transferred to Attica Correctional Facility ("ACF"). *Id.* at p. 50. Plaintiff did not request sick call between April 28 and the day that he was transferred to ACF. By the time he requested sick call at ACF, about a week after April 28, his injury was "no longer a cut," and he was given Tylenol. *Id.* at pp. 49–51 & 53.

Although we certainly do not countenance ignoring the medical complaints of inmates as merely the petulant whining of a "cry baby," it is clear that the Constitution is not invoked every time a prison nurse chooses not to immediately treat a broken lip or cut tongue. While Plaintiff's injury may have been painful, no rational juror could conclude that an injury which healed on its own in a matter of days was objectively sufficiently serious to sustain an Eighth Amendment deliberate indifference claim. Therefore, we recommend that Defendants' Motion for Summary Judgment be **GRANTED** as to this claim.

### E. Defendant Doe

In his Complaint, filed on October 31, 2010, Plaintiff named a John Doe Defendant. *See generally* Compl. However, to date, and despite multiple reminders by this Court, [4] Plaintiff has failed to identify the Doe Defendant. Under FED. R. CIV. P. 4(c)(1) and 4(m), the plaintiff is responsible for service of the summons and complaint for each defendant within 120 days of the filing of the complaint. [5] Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, to dismiss the case without prejudice as to that defendant. *Id.* at 4(m). Because Plaintiff has failed to timely identify and serve the John Doe Defendant, and because as outlined above, no cognizeable cause of action is asserted herein, we recommend dismissal of all claims against him. *Cooks v. Delpiano,* 2008 WL 4186337, at \*1 n. 1 (N.D.N.Y. Sept.10, 2008); *Pravada v. City of Albany,* 178 F.R.D. 25, 26 (N.D.N.Y.1998).

---

[4]    This Court has specifically directed, or reminded, Plaintiff of his obligation to ascertain the true identity of, and serve the Doe Defendant on at least four separate occasions. *See* Dkt. Nos. 6, Order, dated Mar. 29, 2011, at pp. 9–10, 31, Rep.-Rec., dated Jan. 5, 2012, at p. 7 n. 6, & 32, Order, dated Feb. 2, 2012, at p. 5; *See also* Text Order, dated June 14, 2012.

[5]    Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L .R. 4.1(b)

### III. CONCLUSION

For the reasons stated herein, it is hereby

2013 WL 4806457

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 50), be **GRANTED in its entirety;** and it is further

**\*14 RECOMMENDED,** that the Doe Defendant be dismissed due to Plaintiff's failure to timely identify and serve him; and it is further

**RECOMMENDED,** that, in light of the above recommendations, this matter be closed; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 4806457

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00366-DNH-TWD   Document 93   Filed 03/08/21   Page 304 of 353

Woodward v. Lytle, Not Reported in Fed. Supp. (2018)

2018 WL 4643036

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Sawyer v. Locy,  N.D.N.Y.,  October 21, 2020

2018 WL 4643036
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shawn WOODWARD, Plaintiff,

v.

LYTLE, Correctional Officer, Cape Vincent
Correctional Facility, et al., Defendants.

9:16-CV-1174 (NAM/DEP)
|
Signed 09/27/2018

**Attorneys and Law Firms**

SHAWN WOODWARD, Plaintiff Pro Se, 00-A-6563,
Collins Correctional Facility, P.O. Box 340, Collins, New
York 14034.

Attorneys for Defendants: Hon. Barbara D. Underwood,
Attorney General of the State of New York, Helena Lynch,
Esq., Assistant Attorney General, The Capitol, Albany, New
York 12224.

**MEMORANDUM-DECISION AND ORDER**

Hon. Norman A. Mordue, Senior U. S. District Judge

**I. INTRODUCTION**

**\*1** Plaintiff *pro se* Shawn Woodward, a New York State
prison inmate, brings this 42 U.S.C. § 1983 action against
seven individual Defendants employed by the New York
State Department of Corrections and Community Supervision
("DOCCS"), alleging civil rights claims related to his
confinement at Cape Vincent Correctional Facility ("Cape
Vincent"). (Dkt. No. 1). Plaintiff's remaining claims are
for First Amendment retaliation against all Defendants
and Eighth Amendment excessive force against Defendant
Dawley. (Dkt. Nos. 30, 36). On February 9, 2018, Defendants
filed for summary judgment, on the basis that Plaintiff's
claims are barred based on his failure to exhaust the
available administrative remedies prior to filing this action.
(Dkt. No. 41). The matter was referred to United States
Magistrate Judge David E. Peebles, who, on August 13,
2018, issued a Report & Recommendation, recommending

that Defendants' motion for summary judgment be granted
and that the case be dismissed because Plaintiff failed to
exhaust his available administrative remedies. (Dkt. No.
57). Plaintiff then filed timely objections to the Report
& Recommendation, arguing, *inter alia*, that he could not
have exhausted his administrative remedies since they were
"opaque and incapable of use." (Dkt. No. 60, p. 12).

**II. STANDARD OF REVIEW**

This court reviews *de novo* those portions of the Magistrate
Judge's findings and recommendations that have been
properly preserved with a specific objection, as is the case
here. Petersen v. Astrue, 2 F.Supp.3d 223, 228-29 (N.D.N.Y.
2012); 28 U.S.C. § 636(b)(1)(C).

Summary judgment may be granted only if all the
submissions taken together "show that there is no genuine
issue as to any material fact and that the moving party is
entitled to judgment as a matter of law." In re World Trade
Center Lower Manhattan Disaster Site Litig., 758 F.3d 202,
210 (2d Cir. 2014). A fact is material if it "might affect the
outcome of the suit under the governing law." Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91
L.Ed.2d 202 (1986); see also Jeffreys v. City of New York, 426
F.3d 549, 553 (2d Cir. 2005). A fact is genuinely in dispute
"if the evidence is such that a reasonable jury could return a
verdict for the nonmoving party." *Id.* In ruling on a summary
judgment motion, the court "must construe the facts in the
light most favorable to the non-moving party and must resolve
all ambiguities and draw all reasonable inferences against the
movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d
775, 780 (2d Cir. 2003). Where the plaintiff proceeds *pro se*,
the Court must read his submissions liberally and interpret
them "to raise the strongest arguments that they suggest."
McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999)
(quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994) ).

**III. DISCUSSION**

**a. Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C.
§ 1997e(a), requires an inmate to exhaust all available
administrative remedies prior to bringing a federal civil rights
action. *See* Espinal v. Goord, 558 F.3d 119, 123–24 (2d Cir.
2009). To properly exhaust his administrative remedies, an
inmate must complete the administrative review process in
accord with the applicable state procedural rules. *Jones v.*

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 305 of 353

Woodward v. Lytle, Not Reported in Fed. Supp. (2018)

2018 WL 4643036

*Bock*, 549 U.S. 199, 218–19, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford*, 548 U.S. at 90–91, 126 S.Ct. 2378. The defendant bears the burden of proving that a plaintiff failed to exhaust available administrative remedies. *See Samuels v. Fischer*, 168 F.Supp.3d 625, 651 (S.D.N.Y. 2016).

 **\*2** The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). 7 N.Y.C.R.R. §§ 701.5(a)(1), (b). The grievance must be filed within 21 days of the alleged occurrence, using an "inmate grievance complaint form (form #2131)," but if this form is not readily available, "a complaint may be submitted on plain paper." *Id.* at § 701.5(a)(1). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* at § 701.5(c)(1). If the grievant wishes to appeal to the Superintendent, "he or she must complete and sign the appeal section on the IGRC response form (form #2131) and submit it to the grievance clerk within seven calendar days after receipt of the IGRC's written response." *Id.* Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* at § 701.5(d)(1). If the grievant wishes to appeal to the CORC, "he or she must complete and sign form #2133 and submit it to the grievance clerk within seven calendar days after receipt of the superintendent's written response to the grievance." *Id.* If the grievance concerns employee harassment, there is an expedited process: the grievance skips the IGRC level and goes to the Superintendent, who has twenty-five days to make a decision, after which the inmate has seven days to appeal to the CORC. *Id.* at § 701.8. During the grievance process, "matters not decided within the time limits may be appealed to the next step." *Id.* at § 701.6(g)(2). Inmates in special housing units have access to Form #2131, and "[t]he IGP supervisor shall monitor and ensure the proper functioning of the grievance procedure in SHU's." *Id.* at § 701.7.

There is also an exception to the mandatory exhaustion requirement, in the event the administrative remedies are "unavailable." *Williams v. Correction Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (quoting *Ross v. Blake*, ––– U.S. ––––, 136 S.Ct. 1850, 1858, 195 L.Ed.2d 117 (2016) ). An inmate "must exhaust available remedies, but need not exhaust unavailable ones." *Ross*, 136 S.Ct. at 1858. The Supreme Court has identified three circumstances in which

an administrative remedy, while "officially on the books," is not available. *Id.* at 1859. An administrative remedy is unavailable when: (1) "it operates a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Williams*, 829 F.3d at 123–24 (quoting *Ross*, 136 S.Ct. at 1859–60).

### b. Evidence of Exhaustion & Availability

On or about April 3, 2015, Plaintiff was incarcerated at Cape Vincent Correctional Facility in Cape Vincent, New York. (Dkt. No. 1, p. 3). Plaintiff helped other inmates prepare complaints about corrections staff, and he was allegedly warned by the staff against "writing up staff" and "testifying at hearings" in support of other inmates, and he was allegedly subjected to retaliation for doing so. (*Id.*, pp. 7–12). On or about July 3, 2015, Plaintiff was confined to the Special Housing Unit ("SHU"), after being found guilty of charges of fighting and drug use. (*Id.*, p. 13). Although the determinations were eventually reversed, Plaintiff spent nearly two months in the SHU as a result of the charges. (*Id.*). Plaintiff alleges that, on July 14, 2015, while in the SHU, he submitted a grievance complaining of retaliatory conduct by various Defendants, but that "[l]ater that week when the Inmate Grievance Program Supervisor made her rounds [,] she told me that she was not filing my grievance because she knew some of the officers and did not believe what I was saying." (Dkt. No. 52-2, pp. 1–2). There is no record of this particular grievance being filed. (*See* Dkt. No. 41-3). On July 22, 2015, Plaintiff successfully filed a grievance related to the food served in the SHU. (Dkt. No. 41-4).

On July 27, 2015, Plaintiff wrote a letter to Acting DOCCS Commissioner Anthony Annucci, informing him that Plaintiff had attempted to file a grievance on July 14, 2015 but was thwarted by the IGP Supervisor. (Dkt. No. 52-2, p. 1). Plaintiff wrote that "because of this [,] I sent a handwritten copy to the facility's superintendent since he is the next in the chain of the grievance appeal process." (*Id.*, p. 2). Plaintiff wrote that he spoke with the Superintendent on July 27, 2015, who referred him back to the "grievance department." (*Id.*). Plaintiff continued:

Case 9:17-cv-00366-DNH-TWD   Document 93   Filed 03/08/21   Page 306 of 353

Woodward v. Lytle, Not Reported in Fed. Supp. (2018)
2018 WL 4643036

**\*3**  Therefore, because step one (1) and two (2) in the grievance level are refusing to file my complaint, I'm sending it to you to either one (1) order the facility's Grievance Program Supervisor to file such or two (2) delegate this matter to Central Office Review Committee (CORC)[.]

(*Id.*). Annucci referred Plaintiff's letter to Karen Bellamy, the DOCCS Director of the IGP, who wrote Plaintiff in response on August 3, 2015. (Dkt. No. 52-3). In relevant part, Bellamy wrote as follows:

Contact with the [Cape Vincent] administration reveals that the IGP Supervisor did not receive or refuse to file a July 15, 2015 complaint from you alleging staff misconduct. Further, she does not recall speaking with you during rounds on July 15, 2015.

You are advised that Directive #4040 makes no provision for an inmate to refer grievances directly to Central Office, and that specific grievance concerns should be directed to the IGP Supervisor for the most expeditious means of resolution.

(*Id.*). On August 27, 2015, Plaintiff wrote again to Annucci, addressing the Bellamy letter. (Dkt. No. 52-4). Plaintiff expressed confusion as to what to do next, writing that:

This is problematic because if a facility's IGP's Supervisor refuses to file an inmate grievance [,] then what can the inmate do? Especially when as in this case the facility's Superintendent also refuses to except [sic] an inmate's grievance for filing?

(*Id.*). Plaintiff asked that his grievance be forwarded "to the proper facility's staff for filing," since by that time he had been transferred to Southport Correctional Facility in Pine City, New York. (*Id.*). By letter dated October 8, 2015, Bellamy responded to Plaintiff, writing in relevant part that: "Please be advised that your IGP issues were addressed in my

August 3, 2015 letter to you ... You have not presented any compelling evidence to indicate that your grievances are not being processed in accordance with Directive #4040." (Dkt. No. 52-5). According to DOCCS, "[n]either Plaintiff's July 27, 2015 letter nor his August 27, 2015 letter was a grievance or an appeal of a grievance." (Dkt. No. 52-1, ¶ 7). There is no record of an appeal related to the alleged July 14, 2015 grievance. (*See* Dkt. No. 41-5).

### c. Analysis

In their motion for summary judgment, Defendants argued that Plaintiff failed to exhaust his administrative remedies and could not show that the administrative remedies were unavailable to him. (Dkt. No. 41-1). In the Report & Recommendation, Magistrate Judge Peebles correctly found that Plaintiff failed to exhaust his administrative remedies, since Plaintiff never actually filed a grievance related to the claims in this action, nor did he appeal any such grievance to the CORC. (Dkt. No. 57). That left one question: "whether the IGP was unavailable to plaintiff such that he may be excused from his failure to fully exhaust the administrative remedies." (*Id.*, p. 18). After careful review of the record, the Court finds that an issue of fact remains as to this question, in accordance with the Second Circuit's decision in *Williams v. Correction Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016).

In that case, the plaintiff was housed in the SHU at Downstate Correctional Facility, and while there, he allegedly drafted a grievance concerning staff misconduct and then gave it to a correction officer to forward to the grievance office on his behalf. *Williams*, 829 F.3d at 120–21. The plaintiff never received a response to the grievance, he never appealed it, and he was transferred to another facility about two weeks later. *Id.* at 121. He alleged that the correction officer in the SHU never filed the grievance for him. *Id.* The plaintiff filed a civil rights action, but the defendants successfully moved to dismiss, on the basis that the plaintiff failed to exhaust his administrative remedies, citing records that he never filed an appeal of the grievance. *Id.* But the Second Circuit reversed, finding that the administrative remedies were unavailable to the plaintiff under the circumstances, where he had an unfiled and unanswered grievance:

**\*4**  However, even if Williams technically could have appealed his grievance, we conclude that the regulatory scheme providing for that appeal is "so opaque" and "so confusing that ... no reasonable prisoner can use [it]."

Woodward v. Lytle, Not Reported in Fed. Supp. (2018)

Case 9:17-cv-00366-DNH-TWD   Document 93   Filed 03/08/21   Page 307 of 353

2018 WL 4643036

*Ross*, 136 S.Ct. at 1859 (quoting Tr. of Oral Arg. 23). The regulations simply do not contemplate the situation in which Williams found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance.

*Williams*, 829 F.3d at 124. The Circuit explained that the regulations do not outline any process to appeal an unfiled grievance:

> On their face, the regulations only contemplate appeals of grievances that were actually filed. For example, if the grievance had never been filed, the superintendent would never have received it and the timeline for her to provide a response within 25 days "of receipt of the grievance" would never have been triggered. NYCRR tit. 7, § 701.8(f). In turn, the textual provision allowing a grievant to appeal to the CORC would never have come into effect. *See id.* § 701.8(g) ("If the superintendent fails to respond within the required 25 calendar day time limit the grievant may appeal his/her grievance to CORC.").

*Id.* The Circuit concluded that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126. Further, the "obscurity" of the regulations "was compounded by the fact that Williams was transferred to another facility approximately two weeks after giving his grievance to the correction officer," since the regulations also do not provide guidance "on how a transferred inmate can appeal his grievance with the original facility without having received a response." *Id.* The Circuit recommended that, to avoid confusion going forward, "DOCCS revise its grievance procedures to instruct inmates how to appeal grievances that were not properly filed by prison staff, and how to appeal a grievance, to which the inmate never received a response, after being transferred." *Id.* at 126–27.

Likewise, there is evidence in this case that: 1) Plaintiff drafted a grievance while in the SHU on or about July 14, 2015; 2) he gave it the IGP Supervisor for filing; and 3) the grievance was never filed or answered. (Dkt. No. 1; Dkt. No. 52-2). On the other hand, there is evidence that the IGP Supervisor never received or refused to file any such grievance. (Dkt. No. 52-3). It is undisputed that DOCCS has no record of this grievance or any related appeal. Drawing all inferences in the non-moving party's favor, Plaintiff drafted and submitted the grievance, but it went unfiled and unanswered. Under these particular circumstances, "the process to appeal an unfiled and unanswered grievance is

prohibitively opaque, such that no inmate could actually make use of it." *Williams*, 829 F.3d at 126. Moreover, Plaintiff was also transferred after attempting to file the grievance, further compounding the problem. *Id.* Plaintiff's understandable confusion about the process is evident in his letters dated July 27, 2015 and August 27, 2015 to Acting Commissioner Annucci. (Dkt. No. 52-2, 52-4). And in response, DOCCS made no attempt to explain that Plaintiff had to appeal the non-response to his alleged unfiled grievance to the CORC, the position taken by Defendants in this case.[1] In fact, Plaintiff was advised that "Directive #4040 makes no provision for an inmate to refer grievances directly to Central Office, and that specific grievance concerns should be directed to the IGP Supervisor for the most expeditious means of resolution." (Dkt. No. 53-3). Plaintiff correctly identifies this confounding situation in his objections to the Report & Recommendation. (Dkt. No. 60, p. 16).

[1]  The obscurity of this Kafkaesque suggested process is further demonstrated by the fact that the regulations spell out that any appeal to the CORC requires Form #2133, while inmates in the SHU only have access to Form #2131. *Compare* N.Y.C.R.R. §§ 701.5(d)(1), 701.7(a); *see also Davis v. State of New York*, 311 F. App'x 397, 399 n.2 (2d Cir. 2009) (explaining that Form #2133 is the form which has the Superintendent's grievance decision printed on the top half of a single sheet and on the bottom half contains the form an inmate is required to file to appeal the Superintendent's decision to the CORC).

**\*5**  In sum, viewing the evidence in the light most favorable to Plaintiff, the Court finds that an issue of fact exists as to the availability of the grievance process, which precludes summary judgment.[2] *See Williams*, 829 F.3d at 126–27; *see also Medina v. Napoli*, 725 F. App'x 51, 54 (2d Cir. 2018) ("The record establishes that Medina's allegations, supported by witness testimony, about defendants' actions to prevent the filing of Medina's grievances concerning the June 2007 incident are sufficient, when viewed in the light most favorable to Medina, to raise a genuine issue of material fact as to whether the grievance process was 'available' to Medina under the *Ross* and *Williams* exhaustion analysis."); *Jackson v. Downstate Correctional Facility*, No. 16 Civ. 267, 2018 WL 3650136, at \*9, 2018 U.S. Dist. LEXIS 128980 (S.D.N.Y. July 31, 2018) (denying summary judgment motion based on failure to exhaust administrative remedies where evidence showed that the plaintiff "submitted a grievance, but that

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 308 of 353
Woodward v. Lytle, Not Reported in Fed. Supp. (2018)
2018 WL 4643036

grievance was never filed," and the appeal procedures were "prohibitively opaque") (citing *Williams* ); *Hurst v. Mollnow*, No. 16 Civ. 1062, 2018 WL 4178226, at *10, 2018 U.S. Dist. LEXIS 122624 (N.D.N.Y. July 20, 2018) ("In light of *Williams*, the Court finds material issues of fact as to the availability of the grievance process and whether Plaintiff attempted to exhaust his administrative remedies, precluding summary judgment."), *report and recommendation adopted*, No. 16 Civ. 1062, 2018 WL 4153926, 2018 U.S. Dist. LEXIS 147670 (N.D.N.Y. Aug. 30, 2018); *Fann v. Graham*, No. 15 Civ. 1339, 2018 WL 1399331, at *6, 2018 U.S. Dist. LEXIS 6717 (N.D.N.Y. Jan. 11, 2018) ("Viewing the facts in the light most favorable to plaintiff, the record suggests that plaintiff's grievances were submitted, but were unfiled and unanswered, creating an issue of fact as to whether the grievance process was available and whether plaintiff attempted to exhaust his administrative remedies...."), *report and recommendation adopted*, No. 15 Civ. 1339, 2018 WL 1399340, 2018 U.S. Dist. LEXIS 43887 (N.D.N.Y. Mar. 19, 2018); *Reid v. Marzano*, No. 15 Civ. 761, 2017 WL 1040420, at *3, 2017 U.S. Dist. LEXIS 38547 (N.D.N.Y. Mar. 17, 2017) (denying summary judgment motion based on exhaustion argument, noting that "it is DOCCS' borderline incomprehensible regulation governing this situation that is to blame").

2    The fact that Plaintiff successfully filed one grievance while in the SHU related to the food

served there does not demonstrate that he could have filed one about employee misconduct or that he could have appealed an unfiled grievance to the CORC, so as to eliminate the issue of fact as to the availability of administrative remedies.

**IV. CONCLUSION**
**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Peebles's Report & Recommendation (Dkt. No. 57) is **REJECTED**; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 41) is **DENIED without prejudice** to renew should the Defendants request an exhaustion hearing pursuant to *Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011); and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4643036

---

    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4051596
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ako K. BURRELL, Plaintiff,
v.
Lisa ZUREK, et al., Defendants.

9:17-CV-0906 (LEK/TWD)
|
Signed 08/27/2019
|
Filed 08/28/2019

**Attorneys and Law Firms**

Ako K. Burrell, Attica, NY, pro se.

David A. Bagley, Kernan Professional Group, LLP, Oriskany, NY, for Defendants.

**DECISION AND ORDER**

Lawrence E. Kahn, U.S. District Judge

**I. INTRODUCTION**

*1 Pro se plaintiff Ako Burrell filed this 42 U.S.C. § 1983 action alleging that his constitutional rights were violated while he was in pretrial custody at Oneida County Correctional Facility ("Oneida CCF"). This Court reviewed the sufficiency of Plaintiff's Complaint, Dkt. No. 1 ("Complaint"), pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915(A) and ordered that the following claims survived initial review: (1) Fourteenth Amendment excessive force, sexual abuse, and failure to intervene against Defendants Lieutenant Jack Breen, Deputy Dustin Lewis, and Deputy Jeffrey Jones; (2) First Amendment claims against Defendants Captain Lisa Zurek, Sergeant Clayton Smith, Lewis, and Jones stemming from denial of Plaintiff's access to newspapers and other reading material; (3) Fourteenth Amendment due process claims relating to Plaintiff's L-2 classification against Defendant Deputy Todd Woodland; and (4) First Amendment retaliation claims against Defendants Breen, Lewis, and Deputy Christopher Getchell. Dkt. No. 10 ("November 2, 2017 Order").

The parties conducted discovery and Defendants have now moved for Summary Judgment. Dkt. Nos. 41 ("Summary Judgment Motion"); 45 ("Response"); 46 ("Reply"); 47 ("Supplemental Response"). The Honorable Thérèse Wiley Dancks, United States Magistrate Judge, issued a Report-Recommendation and Order, recommending Defendants' Motion for Summary Judgment be granted in part and denied in part. Dkt. No. 50 ("Report-Recommendation"). Defendants timely filed objections to the Magistrate Judge's Report-Recommendation. Dkt. No. 51 ("Objections"). For the reasons that follow, the Court approves and adopts the Report-Recommendation.

**II. RELEVANT BACKGROUND**

The facts and allegations in this case were detailed in the November 2, 2017 Order and the Report-Recommendation, familiarity with which is assumed.

**A. Magistrate Judge Dancks's Report-Recommendation**

Magistrate Judge Dancks recommends granting summary judgment on: (1) the Fourteenth Amendment due process claims relating to Plaintiff's L-2 classification against Woodland; (2) the First Amendment retaliation claims against Breen, Lewis, and Getchell; and (3) all claims against Defendants in their official capacities. She recommends denying summary judgment on: (1) the Fourteenth Amendment excessive force, sexual abuse, and failure to intervene claims against Breen, Lewis, and Jones based on failure to exhaust administrative remedies; (2) the First Amendment denial of access to newspapers and other reading material claims against Zurek, Smith, Lewis, and Jones; and (3) the affirmative defense of qualified immunity raised by Zurek, Smith, Lewis, and Jones. She further recommended that Court conduct a hearing on the administrative exhaustion issue or refer the hearing to her to conduct. R & R at 33–34.

**B. Defendants' Objection to the Report-Recommendation**

Defendants raise three objections to the Report-Recommendation: (1) Breen, Lewis, and Jones should have been granted summary judgment on Fourteenth Amendment excessive force, sexual abuse, and failure to intervene claims because Plaintiff failed to exhaust administrative remedies; (2) Zurek, Smith, Lewis, and Jones should have been granted summary judgment on the First Amendment claim based on denial of access to newspapers and other reading materials because this limitation had a legitimate penological basis; and (3) Zurek, Smith, Lewis, and Jones should have been granted

summary judgment on qualified immunity grounds because it was objectively reasonable for them to believe the limitation on reading materials was constitutional. Objs.

### III. LEGAL STANDARD

**\*2** Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If objections are timely filed, a court "shall make a de novo determination of those portions of the report or specified proposed findings and recommendations to which objection is made." 28 U.S.C. § 636(b). However, if no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-857, 2013 WL 1121353, at \*1 (N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–07 (N.D.N.Y. 2008), abrogated on other grounds by Widomski v. State Univ. of N.Y. at Orange, 748 F.3d 471 (2d Cir. 2014). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." § 636(b).

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

### IV. ANALYSIS

After carful review of the papers and Magistrate Judge Dancks's Report-Recommendation, the Court finds no clear error in the unobjected-to portions of the Report-Recommendation. And after reviewing de novo the portions of the Report-Recommendation to which Defendants object, the Court finds no error. Magistrate Judge Danck's employed the proper legal standards, accurately recited the facts alleged, and correctly applies the law to those facts. As a result, the Court accepts and adopts the Report-Recommendation for the reasons stated therein.[1] The Court adds the following discussion of Defendants' three objections.

[1]    As noted below, the while the Court reaches the same conclusion as the R & R on the issue of qualified immunity, its differs in its reasoning.

#### A. Exhaustion of Fourteenth Amendment claims against Breen, Jones, and Lewis

On the issue of Plaintiff's Fourteenth Amendment claims, there is no dispute that Plaintiff was required to exhaust his administrative remedies, 42 U.S.C. § 1997e(a), that Plaintiff was required to file a formal grievance within five days of the incident complained about in order exhaust those remedies, Dkt. 41-4, Exhibit 1 ("Oneida County Sheriff's Office Policy") at 11,[2] and that Plaintiff did not timely file a formal grievance. R & R at 18; Objs. at 2. Rather, the dispute hinges on whether Oneida CCF staff members prevented Plaintiff from timely filing a formal grievance. See Ross v. Blake, 136 S. Ct. 1850, 1858, 1860 (2016) ("Under § 1997e(a), the exhaustion requirement hinges on the "availab[ility]" of administrative remedies." A remedy is unavailable and thus exhaustion is not required "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.").

[2]    The cited page numbers for documents refer to those generated by the Court's electronic filing system ("CM/ECF").

The alleged incidents giving rise to the excessive force, sexual abuse, and failure to intervene claims took place on March 30 and April 1, 2017. Plaintiff claims that after he filed informal complaints on April 2, 2017, grievance coordinator Robert Carollo was supposed to provide him with formal grievance forms but failed to do so. Pl.'s Resp. at 6. While Defendants do not provide evidence directly contradicting this claim, they counter that an April 7, 2017 Incident Report, No. 17-0678, documents that Plaintiff "improperly assigned his own numbers" to some grievances that he had submitted to Carollo. Objs. at 2; Dkt. No. 45-1 at 182 ("Incident Report, No. 17-0678"). Defendants state that after Plaintiff was informed he needed to re-file those grievances, Plaintiff did not "mak[e] any complaints of having been hindered in the process" and "waited a month, until May 6, 2017, when he filed additional Complaints regarding the same incidents." Id. However, as the incident report itself notes, Plaintiff apparently stated that Carollo was "a liar and that he didn't get the complaint forms." Incident Report, No. 17-0678. Thus, while Defendants claim Plaintiff is "using unsupported averments, to manufacture an issue of fact," Objs. at 4, the

2019 WL 4051596

evidence suggests Plaintiff had at least raised the issue of not being provided the formal grievance forms at the time.

**\*3** Defendants' suggest that "the fact that Plaintiff was thoroughly versed in grievance procedures, having filed 178 of them" indicates that Plaintiff alone was responsible for his failure to file a formal timely grievance in this case. Objs. at 2 n.2; SJ Mot. at 7 n.2. But this does not necessarily weaken Plaintiff's claims—his extensive history of filing grievances could also suggest that, absent interference, he was aware of the five day rule and capable of complying with it.

The R & R found that this dispute creates a genuine issue of material fact about whether Plaintiff's effort to administratively exhaust his claim was thwarted. R & R at 19. The Court agrees. See Ortiz v. Annucci, No. 17-CV-3620, 2019 WL 1438006, at *8 (S.D.N.Y. Mar. 29, 2019) ("If, in fact, Plaintiff timely attempted to file his grievance by handing it to an officer while in SHU and that officer failed to file the grievance, Plaintiff's avenues for pursuing the grievance would be unavailable ... excusing him from any further exhaustion requirements."). However, as the burden is on Plaintiff to show unavailability of the grievance procedure, Jenkins v. Cordero, No. 17-CV-1592, 2019 WL 2121655, at *3 (S.D.N.Y. May 15, 2019) (citing Mojias v. Johnson, 351 F.3d 606, 610 (2d Cir. 2003)), and there remains "confusion regarding whether the [grievance process] was available to Plaintiff," R & R at 19, the Court also agrees that a hearing on the exhaustion issue would be beneficial, and refers the hearing Judge Dancks to conduct.

**B. First Amendment Claims again Zurek, Smith, Lewis, and Jones for denial of access to reading materials**

Defendants argue that denying Plaintiff all reading materials except a Bible, Koran, or holy book on account of his L-2 Classification did not violate the First Amendment because it was "based on legitimate penological interests." [3] Objs. at 4. The R & R correctly assessed whether this was a "reasonable" limitation on Plaintiff's First Amendment rights by applying Turner v. Safley, 482 U.S. 78, 89–91 (1987). See Young v. Scott, No. 16-CV-44, 2017 WL 3662443, at *6 (M.D. Fla. Aug. 24, 2017), reconsideration denied, No. 16-CV-44, 2018 WL 1805147 (M.D. Fla. Apr. 17, 2018) (applying Turner factors to First Amendment claim raised by pre-trial detainee); Mauro v. Arpaio, 188 F.3d 1054, 1059 (9th Cir. 1999) (same). Under Turner, the Court assesses four factors to determine whether a regulation is reasonable: 1)

whether "there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; 2) "whether there are alternative means of exercising the right that remain open to prison inmates"; 3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates"; and 4) whether there is "an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests." Turner 482 U.S. at 89–91 (internal quotations omitted).

[3]    As detailed in the R & R, L-2 classification was for inmates "reclassified 'due to their propensity towards facility violence and/or repeated non-compliance with facility rules and regulations' ... Inmates on L2 status were, among other things, restricted to one hour of recreation a day or one and a half hours five days a week, limited to non-contact visits at special times, allowed limited telephone calls and commissary privileges, and allowed no books other than the Bible, Koran, or Holy book." R & R at 5. Plaintiff was placed on L-2 status on December 26, 2016, after an incident in which he injured a guard. See Dkt. No. 41-4 at 56 ("Incident Report"). The classification was abolished in August 2017 after the Citizen's Policy and Complaint Review Council ("CPCRC") determined that the restrictions violated New York Regulations. See Dkt. No. 41-4 at 121–22 ("CPCRC Letter").

**\*4** With respect to the first and fourth factors, Defendants state "there was a clear relationship to a legitimate government interest in the good order of the Facility" and "it is difficult to imagine a less onerous alternative means in the circumstances for the Correction Facility to have acted in relation to Plaintiff." Objs. at 7. But Defendants are unable to substantiate these conclusory claims. Their Objection asserts that the regulations "were intended to give inmates who were determined ... to be prone to conduct inimical to good order, an incentive to correct their behavior," Id. at 6, but the only citation for this is the Affidavit of Deputy Woodland, which merely states that the L-2 classification was "intended to ensure the safety and good order of the Facility" and makes no direct claims about how limiting reading materials promotes good behavior. Dkt. No. 41-5 ("Woodland Affidavit") ¶ 16. Defendants' reliance on Beard v. Banks, 548 U.S. 521 (2006), which upheld limitations on the most uncooperative prisoners' access to reading materials on the grounds that such limitations could incentivize good behavior, is misplaced. In that case, the defendants "articulated connections between

newspapers and magazines, the deprivation of virtually the last privilege left to an inmate, and a significant incentive to improve behavior." [4] *Id.* at 531–32. Here, in contrast, as the Report-Recommendation correctly notes, Defendants "failed to identify specific legitimate penological interests for the ban." R & R at 22. Further, despite the <u>Beard</u> defendants' acknowledgment that they were depriving prisoners of "virtually the last privilege left," the regulations were still more generous than the L-2 regulations at issue here, as they allowed for "legal and personal correspondence, religious and legal materials, two library books, and writing paper." *Id.* at 526.

[4]   The <u>Beard</u> court further noted that "[t]he undisputed facts statement added that the Policy encourages progress and discourages backsliding by level 1 inmates. These statements point to evidence that the regulations serve the function identified." <u>Beard v. Banks, 548 U.S. 521, 522 (2006).</u>

The second factor also favors Plaintiff because there was no apparent alternative means for Plaintiff to exercise his First Amendment rights. While Defendants state that Plaintiff could have modified his behavior and been reclassified during the monthly classification review, Plaintiff states that Woodland told him "you have 19 felonies, you might never come off this status." Compl. ¶ 59. Finally, on the third factor, Defendants' assertion that "allowing Plaintiff to escape any consequences of having injured an officer could well have an undesirable 'ripple effect' on the behavior of other inmates" is unpersuasive as it provides no explanation for why anything short of a blanket deprivation on reading materials would be "allowing Plaintiff to escape any consequences." Objs. at 7.

Thus, while Courts "must accord substantial deference to the professional judgment of prison administrators," <u>Overton v. Bazzetta, 539 U.S. 126, 132 (2003),</u> Defendants' failure to articulate any specific justification means this case follows the "general rule" that "[a]bsolute bans on inmate access to newspapers and magazines ... violate the First Amendment because they are an 'exaggerated response' to legitimate penological needs." <u>Nelson v. Hjorth, No. 18-CV-88, 2018 WL 2050571, at *6 (D. Neb. May 2, 2018)</u> (quoting <u>Mann v. Smith, 796 F.2d 79, 82 (5th Cir. 1986)</u>).

### C. Qualified Immunity for First Amendment claims against Defendants Zurek, Smith, Lewis, and Jones

Defendants' Objections raises only one ground on which they are entitled to qualified immunity: "it was objectively reasonable for them to believe" that "the limitations imposed by L-2 status were indeed proper penologically-based restrictions" because the L-2 classification "had remained in place and operation unquestioned for over 20 years." Objs. at 8. Defendants do not, however, cite any cases to back the assertion that because a policy has been in effect for a long time, it is objectively reasonable to believe it is constitutional. And the Second Circuit has held a defendant's actions can be objectively unreasonable even if that defendant was following a policy. See <u>Sorensen v. City of New York, 42 F. App'x 507, 510–11 (2d Cir. 2002)</u> (affirming denial of qualified immunity and rejecting defendants' argument "that they were simply low-level employees following orders and that it was objectively reasonable for them to believe that a policy promulgated by the City was constitutional ... immunity has been granted [in such cases] only when the orders were facially valid ... the strip-search policy at issue here, however, had twice been declared unconstitutional by this court, and so was not facially valid.")[5],[6] Thus, Defendants are not entitled to qualified immunity at this time.

[5]   Defendants do not object to the Report-Recommendation's finding that a detainee's First Amendment right of access to reading material is "clearly established." R & R at 23–24 (citing <u>Turner 482 U.S. at 89–90</u>; <u>Beard 548 U.S. at 535</u>). The Court notes that because "public officials are held to constructive knowledge of the law, the issue here is not whether a reasonable person would have known what the law was, but simply whether the law was clearly established." <u>Sorensen 42 F. App'x at 510.</u>

[6]   The R & R found that Defendants were not entitled to qualified immunity in part because there was a need for more fact finding about whether Zurek denied reading materials to punish Plaintiff's filing of a sexual abuse claim. R & R at 24 n.9. The Court notes that because it is denying summary judgment based on qualified immunity on the grounds that Defendants have not shown that their reliance on a longstanding policy is per se objectively reasonable, the Court does not rely on the Report-Recommendations reasoning on the issue of qualified immunity. Not relying the ambiguity of Zurek's motivations does not, of

course, preclude additional fact finding on the issue should it be relevant.

## V. CONCLUSION

**\*5** Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 50) is **APPROVED and ADOPTED in its entirety**, except that Defendants' assertion they are entitled to qualified immunity is denied because they have not shown that their compliance with a longstanding policy was objectively reasonable; and it is further

**ORDERED**, that Defendants' Motion for Summary Judgment (Dkt. No. 41) on all claims asserted against them in their official capacities is **GRANTED**; and it is further

**ORDERED**, that Defendants Woodland and Getchell's Motion for Summary Judgment is **GRANTED**; and it is further

**ORDERED**, that Defendants Breen and Lewis's Motion for Summary Judgment on Plaintiff's First Amendment retaliation claims is **GRANTED**; and it is further

**ORDERED**, that Defendants' Motion for Summary Judgment is **DENIED** with respect to Plaintiff's Fourteenth Amendment claims for excessive force, sexual abuse, and failure to intervene against Defendants Breen, Jones, and Lewis; and it is further

**ORDERED**, that Defendants' Motion for Summary Judgment is **DENIED** with respect to Plaintiff's First Amendment claims for denial of access to reading material against Defendants Zurek, Smith, Lewis, and Jones; and it is further

**ORDERED**, that Defendants Motion for Summary Judgement is **DENIED** with respect to Defendants Zurek, Smith, Lewis, and Jones's assertion of qualified immunity, without prejudice to reconsideration of the issue of qualified immunity at trial; and it is further

**ORDERED**, that Judge Dancks recommendation that a hearing be conducted on the issue of exhaustion is **GRANTED and REFERRED** to Judge Dancks to conduct; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 4051596

---

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00366-DNH-TWD Document 93 Filed 03/08/21 Page 314 of 353

Sheffer v. Fleury, Not Reported in Fed. Supp. (2019)

2019 WL 3891143

2019 WL 3891143
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joshua SHEFFER, Plaintiff,
v.
Correctional Officer FLEURY, et al., Defendants.

9:18-CV-1180 (LEK/DJS)
|
Signed 08/19/2019

**Attorneys and Law Firms**

JOSHUA SHEFFER, Plaintiff, Pro Se, 16-A-1894, Marcy
Correctional Facility, 9000 Old River Road, P.O. Box 3600,
Marcy, NY 13403.

HON. LETITIA JAMES, Attorney General of the State of
New York, OF COUNSEL: KOSTANDINOS D. LERIS,
ESQ., The Capitol, Albany, NY 12224, Attorney for
Defendants.

**REPORT-RECOMMENDATION and ORDER**

DANIEL J. STEWART, United States Magistrate Judge

**\*1** On October 1, 2018, *pro se* Plaintiff Joshua Sheffer
("Plaintiff") commenced this action pursuant to 42 U.S.C. §
1983, asserting claims arising from his confinement in the
custody of the Department of Corrections and Community
Supervision ("DOCCS") at Upstate Correctional Facility
("Upstate"). Dkt. No. 1, Compl. Presently before this
Court is Defendants' Motion for Summary Judgment, and
a Partial Motion to Dismiss by Defendants Smith, Prack,
and Martuscello, Dkt. No. 24, which Plaintiff has opposed
in part.[1] Dkt. No. 31, Pl.'s Opp. Defendants contend that
Plaintiff has failed to exhaust his administrative remedies
and that Plaintiff failed to establish personal involvement
with respect to Defendants Smith, Prack, and Martuscello.
Dkt. No. 30, Defs.' Reply Mem. of Law. The Court
finds that Defendants have not established that Plaintiff
failed to exhaust his administrative remedies, and therefore,
recommends that Defendants' Motion for Summary Judgment
be **denied**. The Court recommends that Defendants' Motion to
Dismiss Defendants Prack and Martuscello be **granted**, and
Defendants' Motion to Dismiss Defendant Smith be **denied**.

1  Defendants' Motion for Summary Judgment does
not pertain to John Doe or Sullivan, as they have
not yet been served or appeared. *See* Dkt. No. 24-9,
Defs.' Mem. of Law, p. 3 n.1 & 2; Dkt. Nos. 14 &
19.

**I. BACKGROUND**

Plaintiff alleges that shortly after arriving at Upstate on
September 15, 2017, he was interviewed by John Doe
regarding his history of sexual abuse. Compl. at ¶ 21. When
John Doe asked Plaintiff if he has a history of sexual abuse,
Plaintiff replied "yes," but Plaintiff alleges that John Doe
allegedly said "no" aloud and circled "no" on Plaintiff's
3278RC form, which is used to determine if an inmate
is susceptible to being sexually abused while in prison.
*Id.* Plaintiff alleges he was then walked back to his cell
by Defendant Fleury, who told Plaintiff that he had the
"perfect bunkie" for him and for Plaintiff "to not ask him for
anything." *Id.* at ¶ 22. Plaintiff alleges that on September 18,
2017, Defendant Smith came to his cell door and that Plaintiff
told Defendant Smith he feared for his life and safety because
of the conduct of John Doe and Defendant Fleury. *Id.* at ¶ 24.
Later that same day, Plaintiff wrote letters to Sullivan, and
Defendants Smith, Prack, and Martuscello relaying that same
concern. *Id.* at ¶ 25.

On or about September 25, 2017, Plaintiff received a
bunkmate who allegedly threatened to physically assault him
if Plaintiff did not give into his sexual demands. *Id.* at ¶
26. When Plaintiff informed Defendant Bond that he feared
he would be sexually assaulted by his bunkmate, Defendant
Bond allegedly told Plaintiff "to work it out." *Id.* Later that
day, Plaintiff was sexually assaulted by his bunkmate. *Id.*
at ¶ 27. The next morning, Plaintiff allegedly placed letters
addressed to Sullivan, and Defendants Smith, Prack, and
Martuscello in the feed up slot of his cell door informing them
he had been sexually assaulted. *Id.* at ¶ 28. Later that day,
Plaintiff was again sexually assaulted by his bunkmate. *Id.*
On or about September 27, 2017, Plaintiff was interviewed
by John Doe regarding the sexual assaults and John Doe
allegedly told Plaintiff that he "deserved what happened to
him" and that he would be placed back in his cell with his
bunkmate. *Id.* at ¶ 29.

**\*2** Plaintiff asserts that he has exhausted his administrative
remedies "to the best of his ability ... to the highest level
afforded [to] him." *Id.* at ¶ 41. Plaintiff commenced the

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 315 of 353

Sheffer v. Fleury, Not Reported in Fed. Supp. (2019)

2019 WL 3891143

grievance procedure when he filed a grievance with the grievance clerk at Upstate on October 1, 2017, alleging that he was sexually assaulted by his bunkmate on September 25 and 26, 2017, and that Defendants, knowing he was susceptible to sexual abuse and harassment, failed to protect him from the sexual assaults. *Id.* at ¶¶ 37-38; Dkt. No. 31-1 at pp. 1-4 & 6.

The next day, Plaintiff received notice from the Inmate Grievance Program ("IGP") Supervisor at Upstate that Plaintiff's Prison Rape Elimination Act ("PREA") claim was forwarded to the Watch Commander and "deemed exhausted upon filing for Prison Litigation Reform Act ('PLRA') purposes." Dkt. No. 31-1 at p. 6. The letter from the IGP Supervisor also stated that Plaintiff's allegations of employee harassment, retaliation, and threats would be investigated by the Superintendent. *Id.* On April 5, 2018, after the completion of an investigation by an IGP supervisor, the Superintendent denied Plaintiff's grievance, concluding there was no misconduct by staff. Dkt. No. 31-1 at p. 11.

## II. MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard on Motion for Summary Judgment

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289

(citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read his supporting papers liberally, and [ ] interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B. Whether Plaintiff Exhausted his Administrative Remedies

**\*3** The PLRA provides, in part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). There is no question that exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that the mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 94 (2006).

Defendants here outline for the Court the familiar three step inmate grievance process within DOCCS, *see Smith v. Kelly*, 985 F. Supp. 2d 275, 280-81 (N.D.N.Y. 2013) (discussing the grievance process), provide evidence that Plaintiff did not fully comply with that procedure, and argue as a result that the

Sheffer v. Fleury, Not Reported in Fed. Supp. (2019)

2019 WL 3891143

Complaint should be dismissed for failure to exhaust. Defs.' Mem. of Law at pp. 7-11.

However, the sole allegation in this Complaint is that Defendants failed to protect Plaintiff from being sexually assaulted by another inmate, *see* Compl. at ¶ 34, and the exhaustion requirement for allegations concerning incidents of sexual assault is different than that for other types of complaints. *See Abreu v. Miller*, 2018 WL 5660409, at *4 (N.D.N.Y. Aug. 16, 2018), *report and recommendation adopted*, 2018 WL 4502007 (N.D.N.Y. Sept. 20, 2018), *order amended and superseded on reconsideration on other grounds*, 2019 WL 761639 (N.D.N.Y. Feb. 21, 2019). One of the primary objectives of the PREA is to "increase the accountability of prison officials who fail to detect, prevent, reduce, and punish prison rape." 34 U.S.C. § 30302(6). As revised on May 15, 2014, DOCCS Directive 4040 provides:

> The department has zero tolerance for sexual abuse and sexual harassment. Consistent with this policy and the Prison Rape Elimination Act (PREA) Standards (28 C.F.R. § 115.52(a)), an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy the [PLRA] exhaustion requirement (42 U.S.C. § 1997e(a)) before bringing a lawsuit regarding an allegation of sexual abuse as long as the matter was reported as set forth below.

7 N.Y.C.R.R. § 701.3(i). For purposes of the PREA and the exhaustion requirement, any allegation concerning an incident of sexual abuse or harassment shall be deemed exhausted if official documentation confirms that:

> (1) an inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident to facility staff; in writing to Central Office Staff; to any outside agency that the Department has identified as having agreed to receive and immediately forward inmate reports of

sexual abuse and sexual harassment to agency officials under the PREA Standards (28 C.F.R. § 115.51(b)); or to the Department's Office of the Inspector General; or (2) a third party reported that an inmate is the victim of sexual abuse and the alleged victim confirmed the allegation upon investigation.

*Id.*

In addition, a grievance alleging sexual abuse or harassment may be submitted at any time. *Id.* If an inmate files a formal grievance alleging sexual abuse or harassment with the grievance clerk, it shall immediately be reported by the IGP supervisor to the watch commander, and that complaint "shall be deemed exhausted upon filing for PLRA purposes." *Id.*

There appears to be no question that Plaintiff alleged to prison officials that he was the victim of a sexual assault and that he received notice from the IGP Supervisor stating his PREA claim has been exhausted for PLRA purposes, and thus his report was documented as required. Dkt. 31-1 at p. 6. Pursuant to DOCCS Directive 4040 that was sufficient to deem his claims regarding the alleged sexual assault exhausted. [2] This was sufficient to exhaust his administrative remedies. *Medina v. Kaplan*, 2018 WL 797330, at *5 (S.D.N.Y. Feb. 8, 2018).

[2]    Plaintiff's grievance not only alleged that several prison employees failed to protect him from being sexually assaulted, but that Plaintiff was not allowed access to certain privileges and items. Dkt. No. 31-1 at pp. 1-4. Plaintiff asserts that his cell did not have a mattress or certain toiletries, he was not allowed his legal work or "religious articles," and was denied access to the law library, to state issued earphones, and had his food and clothes tampered with. *Id.* Defendants may be correct that those claims were not fully exhausted through the three step process, but the Court need not decide that question because those claims are not asserted as part of this litigation.

**\*4**  The Defendants' Motion does not specifically address Directive 4040 and its application to this case. Defendants appear to simply assume that the Plaintiff's claim that the Corrections Officers failed to intervene to stop the abuse, or

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 317 of 353

Sheffer v. Fleury, Not Reported in Fed. Supp. (2019)

2019 WL 3891143

were otherwise responsible for the repeated sexual assault by Plaintiff's bunkmate, is not covered by the Directive. The Court does not adopt such a narrow view. Directive 4040 specifically refers to an "incident" of sexual abuse. That incident could include, not only the acts of sexual abuse by an inmate or a corrections officer, but also other events which are necessarily intertwined with such a claim, such as a physical assault during the course of the abuse; the failure of correctional staff to intervene to stop the rape; or acts or failures to act making a jail official legally accountable for the sexual abuse. *See Abreu v. Miller*, 2018 WL 4502007, at *2 ("[I]it may also be that the sexual assault was carried out by physically assaulting Plaintiff, perhaps to overcome his resistance to the sexual conduct."). Such a reading of the Directive is not only consistent with its language, but also comports with its purpose in attempting to prevent such conduct.

Further, while it is true that not all grievances by inmates are covered by the Directive, conduct that is specifically related to the act of sexual abuse, such as a failure to intervene and protect the inmate as being covered by the Directive. In such a circumstance it would be justifiable for the inmate to rely on the Directive, and the memorandum sent to him indicating that his PREA allegations had been deemed exhausted. Dkt. No. 31-1 at p. 6. As noted in a similar situation: "[a]n inmate would be placed in an untenable position if he were required to adjudicate whether his allegations of sexual assault were sufficient under PREA prior to relying upon the language in Directive 4040 alleviating the need to utilize the normal grievance procedure." *Henderson v. Annucci*, 2016 WL 3039687, at *5 (W.D.N.Y. Mar. 14, 2016), *report and recommendation adopted*, 2016 WL 3031353 (W.D.N.Y. May 27, 2016). Here, where Plaintiff was told his PREA claims were exhausted, this seems especially applicable.

As such, the Court recommends Defendants' Motion for Summary Judgment for failure to exhaust be denied.

### III. MOTION TO DISMISS

#### A. Legal Standard for a Motion to Dismiss

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto*, 405 F.3d 319, 322 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (*overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984)).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 373 U.S. 746, n.6 (1963). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. at 697. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. at 678. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal citation omitted). In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts that [he or she] has not alleged, or that the defendants have violated ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. at 679-80.

**\*5** Where, as here, the complaint was filed *pro se*, it must be construed liberally with "special solicitude" and

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 318 of 353
Sheffer v. Fleury, Not Reported in Fed. Supp. (2019)
2019 WL 3891143

interpreted "to raise the strongest claims that it suggests." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (internal quotation marks omitted) (citation omitted). Nonetheless, a *pro se* complaint must state a "plausible claim for relief." *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice[,]" as well as documents incorporated by reference in the complaint. *Spence v. Senkowski*, 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (citing FED. R. CIV. P. 10(c)).

### B. Personal Involvement

In their Partial Motion to Dismiss, Defendants Smith, Prack, and Martuscello move to dismiss Plaintiff's claims against them on the ground that Plaintiff failed to allege personal involvement in the events giving rise to this action. Defs.' Mem. of Law at pp. 11-13.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a § 1983 claim, a plaintiff must show a "tangible connection" between the acts of a defendant and the injuries suffered by the plaintiff. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

### 1. Defendants Prack and Martuscello

Defendants assert that Defendant Prack, Director of Special Housing Units for DOCCS, and Defendant Martuscello, Deputy Commissioner for Administration for DOCCS, should be dismissed from this action for lack of personal involvement. Defs.' Mem. of Law at p. 11; Compl. at ¶¶ 3-4. Defendants assert that Plaintiff has not alleged any facts that Defendant Prack or Defendant Martuscello: (1) made the decision to place Plaintiff's bunkmate in his cell with him; (2) was informed who Plaintiff's bunkmate was; or (3) was aware of whether Plaintiff's bunkmate had a history of sexual violence. Defs.' Mem. of Law at p. 12. In Plaintiff's Memorandum of Law, he concedes that these two defendants

are not personally involved and requests the Court strike them from this action. Pl.'s Mem. of Law, at p. 9. Therefore, the Court recommends Defendants Prack and Martuscello be dismissed.

### 2. Defendant Smith

Defendants assert that Defendant Smith lacked personal involvement in the alleged violations giving rise to this action. Defs.' Mem. of Law at pp. 11-13. Defendant Smith is an Offender Rehabilitation Counselor with DOCCS. Compl. at ¶ 12. Defendant Smith argues that she had no knowledge or personal involvement in Plaintiff's bunkmate being placed in his cell with him, specifically, that she did not: (1) make the decision to place Plaintiff's bunkmate in his cell with him; (2) know who Plaintiff's bunkmate was; or (3) receive any information regarding Plaintiff's bunkmate having a history of sexual violence. Defs.' Mem. of Law at p. 12.

Plaintiff contends that Defendant Smith is personally involved in this case because she failed to take action to protect him from being sexually assaulted by his bunkmate after Plaintiff told Defendant Smith at his cell, and later wrote to her, that he feared for his life and safety after John Doe and Defendant Fleury allegedly made remarks to Plaintiff about his bunkmate. Pl.'s Mem. of Law at p. 9. Additionally, Plaintiff asserts that it was evident Defendant Smith was aware of the sexual assaults because John Doe interviewed Plaintiff after Plaintiff spoke with Defendant Smith, and a call was placed to Plaintiff regarding his PREA claim. Compl. at ¶ 29; Dkt. No. 31-1 at p. 12.

**\*6** In his Complaint, Plaintiff alleges that on September 18, 2017, Defendant Smith came to visit him at his cell for his initial interview after arriving at Upstate, and during this interview, Plaintiff told Defendant Smith that he feared for his life and safety as a result of his encounters with John Doe and Defendant Fleury. Compl. at ¶ 24. Plaintiff alleges that later that day, he sent Defendant Smith a letter informing her of the same concerns he told Defendant Smith at his cell. *Id.* at ¶ 25. On September 26, 2017, after Plaintiff was sexually assaulted, he wrote to Defendant Smith again, placing the letter in the feed up slot of his cell door, informing Defendant Smith that he had been sexually assaulted by his bunkmate. *Id.* at ¶ 28.

Courts have denied defendants' motions to dismiss for lack of personal involvement when plaintiffs have alleged they met in person with defendants to discuss the events

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 319 of 353

Sheffer v. Fleury, Not Reported in Fed. Supp. (2019)

2019 WL 3891143

giving rise to their actions. *See Hayes v. Dahkle*, 2018 WL 7356343, at *2, 18-19 (N.D.N.Y. Dec. 11, 2018), *report and recommendation adopted*, 2019 WL 689234 (N.D.N.Y. Feb. 19, 2019) (plaintiff expressed his fear about his safety in person to a defendant supervisor); *see also Whitley v. Ort*, 2018 WL 4684144, at *7 (S.D.N.Y. Sept. 28, 2018) (nurse allegedly failed to provide plaintiff with medical treatment and take action under the PREA after plaintiff told nurse in person he had been sexually assaulted).

On a case-by-case basis, a plaintiff may be able to establish a defendant's personal involvement when a defendant receives a letter from the plaintiff detailing the factual allegations giving rise to their claim. The Second Circuit has concluded that a defendant's personal involvement can be established if,

> [a]t the pleading stage, even if [the plaintiff] had no knowledge or information as to what became of his [l]etter after he sent it, he would be entitled to have the court draw the reasonable inference– if his [ ] complaint contained factual allegations indicating that the [l]etter was sent to [a supervisor] at an appropriate address and by appropriate means–that the [defendant] in fact received the [l]etter, read it, and thereby became aware of the alleged conditions of which [the plaintiff] complained.

*Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013); *see Grubbs v. Grimaldi*, 2019 WL 720969, at *5 (N.D.N.Y. Jan. 23, 2019), *report and recommendation adopted*, 2019 WL 719383 (N.D.N.Y. Feb. 20, 2019) (plaintiff stating the multiple letters he wrote to the facility health services director were ignored and unanswered did not establish personal involvement); *see also Ferrer v. Fischer*, 2014 WL 1763383, at *3 (N.D.N.Y. May 1, 2014) (plaintiff's allegations that he sent multiple letters to a named defendant, that defendant was "fully aware" of his situation, and that defendant failed to respond to his letters and take appropriate action was sufficient to defeat defendant's motion to dismiss at the pleading stage); *but see Simpson v. Overbaugh*, 2015 WL 7444369, at *5 (N.D.N.Y. Sept. 28, 2015), *report and recommendation adopted*, 2015 WL 7444617 (N.D.N.Y. Nov.

23, 2015) (plaintiff did not provide sufficient information regarding the specific issues and individuals mentioned in the grievance).

At this stage in the case, Plaintiff has alleged enough facts to show it is plausible that Defendant Smith was personally involved in the events giving rise to this action. Plaintiff states that he expressed his concerns about his safety to Defendant Smith in person. *See Hayes v. Dahkle*, 2018 WL 7356343, at *2; Compl. at ¶ 24. Also, the letters Plaintiff allegedly sent to Defendant Smith raised specific concerns due to particular correction officers' actions and how Plaintiff was sexually assaulted by his bunkmate. *See Ferrer v. Fischer*, 2014 WL 1763383, at *3; Compl. at ¶¶ 24-25 & 28. Plaintiff also provided the specific dates the letters were sent and the means by which the second letter was sent. *Id.*

 **\*7** Plaintiff has also alleged enough facts to show the alleged violations were ongoing. Plaintiff has provided enough evidence that establishes that the alleged violations were not remedied after Defendant Smith was allegedly first made aware of Plaintiff's concerns, and therefore, Defendant Smith may have been able to remedy Plaintiff's damages and mitigate the alleged violations. *See Burton v. Lynch*, 664 F. Supp. 2d 349, 360 (S.D.N.Y. 2009); *see also Young v. Kihl*, 720 F. Supp. 22, 23 (W.D.N.Y. 1989); Compl. at ¶¶ 24-25 & 28.

Therefore, it is recommended that the Court deny Defendants' motion to dismiss for lack of personal involvement with respect to Plaintiff's claims against Defendant Smith.

## IV. REMAINING PARTIES

The Court notes that there remains a John Doe Defendant in this action. Defendants have identified this individual in response to an order by Judge Kahn. *See* Dkt. Nos. 8 & 12. The Court recommends that Plaintiff be ordered to indicate whether he intends to go forward with a claim against the individual identified by Defendants, Sgt. Walantus, and for him to be added as a Defendant to this action.

The Court also notes that Francis Sullivan has not been served as she is no longer employed by DOCCS. *See* Dkt. No. 19. The Court therefore recommends Defendants be ordered to attempt to ascertain a current address where Ms. Sullivan can be served. *See Valentin v. Dinkins*, 121 F.3d 72, 75-76 (2d.

Sheffer v. Fleury, Not Reported in Fed. Supp. (2019)

2019 WL 3891143

Cir. 1997); *see also Billman v. Indiana Dep't of Corrections, 56 F.3d 785, 789 (7th Cir. 1995).*

### V. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment based upon Plaintiff's failure to exhaust his administrative remedies be **DENIED**; and it is further

**RECOMMENDED**, that Defendants' Partial Motion to Dismiss Defendants Prack and Martuscello be **GRANTED**; and it is further

**RECOMMENDED**, that Defendants' Partial Motion to Dismiss Defendant Smith for lack of personal involvement be **DENIED**; and it is further

**RECOMMENDED**, that Plaintiff be ordered to indicate whether he intends to go forward with a claim against the individual identified by Defendants as John Doe; and it is further

**RECOMMENDED**, that an order pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d. Cir. 1997) be issued regarding Defendant Sullivan; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [3] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

[3]    If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3891143

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Castineiras v. Helms, Not Reported in Fed. Supp. (2019)

2019 WL 2870300

2019 WL 2870300
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Roberto CASTINEIRAS, Plaintiff,

v.

A. HELMS, Defendant.

9:17-CV-1084 (BKS/ATB)
|
Signed 06/06/2019

**Attorneys and Law Firms**

ROBERTO CASTINEIRAS, Plaintiff, pro se

AIMEE COWAN, Asst. Attorney General, for defendants.

### REPORT and RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

 *1  This matter was referred to me for Report and Recommendation by the Honorable Brenda K. Sannes, United States District Judge. Plaintiff has filed this civil rights complaint alleging that on August 21, 2017, at Upstate Correctional Facility, defendant Helms used excessive force against him in the course of extracting plaintiff from his cell. (Complaint ("Compl.") ¶ 6, Facts). Plaintiff originally named two defendants: Corrections Officer ("CO") A. Helms, and "Jane Doe," a nurse on duty at the time of the incident. (Compl. at 1). On December 19, 2017, after initial review of the complaint, Judge Sannes dismissed the complaint against defendant Jane Doe. (Dkt. No. 9).

Presently before the court, is a motion for summary judgment filed by defendant Helms, arguing that plaintiff has failed to exhaust his administrative remedies. In the alternative, defendant argues that plaintiff's Eighth Amendment claim may be dismissed on the merits, and that defendant is entitled to qualified immunity. (Dkt. No. 24). Plaintiff has responded in opposition to the motion, and defendant has filed a reply. (Dkt. Nos. 26, 27). For the following reasons, this court agrees that plaintiff has failed to exhaust his administrative remedies and will recommend that the defendant's motion for summary judgment be granted.

### DISCUSSION

#### I. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin*, 467 F.3d at 272.

#### II. Exhaustion of Administrative Remedies

##### 1. Legal Standards

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002)). Inmates must exhaust their administrative remedies even if

2019 WL 2870300

they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

**\*2** The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19, 127 S.Ct. 910 (citing *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103, 126 S.Ct. 2378.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d).

There is a special section for complaints of "harassment." *Id.* § 701.8. Harassment grievances are defined in another section of the regulations as "those grievances that allege employee misconduct meant to annoy, intimidate, or harm an inmate." *Id.* § 701.2(e). Based on this definition, section 701.8 has been found applicable to claims of excessive force by staff. *Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at \*7 n.7 (S.D.N.Y. Sept. 28, 2018) (citing *Torres v. Carry*, 691 F. Supp. 2d 366, 369-70 (S.D.N.Y. 2009)).

Complaints of harassment are handled by an ***expedited*** procedure which provides that such grievances are forwarded directly to the superintendent of the facility, [1] after which the inmate must appeal any negative determination to the CORC by filing a form within seven calendar days of the inmate's receipt of the Superintendent's response. *Id.* §§ 701.8(h) & (i), 701.5. The regulations then provide that "unless otherwise

stipulated in this section, all procedures, rights, and duties pertaining to the processing of other grievances as set forth in section 701.5 of this Part shall be followed." *Id.* § 701.8(i). Thus, if a procedure is not described in 701.8, the inmate must refer to section 701.5. [2]

| | |
|---|---|
| 1 | The regulation states that "[a]llegations of employee harassment are ***of particular concern to the administrators of department facilities.***" 7 N.Y.C.R.R. § 701.8 (emphasis added). |
| 2 | The court also notes that the regulations governing the Inmate Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). |

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

**\*3** However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, 136 S. Ct. at 1857. " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, 656 Fed.Appx. 577, 580 (2d Cir. 2016) (quoting *Ross*, —— U.S. ——, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill*–availability and estoppel–are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, —— U.S. ——, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 656 Fed.Appx. at 580. An administrative procedure is "unavailable" when

Case 9:17-cv-00366-DNH-TWD   Document 93   Filed 03/08/21   Page 323 of 353

Castineiras v. Helms, Not Reported in Fed. Supp. (2019)

2019 WL 2870300

(1) "it operates a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Riles, supra* (quoting *Ross*, —— U.S. ——, 136 S. Ct. at 1859-60).

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Ross*, —— U.S. ——, 136 S. Ct. at 1859-60. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860. Thus, if a plaintiff fails to exhaust his administrative remedies, the court must consider whether those remedies were "available" to him.

In *Williams v. Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to an inmate plaintiff under *Ross*, after the district court granted the defendants' motion to dismiss for failure to exhaust. The plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id.* at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance, and alleged that it was never filed by the officer to whom he had given it. It was undisputed that plaintiff never appealed the grievance. *Id.*

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The defendants relied on a Department of Corrections and Community Services ("DOCCS") regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id.* (quoting N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g)(2)).

The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* Thus, *Williams* holds that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126. [3] *See also Medina v. Napoli*, 725 F. App'x 51, 53-54 (2d Cir. 2018) (following *Williams* in the context of a summary judgment motion).

[3]  My summary of *Williams* tracks that of Magistrate Judge Stewart in *Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at *8 (N.D.N.Y. Mar. 10, 2017), (Rep't-Rec.), *adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).

**2. Application**

**\*4**  In this case, defendant argues that plaintiff failed to exhaust his administrative remedies because he failed to appeal the Superintendent's denial of his grievance to the CORC, and the administrative remedy was "available" to him. (Def.'s Mem. of Law at 3-5) (Dkt. No. 24-9). Defendant also argues that plaintiff failed to specifically identify defendant Helms in his grievance as one of the officers who actually struck plaintiff. [4]  (*Id.* at 4). This court need not reach defendant's last argument regarding exhaustion because there are at least two other reasons why plaintiff failed to exhaust his administrative remedies as discussed below, the first of which was not raised by the defendant.

[4]  Defendant argues that the grievance states only that defendant Helms verbally threatened plaintiff after the excessive force incident. (Def.'s Mem. of Law at 4).

Plaintiff attached his grievance to the complaint in this federal action. (Compl. at CM/ECF p.7). The grievance is dated "9/21/17," and it was received by the Grievance Committee and given Grievance No. UST-61853-17 on "9/22/17." (*Id.*) Plaintiff's federal complaint was also signed "9/21/17," and it was received by the court on "9/28/17." (Compl. at CM/ECF p.6 & Dkt. No. 1 *generally*). If plaintiff signed his administrative grievance and his federal complaint on the same day and mailed the federal complaint to the court,

2019 WL 2870300

it is impossible that plaintiff could have exhausted his administrative remedies before he filed his federal action. In fact, in the section of the form-complaint which asks the plaintiff "What was the final result of your grievance?", plaintiff's answer was: "[it] is being in investigation under Code 49 harassment/misconduct." [5] (Compl. at CM/ECF p.3).

[5]   Exhaustion is an affirmative defense. Thus, even though it seems clear from the face of the complaint that plaintiff's remedies were not exhausted, in an abundance of caution, the complaint was allowed to proceed past initial review.

A civil rights claim must be exhausted by the grievance process, which requires the completion of the three-tiered process, *before* an action asserting that claim may be filed. *See*, e.g., *Casey v. Brockley*, No. 9:13-CV-1271, 2015 WL 8008728, at *5 (N.D.N.Y. Nov. 9, 2015), *Rep't Rec., adopted*, 2015 WL 7864161 (N.D.N.Y. Dec. 3, 2015); *See also Klein v. Fischer*, No. 13-CV-0437, 2015 WL 5174031, at *19 (N.D.N.Y. Sept. 2, 2015) ("a post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced.").

The court will also examine whether plaintiff exhausted his administrative remedies *after* filing this action. If plaintiff had done so, the federal complaint would still have to be dismissed, but the plaintiff would have been able to re-file the federal complaint immediately because his remedies would already have been exhausted. *See Brown v. Napoli*, 687 F. Supp. 2d 295, 298 (W.D.N.Y. 2009); *Morales v. Mackalm*, 278 F.3d 126, 128 (2d Cir. 2002) (dismissal for failure to exhaust should be without prejudice to refiling following exhaustion). If plaintiff did not exhaust his remedies during the pendency of this action, the dismissal may still be without prejudice, but plaintiff will have to attempt to exhaust his administrative remedies prior to refiling.

In this case, the parties dispute whether plaintiff completed the exhaustion requirement during the pendency of this action. Defendant Helms argues that plaintiff did not appeal the denial of his grievance to the CORC, and thus never completed the administrative grievance process for his claim at all. (Dkt. Nos. 24-1; 24-9). Plaintiff argues that he did appeal to the CORC, but did not keep copies of any of the relevant documents. The parties agree that plaintiff filed Grievance UST-61853-17 following the alleged August 21, 2017 incident. (Cowen Decl. Ex. A, at 2). Because plaintiff's

grievance involved allegations of employee harassment, it was forwarded directly to Upstate's Superintendent for review and response. (Cowen Decl. Ex. A at 7). Plaintiff's grievance was subsequently denied by the Superintendent. (Cowen Dec. Ex. A, at 3). However, the parties disagree as to whether plaintiff appealed the Superintendent's decision to the CORC. (Cowen Dec. Ex. A, at 3; Dkt. No. 24 at 7-9; Dkt. No. 24-5 at 32-33).

 **\*5**  Defendant has filed the Declaration of Rachel Seguin, the Assistant Director of the DOCCS IGP and custodian of records maintained by the CORC. (Seguin Decl. ¶¶ 1-2, 7). Assistant Director Seguin reviewed the CORC records, searching for any appeals filed by plaintiff with the CORC and found no grievance appeals by plaintiff. (Seguin Decl. ¶¶ 7-9; Ex. A).

In his deposition, plaintiff claims to have filed his appeal to the CORC and claims that the CORC issued a decision denying his grievance. (Pl.'s Dep. at 32-33). Plaintiff's testimony regarding the appeal was vague. *Id.* Plaintiff has been unable to produce the alleged denial of appeal by the CORC, although he claims to have received such a denial, and has failed to produce any other evidence that the appeal was filed. Plaintiff testified that he did not keep a copy of his appeal or of the CORC's decision. (*Id.* at 32). Although plaintiff responded to the defendant's summary judgment motion, he failed to address the exhaustion issue. (See Dkt. No. 26). [6] Thus, he has failed to address Assistant Director Seguin's sworn statement that there is no record of plaintiff having filed an appeal with CORC regarding any alleged misconduct by defendant Helms.

[6]   Plaintiff argues in his Response to defendant's motion for summary judgment that he is entitled to an appointment of counsel. (Dkt. No. 26). Requests of counsel must be made by a Motion for Appointment of Counsel in compliance with the Northern District of New York's local rules. Plaintiff is aware of this requirement as he has previously moved to appoint counsel and the court has denied his motion. (Dkt. Nos. 18, 20).

Unlike the plaintiff in *Williams*, this plaintiff does not argue that administrative remedies were unavailable to him. Rather, plaintiff claims that he completed all the required steps to exhaust his administrative remedies. He alleges that he did not keep the relevant documents. It is undisputed that plaintiff filed a grievance and received a decision from the

2019 WL 2870300

Superintendent denying his claim. Because plaintiff has failed to claim that administrative remedies were unavailable to him, any recognized exceptions to the exhaustion of administrative remedies requirement are not relevant to the court's analysis. See *Ross*, 136 S.Ct. at 1853-54.

When a plaintiff fails to exhaust his administrative remedies, the court must dismiss the action without prejudice so that the plaintiff may complete the exhaustion process and re-file his action, unless the time permitted for filing a grievance or appeal has finally expired. See *Felix v. Simon*, 303 F. App'x 21, 22 (2d Cir. 2008) (upholding dismissal of a civil rights action with prejudice where the time permitted for filing a grievance had expired because "dismissal with prejudice, when remedies are no longer available, is required in the absence of any justification for not pursuing such remedies") (citation omitted).

In this case, the Superintendent's decision was dated October 27, 2017, and the bottom of the document contains an "Appeal Statement," informing the plaintiff that he had "seven (7) calendar days from receipt of this notice to file your appeal.* Please state why you are appealing this decision to C.O.R.C." (Def.'s Ex. A at 3). See 7 N.Y.C.R.R. § 701.5(d)(1)(i). The text associated with the asterisk above states that "*An exception to this time limit may be requested under Directive #4040, section 701.6(g)." (*Id.*) This document is Form # 2133. (*Id.*) The appeal section of the form is blank,[7] and the regulations specifically provide that "If the grievant or any direct party wishes to appeal to the CORC, he or she *must complete and sign form #2133* and submit it to the grievance clerk within seven calendar days after receipt of the superintendent's written response to the grievance." 7 N.Y.C.R.R. § 701.5(d)(1)(i) (emphasis added). This section of the regulation further states that "an exception to this appeal time limit may be approved by the IGP supervisor under section 701.6(g) of this Part." *Id.* However, section 701.6(g) provides that "an exception to this time limit may not be granted if the request was made more than 45 days after an alleged occurrence."

[7]     This further supports the defendant's assertion that plaintiff did not, in fact, appeal the Superintendent's denial of his grievance to the CORC.

*6    Thus, plaintiff may not return to exhaust his administrative remedies as against defendant Helms because, although he could have requested an exception to the seven-day time limit for appealing to the CORC within 45 days

of the occurrence of the incident, that time limit has long since expired, and there appear to be no exceptions to the 45 day limit in the regulations. Because plaintiff may not return to exhaust his administrative remedies as against defendant Helms, I must recommend dismissal with prejudice as against defendant Helms.

In his response to defendant's motion, plaintiff references another investigation surrounding the events of August 21, 2017 and argues that his Eighth Amendment claim should survive summary judgment, even if defendant Helms is granted a "partial" summary judgment on his exhaustion argument. (Dkt. No. 26). According to plaintiff, an investigation conducted by the Office of Special Investigations ("OSI") established that the *nurse* on duty on the day of the incident was guilty of abusive behavior. (Dkt. No. 26).

A copy of the investigative report is attached to defense counsel's affidavit as Exhibit B. The OSI report referenced plaintiff and another inmate, who complained about an unrelated, but similar incident involving the nurse. (Cowan Decl. Ex. B). The OSI investigated the August 21, 2017 incident. (Cowan Dec. Ex. B). The investigation was conducted to look into allegations made by plaintiff, as well as additional allegations by a different inmate at Upstate Correctional Facility, against the nurse on duty during the August 21, 2017 incident (Nurse Marla Travers). (*Id.*) However, even assuming that this investigation sufficed to exhaust plaintiff's claims against Nurse Travers,[8] all claims against "Jane Doe Nurse" were dismissed from this case *sua sponte* by the Judge Sannes. (Dkt. No. 9).[9]

[8]     Normally, if plaintiff had filed directly with the Inspector General or OSI, such a complaint would not be sufficient for exhaustion purposes. *Smith v. Kelly*, 985 F. Supp. 2d 275, 285 & n.16 (N.D.N.Y. 2013) ("The Court notes that there is no exhaustion where an inmate complains directly to the Inspector General (i.e., instead of complaining to the superintendent and having the complaint referred to the Inspector General pursuant to 7 N.Y.C.R.R. § 701.8[d] ), the Inspector General renders a finding of unsubstantiation, and the inmate fails to appeal that finding to CORC.") In this case, it is clear from the OSI report that the investigation was requested by the Superintendent on September 19, 2017, but was not finally decided

Case 9:17-cv-00366-DNH-TWD   Document 93   Filed 03/08/21   Page 326 of 353

Castineiras v. Helms, Not Reported in Fed. Supp. (2019)

2019 WL 2870300

until June 5, 2018. (Cowen Decl. Ex. B at 1, 4). There would have been no need to appeal the OSI finding because it was in plaintiff's favor, and Nurse Travers resigned from her position on April 18, 2018. (Cowen Decl. Ex. B at 3). However, it appears that whatever grievance or complaint prompted the Superintendent to request an OSI investigation, it must have been based on different facts than the grievance that plaintiff attached to his federal complaint because the Superintendent's response to Grievance UST-61853-17 was a *denial* on October 27, 2017, including a statement that "no misconduct by staff was found." (Cowen Decl. Ex. A at CM/ECF p.3). Plaintiff would have been required to appeal that denial in order to exhaust his claims against defendant Helms.

9    Plaintiff had the opportunity to amend his complaint to add the nurse in question as a party. He clearly knew the nurse's name at the time of the OSI investigation, but never filed an amended complaint with the court. The complaint as to Nurse "Doe" was dismissed without prejudice.

**\*7** In any event, the report states that the investigation was "assigned on September 28, 2017, and Investigator Ryan Graziano signed the completed OSI Report on May 8, 2018, long after plaintiff filed this federal complaint." Thus, notwithstanding the OSI investigation, which focused only on the nurse, plaintiff still failed to exhaust his administrative remedies *prior to* filing this federal complaint. The complaint still remains dismissed without prejudice as to the Jane Doe nurse.

### III. Additional Discovery

#### 1. Legal Standards

Pursuant to Fed. R. Civ. P. 56(f), a party opposing a motion for summary judgment based on insufficient discovery must file an affidavit describing: (1) "the nature of the uncompleted discovery;" (2) "how the facts sought are reasonably expected to create a genuine issue of material fact;" (3) "what efforts the affiant has made to obtain those facts" and; (4) "why those efforts were unsuccessful." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir. 1994); see also *Brunson v. Jonathan,* 677 F. Supp. 2d 640, 641 (W.D.N.Y. 2010).

#### 2. Application

In his response to defendant's motion, plaintiff also argues that he should be allowed to conduct further discovery in this matter in the form of depositions and interrogatories. (Dkt. No. 26). Plaintiff has not met the requirements for additional discovery under Rule 56(f). Plaintiff's response to defendant's motion merely states that discovery "in the form of depositions" and "interrogatories" would be "instrumental" to establish defendant's culpability. Plaintiff's vague and conclusory statement fails to demonstrate how his ability to respond to defendant's motion for summary judgment was impaired by his lack of discovery or what documents he wishes to obtain that would be material to the exhaustion or any substantive issue.

Additionally, in defendant's reply, defense counsel asserts that she complied with the Court's Mandatory Pretrial Discovery order and forwarded the required discovery material to plaintiff. (Dkt. No. 27). Further, defendant notes that plaintiff had six months to conduct discovery after defendant filed his answer to plaintiff's complaint on February 6, 2018 (Dkt. No. 16). The deadline for discovery did not expire until August 7, 2018. (Dkt. No. 17). Moreover, defendant's reply states that there is no indication that plaintiff ever demanded any further discovery or an extension of the discovery deadline. Thus, plaintiff has not met the requirements of Rule 56(f).

### IV. Conclusion

Based upon the complaint itself, the grievance documents, and Assistant Director Seguin's declarations, plaintiff has failed to raise an issue of fact as to whether, prior to the initiation of this action, he properly filed his grievance and/or appealed the grievance against defendant Helms to the CORC as required by the IGP. *See, e.g., Ruggiero v. Cty. of Orange,* 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits.") (internal quotation marks and emphasis omitted)).

The court also concludes that there are no issues of fact material to whether plaintiff has ever exhausted his administrative remedies with respect to the claim against defendant Helms. No reasonable fact finder could conclude that plaintiff pursued an appeal to the CORC after he filed this action or that he could still pursue such an appeal within the applicable deadlines. Accordingly, I recommend that defendant's motion be granted, and that plaintiff's complaint be dismissed with prejudice based on his failure to exhaust available administrative remedies prior to commencing this

2019 WL 2870300

action and thereafter, though the expiration of the applicable deadlines to do so.

**\*8  WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the defendants' motion for summary judgment (Dkt. No. 24) be **GRANTED**, and the complaint be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE AS TO DEFENDANT HELMS**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.

Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2870300

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 229956
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Mariah LOPEZ f/k/a Brian Lopez, Plaintiff,
v.
The CITY OF NEW YORK, et al., Defendants.

No. 05 Civ. 10321(NRB).
|
Jan. 30, 2009.

West KeySummary

**1**    **Prisons** 🔑 Transsexuals; Sex-Change
Operations

**Sentencing and Punishment** 🔑 Medical
Care and Treatment

A preoperative transgender inmate had not
suffered deliberate indifference to her medical
needs in violation of the Eighth Amendment. She
was incarcerated multiple times for a total of
three weeks, and during that time, had received
her hormone therapy most of that time. She was
also offered psychiatric treatment but refused.
U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

**MEMORANDUM & ORDER**

NAOMI REICE BUCHWALD, District Judge.

**\*1**  Plaintiff brings this action pursuant to 42 U.S.C. §
1983 and 42 U.S.C. § 1988 alleging violations of her civil
rights under the First, Fourth, Fifth, Eighth, and Fourteenth
Amendments to the United States Constitution, and also
seeking redress under New York State Executive Law §
296 et. seq. (the "NYS Human Rights Law") and the
Administrative Code of the City of New York § 8-107 et. seq.
(the "NYC Human Rights Law"). At the times relevant to
the allegations in the complaint, plaintiff was a pre operative
transgender individual who was receiving hormones as part

of her effort to transition from Brian Lopez to Mariah Lopez.
Plaintiff alleges that during a number of short periods of
incarceration at Rikers Island defendants violated her rights
by (1) housing her with male inmates; (2) not permitting her
to wear female clothes and undergarments; (3) not permitting
her to take female hormones; (4) subjecting her to verbal
harassment and threatening behavior by defendant correction
officers; (5) physically assaulting her; (6) observing verbal
harassment, threatening behavior, and physical assaults and
failing to intervene; (7) improperly placing her in a classroom
for inmates who have disciplinary problems; and (8) allowing
classmates to verbally abuse and physically assault her.

Defendants Commissioner Martin Horn, Warden Patrick
Walsh, Warden Peter Curcio, Kaw Aung, M.D., Capt. Kevin
Buck, CO. Ronald Flemming [1], Principal Delores Jefferson,
C.O. Theresa John, C.O. George Johnson, Capt. Ellen
Patterson, Jane San Jose, M.D., and Capt. Robin Walker [2]
now move for summary judgment on twelve grounds: (1)
failure to exhaust administrative remedies; (2) vagueness
of claims; (3) the absence of evidence of excessive force; (4) the
absence of personal involvement by defendant Flemming; (5)
the absence of evidence of deliberate indifference to plaintiff's
medical need; (6) the absence of evidence of failure to protect
plaintiff; (7) the absence of evidence of personal involvement
by defendants Horn, Walsh, or Curcio; (8) the absence of
evidence of municipal liability; (9) the failure of emotional
injury claims due to lack of physical injury; (10) the legal
unrecognizability of a denial of gay or female housing claim;
(11) qualified immunity; and (12) the inappropriateness of
continuing to hear the state and city law claims which pend
to the dismissed federal claims.

1        Defendants filed a Suggestion of Death on July
1, 2008 for named defendant Ronald Flemming.
Neither party substituted Mr. Flemming's estate
pursuant to Federal Rule of Civil Procedure 25(a)
(1) within the requisite 90 days. Additionally,
defendants filed an affidavit by C.O. Flemming
dated March 21, 2008 in which he stated that he had
never seen plaintiff. Further, defendants submitted
the employment records of two other corrections
officers, Capt. Joseph Turner and C.O. Michele
Turner, as well as C.O. Flemming's records
showing that although plaintiff alleged that all three
were involved in an attack of her, none of them
ever worked in the same facility at the time of the
alleged attack. Despite this evidentiary showing in

support of defendants' summary judgment motion, plaintiff never sought any relief under Federal Rule of Civil Procedure Rule 56(f) in order to depose C.O. Flemming or the other officers in an effort to rebut this evidence. Nor had plaintiff sought to depose C.O. Flemming or any other defendant during the two years this case was pending before the defendants moved for summary judgment. C.O. Flemming was dismissed from this action in the Court's November 19, 2008 Order, well after the 90 day period for substitution had expired. Plaintiff sought to reargue Mr. Flemming's dismissal and was granted an opportunity to explain her failure to meet the ninety day deadline and how she could succeed on her claim against Flemming even if the ninety day substitution requirement was excused. Plaintiff's submission did not provide a persuasive argument supporting either excusable neglect for failing to substitute Mr. Flemming or a conclusion that plaintiff could prevail at trial against Mr. Flemming. We also had concerns about the equity of permitting plaintiff to proceed against an estate when plaintiff had not taken discovery which would have preserved the defendant's testimony. Consequently, the Court denied plaintiff's motion to seek relief from its November 19, 2008 Order in an Order dated December 3, 2008.

2    Though other individuals were named in this lawsuit by plaintiff, plaintiff either failed to serve or identify them. Since 120 days has long past since the filing of this complaint, all defendants, excluding those named in Defendants' Motion for Summary Judgment are dismissed without prejudice and claims brought against them are not addressed in this opinion. There may, of course, be statutes of limitations bars which would alone preclude such claims.

For the reasons set forth below, defendants' motion is granted.

## Background

### I. Plaintiff's Allegations

Plaintiff was incarcerated at Rikers Island fourteen times between August 17, 2001, and July 7, 2008. [3]

3    The dates of her incarcerations within the statute of limitations are as follows: December 10-13, 2002; March 21-26, 2004; April 17-22, 2004; September 11-24, 2004; and June 16-17, 2005. Defendant was previously incarcerated on August 17-22, 2001, January 8-22, 2002, April 11-15, 2002, and has since been incarcerated at least six times, most recently from April 17 through July 7, 2008.

Plaintiff's complaint contains a host of claims. Broadly, defendant claims that each time she was incarcerated, she was required to be housed with male inmates, not allowed to wear female clothing, not given or given improper dosages of female hormones or testosterone blockers, subjected to verbal harassment and physical assault by defendant correction officers, and not protected from other inmates. (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Opposition") at 2-3.) She also claims to have suffered Post-Traumatic Stress Disorder and offers this as an explanation for failing to provide dates and details about the incidents she alleges in her deposition testimony. (Id.)

*2   Plaintiff fails to provide specific dates for many of these assaults and oftentimes makes accusations against unnamed defendants or officers who were not served in this case.

Specifically, despite her allegations of assaults and failures to provide medical care, plaintiff did not identify many of the corrections officers and doctors who allegedly committed the alleged wrongs. In an effort to assist plaintiff in remedying this glaring deficiency, the Court ordered the city to gather photographs of corrections officers and medical personnel whose paths plaintiff might have crossed. Thereafter, the City proceeded to take plaintiff's deposition and presented her with an array of photographs of corrections officers and medical staff to assist her in identifying the officers and doctors she intended to sue. This deposition occurred on August 28, 2006. Following this lengthy process, which included at least four time extensions from the Court, plaintiff identified some of the defendant corrections officers, for whom the city then accepted service. Others, including Defendant Flemming, were served on the basis that they were the only officer with that particular name who worked in a facility where plaintiff was housed. Another two depositions occurred on July 10, 2007, November 16, 2007. After plaintiff's depositions were concluded, plaintiff did not depose any defendants, despite numerous extensions of the discovery period. In total, this process lasted approximately one and a half years. Thus, the pretrial record is limited to plaintiff's complaint, her

deposition, and the document discovery, including some of plaintiff's medical records.

On March 21, 2008, defendants moved for summary judgment.

## Discussion

### I. Legal Standard

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "Summary judgment is proper if, viewing all the facts of the record in a light most favorable to the non-moving party, no genuine issue of material fact remains for adjudication." *Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir.1996) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The movant has the burden of demonstrating that no genuine issue of material fact exists. *Adams v. Department of Juvenile Justice of the city of New York,* 143 F.3d 61, 65 (2d Cir.1998). Such disputes exist "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.1997) (quoting *Anderson,* 477 U.S. at 248). If the movant meets this burden, the non-moving party must "adduce 'significant probative supporting evidence' demonstrating that a factual dispute exists." *Yearwood v. LoPiccolo,* No. 95 Civ. 2544(DC), 1998 WL 474073 *3 (S.D.N.Y. Aug.10, 1998) (*citing Dzaba v. Haythe & Curley,* No. 84 Civ. 1767(JFK), 1996 WL 31156 *2 (S.D.N.Y. Jan.26, 1996) (quoting *Anderson,* 477 U.S. at 249). Additionally, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City Department of Corrections,* 84 F.3d 614, 619 (2d Cir.1996).

### II. Analysis

#### A. Failure to Exhaust Administrative Remedies

**\*3** Defendants initial position is that plaintiff failed to exhaust her administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), which provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

To satisfy the PLRA in this jurisdiction, an inmate must exhaust all steps of the New York City Department of Corrections' ("DOC") well-established five-step administrative Inmate Grievance Resolution Program ("IGRP") prior to filing his or her complaint. At Rikers, this process requires an aggrieved inmate to (1) file a complaint with the Inmate Grievance Review Committee ("IGRC"), (2) request a formal hearing before the IGRC, (3) appeal to the facility warden, (4) appeal to the DOC Central Officer Review Committee ("CORC"), and (5) appeal to the Board of Correction ("BOC"). *See* 7 NYCRR § 701.

The inmate must file his or her complaint within twenty-one days of the alleged grievance. *See* 7 NYCRR § 701.5(a)(1) ("An inmate must submit a complaint to the clerk within twenty-one (21) calendar days of an alleged occurrence on an Inmate Grievance Complaint Form (Form # 2131). If this form is not readily available, a complaint may be submitted on plain paper.") Courts have held that complaints submitted after the appropriate date are time-barred. *Wright v. Morris,* 111 F.3d 414, 417 n. 3 (6th Cir.1997) ("It would be contrary to Congress's intent in enacting the PLRA to allow inmates to bypass the exhaustion requirement by declining to file administrative complaints and then claiming that administrative remedies are time-barred and thus not then available.").

Here, plaintiff never spent more than fourteen days in prison during the five times relevant to this complaint. Once she left prison, plaintiff was not required to exhaust her administrative remedies under the PLRA because she was not a prisoner under the language of the Act. *Greig v. Goord,* 169 F.3d 165 (2d Cir.1999) (holding that litigants who file prison condition actions after release from confinement are no longer prisoners for purposes of 42 U.S.C. § 1997e(a) and thus do not need to satisfy its exhaustion requirements). *See also Mabry v. Freeman,* 489 F.Supp.2d 782, 784 (E.D.Mich.2007) (holding that "the PLRA's exhaustion requirement [does not] appl[y] to a former prisoner whose claim arose while he was incarcerated").

Defendants rely on *Berry v. Kerik,* 366 F.3d 85 (2d Cir.2003), for the proposition that plaintiff was required to file grievances while at Rikers and that plaintiff's failure to

2009 WL 229956

file grievances warrants the case's dismissal with prejudice. However, the *Berry* case is inapposite for two fundamental reasons. First, unlike the plaintiff here, Berry was in jail at the time he filed his complaint. Second, plaintiff was never in jail for a period greater than the length of time that an inmate has to file a grievance, i.e. for twenty-one days after any of the alleged incidents. Often, plaintiff was incarcerated for just a few days and never more than fourteen. In contrast, Berry remained in jail for more than twenty-one days after the relevant incidents alleged in his case and oftentimes for months afterward. Therefore, Berry could have filed his grievances while in jail within twenty-one days.

**\*4** Thus, we hold that plaintiff did not need to exhaust her administrative remedies under the grievance procedure because (1) she was released from jail before the 21-day time limit had elapsed and (2) once she was released from jail, she was not a "prisoner" subject to the PLRA. Summary judgment on the issue of exhaustion is therefore denied.

### B. Vagueness

Defendants argue that plaintiff's claims of excessive force and deliberate indifference to her medical needs are vague since plaintiff failed to provide sufficient evidence or testimony specifying the names of defendants involved in the alleged conduct, dates and times of the events, and factual details. Whatever might have been the merits of this argument at the initial pleading stage, the vagueness issues-or the lack thereof-in the original complaint are subsumed by the more rigorous standard of summary judgment. The degree of specificity of plaintiff's complaint will be one factor we consider as we address the sufficiency of her claim to withstand defendant's summary judgment motion.

### C. Plaintiff's Substantive Claims

Plaintiff does not specify in her pleading or otherwise precisely which claims she is bringing against which named defendants. Thus, we have searched plaintiff's complaint and deposition to extract the allegations against each defendant. We have found it helpful to group plaintiff's claims according to the occupation of defendants. We also set out the relevant legal standard before addressing the claims defendant by defendant.

#### i. Claims against Officer Defendants

The bulk of the claims alleged against the correctional officers named in this action involve claims of excessive force. The Eighth Amendment, applied to the States through the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishment. *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000).[4] "The core judicial inquiry" for claims of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Jean-Laurent v. Wilkinson,* 540 F.Supp.2d 501, 508 (quoting *Hudson v. McMillian,* 503 U.S. 1, 7-8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). There is an objective and subjective component to this inquiry. *Id.* The objective component is met if it is "shown that the deprivation alleged is objectively sufficiently serious or harmful enough." *Jean-Laurent,* 540 F.Supp.2d at 509 (citing *United States v. Walsh,* 194 F.3d 37, 50 (2d Cir.1999)). "[T]he victim does not [have to] suffer serious or significant injury provided that the amount of force used is more than de minimis, or involves force that is repugnant to the conscience of mankind." *Id.* The subjective component requires that a defendant has a "sufficiently culpable state of mind ... shown by actions characterized by wantonness." *Walsh,* 194 F.3d at 49 (citing *Hudson,* 503 U.S. at 20). However, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973).

4    The same standard of law applies to excessive force claims brought under the Fourteenth Amendment by pre-trial detainees and under the Eighth Amendment by sentenced prisoners. *United States v. Walsh,* 194 F.3d 37, 48 (2d Cir.1999).

#### a. Capt. Kevin Buck

**\*5** Plaintiff does not allege, in her Complaint or her Opposition, excessive force or deliberate indifference to plaintiff's medical need or safety by defendant Buck. In fact, plaintiff does not allege anything at all against defendant Buck. One short reference to defendant Buck was found in Plaintiff's November 16, 2007 Deposition:

> Physical, there is the time in the clinic where I was instructed after Captain Buck ordered me to go to the clinic because I was having chest pains and I needed my hormones as well. That's the time where I got-oh, shit, excuse me-well, one of the photographs I just remembered where I saw one of the

Lopez v. City of New York, Not Reported in F.Supp.2d (2009)

2009 WL 229956

women from and she was in the clinic
that day.

(Pl. Nov. 16, 2007 Dep. at 42.) Nothing here provides any
evidence that Capt. Buck violated any of plaintiff's federal
or constitutional rights. Consequently, we grant summary
judgment in favor of defendant Buck on all grounds.

*b. CO. Theresa John*
Plaintiff does not allege, in her Complaint or her Opposition,
any specific excessive force or deliberate indifference by
Theresa John. She in fact does not make any specific
allegations against C.O. John.

In her deposition, plaintiff states:

Q: Do you know that person's name?

A: I do, CO. John-do you realize you have her name.
Anyway, I could tell you she was the steady A officer
in C-73 gay housing. Horrible to transgender inmates,
absolutely positively horrible. She infracted an ex-
boyfriend of mine for touching me on the shoulder when
we were in Rikers Island. Threatened inmates, she would
call other C.O.'s to harm them. Just really the creme of the
creme of the batch. She is really bad.

Q: Did she ever physically touch you?

A: No she did not.

Q: Did she ever witness anyone physically touch you?

A: Yes?

Q: Who did she witness physically touch you?

A: There was a search that occurred while on her shift
and I was in the middle of a confrontation with one of the
officers and she wasn't one because, you know, they come
with a team of them. She wasn't in their team, she is a
steady officer, but when the male officer was in front of
me, he nudged my head and pushed me in the cell. She was
standing right there, that's when they closed the cell and
the search was over. I had indicated to her that I wanted to
speak to a captain. She has an accent and she replied just
real nasty, "you are not seeing an F'in captain, I run this"
and blah blah blah.

(Pl. Nov. 16. Dep. at 31-32.) She additionally makes a claim
that a CO. John or Johnson was "verbally abusive." (Pl. Aug.
28, 2006 Dep. at 11.) We will assume that these references are
to the same person for the purposes of this summary judgment
motion. No dates were given for either incident.

As plaintiff acknowledges that C.O. John never physically
touched her, there is no basis, as a matter of law, for plaintiff
to maintain an excessive force claim against her. However,
some portions of plaintiff's deposition could be construed to
suggest the possibility that defendant John was deliberately
indifferent to alleged excessive force by the male corrections
officers. This claim fails for two reasons. First, the facts
alleged by plaintiff above do not make out a cognizable
excessive force claim. Second, assuming, *arguendo,* that the
unidentified male corrections officer's "nudge" and "push"
was excessive force, defendant John cannot be held liable for
the unidentified officer's actions.

**\*6** First, plaintiff's recounting does not allege facts to sustain
a conclusion that the male officers used force "maliciously
and sadistically to cause harm," rather than "in a good-faith
effort to maintain or restore discipline." *Hudson v. McMillian,*
*503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).* Further,
as plaintiff alleges no injuries resulting from the unidentified
male officer's alleged force, any harm is simply not serious
enough to reach a constitutional dimension. *See Roman v.*
*Howarth, 998 F.2d 101, 105 (2d Cir.1993); see also Boddie v.*
*Schnieder, 105 F.3d 857, 862 (2d Cir.1997).*

Second, while as a general rule, a law enforcement official
can be held liable for failing to intervene in a situation where
excessive force is being used, the absence of excessive force
and the circumstances as recited by plaintiff preclude such
a finding here. *Jean-Laurent v. Wilkinson, 540 F.Supp.2d*
*501, 512* (citing *O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d*
*Cir.1988)*). "Liability may only attach when (1) the officer had
a realistic opportunity to prevent the harm; (2) a reasonable
person in the officer's position would know that the victim's
constitutional rights were being violated; and (3) the officer
does not take reasonable steps to intervene." *Id.* (citations
omitted). Here, defendant John would not have had a realistic
opportunity to prevent the unidentified male officer's "nudge"
or "push" of plaintiff. The event, although vague, described is
brief and does not approach the sort of repetitive beating that
could give rise to an opportunity for defendant to intervene.

Consequently, there are no facts upon which a reasonable jury
could find in favor of plaintiff for any of the claims she brings

2009 WL 229956

against defendant John, and, accordingly, summary judgment is granted in favor of C.O. John.

### c. Captain Robin Walker

Plaintiff's complaint does not allege any excessive force or deliberate indifference claims against defendant Walker. Contradictory references about a Captain Walker are made in Plaintiff's depositions at various times. Defendant identified someone in a photo lineup marked D-34 as Captain Walker. (Pl. Nov. 16, 2006 Dep. at 24). Among the defendants sued is Captain Robin Walker. Plaintiff identified photo D-34 as Captain Walker during her deposition. However, plaintiff had nothing negative to say about the Captain Walker she identified. Indeed, Plaintiff's description of this individual was entirely positive. Plaintiff notes that this Captain Walker never touched her and describes this Captain Walker as "exceptionally professional." (*Id.* at 24-25). Later, she describes a Captain Walker who allegedly ignored plaintiff while her male cell-mates threw shoes at her and "jumped" her. (*Id.* at 43-45.) Plaintiff explains this contradictory evidence by stating that "[i]t would appear that one of the ACCs [Assistant Corporation Counsels] who handled this case identified the wrong Capt. Walker." (Pl. Resp. to Defs.' Local Rule 56.1 Statement ¶ 14.) However, despite being provide the opportunity to do so, at no time does plaintiff clarify which Capt. Walker, if Robin Walker is in fact either of them, she alleges wrongdoing against. Furthermore, plaintiff fails to make clear when this incident with Captain Walker occurred. Plaintiff does state that the Captain Walker identified by the ACC's is the "wrong Capt. Walker." Thus, plaintiff acknowledges that Robin Walker is not the Walker alleged to have witnessed plaintiff's alleged injuries. On the facts present in the record, even taken in a light most favorable to plaintiff, no reasonable jury could hold Robin Walker liable for any violation of plaintiff's federal or constitutional rights.

### d. George Johnson

**\*7** Plaintiff's allegations against defendant Johnson are as follows:

Q: D11, do you recognize that person?

A: Yes, Johnson.

Q: and can you tell me whether that individual ever touched you physically?

A: Yes.

Q: And can you tell me if it was during the period relevant in the complaint that is December of or rather August of 2001 through June of 2005?

A: Yes

Q: And can you tell me how he touched you?

A: There were more than one incidents [sic]. He smacked me on the back of my head, he pulled my hair, there is more than one incident. I would not like to go over the details if possible.

Q: We need to go over the details.

A: Well, I have known CO. Johnson since my first trip Rikers Island. [5] He studied the school area and escorted the prisoners that were in gay housing. The first time I-well, the first time he ever put his hands on me was on my way back from school at 3:00 in the afternoon. I don't recall the date of the incident or the month, but I remember there was a group of us ... someone made a comment about another male C.O. being attractive and he started from the back of the line and hit everybody on the back of the head with an open hand.

[5]     Defendant's first trip to Rikers Island was outside of the time period relevant for this proceeding.

Q: Did you suffer physical injury from that incident?

A: Pain to the back of my head.

Q: Any other physical injury?

A: No.

Q: And then the next incident you can recall? ...

A: [ ... ] me and this officer ended up getting into an argument after the principal placed me in a classroom with derelict inmates.

They jumped me and I brought this to the officer's attention when they did jump me, I brought up the fight-physically he slapped me to the ground, he slammed me on the back of the head. After this incident they were told to bring me to medical for a post injury report and on the way to medical, as I was explaining to this officer that they just failed to protect me and they had placed me in an unsafe situation, he proceed to punch me in the

back of the head, to pull my hair. He struck me more physically, but the actual specifics I can't recall right now and the injuries I sustained were a lot of pains [sic] in the back of the head and whiplash to the neck.

Q: any other injuries you can recall at that second incident you described?

A: No.

Q: Is there a third incident involving this particular officer?

A: Yes.... I was in the middle of a confrontation, a verbal dispute with an officer and he heard it and he came over to inject his two cents and I got smart with him and he smacked me.... I had pain to my mouth and I believe possibly an abrasion to the inside of my mouth, you know, mostly the guards are smart enough not to leave marks on inmates.

(Pl. Nov. 16, 2007 Dep. at 9-13.) Plaintiff alleges three physical incidents with Officer Johnson. Each of these alleged incidents involving Officer Johnson will be examined in turn.

The first incident described appears to be outside the limitations period as plaintiff stated that she had known Officer Johnson since her first time in Riker's, a date which clearly precedes the limitations period. However, given the possible ambiguity in the questioning, we will assume, for the purposes of this summary judgment motion, that all the incidents happened within the relevant time period.

**\*8** Regardless, the first incident as described fails, as a matter of law, to state facts that could support a claim of excessive force. Plaintiff alleges that defendant Johnson struck her, and a number of other inmates, in the back of the head. The only injury plaintiff claims is "pain in the back of my head." (Pl. Nov. 16, 2007 Dep. at 10.) It is settled in this district that an open-handed slap on the back of the head, with no medical evidence and no other evidentiary support of injury, does not rise to the level of a constitutional violation. *See Santiago v. CO. Campisi,* 91 F.Supp.2d 665, 674 (S.D.N.Y.2000) (holding that an open-hand slap does not rise to the level of excessive force); *Boddie,* 105 F.3d at 861; *Johnson v. Renda,* No 96 Civ. 8613, 1997 WL 576035 at \*1 (S.D.N.Y. Sep.15, 1997) (holding that a single slap to plaintiff's face does not amount to a constitutional violation). Not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson,* 403 U.S. at 9. Plaintiff's third allegation, that defendant Johnson smacked her and

possibly caused an abrasion to the inside of her mouth, fails for the same reason.

Plaintiff's description of the second incident initially appears more substantive, but on closer examination it still fails for lack of evidence. First, it is unclear which allegations in particular are against Officer Johnson, as it seems that two different officers were involved. Assuming, *arguendo,* that the officer who "slapped" defendant to the ground and "slammed" her head is the same officer that punched her and pulled her hair, there is still not enough evidence of physical injury to maintain an excessive force claim. Plaintiff does not point to any medical evidence attributing any of these injuries related to the officers, despite stating that she was further assaulted on her way to medical, apparently as a result of an attack by other inmates. (Pl. Nov. 16, 2007 Dep. at 11.) Nor does plaintiff provide a timeframe for any of these incidents. Further, plaintiff never made any effort to corroborate any of these assaults by deposing defendant Johnson (or defendant Patterson, who plaintiff alleges in her Declaration witnessed these incidents). (Lopez Decl. at ¶ 20.) The absence of allegations and evidence of injury, as we have noted above, precludes a plaintiff from prevailing on such a claim.

For example, in the *Vatensever* case, the plaintiff alleged that a corrections officer slammed his head into a wall. *Vatansever v. New York City,* No. 01 Civ. 11621, 2005 WL 2396904 \*1 (S.D.N.Y. Sept.28, 2005) (WHP) (granting summary judgment when plaintiff could provide no medical evidence of injuries). Though not as serious as the assault alleged by the plaintiff in the *Vatensever* case, we would also expect to find evidence of physical injury if an assault on plaintiff, involving being slapped to the ground and slammed on the back of the head, as well as having her hair pulled and being punched in the back of the head, occurred, particularly if all of these assaults happened as plaintiff traveled to a medical evaluation. *Id.* at \*3. However, plaintiff's "voluminous" medical records are devoid of any support for these alleged incidents. *Id.; see also United States v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) ("The litigant opposing summary judgment ... may not rest upon mere conclusory allegations or denials as a vehicle for obtaining a trial. Rather, he must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful.") (internal quotation and citation omitted). Consequently, summary judgment is granted in favor of defendant Johnson.

Case 9:17-cv-00366-DNH-TWD   Document 93   Filed 03/08/21   Page 335 of 353
Lopez v. City of New York, Not Reported in F.Supp.2d (2009)
2009 WL 229956

### e. Captain Ellen Patterson

**\*9** Plaintiff makes two allegations against Captain Ellen Patterson. First, she claims that Captain Patterson assaulted her by hitting her in the face with keys; and second, she claims that defendant Patterson witnessed her being attacked by defendant Johnson and failed to intervene.

The first incident is described as follows:

A: [ ... ] It's C-74 in the school area in the morning time. Captain Paterson and the principal both struck me with keys in the facial area while I was sitting in orientation class and that left marks on my face....

Q: So when you say someone hit you with keys in your face?

A: I was sitting there, they both had keys, Captain Patterson and Principal Jefferson both had keys. Jefferson's were longer, Patterson's were on like a ring around her belt and I was sitting at my desk and they are like-first Captain Patterson and I had a problem the day before, we had gotten into an argument and I wanted to complain about something.

I don't recall what she said to me, but she slammed keys on my face, not slammed, they was [sic] provoking me to get into it with her. She nudged me and hit me with the keys and then Jefferson came out. She was actually more open about assaulting me than Patterson. They were both-again, I don't recall what they were saying, I was much younger, but they swung the keys and it hit me in the face.

Jefferson made it seem more like an accident, "oh, I'm sorry" and that's where she sent me-ordered me into a certain classroom, even though I excelled in the class.

(Pl. Nov. 16, 2007 Dep. at 40-41.) In their moving papers on their motion for summary judgment, defendants argue that plaintiff's claims against Captain Patterson were vague and that the alleged injury ("left marks on my face") was insufficient. Apparently recognizing the force of defendant's position, plaintiff countered with a declaration asserting that she also received "a bump on my head" from the incident. (Lopez Decl. at ¶ 17.) As noted above, factual issues created solely by an affidavit crafted for the purposes of opposing a summary judgment motion do not raise issues of material fact. *Neidich v. Estate of Neidich,* 222 F.Supp.2d 357, 368 (S.D.N.Y.2002) (CM).

Consequently, the issue presented is whether the incident as originally described in plaintiff's deposition is sufficient to state a claim for excessive force. We assume, *arguendo,* that there was some contact between Patterson's keys and plaintiff's face.

However, in the absence of any evidence of injury and without any supporting medical records, the incident with the keys does rise to the level of a constitutional violation. *See Santiago,* 91 F.Supp.2d at 674; *Yearwood,* 1998 WL 47 4073 at *7; see also Roman,* 998 F.2d at 105; *Boddie,* 105 F.3d at 862.

Plaintiff also raises for the first time in her opposition declaration that defendant Patterson witnessed the assault, described above, by defendant Johnson. Lopez Decl. at SI 20. Curiously, there is no mention of defendant Patterson's involvement in the Johnson incident in plaintiff's deposition testimony, either as she spoke about Johnson or about Patterson. As noted *supra,* parties cannot create new factual disputes in response to a motion for summary judgment. *Hayes,* 84 F.3d at 619 (2d Cir.1996). Consequently, this claim against defendant Patterson is also dismissed and summary judgment is granted in favor of defendant Patterson.

### f. Delores Jefferson

**\*10** As defendant Jefferson's involvement in the alleged incident involving plaintiff's contact with defendant's keys is legally indistinguishable from defendant Patterson's involvement, for the reasons stated above, summary judgment is granted in favor of defendant Jefferson.

### g. Plaintiff's claim for emotional distress

As plaintiff has not shown any issues of material fact sufficient to survive summary judgment on her excessive force claims, her claims for emotional injury are dismissed. 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."); *Cox v. Malone,* 56 Fed. Appx. 43, (2d Cir.2003) ("Cox had failed to show malicious intent on the part of Simms or anything more that *de minimis* physical injury in connection with his Eighth Amendment claim, as required by the Prison Litigation Reform Act, 42 U.S.c. § 1997e(e)").

### ii. Claims against Drs. Kaw Aung and Jane San Jose

Plaintiff endeavors to assert claims of deliberate indifference to plaintiff's medical needs in violation of the Eighth Amendment to the Constitution against Drs. Aung and San Jose.

The two-prong test for deliberate indifference to medical need is well established. *See, e.g., Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000). First, a plaintiff must show that she has a "serious medical condition," and second, she must show that the medical condition was met with "deliberate indifference." *Id.* As the Second Circuit did in *Cuoco,* we assume, for the purposes of this summary judgment motion, that transexualism or Gender Identity Disorder (GID) is a serious medical condition that satisfies the first element of this analysis. *Id.*

To establish deliberate indifference, "a plaintiff must show 'something more than mere negligence.' " *Id.* at 106-107 (quoting *Weyant v. Okst,* 101 F.3d 845, 856 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994))). However, "proof of intent is not required, for the deliberate-indifference standard 'is satisfied by something less than actions or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Id.* at 106-107. "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Chance v. Amrstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Farmer,* 511 U.S. at 837). Even medical malpractice is not deliberate indifference, unless it rises to the level of recklessness. *Id.* at 703.

The medical indifference claim is centered on plaintiff's claim that she was denied hormone therapy during some of her incarcerations at Rikers. To place the claim in a temporal perspective, it should be noted that plaintiff was incarcerated for four days in December 2002, six days in March 2004, six days in April 2004, fourteen days in September 2004, and thirteen days in June 2005. Consequently, any possible denial of hormones could have been at most for a period of no more than two weeks.

**\*11** To further contextualize this claim, it should be noted at the onset that plaintiff acknowledges that she was given hormones "most of the time." (Pl. July 10, 2007 Dep. at 38.) Plaintiff further testified that she was provided hormones during her ARDC incarcerations that occurred prior to her eighteenth birthday. (See Pl. July 10, 2007 Dep. at 38-39.) These include the March 2004 and April 2004 incarcerations.

Moreover, the medical records submitted with defendant's summary judgment motion contain numerous references to plaintiff receiving her medication and/or treatment. Bates numbered document 301 provides evidence that plaintiff was given "Conjugated Estrogens" on December 11-12, 2002. (*See also* Bates 434-35, 446 (indicating that plaintiff was given the hormone Premarin during her December 2002 incarceration)). The plaintiff also refused psychiatric treatment from a social worker during this visit, since the social worker was not a "psychotherapist." (Bates 444-45, 449 .) Plaintiff also was given hormone treatment in April 2004, (Bates 00356-64) and June 2005. (Bates 305, 475.)

Thus, the only period of incarceration for which plaintiff could claim a lack of hormonal treatment is that of September 2004. While defendant points to Bates 261 as showing evidence of no treatment, this document includes the words "Shots for breast" on its face. (Bates 261.) The entry would appear to indicate hormonal treatment and plaintiff has provided no medical evidence to the contrary. Plaintiff never deposed anyone and defendant provides no evidence of whether or not this refers to treatment. Nor has plaintiff linked this document to either doctor named as a defendant.

To the extent that plaintiff's claim is not read as asserting a total denial of hormonal treatment but as a claim that the levels of hormones prescribed to plaintiff while at Rikers were insufficient to treat her condition, we note that plaintiff has neither submitted nor adduced any medical testimony to support such a claim. Such a claim cannot proceed without medical support. Nor has plaintiff adduced any testimony or submitted any evidence that the doctors at Rikers prescribed these doses with the requisite deliberate indifference or claimed that defendant doctors knew of and disregarded "an excessive risk to inmate safety," or that prescribing these drugs in lower doses posed a risk of substantial harm to plaintiff. *Chance,* 143 F.3d at 702 (2d Cir.1998); *see also Murray v. U.S. Bureau of Prisons,* 106 F.3d 401 (Table), 1997 WL 34677 at \*3 (6th Cir.1997) ("However, where, as here, the prisoner is receiving treatment, the dosage levels of which are based on the considered professional judgment of a physician, we are reluctant to second-guess that judgment.")

Further, even assuming that plaintiff had supported her claims concerning hormone therapy with evidence, it is worth noting that plaintiff does not necessarily have the right to require

Lopez v. City of New York, Not Reported in F.Supp.2d (2009)

2009 WL 229956

the prison to duplicate the private treatment she may have received, and that she was offered psychological therapy which she declined. (Bates 444-45, 449.); *see Murray*, 1997 WL 34677 at *3-4. ("It is important to emphasize, however, that [the plaintiff] does not have a right to any particular type of treatment, such as estrogen therapy.... [G]iven the wide variety of options available for the treatment of gender dysphoria and the highly controversial nature of some of those options, a federal court should defer to the informed judgment of prison officials as to the appropriate form of medical treatment."). While a total denial of hormone therapy to a prisoner for an extended period of time might rise to the level of deliberate indifference, nothing in the record of this case supports an allegation.

 *12  In sum, the record of the plaintiff's medical treatment during her numerous, short incarcerations simply does not demonstrate any denial of medical care due to deliberate indifference from doctors or that the treatment provided posed a substantial risk of serious harm. To the contrary, the documentary record provides ample evidence that plaintiff was provided with extensive treatment.

Furthermore, even if plaintiff had sustained her broad claims, she has failed to connect those broad claims to the two doctors named as defendants. For example, plaintiff points to Bates numbered document 472 to establish that she was given less than the dosage recommended by her attending physician. However, this document is signed by Marshall Tse, MD, not a named defendant. Personal involvement of defendants is required to assess damages under § 1983. *Gaston v. Coughlin*, 249 F.3d 156, 165 (2d Cir.2001). Consequently, summary judgment is granted in favor of both defendant Aung and San Jose dismissing plaintiff's claims of medical indifference.

### iii. Claims against Commissioner Martin Horn, Warden Patrick Walsh, and Warden Peter Curcio

Plaintiff does not allege any physical contact by defendants Commissioner Horn, Warden Walsh, or Warden Curcio ("Horn defendants"). Rather, plaintiff alleges that the Horn defendants were involved in "formulating, ratifying, adopting, and/or implementing the policies and procedures that resulted in the violation of her constitutional rights." (Opposition at 23.)

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Moffit v. Town of Brookfield*, 950 F.2d

880, 885 (2d Cir.1991). A defendant in a supervisory position may be found to be personally involved in several ways:

> The defendant may have directly participated in the infraction.... A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong.... A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue.... Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event....

*Wright v. Smith*, 21 F.3d 496, 502 (2d Cir.1994) (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir.1986)). Additionally, supervisory liability could attach when an official shows "gross negligence" or "deliberate indifference" to the "constitutional rights of inmates by failing to act on information indicating that unconstitutional practices are taking place." *Id* . (citing *McCann v. Coughlin*, 698 F.2d 112, 125 (2d Cir.1983)).

Plaintiff claims that defendants violated the Fourteenth Amendment by: (1) refusing to allow her to wear female clothing or undergarments, (2) housing plaintiff with male inmates and denying her gay housing, and (3) placing her, without cause, in a classroom with inmates with disciplinary problems. [6] Plaintiff has not established which policies or customs, if any, the Horn defendants have violated. Even if we assume that there are policies in place that were being enforced here, plaintiff does not articulate any actionable violations of those policies or that those policies lack a rational basis, which both parties concede is the applicable standard of review. Thus, each of these claims fails to state a claim under the Fourteenth Amendment and consequently summary judgment is granted in favor of the Horn defendants.

[6]      Plaintiff also alleges "bias-based assault" but does not point to any policy or give any evidence of a

custom of such assaults that would subject the Horn defendants to liability under § 1983.

### a. Refusal to allow plaintiff to wear female clothing

**\*13** As plaintiff points to no court decision that has found transgender individuals a protected class for the purposes of Fourteenth Amendment analysis, and the Court has found none, her claims that she was subjected to discrimination based on her status as transgender are subject to rational basis review.[7] Though plaintiff does not point to any clothing policy utilized at Rikers, we assume for the purposes of this opinion that some policy exists.

[7] The Ninth Circuit in *Gomez v. Maass,* 918 F.2d 181 (9th Cir.1990), held that a transsexual is not a member of a suspect or quasi-suspect class entitled to greater than rational basis scrutiny under t he equal protection component of the due process clause. The Ninth Circuit in *Holloway v. Arthur Andersen & Co.,* 566 F.2d 659, 664 (9th Cir.1977), explained that transsexualism is not a suspect class when plaintiff claimed "to have [been] treated discriminatorily [not] because she is male or female, but rather because she is a transsexual who chose to change her sex."

Plaintiff also does not point to any authority that suggests that a transgender prisoner has the right to choose the clothing she wears while in prison. In fact, as a general matter, federal courts have in fact held the opposite. *Murray,* 1997 WL 34677 at \*2 (prisoner officials do not violate the Constitution by providing ill-fitting or aesthetically unpleasing clothing); *Knop v. Johnson,* 667 F.Supp. 467, 475 (W.D.Mich.1987), *appeal dismissed,* 841 F.2d 1126 (6th Cir.1988). Further, several rational bases, ranging from a desire to maintain order in prisons through having uniforms to disallowing plaintiff from signaling female sexuality in a male prison readily come to mind. Thus, plaintiff has failed to establish a claim arising from any clothing policy alleged under the Fourteenth amendment.

Further, assuming, *arguendo,* that some constitutional violation was found, the Horn defendants would certainly be qualifiedly immune. In the absence of any case law upholding a claim that a transgender prisoner has the right to choose what clothing she will wear, the Horn defendants could not have violated any of plaintiff's clearly established constitutional or federal rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818-19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

### b. Housing Plaintiff with Male Inmates

As noted by the Supreme Court, "the practice of federal prison authorities is to incarcerate preoperative transsexuals with prisoners of like biological sex...." *Farmer,* 511 U.S. at 829. While the Supreme Court did not take this opportunity to comment on the constitutionality of this practice, and we decline to do so here, it clearly did not state any objection to it on constitutional grounds. We note that a number of problems could arise by altering this practice and housing biologically male inmates who identify as transgender with the female population, not the least of which would be concerns for the safety of female inmates, and consequently hold this practice or policy as rational. Further, even if we held this practice unconstitutional, the Horn defendants would be qualifiedly immune for the reasons stated above.

There is another issue present that fits more squarely in the Supreme Court's decision in *Farmer.* Generally, plaintiff contends that defendant's denial of plaintiff's gay housing amounted to deliberate indifference to plaintiff's safety. However, plaintiff cannot maintain this claim. Defendants provide evidence that plaintiff was placed in gay housing or protective custody at each of plaintiff's visits except for a period of three days when plaintiff refused to sign a form indicating she was gay. Plaintiff refutes this evidence by denying that evidence of her housing placements, which includes prison records kept in the regular course of operations marked "protective custody" or "gay/lesbian housing," (*See e.g.,* Bates 244 and 263) supports defendants claims. (Pl. Resp. to Defs.' Local Rule 56.1 Statement at ¶ 44.) Plaintiff does not point the court to any evidence in her deposition or otherwise that these routine business records of her prison stays are inaccurate.

**\*14** Moreover, on the days where plaintiff was placed in general population, nothing in the record indicates that defendant did this with deliberate indifference to plaintiff's safety. In *Farmer,* the Supreme Court writes, "we hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety...." *Farmer,* 511 U.S. at 837. Here, Plaintiff makes no allegations that any prison official deliberately ignored an excessive risk to her safety by placing her in general population for those three days. Consequently, summary judgment is granted in favor of defendants on plaintiff's claim.

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 339 of 353
Lopez v. City of New York, Not Reported in F.Supp.2d (2009)
2009 WL 229956

*c. Placing Plaintiff in a Disciplinary Classroom*

Plaintiff fails to articulate any evidence supporting her argument that she was placed in a disciplinary classroom in violation of her constitutional rights. She neither articulates any policy or custom which resulted in the placement or any constitutional principle that was violated. Beyond the bald allegation that plaintiff was placed in this classroom without cause, plaintiff fails to adduce any evidence about the process by which she was placed in a disciplinary classroom or how that process was in violation of her due process rights. Consequently, summary judgment is granted for defendants on this claim.

### iv. Claims against the City of New York

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). As discussed above, plaintiff argues that unidentified and unnamed policies or customs concerning transgender inmates violate the Constitution. As we have found that these policies do not violate any of plaintiff's rights under the Constitution or federal law, plaintiff cannot sustain a *Monell* claim against the City of New York. Thus, summary judgment is granted in favor of the City.

### D. Pendant: State and City Law Claims

As we have granted summary judgment in favor of defendants on all of plaintiff's federal claims, we decline to exercise supplemental jurisdiction over plaintiff's city and state law claims. 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction ... [if] the district court has dismissed all claims over which it has original jurisdiction"). Consequently, those claims are dismissed without prejudice.

### *Conclusion*

For the foregoing reasons, defendants' motion for summary judgment is granted and the Clerk of the Court is respectfully requested to close this case on the Court's docket.

**\*15  SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 229956

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4517806
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kirk OCHOA, Plaintiff,
v.
Carol DeSIMONE, Inmate Records Coordinator;
D.S.A. Badger; Lt. Santos, Defendants.

Civ. No. 9:06-CV-119 (DNH/RFT).
|
Sept. 30, 2008.

**Attorneys and Law Firms**

Kirk Ochoa, Bronx, NY, pro se.

Andrew M. Cuomo, Attorney General for the State of New York, Senta B. Suida, Esq., Assistant Attorney General, of Counsel, Syracuse, NY, for Defendants.

### DECISION and ORDER

DAVID N. HURD, District Judge.

**\*6** Plaintiff, Kirk Ochoa, brought this civil rights action pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated September 10, 2008, the Honorable Randolph F. Treece, United States Magistrate Judge, recommended that the defendants' motion for summary judgment (Dkt. No. 32) be granted; that plaintiff's retaliation claim be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii); and that the plaintiff's complaint be dismissed. Objections to the Report-Recommendation have not been filed.

Based upon a careful review of the entire file and the recommendations of Magistrate Judge Treece, the Report-Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment (Docket No. 32) is GRANTED;

2. Plaintiff's retaliation claim is DISMISSED; and

3. Plaintiff's complaint is DISMISSED.

The Clerk is directed to enter judgment accordingly and close the file.

IT IS SO ORDERED.

RANDOLPH F. TREECE, United States Magistrate Judge.

### REPORT-RECOMMENDATION and ORDER

**\*1** On January 30, 2006, *pro se* Plaintiff Kirk Ochoa filed this civil rights lawsuit, pursuant to 42 U.S.C. § 1983, alleging that (1) Defendant Carol DeSimone retaliated against him for filing lawsuits and grievances; (2) Defendant Badger violated his due process rights by denying him a legal assistant and the right to call witnesses during a disciplinary hearing; and (3) Defendant Santos violated his rights by ruling against him in a separate disciplinary hearing. Dkt. No. 1, Compl. at ¶ 7. Defendants have filed a Motion for Summary Judgment to which Plaintiff has not responded. Dkt. No. 32, Defs.' Mot. for Summ. J. The original deadline for Plaintiff's response to the Defendants' Motion was February 25, 2008. *See id.* After Plaintiff failed to meet that deadline, on April 4, 2008, this Court issued the following Order:

> Plaintiff shall file and serve any opposition to Defendants' Motion for Summary Judgment on or before May 19, 2008; **Plaintiff is warned that failure to oppose Defendants' Motion will result in this Court accepting the facts set forth by Defendants as true.** *See* N.D.N.Y.L.R. 7.1(a)(3) ("*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*" (emphasis in original)). **Plaintiff is further warned that failure to respond may, if appropriate, result in the granting of Defendants' Motion, in which [case] there will be no trial.** *See* N.D.N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.").

Dkt. No. 33, Order dated Apr. 11, 2008 (emphasis in original).

Because Plaintiff has failed to respond to the Defendants' Motion, we will accept the facts set forth by Defendants as true.

## I. FACTS

At the time of the events alleged in the Complaint, Plaintiff was in the New York State Department of Correctional Services' (DOCS) custody at the Oneida Correctional Facility. Defs.' Mot. for Summ. J., Ex. 3, Statement Pursuant to Rule 7.1 (hereinafter "Defs.' 7.1 Statement"), at ¶ 3. Plaintiff was subsequently released from DOCS custody on September 6, 2007. *Id.* at ¶ 2. The material facts giving rise to Plaintiff's claims are as follows.

On October 26, 2005, Defendant Carol DeSimone filed a Misbehavior Report (hereinafter "October Report") against Plaintiff accusing him of harassment. *Id.,* Ex. B, Misbehavior Rep., dated Oct. 26, 2005. Defendant Deputy Superintendent for Administration John Badger presided as Hearing Officer over the ensuing Disciplinary Hearing, which was held on November 8, 2005. *Id.,* Ex. C, Disciplinary Hr'g Tr., dated Nov. 8, 2005. At the conclusion of the Hearing, Plaintiff was found guilty and sentenced to thirty (30) days in the Special Housing Unit ("SHU") and one month recommended loss of good time. *Id.* at p. 7. Plaintiff appealed Badger's determination and it was reversed on January 13, 2006. *Id.,* Ex. D, Order Reversing Hr'g Decision, dated Jan. 13, 2006.

**\*2** On December 2, 2005, Plaintiff was issued another Misbehavior Report (hereinafter "December Report") for refusal to obey a direct order. *Id.,* Ex. E, Misbehavior Rep., dated Dec. 2, 2005. Defendant Lieutenant Lance Santos presided over Plaintiff's Disciplinary Hearing at the conclusion of which Plaintiff was found guilty and sentenced to thirty (30) days keeplock. *Id.,* Exs. F, Disciplinary Hr'g Tr., dated Dec. 7, 2005 & G, Inmate Disciplinary Hist. Plaintiff did not appeal that decision. *Id.* at ¶ 11.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations,

2008 WL 4517806

unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### B. Due Process Claims

**\*3** Plaintiff asserts that Defendant Badger violated his due process rights by denying him a legal assistant and the right to call witnesses during a disciplinary hearing related to the October Report, and that Defendant Santos violated his rights by ruling against him in a disciplinary hearing related to the December Report.[1] Badger sentenced Plaintiff to thirty (30) days in SHU with a recommended one month loss of good time and Santos sentenced him to thirty (30) days keeplock. Defs.' 7.1 Statement at ¶¶ 6 & 10.

[1]    The basis for Plaintiff's claim against Defendant Santos is not entirely clear. His Complaint states: "Defendant Lt. Santos Hearing Decision informing Plaintiff that these rules apply while not in DOCS custody is a violation of due process of [law][.] DOCS own rule book clearly states that rules only apply in DOCS custody not out side [sic] custody." Compl. at ¶ 7. Because Plaintiff's claim is unclear, we liberally construe it as a due process claim.

In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). Such interests are derived from the Fourteenth Amendment Due Process Clause itself or from state statute or regulations. *Id.*

The Supreme Court has narrowly circumscribed the scope of liberty interests emanating from the Due Process Clause to protect "no more than the 'most basic liberty interests in prisoners.' " *Id.* (quoting *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). Furthermore, "changes in the conditions of confinement having a substantial adverse impact on the prisoner are not alone sufficient to invoke the protections of the Due Process Clause '[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him.' " *Vitek v. Jones,* 445 U.S. 480, 493, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (quoting *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976)).

However, when a prisoner is subjected to conditions that are "unexpected," *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), and "qualitatively different from the punishment characteristically suffered by a person convicted of crime," the Due Process Clause itself confers a liberty interest. *Vitek v. Jones,* 445 U.S. at 493 (holding an involuntary transfer to a state mental hospital implicated a liberty interest protected by the Due Process Clause); *see also Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (finding the Due Process Clause provides a liberty interest in being protected from the involuntary administration of psychotropic drugs).

In the case at bar, Plaintiff's disciplinary confinement in SHU and keeplock does not constitute an "unexpected" change in condition, nor did those conditions exceed the sentence imposed upon him. *See Dawes v. Dibiase,* 1997 WL 376043, at \*4 (N.D.N.Y. July 3, 1997) (citing *Washington v. Harper & Vitek v. Jones* for the proposition that the Due Process Clause will apply by its own force only for deprivations much more severe than solitary confinement for a year). Therefore, Plaintiff does not have a liberty interest in remaining free from SHU confinement emanating from the Due Process Clause itself.

State statutes and regulations may also confer liberty interests to prisoners. *Arce v. Walker,* 139 F.3d at 334 (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. at 460). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. at 484. Thus, a prisoner asserting a denial of due process as a result of segregated confinement or loss of privileges must (1) make a threshold showing that an atypical and significant hardship was imposed upon him, and (2) establish that the "state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

**\*4** While the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard, *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections, *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (stating that confinement in

SHU exceeding 305 days was atypical); *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (finding 305 days of SHU confinement atypical).

In this case, neither of Plaintiff's thirty (30) day stints in SHU and keeplock, without more, [2] constitute an atypical and significant hardship, and therefore Plaintiff has not asserted that he has a liberty interest at stake. *See Sealey v. Giltner,* 197 F.3d 578, 590 (2d Cir.1999) (101 days in normal SHU conditions did not constitute an atypical and significant hardship); *see also Sandin v. Conner,* 515 U.S. at 486; *Thompson v. LaClair,* 2008 WL 191212, at *3 (N.D.N.Y. Jan.22, 2008) (30 days in SHU does not constitute an atypical and significant hardship).

[2]    The Second Circuit has held open the possibility that a period of restricted confinement of less than 101 days could create a liberty interest if the record were to reflect atypical and significant conditions of confinement. *See Colon v. Howard,* 215 F.3d at 232 n. 5. In this case, Plaintiff has adduced no allegations regarding the conditions of his confinement beyond the loss of privileges that normally accompany disciplinary confinement.

Therefore, these claims should be **dismissed** as a matter of law. [3]

[3]    With respect to Plaintiff's due process claim against Santos, Plaintiff failed to appeal Santos's decision and therefore that claim should be dismissed for failure to exhaust administrative remedies as well. *See* Defs.' 7.1 Statement at ¶ 10; 42 U.S.C. § 1997(e)(a) ("No action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.")

### C. Retaliation Claim

Plaintiff asserts that Defendant DeSimone issued the October Misbehavior Report against him in retaliation for his filing "court actions and grievances against [Oneida Correctional Facility] and its staff." Compl. at ¶ 5. The Defendants failed to address this claim in their Motion for Summary Judgment. *See* Dkt. No. 32, Pl.'s Mem. of Law. However, notwithstanding

that omission, under 28 U.S.C. § 1915(e)(2)(B)(ii), this Court has the power to review Plaintiff's Complaint for failure to state a claim *at any time. See, e.g., Zimmerman v. Burge,* 2008 WL 850677, at *7 (N.D.N.Y. Mar.28, 2008) (noting that "even where a defendant has not requested dismissal based on a failure of the plaintiff to state a claim upon which relief may be granted, a district court may, *sua sponte,* address whether a pro se prisoner has failed to state a claim[.]") (citing 28 U.S.C. § 1915(e)(2)(B)(ii)). We find that, even accepting all Plaintiff's factual allegations as true, he has not stated a valid claim § 1983 retaliation claim.

The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove, "first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted). Thus, there must be a "causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

**\*5** A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d at 138-39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). Other factors that can infer an improper or retaliatory motive include the inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by the defendant regarding his motive for disciplining plaintiff. *McEachin v. Selsky,* 2005 WL 2128851, at *5 (N.D.N.Y.

Aug.30, 2005) (citing *Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995)).

Moreover, "in the prison context [the Second Circuit has] previously defined 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (emphasis in original). This objective test will apply even though a particular plaintiff was not himself deterred. *Id.* If the plaintiff can carry that burden, the defendants will still be entitled to summary judgment if they can show, by a preponderance of the evidence, that they would have taken the same action in the absence of the prisoner's First Amendment activity. *Davidson v. Chestnut,* 193 F.3d 144, 148-49 (2d Cir.1999); *see Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

In asserting his retaliation claim, Plaintiff generally states that he filed grievances and lawsuits which formed the basis for Defendant DeSimone's retaliatory Misbehavior Report. The Supreme Court has noted that the right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *See United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967). The Second Circuit has held that within the prison context, "inmates must be 'permit[ted] free and uninhibited access ... to both *administrative and judicial* forums for the purpose of seeking redress of grievances against state officers.' " *Franco v. Kelly,* 854 F.2d at 589 (quoting *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976)) (emphasis and alterations in original).

Fatal to Plaintiff's retaliation claim, however, is his failure to specify what lawsuits or grievances he filed, against whom, and where such were filed. Plaintiff does not indicate that Defendant DeSimone was even aware of any lawsuit or grievance which he may have filed. Therefore, Plaintiff has failed to allege a causal connection between his filing

of grievances and lawsuits and DeSimone's filing of the Misbehavior Report. "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

Therefore, it is recommended that this claim be **dismissed.**

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 32) be **granted;** and it is further

**RECOMMENDED,** that Plaintiff's retaliation claim be **dismissed** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii); and it is further

**RECOMMENDED;** that in light of the above recommendations, Plaintiff's Complaint (Dkt. No. 1) be **dismissed;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

### All Citations

Not Reported in F.Supp.2d, 2008 WL 4517806

**End of Document**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 699273

2008 WL 699273
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

William ESCALARA, Plaintiff,
v.
T. CHARWAND, C.O., et al., Defendants.

No. 9:04-CV-0983 (FJS/DEP).
|
March 12, 2008.

**Attorneys and Law Firms**

William Escalara, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Bruce J. Boivin, Esq., Christopher Hall, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### ORDER

FREDERICK J. SCULLIN, JR., Senior District Judge.

 *1  Presently before the Court is Magistrate Judge David E. Peebles February 19, 2008 Report-Recommendation in which he recommends that defendants' motion for summary judgment dismissing plaintiff's complaint be granted and that plaintiff's complaint be dismissed in all respects, without prejudice as to defendants West, C. Lambard, Baldwin, and J. Roch, but otherwise with prejudice. The Court having reviewed the Report-Recommendation and the entire file in this matter, and no objections to said Report-Recommendation having been filed, the Court

**ORDERS** that the Report-Recommendation of Magistrate Judge David E. Peebles filed February 19, 2008, is for the reasons stated therein, **ACCEPTED** in its entirety and the Court further

**ORDERS** that defendants' motion for summary judgment dismissing plaintiff's complaint is **GRANTED,** and that plaintiff's complaint is dismissed in all respects, without prejudice as to defendants West, C. Lambard, Baldwin, and J. Roch, but otherwise with prejudice, and the Court further

**ORDERS** that the Clerk of the Court is to enter judgment in favor of Defendants and close this case.

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff William Escalera, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this proceeding pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights. In an amended complaint which is both difficult to follow and couched in vague and conclusory terms, plaintiff appears to assert claims of First Amendment free speech and procedural due process deprivations arising from the issuance of misbehavior reports concerning his conduct as a prison inmate, implicating matters which include his verbal communications with fellow inmates, determined by prison officials to violate policies regarding such interaction, and the disciplinary proceedings which followed. [1]

[1]    Plaintiff's complaint also purports to assert an equal protection denial cause of action, although the particulars of that claim are not well-defined.

Currently pending before the court is a motion filed by those defendants who to date have appeared in the action, seeking the entry of summary judgment dismissing plaintiff's claims as lacking in merit. Having carefully reviewed the record in the light of defendants' motion, without the benefit of any opposing submissions by the plaintiff, I conclude no reasonable factfinder could determine that plaintiff's constitutional rights have been abridged, and therefore recommend that defendants' motion be granted.

### I. BACKGROUND

Plaintiff is a prison inmate who has been entrusted to the custody of the New York State Department of Correctional Services (the "DOCS"). *See generally,* Amended Complaint (Dkt. No. 12); *see also* Defendants' Exhibits (Dkt. No. 59-4) Exh. A (Transcript of Plaintiff's Deposition, held on May 23, 2006) at 11. At the times relevant to his claims plaintiff was designated to the Clinton Correctional Facility ("Clinton"), categorized by the DOCS as a maximum security prison. Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 10-11. At Clinton, plaintiff worked as a maintenance recycling porter

2008 WL 699273

and was permitted to sleep in a cubicle located within a dormitory in the Clinton Annex under conditions more akin to those existing in a medium security prison. *Id.* at 9-10.

**\*2**  Between the time of his transfer into Clinton in May of 2004, *see* Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 11, and the end of 2004 the plaintiff, who as a prison inmate

has amassed a lengthy disciplinary record, was the recipient of several misbehavior reports accusing him of violating various prison disciplinary rules. Defendants' Exhibits (Dkt. No. 59-5) Exh. D. The particulars of those misbehavior reports can be summarized as follows:

| Date of Incident | Violations Alleged |
|---|---|
| 6/14/04 | Creating a disturbance (Rule 104.13) and violation of refusal to obey a direct order (Rule 106.10) |
| 6/24/04 | Property in an unauthorized location (Rule 113.22) |
| 6/26/04 | Refusal to obey a hearing disposition (Rule 181.10) |
| 6/26/04 | Interference with prison officials (Rule 107.10), creating a disturbance (Rule 104.13), making a threat (Rule 102.10) and a messhall violation (Rule 124.16) |
| 8/11/04 | Creating a disturbance (Rule 104.13) and interference with prison officials (Rule 107.10) |
| 9/23/04 | Loss/damage to property (Rule 116.10), Creating a disturbance (Rule 104.13), refusal to obey an order (Rule 106.10) and interference with prison officials (Rule 107.10) |
| 10/27/04 | Creating a disturbance (Rule 104.13) |
| 12/15/04 | Interference with prison officials (Rule 107.10), refusal to obey a direct order (Rule 106.10), delay in count (Rule 112.20) and count violation (Rule 112.21) |
| 12/26/04 | Movement violation (Rule 109.12) |

*Id.* Tier II disciplinary hearings were conducted at various times in connection with a majority of those reports, in each instance resulting in a finding of guilt on one or more of the charged violations and the imposition of sanctions which generally included loss of recreation, package, commissary and/or telephone privileges of varying durations and, in some instances, keeplock confinement extending up to thirty days on one occasion. [2] *Id.* Plaintiff appealed each of the adverse hearing determinations and resulting disciplinary penalties to the facility superintendent, defendant Artus, who on each occasion affirmed the hearing officer's decision. Amended Complaint (Dkt. No. 12) at 4; *see also* Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 50.

**2**

The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

At one point plaintiff attempted to speak with his prison counselor, defendant Joswick, regarding the frequency with which misbehavior reports were being administered to him by prison officials. Amended Complaint (Dkt. No. 12) at 4; Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 59-60. In apparent response to Escalara's persistence, defendant Joswick advised that he was not plaintiff's "pen pal" and threatened disciplinary action if plaintiff continued in his efforts to communicate with him. Amended Complaint (Dkt. No. 12) at 2; Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 60. The situation between the two was alleviated, however, when plaintiff was assigned a new counselor to replace defendant Joswick, therefore making it unnecessary for prison officials to take the threatened disciplinary measures. Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 61.

## II. *BACKGROUND*

**\*3** Plaintiff commenced this action on August 19, 2004 and, at the direction of the court based upon perceived deficiencies in plaintiff's initial pleading, *see* Dkt. No. 6, submitted an amended complaint on December 27, 2004, the filing of which was authorized by the court following a review of the new pleading. Dkt. Nos. 12, 14. Named as defendants in plaintiff's amended complaint are Clinton Superintendent Artus; Mr. Douglas, a dietician at the facility; Mr. Joswick, plaintiff's former corrections counselor; Corrections Lieutenants Baldwin and Armitage; and Corrections Officers T. Charland, West, W. Brown, R. Caron, C. Lambard, L. Favro, and J. Roch. [3] In his complaint, plaintiff claims violation of his rights of free speech and association, deprivation of procedural due process, and the denial of equal protection, and seeks recovery of compensatory and punitive damages. Dkt. No. 12.

**3**

The clerk is directed to amend the docket to reflect the correct spelling of the last names of defendants Charland and Armitage.

On August 23, 2005 an answer was filed by the New York State Attorney General, acting on behalf of various of the defendants named by the plaintiff, including Thomas Charland, Jeffrey Joswick, Dale Artus, William Brown, and Randy Caron. Dkt. No. 31. In that answer defendants have generally denied plaintiff's allegations, additionally asserting various affirmative defenses. *See id.* A second answer was subsequently filed, also by the New York State Attorney General, on behalf of defendant Michael Douglas mirroring the earlier filed answer. Dkt. No. 52. To date, defendants Corrections Captain West, Corrections Lieutenant Baldwin, C. Lambard, and J. Roch have neither been served nor otherwise appeared in the action.

On January 30, 2007, following the close of discovery, the defendants who thus far have appeared in the action moved seeking the entry of summary judgment dismissing plaintiff's complaint in its entirety, as a matter of law. Dkt. No. 59. In their motion, defendants assert that the evidence in the record fails to support plaintiff's claimed constitutional deprivations. *Id.* Despite inclusion within defendants' motion of language properly advising Escalara of the significance of the motion and the potential consequences of any failure on his part to properly respond as required, *see* Dkt. No. 59, plaintiff has not filed any papers in opposition to the pending motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Status of Unserved Defendants*

Despite the filing on December 27, 2004 of plaintiff's amended complaint and the clerk's issuance on March 28, 2005 of summonses, four of the named defendants, including Captain West, Corrections Officer C. Lambard, Lieutenant Baldwin, and Corrections Officer J. Roch, have neither been served nor otherwise appeared in the action. [4]

**4**

The summonses issued to Captain West and C. Lambard were returned in July of 2005, unexecuted. Dkt. Nos. 20, 21. The record is unclear as to the status of efforts to serve the remaining

two defendants, Corrections Lieutenant Baldwin and Corrections Officer J. Roch.

Rule 4(m) of the Federal Rules of Civil Procedure authorizes dismissal of a plaintiff's claims against a defendant where a summons and complaint is not served upon that party within 120 days after filing of the complaint, absent a showing of good cause. [5] Fed.R.Civ.P. 4(m); *Shuster v. Nassau Cty.,* No. 96 Civ. 3635, 1999 WL 9847, at *1 (S.D.N.Y. Jan. 11, 1999) (Rule 4(m) authorizes dismissal where no service within 120 days after filing of the complaint); *Romand v. Zimmerman,* 881 F.Supp. 806, 809 (N.D.N.Y.1995) (McAvoy, C.J.) (120-day period for service of a summons and complaint by a plaintiff under Fed.R.Civ.P. 4(m) applies to *pro se* plaintiffs as well as those represented by counsel). Inasmuch as the four missing defendants have not been served or otherwise appeared in the action within the appropriate time period, this court has never acquired jurisdiction over them, and the complaint should be dismissed as against those defendants, without prejudice. *See, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1282 (S.D.N.Y.1989) (citing *Mississippi Publishing Corp. v. Murphree,* 326 U.S. 438, 444-45, 66 S.Ct. 242, 245-46 (1946)) (court lacks jurisdiction until defendants properly served with summons and complaint).

[5]     That period is further restricted by the local rules of this court, which require that service be effected within sixty days. *See* Northern District of New York Local Rule § 4.1(b).

### B. *Plaintiff's Failure to Oppose Defendants' Motion*

**\*4** Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to dismissal of plaintiff's complaint, based upon their motion.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule

shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). While *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, *see Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N .Y.1997) (McAvoy, C.J.)), the failure of such a plaintiff to oppose a summary judgment motion does not preclude the court from deciding the motion. *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). As can be seen by the face of Local Rule 7.1(b)(3), however, before summary judgment can be granted under such circumstances the court must review the motion to determine whether it is facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

While a plaintiff's failure to properly oppose a defendant's motion does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences. By opting not to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged. Courts in this district have routinely invoked Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement. [6] *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). I recommend that the court follow this well-established practice and, notwithstanding plaintiff's *pro se* status, accept defendants' assertion of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, in light of plaintiff's failure to respond to that statement, when reviewing defendants' motion for facial sufficiency.

6    According to Local Rule 7.1(a)(3), "any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *See* N.D.N.Y.L.R. 7.1(a)(3).

### C. *Summary Judgment Standard*

**\*5** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that no genuine dispute of material fact is to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### D. *Plaintiff's First Amendment Claim*

**\*6** The essence of plaintiff's First Amendment claim appears to be that when engaged in the behavior giving rise to the issuance to him of misbehavior reports, including laughing at corrections officers and talking loudly across a cell block to fellow inmates, in violation of well known and understood directives prohibiting such actions, his conduct was protected under the First Amendment and, accordingly, when disciplined for those actions his constitutional rights were abridged. Defendants assert that the record fails to support a First Amendment deprivation, as a matter of law.

The First Amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble ...." U.S. Const. amend. I. The protections afforded by the First Amendment, like many other constitutional guarantees, are not necessarily forfeited by a person upon his or her entry into prison; many rights conferred by the Constitution, however, are by definition extinguished, or in some cases give way to legitimate, counterveiling penological concerns, upon incarceration. *Shakur v. Selsky,* 391 F.3d 106, 113 (2d Cir.2004). As the Supreme Court has noted, "[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125, 97 S.Ct. 2532, 2537-38 (1977).

While the point of demarcation is not always readily discernable, it is clear that prison inmates enjoy some measure of First Amendment protection, yet forfeit those free speech rights which are incompatible with legitimate penological considerations. *See Pell v. Procunier,* 417 U.S. 812, 822, 94 S.Ct. 2800, 2804 (1974). As the Supreme Court has observed,

2008 WL 699273

> [a] prison inmate retains those First Amendment rights that are not inconsistent with his [or her] status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

*Id.*

Thus, for example, prison officials may not deter the right of a prison inmate to voice complaints regarding prison conditions through established processes by taking adverse actions which are intended, or which have the affect, of chilling or abridging such rights. *See Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Conversely, and at the other end of the spectrum, prison officials are empowered to control the use of threatening and abusive language by inmates. *Jermosen v. Coughlin,* 878 F.Supp. 444, 450-51 (N.D.N.Y.1995) (McAvoy, C.J.). The right of officials to control inmate speech and other behavior through the imposition of measures reasonably calculated to preserve the safety and security of a prison facility, its employees and inmates, is well established, even though such measures may impinge upon an inmate's ability to speak freely or to associate with others. *See Auleta v. LaFrance,* 233 F.Supp.2d 396, 399 (N.D.N.Y.2002) (Kahn, D.J.) (noting that restrictions on inmate communication are constitutional if reasonably related to legitimate penological interests) (citing *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261 (1987)).

 **\*7** In this instance plaintiff does not allege, nor does the record disclose, that plaintiff was engaged in protected activity when disciplined for violating prison rules. Typical of plaintiff's claims, by contrast, is the contention that he was issued a misbehavior report by Corrections Officer Charland for talking loudly within the prison dormitory, despite his awareness that the officer was known to be particularly strict, and that he prohibited such potentially disruptive

communications. *See* Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 10-11.

Clearly, policies of the type implicated by defendant Charland's response to plaintiff's actions are reasonably related to legitimate penological concerns, and thus do not give rise to the constitutional claims for deprivation of the First Amendment right of free speech or association. *Cf. Percy v. Jabe,* 823 F.Supp. 445, 448 (E.D.Mich.1993) (noting that prison officials should be afforded wide latitude in imposing visitation restrictions at prison in light of, *inter alia,* perceived threats to security and order at the institution). It would be novel indeed for prison inmates to assert a First Amendment right to speak freely and communicate with other inmates and prison officials, without restriction based upon legitimate penological concerns. Plaintiff has cited no case authority, nor is the court aware of any, which stands for such a broad proposition and supports an open-ended, unlimited right of prison inmates to speak freely within the prison setting, however disruptive the conduct might be.

Because plaintiff has failed to allege and prove that he was engaged in constitutionally protected activity when disciplined by prison officials, and finding that defendants' actions in disciplining him were reasonably related to legitimate penological concerns, I recommend a finding that his First Amendment claims are deficient as a matter of law.

### E. *Plaintiff's Procedural Due Process Claims*

Intertwined with his First Amendment cause of action is plaintiff's claim that during the course of issuance of misbehavior reports and the ensuing disciplinary proceedings, his procedural due process rights were abridged. To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v.. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996). In their motion the defendants, while not conceding any lack of sufficient due process, assert that plaintiff cannot establish the deprivation of a constitutionally cognizable liberty interest. [7]

[7]     The procedural safeguards to which a prison inmate is entitled before being deprived of a

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.          6

Case 9:17-cv-00366-DNH-TWD    Document 93    Filed 03/08/21    Page 351 of 353
Escalara v. Charwand, Not Reported in F.Supp.2d (2008)

2008 WL 699273

constitutionally cognizable liberty interest are well-established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U .S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* the constitutionally mandated due process requirements, include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin,* 858 F .2d 889, 897-98 (2d Cir.1988). Plaintiff's complaint does not elaborate on his claim that defendants failed to observe these guaranteed safeguards in connection with his various disciplinary proceedings.

In *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84, 115 S.Ct. at 2300; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658. Since the prevailing view is that by its regulatory scheme New York State has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor, *see, e.g., LaBounty v. Coombe,* No. 95 CIV 2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.), I must find that the conditions of plaintiff's disciplinary confinement as alleged do not rise to the level of an atypical and significant hardship under *Sandin* in order to recommend that defendants' motion be granted.

**\*8** Atypicality in a *Sandin* inquiry is normally a question of law .[8] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999). When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997). In cases involving

shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary.[9] *Hynes,* 143 F.3d at 658; *Arce,* 139 F.3d at 336.

[8]     In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999).

[9]     While not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin. Colon,* 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin, see id.* at 232 n. 5, the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure). In fact, in *Colon v. Howard* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See id.* at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

Most of the disciplinary charges against the plaintiff in 2004, virtually all lodged as Tier II level violations, resulted in only modest disciplinary sanctions by constitutional standards. On one occasion plaintiff was sentenced to keeplock confinement for a period of thirty days, receiving shorter keeplock confinements of ten or fifteen days or even more modest restrictions on certain other occasions.[10] Plaintiff's keeplock confinement stemming from the August 11, 2004 and September 23, 2004 misbehavior reports were served in his dormitory cubicle, and plaintiff was permitted to talk with other inmates and to maintain his prison employment during that period. Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 11-12, 18-19, 31-32. Similarly, the keeplock confinement sentences imposed as a result of the June 26, 2004 misbehavior reports were also served by the plaintiff

within his dormitory cubicle, while maintaining his prison employment. *Id.* at 37, 46.

10    Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v. Greene,* No. 95-CV-1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). An inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Inmates can leave their cells for showers, visits, medical exams and counseling. *Id.* Inmates can have cell study, books and periodicals. *Id.* The main difference between keeplock and the general population is that keeplocked inmates do not leave their cell for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.*

Conspicuously absent from either plaintiff's amended complaint or the record now before the court is any evidence establishing that the defendants deprived Escalara of any constitutionally significant liberty interest by their actions. This marked deficiency warrants summary dismissal of plaintiff's due process claims, as a matter of law, without the need to examine the sufficiency of the protections afforded to him in connection with those misbehavior reports.

### F. *Equal Protection*

Plaintiff's amended complaint also asserts a claim for denial of equal protection. Though this is far from clear, plaintiff's equal protection claim appears to be limited to defendant Joswick, his former prison counselor. Defendants also seek dismissal of this claim as lacking in merit.

The Equal Protection Clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result

of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

**\*9** Nothing either contained within plaintiff's amended complaint, or otherwise disclosed in the record, reflects any disparity in treatment by defendant Joswick, a corrections counselor, of the plaintiff and other inmates based upon plaintiff's inclusion in an identifiable or suspect class, nor does the record suggest that if such disparate treatment occurred, it was motivated by some other invidious, prohibited discrimination. Under these circumstances plaintiff's equal protection claim fails, as a matter of law, and is subject to dismissal. *See, e.g., Pena v. Racore,* No. 95-CV-5307, 2001 WL 262986, at *4 (E.D.N.Y. Mar. 14, 2001) (rejecting plaintiff's equal protection claim where he alleged only a difference in treatment and failed to suggest that defendants' actions demonstrated intentional and arbitrary discrimination).

### IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's amended complaint, drafted in exceedingly conclusory terms and bereft of factual allegations, alleges deprivation of his right to free speech under the First Amendment, his right to procedural due process, and his right to equal protection of the law. Having carefully reviewed the record now before the court I am unable to discern any triable, genuinely disputed issue of material fact, and conclude that no reasonable factfinder could determine, based upon the record, that plaintiff's constitutionally rights have been abridged. Accordingly, it is hereby

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 59) be GRANTED, and that plaintiff's complaint be dismissed in all respects, without prejudice as to defendants West, C. Lambard, Baldwin, and J. Roch, but otherwise with prejudice.

NOTICE: pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Any objections shall be

2008 WL 699273

filed with the clerk of the court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 699273

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.    9